IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * *   C.A. NO. 12-517M
                              *
LORI FRANCHINA                *
                              *
    VS.                       *   APRIL 6, 2016
                              *   9:30 A.M.
CITY OF PROVIDENCE            *
                              *
* * * * * * * * * * * * * * *   PROVIDENCE, RI


BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

DISTRICT JUDGE


(Jury Trial - Volume I)


APPEARANCES:

FOR THE PLAINTIFF:     KEVIN P. BRAGA, ESQ.
                       Law Office of Kevin P. Braga
                       2095 Elmwood Avenue, Suite B
                       Warwick, RI  02888

                       JOHN T. MARTIN, ESQ.
                       BENJAMIN H. DUGGAN, ESQ.
                       KJC Law Firm, LLC
                       10 Tremont Street, 6th Floor
                       Boston, MA  02108

FOR THE DEFENDANT:     KEVIN F. McHUGH, ESQ.
                       KATHRYN M. SABATINI, ESQ.
                       City Solicitor's Office
                       444 Westminster Street, Suite 220
                       Providence, RI  02903

Court Reporter:        Karen M. Wischnowsky, RPR-RMR-CRR
                       One Exchange Terrace
                       Providence, RI  02903

**I N D E X**

| | |
|---|---|
| **PLAINTIFF'S WITNESS** | **PAGE** |

<u>Olayinka Oredugba</u>
    Direct Examination by Mr. Martin    65

<u>Danielle Masse</u>
    Direct Examination by Mr. Martin    144
    Cross-Examination by Mr. McHugh    162
    Redirect Examination by Mr. Martin    181

<u>Lori Franchina</u>
    Direct Examination by Mr. Martin    188

**E X H I B I T S**

| **PLAINTIFF** | **FOR ID** | **IN FULL** |
|---|---|---|
| 1 | | 69 |
| 3 | | 73 |
| 10 | | 110 |
| 11 | | 115 |
| 12 | | 120 |
| 14 | | 126 |
| 15 | | 85 |
| 16 | | 98 |
| 17 | | 131 |
| 35 | | 78 |

| **DEFENDANT'S** | **FOR ID** | **IN FULL** |
|---|---|---|
| A | | 69 |
| P | 170 | 172 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    6 APRIL 2016 -- 9:30 A.M.

2            (The jury is present for the following.)

3            THE COURT:  Good morning, ladies and gentlemen.

4    Actually, I should have stopped you because I need for

5    you to rise because the first order of business today

6    is for Ms. McGuire to swear you in as jurors.

7            (Jury sworn.)

8            THE COURT:  So, ladies and gentlemen, before we

9    begin with opening statements this morning, let me do

10   what I'll do every morning, you'll get bored with this,

11   but I'm going to do it, ask you first can you all

12   assure me that you didn't do any outside research on

13   this case?  Great.

14           Can you all assure me that you didn't discuss

15   this case with anyone?  Can you all assure me that you

16   didn't mention anything about your jury service on

17   social media?  And, lastly, can you all assure me that

18   you didn't see any reference to the case on any news

19   items, news stories or whatnot?  Great.

20           Now, ladies and gentlemen, I'm going to just

21   begin very briefly to tell you about Ms. Franchina's

22   claims.  We call this a precharge.  And sometimes I do

23   it, and sometimes I don't.

24           And when I talk to jurors afterwards, they said

25   it would be helpful if they at least had a framework of

1    what the law was so that they could then listen to the

2    evidence that came in with that information in that it

3    would have helped them better understand the evidence

4    as it came in and maybe to try and place it within

5    that.

6          So let me -- and, again, this is very brief.

7    And at the end of all of this, I'm going to give you

8    very extensive jury instructions to follow; but this is

9    just as a way to maybe assist you as you hear the

10   arguments and then the evidence that comes in.

11         So, Ms. Franchina brings two claims against the

12   City of Providence.  First, she claims that the city,

13   through its employees and agents, subjected her to

14   on-the-job harassment and a hostile work environment

15   based on her gender.

16         Second, she claims that the city retaliated

17   against her for having made discrimination complaints.

18   Those are the two claims that will be before you.

19         Now, Ms. Franchina has to prove her claims by a

20   preponderance of the evidence.  That means that she

21   must prove that her claims are more likely than not to

22   have occurred.

23         And, again, we're going to discuss the burden

24   and the proof at the end of this case more extensively;

25   but that, in general, is the Plaintiff's burden.

1          Now, to prove her first claim for harassment and

2     hostile work environment based on gender, Ms. Franchina

3     must establish the following:  One, that she's a member

4     of a protected class; two, that she was subjected to

5     unwelcome sexual harassment; three, that the harassment

6     was based upon her gender, the statute says based on

7     her sex, based on her gender; fourth, that the

8     harassment was sufficiently severe or pervasive so as

9     to alter the conditions of her employment and create an

10     abusive work environment; fifth, that the sexually

11     objectionable conduct was both objectively and

12     subjectively offensive and that a reasonable person

13     would find it hostile or abusive and the victim, in

14     fact, did perceive it to be so; and then lastly that

15     some basis for employer liability has been established.

16          Now, to prove that the City of Providence is

17     liable for her second claim, that is, the retaliation

18     claim, Ms. Franchina must establish that she engaged in

19     protected conduct, meaning that she made a

20     discrimination complaint; two, that she suffered an

21     adverse employment action; and three, that there's a

22     causal nexus that exists between Ms. Franchina's

23     protected activity and the adverse employment action.

24          Now, specifically Ms. Franchina must show that

25     she would not have suffered the adverse employment

1    action but for the exercise of a protected right.  If

2    an adverse employment action was taken, the city will

3    have the opportunity to prove that it was taken for a

4    legitimate, nonretaliatory reason.

5          Now, Ms. Franchina would also need to show that

6    she suffered damages in order to recover under either

7    of those claims.

8          So, ladies and gentlemen, your duty now is to

9    pay attention to the attorneys, listen intently and

10   closely to the evidence and see it as it comes in so

11   that you can later decide, after your deliberations,

12   whether the City of Providence is liable to

13   Ms. Franchina on either or both of these two claims.

14         Again, as I told you, I will give much more

15   detailed, lengthy instructions to you on the law at the

16   end.  We're going to now turn to opening statements.  I

17   want to again tell you opening statements are not

18   evidence.  They are oftentimes very helpful for you to

19   then understand where the Plaintiff and then the

20   Defendant believe the case is going to go and how they

21   want you to perceive the evidence that comes in and

22   what results, obviously, they would ultimately like at

23   the end of it, but it is not evidence.

24         The evidence will begin once the opening

25   statements are completed and you begin to hear from the

1    witness stand and see the evidence that is introduced

2    at trial.  Okay?

3            With that, Mr. Martin, are you prepared to give

4    your opening statement?

5            MR. MARTIN:  Yes.  Thank you.

6            THE COURT:  Great.  The floor is yours.

7            MR. MARTIN:  Good morning again, everyone.  So

8    I'm sure that there were many places that you would

9    have rather been yesterday or many things that you

10   would have rather been doing; but I found it really

11   enjoyable to hear from everybody, some more than

12   others.  If I didn't ask you enough questions, I

13   apologize.

14           I do agree with Judge McConnell that from time

15   to time we will have an opportunity for some enjoyment

16   here in the courtroom over the next two weeks, at least

17   I hope so, but now's the point where our job is to get

18   to work and take on the serious business of proving our

19   claims to you.

20           And the first thing I want to say to you is that

21   we believe that this is a case that's really about

22   rules.  We believe that there's a rule, that there's a

23   law that no employee should ever be subjected to a

24   hostile work environment and that their employer must

25   prevent it when they find out about it.

1        We believe that no employee who is engaged in a

2   protected activity of making a complaint about

3   discrimination or harassment should be retaliated

4   against; and if they are retaliated against, then the

5   employer must prevent it.

6        And Judge McConnell will instruct you on those

7   rules.  We colloquially refer to them as Title VII.

8   You'll hear about rules that the department and the

9   City of Providence themselves put in place to prevent

10  those types of things, but here's the important thing

11  about rules.  They only work if people enforce them.

12       We're going to prove three things to you over

13  the next two weeks:  Number one, that Lori Franchina

14  was harassed over several years.

15       Number two, we're going to prove to you why she

16  was harassed.  It was because of her gender plus her

17  sexual orientation, number one; and number two, it was

18  in retaliation for having complained about harassment

19  and discrimination in the past and concurrent with

20  right before she left work.

21       And before I describe to you how we're going to

22  prove those two points, I'd like to tell you the story

23  that brings us here to the courtroom today.

24       Now, some time ago, I'm not sure when and I'm

25  not sure that it matters, the City of Providence

1    decided to employ an Equal Employment Opportunity

2    person, I guess you could say, or investigator or

3    officer.  And this person is charged with enforcing

4    their sexual harassment policy, their equal and

5    affirmative -- excuse me, their Equal Employment

6    Opportunity policies.

7         This person is charged with investigating

8    complaints of those types of things; but what this

9    person is not authorized to do, at least not with the

10   fire department, they're not authorized to actually

11   discipline anyone whom they found to have violated

12   those laws.

13        What they are allowed to do if they find that

14   somebody's violated the law is make a recommendation to

15   the chief; and then it's the chief's choice to follow

16   the recommendation, to give less punishment, to give

17   more punishment, to give no punishment at all.

18        They have a complaint procedure in which people

19   who believe that they may have been discriminated

20   against or they may have been harassed are encouraged

21   to make complaints directly to the EEO officer.

22        However, if they decide to go through the chain

23   of command and make those complaints to a chief or to a

24   captain or to a superior officer, there is no rule that

25   the superior officer or the chief is required to

1    forward that on to the EEO officer.

2           And if a chief declines or fails or refuses to

3    follow the recommendations of the EEO officer, there's

4    no enforcement mechanism to make sure that they do so.

5    So that's the general system that you're going to learn

6    about.

7           Enter Lori Franchina.  Lori grew up here in

8    Rhode Island.  She has a family with a sister and a

9    brother and a mother and a father.  From a very early

10   age, she was very hard working.  Her first paper route

11   was at the age of 12.

12          Her father, Anthony, is a cobbler who worked

13   here in Rhode Island for many years and now works in

14   New York.  She was immediately recognized as being very

15   athletically gifted and very caring like her mom, who

16   is a nurse.

17          She went to college in eastern Connecticut and

18   was a sports superstar.  She went to the NCAA Final

19   Four twice in softball.  She was a basketball player.

20   And she was a fighter.

21          She tried out for the Olympic team; but before

22   she tried out for the Olympic team, in one of her last

23   seasons in college, she got hit with a bat.  Her face

24   was completely smashed.  She had to go through

25   reconstructive surgeries.  Six months later, she's back

1    on the court with a facemask.

2         She got her degree in emergency medical

3    services, and she immediately went to work as an EMT.

4    When she saw the opportunity to work for the Providence

5    Fire Department, she thought it was perfect.  The pay

6    was great.  The hours were great.  The uniform looked

7    excellent.  She was thrilled to have an opportunity.

8         She went through the academy.  She passed

9    everything.  She did everything she needed to do, and

10   she got herself a job riding around with the Emergency

11   Medical Services division of the department.

12        And her work was excellent.  There's no doubt

13   about that.  In fact, normally you have to wait at

14   least five years before you're even eligible for a

15   promotion to lieutenant.  Lori was promoted to

16   lieutenant before that five years was up, which of

17   course came with a big pay raise.

18        Now, right around the time that she was promoted

19   to lieutenant, another important event happened.  It's

20   probably worth noting that you'll hear in her testimony

21   that things weren't necessarily perfect during those

22   first five years.  There was some issues with whether

23   or not there were men's rooms or ladies' rooms.  There

24   were some incidents where maybe people weren't

25   particularly thrilled to be working with women, but

1   nothing major, nothing that she complained about,

2   nothing that's really important to this case.

3          But what happened towards around August or

4   September of 2006 is she got scheduled to work with a

5   guy named Andre Ferro.

6          So Ferro immediately jumped into the truck, and

7   he turned around and he said, Lori Franchina, my

8   lesbian lover.  You and me like the same thing, you

9   know, and that's -- and then he used a foul word for

10  female anatomy.  And she was shocked.  And she said, I

11  don't know what makes you think that's okay, but it's

12  not okay with me.

13         And then he continued to ask her if she had a

14  girlfriend, if her and her girlfriend would like to

15  spend time with him intimately.  He asked her if she

16  was going to have babies.  He asked her whether or not

17  she used sexual toys, if she would prefer to have him

18  serve as the sexual toy.  And it was a rough shift for

19  her because it pretty much continued throughout 12 to

20  14 hours.

21         It culminated at the hospital where in front of

22  another male on the department he pulled down his pants

23  and tweaked his nipples and again said, Lori, my

24  lesbian lover, in front of nurses, patients, her

25  people.

1          So what happens with lieutenants is, your shifts

2     are so long that you actually have an office with a

3     bed.  You sleep away from the regular bunk, and there's

4     a computer in there.  So they go back, he goes up to

5     the bunk with the subordinates, and she goes down to

6     her office, and she undresses, and she gets into bed.

7          Next thing she knows, she wakes up and he's in

8     her room.  And he's sitting with his feet up on the

9     desk wearing a short pair of shorts, she wasn't sure if

10    they were boxer shorts or not, and he's scratching

11    himself and again asking her -- I shouldn't say

12    "again."  Asking her if she had any problems with what

13    he had said earlier and if she wanted to talk about her

14    problems with what he had said earlier.  After three or

15    four times of yelling at him to get out, he left.

16         So here's what's interesting, is that Lori never

17    complained about this.  Lori didn't want the

18    retaliation.  Lori didn't want to deal with any issues.

19    Lori didn't want any problems.  Lori wanted to work.

20         But the male firefighter who had seen what he

21    did at the hospital went and told the chief because he

22    knew it was bad.  The chief's name is Curt Varone.

23         There's going to be a lot of names that come up

24    during the course of this trial, too many for anybody

25    to learn during this opening statement.  I'll try to

1   throw out important names when they arise, and some

2   other people I'll just refer to generally.

3        Curt Varone is very, very interesting because he

4   was on the department for many years.  He also became

5   trained as a lawyer.  Right now what he does is he's a

6   chief in a different department, and he's an expert who

7   goes around and teaches different departments about

8   what they're supposed to do in circumstances like this.

9        And what he did was he immediately filled out

10  what's called a Form 17, and that's a form you use in

11  the department in order to make complaints to go up the

12  higher ranks.

13       He filled out a Form 17 about everything that

14  he'd learned.  He interviewed Lori.  He went directly

15  to Andre Ferro.  He said, Don't do it again.  I'm

16  bringing you up on charges.  If I hear any more

17  complaints like this, it's over for you.

18       He brought him through the disciplinary process,

19  and Andre Ferro was fired.  Later he ended up getting

20  his job back through a grievance, but that's not a big

21  part of this case.

22       Lori never had a problem with Andre Ferro again.

23  Curt Varone handled everything appropriately, and Curt

24  Varone immediately went into action to prevent

25  retaliation.  He told her captain of the house, Al

1    Horton, If there's any retaliation whatsoever, I want

2    to know about it.  I'm going to take care of it.  He

3    told Lori, If there's any retaliation whatsoever, I

4    want to know.  I'm going to take care of it.

5           Now, around the same time, Lori started to

6    notice things that were happening at the station that

7    hadn't happened before.  She had a new nickname.  Her

8    last name is Franchina.  She's started hearing people

9    referring to her as Frangina.

10          She would walk down the hallways, and she would

11   hear people say, What's that bitch doing here or why is

12   that bitch with us?  She would hear people saying --

13   calling her the C word.  So she complained.

14          And what she learned during the meetings was

15   that it wasn't retaliation.  It was because of her

16   management style, that she was too pushy, that she was

17   too assertive, that she was too strict, that the guys

18   didn't like the way she ordered them to do their jobs.

19   That's what she learned.

20          So she started doing extra meetings with

21   Chief Varone in order to improve her management style

22   and learn about leadership.  He took this very serious,

23   but the problems continued.

24          They made out a list on the whiteboard in the

25   station of 21 things that they did not like about Lori

1    Franchina, 21 things ranging from appearance to --

2    honestly, she doesn't even remember what was on there.

3    She refused to give them the satisfaction of wiping it

4    down or looking at it or acknowledging it in any way.

5        But what you'll learn in this trial is that

6    before all this stuff started happening, a firefighter,

7    a very experienced firefighter from that station, had

8    said to her, Who the fuck do you think you are?  Are

9    you trying to cost him his fucking job?

10       What you'll learn that Lori didn't know at the

11   time was that the captain of the house, Al Horton, knew

12   that Andy McDougal had said, Are you trying to cost him

13   his fucking job?  And after he said to her, Are you

14   trying to cost him his F-ing job, Andy usually did the

15   cooking at the station, he would stop making her food

16   for the meals.  They cooked for everybody there.

17       So Captain Horton went and said, What are you

18   doing with the food?  This better not have anything to

19   do with her complaint.

20       And Captain Horton will admit that all the guys

21   were angry, that he was worried about retaliation

22   because they were so angry, and he ordered Firefighter

23   McDougal to continue to cook for her.

24       But what's interesting is, Captain Horton never

25   told Chief Varone about what he heard Andy McDougal say

1    about costing Andre Ferro his F-ing job.  What he told

2    Chief Varone was that he thought that Firefighter

3    McDougal stopped cooking for her because Lori didn't

4    compliment his cooking or thank him for his cooking

5    when he cooked.

6          So what happens is, on the rescue, they're

7    usually unable to eat with everybody else because

8    they're constantly going.  So all the guys will eat up

9    or all the firefighters and EMT people, there's usually

10    only one woman on a shift, you'll learn about why, they

11    would all eat together and they would put out plates

12    with tin foil marked "rescue lieutenant," "rescue

13    tech."  That's the assistant.  And a rescue tech is

14    usually, I believe, and I might get some of this stuff

15    wrong, a rescue tech is usually a firefighter who

16    assists the rescue lieutenant.

17          So she starts getting sick on her shifts,

18    terrible diarrhea.  Never had a problem with that

19    before.  And this is at the same time she's seeing the

20    things on the board and she's hearing the things about

21    her name.  And she's starting to notice that when she

22    orders people what to do at a scene, because when it's

23    a scene that's involving somebody who needs to be

24    transported to a hospital, it's the rescue lieutenant

25    who is in charge, even in charge of the firefighters.

1    So she thinks it can't possibly be related.  So

2    she starts switching the tags on the plates, and all of

3    a sudden her rescue techs start getting sick.  So she

4    stops eating completely with them.

5    Things got so bad that Captain Al Horton went to

6    Chief Varone and requested that Chief Varone not

7    transfer Lori Franchina but that he transfer every

8    single male out of that station and replace them with

9    other men; in other words, to leave Lori alone in the

10   station and bring in a whole new team and Captain

11   Horton and his team go somewhere else.  That's what

12   he's testified to already.

13   So that's all happening in around 2007.  Towards

14   2008, she moves to a station and she hopes for a fresh

15   start.  So she gets out on the scenes, and wouldn't you

16   know it, once again people aren't listening to the

17   things she says.  People aren't following her orders.

18   She's noticing -- there's an interesting thing

19   about the bathrooms at the stations.  You know, some of

20   these buildings are old.  This is a department with a

21   lot of history.  So a lot of them don't have enough

22   facilities to have a men's room and a women's room.

23   And that's fine.  That's not really a part of this

24   case.

25   They tried to make up for it.  One way that they

made up for it was that they would put a sign on the
door with a chain.  On one side is the male, on the
other side is the female.  So what you do is, if a
female comes up to the door and you see the man, you
have to knock.  If nobody answers, you can go in.  Same
thing if a man sees a female, you have to knock.

So anyways, if you're a male inside of a
bathroom and you hear somebody knock, you know that
it's a female.

Lori started noticing that when she would go
into the bathroom, the seat, the floor, the handles,
the facilities are covered with urine, which, of
course, she has to clean up before she can use them.

She's continuing to hear people call her
Frangina.  She's continuing to see her subordinates
refuse to acknowledge her when she comes into a room.
This is a paramilitary organization.  The treatment of
subordinates to superiors is very important.  You'll
hear a lot about that.

And the insubordination is taking on new levels.
For example, in one case a male firefighter came up to
her, and lieutenants have bars on their collars,
flicked her collar, pointed in her face, said, I will
never fucking take orders from you, you're a doughnut,
and he stared until she walked away.

1      It started to happen on the runs.  She would

2    show up.  She would be waiting for a report.  They

3    wouldn't give her reports.  The reports would be wrong.

4    They wouldn't bring the equipment that she was asking

5    them to bring.  They wouldn't follow her orders.  They

6    would argue with her in front of patients, in front of

7    civilians.

8      In one instance she brought a tech with her

9    where there was an infant who was in the middle of a

10   cardiac event that needed to be defibrillated.  It's

11   very important.  There are different settings of

12   electricity that can be pumped through a body.  One is

13   appropriate for adults.  Much lower for infants.

14     Her co-worker started to put the paddles onto

15   the baby's body without changing the settings.  She

16   said, You can't do that.  He said, I got it.  She said,

17   Wait, don't do it.  He said, I don't need your help.

18   She said, Stop.  He said, You're not in charge of me.

19   She had to literally push him away from the baby's body

20   in order to stop him from sending that electricity

21   through the baby's body.

22     In another incident she showed up for a car

23   accident.  It was an off-duty police officer in the

24   driver's seat.  The fire lieutenant on the scene had

25   called for a special piece of equipment to cut the roof

1     off of the car.  He had never left his truck to inspect

2     the car.  Everybody was waiting for the equipment to

3     come before they could start performing emergency

4     medical services on the police officer.

5          Lori could see that he was bleeding, gasping for

6     breath, in a very dire medical condition; and she

7     realized in the dark of night that the car was a

8     convertible.  So her -- she ordered another firefighter

9     to help her open up the convertible so that she could

10    start doing CPR, which unfortunately failed.

11         And after she did that, the other lieutenant

12    said, Don't ever fucking take over my scene.  You will

13    never tell me what to do.  You will never tell my guys

14    what to do.

15         In another instance, she went to a home in which

16    there was a young man, adult, like 20s, who was

17    exhibiting behaviors consistent with a drug overdose.

18    She ordered her firefighters to go get a stair chair

19    and a collar to bring him down on a piece of equipment

20    so that it would be safe.  They refused.  They wouldn't

21    listen to her.  They were arguing with her assessment.

22         His roommate or girlfriend was yelling, Why

23    won't you help her?  You're going to hear so many times

24    when citizens were yelling, Why won't you help her?

25         They decided to carry him without the chair.

1   They dropped him.  His genitals fell out in front of

2   his family.  They brought him down the stairs.  They

3   got him to the hospital, and it turns out that he had

4   had a brain bleed, which is something different than a

5   drug overdose.  I don't know if he used drugs or

6   alcohol or not, but it's something different than that.

7       On another scene they showed up, there was

8   someone who had a self-inflicted gunshot wound to the

9   head.  She realized that he had a pulse.  It was

10  viable.  She'll tell you that it's not her duty to call

11  who lives or dies.  It's her duty to get them to the

12  hospital and let them do what they can do.

13      She immediately ordered her men to start

14  boarding him onto the chair so that they could get him

15  to the hospital.  And they'd say, Are you kidding me?

16  He's dead.  Look at him.  She said, No, he has a pulse.

17  We have to get him.  They said, If this guy wanted to

18  kill himself, why should we stop him?

19      Finally she got them to do it.  He was covered

20  in blood.  He was slippery.  They dropped him a couple

21  times.  There was nothing intentional about them

22  dropping him.  It was because of the blood.

23      They got him into the back of the unit.  There

24  was her and two firefighters, Sean McGarty and Paul

25  Tang.  They're covered in sweat, end of July,

1    Providence night, hot, humid, carrying a heavy body,

2    covered in blood, brain matter.  It's a scary,

3    terrifying scene.

4         Sean McGarty positions himself at the back door

5    of the unit as he's supposed to.  Lieutenant Franchina

6    is performing CPR to keep the pulse going.  More an

7    experienced firefighter, Paul Tang, is yelling at her,

8    What's her problem?  Look at us.  Look at him.  We

9    can't save him.  And she tells him, It's not your job

10   to decide who we save.  It's your job to follow my

11   orders.

12        And he takes his rubber glove, and he holds it

13   right up to the side of her face, and he snaps it,

14   covered in blood.  She had just said to him, You're

15   covered in blood.  Change your gloves.  Help me perform

16   CPR.  He held it right in her face, and he snapped it.

17        She felt blood, brain matter, chips of bone

18   cover her face, run into her eyes.  She was closing her

19   eyes.  She could feel as she was inhaling through her

20   nose some type of matter coming in and out with each

21   breath.

22        She couldn't open her eyes because she was

23   afraid to let more blood in.  She couldn't wipe her

24   hands because her own hands were covered with blood,

25   plus she had to keep doing CPR.

1        So the next day she went out on stress.  And for

2   the first time she talked to a psychologist, and the

3   psychologist treated her and talked to her.  He

4   listened to the types of scenes that she had seen as a

5   firefighter, he listened to the types of scenes she had

6   seen with her co-workers, and she learned that she had

7   a disease called post-traumatic stress disorder.  It's

8   incurable but treatable, and it's severe.

9        And she stayed out on leave, got all the

10  treatment that she could.  She was doing yoga,

11  exercise.  She was staying in contact with the chiefs.

12  She was going to therapy.  She did everything she could

13  to get back to work.

14        She gets back to work in December; and after two

15  days back, she goes to the union hall to buy some fire

16  department clothes and stuff on sale so she can give

17  them to her family for gifts, and for the first time

18  she runs -- since that run she runs into Sean McGarty.

19  You remember he was the one who was at the back of the

20  door.

21        And he says to her, Do you have a fucking

22  problem with me?  She said, How you doing, Sean?  And

23  he said, You're a nobody.  You're a fucking zero.

24  You're a fucking doughnut.  Who are you to complain

25  about what we did?  You knew he was dead.  Who are you

1    to complain to them about what we did and say we do

2    nothing?  He started screaming at her.

3         You'll see him.  I believe he's being called as

4    a witness by the defense.  He's a large man, pointing

5    at her, swearing, spitting.  He's admitted to those

6    things under oath at a restraining order hearing.  He

7    admits to swearing, to yelling, to screaming at a

8    superior officer, a female superior officer who is

9    probably about half his size, maybe two-thirds of his

10   size.

11        She looks over to his superior officer, Elliot

12   Murphy; and she says, Lieu, are you going to help me?

13   Are you going to stop this?  And Elliot Murphy goes,

14   What am I, your fucking baby-sitter?  And he walks

15   away.

16        There's another guy there, Robert Jackson.

17   She's like, Bo, that's his nickname, will you stop

18   this?  She's trying to get to the door.  Firefighter

19   McGarty is blocking the door, continuing to yell,

20   continuing to point.

21        Finally he storms away.  She walks by Elliot

22   Murphy and (gesturing) on the shoulder and she goes,

23   Thanks for all the help, Lieu.  Just like that.

24        She immediately calls the police.  They have a

25   hearing in court.  A lifetime restraining order is

1   granted against Firefighter McGarty.  Four people

2   showed up to testify for him:  Elliot Murphy, a

3   lieutenant; Bo Jackson, a lieutenant; Michael Evora,

4   firefighter; Sean McGarty himself.

5       After the four of them denied that there was any

6   assault or any threat or any dangerous situation, a

7   Superior Court judge granted a lifetime restraining

8   order.

9       Now, what's really interesting, there was no way

10  for Lori to know this at this time, but you'll learn

11  during the trial, is that Elliot Murphy, 16 hours

12  later, because of this, Thanks a lot, Lieu, filed an

13  injured-on-duty report saying that he'd suffered

14  bruises and contusions on his shoulder.

15      All four of those firefighters, Evora -- maybe

16  I'm wrong about Evora.  Let's take him out.

17  Mr. McGarty, Mr. Jackson, Mr. Murphy all filed reports

18  saying that Lieutenant Franchina had assaulted Elliot

19  Murphy, and they testified consistently with that at

20  the restraining order hearing where the restraining

21  order was granted.

22      So at this time now, Lori just fights through

23  it.  She doesn't leave for stress.  She comes back to

24  work, and it's more of the same.  Month after month

25  after month, run after run, they don't do what she

1    says.

2         Finally come October of 2010, she can't sleep,

3    she can't eat.  She's constantly fighting with her

4    partner, Kristy Adams.  Her family is walking on

5    eggshells around her.  Her sister is not letting her

6    children around her.  She's deciding -- she's

7    consistently speaking with Chief Crawford and other

8    chiefs about what's going on, will anybody help me,

9    will anybody take care of this; and her rescue tech, a

10   nice kid -- I shouldn't call him kid, a nice guy named

11   Jared Scolaro said, You know, when I got the papers to

12   work with you, I got a hundred phone calls.  Lori

13   learned that it was a hundred phone calls from other

14   people in the department, and he let her know that they

15   shouldn't ever expect any help from any firefighter

16   when they go on any scene.

17        So let me take a step back.  I'm sorry.  It's

18   hard to keep it all straight.  After the lifetime

19   restraining order was granted, the department gave an

20   internal order that said Firefighter McGarty should

21   never be allowed to work at a station where there's a

22   rescue.

23        Not every station has a rescue.  That's how they

24   would keep them apart.  He would only work at the

25   stations without a rescue.  She only works at the

1    stations with a rescue.  Nobody's allowed to schedule

2    him at a station with a rescue.  Nobody's allowed to

3    schedule her at a station without a rescue.  Pretty

4    easy, simple solution.

5         So back to the end of October.  She talks to her

6    doctor.  She gets the paperwork.  She goes -- has

7    everything to go out on stress leave to seek treatment

8    again, more intensive treatment.  She continued

9    treatment right throughout the entire time.  And she

10   gets to her station, and she walks through, and she

11   hears a voice saying, Hey, Cap, I'm feeling a little

12   stressed out.  Do you think I could go on medical

13   leave, too?

14        She hears somebody reply, Yeah, yeah, I know

15   what you mean; and then she hears the same voice go,

16   Can't stand that fucking bitch.  What is she doing here

17   with us?

18        And she comes around the door, and it's her

19   chief who said, Yeah, yeah, I know what you mean.  And

20   you could all probably guess who was saying, I can't

21   stand that fucking bitch.  What's she doing here with

22   us?  It's Firefighter McGarty working at her home

23   station with a rescue in direct violation of the fire

24   department's order.

25        I want to be clear about that.  We're not

1    alleging that he violated the restraining order.  He

2    was scheduled to be there by the city, by the fire

3    department.  He didn't go seeking Lori.  He had no

4    reason to know that Lori was going to be there filling

5    out paperwork that day, but it was the department that

6    put him there.

7            So she goes and she complains to the captain of

8    the house, Al Horton; and Scott Mello, the chief who

9    was there, comes down and apologizes to her.

10           And again she goes through intensive treatment

11   until finally her doctor says, You know, you can't do

12   this job anymore.  You're not emotionally or

13   psychologically capable of being an emergency medical

14   services professional anymore.  You freeze in front of

15   pressure.  You overreact to things that aren't

16   necessarily as threatening as they appear.  You aren't

17   sleeping.  We have to prescribe you seven different

18   types of medications just to help you function

19   throughout the day.  It is a danger to you and it is a

20   danger to the people that you want to treat for you to

21   continue with your career.

22           So she went through the process, and she was

23   deemed to be totally and permanently disabled because

24   of post-traumatic stress disorder caused by two

25   separate things, number one, the traumatic events that

1     she had seen and, number two, the harassment that she

2     endured.  That's what her doctors will tell you,

3     Dr. Michelle Olson and Penelope Yanni.

4          So all those events there is how we're going to

5     prove harassment.  How are we going to prove that it

6     was because of sex, because of gender, because of

7     orientation, because of retaliation?

8          You will learn during the course of this trial

9     things that she could have never known then because

10    behind the scenes when she complained in 2009, one of

11    the chiefs, Chief Crawford, went to the EEO officer,

12    remember I talked about them earlier, and said Lori has

13    a complaint of a hostile work environment, and she

14    started an investigation.

15         During her investigation, she learned a couple

16    of things.  The first one, that there was a problem

17    overall with more than one female lieutenant.  I'm not

18    exactly sure how, she doesn't remember, but there were

19    at least two female lieutenants who were complaining

20    that the men were being insubordinate to them.  No

21    evidence that it was happening to any of the male

22    lieutenants.

23         Number two, she learned from Chief Crawford that

24    the men treat certain women better than the other

25    women.  To use his exact words, She's a lesbian, and

1    they know that they don't have a chance with her.  If

2    they have a chance with you, they'll cut you a little

3    more slack; but if they don't have a chance, no slack.

4    That's what the chief said.

5            So then when Ms. Oredugba, that's the EEO

6    officer, when she finds out about what had happened in

7    December, she went and she found out that they were

8    going to file charges against McGarty.  She made a

9    recommendation you must also file charges against

10   Murphy and Jackson, the two guys who refused to help

11   her.

12           Now, remember, she only has the authority to

13   make recommendations for violations of the EEO policy.

14   She doesn't get to tell firefighters or emergency techs

15   what to do.  She doesn't discipline them for rule

16   violations or policy violations, only for EEO

17   violations.  She advised punish both of them.  She

18   never advised punish McGarty because they had already

19   decided to do it.  That's going to be her testimony.

20           On December 22nd, they tell her, Yeah, no

21   problem, we're doing it.  Over the next month or so,

22   based on her conversations with them, she believed that

23   every -- each one of those men had been brought up on

24   charges, had a hearing and had been disciplined.

25           You can imagine her frustration and dismay in

1    May of 2010 when she found out that none of that was

2    true and when she found out that the reason that they

3    didn't do it was because they thought that the case was

4    proceeding to litigation.

5        So in May she told them, That's not a good

6    enough reason, you have to discipline these guys.  To

7    this day, she doesn't know if they were ever

8    disciplined.  To this day, I don't know if they were

9    ever disciplined.

10        I do know that when people are disciplined,

11    there's a memo that goes out to the entire department.

12    Lori continued to get those memos through 2013 before

13    she was deemed to be disabled.  Lori never saw a memo

14    about anybody getting disciplined for what happened to

15    her.

16        During 2010, another investigation was started

17    by Ms. Oredugba.  You'll see that report as well.  And

18    she concluded -- I shouldn't say she concluded.  In

19    November of 2010, she wrote an e-mail memorandum to

20    herself in which -- this is Exhibit 17, Plaintiff's

21    premarked Exhibit 17, in which she was talking to

22    Chief Crawford, who was the chief of Emergency Medical

23    Services for the City of Providence Fire Department at

24    the time, that he reported to her that Chief Crawford

25    believed 90 percent of what Lori was saying was true.

1        He believed that 90 percent of the complaints

2   that they were investigating were true; and he told the

3   EEO officer that he believed there to be, and I quote,

4   "ample merit to her claim of multiple and repeated

5   violations of PFD," Providence Fire Department,

6   "multiple and repeated violation of PFD rules and

7   regulations.  It even seems plausible that the

8   pervasiveness of this behavior creates a hostile work

9   environment for her.  It also seems clear that the

10  Providence Fire Department has failed to stop the

11  behavior."

12       Unfortunately, by this time she was already

13  disabled and she couldn't come back, even though she

14  wanted to.  And, in fact, she still wants to be an EMT,

15  but she can't.

16       So that's how we're going to prove to you that

17  it was based on sex and gender and orientation, number

18  one, because the women who were available for dating or

19  who the guys had a chance with were treated better than

20  she was.  She was unavailable.  She's gay.  And that's

21  consistent with what the EEO officer learned about

22  other female lieutenants.

23       You know that it's retaliation because she

24  engaged in a couple of different protected activities,

25  number one way back when Ferro got fired, but number

1   two when Ms. Oredugba was investigating her complaints.

2   That was also protected activity, her complaints to

3   Ms. Oredugba in July of 2009, in December of 2009, in

4   January of 2010, all of those things.

5          You're going to learn that Chief Crawford or it

6   might have been Chief Farrell told Ms. Oredugba during

7   her investigation, and I want to make sure that I get

8   the words right, this is Exhibit 17 again.  Yes, this

9   is Chief Crawford.  The problem is -- what he wrote is,

10  "We must put a stop to it.  You punish one officer,

11  which makes that officer's subordinates angry and they

12  want to retaliate against Franchina," et cetera,

13  et cetera and so forth.

14         I'm not sure how he knew that because no officer

15  was ever punished, but it's clear that his concern was

16  that she would be retaliated against.  That's how we

17  prove those things.

18         The last part is damages, and that's something

19  more for the end of the trial, I think; but I'll tell

20  you what we're looking for.  Number one is, we want her

21  wages from the day that she was forced to retire until

22  the age of 62, which is the normal forced age of

23  retirement.

24         She made about 120 to 130 thousand dollars a

25  year as a lieutenant, and she would have been able to

1    work for about 19 more years had she not been forced to

2    retire.

3          We're going to ask you to compensate her for her

4    emotional distress because we're not talking about a

5    little bit of aggravation or the types of things that

6    you would normally expect at work.  We're talking about

7    an incurable, debilitating psychological illness that

8    she lives with and everybody who loves her will live

9    with for the rest of her life.

10         And, number three, we're going to ask you for

11   punitive damages, the type of damages that are to

12   punish and deter behavior.

13         Judge McConnell will explain the very specific

14   circumstances in which those are allowed, but suffice

15   it to say there are certain circumstances in which you

16   can find that their behavior was knowing and willful or

17   reckless of her rights.  And if you find that to be so,

18   you can punish them; and you can do that to not only

19   punish them but to deter future conduct, to protect the

20   community.

21         Members of the jury, at the end of this trial,

22   I'm going to ask you for the type of verdict that does

23   all of those things because the rules that the city had

24   in place, the rules that the Providence Fire Department

25   had in place were perfectly capable of protecting Lori

1     Franchina but only if they're enforced.

2          When we talked yesterday about the red light,

3     when you go through the red light and you hit someone,

4     who should be accountable.  They didn't not know about

5     the law.  They didn't not have the capabilities to

6     protect her.  They chose not to protect her.

7          At the end of this trial, the only thing I'm

8     going to ask you to do is enforce the rules that they

9     refused to enforce because if those rules don't protect

10    Lori, they don't protect anybody.

11         Nothing further.

12         THE COURT:  Thank you, Mr. Martin.

13         Mr. McHugh, about how long?  I'm just worried

14    about whether we should take a break now.  Are you

15    going to be much more than a half hour?

16         MR. McHUGH:  I might be, your Honor.  Not too

17    much more.

18         MR. MARTIN:  Sorry, was that way too long?

19         THE COURT:  No, no, no, fine.

20         Ladies and gentlemen, why -- normally we take a

21    break at 11, and I doubt the snacks -- Mike, are the

22    snacks here yet?  Oh, they are.

23         So we're going to do it early just because what

24    I don't want is around 11:00 people get antsy and need

25    to use the facilities or whatnot in the middle of an

1    opening statement.

2         So let's take our morning break now.  And please

3    remember don't discuss anything that's taken place,

4    don't discuss this case in any fashion while you're

5    together, and we'll see you back in about 15 minutes.

6         THE CLERK:  And could you just leave your

7    notebooks in your seats.  Thank you.

8         THE COURT:  Let me assure you, ladies and

9    gentlemen of the jury, and I forgot to tell you this at

10   the beginning, the notebooks are yours; and as I told

11   you I think yesterday, they're to use as you want or

12   not use as you want.  It's purely your personal

13   preference.

14        But know this, they're only yours.  No one will

15   ever look at them.  They are left on your seat every

16   night.  Vickie puts them away safely; and at the end of

17   the trial, they're destroyed without being looked at.

18        So you can use them or not use them as you wish;

19   but always leave them on your chairs when you come and

20   go from the courtroom until deliberation, and you will

21   have them with you during deliberation.  Now we can all

22   rise for you.

23        (Recess.)

24        THE COURT:  Mr. McHugh.

25        MR. McHUGH:  Thank you, your Honor.

1      Good morning, ladies and gentlemen.  I will

2  prove to you that Lori Franchina's problems on the

3  Providence Fire Department were not because of her sex,

4  not because of her gender, not because of her sexual

5  orientation, but because she could not get along with

6  her fellow firefighters, both female and male

7  firefighters.

8      And I will prove to you that Lori Franchina had

9  a reputation within the Providence Fire Department

10  among both the male and the female firefighters of not

11  being able to get along with her fellow firefighters

12  and being very difficult to work with.

13      I'll also prove to you that Lori Franchina also

14  had problems dealing with family members of victims or

15  patients that she was called to the scene to take care

16  of, and that also caused friction between her and her

17  fellow firefighters.

18      You're also going to see that Lori Franchina

19  never took advantage of the process for filing

20  complaints of discrimination and harassment through the

21  EEO officer in city hall even though she knew from the

22  time she was in the fire training academy, which was

23  2002, how to do it because every recruit, and we'll put

24  on some people who were in her recruit class at the

25  training academy, every recruit is given at least one

1    session while they're in the Providence fire training

2    academy on how to file a complaint of discrimination or

3    harassment with the EEO officer in city hall.  She

4    didn't do it.

5         And we will also show that she knew from her

6    tenure on the department how to do it because we also

7    give training to the incumbent firefighters from time

8    to time on how to file a complaint of discrimination or

9    harassment within the fire department.

10        And even though she first complained about

11   harassment in the training academy in 2002, it wasn't

12   until August 11th of 2009, seven years later, that the

13   EEO officer for the City of Providence first learned

14   that Lori Franchina had complaints about the way she

15   was being treated.

16        And the EEO officer, Ms. Oredugba, didn't find

17   out from Lori Franchina that Lori Franchina had

18   complaints.  She found out from Chief Crawford.  And

19   Chief Crawford told the EEO officer that Lori Franchina

20   had come to him to complain to him about this incident

21   with Firefighter Tang in the rescue and the blood.

22        And, look, we all know there are two sides to

23   every story.  You're going to hear our side of the

24   story when it's time for us to put our witnesses on.

25   And I will tell you right now that Firefighter Tang is

1   going to get on this witness stand and he's going to

2   tell you a completely different story about what

3   happened in the back of that rescue with those gloves

4   and that blood than Lori Franchina is going to tell

5   you.

6   Firefighter Tang is going to tell you at the end

7   of the run, yes, there was blood splattered, which is

8   not unusual because of the amount of blood.  He's going

9   to tell you he never snapped his gloves.  He took his

10  gloves off the normal way.  Those gloves are tight on

11  your hands; and when you take them off and there's some

12  fluids on them, they can splatter.

13  He's going to tell you it's not unusual to have

14  a lot of blood in the rescue; and that's why after

15  there is a rescue run and there's blood in the rescue,

16  the entire truck is decontaminated before they take

17  that truck out again.

18  He's going to tell you not only that -- and he's

19  going to tell you that he's the one who was giving CPR

20  to the individual in the back, not Lori Franchina.

21  And he's going to tell you at the end of the

22  run, after the person had died and they were at the

23  emergency room and Lori Franchina walked out of the

24  emergency room and Firefighter Tang was at the truck

25  waiting, he's going to tell you that she went out of

1    her way to go over to Firefighter Tang and say to him,

2    Congratulations, you did a great job.

3         And he's going to tell you that he was shocked

4    days later when he was called on the carpet by a

5    superior officer and asked, What happened on that

6    rescue run?  Lori Franchina is accusing you of snapping

7    your gloves in her face and splattering her with blood.

8         And he's going to tell you he couldn't believe

9    it, this came out of nowhere after she had already

10   congratulated him on doing a good job.

11        Make no mistake, Lori Franchina did know how to

12   complain even though she had not complained to the EEO

13   officer.  And we know that because, and we talked about

14   this somewhat yesterday, injured-on-duty pay, workers'

15   comp., when Lori Franchina decided that she thought she

16   should get injured-on-duty pay, 100 percent of her pay

17   tax free, and the department wouldn't give it to her,

18   she went to the union and she filed a grievance.

19        She knew how to do that.  Even though she didn't

20   file a grievance on any of these other harassment

21   actions that she complains of, she knew how to do it.

22   She just didn't do it.

23        Now, as I said, we all know there's two sides to

24   every story; and we'll get our turn, and you'll hear

25   our witnesses.  But I wanted to go over a few examples

1    of the problems that Lori Franchina had with her fellow

2    firefighters as well as the families of victims and

3    patients, and you're going to hear some testimony.

4         There's going to be -- if we added up the

5    experience of some of the firefighters who are going to

6    testify here at this trial, we'd have over 100 years of

7    firefighting experience among all these witnesses.

8         Let's start with the North Main Street Station,

9    which is right behind this courthouse.  You've driven

10   right by it, I'm sure, many times across from Roger

11   Williams Green.  That's where she went for Engine 5.

12        Early on in her career, as Mr. Martin said, she

13   was making more money than a first-grade firefighter

14   because she had already had the EMT certification; and

15   there was a number of vacancies in the EMT service, and

16   so she was assigned to be an acting lieutenant.

17        And you really have to understand the culture of

18   the fire department to understand this case because a

19   fire department is very different from the jobs all of

20   us have.

21        The firefighters spend a lot of time together.

22   They spend days together, nights together given their

23   schedule.  They eat together.  They sleep together.

24   They watch TV together.  They go to the grocery store

25   together to get groceries for the department -- for

1   their station, rather.  So they spend a lot of time

2   together.

3          Let me give you one example of an incident

4   between Lori Franchina and one of the male firefighters

5   at the North Main Street Station.

6          You're allowed to sleep during your shift if you

7   don't have a run whether you're a firefighter or a

8   rescue person.  At the end of your shift, if you're

9   still asleep and there's no run, someone will wake you

10  up and say, Your relief is here, your relief being the

11  person who is taking your place.

12         There was a firefighter who was supposed to wake

13  up Lori Franchina on one of these days.  She slept past

14  her relief.  He fell asleep himself.  He was asleep in

15  a chair, and she came out and in front of other

16  firefighters kicked the chair hard because she was

17  angry that she was still at the station, not supposed

18  to be working, her relief was there and this

19  firefighter didn't tell her.

20         After that incident, they changed the practice

21  at the North Main Street Station over here; and the

22  practice became to use the loud speaker to announce to

23  firefighters, Lieutenant Franchina, your relief is

24  here, or whoever the firefighter may be.  So that's

25  just one instance.  That, of course, caused friction

1    among the firefighters.

2         Now, let's talk about this problem with the

3    meals.  There's usually one firefighter who does the

4    cooking.  They call him the chef.  And usually it's

5    someone who likes to cook and takes that on himself.

6    And they will eat together, some with the food prepared

7    by the chef, some people will bring in their own food.

8         The rescue is a little bit different because the

9    rescue is much busier than the fire truck; and there's

10   so many runs and they're out of the station so much,

11   it's not atypical to have a rescue run finish the run,

12   not come back to the station, go to the next run, maybe

13   go to the hospital and then go to the next run.

14        So it's estimated by some of the firefighters

15   that people who are on the rescue may only be in the

16   station 10 to 15 percent of the time.

17        A firefighter by the name of Andy McDougal was

18   the one who was cooking at North Main Street, and he

19   enjoyed cooking so he would prepare the meals.  For the

20   rescue personnel, if you weren't bringing in your own

21   food and he was going to prepare yours, yeah, he would

22   put it aside, mark it.

23        He got word that Lori Franchina was complaining.

24   She didn't like the way the food was prepared.

25   Sometimes when she got there, it was cold already.  He

1  didn't -- she didn't like the way the food was being

2  stored.

3       At some point in time Firefighter McDougal had

4  had it and he said, I'm not going to cook for her

5  anymore.  He didn't say he was going to exclude her

6  from meals.  He said, I'm just not going to cook for

7  her anymore, she doesn't appreciate it, she's always

8  complaining.

9       Lori didn't complain to Captain Horton, who is

10 going to testify here, who later became a chief and

11 retired as a chief.  Captain Horton heard of it from

12 other firefighters.

13      So Captain Horton takes it upon himself to go

14 into the station that day, walk up to Firefighter

15 McDougal and says, Listen, you're going to cook for

16 everybody who wants to eat here.  You're not going to

17 choose who you cook for and who you don't.

18      And he explained to Captain Horton, She's always

19 complaining, she doesn't appreciate it.  He said,

20 You're going to cook for Lori Franchina just like

21 you're going to cook for everyone else.  And that was

22 the end of it.

23      He then got the men together and sat them down

24 and had a talk with them about everybody has to work

25 together.  It's important.  We're a team.  We all have

1    to be able to get along together.

2            And now and again there were complaints about

3    Lori or Lori would complain about some other

4    firefighters, and Captain Horton would work on this and

5    pretty much straighten it out.

6            And so for a while Captain Horton thought that

7    things were going pretty well in the North Main Street

8    Station on that group with Lori Franchina and the other

9    firefighters.

10           He went to a fire -- another fire station over

11   on Rochambeau Avenue for a call sometime after this,

12   and one of the other firefighters said to him, What's

13   going on with Lori Franchina?  I heard she's going down

14   to headquarters to see Curt Varone, Chief Varone, to

15   complain about having problems in the North Main Street

16   Station.

17           Well, this was news to Captain Horton because he

18   thought he pretty much had everything on an even keel

19   and there hadn't been any problems.  So at that point,

20   like Firefighter McDougal had had it, he had had it.

21           He drove down to see Deputy Assistant Chief Curt

22   Varone, who was his supervisor; and he told

23   Chief Varone, Look, I don't know what else to do.  I've

24   gotten the men together.  I told McDougal he has to

25   cook for her.  There haven't been any more complaints.

1    Things have been going well.  We've been getting along.

2    I don't really know what the problem is.  At this point

3    I'm going to ask you to transfer my group, not every

4    person in the station, but the fire department has

5    different groups working out of different stations.

6         So he said, I am asking you to transfer -- leave

7    Lori there and transfer my group out of the station to

8    another station.  And he didn't ask that they be

9    replaced with men.  He simply asked that they be or

10   volunteered that they would be transferred.

11        So he goes back to the North Main Street

12   Station.  The next thing he knows, he sees Lori

13   Franchina back at the station at her locker cleaning

14   out her locker; and he says to her, Lori, what's going

15   on?

16        Let me back up a minute.  When he got to see --

17   in to see Chief Varone, Chief Varone said, Yeah, she

18   called me and she's coming down here, but let me handle

19   this before we do anything.

20        So Lori said to him, I'm going to make it easy

21   for you guys.  I'm transferring out of here.

22        Now, it turns out that Chief Varone had been

23   coaching, he called it, or counselling Lori Franchina

24   for a while almost on a weekly basis about how to get

25   along with fellow firefighters; and he was

1    concentrating on two areas that she was having problems

2    with.

3         One was the way she talked to people in a very

4    condescending, arrogant way and the other one saying --

5    the content of what she was saying to people that would

6    hurt people's feelings.  So those are the two things

7    that Curt Varone saw in her that were causing her

8    problems on the job.  And this was going on on a weekly

9    basis.  Captain Horton didn't know about that.

10        So Lori agrees that she will transfer, and she

11   goes to the Branch Avenue Station where later on

12   there's this incident with Firefighter McGarty.  So

13   that's the end of her tenure at the North Main Street

14   Station on Rescue 5.

15        Now, in the meantime, while she's at Branch

16   Avenue or even before she gets to Branch Avenue, there

17   are several incidents or I'll give you a couple of the

18   incidents where she had trouble with, while she was at

19   the North Main Street Station, dealing with the family

20   members of patients.  One of these incidents happened

21   on Jewett Street, which is over behind the State House.

22        Now, you have to understand another thing about

23   the fire department.  The rescues are so busy and out

24   of the station, there's also a fire truck -- at least

25   one fire truck in each station they call an engine

1    company.  So every time there's a call for a rescue,

2    they will send an engine company, which they call first

3    responder.

4           Now, all our firefighters are trained as EMTs

5    also.  Some have additional certifications on the

6    rescue called EMT-C, which is a cardiac, different

7    certification.  So very often it's the engine company

8    that arrives first at the scene rather than the rescue.

9           And basically what happens is the officers on

10   the rescue -- on the engine company will assess the

11   patient, take the vitals, see what's wrong with the

12   patient and then wait for the rescue to get there.

13          So on this particular day when they got to

14   Jewett Street, there was a young mother and her

15   daughter; and she had given the daughter Benadryl, and

16   the daughter had an allergic reaction to the Benadryl.

17   The mother was very upset.  The daughter was very

18   upset.  Captain Horton and his crew calmed the mother

19   down, calmed the daughter down.

20          When the rescue arrived with Lori Franchina,

21   Lori Franchina marched into the house in a very

22   militant way and started interrogating the mother and

23   said to the mother, What did you give her?  And the

24   mother said, I gave her Benadryl.  How much of a

25   dosage?  I gave her a swig.  And then she said, Well,

1    you can't be doing that.

2        And right away a scene that had become calm and

3    less stressful became much more stressful for the

4    mother and for her daughter because of the way

5    Ms. Franchina was speaking to them; and that, of

6    course, caused tension among the firefighters, also.

7        Another example took place across the street at

8    Providence Place Mall.  At Providence Place Mall, there

9    was a call for a young boy, a young Hispanic woman who

10   didn't speak much English, for a -- her son who cut off

11   the tip of his finger, got caught in one of the doors

12   at the mall.

13       So when you go into the mall from the street and

14   you go up on the escalator, right at the first level

15   there before you get into the level of the stores or by

16   Old Navy is the security office.  So they had brought

17   the mother and her son into the security office.

18       Captain Horton again and his crew arrive first.

19   They got in there.  The mother, of course -- there was

20   blood.  The boy was crying.  The mother was upset.  The

21   boy was upset.  They assessed the boy.  They took his

22   vitals.  And they calmed the mother down, they calmed

23   the son down while they waited for the rescue.

24       Again Lori Franchina shows up and marches in in

25   a very militant way and says to the mother, Has he had

1    a tetanus shot?  And the mother said, No.  And she

2    said, Well, he could die from this.

3         So right away, again, a very calming situation

4    that had been taken care of by Captain Horton and his

5    crew becomes a very stressful, tension-filled situation

6    because of the way Lori Franchina acted towards the

7    mother and the son.  And the other firefighters, of

8    course, are standing there witnessing this.

9         Those are some of the -- a couple of examples of

10   the problems she had dealing with patients and their

11   family members.

12        Now, I'm going to talk a little bit about her

13   lack of complaining to the EEO officer for whatever

14   reason because she had complained before early on to

15   immediate supervisors, which I'll talk about in a

16   minute; but if I could have the ELMO turned on, please,

17   your Honor, if I may.

18        THE COURT:  Sure.  Ladies and gentlemen in the

19   back row, you'll see that there are monitors.  If you

20   just twist it and push it forward -- it won't break.

21   Trust me.  Well, don't trust me.  Just push it all the

22   way forward.  It will stop.  And then for the folks in

23   the front row, you should each have one that operates.

24   Great.  And the machine there is what we refer to as

25   ELMO.  It allows you to video-see documents.

1          Mr. McHugh.

2          MR. McHUGH:  Thank you, your Honor.

3          I'm going to show you, this has been marked as

4     Defendant's A.  This is one of the agreed-to exhibits.

5          Defendant's A, you're going to see this again

6     later, but I wanted to show you the city's sexual

7     harassment policy.  You don't have to read the whole

8     thing now because we'll talk about it later, but I

9     wanted you to see that this is what the recruits get

10    and what the city employees get and incumbent

11    firefighters get so there's no doubt on how you go

12    about filing a complaint if you feel you've been

13    harassed.

14         And there's three pages to this.  I wanted to

15    draw your attention -- I'll show you page 2, also,

16    but -- it talks about also down at the bottom

17    prohibiting retaliation, but I wanted to show you in

18    particular for the purposes of opening statement the

19    third page where they get the complaint procedure so

20    that they know specifically what it is.

21         So on the third page, if you look right at the

22    beginning at the top, you'll see "complaint procedure."

23    And you can see there that they have actually the name

24    of the EEO officer, Olayinka Oredugba, who is going to

25    be the first witness, where she's located, her number

1    and her actual extension.

2         And then they go on to tell employees complaints

3    of sexual harassment are accepted in writing.  They

4    prefer that these be put in writing so they can conduct

5    their investigation and have something in writing in

6    front of them and that -- you can go on the city's

7    website to get a complaint form or you can call or

8    e-mail Ms. Oredugba and ask for her to send you a form.

9         So you have the phone number with the extension,

10   you have the website, and you have the e-mail of

11   Olayinka Oredugba who can help you with this complaint;

12   but in addition to that, if you look at that last

13   paragraph in the complaint procedure, you can also skip

14   that if you want per the policy or on your own and you

15   can file directly with the Rhode Island Commission for

16   Human Rights.

17        So I just wanted you to be aware that this is

18   what firefighters and police and city employees see in

19   terms of how do I go about filing a complaint.

20        So on August 11th, 2009, this is the first time

21   that Ms. Oredugba gets this complaint from Chief

22   Crawford from Lori Franchina.  She still hasn't heard

23   from Lori Franchina about Firefighter Tang doing

24   something that he's going to tell you he just didn't

25   do.  It just didn't happen.

1        But in the course of it, Chief Crawford puts,

2   and I think this e-mail was referenced, that in the

3   course of complaining about this incident in the rescue

4   with Firefighter Tang, Lori Franchina also started to

5   tell him about other instances of harassment that she

6   had experienced.

7        And you'll see that Chief Crawford told her,

8   Here is Olayinka's number.  You should call her.  You

9   should go in and see her.  That was August 9th.

10       By August 20th, Chief Crawford checks, and

11  Olayinka Oredugba still has not heard from Lori

12  Franchina nine days later.  And, remember, this

13  incident with Firefighter Tang goes back to July 29th.

14  So it's almost a month later.

15       So Ms. Oredugba calls Lori Franchina herself,

16  and they set up an appointment for September 14th,

17  2009.  Ms. Franchina never shows up.

18       So Ms. Oredugba does her own investigation.  She

19  goes and she meets with Chief Farrell at the time, the

20  chief of the department, tells him apparently there's

21  been a complaint of Lori Franchina that was made to

22  Chief Crawford but not made by Lori Franchina.

23       She sits down with Chief Farrell, and then Chief

24  Farrell says that he is going to order all his

25  assistant chiefs and he is going to tell his assistant

1   chiefs, I want everybody working together, everybody is

2   to be treated the same, there shouldn't be any problem

3   working with anybody else, and I want you chiefs to

4   tell your firefighters and officers the same thing.

5        Now, she doesn't hear from Lori Franchina again

6   until December 13th.  This is after the incident at the

7   Firefighters' Hall.  And there's a voicemail left from

8   Lori Franchina on Olayinka's phone saying that she had

9   to go and get a restraining order against a

10  firefighter, Firefighter McGarty, because she had an

11  altercation with him at the union Christmas bazaar over

12  on 90 Printery Street right behind Benny's, we all know

13  where Benny's is off North Main Street, and she would

14  like to come in and meet with Ms. Oredugba.

15       So Olayinka sets up a meeting for her the next

16  day, December 14th, and Lori Franchina never shows up

17  for that meeting either.

18       Now, before I even talk more about this incident

19  at the union hall, there are a couple of other

20  complaints that Lori Franchina had made early on, right

21  from the beginning she started complaining in the

22  training academy, that were handled by her supervisor

23  or the training staff right away.

24       The first one was she was cleaning the bathroom

25  at the training academy; and while she was cleaning the

1    bathroom, one of the male recruits came in and used the

2    urinal.  She complained to the academy staff about

3    that.  The academy staff called together the whole

4    class, I think there were 35 for that class, talked to

5    him about it, told him he didn't want this going on,

6    this couldn't go on, and they set a time every morning,

7    8 a.m. to 9 a.m., for the bathroom to be cleaned and no

8    one was to use the bathroom between 8 and 9 a.m.  And

9    that took care of it.  That didn't go any further.

10   That never happened again while she was at the training

11   academy.

12        There was one other complaint she had at the

13   training academy, and that was about male trainees

14   talking about women being the weaker sex.  Again, they

15   called the group together of 35, and they tell them,

16   We're not going to have this kind of stuff going on

17   here, we don't want that kind of talk, we're not going

18   to tolerate it, it's going to stop; and that was the

19   end of it.  So when she complained initially in the

20   training academy both times, it was taken care of right

21   away.

22        Now, what about this incident with Andre Ferro?

23   Again, the complaint didn't come from her, but it came

24   from another firefighter to Curt Varone.  When the city

25   found out that Ferro had pulled this, what did they do?

1    They fired Ferro, fired him.  Didn't suspend him,

2    didn't reprimand him.  They fired him.

3         He used the same process under the collective

4    bargaining contract, because, remember, the

5    firefighters are unionized, that Lori Franchina used

6    under the collective bargaining contract to get her

7    100 percent tax-free pay, the grievance procedure and

8    then, when the grievance was denied, asked for

9    arbitration, which was his right under the contract.

10        It was an arbitrator through an award after a

11   hearing that ordered Ferro to come back to work even

12   though the city had fired Ferro.

13        Now, let me talk a little bit about this

14   Firefighters' Hall incident.  That Firefighters' Hall

15   incident was at the union's property on 90 Printery

16   Street.  Lori Franchina was off duty.  It was not

17   something that was sponsored by the city.  It was not

18   something that the city itself took part in.  It was

19   purely a union function.

20        When Lori Franchina went to Superior Court and

21   attempted to get a restraining order, we know that she

22   got one.  Immediately upon learning that there was a

23   restraining order, Chief Dillon, chief of the

24   department, issued an order through an e-mail.

25        That's Exhibit G, your Honor, if I could put

1    that up, please.

2         THE COURT:  Sure.

3         MR. McHUGH:  Now, if you can see that at the

4    top, that's from Chief Dillon.  The subject is Lori

5    Franchina, Lieutenant Franchina, and he says in the

6    e-mail that she's obtained a restraining order against

7    McGarty; but he also says the order's not in force

8    during emergency responses but is in force in the

9    station.

10        So, in other words, if Rescue 3 or Rescue 5,

11   whatever rescue Lori Franchina is working on, is sent

12   to a working fire and, wherever McGarty is working, his

13   truck is there, that's fine; but they don't work

14   together, and he doesn't get assigned to the same

15   station that she does.  And then it talks about they

16   can respond to emergencies together, but they can have

17   no other contact.

18        And admittedly in this e-mail Chief Dillon is

19   talking about it presents a problem for call-backs.

20   Call-backs occur when somebody is on vacation, out

21   sick, and they need someone to cover.  So they will

22   call back, literally call back firefighters who are on

23   a day off and pay them overtime.

24        Different people at different times will be

25   assigning the call-backs.  Now, there's over 400 -- at

1    the time over 400 firefighters in the Providence Fire

2    Department.  Not everyone who is assigning a

3    firefighter to a call-back is going to have in mind

4    Chief Dillon's order of one particular firefighter out

5    of 400 firefighters.

6            So if you look at number one, the order from

7    Chief Dillon was he's not to be given a call back in a

8    station that has a rescue assigned so that there

9    wouldn't be any contact with Lieutenant Franchina in

10   the station, in parentheses, if she is subbing or a

11   change of shift and then, number two, that McGarty was

12   not to be detailed to a station that had a rescue

13   assigned so there could be no possibility of them

14   working together; and number three, McGarty was to be

15   notified, and it's his responsibility under this order

16   to tell who's ever doing that substitution that he's

17   not to be assigned if Lori Franchina was there.

18           Number four is important, too, because number

19   four says these directions are issued to ensure the

20   safety and wellbeing of both members, both McGarty and

21   Lori Franchina.  So the department acted swiftly and

22   tried to make sure that the two of them were separated.

23           Now, the interesting thing about Lori Franchina

24   on this October 28th day is she's in the station

25   filling out the paperwork, again, to get IOD, saying

1    that -- this is in 2010 now, saying that she's had a

2    reoccurrence of the stress that she experienced with

3    the incident with Firefighter Tang, which never

4    happened, you're going to find out, and she's in the

5    station.

6          She's not scheduled to work on the 28th.  She's

7    not there on a call-back.  She's not there on overtime.

8    She walks into the Branch Avenue Station to fill out

9    the IOD paperwork to try to get her 100 percent

10   tax-free pay every week.

11         So when she gets there, as she gets there, she

12   knows McGarty's in the station.  She stays there for

13   several hours anyway.  She stays in the Branch Avenue

14   Station for several hours knowing that McGarty is in

15   there on a call-back.

16         Somehow someone who was scheduling the call-back

17   missed this order from the chief or didn't realize that

18   Lori Franchina was assigned to that station, but it

19   really didn't matter because she wasn't working that

20   day anyway.

21         Even though she stays in the station for several

22   hours, at some point she decides to go with Mr. Martin

23   and Mr. Braga across the river to the Superior Court

24   and allege that because McGarty -- the Fire Department

25   has assigned McGarty to a call-back at the Branch

1      Avenue Station, this is a violation of the restraining

2      order and they want McGarty held in contempt.

3           So they have a hearing in front of Judge Gallo;

4      and, guess what, Judge Gallo says, No, this is denied.

5      There is no contempt.

6           If I could show that on the ELMO, that order,

7      your Honor.

8           THE COURT:  You can, but you might check the

9      name of the judge on it.

10          MR. McHUGH:  So here's the order denying the

11     restraining order violation based upon the incident on

12     October 28th.  So the hearing was before Judge Gallo,

13     but Judge Gibney signed the order.

14          So Lori Franchina was trying to blame the

15     department for a violation of the restraining order by

16     McGarty when she wasn't even scheduled -- not only not

17     scheduled to work that day but happened to be in the

18     station and stayed there for several hours even after

19     she saw him.

20          Now let's talk a little bit about the alleged

21     damage aspect of this case.  We know she's alleging

22     post-traumatic stress disorder, we know she's alleging

23     emotional distress, and we know she's looking for you

24     to award her money.

25          And we're going to have to keep in mind at the

1   time or I'm going to ask you to keep in mind at the

2   time that damages are discussed and there's evidence on

3   damages that her IOD tax-free pay was $1,246.66 per

4   week.  The department had initially denied it; and I

5   told you she went to the union, the union filed a

6   grievance, and they ended up coming to an agreement on

7   that grievance just at the time she was going to

8   retire.

9        So she actually received three-and-a-half years'

10  back pay of injured-on-duty pay.  In fact, she had to

11  amend her tax returns because the pay she had gotten

12  was taxable; but when she got the three-and-a-half

13  years of the IOD pay, that was not taxable.

14       Today she's receiving her pension since

15  December of 2013 from the fire department, and that is

16  $2,063.81.

17       The other thing that you have to remember when

18  she's asking for damages or putting in evidence of

19  damages is that she's worked very little since 2013, a

20  job -- a per diem job at $25 a day cutting lawns.  She

21  hasn't really looked for work, and she's never applied

22  to any of the other 30 or so fire departments in the

23  State of Rhode Island or work as another EMT for any

24  other fire department.

25       Finally, ladies and gentlemen, I told you at the

1   beginning that Lori Franchina had trouble getting along

2   with male and female firefighters, that she has a

3   reputation for being difficult to work with both male

4   and female firefighters, and I'm going to present two

5   rescue lieutenants as witnesses in this case.

6          They stand in the same shoes and one of them

7   went to the same academy as Lori Franchina.  They stand

8   in the same shoes that Lori Franchina sat, rescue

9   lieutenants who work with men and women who have

10  women -- who have men working under them, men working

11  above them, and the rescue tech is assisting the

12  lieutenant and drives the truck.  That's the job of the

13  rescue tech.

14         Both of these individuals, Lieutenant Teresa

15  Wishart, who is still on the Providence Fire

16  Department, and Lieutenant Andrea Stuckus, who is still

17  on the Providence Fire Department, are going to tell

18  you that in their entire tenure on the Providence Fire

19  Department as firefighters, as rescue techs, as rescue

20  lieutenants, they have never been harassed by any male

21  firefighter, they have never been harassed by any male

22  officer, they have never been harassed by any female

23  firefighter, they have never been harassed by any

24  female officer.

25         The next time I will speak to you will be in my

1   closing argument; and at that time, ladies and

2   gentlemen, I will ask you to return a verdict on behalf

3   of the Defendant, the City of Providence.  Thank you.

4           THE COURT:  Thanks, Mr. McHugh.

5           MR. McHUGH:  Thank you, your Honor.

6           THE COURT:  Mr. Martin, is the Plaintiff ready

7   to open its case and call its first witness?

8           MR. MARTIN:  Yes, your Honor.  The Plaintiff

9   calls Olayinka Oredugba.

10          THE COURT:  Someone is going to need to tell

11  her.

12          You can come forward, ma'am.  If you just come

13  by the witness stand over here and remain standing,

14  Ms. McGuire is going to swear you in.

15          **OLAYINKA OREDUGBA, PLAINTIFF'S WITNESS, SWORN**

16          THE CLERK:  Would you please state your name and

17  spell your last name for the record.

18          THE WITNESS:  Olayinka Oredugba,

19  O-R-E-D-U-G-B-A.

20          THE CLERK:  Thank you.  You may be seated.

21          THE COURT:  Ma'am, if you'd just make yourself

22  comfortable, pull the chair in so that you're

23  comfortable and, once you get comfortable, take the

24  microphone and the base, everything moves about it, and

25  you can also move this up and down.  So just speak

1    right into it when you speak.

2            THE WITNESS:  Like this, your Honor?

3            THE COURT:  That's great, but you can pull it

4    closer towards you so you don't have to lean.  That's

5    great.

6            Mr. Martin.

7            MR. MARTIN:  Thank you.

8                    **DIRECT EXAMINATION**

9    **BY MR. MARTIN**:

10   **Q.**   Good morning.

11   **A.**   Good morning.

12   **Q.**   Can you hear me okay?

13   **A.**   Yes, I can.  Thank you.

14   **Q.**   So can you tell the jury what you do for work.

15   **A.**   I am the Equal Employment Opportunity officer for

16   the City of Providence.

17   **Q.**   When did you start doing that?

18   **A.**   Approximately 2006.

19   **Q.**   And tell us a little bit about your

20   qualifications, where did you go to school,

21   professional licenses, stuff like that.

22   **A.**   I am a member of the bar of Rhode Island.  I

23   attended law school at Roger Williams University School

24   of Law.  I attended undergraduate at University of

25   California, Santa Cruz.

1    **Q.**   Now, when you say you're a member of the bar, that

2    means you're a lawyer?

3    **A.**   Yes, it does.

4    **Q.**   Now, in your capacity as the -- did you say your

5    job is the EEO officer?

6    **A.**   Yes.

7    **Q.**   Tell me about the rankings in your office.  Are

8    you the top EEO person?  Is there anyone above you?

9    **A.**   I am the EEO person.  The Director of Human

10   Resources is above me.

11   **Q.**   Okay.  So are you responsible for all EEO office

12   investigations and recommendations for the entire city?

13   **A.**   With the exception of the school department.

14   **Q.**   With the exception of the school department.  So

15   how many employees total are you responsible for

16   throughout the entire city?

17   **A.**   Approximately 2,300, give or take.

18   **Q.**   Do you have a staff?

19   **A.**   No.

20   **Q.**   Okay.  How many of those employees are from the

21   fire department?

22       Let me ask you a better question.  Back in 2007,

23   2008, 2009, how many of those employees were employed

24   by the fire department?

25   **A.**   I don't know.

1    **Q.**   Does 435, give or take a few, sound about right?

2    **A.**   It sounds reasonable.

3    **Q.**   You'd agree that it's certainly more than 15?

4    **A.**   Yes.

5    **Q.**   Certainly more than 15 full time?

6    **A.**   Yes.

7         MR. MARTIN:  I actually want to go a little out

8    of order from what I was expecting to do.  Your Honor,

9    may I show the witness what has been premarked by the

10   Defendant as Exhibit A?

11        THE COURT:  Sure.  As long as you identify the

12   exhibit for the record, you're free to use --

13        MR. MARTIN:  I think in this case it might be

14   easier to bring it up because it's three pages.

15        THE COURT:  The courtroom is yours, Mr. Martin.

16   Whatever you'd like.

17        MR. MARTIN:  So I'm bringing up Defendant's

18   Exhibit A, the sexual harassment policy.

19   **Q.**   Could you just take a moment to look through that,

20   please.  Do you recognize this document?

21   **A.**   Yes.

22   **Q.**   Without telling us any of the contents within the

23   document, can you tell us what it is.

24   **A.**   Sexual harassment policy.

25   **Q.**   For?

1    **A.**    City of Providence.

2    **Q.**    This is the current sexual harassment policy?

3    **A.**    Yes.

4    **Q.**    Is this in the same -- and who created this

5    policy?

6    **A.**    I don't know.

7    **Q.**    Is this the policy that you go by during the

8    course of your everyday work currently?

9    **A.**    It's the policy -- yes.

10   **Q.**    And is it in the same or substantially the same

11   condition as it is when you hand it out or use it or

12   stuff like that?

13   **A.**    Yes.

14          MR. MARTIN:  Your Honor, we offer this as

15   Exhibit 1.

16          THE COURT:  Any objection?

17          MR. McHUGH:  I thought it was Defendant's A

18   already.  I thought it was already entered full as

19   Defendant's A.

20          THE COURT:  There's been no evidence entered so

21   far.  Any evidence that's going to be admitted has to

22   be admitted before the jury.  So right now there is no

23   evidence.

24          So you're moving Plaintiff's Exhibit 1?

25          MR. MARTIN:  Your Honor, I'm moving Defendant's

1      Exhibit A into evidence as Plaintiff's Exhibit 1.

2              THE COURT:  Any objection?

3              MR. McHUGH:  No, your Honor.

4              THE COURT:  Plaintiff's Exhibit 1, which will be

5      a duplicate of Defendant's Exhibit A, are both admitted

6      without objection.

7              (Plaintiff's Exhibit 1 and Defendant's Exhibit A

8      admitted in full.)

9              MR. MARTIN:  May I have the ELMO, please.

10     **Q.**   Ms. Oredugba, am I pronouncing that right?

11     **A.**   Yes.

12     **Q.**   You would agree that this current sexual

13     harassment policy directs people to make their

14     complaints in writing; correct?

15     **A.**   Yes.

16     **Q.**   Directly to your office?

17     **A.**   Yes.

18     **Q.**   Can you see right down here where my finger is?

19     Can you read that?

20     **A.**   I can read the part that says 4/2013.

21             THE COURT:  You can zoom in.

22             MR. MARTIN:  Maybe.

23     **Q.**   Can you see those -- oops.  Can you see the three

24     letters before the 4 now?

25     **A.**   Yes.

1    **Q.**    And what are the three letters?

2    **A.**    It appears to be REV.

3    **Q.**    So it says REV.4/2013?

4    **A.**    Yes, I believe so.

5    **Q.**    Does that mean that was revised in 2013?

6    **A.**    Yes.

7    **Q.**    Was this the policy that was current when Lori

8    Franchina was an active employee for the Providence

9    Fire Department?

10   **A.**    I don't know.

11   **Q.**    I'm now going to show you what's been previously

12   marked as Plaintiff's -- excuse me, the agreed-upon

13   Exhibit Number 3.

14        THE COURT:  Counsel, just so we're clear for our

15   record keeping, any exhibit that you're offering will

16   have a Plaintiff's number and any exhibit that the

17   Defendants are offering will have a Defendant's letter.

18        So if they're jointly agreed to and you're

19   offering it, it will be called Plaintiff's whatever the

20   appropriate number is.

21        MR. MARTIN:  I see.  Thank you.

22        THE COURT:  When you say that, I'll just know

23   that the Defendants don't have an objection to it

24   coming in, but you still have to move it in.  Once it's

25   identified by the witness, it still has to be moved in

1    before the jury to be a full exhibit.

2              MR. MARTIN:  My problem was, I didn't tell the

3    clerk that I only wanted the witness to see it.  I'm

4    sorry.

5              THE CLERK:  It's only being shown to her.

6              MR. MARTIN:  Okay.  Good.

7              THE COURT:  Vickie's pretty good at that.

8              Ladies and gentlemen, let me just sort of

9    explain so that you're not kept in the dark.  How we do

10   this, and it's got nothing -- we do this in every

11   trial, is that before you can see a document, I have to

12   admit it into evidence.

13             Before I admit it into evidence, it has to

14   generically be identified by the witness, this is, you

15   know, a sexual discrimination policy for the city.

16             They've exchanged documents between the sides,

17   so the other party has a right to object to it coming

18   into evidence.

19             That's why there will be times where the witness

20   and I and the parties can see an exhibit but you won't

21   yet.  The only thing that you're to consider is

22   evidence that I admit in full.  It will be considered a

23   full exhibit.  When I say that, Vickie will hit a

24   button, and then you'll be able to see it.

25             Until that point when it's just in the

1    identification stage, you won't see it.  Nothing's

2    being hidden from you.  It's just a procedure we have

3    to go through to make sure that only admissible

4    evidence comes in.

5         In the world of electronics now, we're able to

6    do that very conveniently where a button can just be

7    pushed and the appropriate people can see it.  And then

8    when it's in full, the important people in the room,

9    the 10 of you, will then be able to see it; but you

10    only see it once it's been admitted in full.

11         Mr. Martin.

12         MR. MARTIN:  Thank you.

13    **Q.**    Have you had a chance to look at the document?

14    **A.**    Yes.

15    **Q.**    And without telling us the contents of the

16    document, can you tell us what it is.

17    **A.**    Yes.

18    **Q.**    Could you please do so.

19    **A.**    It is an informational form that's sent to

20    individuals who have contacted me sometimes.

21    **Q.**    And you see down the bottom here it says that it

22    was revised in May of 2007; correct?

23    **A.**    Yes.

24    **Q.**    Is this in the same or substantially the same

25    condition as it was when it was used by your office in

1    May of 2007 and after?

2    **A.**   Yes.

3         MR. MARTIN:  Your Honor, we offer this as --

4    this is marked as Plaintiff's 3.  We offer it as

5    Plaintiff's 2.

6         THE COURT:  You can offer it as Plaintiff's 3.

7         MR. MARTIN:  We offer it as Plaintiff's 3.

8         THE COURT:  Any objection?

9         MR. McHUGH:  No objection.

10        MR. MARTIN:  I see the system now.

11        THE CLERK:  In the book you have Exhibit

12   Number 1, which is not the same as you admitted before.

13        THE COURT:  We'll straighten that out during the

14   break.  Thanks.

15        Plaintiff's Exhibit 3 is admitted as a full

16   exhibit and can be shown to the jury.

17        MR. MARTIN:  Thank you.

18        (Plaintiff's Exhibit 3 admitted in full.)

19   **Q.**   Now, back in 2007, in the second paragraph, fire

20   department and city employees were told that many

21   workplace complaints could be resolved at an informal

22   level; is that correct?

23   **A.**   That's what it says in the document.

24   **Q.**   And they were instructed at times an employee

25   wanting a specific behavior to stop, it goes on to say

1    that they may attempt to speak directly with the

2    individual whom they see as creating the problem;

3    correct?

4    **A.**   That's what it says, yes.

5    **Q.**   And then they're told if that does not resolve the

6    conflict, the employee should seek the assistance of

7    their immediate supervisor; is that correct?

8    **A.**   Yes, that's what it says.

9    **Q.**   And then it's after that informal process then

10   they would be required to make a complaint to you in

11   writing; correct?

12        MR. McHUGH:   Objection as to form, the word

13   "required."

14        THE COURT:   Sustained.

15   **Q.**   Well, according to the document, if this informal

16   approach does not work and the employee is experiencing

17   on-the-job harassment or unlawful discrimination, they

18   should file a complaint with you?

19   **A.**   It says they may.

20   **Q.**   They may.

21   **A.**   They have the option.

22   **Q.**   And then it goes on to say that EEO complaints

23   must be in writing.  Here.

24   **A.**   Yes.

25   **Q.**   So at least in 2007, employees were instructed to

1    take their complaints to their immediate supervisor or

2    the informal approach?

3    **A.**   I don't know how they were instructed.

4    **Q.**   Well, through this form; right?  Isn't that what

5    it says?

6    **A.**   This form -- that is what the form says.

7    **Q.**   Did you train the immediate supervisors on how

8    they should respond when an employee brings them an

9    informal complaint of harassment or discrimination?

10   **A.**   It depends on which immediate supervisors.

11   **Q.**   Did you train any supervisors back in 2007, 2008,

12   2009?

13   **A.**   Probably.

14   **Q.**   When you say probably, does that mean that you

15   don't remember or you do remember training supervisors?

16   **A.**   It means I remember training individuals, and I

17   don't know offhand as I sit here who was trained.

18   **Q.**   Do you know if the supervisors in the Providence

19   Fire Department were trained in how to respond to

20   informal complaints of sexual harassment or

21   discrimination?

22   **A.**   At any point in their history?

23   **Q.**   Fair enough.  During the years 2007, 2008, 2009,

24   do you know if any of their supervisors were trained in

25   how to respond to an informal complaint from an

1    employee of harassment or discrimination?

2    **A.**   I don't know.

3    **Q.**   As the EEO officer, do you know who would know?

4    **A.**   Not necessarily.

5    **Q.**   Is it -- let me move on.  Now, you first

6    interacted professionally with Lori Franchina in August

7    of 2009; correct?

8    **A.**   Yes, as far as I recall.

9    **Q.**   And you'd received an e-mail from Chief Crawford

10   regarding her?

11   **A.**   I received -- I believe so.  I met with Chief

12   Crawford in 2009.

13   **Q.**   Do you recall what Chief Crawford told you about

14   Ms. Franchina at the time, why he was consulting with

15   you?

16   **A.**   I recall some of what he said, yes.

17   **Q.**   Could you tell us what he said.

18   **A.**   Well, I'm not certain whether this was 2009, but

19   he said that there was some concern over placements,

20   partnering and rescue.

21         To be clear, I met with Chief Crawford on

22   various things; but he, I believe, said that

23   Ms. Franchina was concerned about people or I guess

24   maybe her subordinates operating according to procedure

25   or what she perceived procedure to be.

1          I recall him saying that she was a hard worker

2    but that her personality was sometimes somewhat

3    abrasive, and I recall him saying that he was seeking

4    to make the working situation -- to improve the working

5    situation for her and I guess all involved.

6    **Q.**   As the EEO officer at that time, did you have any

7    authority to enforce rules and regulations of the

8    Providence Fire Department that were not related to

9    unlawful harassment or discrimination or retaliation?

10   **A.**   No.

11   **Q.**   Did Chief Crawford tell you, then, why he chose to

12   address those issues with you?

13   **A.**   Not that I recall.

14          THE CLERK:  What number is it, please?

15          MR. MARTIN:  This is Plaintiff's Exhibit

16   Number 1.

17          THE CLERK:  Can't be.

18          MR. MARTIN:  Number 35.

19          THE CLERK:  If that's the next on your list.

20   Yes, I think it is.  You gave me 34, so 35.

21   **Q.**   Let me show you what's been marked as Plaintiff's

22   Exhibit 35.  Can you just take a minute to look at

23   that.

24   **A.**   Yes.

25   **Q.**   Thank you.  This is an e-mail from Jeffrey

1    Crawford to you?

2    **A.**    Yes.

3    **Q.**    On Tuesday, August 11th, 2009, at 3:33 p.m.?

4    **A.**    Yes.

5    **Q.**    And you recall receiving and reading this e-mail?

6    **A.**    Not specifically.

7    **Q.**    Well, you know that it was sent to you, though?

8    **A.**    I don't deny that it was sent.

9    **Q.**    And it's in the same or substantially the same

10   condition as it was when you received it?

11   **A.**    Presumably.

12          MR. MARTIN:  Your Honor, we offer this as

13   Plaintiff's 35.

14          MR. McHUGH:  No objection, your Honor.

15          THE COURT:  Exhibit 35 will be admitted as a

16   full exhibit without objection.

17          (Plaintiff's Exhibit 35 admitted in full.)

18          THE COURT:  Mr. Martin, you might want to zoom

19   in a little bit.  I'm finding it hard to read.

20          MR. MARTIN:  Is that better?

21   **Q.**    So the message started that he had just had a

22   meeting with Lori Franchina; is that correct?

23   **A.**    Yes.

24   **Q.**    Was this the first time you'd ever heard of Lori

25   Franchina making any type of complaint?

1    A.   I don't -- I'm not certain.

2    Q.   And he said that it was following one run in

3    particular in which she believed that she was exposed

4    to blood and bodily fluid?

5    A.   Yes.

6    Q.   It goes on to say that it turned out that the

7    exposure was not significant; however, the manner of

8    exposure has been the last straw of a series of hostile

9    work experiences.  Do you see that?

10   A.   That's what it says here.

11   Q.   Okay.  Did the term "hostile work environment"

12   have any particular meaning for you as the EEO officer?

13   A.   Did it?

14   Q.   Yes.

15   A.   I don't specifically recall reading this e-mail as

16   such.

17   Q.   But do you recall the meeting with him?

18   A.   Yes.

19   Q.   Okay.  Did he explain to you what the manner of

20   exposure was that the e-mail claims was the last straw

21   of a series of hostile work experiences?

22   A.   I believe so.

23   Q.   And what was the manner of exposure?

24   A.   Well, I believe it is alleged to have been someone

25   taking off their glove; and in taking off their glove,

1    bodily fluids, it's my understanding, were spread

2    about.

3    **Q.**   Now, when you get a complaint from someone

4    regarding an allegation or a concern of sexual

5    harassment, you have a few different options, don't

6    you?

7    **A.**   Yes.

8    **Q.**   You could tell them, Hey, this doesn't sound like

9    an EEO issue; right?

10   **A.**   I could.

11   **Q.**   Or you could investigate further?

12   **A.**   Yes.

13   **Q.**   And before -- I mean, with 2,300 employees, before

14   you decide to investigate further, you would have to

15   conclude that the allegation at least had some merit;

16   correct?

17        Maybe "merit" is a bad word.  I'm sorry.  Some

18   indication that it would involve a topic that falls

19   under the category of, or under the jurisdiction of the

20   EEO officer; correct?

21   **A.**   Not necessarily.

22   **Q.**   No?  So there would be circumstances in which you

23   investigate claims that are not related to harassment

24   or discrimination or retaliation?

25   **A.**   Correct.

1    **Q.**   And why is that?

2    **A.**   Because my manager has instructed me to also cover

3    employee disputes, general human resources, employee

4    relations matters that don't necessarily fall under

5    EEO.

6    **Q.**   So you're taking care of all of the EEO

7    complaints, general disputes, general human resources

8    with no staff under you?

9    **A.**   I'm taking care of all of the EEO complaints.  I

10   share responsibility for general disputes and employee

11   relations matters.

12   **Q.**   And when you talk about general disputes and

13   general human relations matters, is that also 2,300

14   employees, the same 2,300, or are there some additional

15   employees?

16   **A.**   There would be additional employees.

17   **Q.**   How many additional employees are there?

18   **A.**   It could be up to an additional 2,000.

19   **Q.**   So 2,300 for EEO, 4,300 for employee disputes and

20   general human resources functions?

21   **A.**   Approximately, yes.

22   **Q.**   And you said you share that responsibility.  Who

23   do you share that responsibility with?

24   **A.**   With other managers in the Human Resources

25   Department.

1    **Q.**   And how many managers were sharing those

2    responsibilities in the years 2007, 2008, 2009?

3    **A.**   It has -- well, so in 2007 -- 2007, I would say

4    there were three; 2008, three; 2009, three.

5    **Q.**   Okay.

6    **A.**   Including myself.

7    **Q.**   If I ever cut you off, just let me know.  I'm

8    sorry.  So when dealing just with your EEO function,

9    when you -- you didn't have authority to discipline

10   firefighters, you could only make recommendations;

11   correct?

12   **A.**   Correct.

13   **Q.**   And in conducting your investigations, you rely

14   heavily on the chiefs of the department; correct?

15   **A.**   At times.

16   **Q.**   Because they have one-on-one, direct contact with

17   the people at play?

18   **A.**   To the best of my knowledge.

19   **Q.**   And they know the policies and the procedures and

20   the kind of specifics of the fire department?

21   **A.**   Presumably.

22   **Q.**   And because your -- you were pretty busy?

23   **A.**   Yes.

24   **Q.**   You couldn't conduct all of the EEO investigations

25   for the entire city all by yourself?

1    MR. McHUGH:  Well, I'm going to object.  Lack of
2    foundation.
3    THE COURT:  Overruled.
4    **A.**   Not to the extent that I would want.  Not as
5    completely as I ideally would want.
6    **Q.**   And in this case you were relying on some
7    information from Chief Crawford; correct?
8    **A.**   Yes.
9    **Q.**   And other chiefs would provide additional
10   information as well from time to time?
11   **A.**   In this matter or in general?
12   **Q.**   Thank you.  I'm sorry.  That wasn't very clear.
13   Let me ask you a better question.
14        In this first encounter with Lori Franchina in
15   August of 2009, you spoke with Chief Crawford and some
16   other chiefs in order to gather information?
17   **A.**   In August 2009, I know I spoke with Chief
18   Crawford.  I don't know if I spoke with other chiefs in
19   August of 2009.
20   **Q.**   Did Lori cancel appointments with you?
21   **A.**   I believe so.
22   **Q.**   You believe so or do you remember her canceling
23   appointments?
24   **A.**   I recall at some point.  I don't know that it was
25   August 2009.

1    **Q.**    Okay.  So do you recall if she canceled two

2    appointments in August, September, October of 2009?

3    **A.**    I don't recall.

4    **Q.**    Huh.  Do you keep any type of datebook or anything

5    where somebody could learn that she canceled or failed

6    to show to two appointments at that time?

7    **A.**    Not as strictly as that.  I do try to make note.

8    **Q.**    And do you prepare a report in connection with

9    your investigation?  Maybe "report" is the wrong word.

10    You filled out a form called Complaint Form,

11    then underneath Complaint Form, EEO/AA Complaint Number

12    2009-026; correct?

13    **A.**    I did not prepare a report with respect to this

14    matter.  I believe that I did fill out my standard

15    complaint form.

16    **Q.**    I'm going to show you what's marked as Plaintiff's

17    15.  It's EEO/AA Complaint 2009-026.  Actually, I'm

18    going to bring it to you because it's multiple pages.

19    Ms. Oredugba, having had a chance to review

20    these four pages, is this complaint in the same or

21    substantially the same condition as it was when you

22    filled it out?

23    **A.**    Yes, to the best of my knowledge.

24    MR. MARTIN:  Your Honor, we offer this as

25    Plaintiff's Exhibit 15.

1          MR. McHUGH:  No objection, your Honor.

2          THE COURT:  Plaintiff's Exhibit 15 is admitted

3     as a full exhibit.

4          (Plaintiff's Exhibit 15 admitted in full.)

5     **Q.**   Now, up here where it says "Crawford (EMS

6     Division)," Chief Crawford was the chief of the EMS

7     Division; correct?

8     **A.**   Yes.

9     **Q.**   Lori Franchina worked for the EMS Division?

10    **A.**   Yes.

11    **Q.**   He was her immediate supervisor?

12    **A.**   I know he was her supervisor.  I'm not certain he

13    was her immediate.

14    **Q.**   And according to the complaint information form we

15    looked at earlier revised in May of 2007, it was

16    appropriate for Lori to bring her informal complaint to

17    Chief Crawford?

18    **A.**   Certainly.

19    **Q.**   And underneath his name are some bullet points of

20    things that you learned from Chief Crawford?

21    **A.**   I don't see bullet points, but --

22    **Q.**   Fair enough.  There is a list of things that you

23    had learned from Chief Crawford that do not have bullet

24    points?

25    **A.**   Correct.

1    **Q.**   Thank you.  One of them is that she's on her game

2    and she knows her stuff and that the chief gets

3    compliments.  Did he say who he gets compliments from?

4    **A.**   I don't recall.

5    **Q.**   Was it patients or family members of patients?

6    **A.**   I don't recall.  It could be.  I don't know.

7    **Q.**   Was it her co-workers?

8           MR. McHUGH:  Objection.  Asked and answered

9    three times.

10          THE COURT:  Overruled.

11   **Q.**   Was it her co-workers who were giving compliments

12   about her?

13   **A.**   I don't know.

14   **Q.**   Did you ever see any type of -- as of this point

15   in August of 2009, any type of written complaint about

16   Lori Franchina's performance of her duties?

17          MR. McHUGH:  Objection.  Lack of foundation.

18          THE COURT:  Overruled.

19   **A.**   Not that I recall.

20   **Q.**   Moving down, it says "difficulty filling spots on

21   resdue."  Do you know what that means?

22   **A.**   I believe that "resdue" is a typo and it should

23   say "rescue."

24   **Q.**   Oh, I'm sorry.  Okay.  So that makes more sense.

25   Sometimes I don't know if it's, like, acronyms.

1    So the difficulty filling spots on rescues.

2  After two years on the job, Lori is getting rescue

3  lieutenant's pay.  Do you see that?

4  **A.**   Yes.

5  **Q.**   And then he said, Some people view it that you

6  aren't a real lieutenant, you just walked in and they

7  handed it to you.  Did you follow up on that at all?

8  **A.**   Can you clarify?

9  **Q.**   Sure.  Did you ask him who felt that way?

10  **A.**   I don't recall.

11  **Q.**   Did you know how much more rescue lieutenants were

12  earning than people under the rescue lieutenant?

13  **A.**   Did I know at that time, I don't -- I don't

14  recall.

15    MR. MARTIN:  I'm going to pull it up in just a

16  second.

17    THE COURT:  Ladies and gentlemen, you will have

18  all of the admitted exhibits in the jury room with you

19  during your deliberations.  Sometimes they fly on and

20  off the ELMO screen, but you will have all of these

21  back with you.  Anything that's admitted full will be

22  back with you when you deliberate.

23  **Q.**   On the next page of Exhibit 15 is more information

24  that you discovered during your investigation; is that

25  correct?

1    **A.**   It may still be part of what Chief Crawford was

2    telling me.

3    **Q.**   So here it says, "One of the engine guys was doing

4    chest compressions.  He had too much blood on his

5    gloves.  She tells him to change the gloves.  In doing

6    so, he snapped the gloves and the blood snapped on her

7    forehead."  Did I read that correctly?

8    **A.**   Yes.

9    **Q.**   Did you ever interview the person who snapped the

10   gloves?

11   **A.**   I believe so.

12   **Q.**   What did he tell you?

13   **A.**   I don't fully -- I don't recall verbatim, but what

14   I recall is that he -- that things were moving quickly

15   and in taking off his gloves, he did not do anything

16   intentional other than taking off his gloves.

17   **Q.**   Huh.  Did you ask him about the normal protocol

18   for removing prophylactic -- soiled prophylactic gloves

19   in an emergency rescue vehicle?

20   **A.**   I don't recall.  I may not have.

21   **Q.**   Okay.  Did you take him at his word that it wasn't

22   intentional?

23   **A.**   You're asking if I believed him?

24   **Q.**   Yeah.

25   **A.**   Yes.

1    **Q.**   Wouldn't it be helpful to know what the normal

2    protocol is in removing those soiled gloves before you

3    determine whether or not he was telling the truth?

4    **A.**   Probably.

5    **Q.**   So if I were to tell you that the normal protocol

6    is that you put your hand into the trash receptacle and

7    then remove the first glove and then you take your bare

8    hand and remove the second glove so that the first one

9    snaps up into it so that any snappage, for lack of a

10   better term, goes into the receptacle, if I were to

11   tell you that that were the proper protocol, would you

12   still find it credible if someone were to say that they

13   could accidentally snap blood and brain matter on

14   another person's forehead?

15        MR. McHUGH:  Objection as to form.  Lack of

16   foundation, speculation.

17        THE COURT:  Assuming that you're asking that and

18   that there will be evidence introduced at some point

19   during the trial of that, assuming that, the

20   objection's overruled.  You can answer.

21        THE WITNESS:  Thank you, your Honor.

22   **A.**   I'm --

23   **Q.**   I'll ask you again if you want.  Be happy to.  So

24   what we're talking about, as an investigator, somebody

25   tells you something and you want to figure out if

1    they're telling the truth; right?

2    **A.**   Uh-huh.

3    **Q.**   Yes, ma'am?

4    **A.**   Go ahead.

5    **Q.**   And one of the things you would do is figure out

6    what the normal protocol and training is; correct?

7    **A.**   Ideally.

8    **Q.**   And then if the person has violated the normal

9    protocol or training, maybe that's some indication as

10   to whether or not they've told you something truthful

11   about their intent; right?

12   **A.**   It could be.

13   **Q.**   So let me tell you this.  If you were to learn

14   that the proper protocol for removing soiled

15   prophylactic gloves is to place your hand into the

16   receptacle, remove the first glove and then remove the

17   second glove so that it snaps over it and there's no

18   soiled glove exposed and that all the debris lands in

19   the receptacle, would you still find it credible if

20   someone were to say that they accidentally snapped

21   blood and brain matter all over someone else's face?

22        MR. McHUGH:  Same objection, your Honor.

23        THE COURT:  Overruled.

24   **A.**   Yes, I could.

25   **Q.**   I'm going to switch to the next page.  Now, here's

1    a series of what looks like questions and answers;

2    correct?

3    **A.**   Yes.

4    **Q.**   And the questions are from you, the EEO officer?

5    **A.**   I believe so.

6    **Q.**   And the answers are from Chief Crawford?

7    **A.**   Yes, I believe so.

8    **Q.**   Okay.  You asked, "Are they treating her

9    differently because she's a woman and they don't like

10   taking orders or being belittled by her?"  Right?

11   **A.**   That's what it says.

12   **Q.**   So you must have gotten some information --

13        MR. McHUGH:  I'm going to object.  He left out

14   the rest of that question.  The whole question should

15   be read.

16   **Q.**   "Are they treating her differently because she's a

17   woman and they don't like taking orders or being

18   belittled by her?  Would they take it better from a

19   man?"  Did I read the entire question?

20   **A.**   Yes.

21   **Q.**   So going back to the first part of the question

22   where it says, "Are they treating her differently

23   because she's a woman and they don't like taking

24   orders," was that something that you were suspicious of

25   during your interview with him?

1        MR. McHUGH:  Objection as to form.  Use of the

2  word "suspicious."

3        THE COURT:  Overruled.

4  **A.**  No, I wasn't suspicious.

5  **Q.**  Why did you ask it?

6  **A.**  Because she's female and he came to see me.  So

7  either he said and/or I presumed that that was the EEO

8  basis on what she was discussing with me.

9  **Q.**  Was Lori Franchina the only rescue lieutenant you

10  knew of who was having a problem with male subordinates

11  not following her orders?

12  **A.**  When?

13  **Q.**  2006, 7, 8, 9.

14        MR. McHUGH:  Well, objection.  That's four

15  years' questions, years in one question.

16        THE COURT:  Can you answer that collectively or

17  do you need it broken down, ma'am?

18        THE WITNESS:  I can answer collectively.

19        THE COURT:  Overruled.

20  **A.**  Lieutenant -- in terms of rank, I don't know.

21  **Q.**  Fair point.  Thank you.  Maybe I was too specific

22  with lieutenant.  Were you aware of any other female

23  superior officers besides Lori Franchina who had a

24  problem with male subordinates not following their

25  orders?

1    **A.**   No.

2         MR. MARTIN:  It looks like you think there's a

3    problem with my question.

4         MR. McHUGH:  Well, objection.  Commenting on --

5         THE COURT:  Sustained.

6    **Q.**   Were you aware of any females who were having

7    problems with males not following their orders besides

8    Lori?

9    **A.**   With males not following their orders?  Yes.

10   **Q.**   Moving down, it says, "She's openly gay, believes

11   they cut her less slack because if the guys think they

12   have a chance, they cut slack; but if they don't, no

13   slack."  Did I read that correctly?

14   **A.**   Yes.

15   **Q.**   When it says "if they think they have a chance,"

16   what did you understand him to be telling you?

17   **A.**   Chance to date.

18   **Q.**   Date?

19   **A.**   (Nods affirmatively.)

20   **Q.**   Does that mean that the women they had a chance to

21   date were cut more slack than women that they did not

22   have a chance to date?

23   **A.**   No.

24   **Q.**   What did it mean to you at the time?

25   **A.**   What it meant to me at the time was that she

1    believed that if -- that she -- I don't like to use the

2    word "slack" but was cut less slack, so to speak,

3    because she believed that if the males in the

4    department had the perception that a female -- there

5    was any potential in dating a female, that she believed

6    that they would cut those females less slack -- I mean

7    more slack, so to speak; and if they believed that

8    there wasn't a chance to date them, then she believed

9    that they would cut such a female less slack.

10   Q.    But you're saying she believed, but this is a

11   summary of your investigation with Chief Crawford.

12   A.    Right.  I believe he was relaying her belief to

13   me.

14   Q.    But it doesn't say "she believes."  It says,

15   "She's openly gay," and then it goes on to say,

16   "Believes they cut her less slack because if they think

17   they have a chance, they cut slack."  It doesn't say

18   that Lori Franchina told that to Chief Crawford; right?

19   A.    No, it says just what you read, but. . .

20   Q.    And then it goes on, and there's a list of female

21   names there.  And, I'm sorry, the hole punch blocks a

22   couple out.  Did you interview all of those females?

23   A.    Not all of them.

24   Q.    Did you interview some of them?

25   A.    I believe so.

1    **Q.**   Earlier when I asked you about females having

2    problems with males in the department, I thought I saw

3    you hesitate.  Was there something else that you were

4    going to say?

5         MR. McHUGH:  Well, I'm going to object.  He's

6    characterizing the witness's --

7         THE COURT:  Hold on, Mr. McHugh.  Hold on,

8    Mr. Martin.  Go ahead.

9         MR. McHUGH:  I'm going to object again.  He

10   keeps characterizing the witness's testimony, the

11   witness's movements, demeanors.  It's improper.

12        THE COURT:  Mr. Martin, have you called this

13   witness as an adverse witness?

14        MR. MARTIN:  Yes, your Honor, Federal Rule 611.

15        THE COURT:  Under 611?

16        MR. MARTIN:  Yes.

17        THE COURT:  Objection's overruled.

18   **Q.**   I thought you hesitated for just a moment when I'd

19   asked you about females and males' problems with orders

20   and whatnot.  Was I wrong?

21   **A.**   I don't think so.  I don't think you were wrong.

22   **Q.**   Do you think that you did hesitate?

23   **A.**   Yes.

24   **Q.**   Could you tell us why you hesitated when I asked

25   you about that.

1   **A.**   Because of the -- because of how specific your

2   question was.

3   **Q.**   Huh.  How would you ask the question?

4        MR. McHUGH:  Objection.

5        THE COURT:  Sustained.

6   **Q.**   So let me ask you, did you have any information

7   from your investigation about males and women having

8   problems together, working together at the Providence

9   Fire Department?

10   **A.**   When?

11   **Q.**   When you were conducting this investigation that's

12   listed in the complaint.

13   **A.**   Yes.

14   **Q.**   And what was the information that you discovered?

15   **A.**   Well, the reason I hesitated is in every

16   department there are people who have problems working

17   together, whether they're male or female.  I'm not

18   trying to be difficult, but --

19   **Q.**   No.  That's fine.  Did you have any other females

20   who made complaints of sexual harassment,

21   discrimination or retaliation during the years 2006,

22   2007, 2008 or 2009?

23   **A.**   Yes.

24   **Q.**   Did you make -- did you recommend corrective

25   action at the end of any of those other investigations?

1    **A.**    Possibly.

2    **Q.**    You don't want to tell us who the other females

3    are; is that correct?

4            MR. McHUGH:  Objection, your Honor.

5            THE COURT:  Overruled.

6    **A.**    I try to keep confidences to the extent possible.

7    **Q.**    Is your concern about keeping confidences related

8    to your concern that they could be retaliated against?

9    **A.**    My predominant concern with all matters with any

10   department is the privacy of the individual who comes

11   to meet with me.

12   **Q.**    Do you have a concern at the Providence Fire

13   Department that women who make complaints to you about

14   harassment or discrimination or retaliation will be

15   retaliated against?

16   **A.**    Not a specific concern.

17   **Q.**    Not a specific concern.  What about a general

18   concern?

19   **A.**    With respect to the fire department?

20   **Q.**    Yes.

21   **A.**    No.

22   **Q.**    I'm approaching with Exhibit Number 16.

23   Ms. Oredugba, you've just reviewed Plaintiff's 16,

24   which is Complaint Form EEO Number 2009-038; is that

25   right?

1    **A.**    Yes.

2    **Q.**    This is another complaint form that you wrote in

3    regards to Lori Franchina?

4    **A.**    Yes.

5    **Q.**    This is in the same or substantially the same

6    condition as it was when you created it?

7    **A.**    It appears so.

8         MR. MARTIN:  Your Honor, we offer this as

9    Exhibit 16.

10        MR. McHUGH:  I object to pages 1 through 6 of

11   Exhibit 16 only, and the reason is they're the same as

12   pages 1 through 6 of Exhibit 15.  So it's cumulative

13   and duplicative.

14        THE COURT:  Objection's overruled.  The exhibit

15   will be admitted as a full exhibit.

16        (Plaintiff's Exhibit 16 admitted in full.)

17   **Q.**    So, Ms. Oredugba, the first six pages are the same

18   as the last report; correct?

19   **A.**    Yes.

20   **Q.**    And what you did was you just copied and pasted

21   that so that this would be comprehensive?

22   **A.**    I copied and pasted it.

23   **Q.**    And then after the six pages is when you started

24   adding the new information related to this new

25   complaint?

1   **A.**   Yes.

2   **Q.**   So I'm going to start with showing you the new

3   pages and not the old pages.

4   **A.**   Okay.

5   **Q.**   Now, on page 7 towards the bottom it says, "Have

6   you brought these events to anyone else's attention?

7   If so, please state who and when the events were

8   brought to their attention."  Do you see that?

9   **A.**   Yes.

10   **Q.**   Did you get an answer to who else she told about

11   the events that she was complaining about?

12        Actually, let me start back and make it a little

13   bit better.  That was a question that you posed to Lori

14   Franchina?

15   **A.**   No, that's just part of the standard form.

16   There's a standard complaint form that, if things were

17   done properly and perfectly, is answered by the

18   complainant.

19   **Q.**   Okay.

20   **A.**   I put my own notes into a complaint form.

21   **Q.**   Okay.  Did you at all during this complaint, your

22   creation of this complaint form, did you speak with

23   Lori Franchina?

24   **A.**   I'd have to actually see other pages of the

25   complaint form again.  I don't know that this form has

1    my -- I don't believe so.  I don't believe that this

2    form has notes.  I'm not sure.  I'm sorry.

3    Q.   If you want to look, I'm happy to show you.

4    A.   Okay.  So this does have notes.

5    Q.   This has notes taken from a conversation with Lori

6    Franchina?

7    A.   Yes.

8    Q.   And when you spoke with Lori Franchina, did you

9    ask her if she brought these events to anyone else's

10   attention?

11   A.   I don't believe or I don't recall whether I asked

12   her that specifically.

13   Q.   And then in number -- underneath number 11, you

14   wrote, "Meeting with Chief Farrell September 4th, '09,

15   in EEO office."  Did I read that correctly?

16   A.   Yes.

17   Q.   Was Lori Franchina present at that meeting?

18   A.   No, I don't believe so.

19   Q.   And there are different levels of chiefs at the

20   Providence Fire Department or at least there were in

21   2007 -- 2009 when you were doing this work; correct?

22   A.   Correct.

23   Q.   And what rank was this chief?

24   A.   At that time I believe he was chief of the

25   department, meaning head of the department.

1   **Q.**   What did you learn from Chief Farrell about the

2   Lori Franchina investigation that you were conducting?

3   **A.**   I'd have to refer to my notes.

4              THE COURT:   Move the document up, Mr. Martin.

5   It can't be seen on the screen.

6   **Q.**   So these notes here are what you learned from

7   Chief Farrell?

8   **A.**   I don't know whether it's what I learned, but it's

9   what I wrote when speaking with Chief Farrell.

10  **Q.**   So now it says -- in the part of your notes

11  underneath where it references your meeting with Chief

12  Farrell, there's reference to Andre Ferro; correct?

13  **A.**   Yes.

14  **Q.**   What did he tell you about Andre Ferro?

15  **A.**   I don't recall.

16  **Q.**   Now, in 2009, in your meeting on September 4th,

17  2009, you were investigating incidents that had

18  occurred in August and July of 2009; correct?

19  **A.**   Presumably.

20  **Q.**   And while you were investigating those incidents

21  in 2009, Chief Farrell informed you about what had

22  happened in 2006; correct?

23  **A.**   I can't say that.

24  **Q.**   Your notes don't indicate that he had told you

25  about the situation between Lori Franchina and Andre

1    Ferro?

2         MR. McHUGH:  Objection.  The document speaks for

3    itself.

4         THE COURT:  Overruled.

5    **A.**   As I look, I don't know what relation this has.

6    At times, if I have several matters in one department

7    and I have a person there, I may address various

8    matters.  So this doesn't spark a memory in terms of

9    all that we discussed, so I can only go by what I

10   wrote.

11   **Q.**   Well, you didn't work in the department in -- you

12   weren't the EEO officer in 2006; right?

13   **A.**   I believe I became the EEO officer sometime in

14   2006.

15   **Q.**   You became the EEO officer in 2006?

16   **A.**   I believe so.

17   **Q.**   Were you the EEO officer when Andre Ferro was

18   brought up on charges for his conduct versus Lori

19   Franchina?

20   **A.**   If I was, I was not involved.

21   **Q.**   You weren't involved?

22   **A.**   (Nods affirmatively.)

23   **Q.**   Moving on to the next page, in bold you wrote

24   here, "There's an issue of female lieutenants not being

25   respected."

1    **A.**   No, I didn't write "there's an issue."  It says,

2    "Issue of female lieutenants not being respected."

3    **Q.**   Okay.  And then underneath it, it says, "Tell them

4    to approach the officer you're coming on the run.  I

5    expect your cooperation.  If response from that officer

6    is that they're not doing it, then they should contact

7    the chief officer."  Did I read that correctly?

8    **A.**   Yes.

9    **Q.**   What is that supposed to represent?

10   **A.**   I believe it's what Chief Farrell was telling me

11   that he either did tell his other officers to tell

12   their subordinates or that he was going to tell his

13   other officers to tell their subordinates throughout

14   the department, the engine companies.

15   **Q.**   Certainly.  So what Chief Farrell's approach was

16   was for the female lieutenants to tell all the other

17   officers on the scene, I expect your cooperation, and

18   that if they didn't get it, they were supposed to call

19   the chief?

20   **A.**   I believe his approach was that all officers,

21   female or male, were to tell their subordinates, You're

22   going to do XYZ, and if their orders weren't followed,

23   that all officers, male or female, should immediately

24   contact whoever the chief officer is.

25   **Q.**   Well, isn't what happened that Chief Farrell

1    thought of the idea to tell the female lieutenants to

2    do that and then you were afraid that that would

3    isolate them or single them out so you asked Chief

4    Farrell to order all of the lieutenants to do that?

5    A.    I don't recall that.

6    Q.    Okay.  And here there's reference to Lori

7    Franchina filing a Temporary Restraining Order in

8    Superior Court against a co-worker?

9    A.    Yes.

10   Q.    Was this the first time you'd become aware of that

11   incident when you wrote this note?

12   A.    I believe so.

13   Q.    On the next page you wrote in italics, "I asked

14   whether they were in the process of disciplining

15   McCaffrey."  The part in italics represents your words

16   to them during this meeting?

17   A.    Yes.

18   Q.    Chief Morgan, who is Chief Morgan?

19   A.    At the time he -- I believe he was the

20   investigative officer for the fire department.  He was

21   one of the chiefs in the fire department, and I believe

22   he was the investigative officer.

23   Q.    Okay.  And Chief Morgan told you that they were

24   bringing the matter to you at HR for you to handle it

25   because they believed it was likely to result in

1    litigation?

2    **A.**   That's what I noted.

3    **Q.**   Did he tell you what type of litigation they

4    thought this was going to result in?

5    **A.**   No.

6    **Q.**   Did they tell you that they thought it was going

7    to be a sexual harassment lawsuit?

8    **A.**   I don't believe so.

9    **Q.**   Did they tell you they thought it was going to be

10   a discrimination lawsuit?

11   **A.**   I don't believe he said anything more than that.

12   **Q.**   So he basically just said litigation, HR, need

13   your help?

14   **A.**   I mean, I don't believe -- I don't recall having

15   any discussion about litigation other than that.

16   **Q.**   Well, as the EEO officer who is investigating Lori

17   Franchina's complaints, weren't you curious as to what

18   type of litigation they were afraid of?

19   **A.**   I think more than -- I think my issue was that I

20   didn't believe it to be procedure to send public safety

21   matters to HR to administer it.  So I think that was

22   more my predominant concern.

23   **Q.**   My question was, as the EEO officer investigating

24   Lori Franchina's complaints of harassment and

25   discrimination, weren't you curious as to what type of

1    litigation her chiefs were afraid of?

2           MR. McHUGH:  Objection as to form.  Asked and

3    answered, use of the word "afraid," lack of foundation.

4           THE COURT:  Overruled.

5    **A.**   I was likely curious, but I don't know that I

6    would -- Chief Morgan is probably not where I would go

7    to get my information.  I could get the information

8    from the Law Department if it's there.

9    **Q.**   Well, my question's a little bit different than

10    that.  My question is, if her superior officers are

11    afraid that she's going to sue the city for harassment

12    or discrimination or retaliation, wouldn't that

13    knowledge be important to you for your investigation so

14    that you could follow up on that?

15    **A.**   If they were afraid, it would be good for me to

16    know.

17    **Q.**   So when they tell you that they're afraid of

18    litigation, wouldn't it also be good for you to say,

19    What type of litigation are you talking about?

20    **A.**   He didn't tell me they were afraid of litigation.

21    **Q.**   Okay.  Well, maybe "afraid" is the wrong word.

22    When he told you they brought the matter down to HR to

23    let you handle it because they believed it is likely to

24    result in litigation, wouldn't it have been helpful for

25    you to say, What type of litigation?

1    **A.**   It might have been helpful.

2    **Q.**   Then you went on to write, "He feels this has a

3    relationship to her being harassed or people not

4    cooperating with her.  Doesn't know if it's because of

5    her sexual orientation.  If it is, then it's

6    information that we need to have."  Did I read that

7    correctly?

8    **A.**   Yes.

9    **Q.**   Now, "He feels this has a relationship to her

10   being harassed," that's from Chief Morgan?

11   **A.**   Correct.

12   **Q.**   "Doesn't know if it's because of her sexual

13   orientation," comma.  That's from Chief Morgan?

14   **A.**   Correct.

15   **Q.**   "If it is, then it's information that we need to

16   have."  Is that from Chief Morgan or is that from you?

17   **A.**   I believe Chief Morgan.

18   **Q.**   Chief Morgan wanted that information?

19   **A.**   I believe so.

20   **Q.**   Do you know who Chief Morgan wanted to find that

21   information?

22   **A.**   I don't understand.

23   **Q.**   Was he bringing this to you so that you would

24   conduct an investigation in order to see whether or not

25   any of these events were related to her sexual

1    orientation?

2    **A.**    I'm not certain.  I think his position is that if

3    there is something that was found, that it was

4    important, that he felt it would be incumbent upon him

5    to take measures so that it wasn't repeated.  That's my

6    understanding.

7    **Q.**    It would certainly be consistent with your

8    position as the EEO officer for someone to bring that

9    type of investigation to you to conduct?

10   **A.**    It would.

11          THE COURT:  Mr. Martin, would this be a good

12   time to break for lunch?

13          MR. MARTIN:  Great time.

14          THE COURT:  Ladies and gentlemen, we're going to

15   break for lunch.  Continue not to discuss this case

16   amongst yourselves or with anyone else, and we'll see

17   you back in an hour.

18          (Recess.)

19          THE COURT:  Ms. Oredugba, you can come up.  You

20   understand you're still under oath?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Did you all have a good lunch,

23   ladies and gentlemen?  At some point if you're looking

24   for food suggestions, I'll tell you; but Thursdays,

25   just for planning sake, we have a lot of food trunks

1    out on Kennedy Plaza.

2         It's always a good day if you're going to buy

3    lunch some day.  There's usually three or four

4    different ones out there.  If you want my personal

5    recommendations at some point, I'll be glad to pass

6    them on.  They're during the week, too, but it's

7    usually one or two.  Thursdays is when there's the

8    most.

9         Mr. Martin.

10        MR. MARTIN:  Thank you.

11   **Q.**   Ms. Oredugba, when we left off, we finished

12   talking about the EEO Complaint Form Number 038.

13   During this fall and winter of 2009, you became aware

14   of an incident that occurred between Lori Franchina and

15   Firefighter Sean McGarty at the Firefighters' Hall?

16   **A.**   Yes.

17   **Q.**   And do you recall how you became aware of that

18   incident?

19   **A.**   I don't recall how I first became aware, no.

20        MR. MARTIN:  May I show the witness Exhibit

21   Number 10.

22   **Q.**   This is an e-mail.  Can you see it?

23   **A.**   Not yet.

24   **Q.**   Can you see that?

25   **A.**   Yes.

1    **Q.**   Please take a moment to read it, and let me know

2    when you're done.

3    **A.**   Yes.

4    **Q.**   You've had a chance to read that?

5    **A.**   Yes.

6    **Q.**   This is an e-mail from Michael Morgan to you?

7    **A.**   Yes.

8    **Q.**   Dated December 14th, 2009?

9    **A.**   Yes.

10   **Q.**   And this is in the same or substantially the same

11   condition as when you read it?

12   **A.**   To the best of my knowledge.

13        MR. MARTIN:  Your Honor, we offer this as

14   Exhibit Number 10.

15        MR. McHUGH:  Objection for the reasons I argued

16   yesterday afternoon.  If need be, I can restate them,

17   your Honor.

18        THE COURT:  No need to restate them.  Thanks,

19   Mr. McHugh.

20        The objection's overruled.  Exhibit 10 is

21   admitted as a full exhibit.

22        (Plaintiff's Exhibit 10 admitted in full.)

23   **Q.**   Was this the first communication that you received

24   regarding the incident at the Firefighters' Hall?

25   **A.**   I'm not certain.

1    **Q.**   Now, did you investigate this incident after you
2    received this e-mail?
3    **A.**   Yes.
4    **Q.**   You read Form 17s that were filled out by
5    firefighters?
6    **A.**   I believe so.
7    **Q.**   And you read a Form 17 that was filled out by Lori
8    Franchina?
9    **A.**   Presumably.
10   **Q.**   And this incident is also referred to in your
11   complaint form that we were referring to earlier,
12   Complaint Number 038; correct?
13   **A.**   Yes, I believe so.
14   **Q.**   I'm just going to flip back to that for one second
15   if you don't mind.
16   **A.**   Okay.
17   **Q.**   I'm putting in front of you page number 8 from
18   Exhibit Number 16.  That's the EEO Complaint 038.  Down
19   here at the bottom, I'll zoom in for you, this is the
20   reference in the report to the Firefighters' Hall
21   incident; correct?
22   **A.**   I believe so.
23   **Q.**   And it says here that Lieutenant Franchina was off
24   duty?
25   **A.**   That's what it says.

1   **Q.**   And the other guys were on duty?

2   **A.**   That is what it says.

3   **Q.**   And Chief Morgan mentioned to you that they

4   shouldn't have been there on duty, but the firefighters

5   claimed that they had permission?

6   **A.**   That's what the form says here.

7   **Q.**   So if someone were to say that none of the

8   firefighters were on duty, that would be inconsistent

9   with what was reported to you during your

10   investigation?

11   **A.**   That would be inconsistent with what is written

12   here, yes.

13   **Q.**   Turning back to the December 14th e-mail, which is

14   Exhibit Number 10, did you speak directly to -- it

15   lists some firefighters involved.  One is Elliot

16   Murphy.  Did you speak to Elliot Murphy directly?

17   **A.**   I don't recall.

18   **Q.**   Did you speak to Sean McGarty directly?

19   **A.**   I don't recall.

20   **Q.**   If we don't have notes from any type of interview

21   like that, would it be safe to assume that you did not

22   speak to them?

23   **A.**   I try not to assume, but --

24   **Q.**   Fair enough.  Do you typically keep notes when you

25   conduct interviews for incidents like this?

1    **A.**    Yes.

2    **Q.**    And you don't have any notes from these interviews

3    or, excuse me, let me ask a better question.  You don't

4    have any notes from any interviews regarding this

5    incident with Elliot Murphy or Sean McGarty?

6    **A.**    I don't believe I do.

7    **Q.**    Now, it says down here that Lieutenant Murphy

8    filed a man annoyed report on December 11th, '09, with

9    the Providence Police for documentation of an

10   altercation.  Did you review the report that Lieutenant

11   Murphy filed with the Providence Police?

12   **A.**    I don't recall.

13   **Q.**    It also goes on to say that Murphy states he was

14   struck in the upper arm by Franchina as she exited in

15   his statement to the police.  Did you ever see anything

16   in which Lieutenant Murphy claimed that he had been

17   struck by Lieutenant Franchina?

18   **A.**    I don't recall.

19   **Q.**    It goes on to say, "Murphy also filed an injury

20   report due to the alleged assault by Franchina."  Did

21   you read the injury report that was filed by Lieutenant

22   Murphy?

23   **A.**    I don't recall.

24   **Q.**    Do you know what type of injuries Lieutenant

25   Murphy claimed that Lieutenant Franchina had caused

1    him?

2    A.    No, I don't.

3    Q.    It was reported to you during your investigation

4    that Lieutenant Franchina had asked Lieutenant Murphy

5    to help her?

6    A.    Correct.

7    Q.    That she believed she was being threatened by

8    Firefighter McGarty?

9    A.    Are you asking if that was reported to me?

10   Q.    Yes.

11   A.    Well, let's see.  It says, "Fire Lieutenant Murphy

12   was asked to intervene in the confrontation by

13   Lieutenant Franchina."

14   Q.    And at the conclusion of this, your investigation

15   of this incident, you did make recommendations for

16   corrective action, didn't you?

17   A.    I don't recall making recommendations -- an

18   official recommendation.

19   Q.    Well, you learned that the department was planning

20   on bringing charges against Firefighter McGarty;

21   correct?

22   A.    Correct.

23   Q.    And then you recommended that they should also

24   file charges against Lieutenant Murphy; correct?

25   A.    I don't recall.

1      MR. MARTIN:  Can I show Exhibit Number 11 to the

2  witness.

3  **Q.**   Can you see that okay?

4  **A.**   Yes.

5  **Q.**   Let me know when you're finished reading it.

6  **A.**   I finished.

7  **Q.**   This is an e-mail from you to you?

8  **A.**   Yes, but in looking at it, it looks like -- I

9  don't know that it was actually sent; but yes, it is a

10  note from me to my note file.

11  **Q.**   And this is a document that you retrieved from

12  your files?

13  **A.**   Yes.

14  **Q.**   And it's in the same or substantially the same

15  condition as it was when you wrote it?

16  **A.**   It appears so.

17      MR. MARTIN:  Your Honor, we offer this as

18  Exhibit 11.

19      MR. McHUGH:  No objection, your Honor.

20      THE COURT:  Exhibit 11 is admitted as a full

21  exhibit without objection.

22      (Plaintiff's Exhibit 11 admitted in full.)

23  **Q.**   So on December 22nd, 2009, you took note that

24  Chief Warren -- who is Chief Warren?

25  **A.**   Chief Warren I believe was the -- he was one of

1    the chiefs in the department.  I don't recall whether

2    he was deputy -- I don't -- I don't recall which

3    position he held, but he was one of the front office

4    chiefs.

5    Q.   And Chief Warren advised you that they were

6    preparing charges against Firefighter McGarty?

7    A.   Yes.

8    Q.   For the incident that occurred at the union hall?

9    A.   Presumably.

10   Q.   And also against the lieutenant who refused to

11   assist Lieutenant Franchina?

12   A.   That's what it says.

13   Q.   Wasn't it your recommendation that the lieutenant

14   who refused to assist Lieutenant Franchina also be

15   disciplined?

16   A.   My recommendation would be for them to proceed

17   with carrying out their procedures.  So when I spoke

18   with Chief Morgan and there was discussion of sending

19   it to HR, HR would not carry out the administrative

20   procedures of the fire or police department.  It would

21   be for the fire or police to carry out their own

22   administrative procedures.

23   Q.   And after this e-mail, it was your belief that

24   that procedure was followed through with?

25   A.   It was my belief that the procedure -- that the

1    procedure was followed through.

2    Q.   You believed that charges had been brought against

3    Firefighter McGarty?

4    A.   Yes.

5    Q.   And a hearing held?

6    A.   I believe that they followed through with whatever

7    is the procedure once charges are brought.

8    Q.   And you believe that Firefighter McGarty was

9    disciplined?

10   A.   It was my belief that it was followed through,

11   charges brought and everything that follows pursuant to

12   fire department procedures, yes.

13   Q.   And the same for Lieutenant Murphy?

14   A.   Yes.

15   Q.   And then over the course of the next few months,

16   January, February and March, you heard from Lieutenant

17   Franchina additional times; correct?

18   A.   I believe so.

19   Q.   On the phone?

20   A.   I believe so.

21   Q.   She would contact you directly?

22   A.   By directly, you mean on the phone?

23   Q.   Directly to you, yes, on the phone.

24   A.   I believe so.

25   Q.   As you advised her to do?

1    **A.**   I'm not sure if I advised her or not, but I try to

2    make myself accessible.

3    **Q.**   Did you fill out any -- do you remember what she

4    said to you during those times that she called you in

5    January, February and March of 2010?

6    **A.**   Not specifically, no.

7    **Q.**   Did you take any notes or fill out any complaint

8    forms to keep track of what she said to you?

9    **A.**   Presumably.  Possibly.

10   **Q.**   Possibly?  Do you recall if she was making

11   complaints to you?

12   **A.**   Possibly.

13   **Q.**   Do you recall what type of complaints she was

14   making to you?

15   **A.**   Not specifically.

16         (Counsel hands document to witness.)

17   **Q.**   Please.

18   **A.**   I do recall her saying that she had filed a

19   restraining order in Superior Court against someone

20   else in the fire department.

21   **Q.**   Do you recall in January, February or March of

22   2010 if she reported to you any improvement in her

23   situation regarding how she was being treated at work?

24   **A.**   I don't recall.

25         MR. MARTIN:  Can I show the witness Exhibit 12.

1     **Q.**   I'm showing you what's been marked as Plaintiff's

2     12.  If you can please take a look and let me know when

3     you're finished reading it.

4     **A.**   Yes.  I finished.

5     **Q.**   This is an e-mail from you to Sybil Bailey?

6     **A.**   Correct.

7     **Q.**   Could you tell us who Sybil Bailey is, please.

8     **A.**   She's the Director of Human Resources for the City

9     of Providence.

10    **Q.**   And you wrote this e-mail to her on May 26th,

11    2010?

12    **A.**   Yes.

13    **Q.**   This is in the same or substantially the same

14    condition as it was when you wrote it?

15    **A.**   It appears so.

16          MR. MARTIN:  Your Honor, we offer this into

17    evidence as Exhibit 12.

18          MR. McHUGH:  I object because it has not been

19    redacted.  This is the one we discussed yesterday about

20    possibly redacting information from.

21          THE COURT:  I don't remember discussing it.  I

22    apologize.

23          MR. MARTIN:  No problem.  I have no problem

24    redacting.  There's a reference to something

25    Ms. Oredugba was going to do that afternoon related to

1    her family.  I have no problem redacting that.

2         THE COURT:  Great.  Can you -- can we do that

3    without putting -- can we do that speedily?

4         MR. MARTIN:  I have a redactor.

5         THE COURT:  Ladies and gentlemen, it's a piece

6    of personal information about her family that was

7    contained in an otherwise relevant e-mail.  And just to

8    protect her privacy, the office privacy rights, we're

9    going to take it out.

10        We're not hiding anything from you.  We're just

11   trying to assure that her privacy rights aren't

12   violated by seeing it.  That's all.

13        Other than that, Mr. McHugh, any objection?

14        MR. McHUGH:  No, your Honor.

15        THE COURT:  Exhibit 12 will be admitted as a

16   full exhibit without objection as redacted.

17        (Plaintiff's Exhibit 12 admitted in full.)

18   **Q.**   Okay.  So at the top, CF, that's Chief Farrell?

19   **A.**   I can't say with certainty.  It would -- I would

20   have to deduce that.

21   **Q.**   Okay.  He became very frustrated re: Franchina

22   situation.  It says that?

23   **A.**   Is it across the bottom?  Oh, yes.  Yes.  "CF

24   became very frustrated re: Franchina situation."  Yes.

25   **Q.**   Now, shortly before this, didn't you learn that

1    charges had not, in fact, been brought against

2    Firefighter McGarty or Lieutenant Murphy?

3    **A.**   I don't recall.

4          MR. MARTIN:  Can I have just a minute?

5          THE COURT:  Sure.

6          MR. MARTIN:   Page 77.  Your Honor, I'm going to

7    be referring to the deposition transcript of Olayinka

8    Oredugba, page 77, lines 14 through 19.

9    **Q.**   Do you recall attending a deposition?

10   **A.**   Yes, I do.

11   **Q.**   And a deposition is an event in which you give

12   testimony under oath?

13   **A.**   Correct.

14   **Q.**   And you were represented by counsel?

15   **A.**   In relation to my position with the city.

16   **Q.**   Mr. McHugh was there with you?

17   **A.**   Yes.

18   **Q.**   And I asked you questions?

19   **A.**   Yes.

20   **Q.**   And you raised your hand and swore to tell the

21   truth, the whole truth and nothing but the truth?

22   **A.**   Yes.

23   **Q.**   And on that day I said to you, "So I just want to

24   make sure I got this right.  Prior to May 19th of 2010,

25   you had been advised that charges had been brought, a

1    hearing had been held and discipline had been meted out

2    in relation to the Firefighters' Hall incident?"  And

3    you wrote, "It was my understanding."

4    A.    Correct.

5          THE COURT:  You mean --

6    A.    I said it.

7          THE COURT:  She answered.

8    Q.    You said it?

9    A.    Yes.

10   Q.    And you asked him why it hadn't been done as you

11   had been promised in December; correct?

12         MR. McHUGH:  Objection as to form.  Use of the

13   word "promised."

14         MR. MARTIN:  Okay.  I'll take out the word

15   "promised."

16   Q.    You asked him why discipline had not been meted

17   out as you were told in December it would be; correct?

18   A.    I don't recall.

19         MR. MARTIN:  Same page, your Honor and

20   Mr. McHugh, starting on line 20.  That's page 77.

21   Q.    I said to you, "And then on May 19th of 2010,

22   Chief Tom Warren told you unequivocally that they had

23   not moved forward with any matters because it had been

24   handed over to the Law Department?"

25         MR. McHUGH:  Objection as to form.  Use of the

1    word "unequivocally."

2         THE COURT:  Overruled.

3    **Q.**   And then on the next page, you objected that you

4    couldn't speak to the word "unequivocally," and you

5    said --

6    **A.**   I don't see that, but okay.

7    **Q.**   You said, "I am not sure where they left off, but

8    he did say that on that day that I spoke with him that

9    they were not doing anything with the matter because

10   they had handed it over to the Law Department.  And, in

11   truth, I recall feeling frustrated by that."

12   **A.**   Correct.

13   **Q.**   Okay.  And the reason they had turned it over to

14   the Law Department was because they thought that

15   Ms. Franchina had filed a lawsuit?

16   **A.**   As I understand that, they turned it over to the

17   Law Department because they thought that's what they

18   were supposed to do.

19        MR. MARTIN:  Your Honor, same page, number 78,

20   starting with line 9.

21   **Q.**   "Did he say why they felt like they were not going

22   to move forward because it resulted in litigation?"

23        Answer, "I think -- my understanding is that it

24   was his or their belief that was the proper procedure,

25   if the matter is in litigation, that they hand it to

1  the Law Department."  Did I read that correctly?

2  **A.**  Yes, you did.

3  **Q.**  So back in December they had handed it over to HR

4  because they believed it was going to result in

5  litigation; correct?

6  **A.**  They attempted to.

7  **Q.**  And you handed it back and said, You handle it

8  even if it is in litigation?

9  **A.**  I didn't say "even if it is," I mean; but we, HR,

10  advised them to proceed with their procedures.

11  **Q.**  And there was no litigation in December of 2009

12  that you're aware of?

13  **A.**  I don't actually know when the Complaint was

14  filed.

15  **Q.**  But as of December of 2009 you had no belief that

16  litigation had been filed?

17  **A.**  I did not have knowledge of it being in

18  litigation.

19  **Q.**  And even if litigation had been filed, that would

20  not be a justifiable reason to not discipline people

21  who were deserving of discipline?

22  　　　　MR. McHUGH:  Objection.

23  　　　　THE COURT:  Overruled.

24  **A.**  Within the fire department?

25  **Q.**  In this specific case.

1    A.    That's my understanding.   That's my belief.

2    Q.    And then after HR, you, handed it back to them,

3    they handed it off to the Law Department; correct?

4    A.    I don't know what they did specifically after my

5    conversation.

6    Q.    When I read to you that you said back in May at

7    your deposition that you felt really frustrated after

8    you found out about it, what was it that made you so

9    frustrated?

10   A.    Because it appeared that they may not have

11   followed through with what I thought that they did.

12   Q.    Did you advise them that they should follow

13   through in May of 2010?

14   A.    I may have.   I don't recall.

15   Q.    Do you know of anybody who was ever actually

16   disciplined for the Firefighters' Hall incident

17   regarding Lori Franchina?

18   A.    I do not know.

19        MR. MARTIN:   I'm going to show the witness

20   Exhibit 14.

21   Q.    Ms. Oredugba, I'm showing you what's marked as

22   Plaintiff's Exhibit 14, if you could just take a minute

23   to read that.

24   A.    Yes.   I've read it.

25   Q.    Okay.   This is an e-mail from you to you?

1    **A.**   It is.

2    **Q.**   Dated November 19th of 2010?

3    **A.**   Yes.

4    **Q.**   And this is in the same or substantially the same

5    condition as it was when you wrote it?

6    **A.**   Well, there's something crossed out at the end.

7    I don't recall doing that, but it's possible.  Maybe

8    I. . .

9    **Q.**   What about the handwritten part up in the corner,

10   is that your handwriting?

11   **A.**   It appears so.

12   **Q.**   So other than the crossed-out part, does

13   everything appear to be the same as when you handwrote

14   on the printout of this e-mail?

15   **A.**   It does.

16          MR. MARTIN:  Your Honor, we offer this as

17   Exhibit 14.

18          MR. McHUGH:  Objection.  It's not the same.

19   It's not a true and accurate copy of the original.

20          MR. MARTIN:  Your Honor, may we approach?

21          THE COURT:  No.  Overruled.  The exhibit can be

22   admitted as full.

23          (Plaintiff's Exhibit 14 admitted in full.)

24   **Q.**   In the handwritten portion, ma'am, it says,

25   "Please draft letter to memorialize direction to PFD,

1    re: con. with C. Farrell"; correct?

2    A.   I believe so.  I was actually having difficulty

3    reading the writing.

4    Q.   I should have been a doctor.  And then it says

5    "cc Morgan and Warren"; correct?

6    A.   It does say "cc Morgan."  That could be Warren.

7    Q.   Did you ever draft a letter to memorialize your

8    direction to the Providence Fire Department regarding

9    that conversation?

10   A.   Not that I recall.

11   Q.   Do you remember -- it says "memorialize direction

12   to PFD."  Do you remember what direction you had given

13   to PFD in November of 2010?

14   A.   I don't believe I had given them direction in

15   2010.

16   Q.   But you were talking about writing the letter in

17   2010?

18   A.   Right.  At times I will write reminders as to

19   something that I want to do or have done ultimately.

20   Q.   In your mind, this is a note to yourself to give

21   direction to the Providence Fire Department, not about

22   direction that you had given?

23   A.   Correct.

24   Q.   Okay.  Thank you for clarifying that.  What was

25   the direction that you were going to give the fire

1   department if you had written a letter?

2        MR. McHUGH:  Objection.  Calls for speculation,

3   form.

4        THE COURT:  Why don't you rephrase.

5        MR. MARTIN:  Sure.

6   Q.   Do you recall at the time you planned on giving

7   directions what those directions were?

8   A.   No, because at that time I don't think I had

9   drawn -- that I had directions to give at that time.

10  Q.   Now, a long time had -- well, about six months had

11  elapsed between the last e-mail I showed you and this

12  e-mail; correct?

13  A.   Yes.  The May, yes.

14  Q.   And at this point in time you knew that Lori

15  Franchina was out on stress leave?

16  A.   I did not, no.  I don't know -- in my course of

17  work, I don't -- I'm not necessarily alerted if one is

18  out or when they're in or when someone retires.

19  Q.   Didn't something happen or some conversation that

20  triggered you six months later to write yourself a

21  note?

22  A.   More likely than not.

23  Q.   You just don't remember what it was?

24  A.   Correct.

25  Q.   At the top it says "OYO."  Those are your

1    initials?

2    **A.**   They are.

3    **Q.**   "Notes."  And in bold it says, "acknowledge

4    harassment, believe it to be so."  Is that you saying

5    that you believed harassment to be so?

6    **A.**   That's not me saying that.  That's putting -- in

7    my notes at times on various matters I may write

8    certain possibilities.  So I may make note if it's X or

9    I may make note if it's the opposite, Y, and with the

10   ultimate intention of filling in the facts that have

11   been ascertained to support X or Y.

12   **Q.**   Okay.  Well, in this case when you wrote

13   "acknowledge harassment, believe it to be so," what did

14   you mean?

15   **A.**   I don't -- I couldn't say.

16   **Q.**   Do you know what you meant when you wrote "not

17   convinced that it is sexual harassment"?

18   **A.**   It could be just as I explained where I may, you

19   know, write, like, hypothetically if, say, one were

20   saying guilty, not guilty, and then you'd plug in facts

21   to support each.

22           So, in short, they're just notes.  I often write

23   notes to trigger my own memory, but then I will also

24   have all of my other notes in front of me that I can

25   refer to.

1          One reason I do that is because I have numerous

2     simultaneous matters that I want to try to remember

3     what goes with what matter, what department.

4     **Q.**   Do you feel like you have -- at this time had too

5     many things to complete this the way that you wanted

6     to?

7     **A.**   Yes.

8     **Q.**   It's fair to say, ma'am, that you're a highly

9     educated attorney; correct?

10    **A.**   I don't --

11    **Q.**   And you have experience, you've been a trial

12    lawyer?

13    **A.**   Somewhat.  Not a jury trial, but. . .

14    **Q.**   Was there some personal drive that led you to

15    working in the City of Providence's EEO office?

16    **A.**   No.

17    **Q.**   Do you believe that it's important to eradicate

18    things like harassment and discrimination and

19    retaliation for making complaints of harassment or

20    discrimination?

21    **A.**   I think it's important to address EEO matters.

22    **Q.**   Do you feel like you have the resources to do that

23    to the best of your -- at this time, 2008, 2009 and

24    2010, that you were provided with the resources to do

25    that to the best of your ability?

1      MR. McHUGH:  Objection.  Relevance.

2      THE COURT:  Overruled.

3  **A.**   No.

4      MR. MARTIN:  Can I show the witness Exhibit 17.

5  Actually, you know what, I'm going to go up.

6  **Q.**   I'm going to bring up to you what's been marked as

7  Exhibit 17 because it's three pages.

8  **A.**   Thank you.  Yes.

9  **Q.**   Ms. Oredugba, Exhibit Number 17 is an e-mail from

10  you to you?

11  **A.**   I believe so.  I didn't look at that part.

12  **Q.**   Sorry.

13  **A.**   Yes.

14  **Q.**   Dated November 24th, 2010?

15  **A.**   Yes.

16  **Q.**   And this is in the same or substantially the same

17  condition as it was when you wrote it?

18  **A.**   It appears so.

19      MR. MARTIN:  Your Honor, we offer this as

20  Exhibit 17.

21      THE COURT:  Any objection?

22      MR. McHUGH:  No objection, your Honor.

23      THE COURT:  Exhibit 17 is admitted as a full

24  exhibit and can be shown to the jury.

25      (Plaintiff's Exhibit 17 admitted in full.)

1   **Q.**   There's a lot to these three pages, so I'm going

2   to jump around a little bit.  Do you recall why you

3   wrote notes to yourself on November 24th of 2010?

4   **A.**   Why on that specific date?

5   **Q.**   Or just why in general in that timeframe, November

6   of 2010, why you were writing another note to yourself.

7   **A.**   Not with respect to that date or timeframe, but I

8   recall that I had a number of matters and some, like

9   this, that I felt needed -- that I needed to review.

10  **Q.**   Do you remember why you felt at this point in time

11  that you needed to review the Franchina matter?

12  **A.**   No.

13  **Q.**   On the second page of the exhibit you wrote,

14  "Chief Farrell said that following our meeting last

15  year, he met with all the chiefs in Providence Fire

16  Department, told them it's their responsibility to

17  assist her."  That's regarding Lori?

18  **A.**   Presumably, but I couldn't say.

19  **Q.**   "If they find out about these things, tell the

20  lieutenants and captains they have to do their job"?

21  **A.**   That's what it says.

22  **Q.**   And then down below, "He says he believes that if

23  the officers know that they will be called in and given

24  a verbal warning, then they will take corrective

25  action."  Correct?

1    **A.**    That's what it says.

2    **Q.**    And those are in regards to Lori's complaints

3    about insubordination and other things that she

4    complained about to all of you; correct?

5    **A.**    Presumably.  I don't know that -- I don't know

6    whether the directive was just as it applies to Lori or

7    that it was in general across the board.

8    **Q.**    And below you made some notations regarding

9    information you obtained from Chief Crawford; correct?

10   **A.**    Where it says "Chief Crawford reading notes"?

11   **Q.**    Yes.

12   **A.**    Yes.

13   **Q.**    And that says that the number of guys who will not

14   help her is increasing?

15   **A.**    It says, "The number of guys who will not help her

16   is increasing."  That's what it says.

17   **Q.**    And that was as of 10/5, 2010, October 5th, 2010?

18   **A.**    Yes, that's what it says.

19   **Q.**    He said that she has Form 17s dating back to 2006

20   that have never been addressed?

21   **A.**    Whether or not he said it, I have, "Chief Crawford

22   reading notes from 10/15/10," and then three bullets,

23   the second one being, "She has Form 17s dating back to

24   2006 that have never been addressed."  I don't know

25   whether he is saying that or he is saying what she has

1    said.

2    **Q.**   Well, I understand that you were busy at the time,

3    but you certainly took care to make sure that your

4    notes were accurate; correct?

5    **A.**   I certainly wrote what I believed to be hearing at

6    the time.

7    **Q.**   And because you were busy and because you have

8    such a large caseload, you know that you can't humanly

9    be expected to remember every detail of every case;

10   right?

11          MR. McHUGH:  Objection as to form.

12   Mischaracterizes the testimony.

13          THE COURT:  Overruled.

14   **A.**   I can't speak to what's a human expectation, but I

15   know that I personally won't remember everything.

16   **Q.**   And the reason that you make these reports is so

17   that later on down the road you can refer to them and

18   remind yourself of things that you may have forgotten?

19   **A.**   Well, it's not a report.  These are notes; and

20   they're notes so that, in an ideal circumstance, I can

21   prepare a report.

22   **Q.**   And certainly if you're creating notes so that you

23   could create a report, your notes are going to be as

24   accurate as you can possibly make them?

25          MR. McHUGH:  Objection.  She just said she

1    doesn't make reports.

2              THE COURT:  Overruled.

3    A.    No.

4    Q.    Is there anything about this note that leads you

5    to believe that your notes are inaccurate?

6    A.    When you say my notes, the entire document or --

7    Q.    This one that we're looking at right here where it

8    says, "She has Form 17s dating back to 2006 that have

9    never been addressed."

10   A.    Oh.  I don't take issue with my having written

11   that.

12   Q.    Okay.

13   A.    It's just that it doesn't -- again, as I stated,

14   it doesn't say whether -- Chief Crawford may have been

15   relaying to me what she relayed to him.

16   Q.    I see.

17   A.    Just as it says next to that, "And if she has not

18   done so," I'm not sure what that means.

19   Q.    Right.  So -- but you agree that it doesn't say

20   Franchina told Crawford, it says that Crawford told

21   you?

22   A.    It also doesn't say Crawford told me.  It just --

23   above it, it says Chief Crawford reading notes from

24   10/15 -- 10/5/10, and then it has three bullet points.

25   Q.    Then two lines down it says, "Crawford believes

1    that 90 percent of what she says is true."

2    A.    It does say that.

3    Q.    So that part, is there any confusion about what

4    that part means sitting here reading it today?

5    A.    I can only go by what it says, "Crawford believes

6    90 percent."

7    Q.    So even if she did relay to him two sentences up,

8    even if she was the source of information that she had

9    Form 17s dating back to 2006 that have never been

10   addressed, Crawford then followed up by telling you,

11   Hey, I think 90 percent of what she says is true?

12   A.    That is what my notes say, and I do not dispute

13   that I wrote that Crawford believes 90 percent of what

14   she says is true.  I cannot guarantee that all of this

15   was said in that sequence within that matter of time.

16   Q.    And then below that -- by the way, right here,

17   after that line, has something been whited out?

18   A.    Not to my knowledge.

19   Q.    Okay.  There's just spaces?

20   A.    I believe so.

21   Q.    Nothing was deleted or anything?

22   A.    No, not to my knowledge.

23   Q.    Okay.  And then it says, "Believe there appears to

24   be ample merit to her claim of multiple and repeated

25   violations of PFD rules and regulations."  Was that

1   your opinion or was that what Chief Crawford relayed to

2   you?

3   **A.**   It wasn't my opinion.  I don't know whether that's

4   what Chief Crawford relayed to me.

5   **Q.**   Well, it's under your Chief Crawford notes;

6   correct?

7   **A.**   I mean, it is what comes next; but the three dots

8   that are above the sentence, usually when I do that, it

9   means I'm -- it's something separate.

10  **Q.**   Then it goes on to say, "Even seems plausible that

11  the pervasiveness of this behavior creates a hostile

12  work environment for her, also seems clear that PFD has

13  failed to stop the behavior"; correct?

14  **A.**   It does say that.

15  **Q.**   Was that your opinion or was that something that

16  was relayed to you from Chief Crawford?

17  **A.**   It wasn't my opinion.  I don't recall Chief

18  Crawford saying anything that emphatically or saying

19  that that emphatically.

20  **Q.**   So it's here in this note, but we, or you, rather,

21  don't know where it came from?

22  **A.**   I don't recall at the moment, but it is here in

23  the notes.

24  **Q.**   And on the next page at the top it says, "You

25  punish one officer, which makes that officer's

1    subordinates angry, and they want to retaliate against

2    Franchina," et cetera, et cetera and so forth.  You

3    wrote that?

4    **A.**   "Et cetera and so forth."  It's in the notes that

5    I wrote, yes.

6    **Q.**   Was that your opinion or was that something that

7    you learned from Chief Crawford?

8    **A.**   I don't -- it was not my opinion.  I don't recall

9    Chief Crawford saying that.

10   **Q.**   Okay.  As the EEO officer, are you aware in 2007

11   of what level of proof was required to show harassment,

12   discrimination or retaliation before you were required

13   to make a recommendation, a corrective recommendation?

14           MR. McHUGH:  Objection as to form, "required."

15           THE COURT:  Overruled.

16   **A.**   We don't actually have -- "we" being the city or

17   city HR, we don't have regulations as stringent as

18   that.

19   **Q.**   What do you mean when you say you don't have

20   regulations as stringent as that?

21   **A.**   Well, you said what level of proof or evidence

22   would be required before I have to make a

23   recommendation.  So the answer I guess would be no.

24   **Q.**   No.  No, you don't know what it is or no, it

25   doesn't exist?

1    **A.**   It could be either, both.

2    **Q.**   What level of proof did you require in 2007, 2008

3    and 2009 before you would recommend that corrective

4    action be taken?

5    **A.**   I don't recall.  Perhaps a preponderance of

6    evidence.  Perhaps clear and convincing.  I actually

7    don't recall, honestly.

8    **Q.**   But you do recall that there's no required action

9    after a certain level of proof; is that right?

10   **A.**   I mean, there's certainly a required level of

11   action if you're aware that there's an imminent threat

12   of bodily harm either to the complainant or the

13   complainant has said that they are about to do imminent

14   bodily harm to someone else.

15   **Q.**   This is page 11, excuse me, starting with line 4.

16   I asked you, "But what is the standard that you

17   typically" --

18           MR. McHUGH:  I'm going to object.  The question

19   should be read first instead of reading in the middle

20   of the -- the middle of it.  Start on page 10, line 25.

21           MR. MARTIN:  Sure.  Okay.

22   **Q.**   So I said, "I think that's a fair point."

23           THE COURT:  Pull it up, Mr. Martin.

24           MR. MARTIN:  Oh, sorry.

25   **Q.**   "I think that's a fair point.  I don't want to put

1    words into your mouth.  If I'm doing that at any point,

2    just let me know, just like you did.  So I guess we're

3    not talking about how you've been trained, but what is

4    the standard that you typically apply when you

5    determine whether or not you think that there's enough

6    evidence to warrant further action at the conclusion of

7    your investigation?  Is unequivocal the standard?"

8         And you said, "No.  I'd say admittedly I

9    don't -- I don't consciously think of the standard; but

10   reflecting on it now, I would say probably more clear

11   and convincing."  Did I read that correctly?

12   A.   Yes.

13   Q.   And then I asked you, "Have you found there to be

14   clear and convincing evidence that Ms. Franchina had

15   been harassed or discriminated against?"  And you

16   answered, "No."  Correct?

17   A.   Correct.

18   Q.   And then I asked, "Did you find there to be a

19   preponderance of the evidence that she had been

20   harassed or discriminated against?"  And you said, "In

21   a couple of situations."  Correct?

22   A.   That's what I said.

23   Q.   Is preponderance of the evidence and reasonable

24   belief, are those similar standards?

25   A.   It could be argued they are.

1  **Q.**   But I don't want to argue with you.  I just want

2  to know what you think.

3  **A.**   I mean, I see preponderance of the evidence maybe

4  51 percent.  Reasonable belief may not, may not

5  quite -- they're similar.  I wouldn't see them as being

6  exactly the same.

7  **Q.**   Reasonable belief is lower than a preponderance of

8  the evidence?

9  **A.**   In my perception.

10  **Q.**   And clear and convincing is higher?

11  **A.**   Yes.

12      MR. MARTIN:  One second.

13      (Pause.)

14      MR. MARTIN:  I'm going to refer back to what's

15  already in evidence as Exhibit Number 3.  Is Exhibit

16  Number 3 in evidence?

17      THE CLERK:  Three is full.

18      MR. MARTIN:  Thank you.

19  **Q.**   Again, this is the EEO Complaint Information Form

20  that was in effect in May of 2007; correct?

21  **A.**   Yes.

22  **Q.**   And here in this fourth paragraph it says, "Once a

23  complaint is filed, the matter is investigated.  Upon

24  determination of reasonable cause to believe that the

25  unlawful discrimination or harassment occurred, the

1    department administrator or supervisor concerned will

2    be notified of the allegations.

3         "If it is the department administrator or

4    supervisor who is alleged to have committed a

5    prohibited act, the EEO officer will confer with and

6    refer the matter to the Director of Human Resources for

7    appropriate action.

8         "Upon completion of the investigation, the EEO

9    officer will make a determination of findings and

10   provide recommendations for corrective action."

11   Correct?

12   **A.**   That's what it says.

13        MR. MARTIN:  Thank you.  I have nothing further.

14        THE COURT:  Thanks, Mr. Martin.

15        Mr. McHugh?

16        MR. McHUGH:  I'm going to reserve on this

17   witness, your Honor.

18        THE COURT:  Great.  You can step down, ma'am.

19   Thank you.

20        THE WITNESS:  Thank you.

21        MR. MARTIN:  The Plaintiff calls Danielle Masse.

22        THE COURT:  Usually during breaks I find time --

23   I don't think I told you this during selection.  Jurors

24   always ask about what the oar is for.  Have any of you

25   wondered why we have an oar?

1          I like to joke that it's to whack lawyers if

2     they go on too long, but I have not done that yet.  We

3     have admiralty jurisdiction in the federal courts,

4     which means anything that occurs on the high seas or on

5     any navigable waters, any disputes, whether it's seamen

6     not being paid or fishermen not being paid or boats

7     that haven't been repaired properly or accidents at sea

8     or anything that happens on navigable waters, you can

9     bring that claim to Federal Court.

10          And years ago when courts sat, you know,

11     depending on the topic, they would take the oar and

12     they'd put it out front of the courthouse; and it would

13     say to all the seamen or the captains or boat owners or

14     injured people that they could bring their dispute in

15     admiralty into court.

16          So it's been a tradition of Federal Court -- oh,

17     you can come up.  It's a tradition of Federal Court

18     that we keep that in here, and it reminds us that we

19     have admiralty jurisdiction.  And if you were hearing

20     an admiralty case, the tradition is you would put it on

21     the bench.

22          At some point during this period you were going

23     to wonder what that is.  Wait until I explain the Great

24     Seal to you during another break and who's staring at

25     us.  We're going to save that one.

1       Mr. Martin.  Oh, would you rise and let

2    Ms. McGuire swear you in.

3           **DANIELLE MASSE, PLAINTIFF'S WITNESS, SWORN**

4           THE CLERK:  Please state your name and spell

5    your last name for the record.

6           THE WITNESS:  Danielle Masse, M-A-S-S-E.

7           THE CLERK:  Thank you.  You may be seated.

8           THE COURT:  Is it Officer Masse or --

9           THE WITNESS:  Lieutenant.

10          THE COURT:  Lieutenant Masse, if you'd just get

11   comfortable in the chair, why don't you try that now,

12   and then just pull the microphone in.  You have to

13   speak right into it.  The whole base moves.

14          It's particularly important because it sounds

15   like your voice may be a little low for you to speak

16   right into it.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Great.  Thank you, Lieutenant.

19                    **DIRECT EXAMINATION**

20   **BY MR. MARTIN**:

21   **Q.**  Good afternoon, Lieutenant.  Could you tell us

22   where you're from.

23   **A.**  From Providence, Rhode Island.

24   **Q.**  Where did you go to school?

25   **A.**  Well, I'm originally from Dighton, Massachusetts,

1    but I went to school at Dighton-Rehobeth High School.

2    Q.   And how far did you go in school?

3    A.   I'm currently finishing up my bachelor's degree in

4    public administration at Roger Williams University.

5    Q.   What did you do after you left high school?

6    A.   When I was a senior, actually when I was a junior

7    in high school, I joined the Army.  I did my basic

8    training finishing year of high school and then

9    continued with the Army and with my college education.

10   Q.   Are you still enlisted?

11   A.   I am.

12   Q.   How long have you been enlisted?

13   A.   A total of 11 years.  I did eight years, had about

14   an eight-year break in service, and I'm currently back

15   in in the Rhode Island National Guard.

16   Q.   So eight years' break in service, then an

17   additional three years?

18   A.   Yes.

19   Q.   Any special certifications or trainings that you

20   obtained in the military?

21   A.   Yes.  I joined as a medic for the Mass. National

22   Guard, and then I transferred to the Reserves as a

23   drill sergeant.

24   Q.   Are you a little bit nervous about testifying here

25   today?

1    A.    Yes, sir.

2    Q.    Why is that?

3    A.    I don't like public speaking.

4    Q.    Well, you're doing fine.

5    A.    Thank you.

6    Q.    When did you start to work for the Providence Fire

7    Department?

8    A.    In 2001.

9    Q.    And can you tell us how you came to be a part of

10   the Providence Fire Department.

11   A.    I started taking karate when I was 12, and a

12   number of my instructors at the karate school were on

13   the Providence Fire Department, and they spoke about it

14   being a secure job and challenging, and it sounded like

15   something I'd be interested in.

16   Q.    When did you go to the academy?

17   A.    March of 2001.

18   Q.    And obviously you finished?

19   A.    Yes.

20   Q.    So tell us, what was your original job once you

21   came out of the academy?

22   A.    The first few months as a firefighter.  Every

23   couple of weeks they had us going to different ladder

24   and engine companies to learn the job.

25   Q.    And then what was your next job or your next rank?

1    **A.**   Well, I was assigned a few months later as a

2    firefighter.

3    **Q.**   And did you eventually transition to Emergency

4    Medical Services?

5    **A.**   I did.

6    **Q.**   When was that?

7    **A.**   In 2006.

8    **Q.**   Any particular trainings or experience that you

9    obtained between 2001 and 2006 that led to the

10   transition?

11   **A.**   I continuously had EMT training through the

12   military, and the fire department sent me to

13   EMT-Cardiac school.

14   **Q.**   When did you become a lieutenant?

15   **A.**   Became a lieutenant in 2007.

16   **Q.**   Can you describe for us what it's like for you as

17   a female working on the Providence Fire Department.

18   **A.**   It's been much more difficult than I had

19   envisioned it to be.

20   **Q.**   Why is that?

21   **A.**   Coming from the military, I figured that having

22   a -- being in good physical condition, being, you know,

23   motivated and knowing how to do my job would be enough

24   to be considered a competent member of the department;

25   and that has not been the case.

1   **Q.**   Are there specific areas of your work performance

2   or your work environment that you found to be

3   challenging?

4   **A.**   There's been a lot of challenges, yes.

5   Particularly, being deemed competent to do my job

6   has -- I don't know.   I constantly have had my

7   competency put into question in ways that it shouldn't

8   be.

9   **Q.**   Does that include during your experience as a

10  lieutenant?

11  **A.**   Yes.

12  **Q.**   Does that include from subordinate members of the

13  department?

14  **A.**   Yes.

15       MR. McHUGH:   I'm going to object, leading.

16       THE COURT:   Sustained.   Be careful, Mr. Martin.

17  That's all.

18  **Q.**   Could you tell us -- describe for us what made you

19  feel as if your competency was being questioned.

20  **A.**   Multiple times throughout my career, like when I

21  was going to become a lieutenant, the officer who I

22  worked for when I was a tech stated that he didn't feel

23  I was competent to do the job; and they decided not to

24  have me act as an officer, and there was no basis or

25  foundation; and my education in EMS and my experience

1  in EMS were greater than that person's.

2  **Q.**  When you say greater than that person's, you mean

3  the person who did get the promotion?

4  **A.**  No.  The person who told the chief and the chief

5  that made that decision, my knowledge of protocol and

6  just the daily workings of how to do my job as an EMT

7  were greater than that officer, yet they decided not to

8  put me in charge; and I had to fight to be put in

9  charge, and there was no reason for it other than they

10  just didn't want to put me in the position.

11  **Q.**  Sorry to be personal, but could you please tell us

12  your sexual orientation.

13  **A.**  I'm a lesbian.

14  **Q.**  And how do you feel that women in general are

15  treated on the department?

16  **A.**  Women are treated as less competent.

17  **Q.**  Can you give me examples besides yourself in which

18  you've observed that type of treatment.

19  **A.**  Women who have been in charge are not given the --

20  just the respect by subordinates.  They're not seen as

21  actually being of -- like, of being in charge.  They're

22  spoken to as if they have no authority by subordinates.

23        When issues are brought to the chain of command,

24  the chain of command doesn't take them seriously,

25  doesn't deal with them appropriately and then in effect

1    turns them around and treats them as if the problem is

2    because of the women on the job and usually find some

3    way to say that the women caused the problem, whether

4    it was, you know, describing their tone of voice as

5    squealing when a man in that same position would have

6    been considered authoritative and competent and

7    professional.

8    Q.   Does that treatment that you just described, does

9    that include women who are available to date their male

10   co-workers?

11        MR. McHUGH:  Objection, leading.

12        THE COURT:  Overruled.

13   A.   There are a number of women on the job that have

14   been in relationships with men, and they seem to get

15   treated differently.  They have protection of some

16   sort.  Other members don't seem to treat them as

17   negatively when they're in a relationship.

18   Q.   Have you ever had an intimate relationship with a

19   male superior while you were employed by the Providence

20   Fire Department?

21   A.   I have.

22   Q.   Who was that?

23   A.   Lieutenant Michael Segee.

24   Q.   What was your rank when you dated Lieutenant

25   Michael Segee?

1   **A.**   Within the first few months finishing the fire

2   academy while they were moving us from company to

3   company, I had a relationship with Lieutenant Michael

4   Segee.  I was assigned to Engine 3 for a few weeks.

5   **Q.**   A moment ago you just described in general that

6   people who dated men on the job seemed to have

7   protection.  When you were dating a man on the job, did

8   you have any type of experiences consistent with that

9   observation?

10          MR. McHUGH:  Objection, leading.

11          THE COURT:  Overruled.

12   **A.**   I did.

13   **Q.**   Could you tell us about that.

14   **A.**   Yes.  When I first got on the job, it was

15   stressful.  It had already proved through the academy

16   and the first few weeks of the job to be not as simple

17   to fit in and, you know, be treated according to how we

18   performed as firefighters.

19          And so Lieutenant Segee was really nice and

20   supportive, and I found him easy to get along with.

21   One day he sent me upstairs to the third floor of the

22   headquarters to have my name put on a detail list so

23   that I could have -- take details to get extra pay.

24          At that time we, as a practice, would leave our

25   portable radios on the coats -- in the coats on the

1    truck.  And so when he sent me up to the third floor, I

2    didn't know the voc alarms, they're the machine that,

3    like, the tone goes off and it tells you where the run

4    is, up on the third floor the voc alarms either didn't

5    work or were turned off, and I didn't know that.  And

6    so while I was up there, I missed a run.

7    Q.    Can you describe what that means to miss a run.

8    A.    It's a violation of the rules and regulations, but

9    culturally as -- more so as a new person, to miss a

10   run, it's -- you're treated based upon how well you do

11   certain things, like, you know, making sure that you,

12   you know, do the housework and going on runs; and those

13   small things show, I guess, your effort.

14         And to miss a run is like one of the worst

15   things as a new person that you could do because it

16   just -- it shows possible lack of motivation, and it's

17   a really bad thing.

18   Q.    And what type of consequences did you experience

19   for missing the run?

20   A.    I didn't.

21   Q.    Do you know why?

22   A.    Yes.  The lieutenant, Mike Segee, told the members

23   on the truck not to say anything.  He knew that he sent

24   me upstairs and that I probably didn't know about the

25   voc alarm, and so he told them not to say anything and

1    to forget that it happened.

2        I don't necessarily think that would have been

3    the case if he and I weren't in that relationship.

4    **Q.**   Tell us about when you first met Lori Franchina,

5    or actually do you know Lori Franchina?

6    **A.**   Yes.

7    **Q.**   Can you tell us about when you first met her.

8    **A.**   I met Lori in 2002 at a club one night.

9    **Q.**   Were you working for the fire department at that

10   time?

11   **A.**   Yes.  I was employed for about a year.

12   **Q.**   Was she working for the fire department at that

13   time?

14   **A.**   She was in the fire academy.

15   **Q.**   Can you tell us about your relationship after you

16   met.

17   **A.**   We dated for 10 months.

18   **Q.**   When it ended after 10 months, was it amicable?

19   **A.**   It was.

20   **Q.**   So have you met -- did you say it was 2002?

21   **A.**   Yes, in 2002.  Probably May of 2002 until I think

22   March of 2003.

23   **Q.**   What was your relationship like after March of

24   2003?

25   **A.**   We didn't talk very much for a while after that.

1    I needed some time away.  But it wasn't contentious.

2    **Q.**   What about in the end of 2006 and the beginning of

3    2007, what was your relationship with her like then?

4    **A.**   We were friends.

5    **Q.**   And what about after the beginning of 2007, what

6    was your relationship like then?

7    **A.**   We stopped talking as much, and I separated from

8    contact with her for a while.

9    **Q.**   Why did you separate from contact with her?

10   **A.**   Because it was proving difficult to be friends

11   with her and feel safe at work.  I was concerned that

12   if I maintained contact and people at work knew,

13   because of the way that they spoke about her at work,

14   that I might be in danger and my work environment would

15   become really difficult.

16   **Q.**   How did you hear people speak about her that made

17   you feel that way?

18   **A.**   She was a pretty general topic of conversation in

19   the stations.  People spoke really poorly of her.

20   **Q.**   Did she have any nicknames?

21   **A.**   She had a lot of nicknames and derogatory comments

22   to describe her.

23   **Q.**   Can you give us some examples of the nicknames and

24   derogatory comments you heard them use to describe her.

25   **A.**   Called her Frangina, bitch, quite a few other

1    really awful things.

2    **Q.**   Can you give us examples of any of the other awful

3    things?  Just so that you know, you have permission to

4    use profanity in a federal courthouse for the purpose

5    of giving testimony.

6    **A.**   They used the C word.  They called her a cunt and

7    words like that.

8    **Q.**   How often would you hear people refer to her as a

9    bitch or Frangina or the C word?

10   **A.**   Quite often, and those are the words that they

11   used.  They never used her real name.

12   **Q.**   Was it always that way or was there a certain

13   point in time when you noticed that started happening?

14   **A.**   For the first few years that she was on the job,

15   it wasn't bad like that; but after she became an acting

16   lieutenant, I started to notice that people were having

17   negative things to say and calling her those things.

18   **Q.**   Sorry.  Were you done?  Did you ever hear anything

19   about her and Andre Ferro?

20   **A.**   Yes.

21   **Q.**   What did you hear?

22   **A.**   I heard that he did some pretty crazy things and

23   that he took his pants off in front of the emergency

24   room and had some pretty awful things to say about her.

25   **Q.**   Did you hear anything about the fact that he was

1    fired for doing that?  Did anyone ever talk about that?

2    A.    Yes.

3    Q.    What did they say about that?

4    A.    They laughed about it.  They thought it was funny.

5    Q.    They thought it was funny that he was fired?

6    A.    The whole scenario.  They thought it was funny

7    what he had done and how he had treated her and that,

8    you know, they said he would probably end up getting

9    his job back.

10   Q.    I want to talk to you about your work experience

11   since you've become part of this case.  Do you know --

12         MR. McHUGH:  Well, objection, leading.  And

13   "part of this case," what does that mean?

14         THE COURT:  I think we'll soon find out.  Go

15   ahead, Mr. Martin.

16   Q.    Do you know when you were disclosed publicly as a

17   witness on behalf of Lori Franchina in this case?

18   A.    Yes.

19   Q.    When was that?

20   A.    When I found out, it was in December, around

21   Christmas of 2014.

22   Q.    Anything interesting happen at work after that?

23   A.    Yes.  At the end of December, on the 30th, I was

24   brought into the chief's office and accusations were

25   made against me by the chief.  He filed charges against

1  me.

2  **Q.**    Now, in your eight or so years with the military

3  and your -- in 2015, that would be 14 years on the

4  department?

5  **A.**    Yes.

6  **Q.**    So in your 20 or so years as a soldier and as an

7  EMT and firefighter, how many times have you ever been

8  informed that you were being brought up on disciplinary

9  charges?

10  **A.**    Never.

11  **Q.**    Do you recall the approximate date of when you

12  attended a deposition in this case?

13  **A.**    It was first or second week of September 2015.

14  **Q.**    Anything interesting happen in work around the

15  first or second week of September of 2015?

16  **A.**    I was notified that they were scheduling a hearing

17  to file charges against me formally.

18  **Q.**    What were the charges about?

19  **A.**    About a run that I went on where I transported a

20  patient to the emergency room who had been high on

21  heroin and crashed his car where a state trooper tried

22  to bully me into signing a refusal for that patient,

23  and I didn't do that because it's against the rules and

24  regulations to sign refusals for patients who are

25  altered, and I transported that patient to the

1  hospital.

2  **Q.**   I just want to break that up.  When you say it's

3  against policies and procedures to accept a refusal

4  from a person who's altered, first of all, what do you

5  mean by the phrase "altered"?

6  **A.**   A person who is under the influence of drugs or

7  alcohol or intoxicating substances or who has a serious

8  head injury cannot sign a refusal.  They need to be

9  treated as if they're a child, and they're assumed that

10  they can't make appropriate medical decisions.

11       And so until they've been cleared by the

12  hospital, we as pre-hospital providers cannot sign a

13  refusal.  They have to be cleared by a doctor before

14  they can be allowed to go.

15  **Q.**   So you mentioned a couple of things, head injuries

16  and drugs.  What evidence had you seen that there was a

17  potential head injury to this person?

18  **A.**   The person had drove their car down the highway,

19  crashed into the barrier on the exit.  There was about

20  a foot of intrusion into the engine compartment of the

21  car, which in EMS terms is considered a significant

22  amount.

23       The windshield was cracked above where the

24  patient was sitting in a circle where it appeared as

25  though the head had hit the windshield.  The airbags

1    had gone off.  So at highway speeds, hitting the car,

2    that showed there was a problem.

3          The patient also had pinpoint pupils, he wasn't

4    speaking appropriately, he had vomited and just wasn't

5    acting normal.

6    **Q.**   So that's for the head injury.  What was the

7    evidence that made you suspect there may have been use

8    of drugs?

9    **A.**   I'm sorry, I combined the two, but the pinpoint

10    pupils are an indicator of drugs; and then symptoms of

11    a head injury and use of narcotics or alcohol sometimes

12    are similar where they might not be speaking

13    appropriately or behaving appropriately.  Those are

14    symptoms of both of those things.

15    **Q.**   So who was it that complained that you transported

16    a patient exhibiting those symptoms?

17    **A.**   Apparently the patient made a written statement,

18    and the trooper stated that I squealed at him.  And so

19    I guess the state troopers forwarded information to the

20    department about that complaint.

21    **Q.**   So we've discussed when you were disclosed as a

22    witness.

23    **A.**   Uh-huh.

24    **Q.**   And when you were deposed.  When did you receive

25    your subpoena to testify here today?

1    **A.**   Last week.

2    **Q.**   Anything interesting happen at work last week?

3    **A.**   I was suspended for two-and-a-half weeks without

4    pay, 10 days, 10 working days.  I was removed from the

5    rescue captains' list.  I've been acting as a rescue

6    captain for the last year and a half.

7         I was given a letter of reprimand in my

8    permanent file; and then on that same day, a few hours

9    later, I received the subpoena to testify here.

10   **Q.**   Are you planning on fighting back about those?

11   **A.**   Absolutely.

12   **Q.**   And who have you chosen as an attorney to help you

13   do that?

14   **A.**   Excuse me?

15   **Q.**   Who have you chosen as an attorney to help you do

16   that?

17   **A.**   You.

18   **Q.**   When you -- let me think of how I want to say

19   this.  When you dated the lieutenant, you said you felt

20   that you were given certain protections.

21   **A.**   Uh-huh.

22   **Q.**   What was it like after you were no longer dating

23   the lieutenant?

24   **A.**   A few -- I think, like I said, for the first few

25   months on the job, we were assigned to different

1  companies for a few weeks at a time to get some

2  experience at different companies; and like I said, a

3  few months later, I think around November of that first

4  year, they assigned me to Engine 2.

5       When the paper came out for me to be assigned

6  there, I was warned by a female firefighter who had

7  been one of the first females hired to watch my back.

8       MR. McHUGH:  I'm going to object, hearsay.

9       THE COURT:  Overruled.

10  Q.  What did the female firefighter warn you?

11  A.  She told me to watch my back with the individuals

12  on that group at that station because they -- she

13  didn't really give much more detail than that, but

14  basically watch out for those individuals.

15  Q.  Aren't you afraid of what's going to happen from

16  you coming here today?

17       MR. McHUGH:  Objection, leading.

18       THE COURT:  Sustained.

19  Q.  Just to be clear, what do you think of the guys

20  you work with currently on your current crew?

21  A.  At Atwells Avenue, I've had a great experience,

22  and I'm supported by the members that I work with.

23       MR. MARTIN:  Thank you.  Nothing further.

24       THE COURT:  Thanks.

25       Mr. McHugh, are you going to be short or should

1    we take the afternoon break?

2              MR. McHUGH:  I think we should probably take the

3    break.

4              THE COURT:  Sure.  Ladies and gentlemen, we'll

5    take our 3:00 break.  We'll see you back in about 15 or

6    20 minutes.

7              (Recess.)

8              THE COURT:  Lieutenant, you understand that

9    you're still under oath?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Okay.  Great.  Mr. McHugh.

12             MR. McHUGH:  Thank you, your Honor.

13                        **CROSS-EXAMINATION**

14   **BY MR. McHUGH**:

15   **Q.**   Lieutenant, I want to ask you some questions about

16   the incident you brought up that you're currently under

17   suspension for.  Okay?

18   **A.**   Okay.

19   **Q.**   And that incident occurred on Sunday,

20   December 14th, 2014; correct?

21   **A.**   Yes.

22   **Q.**   And that was on Route 95?

23   **A.**   Yes.

24   **Q.**   And when you arrived on the scene, Lieutenant

25   Sullivan had already begun an assessment of the

1      patient?

2      A.    Yes.

3      Q.    And the State Police were already there at the

4      time; correct?

5      A.    Yes.

6      Q.    And then when you arrived, you took over the

7      assessment from Lieutenant Sullivan as the acting

8      captain of the rescue; correct?

9      A.    Yes.

10     Q.    And you asked the patient several times if he

11     wanted to go to the hospital; correct?

12     A.    I asked the patient, yes, if he wanted to go to

13     the hospital several times.

14     Q.    And he said no; right?

15     A.    He was under the influence, and what he said

16     didn't matter.  I was using the refusal protocol to

17     determine whether or not he actually could refuse, and

18     I used that and determined that he could not refuse by

19     the way he was answering.

20           So yes, he did say "no" multiple times, but he

21     never had the option of refusing because he was altered

22     and did not meet the qualifications to sign a refusal.

23     Q.    He was under the influence, and that's why the

24     State Police were doing a criminal investigation;

25     correct?

1    A.    At that time the State Police had said nothing

2    about the incident or whether he was under

3    investigation.  All I knew at that time, all I was

4    trying to determine if he could sign a refusal was that

5    he crashed his car into the barrier, which I had seen

6    when I walked by it.  Otherwise, I had no other

7    information to go on.

8    Q.    Okay.  But when you arrived, the State Police were

9    there; correct?

10   A.    They're always on scene on highway accidents when

11   I arrive.

12   Q.    Okay.  And they were there on this day,

13   December 14th; correct?

14   A.    Yes.

15   Q.    And you subsequently learned that the State Police

16   had put out this individual's license plate due to a

17   report of erratic driving; correct?

18   A.    About, I would say, a year later, maybe nine

19   months later.

20   Q.    That's when you learned it?

21   A.    Yes.

22   Q.    And you told one of the state troopers to stand

23   back, didn't you?

24   A.    I asked him if he could back up because he was so

25   close that he was spitting in my face and he was

1    interfering with me assessing the patient.  So yes, I

2    asked him respectfully if he could back up.

3    Q.    And he didn't; right?

4    A.    He did not, no.

5    Q.    Okay.  Because he told you you had no jurisdiction

6    over the State Police; correct?

7    A.    No, he didn't say that to me.

8    Q.    He was -- they were in the process of searching

9    the car, also; correct?

10   A.    I don't know what they were doing, no.  There was

11   a few troopers standing next to me.

12   Q.    You didn't see the trooper search the car?

13   A.    The car was behind me.  So no, I did not see what

14   they were doing.

15   Q.    Okay.  Did you see the trooper take a little

16   plastic bag out of the car?

17   A.    I did not.

18   Q.    And you subsequently transported the individual to

19   the hospital; correct?

20   A.    I did.

21   Q.    And what happened after you transported him to the

22   hospital?

23   A.    I don't understand your question.

24   Q.    Did you just transport him to the hospital and

25   then leave?

1    **A.**   No.  I called my chief to the hospital.

2    **Q.**   Okay.  Why did you call your chief to the

3    hospital?

4    **A.**   Because the trooper had been extremely rude and

5    interfered with my attempt to assess the patient and

6    yelled at me and verbally brandished me on scene while

7    I was trying to assess whether or not the patient could

8    sign a refusal.

9    **Q.**   So you thought that the State Police actually

10   interfered with your assessment; correct?

11   **A.**   Absolutely.

12   **Q.**   And subsequently the State Police complained to

13   the City of Providence about you; right?

14   **A.**   Yes.

15   **Q.**   And they, in fact, complained that you were

16   interfering with their criminal investigation; correct?

17   **A.**   That was their complaint.

18   **Q.**   And the charges that were preferred against you --

19   and December 14th, 2014, that was long before you

20   received a subpoena for this trial; correct?

21   **A.**   The charges were not preferred.  The charges were

22   preferred on January 23rd of 2015.

23   **Q.**   Right.  We'll get to that, Lieutenant.  But the

24   incident itself was December 14th, 2014; correct?

25   **A.**   Yes.

1    Q.    And then subsequent to that, the State Police make

2    a complaint against you to Providence; correct?

3    A.    The State Police showed up at my station the next

4    day trying to discuss what they thought that they --

5    Q.    Well, the State Police, as a matter of fact, made

6    a complaint to the City of Providence about you;

7    correct?

8    A.    Yes.

9    Q.    And based upon that complaint, the acting chief

10   preferred charges against you; correct?

11   A.    Based solely on that complaint, yes.

12   Q.    Right.  Based on the complaint of the State

13   Police; right?

14   A.    Yes.

15   Q.    And there was more than one trooper involved;

16   right?

17   A.    Yes.

18   Q.    And those charges were, you're correct,

19   January 23rd, 2015; correct?

20   A.    Yes.

21   Q.    And that was also long before there were any

22   subpoenas issued for this trial; right?

23   A.    Yes.

24   Q.    Now, then there -- pursuant to the rules and

25   regulations, there was a trial that was set to be held

1   in front of the acting chief; correct?

2   A.   Yes.

3   Q.   And you had a lawyer?  You were allowed to have

4   your own lawyer; right?

5   A.   Yes.

6   Q.   And you did have your lawyer; right?

7   A.   I had a lawyer, yes.

8   Q.   And you were allowed -- your lawyer was allowed to

9   cross-examine witnesses, including the troopers;

10  correct?

11  A.   The witnesses that were allowed to attend.  We

12  requested a number of witnesses, and they were not

13  allowed to attend.

14  Q.   Okay.  But the witnesses who did attend, you were

15  allowed -- your lawyer was allowed to cross-examine;

16  right?

17  A.   Yes.

18  Q.   And at that hearing it was alleged, was it not,

19  that you had told the patient if he went to the

20  hospital, he'd have less a chance of being arrested;

21  correct?

22  A.   That was what was alleged, yes.

23  Q.   And that the State Police was basing that on what

24  the patient told them in his statement; correct?

25  A.   Based upon -- yes.

1   **Q.**   And you had the hearing, and then there was a

2   decision; correct?

3   **A.**   Yes.  A decision was made last week, over a year

4   and a half later.

5   **Q.**   Well, the decision was made on -- the decision was

6   dated March 16th, 2016; correct?

7   **A.**   I don't know.  I received word that there was a

8   decision made last week.

9   **Q.**   All right.  And then you were served with the

10   decision.  When were you served with the decision?

11   **A.**   March 30th.  Yes.

12   **Q.**   March 30th you were served with it?

13   **A.**   Yes.

14       MR. McHUGH:  Your Honor, may I have this

15   identified for identification, marked for

16   identification as Exhibit P.

17       THE COURT:  Sure.

18       MR. McHUGH:  Please.

19       THE CLERK:  Do you want to use ELMO?

20       MR. McHUGH:  I will.

21       THE CLERK:  Oh, you don't have it marked.

22       MR. McHUGH:  No, I don't.  This just came up.

23       MR. MARTIN:  Your Honor, when the exhibit is

24   marked, the Plaintiff requests sidebar.

25       THE COURT:  Okay.  Well, let's get it

1    identified.

2            MR. McHUGH:  So this will be for the witness

3    only, then.

4            (Defendant's Exhibit P marked for ID.)

5    **Q.**   Lieutenant, if you look at the screen in front of

6    you, I'm going to put this document on it, and I want

7    you to read it; and as you read what's on the screen

8    and finish reading it, could you tell me when you're

9    finished so I can turn to the next page, please.

10           THE COURT:  Lieutenant, do you recognize the

11   document that's on the screen before you?

12           THE WITNESS:  Yes.

13           THE COURT:  What is it?  In general, what is it?

14           THE WITNESS:  That's the opinion of the chief

15   that they gave me last week.

16           THE COURT:  That you received last week?

17           THE WITNESS:  Yes, sir.

18           THE COURT:  Okay.  Is there an objection to its

19   introduction, Mr. Martin?

20           MR. MARTIN:  Objection.

21           THE COURT:  I'll hear you at sidebar.

22           (Bench conference held on the record.)

23           THE COURT:  What's the objection, John?

24           MR. MARTIN:  Your Honor, this is a 403

25   objection.  There's never a neutral hearing.  There's

1   no neutral finding.  There's no judicial finding.

2   These are findings of fact made after an administrative

3   proceeding of a chief who is also an adverse party in

4   this case.

5          Second of all, it's hearsay.  It's signed by

6   Commissioner Pare, and it includes his summary of

7   statements from witnesses.  So it's hearsay within

8   hearsay.

9          MR. McHUGH:  This is the order of suspension.

10  Now, there was a witness on the stand, their witness,

11  not mine, who brought this up; and her allegations are

12  that she was suspended because she was a part of this

13  case, a witness in this case.

14         This is the order of suspension and what the

15  suspension was based upon.  She's already testified to

16  much of this.

17         As far as hearsay, it's a government record, a

18  business record; but I think that the Defendants ought

19  to be able to put this in through evidence so that the

20  jury could see that this rebuts what she says, that she

21  was only suspended and reprimanded because she's a

22  witness in this case.

23         THE COURT:  I'm going to overrule the objection.

24  The matters you brought up, John, you can bring up

25  during redirect.

1      MR. McHUGH:  Thank you, your Honor.

2          (End of bench conference.)

3      THE COURT:  Mr. McHugh, do you offer it as a

4  full exhibit?

5      MR. McHUGH:  I do, your Honor.

6      THE COURT:  Defendant's Exhibit P is admitted as

7  a full exhibit and can be shown to the jury.

8          (Defendant's Exhibit P admitted in full.)

9      MR. McHUGH:  Do you want me to hand it to the

10  jury, your Honor, or have them look at it on the ELMO?

11      THE COURT:  I don't think handing it to them

12  would do them much good unless we sat here for an hour

13  while each one read it.  So why don't you make use of

14  the technology as best you can.

15      Mr. McHugh, it might make more sense if you

16  posed -- highlighted parts that you wanted to draw to

17  the witness's attention, and that way the jury can --

18  they'll have the full document with them, but it seems

19  a rather long document for all of us to sit here while

20  they read it.

21  Q.  Lieutenant, can you look at the document in front

22  of you on the screen, please.  And I want to draw your

23  attention to the fourth paragraph where it says "the

24  charges allege."  Do you see that?

25  A.  Yes.

1    **Q.**   And if you go down to the third sentence, "While

2    on the scene, there was a verbal altercation between

3    Acting Rescue Captain Danielle Masse and a member of

4    the Rhode Island State Police."  You do agree with

5    that; correct?

6    **A.**   No, I don't.

7    **Q.**   You don't agree with that?

8    **A.**   No.  I don't agree with the wording of this

9    document at all.

10   **Q.**   Well, you don't agree that there was a verbal

11   altercation between you and a trooper?

12   **A.**   No, I would not describe my statement to the

13   trooper as a verbal altercation.

14   **Q.**   Okay.  Would you describe his statement to you as

15   a verbal altercation?

16   **A.**   I would describe his communication to me as

17   abusive and condescending.

18   **Q.**   All right.  And you see here it says, "It was

19   reported to the chief of the fire department that

20   Acting Rescue Captain Masse repeatedly asked the

21   operator of the vehicle to go with her to the hospital

22   for treatment."  You agree with that?

23   **A.**   No.

24   **Q.**   You asked the patient more than once, didn't you?

25   **A.**   I asked him if he felt he needed to go to the

1    hospital and what his injuries were.

2    **Q.**   Okay.  You asked him more than once; correct?

3    **A.**   Yes.

4    **Q.**   All right.  And then the -- did the trooper, as it

5    says here, approach you for information as to the

6    questions that you were asking him?

7    **A.**   No.

8    **Q.**   All right.

9    **A.**   I asked the patient multiple times about needing

10   to go to the hospital and what his injuries were

11   because he wasn't responding appropriately and I was

12   having trouble getting the information from him and I

13   was trying to ascertain whether or not the patient was

14   competent to sign a refusal.

15        The trooper came up to me and started yelling at

16   me, asking me how long it takes to sign a refusal,

17   hurry up, let's get this done, sign the refusal and

18   let's go in a very demeaning, derogatory tone while he

19   was close enough to spit in my face.

20   **Q.**   Well, that's a verbal altercation; correct?

21   **A.**   No, because I did not interact with the trooper.

22   It was a one-way altercation.  An altercation would

23   mean that there was a back-and-forth.

24   **Q.**   Okay.  If you look at page 2, do you have that in

25   front of you?

1    **A.**   Yes.

2    **Q.**   I want to direct your attention to on Sunday,

3    December 14th, that afternoon.

4    **A.**   Yes.

5    **Q.**   You subsequently learned there had been a 911 call

6    about this car operating erratically.  You remember I

7    asked you about that a few minutes ago?

8    **A.**   This document is written out of time order.  None

9    of this information was available to me until a few

10   months later, about, like I said, eight months later

11   during the hearing.

12   **Q.**   Well, I understand that, but I know -- I

13   understand also that when you came upon the scene, the

14   car was there, this car was there, it had crashed,

15   correct, and there were state troopers there?

16   **A.**   I responded to a car accident, yes.  This BOLO and

17   whatever ensued with the State Police prior to my

18   arrival I was not aware of until months later.  All I

19   knew is I was entering an accident scene on the highway

20   and had no other information --

21   **Q.**   Okay.

22   **A.**   -- about how it happened.

23   **Q.**   Let's look at page 3.  If you look at page 3, the

24   second paragraph, the last sentence.  Bertrand, he was

25   the patient; correct?

1   **A.**   Yes, Bertrand was the patient.

2   **Q.**   "Bertrand eventually told the troopers in his

3   statement and at the hospital that Masse communicated

4   to him if he went to the hospital, he would avoid being

5   arrested."  You knew -- you learned that Bertrand told

6   the State Police that; right?

7   **A.**   Yes.

8   **Q.**   Okay.  And is this the part of this incident

9   you're talking about in the first sentence in the next

10  paragraph, "When Trooper Emerson inquired what was

11  wrong, Masse snapped at him, ordering him to stand back

12  so that she could do her job"?

13  **A.**   Trooper Emerson never inquired what was wrong.

14  **Q.**   Okay.  Is that the trooper you said you asked to

15  step back?

16  **A.**   Yes.

17  **Q.**   Okay.  And then finally on the next page, page 4,

18  under Charge 1, they cite violation of rules and

19  regulation, "Members shall be governed by customary

20  rules of good behavior."  Do you see that?

21  **A.**   Yes.

22  **Q.**   And so on that one, the chief found the charges

23  sustained because he found that you engaged in an

24  unprovoked verbal altercation with the state trooper;

25  correct?

1    **A.**   I don't understand what your question is.

2    **Q.**   Well, in Charge 1 -- there were two charges.

3    Charge 1, the chief sustained that charge after he

4    heard the evidence, and he based that on the fact that

5    he believed that you engaged in an unprovoked verbal

6    altercation with one of those troopers?

7    **A.**   As far as I'm aware, this paper came from your

8    office after the people that your office sent to run

9    this hearing, they wrote this up.  And what I'm being

10   charged with is what your office recommended I get

11   charged with.

12       So I don't know if the chief is the one who

13   actually determined that.  Well, I know the chief

14   didn't determine that because this paper was given to

15   the chief with recommendations from your office.

16   **Q.**   Well --

17   **A.**   And that's the wording that your office chose.

18   **Q.**   Well, the chief, Chief Mello, he's the one who

19   held the hearing; correct?

20   **A.**   This paperwork -- Chief Mello last week told me

21   that this paperwork got to his hands because

22   Commissioner Pare had taken over as acting chief of the

23   department.  And so he was sitting for the hearing, and

24   then Commissioner Pare I guess in conjunction with your

25   office handled this over the last year.

1   Q.   Well, in any event, you received that punishment

2   because Charge 1 was sustained; correct?

3   A.   I guess that's true.

4   Q.   Okay.  And then if you look at Charge 2 down

5   below, Charge 2 was sustained; correct?

6   A.   Obviously, for them to file charges, they would

7   have had to agree with what you wrote down here, yes.

8   Q.   Well, I didn't write anything down here.

9   A.   Well, your office.  I apologize.

10  Q.   And then if you look at the last page of this,

11  what you were served with as you already testified to,

12  I believe, this was the punishment.  You were suspended

13  without pay for 10 days.  You already started that

14  suspension; correct?

15  A.   Yes.

16  Q.   And you were receiving a letter of reprimand.  Did

17  you get that yet?

18  A.   No.  Apparently that goes in my permanent file.  I

19  don't know if I get to read that.

20  Q.   Okay.  And you were removed from the rescue

21  captains' list; correct?

22  A.   Yes.

23  Q.   Now, at the time that --

24       THE CLERK:  Thank you.

25       MR. McHUGH:  Thank you.

1    Q.   By the time you had received this, you had already

2    filed your own Human Rights complaint against the city;

3    correct?

4    A.   Absolutely.

5    Q.   And in that Human Rights complaint, you alleged

6    discrimination; correct?

7    A.   Yes.

8    Q.   And you're represented by Mr. Martin and Mr. Braga

9    in that complaint; correct?

10   A.   I am.

11   Q.   And you're here today to support the case of your

12   friend, Lori Franchina; correct?

13   A.   I'm here to support making sure that it's known

14   how women are treated on the Providence Fire

15   Department, yes.

16   Q.   And you know that Lori Franchina is asking this

17   jury to award her money; correct?

18   A.   I don't know what the terms are of this trial.

19   Q.   Okay.  Well, let me ask you this.  Don't you think

20   that if Lori Franchina wins this case, it will help you

21   win your case?

22   A.   The issues in my case?

23   Q.   Well, I'm asking you about your own case.  If Lori

24   Franchina wins this case, don't you think this would

25   help you in your own case?

1    **A.**    I think my case speaks for itself.

2    **Q.**    Okay.  That's fine.  But I'm asking you if Lori

3    Franchina is found on her behalf -- if a jury finds on

4    Lori Franchina's behalf, I'm sure you think that would

5    help your case, also.

6    **A.**    I'm not quite sure I understand.

7    **Q.**    You know what Lori Franchina's alleging; correct?

8    **A.**    Yes.

9    **Q.**    And you know what you're alleging; correct?

10    **A.**    Yes.

11    **Q.**    And they're similar; right?

12    **A.**    Yes.

13    **Q.**    And they're both against the fire department;

14    correct?

15    **A.**    Yes.

16    **Q.**    So don't you think if Lori Franchina prevailed

17    here with this jury that would help you prevail in your

18    case with a jury?

19    **A.**    I don't think that has anything to do with why I

20    filed my charges.

21    **Q.**    Well, I'm not saying that; but it has to do with

22    why you're here today testifying, doesn't it?

23    **A.**    They're related, yes.

24    **Q.**    Okay.  And you're going to ask for money for your

25    case; correct?

1    **A.**   I'm going to ask for the situation that's going on

2    to be dealt with appropriately.

3    **Q.**   And you're going to be asking for compensation;

4    correct?

5    **A.**   That hasn't been discussed.

6    **Q.**   Well, aren't you going to ask for the 10 days' pay

7    that you lost through this suspension?

8    **A.**   I am absolutely going to ask for these to be

9    overturned.

10    **Q.**   Okay.  And if Lori Franchina were able to get

11    money from this jury, wouldn't that help you in your

12    mind get money from a jury in your case?

13    **A.**   That is not in my mind, no.

14         MR. McHUGH:  All right.  Thank you, Lieutenant.

15    Nothing further.

16         Thank you, your Honor.

17         THE COURT:  Thanks, Mr. McHugh.  Mr. Martin.

18         MR. MARTIN:  Briefly.  Thank you.

19         THE COURT:  Vickie, do you have Defendant's P

20    for Mr. Martin?

21         MR. MARTIN:  Thank you.

22                    <u>REDIRECT EXAMINATION</u>

23    <u>BY MR. MARTIN</u>:

24    **Q.**   Just a couple of things I wanted to clear up.  As

25    far as the process through which these charges went

1    that you just discussed with Mr. McHugh, is the process

2    over?

3    A.   No.

4    Q.   What's the next step?

5    A.   The union has to file a grievance, which they've

6    told me that most likely will immediately be denied;

7    and that goes, I guess, to Commissioner Pare because

8    he's acting as the chief of the department and

9    Mr. McHugh's office; and after that, I can file an

10   appeal.

11   Q.   And do you know if you were to win the appeal what

12   you'd be entitled to?

13   A.   I don't.

14   Q.   It says that the within matter came for a hearing

15   before Scott Mello, the acting chief of the department.

16   Did I read that correctly?

17   A.   Yes.

18   Q.   Was there a neutral arbiter or a judge who made

19   this decision?

20   A.   I believe the city hired Vinnie Ragosta to

21   represent the city; and another person, I don't know

22   his name, came from --

23   Q.   Well, sure, those are the prosecutors --

24   A.   Right.

25   Q.   -- who questioned you?

1    **A.**    Right.

2    **Q.**    But it says the hearing came before Scott Mello;

3    right?  And then above that it says that it's the

4    opinion of the chief?

5    **A.**    Right.

6    **Q.**    Do you know who made this decision?

7    **A.**    The acting chief of the department made the

8    decision.

9    **Q.**    Okay.  Now, could you tell us again what your

10   observations were that led you to believe that this

11   individual was suffering from a head injury or was

12   under the influence of drugs or alcohol.

13   **A.**    He had pinpoint pupils, he had vomit down his

14   shirt, he was very slow to respond and answer the

15   questions, and he wasn't able to actually answer all

16   the questions.  I asked him about what was going on and

17   his injuries.

18          There was significant damage to the vehicle that

19   had hit the barrier.  The airbags had deployed.  The

20   windshield was broken, which indicates he hit his head

21   into the windshield.

22   **Q.**    So we talked about -- you talked about with

23   Mr. McHugh things that you learned about after the

24   fact.  I'd like you to take a look at the trooper's

25   observations of Mr. Bertrand here.  Do you see where it

1    says that he also noted a stain on his shirt?

2    **A.**    Yes.

3    **Q.**    But was unable to ascertain what it was?

4    **A.**    Yes.

5    **Q.**    Did you notice that he also noticed the pupils to

6    be extremely constricted or pinned?

7    **A.**    Yes.

8    **Q.**    Did you notice that he also noticed that

9    Mr. Bertrand's speech was severely slurred and

10   thick-tongued?

11   **A.**    Yes.

12   **Q.**    And what's this part about the presence of knotted

13   plastic bag ends?

14   **A.**    I don't know about that because while I was on

15   scene with the patient and at the hospital, there was

16   no -- that information came after.  After I got to the

17   hospital, then they finally did a pat-down on him and

18   found drugs in his socks and I guess in the car.

19   **Q.**    And the trooper also came to the conclusion that

20   Mr. Bertrand was under the influence of a narcotic?

21   **A.**    Yes.

22   **Q.**    Now, can you explain to us in your profession what

23   is the protocol that you're supposed to follow in order

24   to determine whether or not one of your patients is

25   competent to refuse consent for medical care.

1    A.   There's an altered mental -- there's a couple of

2    different protocols.  It's an altered mental

3    consciousness protocol and then just -- also just basic

4    EMS.  Like, the first week of EMT school teaches about

5    consent and the rights of consent.

6         And then there's a list of criteria for signing

7    refusals on the state form that has to be met; and one

8    of the criteria that has to be met on the state form

9    states, you know, that the patient is not altered by

10   drugs or alcohol or intoxicating substances.  And you

11   have to be able to say "yes" to all those things in

12   order to sign a refusal for the patient.

13   Q.   Was there any reason that you didn't want

14   Mr. Bertrand to get arrested?

15   A.   No.

16   Q.   Had you ever met him before?

17   A.   No.

18   Q.   We've talked a little bit about things you learned

19   after the fact.  Is Mr. Bertrand still alive?

20   A.   No.

21   Q.   How did he die?

22   A.   He died of a drug overdose a few months later.

23   Q.   Is Lori Franchina's name mentioned anywhere in

24   this document?

25   A.   No.

1    **Q.**   When was the last time Lori Franchina worked at

2    the Providence Fire Department?

3            MR. McHUGH:  Objection, beyond the scope.

4            THE COURT:  It's possible.  I'm not sure where

5    you're going with it, Mr. Martin.  So if you can tie it

6    to the cross-examination, I'll overrule it.

7            MR. MARTIN:  Thank you.  I'll ask a better

8    question.

9    **Q.**   You were asked some questions about how the

10   results of this case could possibly affect your case.

11   Do you remember answering those questions?

12   **A.**   Yes.

13   **Q.**   When was the last time that Lori Franchina worked

14   for the Providence Fire Department?

15           MR. McHUGH:  Same objection.

16           THE COURT:  Overruled.

17   **A.**   It's been a few years.

18   **Q.**   Can you give us an idea of how many years?

19   **A.**   I believe she retired a year or so ago; but she

20   hadn't actually worked for at least a few years, at

21   least three years, I believe.

22   **Q.**   Are there any events that you plan on complaining

23   about that Ms. Franchina was a witness to?

24           MR. McHUGH:  Objection, beyond the scope.

25           THE COURT:  Overruled.

1   **Q.**   Are there any events you can think of that you

2   want to complain about that happened to you to which

3   Ms. Franchina was a witness?

4   **A.**   I don't believe so.

5   **Q.**   So this whole deal with the hearing and the

6   opinion and the demotion and the discipline, did

7   anybody explain to you why nobody did that to Sean

8   McGarty?

9   **A.**   No.

10      MR. McHUGH:  Objection, your Honor.

11      THE COURT:  Sustained.

12  **Q.**   Do you know what these are?

13  **A.**   Those are exam gloves.

14  **Q.**   And when these are soiled, is there a specific way

15  they're supposed --

16      MR. McHUGH:  Objection, your Honor.

17      THE COURT:  He has to finish the question.

18  **Q.**   When these are soiled, is there a specific way

19  that they're supposed to be taken off to protect the

20  people around?

21      THE COURT:  Mr. McHugh.

22      MR. McHUGH:  Objection.

23      THE COURT:  Sustained.

24      MR. MARTIN:  Nothing further.

25      THE COURT:  Thanks, Mr. Martin.

1      MR. McHUGH:  No questions, your Honor.  Thank

2  you.

3      THE COURT:  Just so we're clear, there is no

4  recross in the trial absent some extraordinary

5  circumstances.

6      Lieutenant Masse, you can step down, ma'am.

7  Thank you.

8      Mr. Martin.

9      MR. MARTIN:  Your Honor, the Plaintiff calls

10  Lori Franchina.

11         **LORI FRANCHINA, PLAINTIFF'S WITNESS, SWORN**

12      THE COURT:  Ms. Franchina, I think you know the

13  drill having sat here.  If you'd just remain standing,

14  and Ms. McGuire will swear you in.

15      THE CLERK:  Please state your name and spell

16  your last name for the record.

17      THE WITNESS:  Lori Ann Franchina,

18  F-R-A-N-C-H-I-N-A.

19             **DIRECT EXAMINATION**

20  **BY MR. MARTIN:**

21  **Q.**   Good afternoon.

22  **A.**   Good afternoon.

23  **Q.**   So --

24      THE COURT:  Ms. Franchina, would you just bring

25  it in a little closer.  Great.  And try and talk right

1    into it.  I know it's uncomfortable.  I understand

2    that.

3           THE WITNESS:  I think it was my voice at first.

4           THE COURT:  Okay.  Mr. Martin.

5    Q.   So it's come to my attention that I have your

6    place -- your birthplace of origin wrong in the opening

7    statement.  Could you please correct that for everyone.

8    A.   Yes.  I am from Jamestown, New York.

9    Q.   I see.  So you didn't grow up in Rhode Island?

10   A.   No.

11   Q.   When did you move here?

12   A.   I moved here approximately 24 years ago.

13   Q.   Tell me a little bit about growing up in

14   Jamestown.  Where did you go to school?

15   A.   I went to Harvey C. Fenner Elementary School in

16   Falconer, New York; and I then attended Falconer High

17   School.

18   Q.   Any particular interest or activities you took

19   part in high school?

20   A.   Yes.  I played three sports, basketball,

21   volleyball and softball.  I was very active in my class

22   taking part in homecoming, prom, things of that nature.

23   Q.   For the basketball and volleyball, were they

24   regulation size --

25   A.   Yes.  I was a guard.

1   **Q.**   Okay.  After high school, where did you go?

2   **A.**   Eastern Connecticut State University.

3   **Q.**   All right.  And what did you study?  What was your

4   major?

5   **A.**   I studied exercise science, applied anatomy,

6   kinesiology.

7   **Q.**   Can you say that a tad bit slower.

8   **A.**   Exercise science, applied anatomy and kinesiology.

9   I also have three minors, coaching, athletic training

10  and secondary ed.  Actually, that's a major.  I'm

11  sorry.

12  **Q.**   What is the exercise science/kinesiology?

13  **A.**   It's a physical education degree with a secondary

14  major in education, secondary ed.

15  **Q.**   Are there -- does that include medical-related

16  course work, anatomy, things of that nature?

17  **A.**   Extensive anatomy, kinesiology, motor movement

18  analysis, adaptive physical education.

19  **Q.**   Did you play any sports in college?

20  **A.**   I did.

21  **Q.**   What did you play?

22  **A.**   Basketball and softball.

23  **Q.**   Tell us about your softball experience.

24  **A.**   My softball experience started when I was six.

25  **Q.**   Tell us about the Eastern Connecticut State

1    University softball.

2    A.    I played two sports there, but softball was my

3    predominant sport.  I loved it.  I played four years.

4    And in 1992 I suffered 34 facial fractures by breaks,

5    and I was an All-American.  I continued to play two

6    sports.

7    Q.    You had your face broken?

8    A.    Yeah.

9    Q.    I'm sorry.  Can you explain the -- that was not 34

10   separate incidents.

11   A.    No.

12   Q.    That was -- can you explain the 34 fractures.

13   A.    Sure.  I was in a practice setting, and a team

14   member let go of a bat.  It flew approximately 15 feet,

15   striking me predominantly in my nose and my left side

16   of my face.  And I had a LeFort fracture, which my

17   upper jaw was completely movable.  I lost several

18   teeth, and I had five major breaks.

19   Q.    So how long did it take before you got back to the

20   field?

21   A.    Seven months.

22   Q.    And what were the -- tell us about the results for

23   the team during the --

24   A.    My team had gone on to a national tournament in

25   Pella, Iowa, and took third, I believe, that year.

1    Q.   And the next year?

2    A.   We took second.

3    Q.   Now, after you graduated, what did you do for

4    work?  Oh, wait.  What about the Olympics?  Tell us

5    about the Olympics.

6    A.   In 1994 I tried out -- well, I was actually

7    recruited.  I had gotten a letter to participate in the

8    open trials, and that was due to my playing experience

9    for the Lady Shamrocks out of Tonawanda, New York.

10        I played for a former Celtic at the time in the

11   '60s, Larry O'Connor, and we played against a more

12   familiar team in this area in Connecticut, the Robusto

13   Breakouts.  So through that experience, I was given an

14   opportunity to try out for the 1994 open trials, and

15   that was held at Springfield College.

16   Q.   And before we transition to your professional

17   career, tell me about your family.  Who did you live

18   with when you grew up?

19   A.   I lived with my mother, Terry Lee Franchina;

20   Anthony Franchina, my father; my brother, Anthony

21   Franchina, Jr.; and Amy Lynn Erickson, formerly

22   Franchina.

23   Q.   What does your dad do for work?

24   A.   My dad early on was a construction worker and

25   eventually proceeded to continue my grandfather's trade

1    as a cobbler.

2    **Q.**   How about mom?

3    **A.**   Mom was a nurse of 42 years.

4    **Q.**   Did you have any jobs throughout school and

5    college?

6    **A.**   Uh-huh.  My first job was around the age of 12

7    with my brother, a paper route.  We had a double route

8    because, well, my brother always wanted to do more than

9    the next guy.  So with two of us, we could have more

10   papers making more money.

11   **Q.**   Any other jobs in high school or college?

12   **A.**   Yes.  I worked for my father.  Both my brother and

13   I would shine shoes and help glue and do different

14   things that was, we call it, the family trade, he, too,

15   being a cobbler.  So we would do that, get paid a

16   little bit for it here and there.

17          But I also worked for Parks and Recreations in

18   town.  I was a mentor to students, student athletes,

19   did arts and crafts and, you know, sporting events, you

20   know, activities.  I was a lifeguard for a pool in one

21   of the nicer areas of town.

22   **Q.**   What is your sexual orientation?

23   **A.**   I am a lesbian.

24   **Q.**   When -- does your family know that?

25   **A.**   Oh, yes.

1   **Q.**   When did you tell your family?

2   **A.**   I think growing up my family always knew my sexual

3   orientation differed from my brother and my sister.  It

4   was really discussed my freshman year.

5        I had returned home for the summer.  I was

6   painting my mother's pantry, and she came in and said,

7   I have to ask you a question.  I said, Well, ask the

8   question.  And she says, Are you?  And I said, Am I

9   what?

10        But being a mom, you know, she just wanted to

11  hear, you know, that I had grown up and was making

12  decisions on my own, living away from home 10 hours.

13  My school was 10 hours away.  So I then prompted to say

14  that I was gay.

15  **Q.**   And how did your family receive that?

16  **A.**   My brother said, I thought so.  My sister said, I

17  thought so.  My mom was -- she was good.  I mean, she

18  was good to the extent that she expressed her concerns,

19  how I might be treated in society even back in the

20  '90s, I guess.

21  **Q.**   How about dad?

22  **A.**   Dad, you know, I think dad is the guy that always,

23  you know, he walked my sister down the aisle with such

24  pride.  I don't think he had the foresight to see the

25  way society has come today and how far we are

1    progressing.

2           So he was a little reluctant to celebrate; but,

3    I mean, to accept me as a daughter, there was no

4    question.  He accepted me.

5    Q.   So let me get back to your transition after

6    college.  What was your first job?

7    A.   Let's see.  Well, before I graduated college I was

8    employed by Windham Tech Regional High School.  Because

9    of my facial injury, I had to extend my academic career

10   because I chose to play one more year athletically to

11   get my four years in at the university.

12          So in doing so, I had to extend my academics by

13   both a fall and a spring semester.  So, therefore, in

14   my winter phase of academics, I didn't have anything to

15   do.  So I applied for the volunteer coaching position

16   for basketball under Raymond Elliot.  He became a

17   strong mentor for coaching for me.  And also I was the

18   head volleyball coach at the high school.  That was in

19   my senior year of college.

20   Q.   And then after college?

21   A.   After college, I always worked in the summers.  I

22   worked at Lake Compounce, and then after college my

23   first employment opportunity was substitute teaching

24   and working for Natural Bodies Fitness Center.

25          So I would open up a gym sometimes as early as

1    4:30 in the morning, get a little workout in possibly

2    and shoot off to substitute teach in Hartford,

3    Connecticut.  And then after school, I would return

4    home; and if it was in the fall of that year, I coached

5    at Assumption College.

6         So I would open a gym at 4:30, teach, and then

7    I'd literally hop on 395 and go to Assumption College

8    and coach until five, six, seven o'clock at night.

9    **Q.**  And for those of us who are not familiar with the

10   Paris of central Massachusetts, could you tell everyone

11   where Assumption College is.

12   **A.**  You continue up 395 to I90 to 290, and you then go

13   through the City of Worcester to the upper right-hand

14   portion of the city of Worcester, which has 10 colleges

15   in it.  It's a big city.

16   **Q.**  And then when did you first feel attracted to or

17   interested in emergency medicine?

18   **A.**  That actually came very early.  Prior -- I think

19   it was my sophomore year in college.  I was home for

20   the summer, and I would go and see my mother for lunch

21   at the hospital.

22        And on my way there one day, I actually saw a

23   seven-year-old little girl get hit by a car.  I was the

24   car behind it.  And, again, we always say we -- you

25   know, there's some that run to the fire and there's

1    some that run away.

2          I had also taken First Aid and CPR in college, I

3    already had that under my belt, and lifeguard training

4    which I had done in the summers prior to college; and I

5    helped in that scenario prior to a rescue coming.

6    Q.   And when was your -- what was your first job

7    involving emergency medical response?

8    A.   I worked for -- well, I volunteered as a volunteer

9    firefighter in the Town of Scituate, Rhode Island, and

10   I was at Station 20 there.  I worked Mondays and

11   Wednesday nights, volunteered 6A to 6P.  Excuse me, 6P

12   to 6A.

13   Q.   When did you volunteer?

14   A.   That was in the years -- for two-and-a-half years

15   when I lived in the Town of Scituate, and that was -- I

16   graduated '95, so that would have been '97, '98 into

17   '99.

18   Q.   And then what did you do after '99?

19   A.   Employment-wise or EMS?

20   Q.   Both, please.

21   A.   Okay.  At that time -- well, prior to that I was a

22   college coach.

23   Q.   Tell us about that.

24   A.   Well, once I left Assumption College in 1995, I

25   went on to coach and moved to the State of Rhode

1      Island.  I was 25 years old, and I was coaching

2      Division I softball at the University of Rhode Island

3      for Melissa Jarrell.

4      **Q.**   How long did that last?

5      **A.**   That was about a year and a half.  It's about four

6      semesters.

7      **Q.**   Did you continue to acquire any more experience in

8      emergency medicine?

9      **A.**   Yes.

10     **Q.**   How so?

11     **A.**   I took my EMT-Basic course shortly after that;

12     and I was also working then at Providence College as

13     an assistant softball coach, and I was licensed as an

14     EMT-Basic working for Universal Ambulance on

15     Douglas Ave. in Providence, Rhode Island.

16     **Q.**   What did you do for Universal Ambulance?

17     **A.**   I was an EMT-Basic.

18     **Q.**   And for -- give me the timeline starting and

19     ending when you were working for Universal.

20     **A.**   Universal Ambulance was approximately around 1998

21     to 2001 and a half, like half of 2001.

22     **Q.**   Over the course of that time, did you earn any

23     professional certificates or go through any trainings

24     related to emergency medicine?

25     **A.**   I had actually started my EMT-Cardiac at that

1    time, it's a secondary license, and intubation.  I was
2    certified in intubation.
3    **Q.**   So now you've taken us up, I think you said, to
4    around 2000 to 2002.  What was your next job?
5    **A.**   I actually worked -- well, I worked at a couple
6    gyms, too, during that time period.  So I don't know if
7    I was still working at Fitness -- excuse me, Suburban
8    Fitness in Scituate.
9         So then after that my transition went away from
10   fitness and really honed in and applied to the
11   Providence Fire Department.
12   **Q.**   Okay.  When did you apply?
13   **A.**   It was the summer before the -- actually, that was
14   in -- I think that sitting was in 2000.  I was still
15   working for Universal Ambulance at the time.
16   **Q.**   When was your academy?
17   **A.**   My academy was the -- there was two academies
18   drawn out of one test.  So 2,300 people sat for a test.
19   Eight hundred people, men and women, were chosen for
20   the agility.  Out of 800, 80 passed the fitness test.
21   My score was very high amongst the men with the
22   agility.  It's a time test, has to be completed in
23   under six minutes.  I was 4:16.
24   **Q.**   So when you say it was very high among the men,
25   what do you mean?

1    **A.**   My score compared with men taking that agility

2    test.

3    **Q.**   Oh, they publish the scores?

4    **A.**   No, they told us the times.

5    **Q.**   So first there's a written test, you said, of

6    2,300?

7    **A.**   Uh-huh.

8    **Q.**   Yes?

9    **A.**   Yes.  I'm sorry.  Yes.

10   **Q.**   And 800 were selected for the agility test?

11   **A.**   Correct.

12   **Q.**   And then 80 were selected for the academy?

13   **A.**   Correct.

14   **Q.**   When did the academy start?

15   **A.**   I was chosen in the second portion of that

16   academy.

17   **Q.**   What does that mean?

18   **A.**   There was 45 selected for the academy, and that

19   was the 45th academy, and that academy ran one year

20   prior to mine.  Mine started -- that started in March

21   of '91 for them and March 18th, I believe, in 1992 for

22   us.  Excuse me, 2002.  Whoa.  I would have been really

23   young.  Sorry.

24   **Q.**   So what's the academy like?  Do you live there?

25   Do you commute?

1    A.    It is a five-day-a-week academy.  At the training

2    academy, you have to arrive -- as they say, on time is

3    late.  So you have to arrive early and be prepared.

4         It's a paramilitant organization.  We are the

5    second oldest fire department in the country.  We learn

6    our history, it's extensive, from rerouting the rivers

7    here in Providence to the Bucket Brigade.

8         So we come in early, and we stay until 5:00

9    usually five days a week.  We are paid minimum wage for

10    that time period.

11   Q.    Where is the academy located?

12   A.    I'm not sure of the exact address, but it's at the

13    Reservoir Ave. firehouse.

14   Q.    What's the first oldest fire department?

15   A.    Cincinnati.

16   Q.    So what types of things did you learn there?

17   A.    We learned Firefighter 1001, Firefighter 1002.  If

18    you're not already EMT-Basic certified, you receive

19    your EMT-Basic certification in the course.

20         I, on the other hand, had my EMT-Cardiac

21    already, so I became like a student helper.  There was

22    about four of us that already had our cardiacs, so we

23    could aid our, you know, our group.

24         We all want to get through it together.  We all

25    want to pass, and some -- there were some that

1    struggled because the EMT-Basic is a very difficult
2    course, a lot to learn in a very short amount of time.
3    Q.   Is there some type of test or certification that
4    happens at the end that is required before being
5    employed by the department?
6    A.   Yes, absolutely.  We have to take Firefighter 1001
7    exams, which are national, the NFPA standards.
8    Everybody is certified across the country.
9    Firefighter 1001, Firefighter 1002.
10         You have to pass your national certification for
11    EMT-Basic.  I already had my cardiac at the time.  We
12    are high-angle certified.  We rappel from eight
13    stories.  That's where my class jumped from.
14    Q.   High-angle certified?
15    A.   Yup, ropes.  We have to be able to rappel off the
16    side of a building.  We also have to -- I believe, and
17    Captain LaRoche can testify to this, but I believe
18    we're the only one that can -- we use pompier ladders
19    still for our training purposes only.
20    Q.   You use a what?
21    A.   A pompier ladder.  It's a single-rung ladder with
22    a loose neck hook that goes through a window, catches
23    the edge of the windowsill, and you free-climb one
24    story, and you can lock off.
25         And the theory is you pass another ladder up the

1  side of the building.  You then have to manipulate it,

2  get it into a window, unharness, climb, free-climb

3  scaling the side of the building.  It's called a

4  scaling latter, pompier.

5  **Q.**   Huh.

6  **A.**   I thought it was fun.

7  **Q.**   You had to do that?

8  **A.**   Yes.

9  **Q.**   So there's a written component and a physical

10  component?

11  **A.**   Absolutely.

12  **Q.**   Of the 80 who entered your academy, do you know

13  how many eventually entered the department?

14  **A.**   No.  We had several that failed.

15  **Q.**   How did you get along with everybody in the

16  academy?

17  **A.**   I got along great.  I mean, I had a great time.

18  **Q.**   What do you mean you had a great time?

19  **A.**   I enjoyed everything I learned.  I took it in like

20  a sponge.  I wrote a lot of things down.  I had study

21  groups at my house.  Guys and girls would come.  There

22  was two other females in my academy.  They would attend

23  my house.  I lived alone at the time.  I had a pretty

24  big house.  My dogs were nice to get along with.

25  **Q.**   Who were the two other girls in your academy?

1    **A.**    Andrea Stuckus and Heidi Davis.  Her name now is

2    Heidi Kennedy.

3    **Q.**    What was your relationship like with Andrea

4    Stuckus during the academy?

5    **A.**    Excellent.

6    **Q.**    Was it purely platonic?

7    **A.**    No.

8    **Q.**    Any problems with Andrea after the academy?

9    **A.**    I think because of our relationship in the academy

10   she chose to distance herself and create more of a, you

11   know, environment that excluded me.

12   **Q.**    And you mentioned that in your study group and in

13   your social group there were also males.  Did you have

14   any male friends while you were in the academy?

15   **A.**    Absolutely.

16   **Q.**    Like who?

17   **A.**    Ethan McCauley, Brian Belhumeur, Danny Imarone,

18   Stephen Whalen.

19   **Q.**    Were you here when Attorney McHugh on behalf of

20   the city did his opening statement?

21   **A.**    Yes.

22   **Q.**    Did you hear about complaints that you had made

23   during the academy?

24   **A.**    Yes.

25   **Q.**    Could you tell us about those.

**A.**   One in particular caught me off guard.  The women -- there was three women in our academy.  The rest were men.  And during housekeeping, women are -- we have four platoons similar to on the job.  We have an A, B and C and D Group, and that was the same in the academy.  I was part of A Group.  And so each group, you know, academy group, was assigned a specific area of the building to clean.

So from 0800 hours to 0900 hours, we were required to, you know, polish brass, clean the urinals, clean the facilities, mop floors, dust, anything the chief wanted taken out garbage-wise or anything that, you know, they can have us do, we did.  We cleaned the apparatus floor.  So there was a lot of -- tools.

You know, we learned how to prepare for our environment that we were entering, to prepare to go into the stations; and, you know, if a guy or a girl had been doing it for 18 to 20 years, well, you wanted to be comparable.

So in our training academy, I mean, it might sound silly, but we had to learn how to do housekeeping, you know.  So -- oh, on that incident. I'm sorry.

**Q.**   That's fine.  So you're referring to training regarding the -- taking care of the latrine?

1    **A.**    So we were in there that day.  In particular, my

2    group had been assigned the upstairs; and that included

3    our classroom, another back storage room, two offices

4    and a bunk room that we would eventually be using for

5    overnights and working, you know, hands-on, on-the-job

6    training and also the second floor bathroom that was

7    specifically marked men; but when a woman was assigned

8    to clean it, I felt, you know, I could enter that and

9    do my job.

10            And at the time that I was cleaning a toilet, I

11   heard urinating right next to me.  And I said, Whoa,

12   guys.  First, I don't believe we complained.  I believe

13   that we addressed it.  I'm not really sure how it went,

14   but I made it aware that we can't do that.

15            You know, I was 30 years old.  I had several

16   jobs.  I was already a Division I coach for six years.

17   I had been in the field of service, you know; and maybe

18   somebody younger than me, a male that wasn't, you know,

19   with his head on straight up to that, you know, up to,

20   you know, social acceptances, I felt needed to just be

21   told, Look, you can't do this.  And, you know, it was

22   brought right up the chain.

23   **Q.**    And was it taken care of after that?

24   **A.**    Yeah, absolutely.  They asked us if we had any

25   problems, if I felt like I was sexually harassed in any

1  way, and I said no.  I just felt like maybe it just

2  needed to be addressed so that we all could move on and

3  get over it.

4  **Q.**   Does that have any part with the claims that

5  you're bringing here in this lawsuit?

6  **A.**   No.

7  **Q.**   Were there any other complaints that you made

8  about how you were treated during the academy?

9  **A.**   Not that I'm aware of, unless you direct it.  I'm

10  not aware.

11  **Q.**   Do you recall having any problems or anything that

12  you were unhappy with dealing with other people in the

13  academy?

14  **A.**   No.  Like I said, I took a lot of notes, and

15  several of the men noticed that, and we started study

16  groups where some of them had children and because I

17  didn't have children, they would come to my house.  It

18  was quiet.  We could -- you know, I had a big table

19  down in my basement.  It was actually a pool table, and

20  we could throw all our books on it and just kind of get

21  everything out there and start -- you know, we did a

22  lot of brainstorming, a lot of, you know, questions,

23  answers kind of thing so that we would -- it was a very

24  physical job.

25  **Q.**   So your graduation must have been exciting.

1     **A.**   Yes.

2     **Q.**   Tell us about that.

3     **A.**   I graduated tenth overall.  I felt super proud.

4     My brother and my father are cobblers.  My mom's a

5     nurse.  My sister's an accountant.  I have one cousin

6     that's a firefighter in Jamestown.

7          And I felt like I hit the lottery, that I -- I

8     mean, I had a job with a pension.  I had a job doing

9     what I loved, EMS.  And, you know, in the training

10    academy I was paired up with a training number one,

11    Brian Belhumeur, just to go back a little bit to give

12    you an idea of my excitement; but they changed the

13    training trailer on us to try and kind of -- he was the

14    same size as me, and I just challenged myself.  If he

15    led the way, I was going in any burning building or

16    anything to try and just stay up with him and, you

17    know, just learn.  It was so exciting.

18         So when we graduated, there was a corps of us

19    that really had comradery.  We enjoyed ourselves.  We

20    -- I don't know.  I was treated well.  I didn't have

21    any complaints.

22    **Q.**   Where was your first assignment when you

23    transitioned from the academy to the department?

24    **A.**   Ladder 1, LaSalle Square.

25    **Q.**   Ladder 1 at LaSalle Square?

1    **A.**    Yes.

2    **Q.**    What was your job?

3    **A.**    I was a ladderman or ladderwoman.

4    **Q.**    Is that what it's called, a ladderman?

5    **A.**    Yeah.  I was on the ladder.  That was my truck.

6    **Q.**    So what does a ladderman do?

7    **A.**    Well, we do forceful entry.  We attack the roof.

8    We ventilate.  You know, we use K12 saws.  We do

9    extrication of -- Jaws of Life.  We're called to car

10    accidents.

11         If you're on a, you know, a truck with a deck

12    gun, I mean, you could be preserving, you know,

13    exterior.  Just like the other night in Providence, we

14    had a huge fire and, you know, there's a lot of ladder

15    trucks doing exterior exposure, you know, preventing

16    them from, you know, igniting by applying water to

17    them.  Things of that nature.

18    **Q.**    Did you personally fight any fires?

19    **A.**    In the academy, I was in two fires.  And, yeah, my

20    first week on the job, I had a dryer fire, a

21    laundromat.  It wasn't one dryer.  It's a lot of

22    dryers.  And, yeah, I was on that fire.

23    **Q.**    How long were you a ladderman at the LaSalle

24    station?

25    **A.**    One week.

**Q.**   One week?

**A.**   Yup.

**Q.**   And then where did you go?

**A.**   I was for one cycle -- I was in transition because, coming out of the academy, I had already had my EMT-Cardiac.  There was a lot of availability on the rescues.

So, in turn, I eventually just was waiting for my position to open up.  Another female had gotten -- was being transferred off a rescue, in fact, Engine 3; and I was waiting for that spot to open up for me for my assignment coming out of the academy, which was Rescue 3, A Group.

**Q.**   When did you start at Rescue 3?

**A.**   Second week -- third cycle on the job.

**Q.**   So where was your station?

**A.**   Branch Avenue, 10 Branch Ave.

**Q.**   Can you explain to the jury what we mean when we say "your station."

**A.**   I think everybody calls it their station when they're assigned there.

**Q.**   Being assigned to a station, what does that mean?

**A.**   You're assigned to a station long term.  It's not temporary in nature.  Paperwork comes out from the chief of the department assigning you specifically that

1   house and the vehicle.  At Branch Avenue, we had a

2   Battalion 3, Engine 2, Ladder 7 and Rescue 3.

3   Q.   And those are all different vehicles?

4   A.   Correct.

5   Q.   How long were you at Branch Ave.?  Let me ask you

6   a little better question.  What was the approximate

7   day, like month and year, when you started at Branch

8   Ave.?

9   A.   It would have been third cycle.  I graduated

10  September, I believe, 22nd of 2002.  So third cycle,

11  you're looking at about -- it's four days on, four days

12  off.  You do the math.

13  Q.   Okay.

14  A.   I'm not sure.  It was the third cycle.

15  Q.   But was that still in 2002?

16  A.   Oh, yeah.  Yeah.

17  Q.   What does the third cycle mean?

18  A.   You have a cycle on, four days on, and then you

19  have what they call your 96 hours off and then your

20  next cycle.  So it's just how you, you know, see your

21  time, I guess.

22  Q.   So fall/winter 2002 you started at Branch Ave.?

23  A.   Uh-huh.  Correct.

24  Q.   As an EMT 3?

25  A.   I was an EMT-Cardiac, and I was assigned the

1   chauffeur position of Rescue 3.

2   Q.   So tell us what an EMT-Cardiac is.

3   A.   I am licensed through the State of Rhode Island as

4   an EMT-Cardiac with certification in intubation.  I can

5   start IVs.  I'm one level below paramedic.  And through

6   Med Control, we can do paramedic procedures through Med

7   Control.

8   Q.   What's a chauffeur?

9   A.   A chauffeur in the Providence Fire Department is

10  someone that is designated to drive a vehicle.  For

11  rescues, you get a permanent chauffeur position for six

12  months, typically, at a time; but you can be also

13  detailed into a vehicle to be a chauffeur.

14       And usually on the engines and the ladders, the

15  men and women do a rotation to be a chauffeur because

16  that requires those individuals to actually drive the

17  truck and be the pump operator if they're called to a

18  fire or, on ladder, you're the driver of the vehicle.

19  Q.   So how did you like the job?

20  A.   I loved it.

21  Q.   Why?

22  A.   I was doing everything I wanted to do.  I was

23  helping people.  My mother was a nurse of 42 years, and

24  she would always tell us stories at the dinner table of

25  how she helped people, sometimes in the time of need;

1    and sometimes she said that, you know, true compassion

2    in those moments, it could just be holding their hand

3    in their last few minutes, to just, you know, washing

4    their hair and taking care of them while their family

5    is not around.

6            So I saw it as caretaking.  I saw it as a strong

7    job.  I saw it as something physical.  I always liked

8    being outside, more so than an inside job.  You know,

9    it was just wonderful.  I was everything I wanted to be

10   doing.

11   **Q.**   How about your co-workers, how did you like them?

12   **A.**   Good.   Yeah.   In 2002, after 9/11, our pipes and

13   drums from New England was honored by leading the 9/11

14   parade.

15           Our New England Pipes and Drums got to march

16   first, even before the New York City firefighters.  I

17   mean, we're the second oldest fire department in the

18   country.  I mean, we were pretty cool.

19           And to have that honor bestowed upon us, we all

20   boarded trains and headed to New York for the 9/11

21   memorial.  We all got -- well, I don't know about

22   everybody, but Providence got tickets to enter Madison

23   Square Garden for the memorial.  I marched with, you

24   know, Chris Lisi, Chris Wagner, Ronnie Lefebvre, Chief

25   Pare, which is now the Attleboro -- I believe he's

1      still at Attleboro Fire Department in Massachusetts.

2           He was one of our chiefs.  He was my Battalion 3

3      chief.  We actually rode the train together with all

4      the guys.  And they took care of me, and they kept me

5      under their wing.  They didn't let me -- you know, I'm

6      in a big city.  I'm a young kid and a female amongst a

7      lot of drinking and carrying on, and they protected me

8           They took me -- like I said, they took me under

9      their wing, kept an eye on me.  And then we all stayed

10     together in a hotel room, a lot more than should have

11     been, I think, by code.  I'm sorry.

12     Q.   That's fine.  And 2003 through 2006, how was the

13     progression of your career or how did you enjoy your

14     work environment during those years?

15     A.   Those years were difficult because Chief Michael

16     Dillon would call my -- I had soon gone over to North

17     Main Street fire station.  I was assigned there on

18     Rescue 5 under Captain David Raymond.  He was a senior

19     captain, and I had gone over there to become his

20     chauffeur.  And with a year on the job, I was asked to

21     go in charge of a rescue, and I refused.

22     Q.   Why did you refuse?

23     A.   I'm a new guy, you know.  I understand the

24     history.  I mean, you want to fit in.  Even as a guy,

25     to climb rank that quickly just -- unless your father

1    was on the job, I wouldn't suggest it, nor did I.

2         And I sent letters to Chief Dillon, and I had my

3    captain, David Raymond, verbally for six months try to

4    keep him at bay and not force me in charge.

5    **Q.**   What do you mean forced to be in charge?  What was

6    all the pressure?

7    **A.**   Well, you know, at that time I'm 31 years old.  I

8    have great leadership skills.  I had coached softball

9    for years at the Division I level.  I was competitive

10   in nature but yet, you know, I liked rules.  I liked

11   standards, policies.  I understood them, I read them,

12   applied them, you know, as a technician.

13        But as a technician, I was just doing my job,

14   and I was aiding a captain at the time.  It felt

15   normal.  It felt like what I needed to do.  Being

16   forced in charge meant that there's a -- I don't know

17   if it's in the first part of that rules and

18   regulations, but it says for the good of the

19   department, the chief of the department may make -- may

20   move manpower as he sees fit.  That's not a quote, but

21   it's the tone of it.

22   **Q.**   I see.  So you said that they were difficult, and

23   then I interrupted you.  Could you explain to us what

24   you meant that they were difficult.

25   **A.**   What was difficult?

1    **Q.**   I thought that you said that those years were

2    difficult.

3    **A.**   Oh, difficult because I had to continuously

4    request that I don't go in charge.

5    **Q.**   Okay.  For how long did you continuously request

6    that you not be put in charge?  When you say "put in

7    charge," does that mean a promotion to --

8    **A.**   Well, I was acting as an officer in that

9    timeframe.  So if a call-back came in for an officer

10   position, I could take that because with -- anyone on

11   the job one year can be in charge of an engine, a

12   ladder or a rescue.

13        So they only have to have a year experience; and

14   if they are the senior person on that vehicle, they can

15   be bumped up in charge.

16        That was happening periodically for me already.

17   And through some situations, I found it to be

18   uncomfortable and, you know, just very tough to, you

19   know, get things done.

20        Guys with 18 years on the job and been in

21   rescue, one in particular, you know, even said to me,

22   you know, I'll never take an order from you.  I had a

23   year and a half on the job.  He was 18 years, and I

24   think he had completed almost 15 of those 18 on rescue.

25   He was just transferring, you know, his career from

1    being a rescue --

2          MR. McHUGH:  I'm going to object at this point,

3    your Honor.  This is becoming a free-flowing narrative

4    instead of answering questions.

5          THE COURT:  Why don't we let the witness finish

6    this answer, but we have to be careful about ensuring

7    that we have question and answer, back and forth,

8    Mr. Martin.

9    **A.**   Firefighter Dicomitis was on rescue for a lot of

10   years; and, in turn, when I was acting in charge in my

11   first year and a half, I was basically told that he'll

12   never take an order from me.

13         THE COURT:  Mr. Martin, actually is this a good

14   time?  We're right at 4:30.

15         MR. MARTIN:  Yes.

16         THE COURT:  Great.  Ladies and gentlemen, we're

17   going to break for the day.  I'm going to give you the

18   usual admonitions.  Please don't do any independent

19   research about this case, please don't discuss this

20   case amongst yourselves or with anyone else, please

21   don't mention anything about your jury service on

22   social media and please, please don't look at any news

23   reports about this trial.  If you see them, just turn

24   away from them.  And we'll see you back at 9:30.

25         (Adjourned.)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

___February 1, 2017_____
Date

/s/ Karen M. Wischnowsky

Karen M. Wischnowsky, RPR-RMR-CRR
Federal Official Court Reporter

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25