1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF RHODE ISLAND

3

4
       * * * * * * * * * * * * * * *    C.A. NO. 12-517M
5                                  *
   LORI FRANCHINA                  *
6                                  *
       VS.                         *    APRIL 7, 2016
7                                  *    9:30 A.M.
   CITY OF PROVIDENCE              *
8                                  *
       * * * * * * * * * * * * * * *    PROVIDENCE, RI
9

10

11          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

12                       DISTRICT JUDGE

13                  (Jury Trial - Volume II)

14

15    APPEARANCES:

16    FOR THE PLAINTIFF:      KEVIN P. BRAGA, ESQ.
                              Law Office of Kevin P. Braga
17                            2095 Elmwood Avenue, Suite B
                              Warwick, RI  02888
18
                              JOHN T. MARTIN, ESQ.
19                            BENJAMIN H. DUGGAN, ESQ.
                              KJC Law Firm, LLC
20                            10 Tremont Street, 6th Floor
                              Boston, MA  02108
21
      FOR THE DEFENDANT:      KEVIN F. McHUGH, ESQ.
22                            KATHRYN M. SABATINI, ESQ.
                              City Solicitor's Office
23                            444 Westminster Street, Suite 220
                              Providence, RI  02903
24
      Court Reporter:         Karen M. Wischnowsky, RPR-RMR-CRR
25                            One Exchange Terrace
                              Providence, RI  02903

**I N D E X**

**GOVERNMENT WITNESS**                                    **PAGE**

<u>Lori Franchina, Resumes</u>
    Cont. Direct Examination by Mr. Martin        4
    Cross-Examination by Mr. McHugh              186

**E X H I B I T S**

| **PLAINTIFF** | **FOR ID** | **IN FULL** |
|---|---|---|
| 6 | | 150 |
| 20 | | 142 |
| 21 | | 142 |
| 24 | | 164 |
| 25 | | 164 |
| 26 | | 164 |
| 27 | | 164 |
| 29 | | 164 |
| 30 | | 164 |
| 31 | | 164 |
| 32 | | 164 |
| 33 | | 164 |
| 36 | | 165 |

1    7 APRIL 2016 -- 9:30 A.M.

2              (The jury is present for the following.)

3         THE COURT:  Good morning, everyone.  I hope you

4    all had a good evening.  I'll ask you my usual morning

5    questions.  Can you all assure me that you didn't

6    discuss this case with anyone, that you didn't do any

7    outside research, that you didn't mention anything

8    about your jury service on social media and that none

9    of you read or saw any news reports about the trial?

10   Is that all true?  Great.  Everyone affirming.  Thank

11   you.

12        Ms. Franchina, you're still on the stand.

13        Mr. Martin.

14        MR. MARTIN:  Thank you.

15        THE COURT:  Ms. Franchina, you're still under

16   oath.  Do you understand that?

17        THE WITNESS:  Yes.

18        THE COURT:  Great.  While you're coming, you can

19   come forward, a couple of reminders on schedule if you

20   may not have remembered.  We're not meeting tomorrow.

21   I have a long-standing hearing between the federal

22   government and the state government, believe it or not,

23   with a lot of out-of-state attorneys, so I couldn't

24   reschedule it, an all-day hearing tomorrow.  So we'll

25   have you back on Monday.

1          And then today we're going to have to -- I

2     haven't told the attorneys this yet either -- quit

3     about quarter of four.  I have a 4:00 meeting that I

4     have to get to.  So we'll watch the time, but somewhere

5     close to a little before four we'll break today.

6          MR. MARTIN:  Thank you.

7          THE COURT:  Mr. Martin.

8          **LORI FRANCHINA, PLAINTIFF'S WITNESS, RESUMES**

9                **CONTINUED DIRECT EXAMINATION**

10    **BY MR. MARTIN**:

11    **Q.**    Good morning.

12    **A.**    Good morning.

13    **Q.**    Yesterday we had left off sometime around 2006 and

14    your summary of your career up to that point.  So I'd

15    like to pick up from around mid-2006 if that's okay.

16    **A.**    Yes.

17    **Q.**    Can you tell us, who is Andre Ferro?

18    **A.**    Andre Ferro sexually harassed me September 26th,

19    2006.

20    **Q.**    Was he a co-worker?

21    **A.**    He was, approximately 15 to 18 years on the job

22    when I got on.

23    **Q.**    Were you working on September 26th -- excuse me,

24    September 28th of 2006?

25    **A.**    I'm not aware of the date of that.

1    **Q.**   Oh, I thought you just mentioned the date when he

2    had harassed you.

3    **A.**   The 26th.

4    **Q.**   Oh, excuse me.  I apologize.  Were you working

5    that day?

6    **A.**   Yes.

7    **Q.**   What rank were you working?

8    **A.**   In 2006 I was an acting lieutenant on Rescue 5.

9    **Q.**   Can you just explain for us, what is the

10   difference between a lieutenant and an acting

11   lieutenant?

12   **A.**   For the good of the department, the chief of the

13   department has the authority to temporarily or

14   permanently promote somebody into a rank that has not

15   yet been able to test.

16        With our job, you have to have seniority years

17   of seven years, I believe, or six or seven years prior

18   to testing.

19   **Q.**   And were you working the day shift or the night

20   shift?

21   **A.**   I had come in on the night shift.

22   **Q.**   And then how long would your shift last?

23   **A.**   From 5P to 7A.

24   **Q.**   Where would you go when you were between shifts?

25   **A.**   I don't understand the question.

1    **Q.**   Do you stay at the station even when your shift is

2    over?

3    **A.**   No.

4    **Q.**   Where do you stay when you're on shift but you're

5    not on a call?

6    **A.**   Oh, in the firehouse.

7    **Q.**   Where do you when you're an act -- where do you

8    sleep when you're not an acting lieutenant?

9    **A.**   When I'm not an acting officer, I would sleep in

10   the bunk room.

11   **Q.**   And the bank room is -- can you describe that for

12   us.

13   **A.**   Yup.  It's the side of a building.  It's a room

14   probably from the jury end of the box to midway through

15   the floor here, linear.  It's all open, no barriers,

16   probably approximately 12 racks, we call them, beds;

17   and you sleep all in one room as firefighters.

18   **Q.**   Did you ever have any problem with that back in

19   2004, 2005, 2006?

20   **A.**   No.

21   **Q.**   Now, as an acting lieutenant, where would you

22   sleep?

23   **A.**   As an acting officer, I would be in the officer's

24   quarters.

25   **Q.**   Can you describe the officer's quarters for us,

1    please.

2    **A.**    Yes.   At North Main Street where I was stationed

3    first as an officer there, we had an officer for the

4    engine, Engine 7, officer for Ladder 4 and officer for

5    Rescue 5 quarters.

6         They're a single bed, a computer, a desk and

7    four closets usually into the wall that we can -- each

8    officer can secure their items in their off time.

9    **Q.**    Now, when you say an acting lieutenant, that's an

10   acting rescue lieutenant; correct?

11   **A.**    Yes.

12   **Q.**    So tell us when you go on runs, what is the -- are

13   you driving?  What type of vehicle are you taking?

14   Just describe generally how you go on a run.

15   **A.**    Sure.  A rescue vehicle has an officer.  In each

16   rescue unit or group, A, B, C and D platoons, you have

17   a captain, you have three lieutenants.  So in those

18   four groups you'll have a captain and you'll have three

19   lieutenants.

20        I took over one of those lieutenant positions.

21   My title is as an acting officer; but according to the

22   rules and regulations, once you become an acting

23   officer, you assume all responsibilities, rules and

24   regulations, standard operating procedures, memos and

25   general orders of an officer.

1          The vehicle that we drive is a 350 Ford diesel

2     rescue.

3     Q.    Is that like an ambulance?

4     A.    It's a rescue.

5     Q.    There's a difference between an ambulance and a

6     rescue?

7     A.    Well, I'm attached to a fire department, so I'm a

8     rescue.

9     Q.    I see.  Does it serve the same function as an

10     ambulance would?

11     A.    Sure, in the private sector.

12     Q.    Okay.  So when you go on runs, are you alone on

13     the rescue?

14     A.    No.  I have a chauffeur assigned to me.

15     Q.    And what rank is the chauffeur?

16     A.    He would be or she would be determined a rescue

17     technician, and there is a difference in pay grade from

18     a firefighter to a rescue tech because you assume the

19     position of a chauffeur.

20     Q.    On the date that you mentioned earlier, that was

21     September 26th, 2006?

22     A.    Correct.

23     Q.    Who was your rescue tech on September 26th of

24     2006?

25     A.    Firefighter Andre Ferro had come over on what they

1    call a call-back, an overtime shift, and he assumed the

2    rescue chauffeur position for Rescue 5 that night for

3    me.

4    **Q.**    Had the two of you worked together before?

5    **A.**    Never.

6    **Q.**    Had you ever heard of him before?

7    **A.**    Yes.

8    **Q.**    What did you hear about him?

9    **A.**    He was an individual that was, from what I

10   understood, charged with sexually harassing Julia

11   O'Rourke in the academy.

12   **Q.**    How did you feel about working with him that

13   night?

14   **A.**    A little apprehensive.

15   **Q.**    How did you plan to handle your apprehension?

16   **A.**    Professional, you know, inform him of what he and

17   I need to do and, you know, get the job done as

18   efficiently and professionally as we could.

19         I didn't really have an opportunity to establish

20   rapport with him due to his response to me when he

21   first walked in.

22   **Q.**    What was his response to you when he first walked

23   in?

24   **A.**    Engine 7 and Ladder 4 had cleared the building on

25   a run, so they were dispatched.

1    **Q.**    Can I just interrupt you for a second?

2    **A.**    Sure.

3    **Q.**    Can you describe for us what a run means.

4    **A.**    A run is when a fire apparatus is dispatched into

5    the city for -- you know, dispatched to an incident.

6    **Q.**    Okay.  So please continue.  You had just left off

7    that the other vehicles had left for a run.

8    **A.**    Yup.  Engine 7 and Ladder 4 had been dispatched to

9    downtown for probably a box alarm.  I'm not sure of the

10   actual run, but they were dispatched.  The house was

11   empty.

12          I had my back to the opening of the doorway to

13   the kitchen, and I was pouring a cup of coffee.  I

14   start my shift usually with a cup of coffee.  And he

15   came in and said, I'll be working with ya, Lieu; and I

16   said, Oh, okay.  You know the drill.  Have you checked

17   the truck yet?

18          And he just sauntered over and poured himself a

19   cup of coffee and he said, No, I haven't, but I'll get

20   down there soon.  Okay.  No problem.  I was turning to

21   go to my office, and he asked me if I was a lesbian.

22   Straight up, Are you a lesbian?

23   **Q.**    This was on your first encounter with him?

24   **A.**    Those words, that's -- we had a brief exchange,

25   and within minutes of his arrival he asked me if I was

1    a lesbian.

2    **Q.**   So what did you say back?

3    **A.**   I said, It's none of your concern.  Well, I don't

4    normally -- he says, I don't normally like to work with

5    women; but, you know, we like the same thing, so I

6    think we're going to get along.

7    **Q.**   How did you reply to that?

8    **A.**   I was appalled.  I said -- I said, You can't say

9    those things, and I immediately left for my office; and

10   within a few seconds, our tones hit and we were

11   dispatched to an emergency call.

12   **Q.**   Anything happen on the emergency call?

13   **A.**   Yes.  I'm in a moving vehicle.  I have no ability

14   to, you know, exit the vehicle.  We're in motion to a

15   run.

16   **Q.**   Who was driving?

17   **A.**   He was the rescue chauffeur.  I was the

18   lieutenant.  And he proceeded to engage in -- I'm

19   listening to dispatch, which is 100 percent of his

20   responsibility also.  You must be able to hear dispatch

21   and respond appropriately to incoming information.

22          And he was just -- I had to tell him to --

23   actually, I told him to shut up because he would not --

24   he was interrupting my ability, disturbing my ability

25   to hear the dispatching.

1  **Q.**   What was he saying when he was interrupting the

2  dispatch?

3  **A.**   Do you have a partner?  Are you going to have

4  babies?  At one point he said, I could help you with

5  that.  And I actually told him again, Dude, you need to

6  shut up.  And that was my only response.

7       I had never -- I don't know.  I've been a

8  ballplayer for years.  I've been a teacher.  I've been

9  a coach.  I've been a professional, and I've -- I mean,

10 I've never had a co-worker -- I was stunned.  Every

11 time I heard it, I was just shocked, overwhelmed.  And

12 I felt as though my responses were, You've got to shut

13 up.  Like, you can't say those things.  I guess that

14 was my response.

15 **Q.**   Okay.  Did you guys take care of the run?

16 **A.**   Yes.

17 **Q.**   Where did you go after you took care of the

18 emergency call?

19 **A.**   I'm not sure if that one was a treat and transport

20 or if it was a treat and refusal, but I know we got

21 into the vehicle again; and later that evening, I can

22 recall a run that brought us to Rhode Island Hospital.

23 **Q.**   What happened on the run to Rhode Island Hospital?

24 **A.**   He actually -- with the rescue technician

25 position, they clean the vehicle.  I secure the report

1    and give a clear report, verbal report to the triage

2    nurse.  And then depending on the criticalness of the

3    patient, we may even go from triage with the triage

4    nurse into a trauma room and/or a medical facility,

5    medical room, and articulate what we found, you know,

6    on scene, living conditions, you know, cleanliness of

7    the apartment, things of that nature and the patient's

8    condition.

9         And we -- we're patient advocate, so we really

10   kind of just do all of that for the patient and give

11   that clear report to the doctor and the nurse and

12   nursing staff.

13        And then he's supposed to be gathering

14   equipment.  I know on that run in particular he needed

15   to secure an IV bag, 1000 cc bag, you know, his

16   needles, IV tubing.  So he had to get the medical

17   supplies.

18        I had finished my report.  I was standing with

19   Lieutenant Michael Legault, John Tierney, Rescue Tech

20   John Tierney, and I believe there was a total of six of

21   us because there was three rescues there and there's

22   two people on each rescue, and he exited the lobby

23   area.

24   **Q.**  Can I just --

25   **A.**  I'm sorry.

1  **Q.**    Sure.  No problem.  So that's what you had done

2  medically on the run.  Were there any further

3  interactions with Andre Ferro on that run?

4  **A.**    No, because I was in the back of the vehicle and

5  he was driving in the front of the vehicle.

6  **Q.**    Okay.  When was your next interaction directly

7  with Andre Ferro that evening?

8  **A.**    Immediately on that run I had passed off my

9  information to the doctors and nurses.  I had returned

10  to the exterior of the hospital because I had done my

11  report.  I completed it, went to my vehicle, and I was

12  engaging in a conversation with Lieutenant Michael

13  Legault and John Tierney specifically.

14        Andre Ferro had exited the Rhode Island Hospital

15  with an IV bag in I believe it was his left arm; and

16  with his right hand, he linked his fingers, circled his

17  nipple, kind of leapt in the air and said, My lesbian

18  lover, how are you doing?  And again I just shrunk.  I

19  was so embarrassed.

20  **Q.**    Now, you mentioned that there were two other

21  firefighters with you?

22  **A.**    Correct.

23  **Q.**    Could you see their faces after he said that?

24  **A.**    Absolutely.

25  **Q.**    What did they look like?

1   **A.**   Appalled.  I don't think they'd ever heard it.

2   Let me just say this.  I believe they've heard it but

3   never in the presence of the individual they're, you

4   know, belittling, berating, humiliating.

5   You know, with me being there, I think they

6   felt -- they could see how I felt, and then I saw how

7   they appeared, and they were just like overwhelmed.

8   They were startled.

9   **Q.**   Where was the patient?

10  **A.**   That patient was already in a room.

11  **Q.**   Were you inside the hospital or outside the

12  hospital?

13  **A.**   We were just outside the doors of the ER.

14  **Q.**   Were there any medical staff or other people --

15  **A.**   Absolutely.  Within five feet of him, there was a

16  triage desk and table; and in the lobby itself,

17  Cranston, I believe, was there, Cranston rescue.  They

18  had a few guys pulling backboards.

19  And inside the lobby of the hospital -- not

20  lobby.  It's an area of treatment, holding where then

21  they go on to the medical rooms and whatnot, there had

22  to be eight patients there with families standing

23  around.  I mean, I saw heads turn because I was facing

24  him as he was coming out and saw their reactions.

25  **Q.**   Describe for me when he said "my lesbian lover" to

1    you, how far away were you?

2    **A.**   Four or five feet.  He was walking toward me.  I

3    was at the back of my rig, and that's where he was

4    heading, directly at me.  And I happened to be the only

5    female in that area at the vehicles.  I was the only

6    female.

7    **Q.**   Did you or did either of the other firefighters

8    respond?

9    **A.**   Yes.  Michael Legault, lieutenant.

10   **Q.**   What did Lieutenant Legault say?

11   **A.**   I believe he said, You're an idiot, to him and --

12   **Q.**   How did it make you feel to have Lieutenant

13   Legault insult him like that in response to his

14   comments to you?

15   **A.**   I mean, I felt -- I mean, I'm still overwhelmed at

16   this point.  I'm welling up with tears.  My gut hurts.

17   **Q.**   But did it feel good to have somebody have your

18   back?

19   **A.**   Yeah, I mean, as good as it can feel.

20   **Q.**   Okay.  Anything further happen with Mr. Ferro that

21   night?

22   **A.**   I did see, before I went back in service, Legault,

23   Lieutenant Michael Legault was talking with Andre

24   Ferro; but it didn't look -- it looked more one-sided.

25   I don't believe there was a conversation.  What I

1    appeared to see was Lieutenant Legault, finger in his

2    face and that kind of thing.

3    **Q.**    Finger in his face as if he was being admonished?

4    **A.**    Yeah.  Absolutely.

5    **Q.**    Did that feel good?

6    **A.**    Yeah, but I knew I had to get back in the truck

7    with him.

8    **Q.**    Any additional interactions with Mr. Ferro that

9    night?

10   **A.**    Yes.  Our rescues stay on the road quit a bit, and

11   I did avoid him quite a bit.  I was trying to wrap my

12   head around it, try to develop a plan.

13   Administratively, the administration is not -- they're

14   an administrative --

15   **Q.**    I wasn't asking so much about what you thought

16   about the administration at the time, but did you have

17   any additional interactions with Andre Ferro that

18   evening?

19   **A.**    Yes.

20   **Q.**    Could you tell me about the additional

21   interactions you had with Andre Ferro that evening.

22   **A.**    Later that evening, because I had my own quarters,

23   I had taken off my pants and gotten in my rack.  I have

24   two doors that were not locked, but they were shut.

25           And the rule is that if an officer's door is

1    shut, you must knock three times and gain permission.

2    It's a militant-style environment.  You have these

3    rules in place to substantiate, you know, security.

4         There was no knock on my door.  It kind of just

5    opened, and in came Andre Ferro in -- I couldn't even

6    tell if they were boxers.  There was a computer screen

7    and a desk between us.  My bed was on the opposite

8    side.  And I immediately sat up, kept the sheet over

9    my --

10   Q.   Was there a light on in your office?

11   A.   Yes, there's -- the computer screen was --

12   Q.   Was there a light on?

13   A.   Yes, there was a small light right near my desk.

14   Q.   Like a nightlight or like a lamp?

15   A.   No, it's a lamp.  It's a lamp with like a table

16   and a lamp right next to the desk where you can set

17   your equipment and stuff.

18   Q.   So was the room well lit?

19   A.   Enough to see who it was and to see everything,

20   yeah.

21   Q.   And you mentioned his shorts.  Was he wearing a

22   shirt?

23   A.   Yes, he was wearing a shirt.  It was actually a

24   Providence Fire -- blue shirt that says Providence

25   Fire, Providence Fire on the back.

1    **Q.**    Any shoes or anything on his feet?

2    **A.**    Socks.

3    **Q.**    And you mentioned that you had gotten up and

4    pulled a sheet over your legs.  Why did you do that?

5    **A.**    I was in my underwear.

6    **Q.**    Did he tell you why he entered your office?

7    **A.**    He wanted to talk.

8    **Q.**    Did he tell you what he wanted to talk about?

9    **A.**    That if he offended me in any way throughout the

10   night, he'd like to ask me.  At this time he's sitting

11   with his legs up, feet up on my desk and kind of

12   rocking back in the chair.

13       I didn't believe that his intent was -- I didn't

14   believe his intent was sincere.  I mean, the way he

15   approached me all night long, there was no sincerity in

16   what he wanted to talk about.

17   **Q.**    Did you have -- when he was sitting with his feet

18   up on the desk, was he facing towards you?

19   **A.**    Yes.

20   **Q.**    What was he doing with his hands?

21   **A.**    They were on his thighs kind of bouncing and

22   rocking back.  He was kind of pushing his feet off the

23   table, my desk.

24   **Q.**    Did you ask him to leave?

25   **A.**    Yes, I did.

1  **Q.**   How many times?

2  **A.**   Three.

3  **Q.**   Did he eventually leave?

4  **A.**   Yes.  When the third time, I said, You need to get

5  the fuck out of my office.

6  **Q.**   Did you complain to any of your superiors about

7  that?

8  **A.**   I had started writing some things down about the

9  evening, and shortly after that I got a phone call.

10  **Q.**   Who called you?

11  **A.**   The department line rang, and Captain Horton

12  answered it and came to my office and said, Chief

13  Varone's on the department line for you.  And I was

14  like oh, wow.

15  **Q.**   Why were you like "oh, wow" when you heard the

16  name of Chief Varone?

17  **A.**   He had gotten wind.  I had a feeling he had gotten

18  wind, but I didn't know how, you know.

19  **Q.**   And I know that there are different levels of

20  chiefs in the department or maybe the better word is

21  different titles of chiefs.  What was his title?

22  **A.**   He was the DAC on the shift, which is the deputy

23  assistant chief; and below him are two chiefs,

24  Battalion 2 and Battalion 3.

25  **Q.**   How many chiefs are above the deputy assistant

1    chief?

2    **A.**    Quite a few.

3    **Q.**    So what did you and Chief Varone talk about?

4    **A.**    He specifically asked me direct questions where he

5    said did this behavior occur, did this behavior occur

6    and did this behavior occur, the ones I already stated;

7    and then I just said yes; and he goes, I need nothing

8    further from you.

9    **Q.**    Did you ever have any more problems with Andre

10   Ferro after that?

11   **A.**    Yes.  He was removed from --

12   **Q.**    Let me ask you a better question.  Did you ever

13   have any problems with Andre Ferro in the Providence

14   Fire Department after that?

15   **A.**    Yes.

16   **Q.**    Okay.

17   **A.**    He was assigned to a different truck the next day.

18   I believe he went -- he was removed that night to his

19   old -- to his assigned vehicle.  So the reason he

20   wasn't there initially is because the person on shift

21   that has that group stays in their group shift.  The

22   other person will have to leave and get the call-back

23   where the opening is on the shift.

24        So he was brought back to his vehicle pending, I

25   believe, you know, the process or whatever Chief, you

1    know, Varone was going to conduct investigation-wise.

2         And the following day we were at Fatima

3    Hospital, and it was approximately 3:00, and I know

4    this because of shift change.  There were a lot of

5    nurses coming in and out of the ER bay area.  And in

6    front of Chief Varone -- excuse me, Chief Crawford, my

7    partner at the time was John Tierney.  Andre Ferro and

8    his partner, which was Lieutenant Tommy Miller, those

9    people were in the presence of Chief Crawford.  We were

10   discussing -- you know, briefly he took me aside and

11   asked me if I was okay.  We then engaged --

12   **Q.**   Who took you aside?

13   **A.**   Chief Crawford.

14   **Q.**   Okay.

15   **A.**   And we all came back together in the ER bay right

16   in front of the doorway of Fatima Hospital, and Andre

17   Ferro literally drops his pants to his -- beyond his

18   knees; and in the underwear, his underwear, he pulls up

19   his boxers and says, Chief, we need some new equipment.

20   The stair chair, you know, the stair chairs are

21   terrible, and look what it did to my thigh, and he had

22   a bruise on it.  I don't understand it, but it

23   happened.

24   **Q.**   Okay.  So was that the extent of your interactions

25   with Andre Ferro?

1    **A.**   On the job?

2    **Q.**   On the job.

3    **A.**   Yes, besides the trial.

4    **Q.**   What trial?

5    **A.**   The hearing board trial.

6    **Q.**   Can you describe for the jury what the hearing

7    board trial was.

8    **A.**   I believe it was three days long.  It was

9    conducted in response to --

10   **Q.**   What was the trial about?

11   **A.**   Andre Ferro sexually harassing me.

12   **Q.**   Was that in a court or --

13   **A.**   It was at city hall, and it was conducted by a

14   panel.

15   **Q.**   Did you bring forth charges against Andre Ferro

16   personally?

17   **A.**   I did not.

18   **Q.**   Did you fill out a written complaint of sexual

19   harassment?

20   **A.**   Chief Varone did that based on my verbal --

21   according to the rules and regulations that were in

22   force then, written and verbal complaints were taken as

23   the same.

24   **Q.**   My question was, did you fill out a written

25   complaint of sexual harassment?

1    **A.**    I don't believe so.

2    **Q.**    Do you know who brought forth charges against

3    Andre Ferro?

4    **A.**    Chief Varone.

5    **Q.**    And without going through all the details of the

6    three-day trial, what was the result of that trial?

7    **A.**    Andre Ferro was terminated.

8    **Q.**    Did Andre Ferro ever come back to work?

9    **A.**    Yes, he did.

10   **Q.**    Did you ever have any further problems with him

11   directly?

12   **A.**    Yes.

13   **Q.**    At work?

14   **A.**    No.

15   **Q.**    What station were you housed at or what station

16   were you working out of when the Andre Ferro incident

17   occurred?

18         Oh, wait.  Do you know what?  Let me go back for

19   a second.  Were you pleased with the way that

20   Chief Varone responded to your issue at work?

21   **A.**    Absolutely.

22   **Q.**    And how did you feel about the support and the

23   reaction to the incidents with Andre Ferro from the

24   department?

25   **A.**    Good.

1    **Q.**   Did you have any complaints about the way that

2    this was handled?

3    **A.**   No.

4    **Q.**   Do you fault the fire department or the City of

5    Providence for anything that Andre Ferro did that

6    night?

7         Well, actually, no, let me ask you a better

8    question.  Do you find any fault with the way they

9    responded to what he did to you that night?

10   **A.**   No.

11   **Q.**   What station were you working at when that

12   happened?

13   **A.**   North Main Street.

14   **Q.**   Prior to the Ferro incident, how did you enjoy

15   your time working at the North Main Street Station?

16   **A.**   Times were okay.  I mean, I was in a leadership

17   position, so, I mean --

18   **Q.**   Any persistent problems with anybody before the

19   Ferro incident?

20   **A.**   I can't remember if it's before or after.

21   **Q.**   Okay.  Were there any persistent -- what was your

22   experience like at the station after the Andre Ferro

23   incident?

24        MR. McHUGH:  Objection as to form, vague,

25   overbroad.

1        THE COURT:  Why don't you rephrase it,

2   Mr. Martin.

3        MR. MARTIN:  Sure.

4   **Q.**   After September 26th of 2008 -- excuse me, after

5   September 26th of 2006, how would you describe your

6   work experience and your work environment?

7   **A.**   They were less apt to listen to me on runs.

8   **Q.**   Who was less apt?

9   **A.**   Firefighters.

10  **Q.**   When was the trial of Andre Ferro?

11  **A.**   Maybe October.

12  **Q.**   Of the same year?

13  **A.**   Yeah.

14  **Q.**   Okay.  So describe for us what you mean that

15  people were less responsive on runs.

16  **A.**   Even if the engine company arrived before a rescue

17  run on difficulty breathing, oxygen, portable oxygen

18  wasn't brought.  Necessary equipment wasn't brought.

19       MR. McHUGH:  I'm going to object and move to

20  strike.  This is all general, vague narrative.

21       THE COURT:  Overruled.  The motion's denied.

22  **Q.**   Could you please continue or were you done?

23  **A.**   No.  I mean to be specific, would it help with

24  names or is it just the action of, like, a general

25  statement?  I'm not sure.

1      THE COURT:  Why don't you pose a new question.

2      THE WITNESS:  Okay.  Thanks.

3   **Q.**   Were there any people at the department who ever

4   spoke to you directly about your situation with Andre

5   Ferro?

6   **A.**   Yes.

7   **Q.**   Who were those people?

8   **A.**   Firefighter McDougal, Firefighter Fabrizio.

9   **Q.**   So let's get a little background on them.

10  Firefighter Fabrizio, what's his first name?

11  **A.**   Jay.  No, it's Theodore.

12  **Q.**   What did Jay Fabrizio say?

13  **A.**   He would critique my runs and leave me notes on my

14  desk.

15  **Q.**   I'm sorry for being misleading.  My question was

16  about specific comments that people made to you about

17  Andre Ferro.  Did anybody make any specific comments to

18  you about Andre Ferro?

19  **A.**   Yes.  Firefighter Andy McDougal.

20  **Q.**   What did Firefighter Andy McDougal say to you

21  about Andre Ferro?

22  **A.**   It was shift change.  We were in the kitchen.

23  Shift change, your manpower doubles.  A lot of people

24  have coffee before they leave.  We congregate, we talk.

25  And basically we were in that environment, and there

1    was a lot more people than normal; and he looked at me

2    and he says, What are you trying to do, get him fucking

3    fired?  And I was just -- I'm a lieutenant, he's a

4    firefighter, and I just -- I was appalled.

5    **Q.**   Was this before or after the trial?

6    **A.**   It was before.

7    **Q.**   How long after the incident was it?

8    **A.**   Within that few weeks that they had developed a --

9    the procedure of a trial.  So it was in -- I think it

10   was within, you know, a couple weeks to a month.

11   **Q.**   How many people were in the room with you when he

12   said, What are you trying to cost him, his F-ing job?

13   **A.**   At least 10 to 12.

14   **Q.**   How far apart were you guys?

15   **A.**   McDougal approached.  I was sitting near the

16   refrigerator with my back to it.  He opened the

17   refrigerator, and he came right over to me and said --

18   you know, leaned in and said, What are you trying to

19   get him fucking fired?

20   **Q.**   How loud did he say it?  Was he yelling?  Was he

21   talking?

22   **A.**   It was a raised voice.  I wouldn't say it was

23   quite yelling, but it was stern and raised.

24   **Q.**   Could you see the faces of the other people in the

25   room or of any of the other faces in the room?

1    **A.**   Yeah, because a lot of raised eyebrows like, you

2    know, they didn't know what to do either.  I think they

3    were expecting a response from me.

4    **Q.**   Did you respond?

5    **A.**   I don't know my exact response, but it was -- I

6    was shaken, I was affected, and I know I left the room

7    shortly after.

8    **Q.**   I want to take a step back to September 26th just

9    for a second.  You testified that you hadn't filled out

10    a complaint of harassment but that Chief Varone had

11    contacted you.  Do you recall that?

12    **A.**   Yes.

13    **Q.**   Why didn't you fill out a -- why didn't you want

14    to complain about harassment?

15    **A.**   For fear of retaliation, for fear of getting, you

16    know, labeled a complainer or anything that -- I mean,

17    everything that I had heard, you know, you do your job,

18    you come in and you just keep your nose clean; and, you

19    know, as a new guy or newer person, junior person, you

20    just -- you listen and you follow orders.  And, you

21    know, they always said if you write something down,

22    you're done.

23    **Q.**   So what were you feeling when firefighter -- by

24    the way, how long had Firefighter McDougal been on the

25    force -- I mean the department?

1    **A.**    Probably around the same time as Andre Ferro.

2    Same amount of years maybe.

3    **Q.**    I don't remember how many years.

4    **A.**    Oh, 15 maybe at the time.

5    **Q.**    What was his rank?

6    **A.**    McDougal?

7    **Q.**    Uh-huh.

8    **A.**    Firefighter.

9    **Q.**    Oh, that's a rank?

10   **A.**    A firefighter is a rank.

11   **Q.**    Oh, okay.

12   **A.**    Yes.

13   **Q.**    Is that like a supervisory rank?

14   **A.**    No.  It's a subordinate.  When you first get on

15   the job, you're a Class 1 -- you're a Class 3, excuse

16   me, firefighter.  You become a Class 2 and then a

17   Class 3 -- sorry, 3, 2 and 1.  And it's a

18   Firefighter 1.  So you get the number one next -- so it

19   would be Firefighter-1 Andy McDougal.

20   **Q.**    So going back to the fridge when he said that to

21   you, do you remember the names of any of the people who

22   were in the room with you?

23   **A.**    Firefighter Jay Misto; Al Horton, Captain Al

24   Horton; Lieutenant Romano; Jay Theodore Fabrizio,

25   Firefighter Fabrizio; Dicomitis, Firefighter Dicomitis.

1   **Q.**   So I heard two ranks that were higher than

2   firefighter.  One was Captain Al Horton?

3   **A.**   Correct.

4   **Q.**   And there was a lieutenant?

5   **A.**   Lieutenant Romano.

6   **Q.**   What did Lieutenant Romano say when he heard your

7   subordinate say that to you?

8   **A.**   I knew he said something, but right now I can't

9   recall it.

10  **Q.**   Did he say something to you or did he say

11  something to Firefighter McDougal?

12  **A.**   It was a general statement.  I don't believe it

13  was directed at anyone in particular.

14  **Q.**   What did Captain Horton say after he heard your

15  subordinate say that to you?

16  **A.**   I got out of there pretty quickly.  I know he had

17  made a statement later on about not --

18  **Q.**   I wasn't asking about later on.

19  **A.**   I don't know.  I can't recall.

20  **Q.**   In the kitchen, did he say anything?

21  **A.**   Again, I can't recall.

22  **Q.**   Okay.  Did you say anything?

23  **A.**   Right now it's just overwhelming me, and I can't

24  recall.

25  **Q.**   Okay.  Are there any rules and regulations at the

1     Providence Fire Department about how subordinates are

2     required to speak to superior officers?

3     **A.**   Yes.

4     **Q.**   Is using profanity towards a superior officer a

5     violation of any rule or regulations?

6     **A.**   Yes.

7     **Q.**   Do you know if Firefighter McDougal was

8     disciplined in any way for what he said to you?

9     **A.**   No, he was not.

10    **Q.**   Okay.  So tell us about your work environment

11    after he said that to you in front of the lieutenant

12    and the captain.

13          MR. McHUGH:  Objection as to form.

14          THE COURT:  Overruled.

15    **A.**   It was strained.  My trust in them became leery.

16    I spent more time in my room.  Shortly afterwards,

17    there was a disagreement or argument in regards to

18    having me in meals.

19    **Q.**   Tell me about that.

20    **A.**   I know Captain Horton had talked to the men in

21    regards to -- actually, we were all brought into the

22    kitchen.  And Andy McDougal says, I'm not cooking for

23    her.  She doesn't respect me.  And because captain --

24    **Q.**   Let me interrupt you for a second.  How long after

25    this incident at the fridge where he said, What are you

1    trying to cost him, his F-ing job, how long after was

2    it that you had this meeting with you all in the

3    kitchen?

4    **A.**   Had to be about the next day, the next shift.

5    **Q.**   So who was in the room when he said, I'm not

6    cooking for her anymore, she doesn't respect me?

7    **A.**   Our group.

8    **Q.**   How many people in the group, approximately?

9    **A.**   Well, on Engine 7 it would have been Captain

10   Horton; Jay Fabrizio, Firefighter Fabrizio; Firefighter

11   Misto, Jay Misto; and Firefighter McDougal; Lieutenant

12   Romano on Ladder 4.  Again, I'm not sure of the

13   complete members of Ladder 4 because they always had a

14   call-back in.  There was a man down in numbers, so --

15   and then I don't know who the other consistent Ladder 4

16   guy was.  And then my technician, and I'm not aware of

17   his name.

18   **Q.**   Had you and Firefighter McDougal had any other

19   conversations between when he said that to you at the

20   fridge and then when he said that he wasn't cooking for

21   you anymore?

22   **A.**   Yeah.  In between there he wouldn't carry

23   equipment to scenes and, you know, whatever his

24   assignment was.

25        Each position of the truck, the engine, has a

1    specific piece of equipment to carry, whether it be the

2    medical bag, oxygen or the officer always carries his

3    tools, his Halligan.  And so everyone's assigned a

4    piece of equipment.  He would leave his -- specifically

5    leave his equipment on the truck.

6    Q.   My question was a little bit different, though.

7    Did you have any further conversation with Andy

8    McDougal between the time when he spoke to you at the

9    fridge and the next day when he told you that he was

10   not going to cook for you anymore?

11   A.   Yes.  He also told me on a scene, You talk too

12   much and you try to get out of lifting your stretcher.

13   I'm not lifting your stretcher for you.

14   Q.   Was he your chauffeur on that run?

15   A.   No.  He was on the engine.

16   Q.   When there's a rescue on the scene, who is in

17   charge of the scene?

18   A.   If it's a medical scene, it is the rescue officer.

19   Q.   Who was in charge of the scene when he told you

20   that he wasn't going to carry the stretcher for you?

21   A.   Lift the stretcher.  I was.

22   Q.   Had he ever refused to lift the stretcher for you

23   before that?

24   A.   No.

25   Q.   Had any of your subordinates ever refused to lift

1    the stretcher for you before that?

2    **A.**   No.

3    **Q.**   Had any of your subordinates ever refused to do

4    anything that you ordered them to do at a scene before

5    that?

6    **A.**   I can't be specific on the dates, but it wasn't

7    that big of a concern at the time.

8    **Q.**   Okay.  And then tell us about the conversation in

9    the kitchen when he told you that he wasn't going to

10   cook for you anymore.

11   **A.**   Well, the stretcher issue was also brought into

12   question because I had mentioned to both Lieutenant

13   Romano and Captain Horton that, you know, this is

14   getting to be, you know, to the point where it's

15   starting to affect patient care.

16   **Q.**   Why would --

17   **A.**   And I said we have to be a team.

18   **Q.**   Why would their -- excuse me, why would his

19   refusal to lift the stretcher affect patient care?

20   **A.**   Sometimes we need assistance.  Two people can't do

21   the job themselves.  If it's a medical run, we have an

22   extensive amount of equipment laying around, and the

23   person -- the stretcher sometimes for safety concerns,

24   we should do a four-point lift.

25   **Q.**   Do you -- at that point in time, had you ever

1    worked on a scene where there was a male rescue

2    lieutenant?

3    **A.**   Yes.  I had worked for several male officers prior

4    to this.

5    **Q.**   Was it common or did it happen from time to time

6    that male rescue lieutenants would tell subordinate

7    firefighters to lift a stretcher for them?

8    **A.**   Males tell subordinates, yes.

9    **Q.**   And what kind of things does a rescue lieutenant

10   do while other people are carrying the stretcher for

11   them?

12   **A.**   Sometimes we're preparing medications, we're

13   establishing our IV supplies, we're gathering other

14   equipment.  Sometimes they're doing that and we're

15   pushing the stretcher.  It varies.

16   **Q.**   So let's go back to the kitchen.  He just told you

17   that he's not going to cook for you anymore.  How did

18   you respond?

19   **A.**   I stood there, and Lieutenant Romano stated that

20   we can't do that; and Lieutenant Romano asked,

21   Lieutenant Franchina, do you want to be in on meals?

22   Do you want to be in on meals?

23   **Q.**   What did you say?

24   **A.**   I said, Yes, sir.

25   **Q.**   Tell us about meals at a fire department.  What's

1   the tradition or what's the typical setup?

2   **A.**   We have a dinky.

3   **Q.**   What is a dinky?

4   **A.**   A dinky is we pay a monthly fee to buy our coffee,

5   creamer, milk, cooking supplies, oils, salt and pepper,

6   anything that we need to -- a lot of cleaning supplies

7   we end up buying because some of the stuff the city

8   sends us is insufficient.  Just things of that nature.

9        It helps us pay -- also it pays our cable bill.

10   And we do have to have a phone at our station, so we

11   have to have a landline, too.

12   **Q.**   Do you have meals altogether?

13   **A.**   Oh, we do.

14   **Q.**   And how were the meals -- this was called -- this

15   was the North Main Street Station?

16   **A.**   Yes, 151 North Main.

17   **Q.**   So in your group, who prepared the meals when you

18   all had meals together?

19   **A.**   Well, that varies group to group.  Typically --

20   **Q.**   My question was for your group on North Main

21   Street Station.

22   **A.**   Yes.  Typically on my group it rotated between the

23   engine and the ladder, and it was predominantly a group

24   effort.  So if the ladder was cooking, there was three

25   guys to cook.  Usually the officers helped out, too.

1    And if the engine was cooking, there would be four men

2    and women cooking.

3    **Q.**   So when Andy McDougal had said that he wasn't

4    going to cook for you, how often did he actually cook

5    for you before that?

6    **A.**   The group or the engines or the ladders do the

7    cooking.  So he -- at that point in time, I was made

8    more aware that he, I guess, chose to do more cooking.

9    So that's why when he took this ownership of his

10   cooking, I had no idea it was affecting him that much.

11   **Q.**   Okay.  Had you complained about his cooking?

12   **A.**   Never.

13   **Q.**   Had you complained about how the food was stored?

14   **A.**   Stored?

15   **Q.**   As a rescue lieutenant, were you always available

16   to have meals together with the group?

17   **A.**   Oh, left for me?

18   **Q.**   As a rescue lieutenant, were you always available

19   to have your meals together with the group?

20   **A.**   No.

21   **Q.**   Just let me finish.  Okay?

22   **A.**   Yes.

23   **Q.**   As a rescue lieutenant, were you always available

24   to have your meals together with the group?

25   **A.**   No.

1    **Q.**   So what would be done with your food if they had

2    meals -- oh, why weren't you available?

3    **A.**   Because the rescues are 100 percent over the

4    national average, and we are a very active service.

5    **Q.**   Does that mean that because you would not be in

6    the building?

7    **A.**   Correct.

8    **Q.**   So what would they do with your food when you were

9    not in the building because you were out on a run?

10   **A.**   They would cover it with foil and label it "rescue

11   tech" or "lieutenant."

12   **Q.**   Did you ever complain about how the food was

13   stored or kept for you?

14   **A.**   Not initially.

15   **Q.**   Prior to the time when he said he was not going to

16   cook for you anymore --

17   **A.**   No.

18   **Q.**   -- did you ever complain about how it was stored

19   or how it was kept for you?

20   **A.**   No.

21   **Q.**   So what did he -- what happened after the

22   lieutenant said that that couldn't happen?

23   **A.**   I was kept in on meals; and then soon after, I

24   found myself getting diarrhea about four or five hours

25   after I ate.

1    **Q.**    How many times did you get diarrhea after eating?

2    **A.**    It was a shock to me because I don't really have

3    any troubles with my stomach.  I feel like I have a

4    cast-iron stomach; but in this particular case, I was

5    more aware of it.

6             And I eventually got sick again a second time,

7    and I said, you know what, I'm going to switch the food

8    and just see if it happens to my partner.

9    **Q.**    Well, before we get there, though, when -- so

10   there were two times that you got sick?

11   **A.**    Yes, at North Main Street.

12   **Q.**    At North Main Street.  Were both times after you

13   ate food?

14   **A.**    Yes.

15   **Q.**    And who prepared the food that you ate?

16   **A.**    Engine 7.

17   **Q.**    How did you get the food that you ate?

18   **A.**    It was waiting for me with a label on it.

19   **Q.**    And what did the label say?

20   **A.**    Lieutenant, LT.

21   **Q.**    How far apart were those two incidents when you

22   got sick?

23   **A.**    Probably a week.

24   **Q.**    Had you had any other meals that were prepared

25   other places, such as at home or at a restaurant?

1    **A.**    Yes.

2    **Q.**    Did anything else make you sick?

3    **A.**    No.

4    **Q.**    Did you ever have -- did you have any other type

5    of illnesses other than those two bouts of diarrhea

6    during that week?

7    **A.**    No.

8    **Q.**    So you had mentioned that you switched the plates

9    with the rescue lieutenant?

10   **A.**    Yup.

11   **Q.**    I mean with the rescue tech.  Who was the rescue

12   tech?

13   **A.**    Al Pena.

14   **Q.**    And how long after the second bout of diarrhea did

15   you switch the plate with the rescue tech?

16   **A.**    It was just things that were going on at the

17   station.  So it was probably a week.  Yeah.

18   **Q.**    And did you observe anything interesting about the

19   rescue tech after he ate the food that had been labeled

20   rescue lieutenant?

21   **A.**    Yes.  He got diarrhea, and I had to call the chief

22   to get a new tech.  He had to go home sick.

23   **Q.**    So what did you do for meals after that?

24   **A.**    I paid my five dollars, and I didn't eat.  I mean

25   I didn't eat is that I kept my meal in the stored area

1    and that late at night I would empty it into the

2    garbage and then put my dish away as I was supposed to.

3    **Q.**   Were there any changes in how people referred to

4    you during this time period?

5    **A.**   Yeah.  It was more openly -- you know, I could

6    hear guys saying "bitch" more, you know, Frangina.

7    **Q.**   When was the first time you heard somebody call

8    you Frangina?

9    **A.**   Lieutenant Murray, Tom Murray.

10   **Q.**   When was that?

11   **A.**   I'm not sure of the timeframe exactly.  I know it

12   was around 2006.

13   **Q.**   Did you take the term "Frangina" to be insulting?

14   **A.**   Of course.

15   **Q.**   Why?

16   **A.**   Well, I mean, if you Google it by the urban

17   dictionary, it's horrible.

18   **Q.**   What does it say?

19   **A.**   It is an unkept vagina, and it describes a foul

20   odor; and basically it goes on to say that, you know, a

21   guy's not going to have sex with her.  It's in the

22   urban dictionary.

23   **Q.**   But your name is Franchina.  Isn't it possible

24   that somebody could mispronounce it Frangina?

25   **A.**   Sure, but if you hear it being said "gina," my

1    name is not spelled with a G, it's spelled with a C,

2    and in Italian it's "ch," you know, Franchina.

3    **Q.**   Did you ever address anyone who called you

4    Frangina?

5    **A.**   Absolutely.

6    **Q.**   What would you say?

7    **A.**   I said that is -- you can't call me that.  It's

8    wrong.  It's unprofessional.  And that day that I

9    specifically walked in and, you know, approached my

10   lieutenant and said, Lieu, I'm your technician today.

11   Okay, Frangina.  And he looked like he was -- like he

12   got caught.  Like he was (gesturing).  I just turned

13   back and I said, I'm going to pretend like I didn't

14   hear that, sir.  And I was just overwhelmed.

15   **Q.**   Which lieutenant was that?

16   **A.**   Acting Lieutenant Thomas Murray.

17   **Q.**   You mentioned a moment ago that you started to

18   hear the term "bitch" more.

19   **A.**   Uh-huh.

20   **Q.**   Can you describe what you mean by that.

21   **A.**   I'm not going to help that fucking bitch.  She can

22   do her own job.  That bitch can carry her own

23   stretcher.

24   **Q.**   Who was saying that?

25   **A.**   Who does that fucking bitch think she is?

1    **Q.**   Who was saying those things?

2    **A.**   I heard them from --

3    **Q.**   At this point in time, I'm still referring to

4    North Main Street Station.

5    **A.**   McDougal, Andy McDougal.  I know Dicomitis,

6    Firefighter Dicomitis had said -- flicked my collar pin

7    and said, I'll never take an order from you.

8    **Q.**   Well, we'll get to that in a minute, but you just

9    mentioned some specific statements where people would

10   say, I'm not going to help that F-ing bitch, people

11   would say, Who does that bitch think she is.  Who are

12   the people that you heard make those comments?

13   **A.**   At North Main Street, I believe it was mostly Andy

14   McDougal, Firefighter McDougal.

15   **Q.**   Did he ever do this in the presence of other

16   officers?

17   **A.**   I don't believe so.

18   **Q.**   Did you ever complain about it to a superior

19   officer at that time?

20   **A.**   No, not at that time.  No.

21   **Q.**   Why not?

22   **A.**   The Andre Ferro complaint was underway that I did

23   not establish, you know, initially the complaint.  It

24   was rolling, it was in full go, and I just really tried

25   to stay clear of so much, you know.

1        I was getting sick at work.  I had never gotten

2    sick before.  A lot was happening, and I just felt if I

3    brought up one more thing -- I mean, I'm working

4    sometimes 84 hours a week.  I have to come in contact

5    with so many firefighters and officers that I was not

6    out there creating -- trying to create this nepotism

7    that I was going to be such a problem.  I wasn't.  I

8    went there doing a job, and I worked through all of

9    this and tried to do my job.

10   Q.   How long did you stay at the North Main Street

11   Station after Andy McDougal spoke with you at the

12   fridge and asked you if you were going to cost Andre

13   Ferro his fucking job?

14   A.   I'm not aware.  I mean, I can't recall the date.

15   Q.   Was it years, months?

16   A.   I think it was within a year.

17   Q.   Tell us about your interactions with Chief Varone

18   after these incidents started occurring.

19   A.   Chief Varone and I would meet sometimes weekly.  I

20   would pop into his office and say hi to him; and, in

21   turn, you know, social gatherings would more turn into

22   like maybe we can iron out some things I've heard and

23   that kind of stuff.

24        Basically he would say, Well, I heard from

25   captain so-and-so on this run, let me get your side of

1    it.  And I'd explain the more medical and the

2    seriousness of it and how initially, you know, that

3    seriousness wasn't taken in the same light as, you

4    know, the medical issue that was my concern.

5        And later on he had a much better -- I felt at

6    the time when we discussed it, he had a much better

7    idea of what I was thinking on scene in comparison to

8    somebody -- I mean, I could have a captain on scene

9    that is an EMT-Basic and -- he has maybe 30 years of

10   knowledge of fire and whatnot but doesn't have the

11   medical necessarily to support some of my findings.

12       And that's what we were talking about.  We would

13   talk about the necessity to do certain things and get

14   their help and how I could ask for that help and, you

15   know, see their side of it with some of the stuff that

16   we needed to merge, you know.

17   **Q.**   Did you find those meetings helpful?

18   **A.**   Absolutely.

19   **Q.**   Did you ever get any type of written complaint or

20   discipline where somebody complained about your work

21   performance during that time?

22   **A.**   No.

23   **Q.**   Have you ever been disciplined at work?

24   **A.**   No.

25   **Q.**   Have you ever been given any type of notification

1    that you performed your work deficiently?

2    **A.**    I didn't receive Form 17s until this trial

3    started.  There's been Form 17s I've never seen, and

4    they're dated four or five years.

5    **Q.**    Well, Form 17s are things that are filled out

6    by --

7    **A.**    Allegations.

8    **Q.**    -- firefighters or lieutenants or things, but has

9    any superior officer ever given you a written

10   performance review or appraisal or a warning stating

11   that your work performance was in any way deficient?

12   **A.**    No.

13   **Q.**    At the North Main Street Station, is there a

14   whiteboard?

15   **A.**    Yes.

16   **Q.**    And what is the whiteboard used for?

17   **A.**    We write on it for boxes that are out.  A box is a

18   pole box.  It can be triggered by too much exhaust in a

19   pipe.  It can be triggered by, you know, different

20   alarms that set it off.  If a box is out, then that

21   building is not secured.  So box alarms that are out --

22   **Q.**    Is the whiteboard used for messages?

23   **A.**    Yes.

24   **Q.**    And who writes on the whiteboard?

25   **A.**    We all have access to it.

1   **Q.**   And is there any obligation or tradition of

2   checking the whiteboard for messages?

3   **A.**   Yes.

4   **Q.**   Why?

5   **A.**   Again, when you start your shift, there could be,

6   you know, addresses that are necessary to understand

7   that we were just there and there's -- they found holes

8   in the floor; and if there's a fire, it could cause

9   great risk.

10           So we identify with the whiteboard as a means of

11  communication within the station and also from our

12  dispatchers and our administration.

13  **Q.**   Have you ever seen anything on the whiteboard

14  written -- during this period of time, did you ever see

15  anything written on the whiteboard about you?

16  **A.**   Yes.

17  **Q.**   Can you tell us about that.

18  **A.**   I wasn't -- yes.  So there was 21 things written

19  about me that was on the board.  The night that it was

20  being written, Captain Spedutti, I found him to

21  personally have been pointing to the board and say,

22  I'll show her.

23  **Q.**   Did you ever have any problems that you knew of

24  with Captain Spedutti before that?

25  **A.**   Prior to that, there was an incident that had

1    occurred where I had made a suggestion to my captain,

2    Captain David Raymond, that -- I was new to the

3    department.  Our rescue changeovers were taking

4    sometimes up to two-and-a-half hours to three hours to

5    get a truck back in service.

6          And I had made a suggestion that a reserve

7    rescue come over to my station and we could, you know,

8    stock it thoroughly and our changeover would be simple.

9    We'd take our --

10   **Q.**   My question was, did you have any problems with

11   Captain Spedutti before you heard him saying that near

12   the whiteboard?

13   **A.**   Yes.  Because of that rescue coming over, it took

14   a spot of the highest ranking officer that could park

15   on the apparatus floor, which was a violation of rules

16   and regulations.  So where he would park his vehicle on

17   the apparatus floor, sheltered in a garage, the rescue

18   took that spot.

19         And soon after, that night that the rescue was

20   there, it ended up to have 30 gallons of water put in

21   its tank.  And then after that, the 21 things were

22   written about me on the board within 24 hours.

23   **Q.**   Okay.  Do you recall what any of the 21 things

24   were?

25   **A.**   I don't remember all of them.  I do know a few.

1    One was --

2    **Q.**   Wait.  Before you answer that, I'm sorry.  Are

3    there any rules or regulations regarding what type of

4    information may be posted on the whiteboard?

5    **A.**   Yes.  It's professional and --

6    **Q.**   What about personal messages or joking around or

7    stuff like that?

8    **A.**   Not often.  It was more of relief, who is

9    relieving who.  It's utilized by our department.

10   **Q.**   How did you know that the 20 things were about

11   you?

12   **A.**   Because of the incidents that were occurring, the

13   sexual harassment case that was already underway, the

14   things that were being said around the station.  And

15   that day in particular, I told you I started it.

16   Captain Spedutti, I was the only female in the house

17   that night working my shift, and he basically said

18   I'm -- I'll show her.  He was pointing to the board as

19   I was going out on a run, and he was pointing to the

20   board and saying, I'll show her.

21   **Q.**   You mentioned that you couldn't remember all of

22   the things that were on the board.  Do you remember

23   some of the things that were on the board?

24   **A.**   Yes.  Be careful how you talk to her, she'll bark

25   at you.  You get what you get, bitch.  Another one was

1    Frangina leads Team Lesbo to victory.  I would have to
2    try to think.
3    **Q.**    That's okay.  You remember what you remember.  How
4    did it make you feel when you saw those things on the
5    board?
6    **A.**    They were -- well, they remained on the board for
7    an entire 14-hour shift into my next day.
8    **Q.**    Why didn't you just erase it?
9    **A.**    The captain of the house had just been pointing to
10   it saying, I'm going to show her.  And then I also
11   heard him when I went into the kitchen for food or
12   whatnot, and he had -- there was a manpower swap that
13   night, and a new guy was coming over, and he
14   boisterously dragged him over there and goes, Look what
15   we fucking wrote.  You know, look what we did.  I mean,
16   he was a 30-year veteran captain.
17   **Q.**    What was his name?
18   **A.**    Captain Spedutti.  I believe it's Peter.
19   **Q.**    Oh, it was the same captain?
20   **A.**    Oh, yeah.
21   **Q.**    Did you ever complain about what was on the
22   whiteboard?
23   **A.**    It was up.  And did I complain?  Yes, to Chief
24   Crawford.
25   **Q.**    What happened after you complained to Chief

1    Crawford?

2    **A.**    Nothing.

3    **Q.**    When did you leave the North Main Street Station?

4    **A.**    Shortly after.

5    **Q.**    How long after?

6    **A.**    I don't know.

7    **Q.**    Days, weeks, months?

8    **A.**    Tensions were really high.  I would say within

9    that month.

10    **Q.**    What do you mean when you say tensions were really

11    high?

12    **A.**    You know, I couldn't eat with the group anymore.

13    I still paid my five dollars because it's just what I

14    felt was necessary; but like I said, I would come in

15    and either scuff it into the garbage or whatever.

16         Tensions were high.  On medical runs, you know,

17    there was a lot of avoidance of eye contact.  They'd

18    look away from me.  McDougal on the scene, I couldn't

19    believe it.  I had an early run at a prenatal facility,

20    and a woman in her early twenties was pregnant.  Her

21    husband arrives dressed in a suit, and he's worried

22    about his wife, and we have fetal distress.

23         They have doctors and nurses there.  They're

24    monitoring the fetal heart rate, it's elevated, and I

25    want a high flow on the patient right away.  Give

1    oxygen to the patient, oxygen is going to the baby.

2    And he really stood there, and I could see him.

3    There's a bevel or it's called a non-rebreather.  So

4    when you breathe in, the oxygen comes towards you.

5    When you exhale, it -- you know, I'm not sure which way

6    it goes; but it's a thing that you have to hold to

7    allow the bag, the reservoir bag, to fill up.

8         And, in turn, he kept letting it off; and the

9    bag never filled, and he was wasting time.  And I

10   ordered him away from the patient.  This is in front of

11   doctors.  This is in front of nurses.  This is in front

12   of the husband.  And I said, Get away from the patient.

13   Give me that.

14        I couldn't tolerate it.  It became such a

15   blatant disrespect to a patient.  And maybe you're

16   trying to upset me at that time, but I couldn't allow

17   that to occur.  And I filled it up within seconds.

18   Q.   What made you think it was intentional towards

19   you?  Why wouldn't that just be him being negligent or

20   careless?

21   A.   I don't believe so.  Sorry.

22   Q.   But why?

23   A.   His demeanor around the station, his failure to

24   want to cook for me, his leaving equipment on the

25   truck.

1    **Q.**   Had you guys ever had -- worked on similar scenes

2    where he had to follow your orders before the Andre

3    Ferro incident?

4    **A.**   Yes.

5    **Q.**   And how did his performance with that baby compare

6    to the way he responded to your orders before the Andre

7    Ferro incident?

8    **A.**   Not the same.

9    **Q.**   Could you describe how it was different.

10   **A.**   He followed his orders, my orders and the orders

11   of Captain Horton.  You know, I think at some point he

12   was defiant of Captain Horton, you know, and later

13   we've talked about it or you've talked about it, how

14   Captain Horton wanted --

15   **Q.**   I don't want to talk about anything that I've

16   talked about or anything that you learned in the

17   litigation.  Let's just talk about your experiences.

18   Okay?

19   **A.**   Okay.

20   **Q.**   So you mentioned that tensions were high.

21   **A.**   Yeah.

22   **Q.**   Tell us about your last day at the North Main

23   Street Station.  Were there any other significant

24   incidents that happened between Firefighter McDougal

25   and then the fetal distress and your last day?

1    **A.**    No, but there -- no.

2    **Q.**    Let me ask about the bathroom there.  What's the

3    bathroom like at North Main Street?

4    **A.**    There is a single bathroom on the second floor,

5    which is our living quarters.

6    **Q.**    So how do you share between men and women?

7    **A.**    There's a sign on the door that says men/women.

8    You're supposed to lock the door upon entering.

9    **Q.**    Tell me about the sign.  You said it says men and

10   women?

11   **A.**    No.  It says men on one side, and you flip it,

12   it's on a chain, and it says women.  And it's on the

13   inside of the door so you can see it.

14   **Q.**    And how do you make sure you don't walk in on each

15   other?

16   **A.**    You knock three times.  The door is supposed to be

17   locked if somebody's in there.

18   **Q.**    Is it a single seater?

19   **A.**    No.  On the left-hand side there's -- I think

20   there was three showers, and then there were four

21   toilets and then four sinks, I think four or five

22   sinks, and then urinals, basins, floor urinals.

23   **Q.**    The toilets have like metal stalls around them?

24   **A.**    Metal stalls around them.

25   **Q.**    Doors on the stalls?

1    **A.**    Correct.

2    **Q.**    Lock on the door?

3    **A.**    Yup.

4    **Q.**    When you lock the door, is that only for showers

5    or is that also for when you're using the facilities,

6    the toilets or the urinals?

7    **A.**    You're supposed to -- when there's a woman in the

8    building, you're supposed to lock the door.

9    **Q.**    And if there's a man -- when there's a woman in

10    the building, the door gets locked?

11    **A.**    Yup.  I'm on shift for 14 hours or 10 hours.

12    Well, my understanding is when there's a different sex

13    in the building, we lock the doors.

14    **Q.**    Okay.  But more than one person could take a

15    shower or get ready in the morning, shave?

16    **A.**    Correct.

17    **Q.**    So if there were more than one person in there,

18    they would have to lock the door?

19    **A.**    Yes.

20    **Q.**    So tell us about your -- what would happen when

21    you would use the bathroom at the North Main Street

22    Station?

23    **A.**    I would knock on the door.  Sometimes I would find

24    the door unlocked, and one time I entered.  I knocked

25    very loudly and I said, Is anybody in here?  And I

1 walked in, and a guy was using the urinal, and he was

2 pissed; and I said, The door wasn't locked, and I

3 walked out.

4 **Q.** But why wouldn't that just be -- why was that so

5 concerning for you?  Why wouldn't that just be one of

6 those things?

7 **A.** Just follow the rules.

8 **Q.** Who was it?

9 **A.** I don't remember at the time.  I don't recall.

10 **Q.** And what would the -- what kind of condition would

11 the facilities be in when you would go in to use it?

12 **A.** Sometimes when I would knock, I would wait.  The

13 door was locked or they'd say, Hold on.  There's some

14 good guys out there.  I'm not -- so hold on.

15   Other times, you know, the door was locked, and

16 I would enter, and I would find urine on the seats and

17 in front of the toilets.

18 **Q.** Have you ever lived with guys before?

19 **A.** Uh-huh.

20 **Q.** Was it really that unusual to find urine?  How

21 much urine was there?  Why was this so surprising?

22 **A.** There was copious amounts of urine.  You know, I

23 mean, it might have been like, you know, writing their

24 name in the snow kind of thing.  I don't know.  It was

25 all over.

1    **Q.**   I'm remembering yesterday you talked in great

2    detail about the level of training that you and your

3    fellow cadets were given regarding cleaning the

4    latrines.

5    **A.**   Yes.

6    **Q.**   Do you recall that testimony?

7    **A.**   Yes.

8    **Q.**   Is keeping the firehouse facilities to a certain

9    standard of cleanliness a rule or a regulation of the

10   department?

11   **A.**   Absolutely.  We have housecleaning from 0800 to

12   0900 every morning.

13   **Q.**   Is it unusual to find, as opposed to, say, the

14   house or a public restroom, is it unusual to find

15   something like urine or things like that on the

16   facilities in a firehouse floor or a firehouse

17   bathroom?

18   **A.**   It hadn't happened prior to this.

19   **Q.**   It hadn't happened prior to when?

20   **A.**   Prior to this timeframe, it never had happened.  I

21   had never seen it before.

22   **Q.**   So let's move up to your last day at the North

23   Main Street Station.  Tell us about that.

24   **A.**   That day in particular, I had had a meeting with

25   Chief Varone, I believe, earlier in the day, and --

**Q.** Do you recall what the meeting was about?

**A.** Yeah, the tensions that were high, issues that weren't, you know, handled. I had a firefighter, John Morgan, put my truck out of service.

It started to become unsafe for me. I'm the lieutenant on the vehicle. I'm a female voice. I had been on the truck for 10 hours, and a male calls fire alarm and puts my truck out of service. I have a run coming into the city in my district, and I'm not being dispatched. And I ran to my computer and I said, My truck's out of service.

So I called fire alarm and I said, you know, lieutenant down at fire alarm, I said, Sir, I said, how's my truck out of service? Oh, well, somebody called and put your truck out of service. I said, Sir, I've been on the truck all day. I'm in charge of this vehicle.

And then I asked him specifically. I said, Was it John Morgan, Firefighter Morgan, that put my truck out of service? I said, You don't want to get in trouble, sir. Let's just answer the questions. And he said, Yes, it was John Morgan.

**Q.** Is it typical that another person could put a lieutenant's truck out of service without the lieutenant's permission?

1   **A.**    It's insubordination.

2   **Q.**    What do you mean it's insubordination?

3   **A.**    It would be an insubordinate act.  It's

4   paramilitant.  I'm the officer of the truck.  I'm in

5   charge of it just like --

6   **Q.**    You mentioned that word a couple times,

7   paramilitary.

8   **A.**    Yes.

9   **Q.**    What do we mean when we say that something is --

10  that the fire department is a paramilitary

11  organization?

12  **A.**    We have strict rules and regulations that we learn

13  in the fire academy.  We have standard operating

14  procedures that we learn in the academy for on-the-job

15  training that lead us into the ability to get right on

16  the job first day and know our standard operating

17  procedures.

18         We have general orders.  We have memorandums.

19  We receive information from the state and federal

20  governments about high alerts, you know, Kennedy Plaza

21  types of -- could be bombings and whatnot.  So we're --

22  we assist and aid with the federal government; we

23  assist and aid with the state, you know, police and

24  whatnot; and we assist, you know, our Providence PD in

25  an organized -- it keeps us safe, these rules and regs,

1    and it keeps us all on the same page working as a team,

2    working in an environment that's consistent in chaos.

3    **Q.**   So your last day, your meeting with

4    Chief Varone --

5    **A.**   Yes.

6    **Q.**   -- was your departure from the North Main Street

7    Station planned in advance of that day?

8    **A.**   Oh, no.

9    **Q.**   Are transfers between stations typically something

10   that's done with some advanced notice?

11   **A.**   Correct.

12   **Q.**   How did it come about that you transferred out of

13   that station that day without any notice?

14   **A.**   Well, the chief ordered it through -- after the

15   meeting.

16   **Q.**   Which chief?

17   **A.**   Chief Curt Varone felt as though, through our

18   meeting, some of the issues were not being dealt with,

19   not -- you know, my safety had become a major factor to

20   me.  And those things were expressed, and he felt it

21   necessary at the time to transfer me.

22   **Q.**   Where did you transfer to?

23   **A.**   Rescue 3, Branch Ave.

24   **Q.**   Tell me about your experience on Rescue 3, Branch

25   Ave.

1      MR. McHUGH:  Objection as to form, calls for a

2  narrative.

3      THE COURT:  Overruled.

4  **Q.**  Was your experience -- could you answer the

5  question.  Could you tell us about your experience at

6  Rescue 3, Branch Ave.

7  **A.**  Sure.  Initially it was good.  I had gotten over

8  there, and I didn't have any food issues.  We got

9  along.  I had a partner.

10 **Q.**  I heard in your answer that you said initially it

11 was good.  Did that change at some point?

12 **A.**  Absolutely.

13 **Q.**  When did it change?

14 **A.**  2008, 2009, 2010.  I had some tough years there.

15 **Q.**  When was the approximate date when you transferred

16 from North Main Street to Branch Ave.?  Was it 2007 or

17 2008?

18 **A.**  Yeah, I believe it was around the end of 2007.

19 **Q.**  Okay.  It was a little bit more than a year after

20 the Ferro incident?

21 **A.**  Yeah.  It could have been, yeah.

22 **Q.**  Okay.  So for that period at Branch Ave. that you

23 said initially was good, how long did that initially

24 good period last, approximately?

25 **A.**  I had started out my career there at Branch Ave.,

1    so I knew a lot of the guys.  That lasted probably,

2    say, a couple months, three or four months.

3    **Q.**   And what happened or what changed, rather, from

4    your perspective after three or four months of that

5    initially good period?

6    **A.**   Firefighter Bonalewicz, Miles Bonalewicz.

7    **Q.**   Can you give us the spelling for the court

8    reporter, please.

9    **A.**   His last name?  Miles, M-I-L-E-S, and

10   B-O-N-A-L-W-I-C-Z (sic), Bonalewicz.

11   **Q.**   So what happened with Firefighter Bonalewicz?

12   **A.**   He started displaying the same type of behavior

13   McDougal was.  He, you know, resisted orders, became

14   defiant on scenes, became hostile and would walk away

15   from me if I needed help with equipment or just --

16   making a scene flow takes teamwork and cohesiveness,

17   and he -- you know, him walking away completely just

18   threw a wrench in everything.

19        I don't know how else to say it, but it just

20   kind of -- you know, and you have to look for somebody

21   else to say, Hey, we've got this going on, you know,

22   let's try to work together; but his attitude became

23   very much like Andy McDougal.

24   **Q.**   Was Firefighter Bonalewicz part of your team

25   during that initially good period at the Branch Ave.

1    station?

2    **A.**   Yes.

3    **Q.**   Was there any type of interaction with him or any

4    type of event that you can remember that separated the

5    initially good period from his behavior that started to

6    degrade?

7    **A.**   One in particular that I can recall right off the

8    top of my head is a highway accident.  We had multiple

9    victims.  We had two vehicles.  One was a minivan with

10   I believe four people in it, and one was a car with two

11   people in it.

12        And with the firefighters that are licensed the

13   same as I am within the State of Rhode Island as an

14   EMT-Cardiac, they have the same level of training,

15   I've -- according to the EMS policy, anybody that's

16   licensed engine-wise or rescue or ladder can have --

17   because of their training can actually have the

18   document signed as a refusal if you come to the

19   conclusion that they're capable of making that

20   decision.

21        And on that scene in particular, we had six

22   victims.  I had my partner that was also a licensed

23   cardiac start a refusal on one person.  I was doing the

24   same thing.  And according to policy, I could ask the,

25   you know, above license cardiacs to also provide their

1  services in gathering information, where they were

2  seated, name, date of birth, and if they had any

3  injuries and if they were going to be treated or

4  transported.  It's like a triage.  We're all trained so

5  we have the ability to do that together.  And he stated

6  I'm not -- on the scene, I'm not going to fucking do

7  your job for you.

8  **Q.**    What was his rank?

9  **A.**    Firefighter.

10  **Q.**    Were there any other officers like yourself

11  present when he said that?

12  **A.**    Lieutenant Cindy Kiers.

13  **Q.**    Lieutenant Cindy Kiers?

14  **A.**    Correct.

15  **Q.**    How did you respond?

16  **A.**    The best I could.  I got somebody else to assist

17  us on the fire truck that was licensed, and I took a

18  bunch of reports back with me.  And I guess Miles still

19  had a copy of the run report with just the guy's name

20  on it, no date of birth or anything like that.  I

21  didn't know where he was seated in the vehicle.  I

22  didn't have a clear understanding of the -- you know,

23  what he felt.  I had no information.

24        And he came into my office, threw it on my desk

25  and said, Here's your refusal.  And I said, It's not

1    even signed.  I said, And where's the pertinent

2    personal information in regards to the patient?  And

3    he's like, I'm not doing your fucking job for you.

4         He went into the kitchen.  And, I mean, you

5    could hear him from down on the apparatus floor

6    swearing, hollering.  I don't know who the fuck she

7    thinks she is.  She can do her own fucking job.

8         I walked into the kitchen and explained to him

9    that this is his job, he's not just fighting fires and

10   that he needs to be made aware of it because if he's

11   not aware of the EMS policy, you know, you need to be

12   aware of it.

13        I immediately went into Lieutenant Cindy Kiers'

14   office.  I addressed the officer.  I said, You either

15   handle this insubordination and swearing at an officer

16   or I will be calling -- I will be talking to the chief

17   about it.

18   **Q.**  What did -- how did Cindy Kiers -- how long had

19   Cindy Kiers been on the department?

20   **A.**  Quite a few years.  If I had seven, she probably

21   had 17, 18 maybe.

22   **Q.**  Was she a rescue lieutenant?

23   **A.**  No, she was an engine officer.

24   **Q.**  An engine officer?

25   **A.**  Yup.

1    **Q.**    So why if you're both lieutenants, why would you

2    have to go to her to address Bonalwicz's

3    insubordination?

4    **A.**    I was giving her the respect because she hadn't

5    addressed it.  She wasn't taking the initiative, and

6    basically -- before I was going to take it to the next

7    level, I wanted to come to her and say, Look, we need

8    to stop that.

9    **Q.**    My question was probably sloppy.  I was more

10   asking about the chain of command.

11   **A.**    Uh-huh.

12   **Q.**    Why would she have jurisdiction over the

13   firefighter back at the station and not you to write

14   him up or do whatever it is you wanted to be done?

15   **A.**    She is his direct superior.  So, therefore, I was

16   addressing his violation with his direct superior.  And

17   her and I were equal rank, and so I was going to try

18   and mediate before we go to the next level.

19   **Q.**    How long have you known Cindy Kiers?

20   **A.**    Since I've gotten on the job in 2002.

21   **Q.**    Have you gotten to know her a little bit?

22   **A.**    Yes.  We've actually -- we went out for breakfast

23   a few times after shift.

24   **Q.**    Is she married or was she married at the time?

25   **A.**    No.

1    **Q.**   Is she a lesbian?

2    **A.**   I don't believe so.

3    **Q.**   Have you ever seen her male subordinate officers

4    treat her the way that her male subordinate officer

5    treated you?

6          MR. McHUGH:  Objection, lack of foundation.

7    Complete lack of foundation.

8          THE COURT:  Overruled.

9    **A.**   I'm not sure what you mean by subordinate officer.

10   **Q.**   Let me ask a better question.  Have you ever seen

11   the subordinates, like Bonalewicz, treat Cindy Kiers

12   the same way that he treated you that day that you

13   described to us?

14   **A.**   No.

15   **Q.**   So how did Cindy Kiers reply when you told her

16   that you wanted Bonalewicz to be dealt with?

17   **A.**   She said to me that this is not going to be dealt

18   with, that you should really leave this one alone.

19   That's what her statements were.

20   **Q.**   Did you feel that she was being aggressive or

21   angry towards you?

22   **A.**   I mean, the way she said it was you're going to

23   leave this one alone.  And, I mean, she wasn't

24   aggressive.  She was completely the opposite.  She was

25   despondent, not willing to even -- you know, basically

1    the statement "you get what you get" came to mind,

2    meaning that they're going to give me that and she

3    supports that.

4    **Q.**   So did you heed her advice to leave this one

5    alone?

6    **A.**   No.  I wrote it up.

7    **Q.**   What did you do?

8    **A.**   Along with that and other things, I wrote a

9    10-page complaint against Lieutenant Kiers and her

10   crews.

11   **Q.**   When you say you wrote a 10-page complaint, let's

12   keep the language consistent.  Is that a Form 17?

13   **A.**   That is correct, a Form 17 to the administrators.

14   **Q.**   And to whom did you submit the Form 17 to?

15   **A.**   Ultimately it goes to the chief of the department,

16   but it can go through different channels.  I believe I

17   turned that one in to my battalion chief, and I believe

18   it was -- formerly Captain Al Horton is now Chief Al

19   Horton.

20   **Q.**   And Al Horton was a battalion chief at the time?

21   **A.**   Correct, Battalion 3.

22   **Q.**   So I just want to be clear.  These people whom you

23   complained about, were they on your group?

24   **A.**   Yes.

25   **Q.**   Were they within the same station that you were

1    always in?

2    **A.**   Yes, and they did the cooking, and we had to do

3    housecleaning together.  It was our group.

4    **Q.**   And what were the specific complaints that you

5    made about Cindy Kiers and her crew?

6    **A.**   Again, leaving North Main Street, it became a

7    similar environment for me.

8    **Q.**   No, no, no.  I wasn't asking about their behavior

9    towards you.  I was asking you about your specific

10   complaints about them.

11   **A.**   It was very lengthy, but a generalization is a

12   tremendous amount of insubordination, failure to bring

13   equipment of patients with limited activities of daily

14   living, if they're confined to a wheelchair, if they

15   need portable oxygen.  I found those things to be

16   intentionally left behind.

17        I had a woman in her mid-twenties that was a

18   cerebral palsy patient, had to be transported for

19   difficulty breathing on our stretcher.  So, therefore,

20   we transfer from her only means of modality over to our

21   stretcher.  And I specifically directed, you know, the

22   words, Firefighter Bonalewicz, please get the

23   wheelchair and put it in the rescue.  And that

24   wheelchair was left behind.  So those are the kinds of

25   things that I'm saying that were so frequent on a

1    day-to-day, shift-to-shift basis.

2           THE COURT:  Mr. Martin, why don't we take our

3    break now.

4           Ladies and gentlemen, we'll take the afternoon

5    break.  Continue not to discuss this case amongst

6    yourselves, and we'll see you back in 15 minutes.

7           (Recess.)

8           THE COURT:  Mr. Martin.

9           MR. MARTIN:  Thank you.

10   **Q.**   After your transition from North Main Street to

11   Branch Ave., was Andy McDougal ever scheduled to work

12   at your station?

13   **A.**   Yes.

14   **Q.**   And was that during this initial good period or

15   was that afterwards?

16   **A.**   It seemed to coincide with the bad.

17   **Q.**   And tell me about -- did anything significant

18   happen the day that he worked with you?

19   **A.**   Yes.  He worked a night call-back.  It's customary

20   to come into the kitchen, pour yourself a cup of

21   coffee, sit down and discuss our runs, camaraderie,

22   what people are going to do on their days off.

23          And I entered the kitchen, poured myself a cup

24   of coffee, sat down at the head of the table, and

25   Andre -- excuse me, Andy McDougal was speaking about

1    affirmative action's killing this fucking job.

2    **Q.**   Did he know you were in the room when he said

3    that?

4    **A.**   I believe he did, yeah.  I was at an angle to him,

5    but he could see me when I walked in through the

6    kitchen.  And the coffee pot is to the right, and it

7    opens up to the main room, our sitting room.

8    **Q.**   Who else was in the room when he said that?

9    **A.**   It had to be -- we have shift change, so people

10   coming on the shift stayed for coffee and people

11   leaving are there for coffee.  So we're looking at

12   about 12 to 14.

13   **Q.**   Do you recall who any of those people were?

14   **A.**   Miles Bonalewicz, Firefighter Sangermano,

15   Firefighter Davenport, Tim Galagle, Matt Labonte,

16   Lieutenant Kiers.

17   **Q.**   Did Lieutenant Kiers say anything to Firefighter

18   McDougal after he said that affirmative action was

19   killing the job?

20   **A.**   No.

21   **Q.**   By the way, does your department have an

22   affirmative action plan?

23   **A.**   I believe so.

24   **Q.**   Have you ever seen it?

25   **A.**   I believe it's in -- no, I haven't seen it.

1    **Q.**    Okay.  Did you say anything to Firefighter

2    McDougal when he said that affirmative action was

3    killing this F-ing job?

4    **A.**    No.  I immediately got up, poured my coffee away

5    in the sink and exited the room.

6    **Q.**    Who was the officer in charge of his -- in charge

7    of him in the station that day?

8    **A.**    I believe he was on Ladder 7 that night, and his

9    officer was still sleeping.  He had been there for a

10   lot of years.  I don't recall his name.

11   **Q.**    Okay.  Anything else happen with Firefighter

12   McDougal at the Branch Ave. Station?

13   **A.**    Yes.

14   **Q.**    What happened?

15   **A.**    I came in that night for my shift change before

16   5:00.  I was walking up the stairs with a large black

17   duffle bag on my left shoulder, my night bag, and he

18   was at the top of the stairs for shift change leaving.

19         He looked back, there was nobody there.  He

20   entered the stairwell with me having two more steps to

21   be able to clear the stairwell into the landing of the

22   top of the stairs, and he pushed me and struck me

23   against a wall.

24   **Q.**    Did you ever complain about that?

25   **A.**    I ordered -- yes, I did.

1    **Q.**    How did you complain?

2    **A.**    I ordered him to stop at the bottom of the stairs

3    so that we could deal with it with the chief in the

4    house at the moment.  His rebuttal to me was, La la la

5    la la (phonetic), in that manner, and kept walking.  I

6    immediately went into the chief's office and said, I

7    was just pushed by Andy McDougal on the stairs.

8    **Q.**    Now, when you say that you were carrying your bag,

9    can you describe for the jury the size of your

10   equipment bag and the weight.

11   **A.**    It has to be around 30 pounds.  It has an extra

12   pair of boots, a change of clothes in it, another duty

13   belt, large duffle you would see people maybe carrying

14   to a gym full of clothing.

15   **Q.**    How wide is the stairwell?

16   **A.**    Three feet maybe.

17   **Q.**    Enough room for two people to pass each other

18   safely?

19   **A.**    No.

20   **Q.**    Typically in the station when somebody's coming up

21   and somebody's going down, how would they cross each

22   other's paths?

23   **A.**    You would make eye contact and assert that one

24   person was coming down and one person would move out of

25   the way.

1   **Q.**   Isn't it possible that he just bumped you or that

2   he was in a hurry?

3   **A.**   Not from what I saw, sir.  He specifically looked

4   back in the hallway and just entered looking right at

5   me and pushed me.  It felt like, you know, if you were

6   playing hockey, a hockey check.

7   **Q.**   Anything ever come of your complaint to the chief?

8   **A.**   Not that I'm aware of.

9   **Q.**   Did you feel that Lieutenant Kiers was more

10  tolerant of certain behaviors from her male

11  subordinates than you would have been?

12      MR. McHUGH:  Objection as to form, leading.

13      THE COURT:  Sustained.

14  **Q.**   Did you ever observe any other -- earlier you

15  talked about Lieutenant Kiers' advice to you to leave

16  this one alone.  Did you ever observe any other

17  interactions between Lieutenant Kiers and her

18  subordinates?

19  **A.**   Yes.

20  **Q.**   Were her subordinates respectful towards their

21  superior officers?

22  **A.**   Yes.

23  **Q.**   Does that include you?

24  **A.**   At times, but at a certain point in the years, no.

25  **Q.**   And when they stopped being respectful towards

1    you, did they also stop being respectful towards

2    Lieutenant Kiers?

3    **A.**    No.  She joined in.

4    **Q.**    What do you mean when you say she joined in?

5    **A.**    She became despondent on scenes, disruptive at

6    times.

7    **Q.**    Disruptive to whom?

8    **A.**    Myself, engaging in -- making ill-advised

9    statements is one that comes to my mind.

10   **Q.**    What kind of ill-advised statements would she

11   make?

12   **A.**    There was a scene where she wanted to access a PIC

13   line, and we are not authorized as EMTs no matter our

14   level.  We are not trained in it, nor can we access a

15   PIC line.  And we had a scene that she's like, Just use

16   it.  He's going to die.  Just use it.  We hadn't even

17   tried peripheral lines yet.  We hadn't even proceeded

18   to try other means.

19        And those kinds of comments can lead family

20   members to see me not being able -- being competent.

21   And there were many times she would do similar things.

22   I don't know if she didn't have the knowledge or if it

23   was just something she didn't really worry about the

24   rules and that kind of thing, but. . .

25   **Q.**    I want to ask you about a few more people, and are

1    we still referring to all of these incidents in the

2    year 2008?

3    **A.**   Yes.

4    **Q.**   I want to talk to you about a few more people from

5    the Branch Ave. Station.  Who is Jack Devlin?

6    **A.**   He is a firefighter that in my experience had been

7    dispatched -- excuse me, detailed over into a position

8    as a firefighter.  So it wasn't a call-back.  It's a

9    detail.

10         So because manpower is low, he's not making the

11   overtime pay.  He's making his pay that he would be

12   sitting on an engine or a ladder, but instead he has to

13   come to a busy rescue for the night as the rescue

14   technician.

15   **Q.**   Did you have any significant interactions with

16   Jack Devlin?

17   **A.**   Within the first 20 minutes of the shift change

18   and getting onto the vehicle, going to the vehicles, we

19   had a run; and upon entering, I greeted him.

20   **Q.**   Was that the first time you had ever gone on a run

21   together?

22   **A.**   No.  We had been on rescue runs quite a bit, but

23   he wasn't driving me or as my chauffeur.  He was a

24   firefighter on scene.

25   **Q.**   Was this the first time that he'd served as your

1  chauffeur on a scene?

2  **A.**   I believe so.

3  **Q.**   Okay.  So tell me what happened on the run.

4  **A.**   I entered the vehicle and said, Hey, Jack.  And he

5  leaned over and flicked my collar pin and said, I'll

6  never take a fucking order from you.  And that was the

7  start of the shift.

8  **Q.**   What was the rest of the shift like?

9  **A.**   Very reluctant to ask him questions, ask him to do

10  stuff.  I did a lot of the medical assessing in the

11  back.  He, like other firefighters when they come over,

12  tend to be less active in the back of the rescue.  So I

13  assessed most of my patients that night, established

14  the vital signs with the blood pressure and different

15  medical devices.

16  **Q.**   Was he responsive to your orders?

17  **A.**   He did his job to an extent, but not always

18  willingly, and he just seemed very reluctant to help.

19  **Q.**   Did you ever complain to anyone about the way that

20  he snapped your collar?

21  **A.**   Yes.

22  **Q.**   Who did you complain to?

23  **A.**   Chief Crawford.

24  **Q.**   Anything ever come of that complaint?

25  **A.**   No.

1    **Q.**   Who is -- I'm sorry.  I don't have her first name

2    or rank, but the last name is Lancellotti.

3    **A.**   Lieutenant Lancellotti.

4    **Q.**   Who is that?

5    **A.**   He is a male officer at Engine 12.

6    **Q.**   Can you tell us about a run that you went on with

7    Lieutenant Lancellotti involving the car accident.

8    **A.**   Yes.  It was in June of '08.  Off-duty police

9    officer Peter Rocchio was at the time it appeared

10   gravely injured.  He at the time was involved in a

11   single-car accident.  It was a Mustang.  He hit a wall

12   in town, in the City of Providence.  He had a passenger

13   with him that was scalped.  The front part of his head

14   was completely flapped back, profusely bleeding.

15        Officer Rocchio's side of the vehicle, the

16   driver's side of the vehicle, had sustained a

17   tremendous amount of damage, greater than one to two

18   feet intrusion into the passenger compartment space.

19   His door was buckled, so we couldn't open it.

20        Lieutenant Lancellotti had left the scene of the

21   actual vehicle to call for a second rescue for --

22   sorry.

23   **Q.**   Who was in charge of the scene at that point?

24   Because you have a rescue and you have a rescue

25   lieutenant and a firefighting lieutenant.  So who is in

1    charge of the scene?

2    **A.**   The scene is the engine officer.

3    **Q.**   That would be Lieutenant Lancellotti?

4    **A.**   Correct.

5    **Q.**   And what is your role relative to his authority

6    over the scene?

7    **A.**   Assessing patients, triaging of the patients and

8    to assist with the removal of the patient from the

9    vehicle, establish any IVs, collar, anything prior to

10   the removal of the patient that could help sustain

11   life.

12   **Q.**   Are there any particular challenges to assessing

13   or treating a patient who is in a vehicle after an

14   accident?

15   **A.**   Repeat the question.

16   **Q.**   Sure.  Are there any special difficulties or

17   challenges that you would face assessing or treating

18   the driver of the car if he was still in the vehicle?

19   **A.**   Yes.  I mean, it's a small space.  At the time

20   we -- Lieutenant Lancellotti had called for the Special

21   Hazards Unit to be able to remove the roof of the

22   vehicle to gain access to the patient.  So in the

23   meantime --

24   **Q.**   Why was gaining access to the patient something

25   that was important?

1    **A.**    Because, again, the vehicle was a smaller vehicle,

2    two door.  The driver's side door was buckled to the

3    point you couldn't open it.  It was a large impact on

4    the driver's side.  We needed the jaws to cut the roof

5    off, and Lieutenant Lancellotti had ordered that

6    through fire alarm to dispatch Special Hazards to the

7    site, to the incident.

8         In the meantime, he had left the actual scene of

9    the vehicle because we were working medically on him,

10   applying a collar, trying to maybe establish a line at

11   the time I think in the vehicle because right now we've

12   been on scene several minutes.  We needed to assess if

13   he was breathing.  We started to ambu him with an

14   ambu-bag with oxygen.

15        And when Lieutenant Lancellotti was off in the

16   distance with the gentleman that was decapped, I mean

17   his head was flapped, I had realized by touching the

18   roof that it was a convertible.

19   **Q.**    So what did you do then?

20   **A.**    I got the attention of Firefighter Griffin and

21   asked him to, you know, unlatch it and remove the roof

22   of the vehicle.

23   **Q.**    Did that allow you more access to the patient?

24   **A.**    Absolutely.

25   **Q.**    And what did you do with the patient?

1    **A.**   We then were able to extricate him on a long

2    board, secure him, put him on our stretcher.  And

3    immediately we knew he was a police officer.  Some of

4    the -- two gentlemen, two firefighters that were there

5    grew up with him.  They went to school together.  They

6    were making mention of it.

7         And we immediately, high-stress situation, we

8    got Peter Rocchio, Officer Rocchio into the vehicle,

9    rescue vehicle, established multiple lines, an airway,

10   a monitor.

11   **Q.**   Did he survive?

12   **A.**   He did not.

13   **Q.**   Was he alive in the car when you were trying to

14   extract him?

15   **A.**   At the time when we first arrived, he was agonally

16   breathing.

17   **Q.**   I don't know what that means.

18   **A.**   Breathing that does not sustain life.  It's

19   labored, and it's short gasping, you could say.

20   **Q.**   Is it possible to save people when they're in that

21   condition?

22   **A.**   Depending on what the mechanism of injury is,

23   absolutely.

24   **Q.**   How did Lieutenant Lancellotti respond to your

25   having opened up the convertible?

1    **A.**    He became very angry because Special Hazards

2    arrived.  And obviously there was some embarrassment, I

3    feel, on the part of Lieutenant Lancellotti not

4    recognizing in the dark of night and a black vehicle

5    that it was a convertible.  We only found that out

6    afterward.  And he was getting some comments about that

7    the vehicle -- you know, the roof came off.

8    **Q.**    Who was he getting those comments from?

9    **A.**    Special Hazards.

10   **Q.**    Were they like kind of teasing him or did it

11   appear more angry?

12   **A.**    There was some, you know, frustration.  It sounded

13   angry.

14   **Q.**    So how did he respond to you after you took the

15   roof off of the car?

16   **A.**    I was in the rescue.  I was doing, you know,

17   peripheral lines for establishing an IV for, you know,

18   medications to restart his heart and that kind of

19   thing.

20           And it had been a long time that had passed.  We

21   had established lines.  We were doing CPR, and nobody

22   was -- I actually looked up between the compartment

23   from the patient care compartment to the driving area,

24   and I didn't see anybody in the seat.  And I said,

25   Guys, who's driving?  We've got to get a driver.

1          And with the stress of the scene, they wanted to

2    remain with Peter.  We all knew him.  We were doing --

3    you know, nobody was leaving him, put it that way.  And

4    I opened up the side door, and Lieutenant Lancellotti

5    and a few of the officers were out there; and I said,

6    We need a driver.  I've got to get a driver now.  We're

7    ready.  We're ready to go, and in that tone.  He turned

8    and looked at me and said, You'll get a driver when you

9    get your driver.  I don't know.

10   Q.   Did you eventually get a driver?

11   A.   Yup.  Yup.

12   Q.   Do you need a minute?  Did you ever complain about

13   your interaction with Lieutenant Lancellotti?

14   A.   I did several times.

15   Q.   To whom did you complain?

16   A.   Chief Crawford, my immediate supervisor of EMS

17   Division, and my captain, Heidi Rivard.

18   Q.   Did anything ever come of that, of those

19   complaints?

20   A.   I was told by Chief Crawford that meeting with him

21   would create a worse environment than the Andre Ferro

22   situation.  Nothing came about it.

23   Q.   When he said that meeting with him would create a

24   worse situation than the Andre Ferro situation, did he

25   mean meeting -- was he saying meeting with Chief

1    Crawford or meeting with Lieutenant Lancellotti?

2            MR. McHUGH:  Objection.

3            THE COURT:  Sustained.

4    **Q.**   Did you understand him to be referring to a

5    meeting with the chief or a meeting with Lieutenant

6    Lancellotti?

7    **A.**   Lieutenant Lancellotti.  I was asking the chief

8    for this meeting to be mediated.  Earlier in that week,

9    you know, after that incident, in the streets

10   Lieutenant Lancellotti made repeated comments that you

11   need to just stick to your fucking job and do your job,

12   not somebody else's job.  Do your job.  That's what he

13   kept saying.  He directed it right to me.  Do your job.

14   Don't do somebody else's job.  Do your job.  Repeated

15   it all the time.  And so that's when I asked for the

16   meeting.

17   **Q.**   Did you ever see Lieutenant Lancellotti behave

18   that way towards any of the male lieutenants?

19   **A.**   No.

20   **Q.**   What about towards Cindy Kiers?

21   **A.**   No.

22   **Q.**   You mentioned Heidi Rivard.  Was she a lesbian?

23   **A.**   No.

24   **Q.**   Did you ever see him behave that way towards her?

25   **A.**   No.

1    **Q.**   What about Jack Devlin, did you ever see Jack

2    Devlin -- is that the guy who snapped your collar?  Did

3    you ever see him behave that way towards a male

4    officer?

5    **A.**   No.

6    **Q.**   What about towards Cindy Kiers?

7    **A.**   No.

8    **Q.**   Or towards Captain Rivard?

9    **A.**   No.

10   **Q.**   You mentioned Miles Bonalewicz and the many

11   comments that he'd made to you.  Did you ever see him

12   behave that way towards a male officer?

13   **A.**   No.

14   **Q.**   What about towards Cindy Kiers?

15   **A.**   No.

16   **Q.**   What about towards Captain Rivard?

17   **A.**   No.

18   **Q.**   I want to move forward from -- that was June of

19   2008, you said?

20   **A.**   Yes.

21   **Q.**   I want to move forward to the transitioning of the

22   year from 2008 to 2009.  Were there any more critical

23   runs that you can recall with your South Main Street

24   Station group?

25        MR. McHUGH:  Objection.  South Main Street?

1    **Q.**   Did I get the -- is it North Main Street?  I'm

2    sorry.  Can you tell me if there were any more critical

3    runs with your North Main Street Station group.

4    **A.**   We had gone on a run with an infant that needed

5    CPR and a monitor placed on it.

6    **Q.**   What do you mean by monitor?

7         MR. McHUGH:  Objection.  The question was North

8    Main Street.  We've gone beyond that in years.

9         THE COURT:  I'm confused.

10         MR. MARTIN:  I'll ask a better question.

11         THE COURT:  Thanks.  I'm just confused about

12    geography.  That's what I meant.

13         MR. MARTIN:  I'm confused by so many things.

14    **Q.**   So I'm transitioning away from June of 2008.  Were

15    there any more critical runs during that time period

16    between the end of '08 to the beginning of '09, were

17    there any critical runs with your group that you worked

18    with at the North Main Street Station?  I believe

19    earlier you started referring to an infant?

20    **A.**   Yes.

21    **Q.**   Tell us about that.

22    **A.**   We had had a pediatric patient that needed to --

23    it did not have a pulse and it wasn't breathing.

24    **Q.**   Was it a boy or a girl?

25    **A.**   It was a boy.

1  **Q.**   Could you estimate age by the size or could you

2  give us a description of the boy's body?

3  **A.**   Not walking yet, still infantile, not a toddler,

4  just a teeny-tiny baby.

5  **Q.**   Was this nighttime or daytime?

6  **A.**   I don't -- I believe it was nighttime.

7  **Q.**   So was the baby at home?

8  **A.**   Yes.

9  **Q.**   Parents there?

10  **A.**   Yes.

11  **Q.**   Tell us what happened when you got to the scene.

12  **A.**   We immediately removed the baby from the home and

13  brought it to our rescue.  In that time that you're

14  carrying the baby, you're doing an assessment.  You

15  know, you're looking, listening and feeling.  You're

16  feeling the temperature of the baby, and there's a lot

17  you can do on the run.

18      And we got the baby to the -- I got the baby to

19  the vehicle, and we immediately started -- everybody

20  started doing something.  You know, if you're asked to

21  do something, you just immediately apply oxygen or the

22  pads and whatnot.

23      And one of the technicians at the time, I

24  believe it --

25  **Q.**   What do you do about the -- did you say earlier

1    that there was a lack of a pulse?

2    **A.**    Yes.

3    **Q.**    So are you equipped with your rescue to handle

4    somebody who doesn't have a pulse?

5    **A.**    Yes.

6    **Q.**    What are you equipped with?

7    **A.**    Well, we start CPR with our hands, and we have a

8    monitor that can assess the rhythm of the heart.  And,

9    you know, we use stethoscopes to listen to see if

10   they're breathing, and we palp a radial or carotid

11   pulse or in an infant's situation we use the brachial

12   artery to check that area.

13   **Q.**    Are you equipped with anything to help restart the

14   pulse?

15   **A.**    Yes.

16   **Q.**    What are you equipped with?

17   **A.**    We are equipped with a monitor, oxygen and IV

18   medicines and IV supplies.

19   **Q.**    What about a defibrillator?

20   **A.**    Yes, that's the -- I'm sorry, that's the monitor.

21   We call it a monitor.  It's a defibrillator.

22   **Q.**    So when you're saying the word "monitor," it's the

23   same thing as defibrillator?

24   **A.**    Yes.

25   **Q.**    I didn't realize that.  Is that something that you

1    can use on children and adults?

2    **A.**   Yes.

3    **Q.**   And is the use of the monitor on a child the same

4    as the use of the monitor on an adult?

5    **A.**   No.  You have to apply pediatric pads on an infant

6    up to a certain age, and then there are adult-size pads

7    that can be applied.

8    **Q.**   And what is the difference between the pediatric

9    pads and the adult-size pads?

10   **A.**   The size and the amount of joules that can be

11   delivered through them.

12   **Q.**   And when you say the amount of joules, is that in

13   reference to electricity?

14   **A.**   It is a -- yes, it's what it's called, joules.

15   There's volts and whatnot.  This is joules.  I don't

16   know how to explain it.  The monitor sends an

17   electrical shock.  They do call it an electrical shock.

18   **Q.**   Now, does the machine -- does the monitor

19   automatically change the amount of joules based on the

20   type of pad that you use or does the operator have to

21   do that manually?

22   **A.**   During this time period, we had gotten monitors

23   that are biphasic in nature; and they're preset at 200

24   joules, and the next shock would be delivered at 360.

25   **Q.**   So break that down.  The first shock is preset at

1    200?

2    **A.**    Correct.

3    **Q.**    And the next shock would jump to 360?

4    **A.**    Correct.

5    **Q.**    And then the next shock would be?

6    **A.**    360.

7    **Q.**    How do you change -- do you ever need to change

8    the amount of joules?

9    **A.**    Yes.

10   **Q.**    When?

11   **A.**    For a pediatric patient, it's joules per kg.  So

12   you have to know the baby's weight in pounds, divide

13   that into kilograms, and then that amount of kilograms

14   would then determine your joules of shock.

15   **Q.**    How do you change the joules that will be

16   delivered on the monitor?

17   **A.**    You have to manually dial it down.

18   **Q.**    And on a rescue scene, whose job is it to weigh

19   the baby, calculate the joules and properly calibrate

20   the monitor?

21   **A.**    That's my job as the rescue officer.

22   **Q.**    So tell us what happened when you got the baby to

23   the rescue.

24   **A.**    Again, that's what we call organized chaos.  We're

25   all doing something, and usually the rescue officer is

1    delivering these directives where I say start the

2    process of, you know, the IV, let's get the monitor set

3    up, this, this, this.

4         The pads had been brought out.  Again, we're all

5    trained, but we all try to just flow with what we've

6    seen before and how we experience that situation.

7         The pads were applied.  Pediatric pads were

8    applied to the infant.  The monitor deemed that a shock

9    was advised; and the individual, the technician at the

10   time, said, All right, I'm going to shock.  And I

11   looked over at the monitor and realized it was

12   biphasically set, you know, automatically at 200.  And

13   I said, No, not yet, not yet.

14        And, you know, I physically -- he said, I'm all

15   set.  I got this.  And knowing that the outcome would

16   have been irreversible damage, I'm not even sure what

17   would happen with a 200-joules delivery on a small

18   body, I have --

19        MR. McHUGH:  I'm going to move to strike the

20   answer.  She just said she doesn't even know what would

21   happen.

22        THE COURT:  Overruled or denied.

23   **Q.**   So there's a lot of information there, so I just

24   want to follow up a little bit.

25   **A.**   Sorry.

1   **Q.**   How many times did you tell him not to deliver the

2   shock?

3   **A.**   Three times.

4   **Q.**   And on the third time, did he listen to you?

5   **A.**   I put my arm in front of him, and I put my hand on

6   the monitor.  And I said, We have to dial it down, and

7   I dialed it down to eight joules.

8   **Q.**   Isn't that just -- I mean, isn't that just an

9   inexperienced technician's response to an emergency?

10       MR. McHUGH:  Objection, leading.

11       THE COURT:  Sustained.

12   **Q.**   Why did you think that that was a sign of -- why

13   did you think that that was a particularly troublesome

14   run?

15   **A.**   I think at this point things were building.  I

16   didn't get the assistance and, you know, the respect

17   for an off-duty police officer that was gravely

18   injured, and the responses were becoming very similar.

19   And his defiant behavior of I've got this, I've got

20   this, meant that we weren't working as a team anymore.

21   **Q.**   How often on your runs were you encountering that

22   type of behavior where they were unresponsive to your

23   commands?

24   **A.**   It depended on the engine that I was responding

25   with at this time.  Different engines did their jobs,

1    and different engines didn't.

2    **Q.**   But for the ones that didn't, how often on your

3    runs would you encounter subordinates who would not

4    follow your orders?

5    **A.**   At this point, maybe every two, three runs.

6    **Q.**   Did you complain about the incident with the

7    child?

8    **A.**   Yes.

9    **Q.**   Oh, the tech, do you remember what his name was?

10   **A.**   No, I don't.

11   **Q.**   Do you remember if it was somebody who was new to

12   the job?  Do you remember anything about him?

13   **A.**   Yes.  It was a newly assigned six-month person at

14   the time, six months into rescue, and they probably had

15   around maybe a year on the job.

16   **Q.**   And you mentioned earlier that everyone's trained.

17   Does that include training on the defibrillator?

18   **A.**   Oh, yes.

19   **Q.**   And how long -- earlier you said at that time we

20   were equipped with a biphasic monitor.

21   **A.**   Yes.

22   **Q.**   For how long had you been equipped with a biphasic

23   monitor?

24   **A.**   It was newly added at that time, like around that

25   time period.

1    **Q.**   Had training been given on the biphasic monitor?

2    **A.**   Oh, yes.

3           MR. McHUGH:   Objection, lack of foundation.

4    Withdrawn.

5    **Q.**   I didn't hear your answer.

6    **A.**   I would need the question again.

7    **Q.**   Had training been given on the biphasic monitor?

8    **A.**   Yes.

9    **Q.**   Did you ever complain about that situation?

10   **A.**   Yes, because I felt like it related to what was

11   going on.

12   **Q.**   To whom?

13   **A.**   Chief Crawford.

14   **Q.**   Did anything come of that complaint?

15   **A.**   No.

16   **Q.**   Now, we've discussed over the last few minutes

17   multiple incidents in which you conferred with Chief

18   Crawford.  At any point did he advise you to make

19   complaints to the EEO officer?

20   **A.**   Yes.

21   **Q.**   At any point during these meetings that we just

22   discussed?

23   **A.**   I believe it was later on.  I'm not aware of the

24   date.

25   **Q.**   You don't know when it was?

1    **A.**   No.

2    **Q.**   I'd like to show you a document that's already in

3    evidence as --

4            THE CLERK:   What's the number, please?

5            MR. MARTIN:   Exhibit 1.

6    **Q.**   This name at the top, Jeffrey Crawford, is that

7    Chief Crawford?

8    **A.**   Correct.

9    **Q.**   And in this e-mail, he references a long meeting

10   with you.   The e-mail is dated August 11th, 2009.   Do

11   you see that?

12   **A.**   Yes.

13   **Q.**   Do you recall if you'd ever been given or advised

14   to contact the EEO office before August of 2009?

15   **A.**   I'm not sure of the date, but the president of the

16   local had sent me something in regards to contacting

17   the EEO officer.

18   **Q.**   When was that?

19   **A.**   I'm not aware of the date.

20   **Q.**   In 2007, had anyone advised you to contact the EEO

21   officer?

22   **A.**   No.

23   **Q.**   2008?

24   **A.**   I'm not sure of when that occurred with the

25   president, Paul Doughty.

1    **Q.**   But with regards to the chiefs --

2    **A.**   No.

3    **Q.**   Oh, the union president, Paul Doughty.  Okay.  I'm

4    not talking about him yet.

5    **A.**   Oh, okay.

6    **Q.**   With regards to the chiefs, did any of the chiefs

7    that you spoke to advise you to contact the EEO

8    officer?

9    **A.**   No.

10   **Q.**   Now, you just mentioned the union president, Paul

11   Doughty.  Did he ever advise you to contact the EEO

12   officer?

13   **A.**   Yes.

14   **Q.**   Did he ever advise you to file a grievance under

15   the CBA related to your complaints about your work

16   environment?

17   **A.**   No.

18   **Q.**   Now, tell me about the events in 2009, the summer

19   of 2009 leading up to that meeting with Chief Crawford

20   that we just discussed in Exhibit Number 1.

21   **A.**   During that time period, we had had some stressful

22   runs that occurred between Engine 12 and Rescue 3,

23   stressful meaning the criteria of the run should have

24   been provided with critical incident stress debriefing.

25        In my entire career, I've asked many, many times

1   for different vehicles to get together and be able to

2   critically debrief these runs.  This was a time period

3   that I'd asked repeatedly for that in that early part

4   of June, July of 2009.

5   **Q.**   Did one of those runs involve Lieutenant Kiers?

6   **A.**   It did.

7   **Q.**   Tell us about that run.

8   **A.**   We had in the early morning hours responded,

9   approximately 6:30 to 7 a.m., to a house with a male

10  that was unresponsive in his bed fully clothed.  The

11  woman I believe was his fiancee that described that he

12  came home from a night out with his friends, started to

13  vomit profusely; but she was very, very adamant that I

14  see the type of vomit.  She was describing it as bright

15  red blood.

16  **Q.**   What time of day was this?

17  **A.**   Between -- it was early morning hours, 6:30 or

18  7 a.m.

19  **Q.**   Does blood in the vomit have any significance when

20  you're assessing a patient?

21  **A.**   Several things it can be indicative of.  The type

22  of blood is very key.  Dry, granular-looking blood can

23  be a GI bleed.  Bright red blood is hemorrhagic, and it

24  needs to be dealt with immediately.

25  **Q.**   Did you follow her advice to go look at the vomit?

1   **A.**   I did.   I at the time directed Lieutenant Kiers of

2   the engine to assess the patient with a full

3   assessment; and that basically means full set of

4   vitals, monitor, a sugar, blood glucose level.

5   **Q.**   I wasn't asking about Lieutenant Kiers yet.   Did

6   you go look at the vomit?

7   **A.**   Yes, I did.

8   **Q.**   What did it look like?

9   **A.**   Bright red blood spanning the entire shower, the

10  back of it, the floor, onto the floor.   It was copious,

11  and it was bright red.

12  **Q.**   Could you tell what the consistency of it was?

13  Was it blood and bile or --

14  **A.**   It appeared to be bright red blood.   No vomitus.

15  I didn't see any food.   It was bright red.

16  **Q.**   So there are two lieutenants on the scene.   Who is

17  in charge?

18  **A.**   I am.

19  **Q.**   What was Lieutenant Kiers doing while you were

20  observing, or what had Lieutenant Kiers been ordered to

21  do while you were inspecting the vomit?

22  **A.**   I again directed them to give me a full set of

23  vitals so that we could have an accurate assessment

24  immediately after I had seen the description of the

25  blood and asked for a full set of vitals.

1   **Q.**   And is that their typical job, to get the full set

2   of vitals for you?

3   **A.**   Absolutely.

4   **Q.**   Why are a full set of vitals important to you

5   during this assessment phase?

6   **A.**   A lot of times you can determine a patient's level

7   of consciousness based on the blood pressure, if

8   there's a low blood pressure.  And what we want to

9   do -- vitals determine everything that we're going to

10   do to treat them in the best way possible.

11   **Q.**   Okay.  How long does it usually take to get a full

12   set of vitals?

13   **A.**   Could be about five minutes, four to five minutes.

14   But as you're finding one assessment of a blood

15   pressure and leading into an oxygen saturation, you're

16   making those conclusive decisions and trying to really

17   just do your next step, where are we proceeding, where

18   are we going from there.  And that's my job.  My job is

19   to really take in --

20        MR. McHUGH:  I'm going to object, nonresponsive.

21   It's a narrative again.

22        THE COURT:  Overruled.  You can continue.

23   **A.**   Oh.  But, again, when they're assessing because

24   there's -- an engine is sent with critical runs so that

25   we have more people to apply more hands on and more

1    equipment.  So the more vital the run, the more people

2    we get.  So they were there to do their job, a job, you

3    know, which is assess the patient for me.

4    **Q.**    So when you returned from inspecting the vomit,

5    had the vitals been taken?

6    **A.**    No.

7    **Q.**    Where was Lieutenant Kiers?

8    **A.**    She was in the bedroom.  So if --

9    **Q.**    She was in the bedroom?

10   **A.**    Yes, she was in the bedroom.

11   **Q.**    And were there any other members of the team in

12   the house?  Was it a house or apartment?

13   **A.**    It was a house.  We were on the second floor.

14   **Q.**    Were there any other people up there with you?

15   **A.**    Yes.

16   **Q.**    Who was up there?

17   **A.**    Ken Magnon was my rescue technician.  Cynthia

18   Kiers was the lieutenant.  I cannot remember the --

19   Jeff Davenport was there, and two call-backs were there

20   from I believe B Group, firefighters.

21   **Q.**    When you -- did you find out why the vitals hadn't

22   been assessed yet?

23   **A.**    Abruptly I found out why.

24   **Q.**    Well, how long had it taken you to go inspect the

25   vomit?

1    **A.**   Less than a minute.

2    **Q.**   So when you came back, what was being done as far

3    as your orders?

4    **A.**   I came out of the bathroom.  The bedroom was

5    immediately to my right.  And I found the two B Group

6    engine or firefighters dragging a male under each arm.

7    His toes were dragging, his head was down, and he

8    appeared to be unconscious.

9    **Q.**   So when you say his head was down, was his face

10   pointing towards the floor?

11   **A.**   Yes.

12   **Q.**   Okay.  Was he dressed?

13   **A.**   He did.  He had a shirt on and pants and no belt,

14   jeans.

15   **Q.**   Where was -- you mentioned earlier a fiancee.

16   Where was the fiancee?

17   **A.**   She was leaving the bathroom with me because she

18   directed me to where the vomit was.

19   **Q.**   How did you respond when you saw the firefighters

20   moving the patient?

21   **A.**   I immediately stood in the way of them; and when

22   they lost their momentum of carrying him because he was

23   lifeless, they started to drop him; and one firefighter

24   grabbed his pants and kind of snugged them up, and they

25   immediately ripped open.

1          He had no underwear on.  His genitals came out,

2     and they dropped him on the floor.  And the fiancee was

3     immediately to my left.

4     **Q.**   How did she respond to that?

5     **A.**   She's just like, What's going on?  You know,

6     what's going on?

7     **Q.**   Did anyone tell you why they were moving the body

8     when they were supposed to be assessing vitals?

9     **A.**   No.  I looked at Lieutenant Kiers and I said, This

10    has to stop.  And she goes, It's probably just alcohol

11    or weed.  And I go, We haven't -- we need an assessment

12    on this patient.  I immediately had my rescue tech, Ken

13    Magnon, go to the rescue for the stair chair to carry

14    him off the second floor.

15    **Q.**   Can you describe what a stair chair is.

16    **A.**   It is a chair device that folds.  It has two sets

17    of straps across the chest and the legs, and it has

18    handles at the bottom and at the rear of the top.  And

19    you can literally strap in a patient and lift and carry

20    down, down off of stairs or any type of -- you know,

21    where we need to maneuver.

22    **Q.**   And what was the fiancee doing during this period

23    of time when he had been dragged and dropped?

24    **A.**   She mentioned why aren't we helping him.

25    **Q.**   Okay.

1   A.   In a very, you know, upset -- I mean, his penis

2   was out.  The guys appeared not to want to touch it,

3   and so we --

4   Q.   Why would they need to touch it?

5   A.   Well, to put it back in his pants just to --

6   family was there.  I mean, it's just unnecessary.

7   Q.   But why was he being moved in the first place, was

8   more my question, I guess.  Maybe I asked it wrong.  Do

9   you know?

10  A.   No.

11  Q.   Who gave the order?

12  A.   It would have been Lieutenant Kiers.

13  Q.   So what happened after you assessed him?

14  A.   I immediately looked back at the guys with the,

15  you know, equipment, the monitor.  I have a light --

16  pen light on my belt where I carry my radio.  I

17  immediately assessed his pupils to be one enlarged

18  appearing to be a blown pupil.  The other one was

19  constricted.  He was agonally breathing.  We applied

20  high-flow O2.  We got him into the chair after a full

21  set of assessment and blood sugar, which was normal at

22  the time; and we got a blood pressure, and it was

23  substantially high, both systolic and diastolic.

24  Q.   Agonally breathing, is that the one you mentioned

25  earlier?

1    **A.**    It is a medical terminology for the type of

2    respirations that are not sustaining for life.

3    **Q.**    So that is the one that you mentioned earlier?

4    **A.**    The terminology, yes.

5    **Q.**    And describe for me what you mean when you say

6    that the breathing is not sustaining life.

7    **A.**    It is not a breath in or out, expiratory or

8    inspiratory, that is providing enough oxygen to sustain

9    life.

10   **Q.**    I'd asked you earlier if you can save somebody

11   with that type of condition when agonally breathing,

12   and you said sometimes.

13   **A.**    Yes.

14   **Q.**    What are the steps that you take to maximize the

15   chance to save somebody who is in that type of

16   condition?

17        MR. McHUGH:   Objection as to form.   She hasn't

18   testified to a specific incident when she did it.

19        THE COURT:   Why don't you rephrase, Mr. Martin.

20   **Q.**    Sure.   What kind of steps would you have taken in

21   this -- what kind of steps did you want to take in this

22   incident to maximize your chance of saving this

23   patient?

24   **A.**    In the environment that we were in, we would apply

25   high-flow O2 with a non-rebreather.

1    **Q.**   Even when you first get to the scene, is this
2    assessment process important?
3    **A.**   Absolutely.
4    **Q.**   Why?
5    **A.**   Because, as I said earlier, you -- everything you
6    do to assess a patient you use as your tools to then
7    continue your process of aiding them and helping them
8    medically with different procedures, adjuncts.
9    **Q.**   What about moving the body prior to, you know,
10   figuring out what kind of condition the patient is in?
11   Is that helpful or --
12        MR. McHUGH:  I'm going to object on relevance.
13   What does this have to do with a hostile work
14   environment?
15        THE COURT:  Overruled.
16   **Q.**   What about moving the patient before you finish
17   the assessment?
18   **A.**   They violated a direct order from me.
19   **Q.**   I know that they did, but how is that important to
20   your trying to maximize the chance to save the patient?
21   **A.**   I think early intervention, early CPR, I think
22   even the layperson can understand; and when we're
23   taught CPR, that early intervention is everything.
24   It's key.  I would say that for me it's truly -- I base
25   everything on my assessment and what I can do best to

1   aid them in survival.

2   Q.   So were you able to save this one?

3   A.   We did.

4   Q.   And did you find out what the cause of his

5   vomiting and his unconsciousness was?

6   A.   Yes.  He had a left-sided head bleed with a shift.

7   His brain had already been shifted.

8   Q.   Was the type of behavior that you just described

9   where your orders weren't followed, was that something

10   that you encountered often throughout the year 2009?

11   A.   Absolutely.

12   Q.   How often would you find yourself in a situation

13   where your orders were not followed on the scene?

14   A.   It started to be shift to shift, run to run,

15   again, depending on the trucks responding.  It could

16   have been every time.

17   Q.   Did you make complaints?

18   A.   Absolutely.

19   Q.   To who?

20   A.   Chief Michael Morgan, Chief Tom Warren, my DACs,

21   deputy assistant chiefs that were there, Chief Al

22   Horton, Chief Thomas.  Chief Thomas was my DAC for a

23   long time, deputy assistant chief, so he was in charge

24   of my group, my A Group.  Yeah.

25   Q.   Anything ever come of those complaints?

1    **A.**   No.

2    **Q.**   Did you see any of your -- any of the male

3    lieutenants encountering similar types of

4    insubordination on their runs?

5    **A.**   No.

6    **Q.**   How about the straight female lieutenants, did you

7    see any of them encountering the same type of

8    insubordination on their runs?

9    **A.**   No.

10   **Q.**   You mentioned at the Branch Ave. Station you heard

11   yourself referred to as a lot of different words.  Do

12   you recall that testimony?

13   **A.**   Yes.

14   **Q.**   How did you hear people refer to you while you

15   were working at the North Main Street Station in 2008,

16   2009?

17   **A.**   North Main Street?

18   **Q.**   Uh-huh.

19   **A.**   With the things on the board and that kind of --

20   **Q.**   I'm sorry.  You moved from North Main Street to

21   Branch Ave.?

22   **A.**   Yes.

23   **Q.**   I'm confusing the two.  I apologize.  When you

24   were working at the Branch Ave. Station, how would you

25   hear people refer to you?

1    **A.**   The bitch, the cunt.  I heard Frangina.  I mean, I

2    heard it on runs.  I heard when guys would walk away

3    from me to the truck, I'm not helping her, you know,

4    I'm done with this, things of that nature.

5    **Q.**   I want to draw your attention forward to July 29th

6    of 2009.  Do you recall that date?

7    **A.**   Yes, I do.

8    **Q.**   Were you working?

9    **A.**   Yes.

10   **Q.**   Did you have any critical runs?

11   **A.**   Yes.

12   **Q.**   Where was the critical run?

13   **A.**   43 Job Street, Providence.

14   **Q.**   Who was your chauffeur?

15   **A.**   Rescue Tech Paul Tang.

16   **Q.**   Had you worked with Paul Tang before?

17   **A.**   No.

18   **Q.**   Was this the first time you had met him?

19   **A.**   No.  I had met him before.

20   **Q.**   Any significant interactions with him before

21   July 29th of 2009?

22   **A.**   No.

23   **Q.**   Did you say it was 43 Job Street?

24   **A.**   Yeah.

25   **Q.**   Were there any other vehicles on scene at 43 Job

1    Street when you got there?

2    **A.**   There was a report of a single gunshot wound or

3    single -- you know, a GSW.  We had arrived.  Police had

4    already secured the scene.  Rescue 3 and Engine 12 were

5    dispatched to that address.

6    **Q.**   Who was in charge of the scene?

7    **A.**   I'm ultimately in charge of the scene.

8    **Q.**   Why were you in charge of the scene?

9    **A.**   I'm the rescue lieutenant.

10   **Q.**   How did you go about assessing the patient?

11   **A.**   Engine 12 members and officer Lieutenant Bo

12   Jackson were already on scene with us, arrived at the

13   scene at the same time.  I had seen the patient on the

14   bed in his underwear and a tee-shirt and a single shell

15   casing on the ground that we all made each other aware

16   of to step over.

17        I immediately went over to the patient, saw that

18   it was a single gunshot wound, not to and through.  It

19   was a single entry.  It did not exit.  I immediately

20   felt for a radial pulse on his right arm and found him

21   to be agonally breathing again and with a radial pulse,

22   which is indicative of a blood pressure greater than 90

23   systolic.

24   **Q.**   What did you decide to do?

25   **A.**   His heart was beating, he had a perfusing blood

1    pressure, and he was agonally breathing.  He is a

2    viable candidate for life.  I requested transport.

3    **Q.**   Did you give any orders?

4    **A.**   Yes, I did.

5    **Q.**   Who did you give orders to?

6    **A.**   The officer on scene was Lieutenant Robert

7    Jackson, and I ordered him -- Paul Tang had brought up

8    the stair chair on my request that we bring the stair

9    chair up because we knew he -- this was on the second

10   floor of where the police were calling us to on the

11   balcony.  And so I knew ahead of time that we needed

12   the stair chair.

13        We then proceeded up as a group.  And, again,

14   with the stair chair already there, I asked Lieutenant

15   Jackson to assist and put the body of, you know, a

16   viable candidate for life in a chair and we'd carry him

17   out to the rescue.

18   **Q.**   What was the response to your order?

19   **A.**   Lieutenant Jackson crossed his arms and said,

20   That's a lot of blood.

21   **Q.**   Were they -- was there any other conversation

22   happening in the room at that time?

23   **A.**   Yeah.  Another guy, I believe it was Firefighter

24   Sean McGarty, stated, If he wanted to kill himself,

25   maybe we should just let him.

1   **Q.**   So what did you do next?

2   **A.**   There was a tremendous amount of resistance on the

3   scene.

4   **Q.**   I'm sorry.  I didn't understand that.

5   **A.**   A tremendous amount of resistance on the scene.

6   Nobody was moving to remove the body from the bed and

7   put him in the chair that was there.

8   **Q.**   How many times did you tell them to do that?

9   **A.**   Three or four.

10   **Q.**   Was there any family members in the house?

11   **A.**   I believe the wife was off in the living room with

12   police.

13   **Q.**   Okay.  So how many times did you tell them to move

14   the body into the chair?

15   **A.**   Four at least.  My tone got louder and louder.

16   **Q.**   And what were their responses to your orders each

17   time?

18   **A.**   They didn't move.  Paul Tang slammed and opened

19   the chair down and slammed the stair chair.  I

20   immediately exited the room and got a police officer to

21   help.  I ended up telling him he's ultimately

22   responsible if this guy dies because these men aren't

23   doing their job.

24       MR. MARTIN:  You can take a minute if you need

25   it.

1           (Pause.)

2    **Q.**    Did the officer come upstairs?

3    **A.**    The officer?  I'm sorry.

4    **Q.**    The police officer.

5    **A.**    He was upstairs, and he had said that I've never

6    had this happen before.  What's going on?  And I asked

7    him to come into the room.  And I addressed Lieutenant

8    Jackson, and I said, He's in charge now.  And he was a

9    white shirt, so it meant it was a lieutenant on scene,

10   and Lieutenant Jackson and I were both lieutenants.

11   And I said, He's in charge now.  I said, I've told him

12   this body gets brought to my truck now.

13           And I said to the officer, which is not in our

14   chain of command whatsoever, I said, I am going to the

15   truck to establish my life-saving equipment, and I

16   waited for the body to be brought down.

17   **Q.**    How long did it take before the body came down?

18   **A.**    I don't know.  It felt like forever for me.

19   **Q.**    Was the body eventually brought to you?

20   **A.**    Yes.  It was brought down.  It was put in the

21   street.  He was lifeless at this point, slumped off to

22   the side.  He was left there.  My stretcher was out and

23   down on the ground.  I had prepared that.  I had all my

24   IV supplies, intubation equipment out.  I had all my

25   medicines out to restart his heart.  I believe he would

1     have been -- you know, epi and atropine that I needed,

2     I had it on the bench, everything cracked, ready to go.

3          And they delayed getting the body from the stair

4     chair to the stretcher because Lieutenant Jackson had

5     advised Patty Connell, I believe it was Connell,

6     O'Connell, she was a BCI --

7     **Q.**   Let me jump in.

8     **A.**   Yeah.

9     **Q.**   So the body's on the chair?

10    **A.**   Yup.

11    **Q.**   You said lifeless.

12    **A.**   Yes.

13    **Q.**   What about -- any viable signs whatsoever?

14    **A.**   No.

15    **Q.**   Was he dead?

16    **A.**   You can't determine death.

17    **Q.**   What do you mean you can't determine death?

18    **A.**   Well, we determine viability of human life.  In

19    this situation that he was in, he was viable.  Only a

20    coroner can pronounce death.  My job was to sustain

21    life until he could have advanced life-saving measures

22    by a doctor at a trauma facility.

23    **Q.**   So even if it looks hopeless, your job is to do

24    that, life-sustaining measures until you get to the

25    hospital?

1    **A.**   You have a criteria that you make a determination

2    on in the initial phases; and up in that room, I had

3    made a determination that he was a viable candidate for

4    life based on the fact that his heart was still beating

5    and he still had a perfusing radial pulse, and that's

6    indicative -- it's an indicator that the systolic

7    pressure is greater than 90, and he was agonally

8    breathing.

9         So in my initial assessment, if we moved quickly

10   without delay, it increases the chances of survival

11   dramatically.

12   **Q.**   So tell me what happens when he gets into the

13   truck.  Who is in the truck with you or into the

14   rescue?

15   **A.**   There was some bantering outside of the vehicle

16   prior.

17   **Q.**   Yes, but let's --

18   **A.**   Okay.  We get into the truck, and I immediately

19   monitor --

20   **Q.**   Who was in the truck with you?

21   **A.**   Sean McGarty, Lieutenant Robert Jackson, Paul

22   Tang.

23   **Q.**   Who is driving?

24   **A.**   I'm not sure.  Well, there was Timothy Kelly,

25   Firefighter Tim Kelly, and that's all I can remember.

1    **Q.**   What was Paul Tang doing when you first left the

2    house?

3    **A.**   He was the one banging the stair chair and

4    acting --

5    **Q.**   When you left the house in the rescue, what was

6    Paul Tang doing?

7    **A.**   I'm not sure I understand.  I'm sorry.

8    **Q.**   Did the rescue truck eventually leave the house?

9    **A.**   Leave the scene?

10   **Q.**   Yes.

11   **A.**   I'm sorry.  I didn't understand what you meant by

12   the house.  But yes, leave the scene, yes.

13   **Q.**   Okay.  So in the back of the truck when you left

14   the scene, what was Paul Tang doing?

15   **A.**   He was doing CPR.

16   **Q.**   What was Sean McGarty doing?

17   **A.**   He was standing in the back of the vehicle bracing

18   himself because we were moving.

19   **Q.**   What were you doing?

20   **A.**   I was doing the rest of the assessments, again,

21   vitals, if he had a -- we put a blood pressure cuff on,

22   a monitor on and things of that nature to see where we

23   were at now from the time that I assessed him in the

24   house to our transporting.  We had multiple lines

25   established, and I was to the left of Paul Tang.

1    **Q.**   Was Paul Tang saying anything?

2    **A.**   Lieutenant Jackson had looked at me and said that

3    I had made him a donor because at the time --

4         MR. McHUGH:  Objection, nonresponsive.  He asked

5    what Tang said.

6         THE WITNESS:  Oh.

7         THE COURT:  Overruled.

8    **Q.**   So Lieutenant Jackson said that in the back of the

9    rescue while you were transporting the patient?

10   **A.**   Yes.

11   **Q.**   Was Paul Tang saying anything to you?

12   **A.**   Not at the time.

13   **Q.**   Was Firefighter McGarty saying anything to you?

14   **A.**   There was a comment, I don't know if it was from

15   him, but it was -- the statement was if he wanted to

16   kill himself, we should have let him.

17   **Q.**   Now, did Paul Tang continue to provide CPR the

18   entire trip to the hospital?

19   **A.**   No.

20   **Q.**   Tell us about when he stopped and why.

21   **A.**   We were under control.  We had everything

22   established.  He was doing CPR.  He had perfusing sweat

23   coming down.  CPR is a very strenuous activity.  I had

24   noticed that the fatigue was setting in and

25   compressions weren't as deep.

1        I told him because he had a large amount of

2    blood on his gloves, he was sweating and he was trying

3    to wipe -- he had a lot of blood.  So I said, You've

4    got a lot of blood on your gloves, man.  I'll take over

5    CPR.  You take a break.  And he didn't do it.  He

6    didn't stop.

7        So then I said it again.  And even McGarty said,

8    Paul, you got a lot of blood on your gloves.  Just

9    change your gloves.  And immediately he asked, Well,

10   how do you want me to do that?  Kind of like, you know,

11   boisterous.  How do you want me to do that?

12       And I said -- I was sliding in to take over CPR,

13   and I said, You just need to take your gloves off, dry

14   your hands with a towel, blow on them, take a break as

15   I start CPR.  And then I was hit with a glove and blood

16   and brain.

17   Q.   So when you told him to take off the gloves and

18   blow on his hands, is it more difficult to put on

19   rubber gloves if they're sweaty or wet?

20   A.   Absolutely.

21   Q.   And is there a receptacle in the unit to put --

22   throw away things like gloves or masks or other types

23   of equipment that you may need to throw out?

24   A.   Yes.  The rescue is -- when you look into the back

25   of a rescue, it's linear.  The stretcher is off to the

1    left.   There's what we call the captain's chair or the

2    officer's chair.   There's a bench off to your right.

3    And between the passenger transport compartment and the

4    driving compartment, there is a garbage bin with a red

5    bag in it for biohazards.

6    Q.   Could you demonstrate for us with rubber gloves

7    how he snapped it?

8         MR. McHUGH:   Objection.

9         THE COURT:   What's the objection?

10        MR. McHUGH:   We don't know if those are the same

11   gloves that were used by the fire department at that

12   time.

13        THE COURT:   Why don't you lay the predicate,

14   Mr. Martin.

15   Q.   Could I hand you these?

16   A.   Sure.

17   Q.   Are those gloves the same or similar to the gloves

18   that you were using at the fire department on July 29th

19   of 2009?

20   A.   Yes.

21        MR. McHUGH:   Objection.   He said similar.   We

22   need the same gloves --

23        THE COURT:   Overruled.

24        MR. McHUGH:   -- the department was using.

25        THE COURT:   Overruled.

1   **Q.**   Could you please put them on.  Now, this body that
2   you were talking about, it was not on the ground, it
3   was on a stretcher; right?
4   **A.**   Correct.
5   **Q.**   How high off the ground was the stretcher?
6   **A.**   About a foot and a half.
7   **Q.**   So when you were doing CPR, were you standing over
8   it, were you kneeling?
9   **A.**   Leaning over.
10  **Q.**   Leaning over?
11  **A.**   Yes, bracing my knees on the front of the
12  stretcher and leaning over.
13  **Q.**   And the vehicle, was it moving or was it still?
14  **A.**   It's moving.
15  **Q.**   Where was Paul Tang after you took over the
16  performance of the CPR?
17  **A.**   He became more upright, and he was right here.
18  **Q.**   Okay.  Can you show us what you saw him do with
19  his gloves before you felt the materials hit your face.
20  **A.**   I could see a hand, and all I heard was a snap,
21  and it was on me.
22  **Q.**   The hand that you saw, show the jury what position
23  it was in when you saw it.
24  **A.**   It was right here.
25  **Q.**   How far away from it were you?

1    **A.**   We were shoulder to shoulder when we started this

2    process of relieving him, and he became upright, and

3    the hand was right at my eye level.

4    **Q.**   Could you see if the glove was off of his hand

5    after you felt the materials hit your face?

6    **A.**   No.  I just felt -- heard a snap and felt blood

7    and brain and materials, you know, liquids on my face

8    and hair and neck and eyes, nose and mouth.

9    **Q.**   Where in your nose was it, like on the outside?

10   **A.**   Over here (indicating), corner of my mouth, in my

11   ear.

12   **Q.**   Any go in your mouth?

13   **A.**   Yes.

14   **Q.**   What did that taste like?

15   **A.**   Just disgusting.  I mean, just --

16   **Q.**   Was it in your ears?

17   **A.**   Yup.

18   **Q.**   Did you stop performing CPR on him?

19   **A.**   No.

20   **Q.**   Why not?

21   **A.**   I turned to Paul and said, You just made me a

22   patient.

23   **Q.**   What did you mean when you said, You just made me

24   a patient?

25   **A.**   I have to be treated.  I have to be treated for a

1    high-level exposure.  Anything in your eyes, nose,

2    mouth, any type of a, you know, opening, could be to

3    your skin or anything, a cut, makes you -- until

4    deemed -- it's a high risk.

5    **Q.**   Is there any protocol for how to remove gloves

6    safely?

7    **A.**   I've seen videos.  The Department of Health has

8    issued standard, you know, training and --

9    **Q.**   Have you ever seen on any of the rescue runs

10   you've done anybody have blood or matter like that

11   snapped onto their face in that way before?

12   **A.**   I haven't.

13   **Q.**   And how are you supposed to remove your gloves

14   when they're soiled?

15   **A.**   Down.  You could be --

16   **Q.**   You have a pair on.  Maybe you could stand up and

17   show us.

18        MR. McHUGH:  I'm going to object to the

19   question.

20        THE COURT:  Can you just pull the mike.

21        MR. McHUGH:  The question has a lack of

22   foundation.  We're talking about a very specific

23   incident in the complaint that she talked about, and he

24   just asked her how you're supposed to take your gloves

25   off.  There can be all kinds of situations where you're

1  wearing gloves.  So I think we need --

2      THE COURT:  Why don't you put some timeframe on

3  the question, Mr. Martin.

4  **Q.**  Sure.  In 2009 when a firefighter or a rescue tech

5  is wearing prophylactic gloves like the ones that you

6  have on your hand at this very moment, is there any

7  particular protocol or procedure that you're supposed

8  to follow when you remove them in order to minimize the

9  risk of unnecessary exposure to the people around you?

10  That would be a yes or no.

11  **A.**  Oh, yes.

12  **Q.**  And are you familiar as a rescue lieutenant on the

13  department since 2006 with that procedure?

14  **A.**  Yes.

15  **Q.**  Would you be comfortable demonstrating that

16  procedure for us?

17  **A.**  Yes.

18  **Q.**  Could you please do so.

19  **A.**  (Witness Complies).

20  **Q.**  And then where does that -- so the record

21  reflects, one glove is taken off and then wrapped up in

22  the other glove.  Where does that go?

23  **A.**  It's supposed to be disposed in a bloodborne

24  pathogen or contaminant container.

25      MR. MARTIN:  Thank you.

1    THE COURT:  Want to take the lunch break now?
2    Great.
3        Ladies and gentlemen, continue not to discuss
4    this case amongst yourselves, and we'll see you back in
5    an hour.
6        Counsel, I have a hearing at 1:00 in here, so if
7    you could just slightly tidy up.  You don't have to
8    move everything, but just tidy it up.  It will only be
9    about 20 minutes.
10       (Recess.)
11       THE COURT:  Mr. Martin.
12       MR. MARTIN:  Thank you.
13  **Q.**   Did you return to work after the Job Street
14   incident that we finished discussing just before the
15   lunch break?
16  **A.**   Yes.
17  **Q.**   When?
18  **A.**   Approximately six months later on December 5th,
19   2010.
20  **Q.**   What had you done in between?
21  **A.**   Therapy.
22  **Q.**   Let me ask you a better question.  Why was it six
23   months before you returned to work?
24  **A.**   Immediately on July 29, '09, Chief James Gallant
25   had a meeting with me that I requested and asked him

1    who I could seek for treatment for the symptoms that I

2    was feeling.

3    Q.    And during that six months, did you go through

4    treatment?

5    A.    Yes.

6    Q.    I want to bring your attention back to a meeting

7    that we discussed earlier with Chief Jeffrey Crawford

8    in August of '09.  Do you recall that meeting?

9    A.    Yes.

10   Q.    Who requested that meeting?

11   A.    I did.

12   Q.    What was the purpose of requesting the meeting?

13   A.    I felt as though I couldn't continue working in

14   the capacity that I was in with the hostile work

15   environment.

16   Q.    What did you tell Chief Crawford during that

17   meeting?

18   A.    That the name calling was increasing, the

19   derogatory nature of the names was increasing, more

20   people were using them, more male members were using

21   them, that the sexual harassment I felt was very

22   obvious, that I had requested meetings and all the time

23   I had requested, like, assistance and nothing was

24   getting done.

25   Q.    What did Chief Crawford say back to you?

1    **A.**    That I needed to go to the EEO officer.

2    **Q.**    Did he tell you why you needed to go to the EEO

3    officer?

4    **A.**    Because it was a hostile work environment and it

5    was sexual harassment and that it involved issues that

6    the EEO needs to be made aware of or -- prior to this

7    she was aware, but we had to have a meeting.

8    **Q.**    Did you ever have contact with the EEO office

9    after that meeting?

10   **A.**    Yes.

11   **Q.**    And whom did you contact or did you contact the

12   office or did the office contact you?

13   **A.**    I know Chief Crawford had called and left a

14   message for Olayinka; and he basically said to her,

15   Expect a call from her, and if she doesn't, call her.

16   The message was either return the call to her or, you

17   know, expect a call from Lieutenant Franchina.

18   **Q.**    And did you and Olayinka ever connect?

19   **A.**    Yes, we did.

20   **Q.**    When was that?

21   **A.**    I don't know the exact dates.  I know she has

22   extensive notes.

23   **Q.**    Did you miss meetings with her in the beginning?

24   **A.**    No.

25   **Q.**    Okay.  We talked about Chief Varone's response to

1    the Andre Ferro situation in 2006.  Can you compare

2    that response to the response you received from Chief

3    Ferro in 2009 (sic)?

4         MR. McHUGH:  Objection as to form.

5         THE COURT:  Why don't you rephrase it,

6    Mr. Martin, please.

7         MR. MARTIN:  Certainly.

8    Q.   After your meeting with Chief Crawford, are you

9    aware if there was anyone who was brought up on any

10   charges?

11   A.   No.

12   Q.   Are you aware of whether or not any steps were

13   taken to prevent further occurrences of the behavior?

14   A.   No.

15   Q.   Are you aware of whether or not the chief or any

16   chief took any steps to contact people whom you had

17   accused of harassing you?

18   A.   No.

19   Q.   You said that you returned to work six months

20   later.  I'd like to direct your attention to the date

21   of December 9th, 2009.  Were you on duty that day?

22   A.   No.

23   Q.   What were you doing that day?

24   A.   I believe it was my first day off.

25   Q.   How long had you been back to work?

1  **A.**   I started my cycle working my first two days 5th

2  and 6th, then my two nights 7th and 8th.

3  **Q.**   And what were you doing on December 9th during

4  your day off?

5  **A.**   Don't know.

6  **Q.**   Did you have occasion to go to the Firefighters'

7  Hall?

8  **A.**   I believe that was on December 10th.

9  **Q.**   Excuse me.  What were you doing on December 10th?

10  **A.**   My partner, Kristy Adams, and I went to the

11  Firefighters' Hall where I'm a union member; and we

12  chose to buy Christmas -- apparel, sweatshirts, hats

13  were for sale with our logos on it, Providence Fire

14  Department, and we were purchasing them for Christmas

15  gifts.

16  **Q.**   Were there any other firefighters there?

17  **A.**   Yes.

18  **Q.**   Who did you see there?

19  **A.**   I realized that Ladder 3 and Engine 12 were on

20  duty at the Christmas sale along with plenty of

21  off-duty firefighters selling apparel and buying and

22  purchasing items.

23  **Q.**   How could you tell they were on duty?

24  **A.**   They were in uniform with their radios, portable

25  radios.

1   **Q.**   Is portable radios a sign if somebody is on or off

2   duty?

3   **A.**   Well, yes.  A portable radio has to be maintained.

4   You have to be able to hear and respond, especially

5   when you're not in a station with voc alarms, that the

6   lights come on and indicate with a tone that you're

7   being dispatched to a particular incident or a run.

8       The radios are portable so that you have a

9   speaker, a mike, and that you are able to hear and be

10   in connection with the department and the dispatchers.

11   **Q.**   Was Firefighter Sean McGarty one of the people

12   that you saw at the union hall that day?

13   **A.**   Yes.

14   **Q.**   Did you have a chance to speak with him?

15   **A.**   I don't know if you want to call it speaking, but

16   yes.

17   **Q.**   Tell us about that interaction.

18   **A.**   I had -- my partner and I, Kristy, had purchased

19   several items for both families.  We had exited, and

20   we -- she had stated that when we were at the cars

21   looking through the items, she said, We forgot to get

22   my dad a long-sleeve tee-shirt.  And I said, Ugh, okay,

23   I'll go back in.

24       So I went back in and just went right to where

25   the long sleeves were, and I went to go purchase it,

1    and Firefighter McGarty approached from my right-hand

2    side.

3    Q.   How long had you been in the Firefighters' Hall

4    for the second time before he approached?

5    A.   Minutes.

6    Q.   Had you spoken to him at all before he came over?

7    A.   No.

8    Q.   When you were back on duty for the few days prior

9    to this, had you and Firefighter McGarty interacted at

10   all?

11   A.   No.

12   Q.   Had you and Firefighter McGarty had any

13   interaction whatsoever since the Job Street incident on

14   July 29th, 2009?

15   A.   Not prior to that.

16   Q.   And how about with Firefighter Elliot Murphy, had

17   you had any interactions with him between July 29th,

18   2009, and December 10th, 2009?

19   A.   I don't believe so.

20   Q.   So when Firefighter McGarty approached you from

21   the right, did you speak to him?

22   A.   Yes.

23   Q.   What did you say?

24   A.   Well, he immediately responded to me.  I think his

25   first statement was, Who the fuck do you think you are?

1    And I looked at him; and I go, Hello, Sean.  And it was

2    just startling.

3    **Q.**    I noticed when you said that that you were looking

4    up.  How tall is Firefighter Sean McGarty?

5    **A.**    He's got to be 6'6".

6    **Q.**    How much does he weigh about?

7    **A.**    Probably two and change.

8    **Q.**    Muscular?

9    **A.**    Yeah.

10   **Q.**    What was he wearing?

11   **A.**    Black collar shirt issued by the department with

12   Providence Fire and Providence Fire on the back, black

13   pants, black belt.  I didn't really indicate the shoes.

14   **Q.**    Did he respond after you said, Hello, Sean?

15   **A.**    Yup.  He goes, Who do you think you are going

16   above our heads and telling the chiefs that we did

17   nothing on that run?

18   **Q.**    Had you gone above their heads and told the chiefs

19   that they did nothing on that run?

20   **A.**    I went to Chief Crawford and explained in great

21   detail my emotional state at the run, on the run, after

22   the run and seeking treatment.

23   **Q.**    Was that at the same meeting that you discussed

24   earlier that occurred in August of 2009?

25   **A.**    No.  It would have been -- I went off July 29th,

1    so possibly, yeah.

2    Q.   When you had that meeting with Chief Crawford, did

3    you have any expectation that it would be confidential?

4    A.   I truly believed it was confidential.

5    Q.   Why?

6    A.   Because my understanding of the complaint system

7    is that a complaint can be in writing or a verbal and

8    that all reports are to be confidential and handled

9    subsequently efficiently and quickly.  That's my

10   understanding of how it reads.

11   Q.   Okay.  So when he said who, you know, the

12   expletives and whatnot, who do you think you are, did

13   you reply?

14   A.   I said, I don't know what you're talking about.  I

15   didn't go to the chiefs.  I don't know what you're

16   talking about.

17   Q.   Why did you deny going to the chief?

18   A.   Because I thought it was confidential.  Like, why

19   was I going to own up to something that I felt was in

20   confidence?

21   Q.   What did you expect to happen after your meeting

22   with Chief Crawford?

23   A.   I expected him to understand that I am out on

24   stress.  I've been attacked repeatedly.  It was so

25   volatile at this point, I expected them to try to

1    understand and do something.

2          I mean, there's laws.  There's policy and

3    procedure that's being violated left and right.  I was

4    writing it down.  He told me I had to write it down,

5    and I did.

6    Q.    Had you had your contact with Olayinka Oredugba

7    prior to December 10th, 2009?

8    A.    I would have to look at my notes or hers.  I'm

9    assuming so.

10   Q.    How did he respond when you said that you didn't

11   know what he was talking about?

12   A.    He says, You know exactly what I'm talking about.

13   He said, You went to the chiefs.  And, you know, and he

14   even made a statement that the administration has, you

15   know, told them that litigation.  So for my chief

16   officers to start a rumor --

17   Q.    Well, I don't know --

18   A.    Okay.

19   Q.    I don't know what the chief officers -- I wasn't

20   asking so much about that, but what did he say about

21   the litigation?

22   A.    He said that I'm -- you know, I have litigation,

23   I'm suing.

24   Q.    Had you filed any type of lawsuit or claim?

25   A.    No.

1   **Q.**   Did you intend at that time to file any type of

2   lawsuit or claim?

3   **A.**   No.

4   **Q.**   Did you tell anyone that you're going to file any

5   type of lawsuit or claim?

6   **A.**   No.

7   **Q.**   What were you seeking, then, when you met with

8   Chief Crawford?

9   **A.**   I was an officer of the department.  I'm a female.

10   I felt that I wanted the rules to be enforced.

11   **Q.**   Now, when he said that to you about the

12   litigation, did you reply?

13   **A.**   I basically in that -- in his rage, he kept, you

14   know, asserting the next comment.  He called me a

15   fucking zero, a fucking doughnut and a fucking loser.

16   **Q.**   How far away from you was he when he was saying

17   those things?

18   **A.**   He was in my face spitting and, you know, blocking

19   my way the whole time he's, you know, directing his

20   comments in just an aggressive manner.

21   **Q.**   What was the volume of his speech?

22   **A.**   His tone was very agitated, aggressive, loud.

23   **Q.**   Was he yelling?

24   **A.**   Violent.  Yes.

25   **Q.**   You made a hand gesture.  Was he doing something

1  with his hands when he was yelling at you?

2  **A.**   Yeah.   He was pointing down at me right in my

3  face.

4  **Q.**   And how far was his finger coming from your face?

5  **A.**   Within striking distance.   He was right within

6  inches of my face, and I could feel his spit hitting

7  me.

8  **Q.**   You also mentioned that he was blocking you.

9  **A.**   Yes.

10  **Q.**   Can you explain what you meant by that.

11  **A.**   Yes.   We had gotten turned around, and the two

12  exits to the bar area and where my car was parked, he

13  was blocking that way.   And there were two doors behind

14  me that led to a river, and I wasn't going that way.

15  **Q.**   Were there any other officers in the Firefighters'

16  Hall when that was happening?

17  **A.**   Yes.

18  **Q.**   Who were the other officers?

19  **A.**   Lieutenant Elliot Murphy and Lieutenant Robert

20  Jackson.

21  **Q.**   How far away was Lieutenant Murphy from this

22  interaction?

23  **A.**   He was probably 15 to 20 feet.

24  **Q.**   Did he ever come any closer?

25  **A.**   No.

1    **Q.**   Where was Robert -- Lieutenant Jackson when this
2    was happening?
3    **A.**   He was on the other side of the room.
4    **Q.**   Did you say anything to either one of them?
5    **A.**   Yes.  I was able to move away, getting toward the
6    lieutenant that was in charge of his subordinate.  And
7    I got to him, and I said -- within five feet I said,
8    Lieu, I need your help here.  I go, Get control of your
9    guy.  And he goes, I'm not your fucking baby-sitter.
10         At that point I felt like I could make it to the
11   door, and I literally went by the lieutenant and said,
12   you know, Thanks for your help, and I exited and I got
13   out of there in a hysterical manner.
14   **Q.**   Did you touch the lieutenant on your way out the
15   door?
16   **A.**   I did with an open hand and I just said -- you
17   know, because he was turned slightly away from me, and
18   as I was trying to leave and get away from McGarty, I
19   mean, he was still yelling obscenities, and I said to
20   the lieutenant -- I touched him as light as that, and I
21   said, Thanks for helping me.  I really needed your help
22   there.
23   **Q.**   How did he respond?
24   **A.**   Nothing.  I didn't hear anything.
25   **Q.**   Did you ever complain to the chiefs or to the EEO

1     office about that?

2     A.   Yes, down the line, but my initial complaint went

3     to the chief on duty.

4     Q.   Who was that?

5     A.   I don't recall the officer on duty.  I was off

6     duty, so I immediately exited and drove to my

7     therapist's office and spoke with a receptionist and

8     asked for an emergency meeting, which was accommodated.

9     Q.   So how were you feeling after that incident?

10    A.   I was devastated.  I mean, I'm overwhelmed.  I had

11    just been told that I have PTSD.  I worked six months

12    to get back to work.  I did all my therapy.  I was

13    working out.  I was, you know, doing the program as

14    they call it, you know.  I was sticking to the

15    guidelines.  I was taking my medicine.  I was doing

16    what I needed to do to become -- you know, to keep my

17    job, to work really hard to stay doing what I was

18    doing, and it didn't seem like they were going to let

19    it happen.

20    Q.   What did you do specifically in regards to Sean

21    McGarty after that incident?

22    A.   I immediately called my union rep.  I immediately

23    called the president, President Paul Doughty.  I wanted

24    to know how the union wanted me to respond.  I was

25    getting nowhere with the chiefs, and no charges had

1   ever been filed.  So I went to my union.  I had made

2   probably five calls that day, and I did not get a

3   return call back.

4   **Q.**   What about with the courts?  Was there any

5   response from you to Mr. McGarty involving the courts?

6   **A.**   I'm not sure.  A court order?

7   **Q.**   Did you contact the police or contact the Superior

8   Court?

9   **A.**   Oh, yes.  I was due back on shift.  So if I got

10  off on the 8, 9, 10, 11, 12, I was due back on the

11  13th.  I believe that's -- I believe I was due back on

12  the 13th.

13       I had actually spent two-and-a-half days trying

14  to contact my union.  The individual that called me

15  back was Captain Scott Mello, and he took a report for

16  the union.

17  **Q.**   I'm sorry.  I wasn't asking about the union.  I

18  was asking about the police or the courts.  Did you

19  take any action with the police or the courts regarding

20  Firefighter McGarty?

21  **A.**   Yes.

22  **Q.**   What did you do?

23  **A.**   When I didn't get anywhere with my union, I then

24  went to the Rhode Island State Police to file a TRO.

25  **Q.**   What's a TRO?

1    **A.**    Temporary Restraining Order.

2    **Q.**    And was there any type of hearing associated with

3    that?

4    **A.**    No.  I basically filed a complaint, and with that

5    I spoke with Lieutenant Michelle -- I can't remember

6    her name from the Rhode Island State Police, and she

7    said that I had to go down -- after leaving the State

8    Police, I would then have to go down to the courthouse

9    and file the TRO.

10   **Q.**    Was there ever a hearing?

11   **A.**    Yes.

12   **Q.**    When was that hearing?

13   **A.**    The initial hearing was on December 13th.  And

14   then they allowed us, because I did not have union

15   representation -- I mean, I didn't have a lawyer, an

16   attorney at that time.  So I went in there and asked

17   for an extension for my protection.

18   **Q.**    Was there ever a hearing?

19   **A.**    Yes, on January 5th.

20   **Q.**    When was the hearing?

21   **A.**    January 5th.

22   **Q.**    Okay.  Now, who testified at the hearing?

23   **A.**    Myself and Kristy Adams; and on the other side was

24   I believe Paul Tang, Elliot Murphy, Bo Jackson, Robert

25   Jackson, Firefighter McGarty and Mike Evora.

1    **Q.**   Did you have a lawyer?

2    **A.**   No, I did not.

3    **Q.**   Did they have a lawyer?

4    **A.**   Yes, they did.

5    **Q.**   Who was their lawyer?

6    **A.**   Edward Roy of the -- represents our union.

7    **Q.**   You mentioned earlier that you also contacted the

8    union regarding this hearing.  Why did you contact the

9    union regarding this hearing?

10   **A.**   Union representation and an attorney.

11   **Q.**   Were you provided with an attorney?

12   **A.**   No.

13   **Q.**   Do you know who provided the attorney to

14   Firefighter McGarty?

15   **A.**   My understanding is the union.  Edward Roy

16   represents other negotiations within our union.

17   **Q.**   This is Exhibit 20.  Can you just take a moment to

18   look at that.  Can you tell us what that is.

19   **A.**   This is the court document, Lori Franchina versus

20   Sean McGarty.

21   **Q.**   Is that a transcript?

22   **A.**   Yes.

23   **Q.**   Have you read that transcript?

24   **A.**   Yes.

25   **Q.**   Who obtained that transcript from the court?

1   **A.**   This one here?

2   **Q.**   Yes.

3   **A.**   Myself.

4   **Q.**   Is that in the same or substantially the same

5   condition as it was when you obtained it?

6   **A.**   Yes.

7   **Q.**   Have you read it completely?

8   **A.**   Today?

9   **Q.**   No, ever.

10  **A.**   Yes.

11  **Q.**   Is it a fair and accurate representation of

12  everything that you recall being said that day during

13  the proceeding?

14  **A.**   Yes.

15          MR. MARTIN:  Your Honor, we offer this as

16  Exhibit 20.

17          MR. McHUGH:  Objection, your Honor, hearsay, 403

18  as well, not authenticated as well.

19          THE COURT:  Are you challenging the authenticity

20  of the Superior Court transcript, Mr. McHugh?

21          MR. McHUGH:  Yes, your Honor.  The last page is

22  unsigned.

23          MR. MARTIN:  Your Honor, it was my recollection

24  at our final pretrial conference Friday that we'd agree

25  that there were going to be no challenges to

1    authentication.  I had all week to go get it stamped.

2         THE COURT:  That's what I thought as well.

3    That's why I was inquiring.  You can require a court

4    reporter to come in here and testify and authenticate

5    it, but I doubt we want to put all of us through that.

6         Is there any question that this is the

7    transcript from that hearing, Mr. McHugh?

8         MR. McHUGH:  I don't know that it isn't.

9         THE COURT:  Objection's overruled.  Exhibit 20

10   is admitted as a full exhibit.

11        (Plaintiff's Exhibit 20 admitted in full.)

12        MR. McHUGH:  Could we come to the sidebar, your

13   Honor?

14        THE COURT:  No.

15        MR. McHUGH:  May I make an argument at the break

16   then?

17        THE COURT:  Go ahead, Mr. Martin.

18        MR. MARTIN:  Thank you.  Can I have just a

19   minute, Judge?

20        (Pause.)

21        MR. MARTIN:  Can I show some pages?

22        THE CLERK:  Sure.

23   Q.   Ms. Franchina, because this is so long, I'm going

24   to put some pages in and out and try to direct us with

25   a little context so everyone will know where in the

1    proceeding we were.

2    A.    Sure.

3    Q.    But this page, do you see here that Lieutenant

4    Robert Jackson was duly sworn and then was testifying?

5    A.    Yes.

6         THE COURT:  Can you just identify the page of

7    the transcript.

8         MR. MARTIN:  Oh, thank you.  Yes, this is page

9    number 27 of Exhibit 20.

10        THE COURT:  Thanks.

11   Q.    Now, did Mr. Jackson make reference to litigation

12   during his testimony?

13   A.    Yes, he did.

14   Q.    Can you tell us what Mr. Jackson said about

15   litigation during his testimony at the restraining

16   order hearing.

17        MR. McHUGH:  Objection, your Honor.  If it's

18   going to be in evidence, it's right there.

19        THE COURT:  Sustained.

20   Q.    Oh, by the way, cross-examination, you know what

21   that is?

22   A.    Yes.

23   Q.    Can you explain to the jury what cross-examination

24   is.

25        MR. McHUGH:  Objection.

1         THE COURT:  Overruled.

2    **A.**   I believe it's when there's a direct and then you

3    cross-examine somebody the following.

4    **Q.**   So you mentioned earlier that Elliot Murphy,

5    Robert Jackson, Mike Evora and Sean McGarty testified.

6    Who cross-examined them?

7    **A.**   I did.

8    **Q.**   I'm moving over to page 32 of Exhibit 20.  We're

9    going to be looking to lines 3 through 10.

10   **A.**   Can it be moved to the left a little?

11   **Q.**   So sorry.

12   **A.**   Thank you.

13   **Q.**   Okay.  So when it says, Question:  "From

14   lieutenant to lieutenant, I ask you in court, what does

15   trying to stay clear of me mean," was that you asking

16   the question?

17   **A.**   Correct.

18   **Q.**   And here where he said in reply --

19        MR. McHUGH:  Objection, best evidence rule.

20        THE COURT:  The document is admitted as an

21   exhibit in full.  It can be published to the jury by

22   your reading it, Mr. Martin.  It's in full evidence.

23        I think the problem that Mr. McHugh is having is

24   that the transcript itself speaks for itself as opposed

25   to the Plaintiff's comments on it.

1          If there are portions that you want to read of a

2     full exhibit in evidence to the jury and publish it to

3     the jury, you're welcome to do that; but I think the

4     problem is when you're asking someone about an exhibit

5     that's in evidence as a transcript.

6          MR. MARTIN:  I'm sorry.

7          THE COURT:  That's okay.

8     **Q.**   So here in his answer he said to you, "Prior to

9     that, you obviously had an issue on the prior run and

10    supposedly through rumor control you possibly have a

11    lawsuit and problems against me and other members."  Do

12    you recall him saying that?

13    **A.**   Yes.

14    **Q.**   Now, at this time, this is almost a month after

15    the Firefighters' Hall incident, did you have a

16    lawsuit?

17    **A.**   No.

18    **Q.**   Were you planning on filing a lawsuit?

19    **A.**   No.

20    **Q.**   Had you ever told anyone that you were filing a

21    lawsuit?

22    **A.**   No.

23    **Q.**   Did anyone ever explain to you what type of

24    lawsuit that they were afraid you were going to file?

25    **A.**   No.

1  **Q.**   Did anyone ever tell you what type of lawsuit they
2  thought that you had filed?
3  **A.**   No.
4  **Q.**   Turn to page 39 for just one second.  Here on page
5  39, lines 23 to 34, this is when Sean McGarty was sworn
6  in; correct?
7  **A.**   Yes.
8  **Q.**   Okay.  And at question number 2, his attorney
9  asked him, said, "And you were on duty?"  Do you see
10  that?
11       THE COURT:  Page, Mr. Martin.
12       MR. MARTIN:  Page number 45.
13  **A.**   Oh, number 2.
14  **Q.**   Line number 2.
15  **A.**   Yes.
16  **Q.**   Sorry, everybody.  Do they serve alcohol at the
17  Firefighters' Hall?
18  **A.**   Yes, they do.
19  **Q.**   Is it permissible to go there on duty?
20       MR. McHUGH:  Objection, relevance.
21       THE COURT:  Sustained.
22  **Q.**   Turning to page 48, at line number 2 his lawyer
23  said, "Did you use profanity?"  Do you see that?
24  **A.**   Yes.
25  **Q.**   And he replied, "There was some harsh profanity as

1    the argument escalated."  Do you see that?

2    A.   Yes.

3    Q.   Is using profanity towards a superior officer a

4    violation of the Providence Fire Department rules and

5    regulations?

6         MR. McHUGH:  Objection.

7    A.   Yes.

8         MR. McHUGH:  Relevance as to this hearing.  Move

9    to strike the answer.

10        THE COURT:  Overruled.  Denied.

11   Q.   What was your answer?

12   A.   Yes.

13   Q.   Do you know if Firefighter McGarty was ever

14   disciplined by the Providence Fire Department for this?

15   A.   No.

16   Q.   How are members of the union notified when other

17   members are disciplined?

18   A.   There is a --

19        MR. McHUGH:  Objection, lack of foundation.

20        THE COURT:  Do you know, Lieutenant?

21        THE WITNESS:  Yes.

22        THE COURT:  You can answer.  Overruled.

23   A.   All information in years previous, in my early

24   years, the name, rank of the individual being charged

25   with misconduct or a violation was given throughout our

1   e-mail system or actually, excuse me, it was on our

2   computers through an e-mail system of general orders

3   and memorandums.

4          And after a certain period of time, the names

5   then became voided, not shown, but the charges were

6   still put out to the general body of the department.

7   Q.   Did you ever see any such notices that referred to

8   the incident that occurred in Firefighters' Hall?

9   A.   No.

10  Q.   Was the restraining order granted?

11  A.   Yes.

12         MR. MARTIN:  Could I show this to just the

13  witness.

14         THE COURT:  This is Exhibit 21?

15         MR. MARTIN:  Exhibit 21.

16  Q.   Do you recognize this?

17  A.   Yes.

18  Q.   Can you tell us what this is.

19  A.   This is the decision by Judge Lamphear indicating

20  to me on January 5th, 2010, that I was successful in

21  obtaining a lifetime restraining order against Sean

22  McGarty.

23  Q.   Is this in the same or substantially the same

24  condition as it was when you received it?

25  A.   Yes.

1          MR. MARTIN:  Your Honor, we offer this as

2     Exhibit 21.

3          THE COURT:  Any objection?

4          MR. McHUGH:  No objection, your Honor.

5          THE COURT:  Exhibit 21 is admitted as a full

6     exhibit and can be shown to the jury.

7          (Plaintiff's Exhibit 21 admitted in full.)

8     **Q.**   I'd like to draw your attention specifically to

9     the paragraph number 4 where it says that Mr. McGarty

10    may contact Ms. Franchina and communicate with her

11    while on the scene of a call in the line of duty.

12         Were there any steps taken at the Providence

13    Fire Department to prevent your interactions other than

14    that?

15    **A.**   Yes.

16    **Q.**   This is Plaintiff's Exhibit 6.  Do you recognize

17    this?

18    **A.**   That's not --

19         THE CLERK:  Hold on.

20         THE WITNESS:  Oh, thank you.

21         MR. MARTIN:  Take a chance to take a look and

22    then let me know when you're done.

23         THE COURT:  This is an agreed-to exhibit as I

24    understand, Mr. McHugh.

25         MR. McHUGH:  Yes, your Honor.

1        THE COURT:  Are you moving its admission?

2        MR. MARTIN:  Yes.

3        THE COURT:  Exhibit 6 is admitted as full and

4    may be shown to the jury.

5        (Plaintiff's Exhibit 6 admitted in full.)

6    **Q.**   Had you ever seen this when you were a member of

7    the department?

8    **A.**   Yes.

9    **Q.**   Okay.  I want to point out paragraph number 2 to

10   you.  Excuse me.  So in paragraph number 1 it says "not

11   be given a CB."  Can you describe what a CB is.

12   **A.**   Call-back.

13   **Q.**   "At a station that has a rescue assigned."  Can

14   you describe for us what the difference is between a

15   station with a rescue assigned and a station without a

16   rescue assigned.

17   **A.**   Yes.  We have 15 firehouses, and six of those have

18   a rescue assigned to them, and the remaining nine do

19   not.

20   **Q.**   And the first paragraph that's number 2, it says,

21   "Firefighter McGarty is not to be detailed in a station

22   that has a rescue assigned."  Do you see that?

23   **A.**   Correct.

24   **Q.**   Was this order followed?

25   **A.**   No.

1  **Q.**  How do you know that?

2  **A.**  Because I have been at a rescue where -- Rescue 6

3  when rescue McGarty (sic) was given a call-back to

4  Ladder 6.  Engine 14, Ladder 6 and Rescue 6 are housed

5  at Atwells Ave.  Excuse me, Allens Ave.  No, I'm sorry.

6  I'm sorry.  Atwells Ave.  I don't know why -- sorry.

7  **Q.**  How many times did you personally observe this

8  order to be violated?

9  **A.**  Four times.

10  **Q.**  Four times.  Did you make a complaint every time?

11  **A.**  I sure did.

12  **Q.**  Whom did you complain to?

13  **A.**  The chief, division chief, the DAC -- the captain

14  that was in charge of the house, and also then it would

15  have been the DAC, the deputy assistant chief, on that

16  shift that night.

17  **Q.**  Did anything come of those complaints?

18  **A.**  Yes.  I was moved from the firehouse as a

19  lieutenant, and Firefighter McGarty remained where he

20  was in violation of the order.

21  **Q.**  When you complained, you were the one who was

22  removed from the station?

23  **A.**  That is correct.

24  **Q.**  How many times did that happen?

25  **A.**  Three.

1   Q.   During the year 2010 after this restraining order

2   incident, did you notice any improvement in the level

3   of cooperation or obedience you were getting from your

4   subordinates while you were on calls?

5          MR. McHUGH:  Objection, leading.

6          THE COURT:  Sustained.

7   Q.   What was it like working with your subordinates

8   after January 5th, 2010?

9   A.    Increasingly difficult.  More than a

10  shift-to-shift, it became a run-to-run basis of

11  insubordination.  The flagrantness (sic) of the

12  behavior became just intentional.  I've cited incidents

13  to Chief Crawford in Form 17s.  It was every minute

14  that I was at work.

15  Q.   Did you make complaints?

16  A.   Yes, I did.

17  Q.   Did anything come of those complaints?

18  A.   No.

19  Q.   Did you speak to the EEO office?

20  A.   Yes.

21  Q.   Did anything come from those complaints?

22  A.   No.

23  Q.   Earlier we talked about you being referred to in

24  certain derogatory terms.  Did at least that part stop

25  after you went to the EEO and to Chief Crawford?

1    A.    No.

2    Q.    What kind of names would you hear people refer to

3    you as during the year 2010?

4    A.    Lesbo, and that was written on the board, also,

5    lesbo; Frangina was a more frequent term; bitch; I'm

6    not taking orders from that cunt.  It was every day.

7    Q.    Who is Jared Scolaro?

8    A.    He was a newer guy on the job that had come over

9    and was assigned to me for six months as a detail.

10   Q.    When did he get assigned to you?

11   A.    I'm not sure of the effect date.

12   Q.    Did you work with him in October of 2010?

13   A.    I believe so.

14   Q.    Did you have any conversations with him about your

15   interactions with the other firefighters and the other

16   subordinates?

17   A.    Yes.  Jared and I got along real well.  He

18   actually confided in me.  I'm sorry, can you repeat the

19   question.

20   Q.    Sure.  Did you guys ever talk about what was

21   happening between you and the rest of the firefighters?

22   A.    Yes.

23   Q.    When was that?

24   A.    Returning to the station on a run one time.

25   Q.    I'm sorry.  I meant like in a general month and

1    year.

2    **A.**   I would have to look.

3    **Q.**   Okay.  That's fine.  Well, continue.

4    **A.**   When he was assigned to me, obviously.  I mean,

5    it's well documented.  Sorry.

6    **Q.**   What did he say to you?

7         MR. McHUGH:  Objection, hearsay.

8         THE COURT:  Probably goes to state of mind.

9    Overruled.

10   **Q.**   What did he say to you?

11   **A.**   He basically -- basically we were talking, and he

12   said, It's different when you're on rescue with you,

13   because he had had a few call-backs with other

14   officers.  And I said, Oh, what do you mean by that?

15   And, you know, I knew.  My heart's breaking.

16        He basically said that I received over a hundred

17   phone calls.  I kind of knew it was going to be tough

18   when I got over here.  And I said, Oh, yeah?  What were

19   the phone calls?  And he said, Guys just apologizing

20   ahead of time, because Jared was like an assistant to

21   the union.  So he was kind of getting mentored into

22   becoming part of the union.  So there was some respect

23   out there for him being a younger, you know, younger

24   firefighter.  And in a sense he owned up to the guys

25   calling him and saying that, sorry, but we don't help

1   her, we don't help her.

2           MR. MARTIN:  Can I show the witness Exhibit 22,

3   please.

4   **Q.**   Have you read the first page?

5           THE COURT:  Might want to zoom in a little bit,

6   Mr. Martin.  I think it's probably difficult for her to

7   read.  Is that better?

8           THE WITNESS:  I can probably comment on it.  I

9   wrote it.

10  **Q.**   I want to show you the second page.

11  **A.**   Okay.  Down a little more.

12  **Q.**   I direct your attention to the signature line.

13  **A.**   Okay.

14  **Q.**   Do you see who signed it or who had a signature

15  line there?

16  **A.**   Captain Scott Mello.

17  **Q.**   Was this ever given to you during the year 2010?

18  **A.**   No.  Nope.  This one I didn't write.  I'm sorry.

19  I only looked at the date on the other one, the first

20  page.

21  **Q.**   Okay.  Just slow down and wait for questions, and

22  you'll be fine.  Have you ever seen -- had you ever

23  seen this during October of 2010?

24  **A.**   No.

25  **Q.**   Where were you on October 28th, 2010?

1    **A.**    I'd reported to the Branch Ave. Fire Station to

2    fill out injured-on-duty paperwork.

3    **Q.**    And how were you injured?

4    **A.**    Reoccurrence of stress.

5    **Q.**    What was your diagnosis?

6    **A.**    Post-traumatic stress disorder.

7    **Q.**    Who diagnosed you?

8    **A.**    Dr. James Curran and Dr. Penelope Yanni.

9    **Q.**    Why did you have to go to the station to fill out

10   the paperwork?

11   **A.**    Because your IOD paperwork is only on the

12   computers at work.  We don't allow for our

13   documentations to leave the station.

14   **Q.**    What time did you go to the station?

15   **A.**    It was in the morning hours at the station.

16   **Q.**    Is there any rule or regulation that would

17   prohibit an officer from being at their own station

18   when they're not on duty?

19   **A.**    No.

20   **Q.**    So who was there when you got there?

21   **A.**    Captain Jaffrey was in charge of Engine 2.  As a

22   captain, I'm not sure of his crew that day, and I'm

23   not sure of who was in charge of the ladder truck,

24   Ladder 7.

25   **Q.**    Was Sean McGarty there?

1    A.    Yes.

2    Q.    When did you see him?

3    A.    When I returned the second time to get the

4    signature of the chief.

5    Q.    How long had you been there before you saw him?

6    A.    I had heard boisterous statements being made and

7    swearing as I made it up to the second-floor landing.

8    Q.    Did you know that he was there before you saw him?

9    A.    I did not.

10   Q.    How long had you been there before you heard his

11   voice?

12   A.    Only minutes.

13   Q.    How long did you stay after you realized he was

14   there?

15   A.    I was held by the chief in his office for a while.

16   Q.    When you heard his voice -- did you say you heard

17   his voice or you heard voices?

18   A.    I heard voices until I approached -- I have to go

19   towards Ladder 7's room to then take the hallway down

20   to my office on the left-hand side and the chief's

21   office on the right-hand side.  So when I was -- when I

22   could hear what they were saying, I knew it was about

23   me.

24   Q.    What did you hear them saying?

25   A.    I know this is documented in my Form 17s.  I know

1    he said, Do you know who was in the fucking station

2    today?  That bitch was in the station.  You know, Hey,

3    Cap, I need an IOD plan like that.  You know, How do I

4    get an IOD plan like that?  I'm stressed out, too.

5    Along those lines.

6    **Q.**    Did you say anything to him?

7    **A.**    Yeah.  I approached the door and knocked three

8    times.  I looked at Captain Scott Mello, and then I

9    said, Captain, if there's anything you need to discuss

10   with me, you need to discuss it now.  I'm going to the

11   chief's office.  You can meet me in there.

12   **Q.**    What was his rank at the time, Scott Mello?

13   **A.**    Captain Scott Mello.

14   **Q.**    Did Captain Scott Mello follow you down to the

15   office?

16   **A.**    He did.

17   **Q.**    What did he say?

18   **A.**    I got in there, and Captain Horton could see that

19   I was upset.  And Captain Scott Mello said, If

20   something was said that bothered you, I'm sorry.

21   **Q.**    Huh.  Okay.  Did you ever actually return to an

22   active-duty lieutenant after that day?

23   **A.**    No, I did not.

24   **Q.**    Why not?

25   **A.**    Well, my requests over years of assistance have

1   never been met.  To this day, I don't know who has ever

2   been charged for my complaints.  I'm still being

3   treated for severe post-traumatic stress related to

4   work-related incidents.

5   **Q.**   Are you physically capable of performing the job

6   anymore?  Actually, I shouldn't say physically.  What

7   was your work status as far as active duty, injured on

8   duty, things like that, after October 28th?

9   **A.**   Injured on duty.

10  **Q.**   Injured on duty.  And for how long were you

11  injured on duty?

12  **A.**   They held me out for three years and three months.

13  **Q.**   Was it a partial disability or total disability?

14  **A.**   That I received?

15  **Q.**   Yes.

16  **A.**   I received an ordinary disability.

17  **Q.**   I understand, but your -- --

18  **A.**   Oh, total disability.

19  **Q.**   And what does total disability mean in terms of

20  your ability to return to work?

21  **A.**   That I am incapable of performing the job duties.

22  **Q.**   I know that you didn't return to active duty after

23  October 28; but during the year 2011, would you return

24  to the station from time to time?

25  **A.**   Yes.  I had to fill out additional IOD paperwork;

and because you're still on duty or an active member of the department but you're only placed on injured on duty, you are still -- as an officer, according to the rules and regulations, you have to maintain knowledge of your GOs and memos, general orders and memorandums, and any additional training, policies and procedures.

**Q.**   How often would you return to the station?

**A.**   In the initial phases, I was pretty active, weekly.  My IOD status was not granted after 14 days. Therefore, I would check my -- on my TeleStaff because you could get it at home.  So I'd check my TeleStaff, and it indicated that I was off Item A.

**Q.**   So how often would you go back to the station in 2011?

**A.**   For a good portion there weekly.

**Q.**   Weekly.  And when did you stop going back to the station in 2011?

**A.**   When I was asked not to return to the station.

**Q.**   When was that?

**A.**   I don't know my last entry into the logbook or when I logged on to my TeleStaff, but I was asked by Chief Greeley not to return.

**Q.**   Yeah, but I was asking when.  Do you have an idea? Was it March?  Was it June?

**A.**   No, I don't.

1  **Q.**   How were you received when you went to the

2  station?

3  **A.**   I was ignored.  Guys would completely walk away

4  from me.  They would tell the guys that I was in the

5  station, and I'd hear muttering and hear -- you know,

6  just hear people saying stuff.

7  **Q.**   What would you hear them saying?

8  **A.**   The bitch is in the house.  Better get out of

9  here, you know, let's go find something to do, and they

10  would leave.

11  **Q.**   Anything else?

12  **A.**   Not that I can recall at this time.

13  **Q.**   Did you ever see or hear Miles Bonalewicz?

14  **A.**   Yes.

15  **Q.**   And what would you hear from Miles Bonalewicz?

16  **A.**   In those first weeks coming back, he was very

17  angry and he would use the same profanity that he would

18  use earlier that we've heard.

19  **Q.**   Well, can you give me specific examples of things

20  that you heard him say in 2011.

21  **A.**   You know, F that bitch.  I'm not -- you know,

22  thank God she's not here anymore, you know.  Thank God

23  we don't have to deal with that bullshit.  I'm done

24  with it.  Just stuff like that.

25  **Q.**   So at this point in 2011, had you ever been

1    disciplined in any way by the department for any type

2    of misconduct?

3    **A.**   No.

4    **Q.**   So when he says things like, Thank God we don't

5    have to deal with the bullshit, do you know what that

6    was in reference to?

7    **A.**   No.

8    **Q.**   You mentioned Form 17s a few times, and I probably

9    should have asked you to explain to the jury what a

10   Form 17 is and how it's used in the department.  Could

11   you explain to everyone what a Form 17 is.

12   **A.**   A Form 17 is a legal document that can be used for

13   or against you in court depending on the proceedings.

14   It can be to clarify a situation or incident in

15   reference -- a chief may -- will request it to, you

16   know, if they have questions about something, they may

17   indicate to you fill out a Form 17 in regards to that

18   scene, what happened on it; but it's a legal document.

19   **Q.**   Okay.  How many Form 17s did you fill out

20   regarding insubordination or harassment or

21   discrimination during the years 2007, 2008, 2009, 2010

22   and 2011?

23   **A.**   Approximately 40.

24        MR. MARTIN:  I'm going to go through just a

25   couple of them now.  This is Exhibit 27.

1      THE COURT:  Mr. Martin, if you're going to do

2  multiple of these, maybe if you told Mr. McHugh the

3  numbers now, we can see if there's an objection.  That

4  could speed the process along.

5      I don't know if there is or not.  If there is,

6  then we'll go through it slowly; but if you told him

7  all the numbers now, he could take a look at them and

8  we could speed it up a little bit.

9      MR. MARTIN:  Thank you.  Can I just offer them?

10      THE COURT:  Go ahead.

11      MR. MARTIN:  Your Honor, I offer Plaintiff's 24,

12  25, 26, 27, 29, 30, 31, 32 and 33.

13      THE COURT:  Any objection, Mr. McHugh?

14      MR. McHUGH:  Well, I think I do, but maybe we

15  can narrow it down if I could look at these for a

16  minute.

17      THE COURT:  Okay.  We'll have to take them one

18  at a time, Mr. Martin.

19      MR. McHUGH:  I have an objection to all of

20  these, and it's the same objection, hearsay, hearsay

21  within hearsay, 403 and prior consistent statement.

22      THE COURT:  Are these all writings that were

23  submitted to the Providence Fire Department?

24      MR. MARTIN:  Yes.

25      THE COURT:  And did you receive copies of these

1    from the City of Providence?

2         MR. MARTIN:  Yes.

3         THE COURT:  From their records?

4         MR. MARTIN:  From the discovery in this case.

5         THE COURT:  Discovery in this case?

6         MR. MARTIN:  Yes.

7         THE COURT:  Mr. McHugh, do you know different

8    than that?

9         MR. McHUGH:  No.

10        THE COURT:  The objection's overruled.  The

11   Exhibits 24, 25, 26, 27, 29, 30, 31, 32 and 33 are

12   admitted as full exhibits.

13        (Plaintiff's Exhibits 24, 25, 26, 27, 29, 30,

14   31, 32 and 33 admitted in full.)

15        MR. MARTIN:  Since we've already discussed all

16   the incidents, we'll just move on.  Can I show the

17   witness Plaintiff's 36.  This is the new one.  I'm

18   sorry, this is multiple pages.

19        THE WITNESS:  Oh, okay.

20   **Q.**   Do you recognize the document I've just shown you?

21   **A.**   Yes.

22   **Q.**   And what is this?

23   **A.**   It is a sexual harassment policy that is in our

24   rules and regulations.

25   **Q.**   Is this in the same or substantially the same

1   condition as it was when you received it in the rules

2   and regulations?

3   **A.**   Yes.

4          MR. MARTIN:   Your Honor, we offer Plaintiff's 36

5   into evidence.

6          THE COURT:   Just so the record's clear

7   timing-wise, it's dated January 7th, 1998, at the top;

8   and at the bottom it appears to be dated January 1st,

9   1997.

10          Any objection, Mr. McHugh?

11          MR. McHUGH:   No objection, your Honor.

12          THE COURT:   Exhibit 36 will be admitted as a

13   full exhibit without objection.

14          (Plaintiff's Exhibit 36 admitted in full.)

15   **Q.**   I'd like to show you the second page of the

16   exhibit which is labeled at the bottom as Chapter 16,

17   page 7.  I'm going to focus in on the part called the

18   complaint procedure.  When did you receive this policy?

19   **A.**   Upon entering the academy.

20   **Q.**   Were you tested on this policy?

21   **A.**   Yes.

22   **Q.**   And can you explain to the jury what it means when

23   we say that you were tested on the policy.

24   **A.**   This was my study material for my lieutenant's

25   exam.

1    Q.   I see.  In the second paragraph underneath the

2    heading of Complaint Procedure, it says, "Complaints of

3    sexual harassment and/or retaliation will be accepted

4    in writing or verbally."  Did I read that correctly?

5    A.   Correct.

6    Q.   Were you ever advised that complaints needed to be

7    presented in writing?

8    A.   Yes.

9    Q.   By whom?

10   A.   Chief Crawford.

11   Q.   Were you ever advised that there was a policy or a

12   procedure that complaints had to be presented in

13   writing?

14   A.   He stated that -- Chief Crawford stated that he

15   could not do anything until I wrote things down.

16   Q.   I see.  So Chief Crawford told you that he

17   wouldn't accept things until you wrote it down?

18   A.   Correct.

19   Q.   But my question is, were you ever advised that

20   there was a policy from the City of Providence that

21   your complaints had to be submitted in writing?

22   A.   I need the question again.

23   Q.   Did you ever get a policy typewritten like this

24   that says something different than what you see on the

25   screen before you now?

1   **A.**   Yes, later on in years later.

2   **Q.**   When you were employed by the City of Providence,

3   did you ever get a typewritten policy that said

4   something different than what you have before you now?

5   **A.**   Yes.

6   **Q.**   When?

7   **A.**   I'm not sure of the year.

8   **Q.**   Okay.  Were verbal complaints permissible?

9   **A.**   In the other ones?

10   **Q.**   Yes.

11   **A.**   No.

12   **Q.**   When did you get the ones that said verbal

13   complaints were impermissible?

14   **A.**   I'm not sure of the years, but they've changed

15   this.

16   **Q.**   Okay.  Now, at the time that this was in effect --

17   excuse me, at the time that you were employed by the

18   department, you mentioned earlier that you submitted 40

19   Form 17s?

20   **A.**   Correct.

21   **Q.**   How many verbal complaints had you made?

22   **A.**   Hundreds.

23        THE COURT:  Do we know, either counsel, what

24   date this was applicable until?  In other words, it

25   appears to have started somewhere in '97 or '98.  Do we

1   know how long this policy was the applicable policy?

2           MR. McHUGH:  That was applicable -- that came

3   out in a general order through the fire department as

4   opposed to the citywide one which went to everybody,

5   including the fire department.

6           THE COURT:  And was this one -- is this one

7   still in effect, Plaintiff's Exhibit 36, as far as we

8   know?

9           MR. McHUGH:  It is.

10          THE COURT:  Okay.  Thanks.

11  **Q.**   I'd like to turn you to the next page of the

12  exhibit, which is marked at the bottom Chapter 16,

13  page 8.  Underneath Retaliation, it says, "It is

14  unlawful to retaliate or take reprisal in any way

15  against anyone who has articulated any concern about

16  sexual harassment or discrimination."  Did I read that

17  correctly?

18  **A.**   Yes.

19  **Q.**   Did you ever make a complaint verbally or in

20  writing that you felt that you'd been retaliated

21  against?

22  **A.**   Yes.

23  **Q.**   How many complaints do you think that you made?

24  **A.**   I know in writing at least five.

25  **Q.**   And at the bottom underneath the heading

1    Cooperation, it says, "The City of Providence officials

2    who refuse to implement remedial measures, obstruct

3    remedial efforts or who retaliate against complainants,

4    witnesses or the alleged harasser may be disciplined by

5    suspension or termination of employment."  Did I read

6    that correctly?

7    A.   Yes.

8    Q.   Are you aware of anyone who has ever received any

9    level of discipline for any of your complaints?

10   A.   Only Andre Ferro.

11   Q.   Just a few more minutes.  Let's go back in time to

12   just after July 29th of 2009.  You told us earlier that

13   you were in treatment.  Do you remember that?

14   A.   Yes.

15   Q.   Who was your doctor?

16   A.   Dr. James Curran.

17   Q.   Where was Dr. Curran's office located?

18   A.   Woonsocket.

19   Q.   What type of doctor is he?

20   A.   He's a psychologist.

21   Q.   Is he still your doctor?

22   A.   No.

23   Q.   Why not?

24   A.   He passed away.

25   Q.   When did he pass away?

1   **A.**   I believe it was May of last year.

2   **Q.**   Was he a good doctor?

3   **A.**   Yeah.

4   **Q.**   Did you like him?

5   **A.**   Yeah.

6   **Q.**   What were the symptoms that you were experiencing

7   when you went to see him?

8   **A.**   Night sweats, sleeplessness, agitation, quick

9   tempered.  Hypervigilance was described to my behavior

10   and how I responded to entering the City of Providence

11   and seeing different street corners, different

12   buildings, different incidents where I had runs that

13   would trigger physical responses of sweating or

14   anxiety.  My relationship at home with my partner of

15   eight-and-a-half years began to struggle.

16   **Q.**   What made you decide to seek a psychologist for

17   those things?

18   **A.**   I couldn't handle it on my own.  I felt broken.  I

19   don't know, when they use the term "broken," I guess

20   that's a real indicator to some doctors that, you know,

21   you're not complete anymore.  You can't get through

22   your days.

23        My mind was constantly focused on the

24   mistreatment and just thoughts that would just reoccur

25   and lead into my nightmares or daymares, as I called

1    them, because I couldn't get rid of it.

2    **Q.**   Did you treat with him consistently from July or

3    August of 2009 until he passed away last year?

4    **A.**   Weekly.

5    **Q.**   Weekly.  How long would the meetings last?

6    **A.**   Fifty minutes to an hour, sometimes longer

7    depending on my level of anxiety or situation that we

8    were trying to talk about.

9    **Q.**   What other types of treatment did you engage in?

10   **A.**   I attended or I mean I went to as a patient,

11   inpatient, at On-Site Academy in Danvers,

12   Massachusetts.

13   **Q.**   Inpatient for what type of treatment?

14   **A.**   EMDR and TFT, thought field therapy.

15   **Q.**   What does the EMDR stand for?  Let me ask you a

16   better question.  I wasn't asking you to describe

17   medical -- I shouldn't have asked you to describe

18   medical terms.

19        What condition were you seeking treatment for

20   when you went inpatient?

21   **A.**   PTSD.

22   **Q.**   And how long were you inpatient?

23   **A.**   One week.

24   **Q.**   Okay.  Was that the only time you've ever gone

25   inpatient?

1    **A.**   No.  I returned to the facility twice, two other

2    times, for weekends.

3    **Q.**   When was the first time you went there when you

4    stayed for a week?

5    **A.**   That was during the July -- I believe after the

6    July 29, '09, incident where Chief James Gallant and

7    Dr. James Curran had made me a patient, and then

8    sometime after that I bottomed out.  My depression was

9    so deep, my anxiety.  The intrusive thoughts were --

10   some I couldn't stop.

11   **Q.**   Can you continue?  Do you need a minute?

12   **A.**   Yeah.

13        (Pause.)

14        THE WITNESS:  Sorry.

15        THE COURT:  Ms. Franchina, if you want to take a

16   break --

17        THE WITNESS:  Could we?  Thanks.

18        THE COURT:  Ladies and gentlemen of the jury,

19   we're going to leave a little early, so it makes sense

20   if we take an afternoon break at this time.  We'll see

21   you back shortly.

22        Counsel can stay here.

23        (The jury is not present for the following.)

24        THE COURT:  During the last session here, there

25   were some objections from the defense counsel, and the

1    Court felt it was unduly quick with you, Mr. McHugh,

2    and I want to apologize for that.  You wanted to put

3    something on the record.

4              MR. McHUGH:  Yes, your Honor.  Well, you don't

5    have to apologize.  It's not the first time I couldn't

6    come to the sidebar.

7              THE COURT:  Well, it was not called for.

8              MR. McHUGH:  I just thought it was important

9    that I put the reasons on the record why I objected to

10   the transcript of the hearing on the restraining order,

11   because if you go back, one of my motions in limine was

12   anything to do with the incident at the union hall as

13   being unduly prejudicial, as being not related because

14   it wasn't at work.  She was not at work.  She was not

15   on duty.  It was on union property sponsored by the

16   union.

17             Then we have I think it's Exhibit 10 which I

18   objected to, which was Chief Crawford's, I think,

19   e-mail or Chief Morgan's e-mail regarding this incident

20   which I said was, you know, hearsay within hearsay.  It

21   was his summary of summaries.

22             And now we've had all this testimony already

23   from the Plaintiff, yet now we have the transcript

24   going in, which also is hearsay and unduly prejudicial.

25             So I think all this stuff is piling on the

1    Defendants under Rule 403.  It will make it very

2    difficult to get a fair trial with respect to that

3    out-of-work environment incident and all this hearsay.

4         So that's what I wanted to say because now it's

5    becoming cumulative evidence on that point.  Thank you,

6    your Honor.

7         THE COURT:  Thanks, Mr. McHugh.  I had ruled

8    pretrial on a number of these matters, primarily on the

9    issue of it being an out-of-work environment, relying

10   on the *O'Rourke* case, which I don't have to tell

11   Mr. McHugh about, of course.

12        MR. McHUGH:  That was the last time I couldn't

13   come to the sidebar.

14        THE COURT:  And I think the District Court judge

15   might have -- I'll leave that.  Relying on *O'Rourke,*

16   which the Court believes is dispositive of the issue,

17   so my pretrial ruling stands.  Anything further while

18   we're --

19        MR. MARTIN:  One brief thing, your Honor, for

20   scheduling that I thought we might address before --

21        THE COURT:  Oh, you said something about Monday?

22   Do we need to be on the record for this?  Can I let

23   Vickie and Karen go?  We're off the record.

24        (Discussion held off the record.)

25        (Recess.)

1           (The jury is present for the following.)

2           THE COURT:  Mr. Martin.

3           MR. MARTIN:  Thank you.

4    Q.   Ms. Franchina, before we took a break, you'd

5    mentioned a number of things I'd like to ask you about

6    individually.  Number one, could you describe for me

7    what you meant when you said that you were experiencing

8    night sweats.

9    A.   I would suffer probably five to six nights a week

10   for a very long time where I would wake up with my

11   shirt saturated.  At times my partner would ask where I

12   was going in the middle of the night, and I'd say I'd

13   have to change; and, you know, she could tell that my

14   clothes were soaked.

15   Q.   You also mentioned nightmares.  Do you remember

16   what the nightmares were about?

17   A.   A lot of it was work related in the sense of just

18   being left on scenes, manifestations of like just pain.

19   She found me, I would wake crying, and we'd talk about,

20   you know, scenarios that, you know, that it's not real

21   and that, you know, we have to get back to sleep, stuff

22   like that.

23   Q.   You mentioned a term I'm not sure that everyone

24   will be familiar with.  You said that you suffered from

25   intrusive thoughts.  What does intrusive thoughts mean?

1    A.    Just repeated same thoughts over and over until I

2    either call somebody.  I call my family a tremendous

3    amount.  I rely on them daily even to this day where

4    repetitive thoughts of, you know, situations, a lot of

5    stuff we've discussed here today, just revisit.

6         And I have a difficult time driving through

7    Providence, I live in West Warwick, and it just

8    triggers different things, and my mind goes to the

9    point where I need to stop those thoughts.  A lot of

10   that's done through calling my family.

11   Q.    You mentioned anxiety.  Had you suffered -- when

12   did you start to suffer from anxiety, if you remember?

13   A.    I didn't realize through some of my counselling

14   with Roz Johnson in 2006 that I was suffering anxiety.

15   And then with Dr. James Curran in 2009, it was a

16   diagnosis that began to be treated with medications.

17   Q.    I heard you mention depression, too.  Was

18   depression something that you'd suffered from earlier

19   in your life?

20   A.    No.

21   Q.    When did you start suffering from depression, if

22   you know?

23   A.    It varied.  I'd have good days and bad days

24   depending on scenarios at work, but my depression

25   really began to really set in around 2009 when I

1    started seeing Dr. Curran and trying to figure out how

2    to get beyond all this, just started to -- my

3    self-worth was broken.  My sense of value just was

4    gone.  I didn't have a sense of value.

5            I feel like a lot of the lack of sleep and night

6    sweats and just everything that was building created

7    the depression to the point where my value of myself --

8    my self-value was just nothing.

9    **Q.**   Do you continue to suffer from those things today?

10   **A.**   Oh, yeah.  Yes.

11   **Q.**   Is it improved since 2009?

12   **A.**   No.

13   **Q.**   Do you continue to treat regularly?

14   **A.**   Absolutely.

15   **Q.**   Who do you treat with?

16   **A.**   I still have my psychologist or psychiatrist,

17   Dr. Penelope Yanni.  She was co-doctor with Dr. James

18   Curran.  And when Dr. James Curran passed away, I

19   started with Dr. Michelle Olson.

20   **Q.**   And what does the psychiatrist, Dr. Yanni, do

21   that's different from what the psychologist does?

22   **A.**   With the psychologist, we meet as often as we have

23   met recently as stress increases.  She's my

24   psychologist.  I speak with her on theory and, you

25   know, how to progress through thoughts and stuff like

1    that.

2         My psychiatrist is the medication prescriber;

3    and I do meet with her, but it's more about how the

4    medications affect me.

5    Q.   How many different medications are you prescribed

6    right now?

7    A.   I believe five.

8    Q.   I'd like to ask you about each one of them.  Would

9    it be helpful to you to have the prescriptions with you

10   so that you can explain to us what they are?

11   A.   Sure.

12   Q.   Could you tell me that prescription bottle that is

13   in your hands, what is the name of that?

14   A.   It's clonazepam.

15   Q.   Who prescribed that to you?

16   A.   Dr. Penelope Yanni.

17   Q.   Do you recall when she prescribed it?

18   A.   I believe that was in '09.

19   Q.   What symptoms were you complaining of when she

20   prescribed clonazepam?

21   A.   Panic attacks, extreme anxiety, situations that

22   could prevent a migraine, to calm me down.

23   Q.   Can you show us what the pill looks like.

24   A.   I don't know how to show it.

25        MR. McHUGH:  Objection, cumulative.

1    Q.    You can put it back in the bottle.

2    A.    Okay.  Sorry.

3    Q.    How often do you take that?

4    A.    As needed for stress.

5    Q.    And how often do you need to take it?

6    A.    It varies.  I mean, days like this, I'll have to

7    take one and similar days with high stress.  If my

8    intrusive thoughts are -- probably maybe once a week.

9    Q.    Can you show us another bottle.  What's that one?

10   A.    Vistaril.

11   Q.    Can you say that a little bit slower.

12   A.    Vistaril, V-I-S-T-A-R-I-L.

13   Q.    And who prescribed Vistaril to you?

14   A.    Dr. Yanni.

15   Q.    Do you remember when?

16   A.    This one was more recent in the last year, year

17   and a half.

18   Q.    What symptoms were you complaining of before she

19   prescribed Vistaril?

20   A.    Again, just more of not being able to get

21   comfortable at night.  I can take it prior to sleep.

22   The Klonopin I can use in daily life whereas this one's

23   more toward bedtime and if it's really bad.  I wouldn't

24   be able to function after.

25   Q.    How often do you take it?

1    **A.**   That one I use probably two to three times a week.

2    **Q.**   Could you show us the next one, please.

3    **A.**   Yes.  It's Lexapro.

4    **Q.**   And who prescribed Lexapro?

5    **A.**   Dr. Penelope Yanni.

6    **Q.**   Do you remember when she prescribed it?

7    **A.**   This was around July 29, '09.

8    **Q.**   And those are the symptoms that you discussed

9    earlier before you went to -- first went to Dr. Curran?

10   **A.**   Uh-huh.

11   **Q.**   Yes?

12   **A.**   Yes.

13   **Q.**   How often do you take the Lexapro?

14   **A.**   This is daily.

15   **Q.**   How many per day?

16   **A.**   It is a pill and a half.  It's 30 milligrams of

17   Lexapro.

18   **Q.**   Could you show us the next one, please.

19   **A.**   Sure.  Trazodone.

20   **Q.**   And when did Dr. Yanni prescribe you the

21   Trazodone?

22   **A.**   Early in '09.

23   **Q.**   How often do you take that one?

24   **A.**   This is at bedtime every night.

25   **Q.**   How many?

1    **A.**    It's two pills, 200 milligrams.

2    **Q.**    Could you show us the next one, please.

3    **A.**    And this is simvastatin.  I had a spike in my

4    cholesterol when I started the most stressful period of

5    my job in 2006.

6    **Q.**    Is that all of them?

7    **A.**    And Valtrex.  It's stress-related blisters, and I

8    only got that in -- around 2010.

9    **Q.**    How often do you take that?

10   **A.**    Whenever I have a breakout.

11   **Q.**    You mentioned a couple of times your partner in

12   2007 and 2008.  What was her name?

13   **A.**    Kristina M. Adams.

14   **Q.**    Are you and Kristina still together today?

15   **A.**    No.

16   **Q.**    In 2007, 2008 and 2009, can you describe the

17   nature of your relationship.

18   **A.**    I believe it was in 2008 we got engaged, and we

19   were planning a future.

20   **Q.**    You lived together?

21   **A.**    Yes.

22   **Q.**    Own a home together?

23   **A.**    No.  I owned the home prior to our relationship.

24   **Q.**    When did you break up?

25   **A.**    Approximately a year and two months ago.

1  **Q.**   How did all of these events affect your

2  relationship?

3  **A.**   We started couples counselling, and I've actually

4  gone through some of my experiences and found that most

5  of our difficulties were around high points or I should

6  say low points with the fire department that caused,

7  you know, increased tension.  My irritability was

8  gaining, and my sleeplessness was a problem.

9  **Q.**   When you first met her and the two of you started

10  dating, were you taking any type of prescription drugs

11  or any type of drugs regularly?

12  **A.**   None.

13  **Q.**   Do you notice in your own life any side effects

14  from those medications that you just explained to us?

15  **A.**   Yeah.

16  **Q.**   What kind of side effects do you experience after

17  you take those?

18  **A.**   A lot of people tell me that I've lost my funny

19  and my laughter and my smile has changed, that I'm not

20  the same person they knew.  And for my family to say

21  that, it hurts.  They, you know, feel like they walk on

22  eggshells around me because of my explosiveness and

23  irritability.

24       I know it affected our life toward the end of

25  our relationship because some of these medications, if

1    not a lot of them, affect your libido and I just wasn't

2    interested anymore.

3    **Q.**    Are you dating anyone now?

4    **A.**    No.

5    **Q.**    I want to transition more to the business end of

6    what happened with the fire department.  How much were

7    you earning as a rescue lieutenant?

8    **A.**    I started out as a rescue tech making $68,000,

9    near there, a year with some call-backs.  And then as a

10   lieutenant, I gained momentum with my income and was

11   anywhere between 98,000 and about 130,000 a year.

12   **Q.**    And can you explain why it would fluctuate from 98

13   to 130 thousand per year.

14   **A.**    The amount of call-backs that you were able to

15   take, you know, that you were given.  If you could

16   possibly -- you know, depending on how you felt if you

17   took the call back, but it definitely fluctuated.

18   **Q.**    And overtime?

19   **A.**    Overtime, yes.  That's key.

20   **Q.**    Now, you mentioned earlier that you'd gone on

21   injured-on-duty status after October 28th of 2010?

22   **A.**    Correct.

23   **Q.**    How were you paid while you were on -- what was

24   your pay while you were on injured-on-duty status?

25   **A.**    I believe it was about $4,400 a month tax free.

1    Q.    And that continued until you were granted ordinary

2    disability retirement?

3    A.    Correct.

4    Q.    When were you granted ordinary disability

5    retirement?

6    A.    The decision was made December 13th --

7    December 19th, 2013.  I believe that's the date.

8    Q.    And what are the payments that you receive from

9    your ordinary disability benefits?

10   A.    I receive a check once a month for $2,026, I

11   believe.

12   Q.    And is that taxed?

13   A.    That is taxed.

14   Q.    What do you net after the taxes?

15   A.    After taxes I get $1,764.

16   Q.    You mentioned that you own your own home?

17   A.    Yes, I do.

18   Q.    Back in October of 2010, did you have any savings?

19   A.    I did.

20   Q.    What were your savings?

21   A.    In October?

22   Q.    October of 2010.

23   A.    I didn't have my retirement yet, so I had

24   approximately 50-something thousand in savings.

25   Q.    Have you had to use those savings at all?

1    **A.**    Over the last two years, I've had to take a lump

2    sum of about $1,500 per month from my savings to

3    supplement my income.  It works out to be like 18,000 a

4    year.

5    **Q.**    Now, you were here when Mr. McHugh gave his

6    opening statement?

7    **A.**    Yes.

8    **Q.**    And you heard him say that you don't -- that you

9    haven't been looking for jobs?

10   **A.**    Yes.

11   **Q.**    What is it that you want to do with your career

12   moving forward?

13   **A.**    I work part time right now for a health screening

14   company.  That's per diem.

15   **Q.**    But what do you want to do?

16   **A.**    I don't even know that.  I know that I'm disabled.

17   I have to find something that's going to accommodate me

18   with my situation.

19   **Q.**    So what's your plan?  How are you going to make

20   that happen?

21   **A.**    I don't know; but, I mean, I can't -- I mean, I

22   don't want to lose my house.  I don't want to lose what

23   I have, what I've built, you know, my security, my -- I

24   don't know.

25   **Q.**    When you were treating with Dr. Curran who

1    diagnosed you with PTSD, did he tell you what caused

2    your PTSD?

3    **A.**    Yes.

4    **Q.**    What was it?

5    **A.**    Job-related stress, harassment, you know, the

6    inability for people to follow rules and regulations

7    and provide assistance.

8             MR. MARTIN:  Thank you.  Nothing further.

9             THE COURT:  Thanks, Mr. Martin.

10            Mr. McHugh, we have probably about 15 minutes.

11   Do you want to take that time?

12            MR. McHUGH:  I do.

13            THE COURT:  Sure.

14            Ladies and gentlemen, while Mr. McHugh is coming

15   up, we're going to start at 10:00 Monday morning, a

16   little bit later.  The lawyers pointed out some issues

17   that we need to run through.  So rather than have you

18   sit in there and wait, it makes more sense to just have

19   you come in for 10:00 Monday morning.

20            MR. McHUGH:  Could I have the ELMO on, Vickie.

21            THE CLERK:  Oh, sure.

22                      **CROSS-EXAMINATION**

23   **BY MR. McHUGH**:

24   **Q.**    Ms. Franchina, you told us that the Andre Ferro

25   incident was in 2006; correct?

1    **A.**    Yes.

2    **Q.**    And you told us that it was after the Andre Ferro

3    incident that you began to be called Frangina; correct?

4    **A.**    That I was aware of, yes.

5    **Q.**    And you told us that it was after the Andre Ferro

6    incident in 2006 that Firefighter McDougal refused to

7    cook for you; correct?

8    **A.**    Yes.

9    **Q.**    And you told us it was after the Ferro incident in

10   2006 that the list of 21 things were written on the

11   board about you at North Main Street; correct?

12   **A.**    I believe so.

13   **Q.**    And do you remember I served you through your

14   attorney with a set of written questions that you had

15   to provide answers to?

16   **A.**    I'm not aware.

17        MR. McHUGH:   Okay.   Your Honor, Defendant's B

18   for identification, if I could show that to the

19   witness, please.

20        THE COURT:   You may.

21   **Q.**    Let me show you -- first of all, Ms. Franchina, if

22   you look at the screen, that's entitled Plaintiff Lori

23   Franchina's Answers to Defendant City of Providence's

24   First Set of Interrogatories Propounded to Plaintiff.

25   Do you see that?

1    A.    Yes.

2    Q.    Do you remember answering questions on this?

3    A.    Yes.

4    Q.    Okay.  So I want to direct your attention to page

5    17 of that document, line 21, question 21.  Can you see

6    that on the screen?

7    A.    Line 21?

8    Q.    Yes, question number 21.

9    A.    Yes.

10   Q.    And just let me read 21(a).  It says, "Please list

11   each and every instance of harassment as alleged in

12   your Complaint, including in your answer for each such

13   instance (a) the date, time, location and manner in

14   which the alleged harassment occurred."  Do you see

15   that?

16   A.    Yes.

17   Q.    Now, if you turn over the page, page 18, to where

18   it says your answer, and after answer --

19         MR. MARTIN:  Objection.  May we approach?

20         THE COURT:  What's the objection, Mr. Martin?

21         MR. MARTIN:  There's no inconsistent statement.

22         MR. McHUGH:  There is, your Honor.

23         THE COURT:  Are you pointing to where you had

24   the sticker on there, Mr. McHugh?

25         MR. McHUGH:  Yes, your Honor.

1    THE COURT:  Overruled.

2    Q.  If you look at -- I want to get this straight

3    enough so that you can read it easy enough.  I realize

4    it's a little crooked, but can you read it?

5    A.  Yes.

6    Q.  Okay.  So the answer is, "When I first started as

7    a supervisor with Rescue 5, I was called Frangina by my

8    male colleagues."  Now, that was prior to the incident

9    with Andre Ferro; correct?

10   A.  Yes, I was made aware of that.

11   Q.  Okay.  "This was a combination of my surname and

12   the word 'vagina.'  My subordinate officers referred to

13   me as R/T Frangina regularly and in front of my

14   superior officers.  My supervisor, Lieutenant Murray,

15   called me Frangina directly.

16       "During the year 2005, Firefighter Andrew

17   McDougal kicked me out of the meal in the North Main

18   Street Fire Station.  He conducted a meeting with

19   Captain Alan Horton and Lieutenant Jack Romano in which

20   both decided that I was not allowed to eat meals cooked

21   by firefighters but that I was allowed to cook for the

22   firefighters.  All of those firefighters were males.

23       "During that meeting, Firefighter McDougal told

24   me in the presence of Captain Horton and my

25   subordinates, 'I will never help you lift a stretcher.'

1    On another occasion, the team of males wrote a list of

2    21 things they did not like about my personality on the

3    chalkboard."

4         Did I read that correctly?

5    **A.**   Yes.

6    **Q.**   So those things, the nickname that you were given,

7    the refusal of McDougal to cook for you and the list on

8    the board, happened before the Ferro incident; correct?

9    **A.**   I believe the date on that is incorrect.

10   **Q.**   Okay.  Well, did you read these before you signed

11   them?

12   **A.**   I did.

13   **Q.**   And you signed them under oath; correct?

14   **A.**   That's my understanding.

15   **Q.**   All right.  Let me show you your signature on the

16   last page.  On the last page, "I, Lori Franchina,

17   hereby state the aforementioned answers are true and

18   accurate under the pains and penalties of perjury," and

19   that was signed on December 17th, 2014; correct?

20   **A.**   Correct.

21   **Q.**   Now, you also told us that you didn't complain

22   right away about the list of 21 items written about

23   you; correct?

24   **A.**   It was within 24 hours of it.

25   **Q.**   All right.  So you think you complained within 24

1   hours, and who did you complain to?

2   **A.**   I believe it was the captain, Captain Horton.

3   **Q.**   Okay.  Do you remember giving a deposition over

4   several sessions with me in my office three different

5   days?

6   **A.**   Yeah, 21 hours.

7   **Q.**   And you took an oath to tell the truth that day;

8   correct?

9   **A.**   Absolutely, sir.

10   **Q.**   All three days.  And you were represented by

11   Mr. Martin and Mr. Braga; right?

12   **A.**   That's correct.

13   **Q.**   So I want to direct your attention to Volume I of

14   your deposition, which was April 3rd, 2015.  The Court

15   has it.

16        THE COURT:  Do you have a copy for her, though?

17        MR. McHUGH:  I was going to put it on the ELMO.

18        THE COURT:  Okay.  Mr. Martin, do you have a

19   copy, an extra copy?

20        MR. McHUGH:  I provided the Court with a bench

21   copy.

22        THE COURT:  Okay.  How many volumes is it?

23        MR. McHUGH:  There are three, your Honor.

24   **Q.**   I want to show you in Volume III, Ms. Franchina,

25   I'm going to put this on the screen, I'm just going to

1    read you the question and answer, and I just want you

2    to tell me if I read it correctly.  Okay?

3    **A.**   (No verbal response.)

4    **Q.**   So if you look at the box in the upper left-hand

5    corner of page 53, do you have that?

6    **A.**   Yes.

7    **Q.**   And line 7 -- line 11, rather.  So page 53,

8    line 11, question, "When did you see the list the first

9    time?"

10         Answer, "The list was during a period of

11   harassment that I experienced from I believe 2005,

12   2004, maybe even -- I'm not exactly sure of the date on

13   that incident."

14         Question, "How long was the list up there?"

15         Answer, "A 24-hour period that I'm aware of."

16         Question, "Okay.  And that 24-hour period, it's

17   right after that that you leave there and go to North

18   Main Street; correct?  Branch Avenue, rather?"

19         Answer, "No."

20         "How long after the list do you go to Branch

21   Avenue?"

22         Answer, "Months."

23         "Well, do you know how the list came down?"

24         Answer, "No, because I left to go to my home.  I

25   was on a 24-hour shift.  During my entire 24-hour

1   shift, it remained."

2           "When you came back, it was gone?"

3           "Yes.  That's a 96-hour period."

4           Question, "And that was after you complained to

5   Chief Varone about it?"

6           Witness, "That it was gone?"

7           Question, "Did you complain to Chief Varone

8   about it that very day?"

9           Answer, "Absolutely.  Absolutely."

10          Question, "So when you came back, the list was

11  gone when you came back to work; correct?"

12          Answer, "Correct."

13          Question, "And do you know if Chief Varone had

14  anything to do with that?"

15          Answer, "Unaware."

16          But that was after you had complained to

17  Chief Varone that you come back to work and the list is

18  down; correct?

19  **A.**   I would say so.

20  **Q.**   And you didn't -- you could have erased it

21  yourself the way the board is; right?

22  **A.**   I didn't have an opportunity, sir.

23  **Q.**   Well, you saw it when you were in the station;

24  right?

25  **A.**   It was pretty much manned, sir.

1    Q.    Well, are you saying that you couldn't have walked
2    up to it and just erased it?
3    A.    No.
4    Q.    You're saying no, you could not have?
5    A.    No, I could not have.
6    Q.    Why was that?
7    A.    Because a captain wrote it.  The captain of the
8    house, Captain Peter Spedutti, wrote it.
9    Q.    Well, that's the same board that somebody wrote
10   something about DeNinno and Fabrizio on, isn't it?
11   A.    Yes, it is.
12   Q.    And didn't DeNinno and Fabrizio erase it when it
13   was written about them?
14   A.    I don't know that, sir.
15   Q.    You know it was erased; right?
16   A.    No.  I'm on rescue, and I'm very seldom at the
17   firehouse.
18   Q.    So you're not there that often for meals anyway,
19   then; correct?
20   A.    I eat my meals when I'm there.
21   Q.    Okay.  But you're there very seldom, you just
22   said; correct?
23   A.    That is correct.
24   Q.    Now, you talked also -- you told us also earlier
25   that you went to -- well, let's back up a minute.

1            You were physically afraid of Sean McGarty after

2     that incident at the union hall; correct?

3     **A.**    Correct.

4     **Q.**    And you were afraid to the extent that you

5     actually went to the Superior Court yourself and got a

6     restraining order; right?

7     **A.**    I was not by myself, no.

8     **Q.**    Well, I mean without a lawyer; correct?

9     **A.**    Correct.

10    **Q.**    And you actually went and complained to the State

11    Police; correct?

12    **A.**    Yes, I did.

13    **Q.**    You didn't complain to the Providence Police.  You

14    went right to the State Police; right?

15    **A.**    That is correct.

16    **Q.**    And the State Police never brought criminal

17    charges against Mr. McGarty; correct?

18    **A.**    No, they did not.

19    **Q.**    But they took a statement from you; correct?

20    **A.**    Yes.

21    **Q.**    And then you were able to get a restraining order

22    from Judge Lamphear against Firefighter McGarty;

23    correct?

24    **A.**    Yes.

25    **Q.**    And then the department issued that order, which

1    we'll talk about later, which was going to restrict

2    where he could work so the two of you wouldn't be

3    together; correct?

4    **A.**   That's correct, for my safety.

5    **Q.**   Right, because you were afraid of McGarty; right?

6    **A.**   I have said yes.

7    **Q.**   He's a big guy; right?

8    **A.**   He's 6'4".

9    **Q.**   And on October 28th, which was your last day in

10   the station; correct?

11   **A.**   Yes.

12   **Q.**   You walked into the Branch Ave. Station to make

13   out your application for injured-on-duty pay; right?

14   **A.**   Yes.

15   **Q.**   And the first person you see when you walk in is

16   McGarty; right?

17   **A.**   Correct, violating a standing order.

18   **Q.**   So you thought he was violating the order of the

19   department; correct?

20   **A.**   He was, yes, sir.

21   **Q.**   And so instead of turning around and leaving, you

22   stayed there; right?

23   **A.**   I stayed to turn in my paperwork, sir.

24   **Q.**   Well, you stayed there for several hours, didn't

25   you?

1   **A.**   I was held in a chief's office being asked to not
2   leave at this time because of unknown tempers.
3   **Q.**   For several hours?
4   **A.**   No, not several hours.  At least 20 to 30 minutes
5   I was in the chief's office.  That's correct.
6   **Q.**   But you were at the station for several hours that
7   day; right?
8   **A.**   Earlier in that day, yes, filling out my
9   paperwork.  I then had to leave to get paperwork
10  signed.
11  **Q.**   Well, you thought that you could stay there
12  because -- as long as you wanted because you weren't in
13  violation of the order; correct?
14  **A.**   I was not aware that McGarty was in the building
15  prior to my arrival.
16  **Q.**   No, but as soon as you got there, you saw him?
17  **A.**   When I returned to turn in my paperwork, yes, sir,
18  I did hear him and see him.
19  **Q.**   And you thought that there was no problem with
20  your remaining at the Branch Avenue Station because you
21  weren't in violation of the order?
22  **A.**   That is correct.
23  **Q.**   And you, in fact, stayed there for a while?
24  **A.**   I was asked to remain in a chief's office with
25  him, yes.

1    **Q.**    With whom?

2    **A.**    Chief Al Horton in the Battalion 3's office behind

3    a closed door.

4    **Q.**    So you're telling us that you stayed at the -- you

5    stayed at the station only because Chief Horton had you

6    in his office?

7    **A.**    Correct.

8    **Q.**    Even though as soon as you walked in and you saw

9    McGarty, who you were afraid of, you could have turned

10   around and walked right out; correct?

11   **A.**    I needed to turn in my paperwork, sir.

12   **Q.**    Well, you didn't have to turn it in that day, did

13   you?

14   **A.**    Yes.  I was due on shift on October 29th, 2010,

15   back to duty.

16   **Q.**    Well, you had the day -- the last day you had

17   worked was the 23rd of October; right?

18   **A.**    Correct.

19   **Q.**    And this was the 28th of October; right?

20   **A.**    Correct.

21   **Q.**    So you had five days before that to fill out the

22   paperwork; right?

23   **A.**    No, I did not, sir.

24   **Q.**    You did not?

25   **A.**    No.

1    Q.   So between -- well, you agree between October 23rd

2    and October 28th there are five days; right?

3    A.   That is correct.

4    Q.   And you weren't working on any one of them.  You

5    were off; right?

6    A.   That is correct.

7    Q.   So you could have walked into that station on any

8    one of those other days and filled out your paperwork?

9    A.   No, sir.

10   Q.   You don't think you could?

11   A.   Sir, I had a meeting on the 26th with a chief that

12   issued me the reoccurrence, and then I had an emergency

13   meeting with my doctor on the 26th, which then, in

14   turn, he submitted paperwork through the department,

15   and then I was ordered to fill out my IOD paperwork,

16   sir.

17   Q.   So you had a meeting with Chief Crawford, did you

18   say?

19   A.   I had a meeting with Chief Crawford, and then I

20   had a meeting with my -- emergency meeting with my

21   therapist, Dr. James Curran.

22   Q.   Okay.  And what day was your meeting with your

23   therapist, Dr. Curran, on?

24   A.   I believe it was the 26th of October.

25   Q.   Okay.  But you saw McGarty there on the 28th;

1  right?

2  **A.**   That's correct.  I had to wait for the fax to go

3  from my doctor, Dr. James Curran, to Chief Michael

4  Morgan, which, in turn, when that was issued as a

5  reoccurrence of injury, I was then ordered to fill out

6  my paperwork.

7  **Q.**   And you told us earlier that when you left the

8  Branch Avenue Station, you went right to the

9  therapist's office; correct?

10  **A.**   On the 28th?

11  **Q.**   Right.

12  **A.**   I don't believe so.

13  **Q.**   Wasn't that your testimony, that when you left the

14  Branch Avenue Station, you went right to see your

15  therapist for an emergency?

16  **A.**   I believe you're mistaken, and I believe that's

17  when I left the Firefighters' Hall in a very upset

18  state.  I immediately went to 100 Lafayette Street in

19  Providence where Roz Johnson was my therapist and saw

20  me immediately.

21  **Q.**   So you went to the doctor on October 26th, and

22  then you applied for IOD on October 28th?

23  **A.**   That is correct, sir.

24       THE COURT:  Mr. McHugh, we're going to have to

25  break.

1          MR. McHUGH:  Thank you, your Honor.

2          THE COURT:  Okay.  Thanks.

3          Ladies and gentlemen, usual admonitions.  Please

4    don't read any news reports or listen to any news

5    reports about this trial, don't do any independent

6    research, don't discuss this case amongst yourselves or

7    with anyone.  Even though you're going to have three

8    days off and you might be tempted, please be sure not

9    to do that.  Don't say anything about your jury service

10   on social media, and remember we're going to start at

11   10:00 on Monday morning.

12         Counsel, I'll see you here at 9:00, but the

13   jury -- 9:00 on Monday, and the jury will report back

14   for 10:00, and we'll start promptly at 10:00 Monday

15   morning.

16         (Adjourned.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4              I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5     hereby certify that the foregoing pages are a true and

6     accurate transcription of my stenographic notes in the

7     above-entitled case.

8

9              __February 1, 2017_____

10     Date

11

12

13     /s/ Karen M. Wischnowsky_____

14     Karen M. Wischnowsky, RPR-RMR-CRR
       Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25