1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF RHODE ISLAND

3

4
     * * * * * * * * * * * * * * *   C.A. NO. 12-517M
5                                *
   LORI FRANCHINA                 *
6                                *
       VS.                        *   APRIL 11, 2016
7                                *   9:00 A.M.
   CITY OF PROVIDENCE             *
8                                *
     * * * * * * * * * * * * * * *   PROVIDENCE, RI
9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                     DISTRICT JUDGE

12

                       (Jury Trial - Volume III)
13

14   APPEARANCES:

15   FOR THE PLAINTIFF:    KEVIN P. BRAGA, ESQ.
                           Law Office of Kevin P. Braga
16                         2095 Elmwood Avenue, Suite B
                           Warwick, RI  02888
17
                           JOHN T. MARTIN, ESQ.
18                         BENJAMIN H. DUGGAN, ESQ.
                           KJC Law Firm, LLC
19                         10 Tremont Street, 6th Floor
                           Boston, MA  02108
20
     FOR THE DEFENDANT:    KEVIN F. McHUGH, ESQ.
21                         KATHRYN M. SABATINI, ESQ.
                           City Solicitor's Office
22                         444 Westminster Street, Suite 220
                           Providence, RI  02903
23
     Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
24                         One Exchange Terrace
                           Providence, RI  02903
25

1                                                I N D E X

2      **PLAINTIFF'S WITNESS**                                              **PAGE**

3      <u>Lori Franchina, Resumes</u>
               Cont. Cross-Examination by Mr. McHugh              27
4              Cont. Cross-Examination by Mr. McHugh             180
               Redirect Examination by Mr. Martin               201
5
       <u>Michelle Olson, Ph.D.</u>
6              Direct Examination by Mr. Martin                 121
               Cross-Examination by Mr. McHugh                  136
7              Redirect Examination by Mr. Martin               145

8      <u>Penelope Yanni, M.D.</u>
               Direct Examination by Mr. Martin                 150
9              Cross-Examination by Mr. McHugh                  164
               Redirect Examination by Mr. Martin               174
10
       <u>Terry Franchina</u>
11             Direct Examination by Mr. Duggan                 211

12

13

14                                          E X H I B I T S

15     <u>JOINT</u>                          <u>FOR ID</u>                  <u>IN FULL</u>
          5                                                            38
16

17
       <u>PLAINTIFF</u>                      <u>FOR ID</u>                  <u>IN FULL</u>
18        34                                                           120

19

20     <u>DEFENDANT</u>                      <u>FOR ID</u>                  <u>IN FULL</u>
          D                                                            83
21

22

23

24

25

1    11 APRIL 2016 -- 9:00 A.M.

2              (The jury is not present for the following)

3         THE COURT:  Good morning, everyone.  We're here

4    outside the presence of the jury because the attorneys

5    said that there were some issues about some documents

6    that they wanted to be heard on.

7         MR. MARTIN:  Yes, your Honor.  I think that

8    we've simplified things a bit.  I've taken Exhibit 34

9    and I've numbered it in the bottom corner, which would

10   make it easier to go along with.

11             We've also agreed to some I guess you'd call it

12   redactions.  We just agreed to take Dr. Curran's

13   records out entirely.  So I'll read into the record

14   what pages those are once we get those in, and then I

15   believe Mr. McHugh has additional objections that he

16   would like to address to the records from Dr. Olson and

17   Dr. Yanni.

18        THE COURT:  Okay.  I'm going to put this big one

19   aside.

20        MR. MARTIN:  So, your Honor, this Exhibit

21   Number 34 is numbered from page 1 to 107, and the

22   parties by agreement have redacted pages 24 to 50.

23   Those are treatment records from Dr. James Curran.

24        THE COURT:  Okay.  So 24 to 50 are not included

25   in this?

1      MR. MARTIN:  Correct.  Would you like a copy of

2  24 to 50?

3      THE COURT:  No.  I actually have one, but

4  thanks.  Whatever version we're going to send back to

5  the jury should not be numbered like this because it

6  would cause them to question the page numbers.  So once

7  we agree on whatever we agree to, we should make sure

8  that it's sequentially numbered.

9      MR. MARTIN:  Okay.

10      THE COURT:  Don't you think?

11      MR. MARTIN:  Yes.  That's fine.

12      THE COURT:  Because if I were sitting on a jury,

13  I'd say, Where's page 24?  It would cause me to wonder.

14      MR. MARTIN:  Sure.  This was just for

15  convenience.  I'm happy to bring them in redacted as

16  instructed without the numbers on the bottom.

17      THE COURT:  Right.  We can use this, depending

18  on what comes in, what doesn't come in, for purposes of

19  the jury; but the one that actually goes back to them,

20  if you can substitute in that, we can agree on the page

21  numbers, I think it would make more sense.

22      So who wants to be heard on -- so I assume

23  you're offering pages 1 through 104 of Plaintiff's

24  Exhibit 34 -- up to page 107 minus pages 24 through 50

25  as a full exhibit.

1          MR. MARTIN:  Yes, your Honor.

2          THE COURT:  And, Mr. McHugh, you have certain

3    objections?

4          MR. McHUGH:  Right, and there were some

5    duplicates in there, John.  I don't know if they may be

6    included in other pages, two of the same page.

7          MR. MARTIN:  I think that there are duplicates

8    that Ms. Sabatini pointed out that are in this group.

9    I think there's 11 or 12 pages that might be there

10   twice.

11         MS. SABATINI:  I don't have my copy with me, but

12   they are marked on Mr. McHugh's copies; and they are

13   the page groupings I conferred with you about

14   yesterday, and I believe you agreed to removing them.

15         MR. MARTIN:  Yeah.  They're in there because

16   that's how the doctor's office produced them to me, but

17   they do appear to be duplicates, and I'll have no

18   objection to the request for redaction on those.

19         THE COURT:  Great.  That makes sense.

20         MR. McHUGH:  I haven't given up on my

21   overarching Rule 403 objection as to all the records

22   being cumulative since the doctors are testifying; but

23   having said that, if that is overruled and the medicals

24   do come in, there are some that I think need to be

25   redacted.  I don't know if you want me to put these up

1    on the ELMO.

2            THE COURT:  Just reference the page.

3            MR. McHUGH:  The first one is on page 6, your

4    Honor.

5            THE COURT:  Could I ask about one before you get

6    to that, then, that concerned me on page 2?  There's a

7    reference to communications with attorneys.

8            MR. MARTIN:  Yes.  That's our one requested

9    redaction, is the line on page 2 that says that she

10   rejected a settlement offer and will proceed to trial.

11           THE COURT:  Right, which obviously should come

12   out; but the one that concerned me was the one that

13   said that she's having concerns about her

14   communications with her lawyers whom she feels are not

15   communicating with her very well.

16           MR. MARTIN:  I had a beef with that one, too.

17           THE COURT:  It doesn't seem that that belongs in

18   there.

19           MR. MARTIN:  Must have been them.

20           THE COURT:  What?  Must have been them.

21           MR. MARTIN:  I would appreciate that being

22   redacted.

23           MR. McHUGH:  That's fine.

24           THE COURT:  I think that should be redacted.

25   Okay.  So why don't you redact that.  And, Kevin, what

1    page, 6, is your first one?

2         MR. McHUGH:  Page 6, your Honor.  And the one I

3    wanted to redact was the second line down, the first

4    full sentence where it says, "At the second," this is

5    referring to her deposition, "a different female

6    firefighter denied abuse even though Lori has seen her

7    to be the victim of harassment," including the fact --

8    "Lori learned some distressing information in the

9    depositions, including the fact that other firefighters

10   still talk about her with a great deal of ire and even

11   threaten her."

12        This is her version of the deposition, and it's

13   not pertinent under that exception to the hearsay rule

14   to treatment or diagnosis.

15        THE COURT:  Who is the medical provider here?

16        MR. McHUGH:  Dr. Olson.

17        THE COURT:  And who is Dr. Olson?

18        MR. McHUGH:  Psychologist.

19        THE COURT:  And what is he treating her for?

20        MR. McHUGH:  Post-traumatic stress disorder.  So

21   this is in 2015.  This is, you know, two years after

22   she retired and five years after she worked, and she's

23   talking about depositions that are taken five years

24   later.  Both of these --

25        THE COURT:  I'm inclined to believe that should

1    come out, Mr. Martin, and not a sweeping ruling under

2    803(4), I don't mean it by that, but this specifically

3    refers to her reaction to litigation and things that

4    occurred during litigation.

5         And it seems to me that that doesn't fall -- if

6    it does fall within 803(4), which is a statement for

7    purposes of medical treatment, that at a minimum it

8    probably comes out under 403.  I don't think the jury

9    should be speculating about what went on or didn't go

10   on during the course of the deposition -- during the

11   course of the litigation.

12        MR. MARTIN:  Of course, your Honor, 403 is

13   almost completely discretionary, so I won't really

14   argue the 403 issue.

15        As far as the treatment and diagnosis, I believe

16   that this litigation has caused a great deal of

17   distress, a great deal of emotional distress that

18   continues to this day, that was important for the

19   purpose of treatment, that was important for the doctor

20   to know and the doctor to work with, and she expressed

21   it.

22        It doesn't include any of the types of

23   inadmissible hearsay that would typically be excluded

24   from a medical record.  So the only, I believe, basis

25   for redaction would be that it's unfairly prejudicial.

1    I, of course, think that it's fairly

2    prejudicial; but, again, it's a completely

3    discretionary decision and I don't need to argue it too

4    hard, I think, because it's entirely your view.

5    THE COURT:  I'm going to exclude that, have that

6    redacted under 403.  I think it's a close call, to be

7    honest with you, when 803(4) is as broad as it is

8    written; but I also don't think when you weigh the need

9    for it there's -- I read these records over the weekend

10   as I said I would, and there's sufficient

11   nonlitigation-related evidence of comments that she

12   made that do seem to be appropriately admissible that

13   we could keep those out and not get into the jury being

14   concerned over the litigation itself.

15   MR. McHUGH:  So is it going to be from "at the

16   second" until the end of that paragraph?

17   THE COURT:  It probably should be "at the first"

18   because if the first refers to the deposition --

19   MR. McHUGH:  All right.

20   THE COURT:  So why don't we take "at the

21   first" --

22   MR. McHUGH:  All the way through the rest of

23   that paragraph?

24   THE COURT:  Correct.

25   MR. McHUGH:  The next one is on page 10.

1          THE COURT:  I assume, Mr. McHugh, that you don't

2    have any intent of arguing things that she didn't

3    discuss or didn't deal with or didn't, you know, convey

4    to her medical providers; right?

5          I mean, it would be unfair if we're going to

6    redact things and that's going to be a central theme of

7    your argument.

8          MR. McHUGH:  No, I'm not going to question her

9    about things she didn't tell.

10          THE COURT:  Okay.

11          MR. McHUGH:  Next one is on page 6.

12          THE COURT:  That's the page we just did.

13          MR. McHUGH:  I'm sorry, page 10.  She has

14    been -- this would be the second sentence.  "She

15    reports that she has been stressed and worried about

16    money."  That part of it.  This, again, is five years

17    after she worked and two years after her retirement.  I

18    don't see the relevance of this to damages in the case.

19          THE COURT:  I think that's clearly 803(4)

20    admissible when someone is seeking a PTSD diagnosis.

21    In fact, not to try your case for you, Mr. McHugh, but

22    I would imagine you might want that in to show that

23    some of her problems were not all caused by her alleged

24    harassment on the job but there were other potential

25    causes for it.  She's identifying money stress as a

1          cause for it.  That request for redaction is denied.

2                MR. McHUGH:  The next one is on page 14, and in

3          that second paragraph -- this whole paragraph is

4          talking about other firefighters, someone who was

5          suspended twice for drug abuse.  I mean, we don't even

6          know who this is or what the circumstances were.

7                She was transferred to a station that had vocal

8          anti-gay members?  I don't remember any testimony of

9          hers that there were vocal anti-gay members at the

10         Branch Avenue Station.  I think that whole second

11         paragraph should come out.

12               THE COURT:  I disagree.  I think that's, again,

13         directly 803(4) kind of admissible statements for the

14         purposes of diagnosis specifically when speaking to a

15         psychologist about psychological injuries and

16         allegations of PTSD.

17               You know, if at any point, Mr. McHugh, you want

18         an instruction on any of this that it's not being

19         admitted for the truth of the matter but, rather, for

20         purposes of medical treatment and state of mind and

21         whatnot, I'd be glad to give that; but I think it comes

22         in.  And 803(6).  I keep saying 803(4), but 803(4)

23         works in combination with 803(6).

24               MR. McHUGH:  The next one is on page 17, your

25         Honor.  These are handwritten, and specifically --

1          THE COURT:  Whose are these, Mr. McHugh, do you

2     know, whose handwritten notes?

3          MR. McHUGH:  I'm not sure if these are

4     Dr. Yanni's or Dr. Olson's.  I don't know if Mr. Martin

5     knows which ones these are.

6          MR. MARTIN:  Well, these are records that were

7     produced with Dr. Olson's records, but it appears to me

8     that this was written by Lori Franchina.

9          MR. McHUGH:  Oh.

10          MR. MARTIN:  To the doctor.  The date

11     coincides with last April or maybe late March of 2015.

12     Dr. Curran died unexpectedly while undergoing an

13     operation.  Dr. Olson took over his treatment.  And

14     this date here, 4/29/15, appears to be a summary of

15     Lori's experiences and symptoms that she was feeling

16     that she prepared for the doctor for their first

17     appointment.

18          MR. McHUGH:  In that case, I'd want to take out

19     all of them, 17 through 20, if they're her notes within

20     the medical records that she wrote.

21          THE COURT:  They don't read like she wrote them,

22     Mr. Martin.  You may know otherwise or you may

23     recognize her handwriting.  These look to me like the

24     handwritten notes of someone taking a history, some

25     medical provider, either a nurse practitioner, a nurse

1    or a doctor or whatnot.  Maybe I'm wrong, but my read

2    of these when I read them --

3            MR. MARTIN:  Mr. Duggan just pointed out the

4    same thing, and I guess I could be wrong.  What I was

5    looking at was the paragraph that says, "My case is one

6    of the most horrific," but it appears to be you're

7    correct because it says, "Federal lawsuit, hard for her

8    to keep reliving it, separation six months ago, had to

9    ask her to move on, was lieutenant."

10           So I guess I was mistaken.  These are

11   handwritten notes taken from the history that

12   Ms. Franchina provided, not something that

13   Ms. Franchina provided in writing.

14           THE COURT:  That's my guess, and I'm guessing

15   that's LF up above the date on the top left-hand corner

16   on page 17 refers to who he was or she was interviewing

17   at the time.

18           MR. MARTIN:  Correct.

19           THE COURT:  Again, unless you want to point out

20   specific things in here, Mr. McHugh, I think in general

21   these come in.

22           MR. McHUGH:  There is one halfway down that

23   page 17 where she says, "My case is one of the most

24   horrific cases out there, assaulted three times,

25   19-page Human Rights Commission report, pushed against

1    a wall."

2         I mean, that's pure opinion.  We don't even know

3    what it's based upon or what other lawsuit she's taking

4    about.  It has nothing to do with this case.

5         THE COURT:  Why do you think it has nothing to

6    do with this case?

7         MR. McHUGH:  When she says, "My case is one of

8    the most horrific cases out there," comparing them to

9    other cases.  What other cases?  Her treatment or her

10   problems are not going to be compared to those in

11   somebody else's lawsuit.

12        THE COURT:  No, but her impression of it might

13   well be.  I mean, her impression of the magnitude of

14   her treatment is probably precisely the kind of

15   statement made for attempting to diagnose something

16   like PTSD.

17        MR. McHUGH:  I mean, that's her opinion about

18   other litigation.  We don't even know what litigation

19   she's talking about.

20        THE COURT:  I'm inclined, Mr. Martin, to take

21   that one sentence out, "My case is one of the most

22   horrific cases out there," again, under 403.  I think

23   that brings in a -- you know, if it had said my case is

24   horrific, but the fact that she's comparing it to an

25   unknown out there that could bring us down a path of

1    Mr. McHugh trying to prove that hers isn't as horrific

2    as others he's seen, which I doubt he's going to try

3    and do, but I think under 403 that sentence should come

4    out.

5          MR. MARTIN:  No objection.

6          THE COURT:  I think the rest of the paragraph

7    stays in under 803(4).  Next, Mr. McHugh?

8          MR. McHUGH:  Next one, on page 21 where it says

9    History of Present Illness, that whole lawsuit -- I

10   mean that whole paragraph seems to be a summary of what

11   she's saying, and everything is kind of lumped in

12   together, kind of piling on, you know, "refusing to

13   follow her orders," "federal lawsuit," "19-page Human

14   Rights Commission report on her case."  There's not a

15   report.  There's a complaint that she made.  "Several

16   traumas cause by both the nature of the career and

17   difficulties with co-workers."  It all seems to be

18   lumped together in like a general summary type of

19   thing.

20         THE COURT:  I think this is okay under 803(4).

21   Actually, it's probably 803(6).  It's a business

22   record.

23         MR. McHUGH:  The next one on page 51, I don't

24   know what district this case was in, but she's talking

25   about a sexual harassment case with a $2.5 million

1    verdict.

2           At the top it says, Interim History, "Going

3    through her deposition, went to court with her friend

4    who has been going through a similar thing who won 2.5

5    million."

6           MR. MARTIN:  That was something we were going to

7    move to redact as well.

8           THE COURT:  It should be removed.  Why don't you

9    take "going through her deposition" through "2.5M" out.

10          MR. McHUGH:  The next one is on page 62.  We

11   filed a motion in limine to which the Plaintiffs did

12   not object on any IMEs; and on interim history, one,

13   two, three, the third line down, she references "had

14   IME."  And there is a nurse on the jury, too.  So I'd

15   like to take out "had IME."

16          THE COURT:  Probably should come out,

17   Mr. Martin.

18          MR. MARTIN:  Agreed.

19          MR. McHUGH:  Page 75, maybe it's me, but I can't

20   read under -- the handwriting under Psychiatric

21   Diagnosis.

22          THE COURT:  It's clearly PTSD and then the DSM

23   code 309.81.

24          MR. McHUGH:  That much I can read.

25          THE COURT:  Then it says -- I have no idea.

1    Probably ends with firefighter, "the FF."  Mr. Martin,

2    any help there?

3         MR. MARTIN:  So I agree with the PTSD 309.81.  I

4    can't read the rest of that line.  The next line I

5    believe says repeated exposure, lot of trauma, plus

6    blank, the FF, currently on Texapro (sic) and Klonopin.

7         THE COURT:  I think it's Lexapro.

8         MR. MARTIN:  Lexapro, thank you, and Klonopin.

9    I agree it's hard to read.  I don't know if that makes

10   it inadmissible, though.

11        THE COURT:  I don't either.  I think it comes

12   in.  We actually have a nurse on the jury who may be

13   better than all of us at -- I think one nurse, maybe

14   two.  Let's see, one nurse.

15        MR. McHUGH:  I think page 76 is one of those

16   duplicate pages, I think.  That's the only reason I

17   had --

18        THE COURT:  I think if Kate and John got

19   together, you'd probably agree on removing the

20   duplicates, if that's okay; and if there's any -- well,

21   there shouldn't be any disputes.  A duplicate's a

22   duplicate.  If there are disputes, then you guys have

23   bigger problems than I can solve.

24        MR. McHUGH:  Page 90, under that paragraph,

25   Subjective, the last two sentences, it says, "Case got

1    delayed due to negotiating a settlement."  Well, first

2    of all, it's not true; but second of all, it's unduly

3    prejudicial.  It's going to lead the jury to believe

4    that we were trying to settle this case.

5        THE COURT:  Why isn't it true, Mr. McHugh?  Just

6    curious.

7        MR. McHUGH:  Why isn't it true?

8        THE COURT:  Why haven't the parties attempted,

9    if you tell me it's not true, that you haven't

10    attempted to settle it?

11        MR. McHUGH:  We had -- you know, I said to Judge

12    Almond that I -- quite frankly, I said, you know, we'd

13    be willing to engage in a mediation with your Honor,

14    but I think that the Plaintiff wants to get up there

15    and tell her story to the world; and that turned out to

16    be the case.

17        THE COURT:  Okay.

18        MR. McHUGH:  So there was really -- you know, we

19    never had one because I said to the judge, and

20    Mr. Martin agreed, it would have been a waste of

21    everybody's time.

22        THE COURT:  Okay.

23        MR. McHUGH:  That's the truth.

24        THE COURT:  You've only ever told me the truth,

25    Mr. McHugh.  You don't have to assure me of that.  I

1   think the settlement language obviously comes out,

2   Mr. Martin.

3          MR. MARTIN:  I agree.

4          THE COURT:  Why don't we just take that

5   whole sentence, "the case got delayed" all the way

6   through "2/22."

7          MR. McHUGH:  I find troubling on page 91 under

8   Subjective, one, two, three in parentheses, "When

9   insubordination almost caused baby to get too many

10  volts."

11         This is kind of hanging in there, and I don't

12  know that it makes too much sense in a medical record.

13  I think certainly Dr. Yanni could say that, you know,

14  the Plaintiff told him that in a session; but to have

15  that in writing just hanging there, it seems like --

16         THE COURT:  I think it stays in.  It comes right

17  after the clarifying phrase of "under extreme stress."

18  So I think it's her -- right?  Is Dr. Yanni a her?

19  Yeah.  It's her noting what the subjective comment was

20  about the cause of the extreme stress at the time.

21  That request for redaction is denied.

22         MR. McHUGH:  And then the others, I think

23  pages 94 through 107, were duplicates.

24         THE COURT:  Great.

25         MR. McHUGH:  So --

1          THE COURT:  I mean, not great that they're

2    there, but I imagine you folks can work that out.  I

3    understand a lot of times medical records are just

4    produced that way; but for the best of this jury and

5    all that it's going to have to go through and whatnot,

6    it's better to just pull duplicates out.

7          MR. MARTIN:  I agree.  They kind of look like

8    they just threw them in air, but thank you.

9          THE COURT:  It's like when they produce e-mails

10   sometimes.  You see many of them repeated over and over

11   and over again.

12         MR. McHUGH:  So when the time comes, your Honor,

13   I had planned on just getting up and, when it comes

14   time to enter these, saying, "Objection, Rule 403."

15         THE COURT:  Sure.

16         MR. McHUGH:  Unless -- I don't know if the Court

17   wants to admit them now and I'll just make my objection

18   now and save the time.

19         THE COURT:  That would be fine, but are you

20   going to use these on cross, Mr. McHugh, currently?

21         MR. McHUGH:  Yes.

22         THE COURT:  So we should get them admitted

23   before just for the ease of everyone operating with

24   them.  Don't you think, Mr. Martin?

25         MR. MARTIN:  Yeah.  I was thinking maybe -- I

1    don't know if they call it this everywhere, but I've

2    admitted de bene before, and then I'll just do

3    foundation.  You can admit it in full.  I have no

4    problem with it being used with Ms. Franchina.  My only

5    concern is --

6         THE COURT:  Sounds like absent the 403 argument,

7    Mr. McHugh is stipulating to these.

8         MR. McHUGH:  Correct.  Right, your Honor.

9         THE COURT:  So we can preserve his 403 argument,

10   which you've made consistently and throughout and I

11   think is fully preserved by just having them admitted

12   by stipulation subject to the 403 objection of the

13   Defendant.

14        MR. McHUGH:  Very good.

15        MR. MARTIN:  My only question is procedurally

16   for the clerk's benefit, I'm going to need to do a set

17   that's congruent with your orders and then provide it

18   to the clerk.

19        Will we be able to just give it to the clerk and

20   she can mark it at that time or should the set that you

21   have be marked now and then we'll replace it on the

22   record later?

23        THE COURT:  That probably makes the most sense.

24   I mean, it's just a practical issue.  I mean,

25   Mr. McHugh knows -- I doubt he's going to go into

1   showing her any area that he wanted redacted.  So it's

2   incumbent on him to make sure of that, but it's also in

3   his interest to make sure of that.

4           And, Mr. Martin, you just need to be aware when

5   you redirect, if you're going to redirect on any of

6   that, that anything I've ordered redacted isn't shown

7   to her or on the ELMO.

8           And then the exact copy that conforms to the

9   dupes being out and the proper redaction and whatnot,

10  just make sure that before it goes to the jury Vickie

11  has a correct copy that you both sign off on.  I think

12  that's the easy way to do it.

13          And what we'll do, Mr. McHugh, is when you're

14  going to go to the medical records, when you're

15  crossing Ms. Franchina, is, you know, you can just

16  represent -- at that point just say that the parties

17  have, you know, produced a copy of the medical records,

18  and I don't think it really matters whose exhibit it

19  is.  So either one of you can move them.

20          If you want to say subject to 403, feel free.

21  If not, I consider that fully preserved, Mr. McHugh.  I

22  don't think you have to worry about that.  So whatever

23  just makes it easier, but it will be a whole lot easier

24  to do this if these are admitted records because then

25  you can use them as need be.

1          MR. McHUGH:  All right.  Thank you, your Honor.

2          THE COURT:  Good.  What else do we have that we

3    can resolve?  Mr. Martin?

4          MR. MARTIN:  Nothing from us.  Thank you.  Oh,

5    yes, one thing.  Mr. McHugh and I have agreed that if

6    Ms. Franchina's cross-examination is not completed at

7    12:30, with the Court's permission, we would call two

8    witnesses out of order, those are the two treating

9    doctors, and then we would resume Ms. Franchina's

10   cross-examination.

11         THE COURT:  Any objection to that, Mr. McHugh?

12         MR. McHUGH:  No, your Honor.

13         THE COURT:  Okay.  I'll explain to the jury.

14   Have we done that yet in this trial?

15         MR. MARTIN:  No.

16         THE COURT:  I'll explain to the jury what that

17   is and how we do it and whatnot.  And the same -- John,

18   I don't know what your redirect will look like

19   lengthwise and you may not know it until Kevin

20   finishes, but the same thing.  If we need to put off

21   part of the redirect, we can do that as well to allow

22   the treatings.

23         I always try to accommodate witnesses,

24   particularly practicing doctors that have a life

25   outside the courtroom.

1      MR. McHUGH:  I had asked when we had our final

2  pretrial conference about doing a brief voir dire when

3  the family members testify.  I just wanted to remind

4  your Honor.

5      It's a foundational objection.  I don't know if

6  they have the right foundation to be able to testify as

7  to their observations.  They certainly can't give their

8  opinions, but -- it's been a long time since these

9  events and since the time.

10      THE COURT:  Mr. Duggan?

11      MR. DUGGAN:  Good morning, your Honor.

12      THE COURT:  Good morning.  How are you?

13      MR. DUGGAN:  I'm only speaking because I'll be

14  doing the direct examinations of the family members.

15  We aren't intending to offer any expert opinion

16  whatsoever.  I'm well aware that they are only lay

17  witnesses.  They're only here to testify to their lay

18  observations of the changes they have observed in Lori

19  Franchina.

20      We're going to call her mother, her sister and

21  potentially her father, all of whom spoke with her on a

22  daily basis throughout the entirety of all of the

23  events we've been discussing.

24      THE COURT:  Mr. McHugh, what is it that you want

25  to inquire about?

1       MR. McHUGH:  I think we need to hear that under

2   oath, they're all out of state, what contact they did

3   have with her during this period of time.  I think

4   that's important when you have such a long period of

5   time that lapsed from the events and the treatment with

6   family members.  It's not like she was living with

7   these people every day when this was going on.

8       THE COURT:  Isn't that cross-examination?  If

9   they can testify either through their knowledge of her

10  in terms of even conversations they had with her over

11  the phone or personally observed, in what they

12  personally observed in the change to her, even if a

13  long period of time has lapsed and their memory may

14  have faded or whatnot, why isn't that just

15  cross-examination material?

16      MR. McHUGH:  Well, because if they lack the

17  foundation to say even that, it shouldn't come in.  If

18  they talked to her once every eight months on the

19  phone, I certainly don't think there's a proper

20  foundation for them to say what their observations were

21  of her during that period of time or before that period

22  of time.  That's all I'm saying.

23      THE COURT:  Mr. Duggan, why don't you proffer

24  just briefly what the foundation would be of each in

25  essence, roughly.  Are there ones that have not had

1  contact with her for that kind of period?

2          MR. DUGGAN:  No.  I can proffer to the Court

3  that I expect all three of these family members, if

4  they testify, would testify to the effect that they

5  speak with their either daughter or sister, Lori

6  Franchina, daily on the telephone and have for years

7  going all the way back to even as she was entering the

8  fire academy and even before that; that they literally

9  speak as frequently as family members might speak who

10 are out of state.

11         THE COURT:  I think I'll let you do your work on

12 cross-examination, Mr. McHugh.  What else do we have?

13         MR. MARTIN:  That's it.  Thank you.

14         MR. McHUGH:  Nothing, your Honor.

15         THE COURT:  Great.  We'll see you in about 20

16 minutes.

17         (Recess.)

18         (The jury is present for the following.)

19         THE COURT:  Good morning, ladies and gentlemen.

20 Welcome back.  I hope you all enjoyed your long

21 weekend.

22         Can you all assure me that you didn't discuss

23 this case with anyone, that you didn't do any

24 independent research, that you didn't mention anything

25 about your jury service on social media and you didn't

1    see or hear any news reports about the case?  Great.

2    All jurors have nodded their heads.

3          Ms. Franchina, why don't you come forward.

4          You may recall, ladies and gentlemen, that the

5    Plaintiff's direct examination was concluded on Friday

6    and the Defendant began their cross-examination.  So

7    we're going to pick up on that where we left off.

8          Ms. Franchina, you understand you're still under

9    oath?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  Great.  Mr. McHugh.

12          MR. McHUGH:  Thank you, your Honor.

13          **LORI FRANCHINA, PLAINTIFF'S WITNESS, RESUMES**

14                  **CONTINUED CROSS-EXAMINATION**

15   **BY MR. McHUGH**:

16   **Q.**   Good morning, Ms. Franchina.

17   **A.**   Good morning.

18   **Q.**   Ms. Franchina, on Thursday you testified as to

19   numerous rescue runs that you had made over the course

20   of your career.  Remember?

21   **A.**   I have been on numerous rescue runs, yes.

22   **Q.**   And you testified as to many of them on Thursday;

23   right?

24   **A.**   Some of them.

25   **Q.**   And you testified that there were many

1   firefighters on those various runs who had violated the

2   rules and regulations of the department; correct?

3   **A.**   We discussed a limited amount of runs, yes, and on

4   some of those I did discuss that.

5   **Q.**   And Lieutenant Kiers was one of them; right?

6   **A.**   Lieutenant Kiers, yes.

7   **Q.**   Lieutenant Jackson was another?

8   **A.**   Lieutenant Robert Jackson, yes.

9   **Q.**   Lancellotti was another?

10   **A.**   Yes.

11   **Q.**   McGarty was another?

12   **A.**   Correct.

13   **Q.**   And Tang was another?

14   **A.**   Correct.

15   **Q.**   Correct?  So I just gave you five that you said

16   had violated rules and regulations of the department on

17   various runs; right?

18   **A.**   Correct.

19   **Q.**   But you on those runs had not violated any rules

20   and regulations of the department; correct?

21   **A.**   Not that you have noted.

22   **Q.**   Well, did you make any violation of the rules and

23   regulations on those runs yourself?

24   **A.**   No.

25   **Q.**   And some of those individuals that we just

1    mentioned that you said violated rules and regulations,

2    they also made mistakes; correct?

3    **A.**   I'm not sure what you mean by mistakes, sir.

4    **Q.**   Well, some of them were outright violations of

5    rules and regulations, you said; right?

6    **A.**   Can you be more specific?

7    **Q.**   Tang snapped the gloves in your face; right?

8    **A.**   Yes, he did, sir.

9    **Q.**   That's an outright violation of a rule and

10   regulation; correct?

11   **A.**   I wouldn't stipulate -- I'm not sure what you're

12   getting at with the rules and regulations, sir.

13   **Q.**   Well, I'm asking you if Firefighter Tang snapped a

14   blood-filled glove right in your face in the back of

15   the rescue, wouldn't that be a violation of the rules

16   and regulations?

17   **A.**   Sir, it's a felony in the medical field.

18   **Q.**   So it's a crime?

19   **A.**   If intentional, it's a felony.

20   **Q.**   So Firefighter Tang committed a crime, then?

21   **A.**   That is correct.

22   **Q.**   Which you didn't report to the State Police like

23   you reported McGarty to the State Police; right?

24   **A.**   Sir, I reported it to my direct chain of command

25   in a Form 17.

1    **Q.**   And you did not report it to the State Police like

2    you reported McGarty; correct?

3    **A.**   That is correct.

4    **Q.**   You didn't report it to the Providence Police;

5    right?

6    **A.**   That is correct.

7    **Q.**   You didn't trust the Providence Police; right?

8    **A.**   Sir, I think -- I don't agree with that statement,

9    sir.

10   **Q.**   Well, you could have -- the incident with

11   McGarty happened right over here a few blocks away on

12   90 Printery Street; right?

13   **A.**   It did occur there at that location, sir.

14   **Q.**   And you could have from there driven right to

15   police headquarters and made out a complaint; right?

16   **A.**   No, sir.  I was under extreme stress and drove

17   right to 100 Lafayette Street to my therapist.

18   **Q.**   Well, eventually you went to the State Police?

19   **A.**   Three days later.

20   **Q.**   Was that at the Scituate barracks?

21   **A.**   Correct, sir.

22   **Q.**   So three days later you drove to the Scituate

23   barracks to make out a complaint?

24   **A.**   Correct.  I tried to reach my union for three days

25   with no return calls.

1    Q.   Well, the union can't bring criminal charges, can

2    they?

3    A.   I'm not sure, sir.

4    Q.   You think that a union can actually file criminal

5    charges on your behalf?

6    A.   I'm not aware of that, sir.

7    Q.   And so you had to file them yourself; right?

8    A.   I did go and make a Temporary Restraining Order

9    request, correct.

10   Q.   And you went to the State Police instead of the

11   Providence Police because you did not trust the

12   Providence Police?

13   A.   Sir, I don't agree with that statement.

14   Q.   Well, why did you go to the State Police instead

15   of the Providence Police?

16   A.   Because I was directed to.

17   Q.   You were directed to?

18   A.   Yes.

19   Q.   And who directed you to do that?

20   A.   A friend of mine that is a detective in the East

21   Providence Police Department.

22   Q.   So you talked to the East Providence Police about

23   this?

24   A.   No, sir, I did not.

25   Q.   You talked to a detective in the East Providence

1    Police Department about this?

2    **A.**   That is a friend of mine, correct.

3    **Q.**   You talked to the State Police about this?

4    **A.**   That is correct.

5    **Q.**   But you never talked to the Providence Police

6    about this?

7    **A.**   You are correct, sir.

8    **Q.**   Now, you told us that you thought that somebody

9    was putting something in your food at the station;

10   correct?

11   **A.**   That is correct.

12   **Q.**   And so you said that you -- when you ate your

13   food, at least a few times you got diarrhea; correct?

14   **A.**   Correct.

15   **Q.**   And you -- that's what made you assume that

16   somebody was adding something to your food; right?

17   **A.**   It has been made aware that we will -- at times

18   I've heard that food and equipment are tampered with.

19   I know that for a fact, sir.

20   **Q.**   Somebody else's food other than yours?

21   **A.**   Yes, sir.

22   **Q.**   So you're not the only one who had food tampered

23   with, then?

24   **A.**   I'm not sure, sir.  It's a way to treat people,

25   yes.

1   **Q.**   Well, I'm confused now.  You told us that at the
2   North Main Street Station they tampered with your food?
3   **A.**   That is correct.
4   **Q.**   Did they tamper with anyone else's food there?
5   **A.**   Not at that time, sir.  I traded plates, and my
6   partner ended up getting diarrhea.
7   **Q.**   Right.  You used your partner as a guinea pig,
8   didn't you?
9   **A.**   I don't understand that statement, sir, if you
10  could rephrase it.
11  **Q.**   You don't know what that means?
12  **A.**   No, I do not.
13  **Q.**   You conducted an experiment to see if your food
14  had been tampered with, didn't you?
15  **A.**   Yes, sir.
16  **Q.**   And that experiment was to switch your food with
17  your partner's; right?
18  **A.**   To see if he would get diarrhea.
19  **Q.**   Exactly.  And he did; right?
20  **A.**   He did.  Yes, sir.
21  **Q.**   And he had to leave work?
22  **A.**   That is correct, sir.
23  **Q.**   And so that's when you knew that your food had
24  been tampered with?
25  **A.**   Yes.

1    **Q.**   What was your partner's name?

2    **A.**   Al Pena.

3    **Q.**   Al Pena?

4    **A.**   Pena.

5    **Q.**   Al Pena?

6    **A.**   Alfred Pena.

7    **Q.**   Okay.  So when you switched your food with Al

8    Pena's, you knew that you may be putting Al Pena at

9    risk, didn't you?

10    **A.**   How would I know that, sir?

11    **Q.**   Well, you switched your food because you thought

12    your food had been tampered with and it made you sick;

13    right?

14    **A.**   On that day I did in question, sir.

15    **Q.**   And so you knew when you gave your food to Pena

16    that you may be putting him at risk; right?

17    **A.**   I was not aware of that, sir.

18    **Q.**   Well, look.  You're telling us your food was

19    tempered with and it made you sick; right?

20    **A.**   Sir, I was not aware of that.

21    **Q.**   Well, you were aware that your food had been

22    tampered with after you made Pena sick, weren't you?

23    **A.**   I'm not aware of tampering or if it made somebody

24    sick.  I knew he had to go home because of diarrhea.

25    **Q.**   And that was the same day you switched your food

1    with him; correct?

2    **A.**    Correct.

3    **Q.**    Well, do you think he got diarrhea from something

4    other than the food that you switched with him?

5    **A.**    I'm not aware of that, sir.

6    **Q.**    And did you know if Al Pena had any food

7    allergies?

8    **A.**    I'm not aware of that, sir.

9    **Q.**    So for all you know, he could have had a food

10   allergy; correct?

11   **A.**    He may have, sir.

12   **Q.**    And if you gave him food that had been tampered

13   with, he could have had a serious illness; right?

14   **A.**    Sir, the food is prepared by firefighters, and

15   we're all aware of our food allergies prior to and

16   we're all doing cooking together, sir.  We're a

17   community, a family-based environment.

18   **Q.**    Well, family members don't conduct experiments on

19   their other family members to see if they get sick on

20   food, do they?

21   **A.**    I don't know how to answer that question, sir.

22   **Q.**    Well, that's what you did, isn't it?

23   **A.**    I did not use my plate that was labeled rescue

24   officer.  I took the rescue tech plate.  That's

25   correct, sir.

1    **Q.**   Right.  And you gave Al Pena the rescue lieutenant

2    plate?

3    **A.**   I didn't give him anything, sir.  He went and got

4    that plate.  I didn't give him anything.

5    **Q.**   Well, you're the --

6    **A.**   The plates are set there, sir.

7    **Q.**   You're the one who put his name on it, aren't you?

8    **A.**   Absolutely not, sir.

9    **Q.**   You're the one who switched the rescue lieutenant

10   food with the rescue tech food; right?

11   **A.**   No, I did not, sir.

12   **Q.**   Well, how do you know that Pena ate your food,

13   then?

14   **A.**   Sir, I grabbed a plate off the top of the oven

15   where there was a shelf and it's set on top with two

16   pieces of foil, one on each plate.

17   **Q.**   Didn't you -- you did tell us on Friday that you

18   intentionally switched your plate with Pena's to see if

19   he'd get sick?

20   **A.**   Sir, I did not switch the plate.  I simply grabbed

21   the one labeled rescue technician.

22   **Q.**   So now you're trying to tell us you didn't switch

23   the plate?

24   **A.**   I think I misspoke earlier based on the

25   communication between you and I that I grabbed the

1    plate labeled rescue technician.

2    **Q.**   Like you misspoke in your interrogatories, you

3    told us on Thursday, when you said all these things

4    happened 2005 before the Ferro incident and not after?

5    **A.**   Sir, there's been a long time between here and

6    there, and I do suffer from severe post-traumatic

7    stress.  My memory, I struggle at times, sir, but I'll

8    correct any statements that I make in the future.

9    **Q.**   Well, I'm still confused as to this business of

10   your giving Pena the food that you were supposed to

11   get.

12          THE WITNESS:  Is there a question there?  I'm

13   just not sure.

14          THE COURT:  There doesn't appear so.

15          MR. McHUGH:  The rules and regulations, your

16   Honor, we have agreed as a joint exhibit.  I think it's

17   Exhibit 5, Joint Exhibit 5.

18          MR. MARTIN:  Yes.

19          THE COURT:  Are you moving its admission?

20          MR. McHUGH:  Yes, your Honor.

21          THE COURT:  Vickie, what are we doing

22   numbering-wise?  Are we going to give that a defense

23   number if it hasn't otherwise come in or do you want to

24   stick with the -- whatever you say.

25          THE CLERK:  They only have two in anyway.  So I

1    don't know what number.  It's all over.  I have P and

2    B, that's it, from you.

3            MR. McHUGH:  This was Joint Exhibit 5, wasn't

4    it?

5            MR. MARTIN:  I believe it's listed as 5.  That

6    should be consistent with what we've done so far.

7            THE COURT:  What are we referring?

8            MR. McHUGH:  The rules and regulations of the

9    fire department.

10           THE COURT:  Vickie, are we going to call this

11   Plaintiff's 5?  Are we going to call it Defendant's 5?

12   Are we going to give it a brand new number?

13           THE CLERK:  We can keep it as 5.  Stipulated

14   exhibits are weird.

15           THE COURT:  I won't take anymore of the jury's

16   or parties' time.  We'll just call this Exhibit 5.

17           Go ahead, Mr. McHugh.  It's admitted as a full

18   exhibit and can be used as appropriate, Mr. McHugh.

19           (Joint Exhibit 5 admitted in full.)

20           MR. McHUGH:  What I'd like to do, your Honor, is

21   to put on the ELMO page 2, the preamble of the rules

22   and regulations of Exhibit 5.

23           THE COURT:  Sure.

24           MR. McHUGH:  And for the jury to see.

25   Q.   Now, Ms. Franchina, you do recall the rules and

1   regulations of the Providence Fire Department?

2   **A.**   Can I make a correction on my name?  It's

3   Franchina, not "er."

4   **Q.**   You do remember the rules and regulations of the

5   Providence Fire Department; correct?

6   **A.**   Correct.

7   **Q.**   I want you to look at the preamble, and I want you

8   to look at the objective.  Is that in front of you on

9   the screen?

10  **A.**   Yes.

11  **Q.**   All right.  And the objective says, "The objective

12  of the Providence Fire Department shall be the

13  protection of human life and property from fire or

14  other disaster."  That's part of what it says there;

15  correct?

16  **A.**   Yes.

17  **Q.**   "The prevention, suppression and investigation of

18  fires, the provision of emergency medical services and

19  the removal of all persons from danger, whatever the

20  cause."

21         When you had Pena eat your food, you certainly

22  were not engaged in the objective of the fire

23  department of protecting human life, were you?

24  **A.**   How would I know I was harming someone?

25  **Q.**   Is that your answer, how would you know you were

1    harming someone?

2    **A.**   I did not prepare the food, sir.

3    **Q.**   You thought the food was poisoned, essentially.

4    **A.**   I was unaware of any of this, sir.

5    **Q.**   You were unaware that someone was putting

6    something in your food?

7    **A.**   I had a true belief that something was happening

8    to my food.  You're absolutely right.

9    **Q.**   Right.  And so to test out whether it was, you had

10   Pena eat what would have been your food?

11   **A.**   Again, I would not have known who prepared my food

12   and how it was prepared.  I was not there at the

13   station when that food was prepared.

14   **Q.**   Well, you were there when Pena ate it, though;

15   right?

16   **A.**   No.  I was in my office, sir.

17   **Q.**   Well, you were in the station?

18   **A.**   You are correct.

19   **Q.**   And you knew that Pena went home sick after he ate

20   it?

21   **A.**   He had to report to me to go off duty, yes.

22   **Q.**   And he reported to go off duty because he was sick

23   after he ate the food; correct?

24   **A.**   That could be an assumption, sir.

25   **Q.**   Well, it wasn't an assumption.  Isn't that what

1    you told us on Thursday?

2    **A.**    But I didn't actually see him eat the food.

3    **Q.**    Okay.  Look at the last part of that, "the removal

4    of all persons from danger."  If you knew the food or

5    even suspected that your food was being tampered with

6    and you switched it and gave it to Pena, you would be

7    putting him in danger, wouldn't you?

8    **A.**    Sir, you use the word "switched."  I never

9    switched food.  I grabbed the other food.  There was

10   two plates.  I grabbed one of the plates, sir.

11   **Q.**    And one of the plates said rescue lieutenant;

12   right?

13   **A.**    Yes.

14   **Q.**    And one said rescue tech; right?

15   **A.**    I believe so.

16   **Q.**    Well, you believe so.  You intentionally took the

17   one that said rescue tech, didn't you?

18   **A.**    I did.

19   **Q.**    Because you didn't think that one had been

20   tampered with?

21   **A.**    I was unaware of that, sir.

22   **Q.**    Now, take a look at Chapter 1, page 2, of the

23   rules and regulations.  That's Chapter 1, page 2.

24   **A.**    May I see the entire copy?

25   **Q.**    It's right there on the ELMO.

1   **A.**   Does it start with 1?

2           THE COURT:  Hold on.  Could you give her a

3   complete copy of the exhibit.  I think that's the

4   practice that we have followed.

5           MR. McHUGH:  You want her to have a paper copy?

6           THE COURT:  Yes, the full thing, just as we did

7   with the other witnesses.

8           MR. McHUGH:  May I approach the witness?

9           THE COURT:  I think --

10          THE WITNESS:  Oh, thank you.

11          THE COURT:  Thank you.

12  **A.**   Preamble, page 1?

13  **Q.**   No, Chapter 1, page 2.

14  **A.**   Thank you.

15  **Q.**   Look at number 6(a).  Well, let's look at

16  number 6, "each officer of the department."  You were

17  an officer; correct?

18  **A.**   What year, sir?

19  **Q.**   2005.

20  **A.**   I was an acting officer.

21  **Q.**   Right.  You weren't, as you call it, a firefighter

22  at that point; right?

23  **A.**   No.  I was at the rank of acting lieutenant.

24  **Q.**   So look at number 6.  "Each officer of the

25  department or any member thereof acting as an officer."

1    That would have included you; right?

2    **A.**    Correct.

3    **Q.**    "Shall at all times exercise the prerogatives of

4    command in a manner consistent with high standards of

5    courtesy, decency and restraint and with due regard for

6    the rights and sensibilities of subordinates and shall

7    at all times issue orders or directions in accordance

8    with the requirements herein set forth."

9         Don't you think when you had the rescue tech,

10   Pena, eating the food that was intended for you that

11   you were not treating him with courtesy?

12   **A.**    Sir, if somebody was tampering with my food at the

13   department, I think that responsibility solely relies

14   on the individual tampering with the food, putting

15   something in my food; therefore, they're in complete

16   violation of this 6, Chapter 1, number 6.  How would it

17   be my responsibility if I never prepared the food, sir?

18   **Q.**    And don't you think, Ms. Franchina, that when you

19   had Firefighter Pena, Rescue Tech Pena, eating that

20   food, it was not with the due regard for the rights and

21   responsibilities of your subordinate?

22   **A.**    Sir, have you gone to 6(a) with that comment?

23   **Q.**    No.

24   **A.**    Absolutely not, sir.

25   **Q.**    And he was your subordinate; right?

1    **A.**   He was my subordinate, sir.

2    **Q.**   And you'd been complaining here on Thursday about

3    the way your subordinates treated you; right?

4    **A.**   Correct, sir.

5    **Q.**   Well, you didn't treat your subordinate very well,

6    Mr. Pena, when you gave him your food, did you?

7    **A.**   I'm going to revert back to my other statement,

8    sir.  I did not prepare the food; and if it was

9    contaminated, then the individuals or individual

10   preparing that food should be in question right now,

11   sir.

12   **Q.**   Do you know what it means to self-report?

13   **A.**   I do know what the word means, "self" and

14   "report," yes.

15   **Q.**   And a firefighter or officer, if they commit an

16   infraction of the rules and regulations, they can

17   self-report that they violated those rules and

18   regulations, can't they?

19   **A.**   That is true.

20   **Q.**   And you never reported that you violated this rule

21   and regulation when you gave Pena food that you thought

22   might be poisoned, did you?

23   **A.**   Can you cite the rule and regulation that was in

24   violation, sir?

25   **Q.**   I just did.  I just asked you that.

1    **A.**   Sir, I did not prepare the food.  I was unaware of

2    anything that could have been put in the food, sir.

3    **Q.**   6(a), "Be diligent to provide for the comfort,

4    convenience and well-being of subordinates before

5    caring for one's own needs."

6         You put yourself above your subordinate, Al

7    Pena, when it came to that meal, didn't you?

8    **A.**   Absolutely not, sir.  I brought him back to the

9    station.  We reported back to the firehouse.  He then

10   got his food, and I thought I was diligent in

11   delivering him to the firehouse to be able to eat his

12   food, sir.

13   **Q.**   The food that was intended for you which you

14   thought had been tampered with; right?

15   **A.**   Sir, I was unaware of any tampering.  I did not

16   prepare the food.

17   **Q.**   You were unaware of any tampering until you gave

18   it to Pena; right?

19   **A.**   Sir, again, I'm unaware of the -- the food was

20   never tested; therefore, the individual had to go home

21   for his own illness.

22   **Q.**   Well, that was your test, wasn't it?  You tested

23   it out on your subordinate?

24   **A.**   I did my job that night by providing him with an

25   injured-on-duty report and notifying the chief officer

1   that he was sick at that time, sir.

2   **Q.**   But you didn't tell the chief officer why he was

3   sick, did you?

4   **A.**   Sir, how would I know why he's sick?

5   **Q.**   Well, isn't that what convinced you that your food

6   had been tampered with?  You told us on Thursday,

7   Ms. Franchina, that once you saw Pena get sick, then

8   you knew they're tampering with my food because I gave

9   him the food that was supposed to have been mine.  Do

10  you remember that testimony?

11  **A.**   I do, sir.

12  **Q.**   Now, take a look at Chapter 16, page 1.  And you

13  have the paper copy in front of you; correct?

14  **A.**   Yes.

15  **Q.**   Look at number 6.  "In matters of general conduct

16  not within the scope of these rules and regulations,

17  members shall be governed by the customary rules of

18  good behavior observed by law-abiding and

19  self-respecting citizens.

20       "In all cases where members conduct themselves

21  in a manner which may bring reproach or reflect

22  discredit upon the department, charges shall be

23  preferred."

24       You didn't exhibit customary good behavior when

25  you got your subordinate Pena sick on your food, did

1    you?

2    **A.**   Sir, shame on the individual or individuals who

3    would ever violate Chapter 6 and tamper with somebody's

4    food.

5    **Q.**   Well, do you think there should be shame on the

6    individual who switched the food that had been tampered

7    with and give it to one of their subordinates?

8    **A.**   Are you saying that the food was tampered with,

9    sir?

10   **Q.**   There's a question pending, Ms. Franchina.

11   **A.**   I'm not aware of the question.

12         MR. McHUGH:  Can I have the question read back,

13   please, your Honor.

14         THE COURT:  Why don't you pose another one,

15   Mr. McHugh.

16   **Q.**   All right.  Let's look at number 7, "members of

17   the department shall."  I want to draw your attention

18   to (b), "be courteous and respectful at all times."  Do

19   you think you were respectful to your subordinate,

20   Rescue Tech Pena, when you gave him that food you

21   thought had been tampered with?

22   **A.**   Sir, I never gave him any food.  I chose a plate,

23   and I took my food.

24   **Q.**   You chose the plate that was intended for him;

25   right?

1    **A.**   Sir, I took a plate that had the rescue

2    technician's label on it, yes.

3    **Q.**   And you're not a rescue tech; right?

4    **A.**   I was an acting lieutenant that night.

5    **Q.**   Rescue lieutenant?

6    **A.**   I was an acting officer, correct.

7    **Q.**   Now let's take a look down below at 7(f), "Use

8    every precaution to avoid damage or injury when engaged

9    in performing work in or about company quarters."

10        You did the opposite and caused damage to your

11   subordinate, Rescue Tech Pena, when you gave him the

12   food that had been tampered with; right?

13   **A.**   Again, are you suggesting that the food was

14   tampered with?

15   **Q.**   I'm asking you if you put him at risk when you

16   gave him food you believed to have been tampered with.

17   **A.**   Again, I did not know that the food was tampered

18   with, sir.

19   **Q.**   That's right.  And you wanted to find out; right?

20   **A.**   Sir, I grabbed the rescue technician's plate and I

21   ate that, yes.

22   **Q.**   Because you suspected your food had been tampered

23   with previously; right?

24   **A.**   I was unaware of that.  I did not prepare the

25   food, sir.

1    **Q.**   Well, you suspected it, though; right?

2    **A.**   There was some belief there, yes.

3    **Q.**   Because you had gotten diarrhea from it; right?

4    **A.**   Yes, on the same group.

5    **Q.**   So you wanted to find that out, whether or not

6    your food had been tampered with; right?

7    **A.**   I ate the rescue tech plate labeled rescue

8    technician.

9    **Q.**   And you didn't get sick?

10   **A.**   I'm not aware of that evening.

11   **Q.**   Well, you didn't get sick when you ate Pena's

12   food, did you?

13   **A.**   I don't believe so.

14   **Q.**   But he got sick when he ate yours; right?

15   **A.**   He got sick eating the other plate, that's

16   correct.

17   **Q.**   Now let's look at (h), "Promptly notify the

18   officer in command of their unit of any matter coming

19   to their attention which may affect the interest or the

20   welfare of the department."

21        So you told us you thought someone was tampering

22   with your food; right?

23   **A.**   Yes.

24   **Q.**   It made you sick.  You got diarrhea.  Right?

25   **A.**   Correct.

1    **Q.**    So you took the rescue tech's food that night to

2    see if that food would not make you sick; right?

3    **A.**    I did grab the rescue tech plate, correct.

4    **Q.**    And so the rescue tech got the rescue lieutenant's

5    food, which was yours; right?

6    **A.**    Yes.

7    **Q.**    And then after he ate it, he got sick and had to

8    go home with diarrhea; right?

9    **A.**    I think you're making it very clear that maybe

10   there was something wrong with that plate.

11   **Q.**    Well, I'm asking you.

12   **A.**    He did have to go home that evening.

13   **Q.**    So if you look at the rule and regulation 7(h)

14   about notifying the officer in command about anything

15   that could interfere with the welfare of the

16   department, you didn't do that as to Rescue Tech Pena;

17   correct?

18   **A.**    Prior to that evening, I had spoken several times

19   with the captain, David Raymond, and also with Chief

20   Jeffrey Crawford in regards to this issue; and that

21   evening, upon his sickness, I immediately notified my

22   officer in command, which was Battalion 3.  I did, sir.

23   **Q.**    You notified your officer that Rescue Tech Pena

24   had gotten sick and had to leave.  That's what you

25   notified them of?

1  **A.**  Correct.

2  **Q.**  And then after that, once he got sick, you stopped

3  eating your food; correct?

4  **A.**  I still paid for dinners; and at times, depending

5  on the groups, I would eat the food, correct.

6  **Q.**  Now, I wanted to ask you some questions about the

7  order that was issued from the department, the e-mail.

8  **A.**  Am I done with the rules?

9  **Q.**  Yes.

10  **A.**  Okay.

11      MR. McHUGH:  Firefighter McGarty.  So I would

12  ask the clerk if you could give to the witness

13  Exhibit 6, which has been admitted full.

14      THE WITNESS:  Thank you.

15  **Q.**  Do you have the paper copy in front of you,

16  Ms. Franchina?

17  **A.**  Yes.

18  **Q.**  And you told us earlier in your direct examination

19  that as far as you were concerned, McGarty never

20  received any discipline; correct?

21  **A.**  I was never made aware of it until my departure

22  from the department in December of '13.

23  **Q.**  And this order from Chief Dillon came out

24  January 5th, 2010; correct?

25  **A.**  Yes.

1   **Q.**   And that was the same day you got your restraining

2   order; right?

3   **A.**   I received a lifetime restraining order against

4   Sean P. McGarty, yes.

5   **Q.**   On January 5th, 2010; right?

6   **A.**   Correct.

7   **Q.**   And so if you look at this, Chief Dillon sent this

8   e-mail out on January 5th, 2010, at 3:14 p.m.; correct?

9   **A.**   I do read that.

10   **Q.**   So it was the same day you got the restraining

11   order, the department issued this order; correct?

12   **A.**   It is an order, yes.

13   **Q.**   They didn't delay at all; right?

14   **A.**   Correct.

15   **Q.**   And are you the one who informed them that you had

16   gotten a restraining order?

17   **A.**   Yes.   I turned in my restraining order with my

18   city where I live in West Warwick, with the Providence

19   Police Department and with the State Police and also

20   with where I'm employed at the Providence Fire

21   Department.

22   **Q.**   All right.   And if you look at the second sentence

23   of Exhibit 6, it says, "The order is not in force

24   during emergency response but is in force in the

25   station.   In other words, they can respond to

1    emergencies together but can have no other contact."

2         So there was no restraining order if there had

3    been a fire or an incident preventing Firefighter

4    McGarty from being on the same scene as you; correct?

5    **A.**   That's my understanding.

6    **Q.**   Now, it also says that this presents a problem for

7    D1.  That's District 1; correct?

8    **A.**   Negative.

9    **Q.**   What is D1?

10   **A.**   Division 1.

11   **Q.**   I'm sorry, you're right, Division 1, in scheduling

12   call-backs.  And the next part of it says, "The

13   following measures are to be in place to ensure no

14   violation of the court order."  In a call-back, and you

15   testified yourself that you took many call-backs;

16   correct?

17   **A.**   I have, yes.

18   **Q.**   And I think you said that your last year on the

19   job, 30 to 40 thousand dollars' worth of your salary or

20   the amount of money you earned came from call-backs;

21   right?

22   **A.**   I'm not sure of the amount, but I did take

23   call-backs.

24   **Q.**   I think you were estimating that in your direct

25   testimony; but in any event, call-backs are at

1    time-and-a-half; right?

2    **A.**   Yes, they are.

3    **Q.**   So number one on this says, "Firefighter McGarty

4    is not to be given a call-back."  "CB" is call-back;

5    right?

6    **A.**   Correct.

7    **Q.**   "In a station that has a rescue assigned so there

8    can be no possibility that he will contact Lieutenant

9    Franchina in the station (if she is subbing or at

10   change of shift)."  And so there were six stations that

11   had rescues, correct --

12   **A.**   Correct.

13   **Q.**   -- at the time?  So that meant that McGarty

14   couldn't work any overtime in six stations?

15   **A.**   Correct.

16   **Q.**   So that limited the amount of money McGarty could

17   make; correct?

18   **A.**   Negative.

19   **Q.**   Well, if McGarty could not do a call-back in six

20   out of the fire stations, then he was shut out of those

21   six stations from working a call-back at

22   time-and-a-half; right?

23   **A.**   Absolutely not.

24   **Q.**   So you think that under this order of the fire

25   department, McGarty could have taken a call-back in any

1    one of the stations that had a rescue?

2    **A.**    No, it says he may not.  Sir, we have 15 stations.

3    We have ample engines and ladders, and there's nine

4    other stations that he could have functioned -- yeah,

5    nine other stations he could have functioned out of,

6    and manpower is consistent with his ability to work

7    both engine and ladder.  There's 116 individuals on a

8    shift at one time.  You're only regarding six stations,

9    sir.

10   **Q.**    Well, the fact of the matter is, the chief would

11   not allow him to work in six fire stations; correct?

12   **A.**    Because I was awarded a lifetime restraining order

13   for an assault that took place while he was on duty and

14   under command of a direct officer, sir.

15   **Q.**    And the chief's answer to that was, Hey, McGarty,

16   guess what?  You're not going to work in any of the six

17   stations where there's a rescue whether Franchina's on

18   duty or not.  You're out.  Right?

19   **A.**    For his better judgment, that is correct, sir,

20   because it would have been in violation of a judge's

21   order.

22   **Q.**    Well, it wouldn't have been a violation of the

23   judge's order if you weren't working at that station,

24   would it?

25   **A.**    Could you repeat the question.

1    **Q.**   If you were working on Branch Avenue and they sent
2    McGarty to North Main Street, that wouldn't have been a
3    violation of a judge's order because you weren't
4    stationed at North Main Street; correct?
5    **A.**   It would be, sir, according to this.  He is not to
6    work at a station with a rescue assigned.  It would
7    have been a violation, sir.
8    **Q.**   Of the order, not of the restraining order; right?
9    **A.**   Correct.  You are right.
10   **Q.**   Chief Dillon went far beyond what the Court
11   required in his order, didn't he?
12   **A.**   I don't believe so.
13   **Q.**   Well, he went above and beyond what the
14   restraining order required him to do, didn't he?
15   **A.**   I don't believe so.  He violated in Chapter 1, I
16   believe you said, with the customary code of conduct;
17   and he was already in violations of multiple rules and
18   regulations, and none of them were ever enforced.
19   **Q.**   Well, you were in violation we just saw of
20   numerous rules and regulations when you gave that food
21   to Pena, but that wasn't enforced; right?
22   **A.**   I do not agree with that statement, sir.
23   **Q.**   Because you wouldn't own up to it; right?
24   **A.**   I don't agree with that statement, sir.
25   **Q.**   You weren't going to self-report?

1   **A.**   Sir, I did not contaminate the food.  I never

2   prepared it.  How would I know I was putting somebody

3   at risk?  And, again, shame on the individual or

4   individuals who did that, sir.

5   **Q.**   So the order from the Court didn't mention any

6   particular fire station that McGarty couldn't work in,

7   did it?

8   **A.**   No, it did not.  It allowed us to work on scenes

9   together.

10  **Q.**   But the chief took it upon himself to say, Hey,

11  McGarty, you're not going to work in six fire stations?

12  **A.**   Correct, and he was in violation four times, in a

13  house with a rescue, when I was there.

14  **Q.**   We're going to get to that.

15  **A.**   Oh, okay.

16  **Q.**   And so he went beyond what the judge ordered;

17  right?

18  **A.**   I don't believe he did, sir.

19  **Q.**   You think that Judge Lanphear ordered McGarty not

20  to work in any station where there was a rescue?

21  **A.**   Sir, my understanding is he violated multiple

22  rules and regulations, and he was never disciplined.

23         MR. McHUGH:  Let's take a look at the

24  restraining order, which I think is already in

25  evidence.  We'll come back to this.  I think the

1   restraining order has already been admitted, your

2   Honor.

3        THE COURT:  Okay.

4        MR. McHUGH:  Is it 21?  I'm not sure.  I'll let

5   the clerk correct me if I'm wrong on that one.

6        THE COURT:  It is Exhibit 21.

7        MR. McHUGH:  Thank you, your Honor.  Could the

8   witness have Exhibit 21, please, then.

9        THE COURT:  Sure.

10       THE WITNESS:  Thank you.

11       MR. McHUGH:  May I put that on the ELMO, your

12  Honor?

13       THE COURT:  Sure.

14  **Q.**   Have you been able to read that, Ms. Franchina?

15  **A.**   Yes.

16  **Q.**   And you've seen that before; right?

17  **A.**   Absolutely.  I carry it with me daily.

18  **Q.**   So Number 2, Judge Lanphear said the Defendant's

19  restrained and enjoined from harassing, interfering

20  with, molesting or threatening the Plaintiff in any

21  manner, directly or indirectly; right?

22  **A.**   Correct.

23  **Q.**   And that doesn't put any restriction on doing that

24  anywhere in the State of Rhode Island; correct?

25  **A.**   Could you repeat the question.

1    **Q.**    That is unrestrictive, Number 2, as far as

2    interfering with you or harassing you, in other words,

3    as to place; correct?

4    **A.**    Correct.

5    **Q.**    So he couldn't -- McGarty was enjoined from

6    harassing you or interfering with you anywhere?

7    **A.**    Yes, because he violated, you know, laws against

8    harassment.

9    **Q.**    And -- well, wait a minute now.  The State Police

10   never charged McGarty with a crime; right?

11   **A.**    It's not a crime.  I obtained a lifetime

12   restraining order, sir.

13   **Q.**    So under this restraining order --

14   **A.**    Order of protection, I believe it's called.

15   **Q.**    Under this restraining order, if McGarty saw you

16   in Whole Foods over here on North Main Street, he

17   couldn't harass you; right?

18   **A.**    He could not come within 100 feet of me, correct.

19   **Q.**    And if McGarty saw you in the Branch Avenue

20   Station, under this order he couldn't harass you;

21   correct?

22   **A.**    He was ordered not to be in a station, sir.

23   That's a direct and indirect order written.

24   **Q.**    Well, let's separate the order of Chief Dillon

25   that goes beyond Exhibit D, I think, the order of

1   Chief Dillon, separate that from what's in front of the

2   jury now, Judge Lanphear's injunction.  Okay?  Two

3   different things; right?

4   **A.**   Yes, sir.

5   **Q.**   One was issued by Judge Lanphear, what's on the

6   screen now; right?

7   **A.**   Correct.

8   **Q.**   And then in response to that, the other one was

9   issued by Chief Dillon; correct?

10   **A.**   Correct.

11   **Q.**   So we're talking about two different things here.

12   And then it says, "This order is effective immediately

13   and shall remain in effect until further order of the

14   Court."  Is that why you think this is for lifetime,

15   because it says "until further order of the Court"?

16   **A.**   Yes.

17   **Q.**   So you don't think that McGarty could file a

18   motion and go back and try to have this lifted?

19   **A.**   If he has, it has not been brought to my

20   attention.

21   **Q.**   Well, that's not my question.  Listen to my

22   question now.  You don't think that McGarty could go

23   back to Superior Court and say, Hey, it's been five,

24   six years now.  Ms. Franchina doesn't work for the

25   Providence Fire Department anymore.  She's retired.

1      Can you lift this order?

2      **A.**   I think he could go back, but I believe the judge

3      would decide the same, sir.

4      **Q.**   Okay.  You think it would be the same decision?

5      **A.**   Absolutely.  He was violent, and it's an order of

6      protection, sir.

7      **Q.**   And then Number 4, Judge Lanphear wrote this in;

8      correct?

9      **A.**   Yes.

10     **Q.**   Mr. McGarty may contact Ms. Franchina and her

11     commanding officer while on the scene of a call.

12          THE COURT:  Mr. McHugh --

13     **A.**   I don't see that.

14          THE COURT:  Hold on.  I think you might have

15     misread it that.  It's, "Mr. McGarty may contact

16     Ms. Franchina and communicate."  Isn't that it?

17          THE WITNESS:  Correct.

18          THE COURT:  Probably means "with her."

19     **Q.**   "Communicate her while on the scene of a call in

20     the line of duty."  So one thing Judge Lanphear didn't

21     do was say, Hey, McGarty, you can't contact with her or

22     communicate with her if the two of you are on a scene;

23     correct?

24     **A.**   Could you repeat that.

25     **Q.**   One thing Judge Lanphear didn't do in his order

1    was say, Hey, McGarty, you can't contact her or

2    communicate with her if the two of you are on a scene;

3    right?

4    **A.**   We have a duty to act, sir.  We have an oath.  So

5    I'm believing he allowed us to do our duty.

6    **Q.**   Right.  You took an oath; right?

7    **A.**   Yes.

8    **Q.**   When you got on the fire department, you raised

9    your hand and took that oath; correct?

10   **A.**   You're absolutely right, sir.

11   **Q.**   And that's an important oath; right?

12   **A.**   Correct.

13   **Q.**   It's not to be taken lightly; right?

14   **A.**   Absolutely not, sir.

15   **Q.**   And we looked at that page 1 of the -- page 2 of

16   the rules and regulations about the objective of the

17   fire department; correct?

18   **A.**   Correct.

19   **Q.**   And then we talked about how you didn't follow the

20   objective when you switched the food with Pena;

21   correct?

22   **A.**   Sir, I never switched the food.  I grabbed my

23   plate, and I ate it.

24   **Q.**   Now, can you show me anywhere at all, and take

25   your time, read it however many times you want, can you

1   show me anywhere at all where Judge Lanphear told the

2   Providence Fire Department that McGarty can't work in

3   certain stations?

4           MR. MARTIN:  Objection, your Honor.  This

5   document speaks for itself.

6           THE COURT:  Overruled.

7   **A.**   He did not state that; but in his closing

8   arguments, he argued the unprofessionalism and the

9   untruth of the individuals, and it's in a transcript

10  very clear, sir, and also how he described to a chief

11  that was sitting in the gallery that several rules and

12  regulations have been --

13          MR. McHUGH:  I'm going to move to strike.

14  **A.**   -- broken.

15          THE COURT:  Hold on for one second, ma'am.

16          What are you moving to strike?

17          MR. McHUGH:  From the time she said he said in

18  his closing argument, that portion of it.

19          THE COURT:  Overruled or motion denied.  Why

20  don't you put another question to the witness.

21  **Q.**   So the fact of the matter is, Judge Lanphear

22  issued this order, he never restricted what station

23  McGarty could work in; correct?

24  **A.**   You are correct.

25  **Q.**   And he didn't put any restrictions on you; right?

1    **A.**   That is correct.

2    **Q.**   So let's go back to the order of Chief Dillon.

3    **A.**   May I have a hard copy, please.

4    **Q.**   We have this down as Exhibit D.  It may have come

5    in as Exhibit 6.  I'm not sure.  The clerk was good

6    enough to give me the list when I came in.  Here it is.

7    **A.**   Thanks.

8         MR. McHUGH:  This came in as -- yeah, this came

9    in as Plaintiff's 6 full.  It's going to be a joint

10   exhibit.

11   **Q.**   So we went over Number 1 where the chief restricts

12   McGarty from being in six different stations, which he

13   was not required to do; correct?

14   **A.**   I'm not aware of what a judge can do, sir.

15   **Q.**   No, I'm asking you what Chief Dillon did.

16   **A.**   Could you repeat the question.

17   **Q.**   Sure.  We went over Number 1 where Chief Dillon

18   restricted McGarty from not being able to work in the

19   six fire stations that have rescues; right?

20   **A.**   Correct.

21   **Q.**   And Number 2, "Firefighter McGarty is not to be

22   detailed to a station that has a rescue assigned so

23   there could be no possibility of them working

24   together."

25   **A.**   Which Number 2 are you referring to?

1   **Q.**   Number 2 on the order of Chief Dillon.

2   **A.**   There is two Number 2s, sir.

3   **Q.**   Well, let's take the first one.  Okay?

4   **A.**   Okay.

5   **Q.**   "Firefighter McGarty is not to be detailed to a

6   station that has a rescue assigned so there can be no

7   possibility of them working together."  That's another

8   thing that Chief Dillon ordered that Judge Lanphear did

9   not; correct?

10   **A.**   And Chief Dillon also allowed that violation to

11   occur four times.

12   **Q.**   Well, we'll get to that.

13   **A.**   Okay.

14   **Q.**   But my question is -- listen to my question now.

15   Number 2, the first Number 2, that's another thing that

16   Chief Dillon ordered that Judge Lanphear did not order;

17   correct?

18   **A.**   Correct.

19   **Q.**   And then the second Number 2, Firefighter

20   McGarty's substitutes are to be reviewed by a battalion

21   chief to ensure there is no possibility -- "Firefighter

22   McGarty's substitutions are to be reviewed by a

23   battalion chief to ensure there is no possibility that

24   their paths will cross in the station."

25        Now, Judge Lanphear didn't require any specific

1    person or rank in the Providence Fire Department to

2    review the assignments of Firefighter McGarty; correct?

3    **A.**   You're absolutely incorrect, sir.

4    **Q.**   Well, can you show us -- we can give you back that

5    exhibit if you want.  We can show you the restraining

6    order if you need to look at it again.  You can point

7    that out to us.

8    **A.**   Could you repeat the question.  I may have

9    answered it incorrectly.

10   **Q.**   Number 2, the second Number 2.

11   **A.**   Correct.

12   **Q.**   "Firefighter McGarty's substitutes are to be

13   reviewed by a battalion chief so there can be no

14   possibility of them working together," referring to you

15   and McGarty; right?

16   **A.**   Correct.

17   **Q.**   And I asked you isn't that yet another restriction

18   that Chief Dillon put on McGarty that Judge Lanphear

19   did not?

20   **A.**   Correct.

21   **Q.**   And then Number 3, "Firefighter McGarty is to be

22   notified of this directive and notified that it is his

23   responsibility to notify Battalion 3 that he is

24   requesting a substitution and what company he will be

25   in.  Substitutions are not to be approved for companies

1    that are housed with a rescue."

2         So in Number 3, the chief put this -- after

3    McGarty is notified, the chief put this responsibility

4    on McGarty that he had to notify someone when he was

5    requesting a substitution; correct?

6    **A.**   That's correct, and four times McGarty

7    intentionally violated the order.

8    **Q.**   We're going to get to that.  And Judge Lanphear

9    never said that McGarty had to tell a person, a

10   battalion chief, that he was requesting a substitute,

11   did he?

12   **A.**   No.

13   **Q.**   That was Chief Dillon; right?

14   **A.**   It was, sir.

15   **Q.**   And then the chief goes on to say, "Substitutions

16   are not to be approved for companies that are housed

17   with a rescue," and there were six rescues; correct?

18   **A.**   Absolutely.

19   **Q.**   So there were six fire stations that had rescues;

20   right?

21   **A.**   Correct.

22   **Q.**   So now he says to McGarty, Not only am I going to

23   tell you that you can't take call-backs in these six

24   houses, but now I'm telling you if you ask for a

25   substitution, you're not going to be approved if it has

1   a rescue, whether you were working or not; correct?

2   A.   Negative, sir.

3   Q.   So that was yet another restriction that Chief

4   Dillon put on McGarty that Judge Lanphear did not;

5   correct?

6   A.   Negative.  If he needed a substitution, he was

7   already in a house without a rescue, so there was no

8   limitations for him to receive a substitution.

9   Q.   Well, he was in a house without a rescue at that

10  point?

11  A.   That is correct.  He was at Ladder 3 with

12  Engine 12.

13  Q.   And you're a member of Local 799?

14  A.   You're absolutely right, sir.  I'm a retired

15  member now.

16  Q.   And so is McGarty?

17  A.   That is correct.

18  Q.   And under the union contract, you can put in bids

19  for other stations, correct, if you want to transfer?

20  A.   I had a permanent assignment, sir.

21  Q.   No, I understand that.  But if you're a

22  firefighter, a member of Local 799, and you want to

23  transfer from, let's see, Branch Avenue to Allens

24  Avenue, when something comes up, you can put a bid in

25  for it; right?

1    **A.**    Correct.

2    **Q.**    But McGarty didn't have that right anymore;

3    correct?

4    **A.**    Because he violated civil law, sir.  He had a

5    civil complaint, and the judge issued me a protective

6    order for violence while at work, sir.  Not at home,

7    while at work.

8    **Q.**    So another thing that McGarty couldn't do that you

9    or your fellow firefighters could do is put in a bid

10   for a station that had a rescue; right?

11   **A.**    You're absolutely correct, sir.

12   **Q.**    And you don't consider any of this discipline, do

13   you?

14   **A.**    I do not, sir.

15   **Q.**    So you don't think with the chief restricting

16   McGarty from six fire stations, even though you might

17   not be assigned or working there at all, that wasn't

18   discipline; right?

19   **A.**    Absolutely not, sir.  He was doing him a favor by

20   not putting him in a situation where his temper could

21   get the best of him again.  Absolutely.

22   **Q.**    And you don't think that by the chief saying,

23   McGarty, there's six fire stations in this city, you're

24   not going there for overtime for call-backs because of

25   this, you don't think that was discipline either;

1   right?

2   **A.**   Absolutely not, sir.  There's 15 other stations.

3   That man still had his job.

4   **Q.**   And you don't think that saying to McGarty,

5   McGarty, forget about putting a bid on Branch Avenue or

6   North Main or Atwells Avenue, you ain't getting it

7   because there's rescues there, you don't think that's

8   discipline either; right?

9   **A.**   When you said "you," were you referring to me

10   making a suggestion that I had the authority to give

11   him a bid, sir?

12   **Q.**   I'm asking you if McGarty tried to use his union

13   rights under the contract and bid into a station that

14   had a rescue, the bid's going to be turned down because

15   of this order, isn't it?

16   **A.**   Absolutely not, sir.  They already violated the

17   order four different times.  I'm sure they probably

18   would have given him his bid.

19   **Q.**   So you think that even though Chief Dillon put out

20   an order saying McGarty can't work in any of the

21   stations that has a rescue, the six of them, if McGarty

22   just put in a bid to go to North Main Street, the chief

23   would say, Okay, you can go?

24   **A.**   Absolutely.  That's my true belief, sir, because

25   the violation occurred multiple times where he was made

1    aware that it was his responsibility to not intimidate,

2    coerce, place me at fear.  He had already done so.

3    **Q.**    Three times?

4    **A.**    Four, sir.

5    **Q.**    Four times?  And was the fourth time October 28th,

6    2010?

7    **A.**    Correct.

8    **Q.**    And it wasn't until October 28th, 2010, when you

9    saw him in the Branch Avenue Station that you ran back

10   to Superior Court to ask for a contempt citation for

11   being in violation; correct?

12   **A.**    I'm going to have to check dates on that, sir.

13   I'm not aware.

14   **Q.**    Check dates?  Wasn't it December of 2010 that you

15   went to Superior Court?

16   **A.**    I believe so, yes.

17   **Q.**    You waited almost two months after you saw him in

18   the station to go back and ask for a contempt citation;

19   correct?

20   **A.**    No, that was the time where they issued it.  I'd

21   have to look at dates, sir.  If you have it, I will

22   look at it.

23   **Q.**    Well, you weren't issued one, were you?

24   **A.**    Excuse me?

25   **Q.**    You weren't issued a contempt citation against

1    Firefighter McGarty?

2    **A.**   I'm not sure of the terminology you're using.  You

3    have to rephrase it.

4    **Q.**   Let's talk about that for a minute.

5            THE COURT:  Seeing it's slightly going to a new

6    topic, can we take the morning break now?  Is that all

7    right?

8            MR. McHUGH:  Sure.

9            THE COURT:  Ladies and gentlemen, we're going to

10   take the morning break now.  See you back in 15

11   minutes.

12           (Recess.)

13           THE COURT:  Good morning.

14           MR. McHUGH:  Thank you, your Honor.

15   **Q.**   Ms. Franchina, do you have the exhibit in front of

16   you?

17   **A.**   I do not.

18           MR. McHUGH:  Could she have the exhibit, please,

19   Madam Clerk.

20           THE CLERK:  Which one?

21           MR. McHUGH:  It's 21, the order from Chief

22   Dillon.

23           THE CLERK:  It's 6, the one from Dillon?

24           MR. McHUGH:  Six, six.

25           THE WITNESS:  Thank you.

1    **Q.**   I just wanted to ask you about the last part of

2    this order from Chief Dillon, Number 4, and he says,

3    "These directions are issued to ensure the safety and

4    well-being of both members."  So Chief Dillon wanted to

5    ensure your safety by putting out this order; correct?

6    **A.**   Correct.

7    **Q.**   And he also wanted to ensure the safety of McGarty

8    by putting out this order; correct?

9    **A.**   I'm assuming so that he didn't reviolate it, yes.

10   **Q.**   Because when he says both members, don't you think

11   he's talking about you and McGarty?

12   **A.**   Yes, I do.

13   **Q.**   Now, you started to tell us earlier that you

14   thought that -- well, you thought that October 28th,

15   2010, the day you went into the Branch Avenue Station

16   to fill out your IOD paperwork -- well, let me back up.

17         October 28th, 2010, you go to the Branch Avenue

18   Station to fill out your IOD paperwork; correct?

19   **A.**   Correct.

20   **Q.**   You were not scheduled to work that day; right?

21   **A.**   I was scheduled to work the next day, correct.

22   **Q.**   But you were not scheduled to work on the 28th;

23   right?

24   **A.**   Correct.

25   **Q.**   So you're in the station off duty, and you hear

1    McGarty's voice as soon as you get there; right?

2    **A.**   That was when -- upon returning the second time.

3    **Q.**   So as soon as you returned, you came in, you hear

4    McGarty's voice and you know McGarty's there; right?

5    **A.**   I thought it was his voice, and I was -- when I

6    approached the doorway, I then knew it was him.

7    **Q.**   And he was working a call-back; right?

8    **A.**   I'm not sure of his status that day.

9    **Q.**   But he was working in there; right?

10    **A.**   He was -- yes, he was there.

11    **Q.**   And that was not his normal station; right?

12    **A.**   Correct.

13    **Q.**   Because that would have been a violation of Chief

14    Dillon's order if they detailed him there; correct?

15    **A.**   Yes.

16    **Q.**   So that was one of the times you told us just

17    before we broke that in your view McGarty had violated

18    the restraining order; correct?

19    **A.**   Yes.

20    **Q.**   And then you had opined that McGarty had violated

21    the restraining order, you thought, a couple of other

22    times; right?

23    **A.**   I know he violated it, sir.  I was working, and so

24    was he.

25    **Q.**   All right.  Do you remember what station it was

1    that you claim he violated the restraining order?

2    **A.**    Yes.

3    **Q.**    What station was that?

4    **A.**    Atwells Ave.

5    **Q.**    What engine company and rescue is that?

6    **A.**    Well, sir, there's a Ladder 6 there, Engine 14 and

7    Rescue 6.

8    **Q.**    And so were you working at Atwells Avenue that

9    day?

10   **A.**    Yes, sir.  I was assigned a call-back into

11   Rescue 6 as the officer in charge.

12   **Q.**    All right.  And when you -- at what point in time

13   during your shift did you see McGarty?

14   **A.**    At the beginning, sir.

15   **Q.**    And McGarty didn't have any choice on whether or

16   not he was working on that shift; correct?

17   **A.**    He absolutely had a choice, sir.  He was aware

18   that he was not allowed to be in a house with a rescue.

19   **Q.**    He didn't know that you were going to be there

20   that day; right?

21   **A.**    I don't know.  I cannot make mention to what he

22   knows.

23   **Q.**    You remember over three days you gave a deposition

24   in my office; correct?

25   **A.**    Is that your office?  It was in downtown on

1    Westminster.

2    **Q.**   444 Westminster Street?

3    **A.**   That is correct.

4    **Q.**   When you came in and you took your deposition, you

5    were represented by Mr. Martin and Mr. Braga; correct?

6    **A.**   That is correct.

7    **Q.**   And you took an oath to tell the truth that day;

8    right?

9    **A.**   We sat for three days, I believe, over a period of

10   21 hours, so if you could be more specific.

11   **Q.**   Well, when you testified at the deposition, you

12   raised your hand and took an oath to tell the truth;

13   correct?

14   **A.**   Absolutely.

15   **Q.**   Just as you raised your hand and took an oath to

16   tell the truth here; right?

17   **A.**   Absolutely.

18        MR. McHUGH:  Your Honor, I'd like to read to the

19   witness her deposition, Volume III, May 28th, 2015.  I

20   brought the originals to the Court prior to the trial.

21        THE COURT:  Just make sure she has a full copy

22   of it and opposing counsel has it handy, too.

23        Mr. Martin?

24        MR. MARTIN:  I was just going to see if we can

25   put it on the screen.

1          THE COURT:  The practice that I usually adopt in

2     trials and we've adopted so far is, if it's a

3     multi-page document and the witness wants the full

4     copy, then we should afford him or her the full copy.

5     I have an extra copy if you don't have one, Mr. McHugh,

6     I could give her.

7          MR. McHUGH:  That's fine.

8          THE COURT:  Which volume?

9          MR. McHUGH:  It's Volume III, May 28th, 2015.

10          THE COURT:  I'll give her all three volumes.

11          THE WITNESS:  Thank you.

12          MR. McHUGH:  And it's page 415, your Honor.

13          THE COURT:  Did I give you all of them?  Is

14     Volume III there?

15          MR. McHUGH:  Actually, I'll start on page 414,

16     and I want to read from line 21 on page 414 to page

17     415, line 10.

18          THE WITNESS:  What line are we starting on?

19          MR. McHUGH:  I'm going to start on -- I don't

20     know what your Honor's practice is.  Do you want this

21     on the ELMO for the jury?

22          THE COURT:  No, the jury doesn't see it.  You

23     read the question, ask was that the answer, and then

24     we'll move on.

25     **Q.**   I want you to look, Ms. Franchina, on page 414,

1　　line 21.  And I'm going to read you the questions and

2　　the answers; and then after I finish reading them, I'm

3　　just going to ask you if I read them correctly.  Okay?

4　　Ms. Franchina?

5　　**A.**　I'm sorry.  I'm trying to find the line.  It's

6　　414, line 21?

7　　**Q.**　Line 21.

8　　**A.**　Yes.

9　　**Q.**　So I'm going to read you a series of questions and

10　answers from your deposition; and when I finish, I'm

11　just going to ask you if I read it correctly.  Okay?

12　Do you understand that?

13　**A.**　Yes.

14　**Q.**　Page 414, line 21.  Question, "Now, you just said

15　that McGarty had violated that restraining order three

16　times."

17　　　　Answer, "Correct."

18　　　　Question, "What were the three times that he

19　violated it?"

20　　　　"He was assigned to Ladder 6 where I had a

21　call-back at Rescue 6 at the time; and due to the

22　violation, as an officer, I was ordered to leave that

23　station.  The subordinate in violation of the order

24　remained in violation."

25　　　　Question, "Well, did McGarty have any choice on

1      whether or not he was working on that shift?"

2             Answer, "No, he did not.  That's an order."

3             Question, "And he didn't know that you were

4      going to be doing a call-back then, did he?"

5             Answer, "He did not know, but the chiefs do."

6             Did I read that correctly?

7      **A.**   Yes, but I believe I misspoke during that

8      transcript.

9      **Q.**   You misspoke during the transcript?

10     **A.**   Correct.

11     **Q.**   Well, you misspoke in your interrogatory when you

12     said the things at North Main Street happened before

13     Andre Ferro; right?  That was a mistake?

14     **A.**   Am I going to be able to correct it?

15     **Q.**   Well, I just want to ask you a question.  You

16     misspoke in your interrogatory when we were here on

17     Thursday as to when those events occurred at North Main

18     Street; correct?

19     **A.**   I think it's a simple correction after 10 years of

20     this experience.  I think I made the correction on

21     that, though, didn't I?

22     **Q.**   On the interrogatory?

23     **A.**   I think when I misspoke, I made a correction.

24     **Q.**   Well, you remember you testified that you read

25     them and signed them; right?

1    **A.**   Yes, and I'm aware of Garrity rights where if I

2    make a statement, I have the right to amend it and make

3    corrections based on my memory.

4    **Q.**   And in this deposition, you were sent out a sheet

5    to make any corrections; right?

6    **A.**   I'm not aware.

7    **Q.**   Well, you never turned in a sheet for this

8    deposition correcting anything, did you?

9    **A.**   I don't believe I read these volumes.  I know I

10   testified to them, sir.

11   **Q.**   So you never read them after you got them and

12   looked for mistakes and used that sheet that they give

13   you to fill out to say there was a mistake?

14   **A.**   I did not, sir.

15   **Q.**   Okay.  You can return the deposition.  So now we

16   have two instances where you say McGarty violated the

17   order.  We've got the one October 28th, 2010, when you

18   weren't working and he was doing a call-back at Branch

19   Avenue; right?  That's one.

20   **A.**   I'm not sure of what his assignment was, detail or

21   call-back, sir.

22   **Q.**   But, in any event, he was working at Branch Avenue

23   October 28th, 2010?

24   **A.**   Yes.

25   **Q.**   And then we have the one that you testified to in

1    your deposition that was at Atwells Avenue, Rescue 6,

2    where he was working a call-back; correct?

3    **A.**   Yes, and the chiefs allowed him to remain in

4    violation of the order, sir.

5    **Q.**   And you told us in your deposition that McGarty

6    didn't have any choice but to go where they sent him to

7    work; correct?

8    **A.**   No, sir.  He, according to the order, was made

9    aware that he was supposed to bring it to his officer's

10   attention and the chief's attention when he was in

11   violation of the order in case there was a mishap of

12   him being assigned to one.  That's my understanding of

13   the order, sir.

14   **Q.**   When you're talking about the order, you're

15   talking about Chief Dillon's order and not Judge

16   Lanphear's; right?

17   **A.**   Correct.

18   **Q.**   And you said there's a third time that he violated

19   the order, Chief Dillon's order, but you didn't tell us

20   when and where that was.  I know it's been 10 years,

21   you just said.  Do you remember when and where that

22   was?

23   **A.**   I do not at this time, but I could find out.

24   **Q.**   But the last one, the last violation you think was

25   October 28th, 2010; correct?

1    **A.**    I know it was.  I witnessed it, sir.

2    **Q.**    All right.  And that was the last day you were in

3    the fire station; right?

4    **A.**    Last day meaning what, sir?

5    **Q.**    Well, that you were still on the job because that

6    was the day you were applying for the IOD.

7    **A.**    Absolutely not, sir.  My last day on the job was

8    December 19th, 2013.

9    **Q.**    All right.  Well, let's talk about that.  Your

10   retirement date was December 19th, 2013; correct?

11   **A.**    Correct.

12   **Q.**    But from -- October 23rd I think was your last day

13   at work?

14   **A.**    Correct.

15   **Q.**    October 23rd, 2010, from there until December 13th

16   when you retired 2013, you didn't actually work as a

17   firefighter; right?

18   **A.**    Correct.  I was a rescue lieutenant at the time;

19   therefore, I could never work as a firefighter.

20   **Q.**    Well, you didn't work as a rescue lieutenant

21   from December -- from October 23rd, 2010, until

22   December 19th, 2013, either; right?

23   **A.**    Correct.

24   **Q.**    Now, it wasn't until December that you went back

25   to Superior Court and tried to get an order of contempt

1    against Firefighter McGarty saying that he had violated

2    not the chief's order but Judge Lanphear's order;

3    correct?

4    **A.**    Can you tell me what year?

5    **Q.**    2010.

6    **A.**    Yes, December of 2010.

7    **Q.**    So you waited from that last time you saw him, you

8    saw McGarty in the station on Branch Avenue on

9    October 28th, 2010, until December 2010 to go with

10   Mr. Braga and Mr. Martin over across the river to

11   Superior Court to ask for a contempt citation against

12   McGarty; correct?

13   **A.**    I'm unaware of the date.  So if there's a document

14   that says it, I could definitely, you know, confirm it.

15           MR. McHUGH:  Your Honor, I'd ask that

16   Defendant's D, which is the order from Judge Gibney, be

17   admitted as a full exhibit.

18           THE COURT:  Any objection?

19           MR. MARTIN:  No objection.

20           THE COURT:  Exhibit D will be admitted as a full

21   exhibit without objection.

22           (Defendant's Exhibit D admitted in full.)

23           MR. McHUGH:  After it's entered, can I publish

24   it to the jury and the witness, your Honor?

25           THE COURT:  Sure.

1    THE WITNESS:  Am I going to get a copy?

2    THE COURT:  That's one page?

3    MR. McHUGH:  Two pages, your Honor.  The second

4    page is the certification page.  May I publish it, your

5    Honor?

6    THE COURT:  Sure.

7    MR. McHUGH:  Thank you, your Honor.

8    Q.   Let's give everybody a moment to read this, and

9    then I have some questions for you.

10   A.   I'm all set.

11   Q.   Now, when you went back to Superior Court in

12   December of 2010 to ask for contempt against

13   Mr. McGarty, this was a different judge.  This was

14   Judge Gallo; correct?

15   A.   I don't believe this is accurate.  Let me just

16   review it.  This is not the reviolation, sir.  Is that

17   what you're referring to, is the reviolation?

18   Q.   I'm asking you about the contempt order you

19   attempted to get against Firefighter McGarty in 2010.

20   A.   This is not the page.

21   THE WITNESS:  May I describe what this is?

22   THE COURT:  If it answers the question.

23   A.   Okay.  This is the first time that he violated the

24   order on -- excuse me, when he attacked me on

25   December 9th, 2010 -- December 10th, 2010, at

1   90 Printery Street in the union hall.  In turn, I was

2   given the date of December 13th because within a 30-day

3   window the TRO had to be -- it couldn't go past 30

4   days.

5         In turn, I went to court by myself because the

6   union didn't arrive with an attorney for me, and

7   they -- he had an attorney.  So I asked for what I was

8   told was an adjournment and I could get an attorney.

9   And on December 5th, I then went pro sue (sic) again,

10  and he arrived with a union attorney, and I defended

11  myself on January 5 of 2010 and was then granted a

12  lifetime restraining order.

13        This is not the reoccurrence.  This is actually

14  I had two court dates to initially assert my rights of

15  protection.

16  **Q.**   Well, we already have an order in evidence, the

17  restraining order that Judge Lanphear issued after a

18  hearing; correct?

19  **A.**   On January 5th, 2010, I was granted my lifetime

20  restraining order.  I never spoke at the December 13th,

21  2010, hearing because my motion -- oh, it says it right

22  there, motion to adjourn was granted to me to try and

23  get an attorney.  And I sought that through my union,

24  once again, and did not receive an attorney from my

25  union and then arrived to court on January 5th, 2010,

1    by myself pro sue (sic) and defended myself against

2    Sean McGarty and four others.

3    **Q.**   Let go through this order so there's no confusion

4    here.

5    **A.**   Did I clear up the confusion?

6         THE COURT:  I am totally confused.  Let me tell

7    you why I'm confused, and maybe that will clear

8    everyone's confusion up.

9         The original restraining order, which is

10   Plaintiff's Exhibit 21, appears to be dated

11   January 5th, 2010.

12        MR. McHUGH:  Correct.

13        THE COURT:  Though it's got a stamp of

14   January 7th.  That must be the entered order or

15   something.

16        MR. McHUGH:  Right.

17        THE COURT:  The Defendant's Exhibit D refers to

18   the January 10th restraining order.

19        MR. McHUGH:  Correct.

20        THE COURT:  But it appears to be based on a

21   hearing -- never mind.  I see all the dates.  So the

22   restraining order was in January of 2010.

23        MR. McHUGH:  Correct.

24        THE COURT:  And the hearing on contempt was held

25   before Judge Gallo on December 13th, 2010, about 12

1    months, 11, 12 months later.

2             MR. McHUGH:  Right.

3             THE COURT:  And then the judge issued the denial

4    on January 4th, 2011, the next year.

5             MR. MARTIN:  That's correct.

6             MR. McHUGH:  Correct.

7             THE COURT:  Got it.  Thank you.

8    **Q.**   Do you understand what this is now, Ms. Franchina?

9    **A.**   No.

10   **Q.**   Okay.  In December of 2013, you had a hearing --

11   December 13th, 2010, you had a hearing across the river

12   at Superior Court in front of Judge Gallo; right?

13   **A.**   I'm assuming so.

14   **Q.**   And you were represented at that hearing by

15   Mr. Martin and Mr. Braga; correct?

16   **A.**   Yes.

17   **Q.**   And at that hearing, that was your attempt based

18   on having seen Firefighter McGarty in a couple of

19   stations to ask Judge Gallo to hold McGarty in contempt

20   for violating the restraining order that you were given

21   on January 5th, 2010; correct?

22   **A.**   Correct.

23   **Q.**   And so at that hearing -- now, the original

24   hearing when you got the restraining order, you

25   represented yourself?

1    **A.**    That is correct.

2    **Q.**    And then at this hearing in December 2010, you had

3    Mr. Martin and Mr. Braga representing you; right?

4    **A.**    What was the date again?

5    **Q.**    December 13th, 2010.

6    **A.**    Yes.

7    **Q.**    And Mr. McGarty had Attorney Edward Roy represent

8    him; correct?

9    **A.**    Again, yes.

10    **Q.**    And both sides were allowed at this hearing by

11    Judge Gallo to present witnesses; right?

12    **A.**    I'm assuming so.

13    **Q.**    Well, you were there, weren't you?

14    **A.**    Yes.  I'm still trying to really wrap my head

15    around this.

16    **Q.**    All right.  And when you were there that time with

17    Mr. Martin and Mr. Braga, you had the right if you

18    wanted to to put on witnesses; correct?

19    **A.**    Yes.

20    **Q.**    And McGarty had the right to put on witnesses if

21    he wanted?

22    **A.**    I believe so.

23    **Q.**    And he could cross-examine your witnesses; right?

24    **A.**    I'm assuming so.

25    **Q.**    And you could cross-examine his witnesses; right?

1    **A.**   I'm not an attorney.  I don't believe -- I was

2    being represented that day, so they -- my attorneys

3    would have that choice.

4    **Q.**   Correct.  So the point is, you had a full

5    evidentiary hearing in front of Judge Gallo on

6    December 13th, 2010, as to whether or not McGarty

7    should be in contempt of Judge Lanphear's restraining

8    order; correct?

9    **A.**   Yes.

10   **Q.**   And Judge Gallo denied your motion for contempt;

11   correct?

12   **A.**   I believe that was for criminal charges, yes.

13   **Q.**   Well, wait a minute now.  Look at the order again.

14   Here's what the order says you asked for.  You were the

15   Plaintiff; right?

16   **A.**   Yes.

17   **Q.**   It says the Plaintiff's motion, your motion;

18   right?

19   **A.**   Yes.

20   **Q.**   To adjudge the Defendant, and the Defendant up

21   there is Sean McGarty, he's the only Defendant; right?

22   **A.**   Correct.

23   **Q.**   In contempt as to a prior injunctive order of the

24   Court dated January 5th, 2010.  That's the one we've

25   been talking about that you represented yourself in and

1    you got the restraining order from Judge Lanphear;

2    correct?

3    **A.**   Yes.

4    **Q.**   So after whatever witnesses you wanted to put on

5    and cross-examination and whatever witnesses they

6    wanted to put on and cross-examination, Judge Gallo

7    said it's denied, he's not to be held in contempt;

8    correct?

9    **A.**   Correct.

10   **Q.**   And even though you say that McGarty was in

11   violation of this order three times, as far as you were

12   concerned, Judge Gallo found he wasn't in violation of

13   the order; correct?

14   **A.**   He was not in violation of the court order, but he

15   was clearly in violation of the rules and regulations

16   that we've already covered today; and he repeatedly

17   violated the code of conduct, our oath and duty.

18   **Q.**   And the other two times had to have been -- that

19   you saw him had to have been prior to October 28th,

20   2010; right?

21   **A.**   Correct.

22   **Q.**   So do you know how far before October 28th, 2010?

23   **A.**   No, I do not.

24   **Q.**   In any event, you waited until December 2010 to go

25   across the street and try to have him held in contempt

1    even though you had seen him at the Atwells Avenue

2    Station once or twice before October of 2010 and you

3    had seen him at Branch Avenue on October 28th, 2010?

4    You waited all that time; correct?

5    **A.**   No, I did not.  I immediately filed the Form 17s

6    with my superiors and followed the entire rules and

7    regulations, policies and procedures as an officer of

8    continuous violation and harassment.

9            I also referred to multiple times in Form 17s

10   that violate federal laws, which I believe it's the

11   federal health and safety act of 1970 which my employer

12   is responsible to uphold the law and give me --

13           MR. McHUGH:  I'm going to move to strike.  This

14   is nonresponsive.  It's becoming a narrative.

15           THE COURT:  I'm going to deny the motion, but

16   I'm going to instruct you to just try and answer the

17   direct question that's asked.

18           Why don't you pose another question, Mr. McHugh.

19           THE WITNESS:  Or repeat the question.  I'm

20   sorry.

21   **Q.**   So you waited -- I'm not talking about Form 17s.

22   I'm talking about going across the street.  You waited

23   from sometime prior to October of 2010 when you said

24   McGarty violated the order until December 13th of 2010

25   to go across the street and ask for him to be held in

1     contempt; correct?

2     **A.**   I believe it's the word you're using with

3     "waited."  I immediately started the process, and that

4     process took that long to give me my day in court.

5     **Q.**   Well, you think it took you a whole month to get a

6     date or a contempt on a restraining order of someone

7     you said you feared for?

8     **A.**   I know for sure I immediately entered therapy and

9     followed my attorneys' advice at that time, sir.

10    **Q.**   Okay.  Well, do you think that -- by that time you

11    were already represented by Mr. Martin and Mr. Braga;

12    correct?

13    **A.**   I'm not sure of when that date started.

14    **Q.**   Well --

15    **A.**   But I was represented that day.

16    **Q.**   By them at this hearing on December 13th, 2010;

17    right?

18    **A.**   Yes, I was.

19    **Q.**   And then they ended up representing you in this

20    case; right?

21    **A.**   The current one?

22    **Q.**   Yes.

23    **A.**   Yes.

24    **Q.**   And did you think that if you were able to get a

25    contempt citation against McGarty that would help you

1    in this Federal Court lawsuit?

2    **A.**    Sir, he violated rules and regulations.  At this

3    point, nothing had been done at the department level.

4    We went to the state and federal government to protect

5    me.  And at that point, sir, my therapy was my most

6    concern, my health and well-being.  I was granted IOD,

7    and I did what I was told.  I was a compliant patient.

8    **Q.**    Well, you got IOD in a settlement through the

9    union at the time of retirement; correct?

10   **A.**    I received an ordinary disability pension with

11   tax, that is, taxes taken out.  Yes, it's --

12   **Q.**    Well, you mentioned IOD.  You were in the station

13   on October 28th, 2010, filling out your injured-on-duty

14   paperwork; right?

15   **A.**    That is correct, sir.

16   **Q.**    And so you didn't get injured-on-duty pay from the

17   time that you went out in 2010 for that until you --

18   **A.**    Could you be more specific with a date?

19   **Q.**    Okay.  When you put in initially for IOD in

20   October of 2010, you didn't get IOD; correct?

21   **A.**    I did for 14 days, sir.

22   **Q.**    For 14 days, the standard practice, 14 days so the

23   city could look into whether or not it was really a

24   case for IOD.  So you got two weeks' worth of IOD;

25   correct?

1    **A.**   Correct.

2    **Q.**   And then you were denied IOD from that point on;

3    right?

4    **A.**   I was put on Item A, which is my own sick time,

5    which I exhausted; and I then used all my vacation at

6    that point, yes.

7    **Q.**   So you get 14 days' worth of IOD?

8    **A.**   Correct.

9    **Q.**   And then you used up all your Item A, which is

10   your sick?

11   **A.**   Yes.

12   **Q.**   And then you used up all of your vacation time?

13   **A.**   Correct.

14   **Q.**   And then when it came time that you were going to

15   retire in December 2013, you had -- by that time you

16   had filed a grievance with the union over the IOD pay;

17   correct?

18   **A.**   I believe so.

19   **Q.**   And the union came to an agreement with the city

20   that upon your retirement you would be backed up for

21   the IOD pay all the way back to 2010; correct?

22   **A.**   Yes.

23   **Q.**   So you got about three years -- a little over

24   three years' worth of IOD at the time of retirement;

25   correct?

1   **A.**   Not in one lump sum.  I was paid a supplement of

2   that because I was receiving only my vacation and sick

3   time with taxes taken out.

4   **Q.**   Okay.  And the IOD was without taxes, it was

5   tax-free; correct?

6   **A.**   Correct, but I sustained a great hardship during

7   that time period.

8   **Q.**   And so then you had to go back -- you actually had

9   to go back and amend your tax returns to reflect the

10   fact that that money you earned should not have been

11   taxed, correct, the IOD money?

12   **A.**   Correct.

13   **Q.**   Now, I wanted to back up and talk somewhat about

14   this Andre Ferro business because you told us that the

15   first incident you had with Andre Ferro, that was at --

16   **A.**   I never did business with Andre Ferro.

17   **Q.**   Well, I don't mean do business.  That was a manner

18   of speaking.

19   **A.**   Oh.

20   **Q.**   The facts of this case that are related to Andre

21   Ferro.  I believe, correct me if I'm wrong, I know you

22   will, that that first incident took place outside of

23   Rhode Island Hospital Emergency Room?

24   **A.**   No, it did not.

25   **Q.**   Okay.  Where did that first incident take place?

1    **A.**   Upon his arrival at 151 North Main Street, second

2    floor, kitchen.

3    **Q.**   Okay.  I understand that.  I meant to say when you

4    got to the hospital when Lieutenant Legault was there.

5    Which hospital was that?

6    **A.**   Could you make reference to the date?

7    **Q.**   When he dropped his pants.

8    **A.**   That was not at Rhode Island Hospital, sir.  That

9    was at Fatima Hospital.

10   **Q.**   Fatima.  Okay.

11   **A.**   Big difference, North Providence versus

12   Providence.

13   **Q.**   So Lieutenant Legault, you said, witnessed that;

14   correct?

15   **A.**   Lieutenant Legault did not witness that one, sir.

16   That's a separate incident.  That was witnessed by

17   Chief Jeffrey Crawford; Tommy Miller, Lieutenant Tom

18   Miller; and Firefighter Andre Ferro was the person

19   accused; and John Tierney, Firefighter John Tierney;

20   and myself, sir.

21   **Q.**   Well, let's go back to the incident that

22   Lieutenant Legault did witness.  Which incident did

23   Lieutenant Legault witness?

24   **A.**   The one that occurred at Rhode Island Hospital.

25   **Q.**   And Lieutenant Legault, you told us, was dressing

1    down, so to speak, Ferro after that, pointing his

2    finger at him over to the side; correct?

3    **A.**    Correct.

4    **Q.**    And then you didn't complain that day about that

5    incident with Ferro; correct?

6    **A.**    Lieutenant Legault did, and the chief called me to

7    confirm his complaint.

8    **Q.**    And Lieutenant Legault is the one who called

9    Chief Varone about that; correct?

10   **A.**    That is correct.

11   **Q.**    Not you?

12   **A.**    That is correct.

13   **Q.**    And then Chief Varone called you; correct?

14   **A.**    That is correct.

15   **Q.**    And he asked you if this happened?

16   **A.**    Yes.

17   **Q.**    And you verified that it did?

18   **A.**    Absolutely.

19   **Q.**    And then after that Ferro was disciplined;

20   correct?

21   **A.**    Yes.  In a process, yes.

22   **Q.**    And Chief Costa was the chief at the time; right?

23   **A.**    If you give me the dates, I could be more

24   specific.

25   **Q.**    Well, I'm not sure which date you're talking about

1    with Andre Ferro; but I'm talking about at the time of

2    this incident, David Costa was the chief of the

3    department, wasn't he?

4    **A.**   I'm unaware.

5    **Q.**   So subsequent to this, after you talked to

6    Chief Varone and then the chief of the department found

7    out, they fired Ferro; correct?

8    **A.**   We had a hearing board, and he was terminated.

9    **Q.**   Okay.  That was the trial board; right?

10   **A.**   Correct.

11   **Q.**   And you were allowed to testify at the trial

12   board?

13   **A.**   Yes.

14   **Q.**   And that was a three-person board comprised of

15   city officials; right?

16   **A.**   I'm not sure of the number.  It seemed more than

17   three, but -- it was a lot of people.

18   **Q.**   In any event, all three people on the trial board

19   worked for the city; right?

20   **A.**   I'm not sure of the process.  I know I reported

21   there.

22   **Q.**   Do you remember who was on the trial board?

23   **A.**   No.

24   **Q.**   Well, in any event, the trial board unanimously

25   found Ferro guilty of violating the rules and

1    regulations; correct?

2    **A.**   As he should have been.

3    **Q.**   And that's what they found; right?

4    **A.**   Yes.

5    **Q.**   And you certainly got a fair hearing before the

6    city's trial board, didn't you?

7    **A.**   I would assume so.

8    **Q.**   Well, the most they could have done to Ferro was

9    fire him; correct?

10   **A.**   Yes, I guess.

11   **Q.**   They didn't -- the trial board didn't suspend him;

12   right?

13   **A.**   Correct.

14   **Q.**   They didn't reprimand him?

15   **A.**   Reprimand?  Termination I believe is reprimand.

16   I'm not sure.

17   **Q.**   All right.  Well, you can be -- would you agree

18   with me that someone can be reprimanded but not

19   terminated?

20   **A.**   Correct.

21   **Q.**   And in Ferro's case, they just fired him?

22   **A.**   He was terminated, yes.

23   **Q.**   And subsequently there was an arbitration hearing

24   because he filed a grievance through the union;

25   correct?

1    **A.**    Yes.

2    **Q.**    And you were at that arbitration hearing; correct?

3    **A.**    Yes.

4    **Q.**    And the city consulted with you as to how to

5    proceed against Ferro; correct?

6    **A.**    No.

7    **Q.**    The city asked you what you thought of it, didn't

8    they?

9    **A.**    The arbitrator never heard the meeting that day.

10   **Q.**    You talked to Chief Farrell that day at the

11   arbitration, didn't you?

12   **A.**    Myself and six chiefs were on one side; Mark

13   Gursky, the attorney for Andre Ferro, was on the other

14   side with the vice president, Phil Fiore.  I was

15   removed six different times over a period of

16   three-and-a-half hours to consult about giving him his

17   job back and that my status on the job would be

18   improved.  At no point did someone hear my case, and

19   Andre Ferro was granted his job back.

20   **Q.**    Well, that was with your acquiescence; correct?

21   **A.**    I'm going to stand here today and tell you that it

22   was not my intent to give a sexual harasser his job

23   back.

24   **Q.**    So you deny that Chief Farrell, the chief of the

25   department, told you he would do whatever you wanted?

1    **A.**   He told me repeatedly that I would get better

2    treatment if he got his job back.  I never did that,

3    sir.

4    **Q.**   You say Chief Farrell told you that?

5    **A.**   Absolutely.  Emphatically.

6    **Q.**   And you deny that Chief Farrell told you that he

7    wouldn't agree to any such thing unless you did?

8    **A.**   I'm not aware of that, sir.

9    **Q.**   You remember talking to Chief Farrell at the

10    arbitration, don't you?

11         THE WITNESS:  I think I need a minute.

12         THE COURT:  Sure.  Why don't we take a short

13    break.

14         (Recess.)

15         THE COURT:  Mr. McHugh.

16         MR. McHUGH:  Thank you, your Honor.

17    **Q.**   Now, on Thursday, Ms. Franchina, you told us that

18    you were pleased with the way Curt Varone,

19    Chief Varone, handled the Ferro situation.  Do you

20    remember that?

21    **A.**   Yes.

22    **Q.**   And on Thursday you told us that you felt

23    supported by the department when they fired Ferro.  Do

24    you remember that?

25    **A.**   Yes.

1    **Q.**   And you told us that after Ferro was fired, there

2    were no more issues with him on the fire department.

3    Do you remember that?

4    **A.**   Who's "him"?

5    **Q.**   Ferro.

6    **A.**   Andre Ferro?

7    **Q.**   Right.

8    **A.**   Yes.

9    **Q.**   And what you didn't tell us on Thursday was that

10   you never said that you were upset that he was brought

11   back, did you?

12   **A.**   I don't know if the question was posed.

13   **Q.**   Well, you couldn't tell us that you were upset

14   when he was brought back because you agreed to it;

15   correct?

16   **A.**   I did not agree to it.

17   **Q.**   Now, I want to go back over some of what you

18   talked about on Thursday, and one of the things you

19   talked about was McDougal saying that he was not going

20   to cook for you anymore.  Do you recall that?

21   **A.**   Yes.

22   **Q.**   And you said that Lieutenant Romano spoke up and

23   said, You can't do that.  Do you recall that?

24   **A.**   He had a meeting, correct.

25   **Q.**   And so Lieutenant Romano was supportive of you in

1   that; right?

2   A.   Yes.

3   Q.   Now, you also talked about on Thursday how -- you

4   seemed to indicate that the firefighters were urinating

5   on the toilet seats so that when you went in there you

6   would have to clean it up.  Do you remember that?

7   A.   Yes.

8   Q.   And there was another rescue lieutenant, female

9   rescue lieutenant at North Main Street when you were

10  there, Lieutenant Teresa Wishart; correct?

11  A.   Yes.

12  Q.   So I take it she must have experienced the same

13  thing as you did, then; right?

14       MR. MARTIN:  Objection.

15       THE COURT:  Sustained.

16  Q.   Do you know if Lieutenant Teresa Wishart had the

17  same experience with that bathroom?

18  A.   She never complained to me about it.

19  Q.   Now, you also told us that it was McDougal who

20  said to you, What are you trying to do, get him fired?

21  Do you remember that?

22  A.   Yes.

23       MR. McHUGH:  Can I see, your Honor, Volume I of

24  the Plaintiff's deposition, please.  I want to read,

25  your Honor, from Volume I, page 75, lines 15 through

1   23.  Okay?

2        THE COURT:  Sure.

3   **Q.**   Ms. Franchina, I'm going to do the same thing I

4   did the last time with your deposition.  This is

5   obviously a different volume, and I'm just going to

6   read you on page 75 those lines, the question and

7   answer, and then I'm going to ask you if I read it

8   correctly.  Okay?

9   **A.**   Yes.

10  **Q.**   Page 75, line 15, from your deposition, Volume I.

11  Question, "You're the only woman; correct?"

12       Answer, "I'm the only female, correct.  Again, I

13  thought my complaint was going to be held confidential.

14  I walked by Executive Board member Michael Johnson, and

15  he said, Who the fuck do you think you are?  Are you

16  trying to get him fucking fired, in front of everybody.

17  I didn't know what to do.  I said, I don't think you

18  have all your facts, and I walked to my office."

19       Did I read that correctly?

20  **A.**   Yes.

21       MR. McHUGH:  I want to go back, also, and ask

22  you about your interrogatories which we talked about on

23  Thursday.

24       And the Plaintiff's interrogatories have been

25  marked for ID, your Honor, as Defendant's Exhibit B for

1    identification, Plaintiff's Answers to Defendant's

2    Interrogatories; and I want to read to Ms. Franchina

3    part of -- one of the questions to the interrogatories

4    and part of the answer.

5    **Q.**   And, Ms. Franchina, I would direct your attention

6    to page 17 of the interrogatories, Question 21.  Do you

7    have that in front of you?

8    **A.**   I do.

9    **Q.**   I'm going to read you the question, and then I'm

10   going to go over and read part of the answer.  Again, I

11   just ask you if you would answer whether or not I read

12   it correctly.

13        So Question Number 21 says, "Please list each

14   and every instance of harassment as alleged in your

15   Complaint, including in your answer for each such

16   instance," and (c) says, "the specific individuals you

17   allege engaged in the harassment."

18        Now, if you go over, the answer begins on page

19   18, and I'm not going to read the whole answer.  If you

20   go on page 19, that part of the answer in the first

21   full -- do you see the first full paragraph where it

22   says, "I filed my formal complaint"?

23   **A.**   Yes.

24   **Q.**   All right.  I'm going to read that.  "I filed my

25   formal complaint against Ferro on or after

1    September 26th, 2006, after the 'lesbian lover'

2    incident.  Shortly thereafter, while I was in the North

3    Main Street Fire Station, I was confronted by a male

4    firefighter, Michael Johnson, in front of eight males.

5    Included among the eight males were Captain Horton and

6    Lieutenant Romano.

7             "Firefighter Johnson said to me in the presence

8    of the other males, including two of my superiors, 'Who

9    the fuck do you think you are?  Are you trying to get

10   him fired?'"

11            Did I read that correctly?

12   A.   Yes, you did.

13   Q.   And if you go over to page -- the last page, page

14   22, is that your signature?

15   A.   I do not see a signature on page 22.

16   Q.   Page 22 at the top, it says "I, Lori Franchina."

17   Do you see that part?

18   A.   I do not.  Page 22 at the bottom?

19   Q.   Yes.

20   A.   I don't see that.

21   Q.   I'm sorry.  That is the last page.  Actually, it

22   should be page 26.  It's the last page of the

23   interrogatories.  Do you see the last page of the

24   interrogatories?

25   A.   Yes.

1    **Q.**   And do you see where it says, "I, Lori Franchina,

2    hereby state the aforementioned answers are true and

3    accurate under the pains and penalties of perjury,

4    December 17, 2014"?  And that's your signature;

5    correct?

6    **A.**   That is.

7    **Q.**   Now, you talked about on Thursday an incident that

8    Lieutenant Kiers was on scene for, and you came back to

9    the station and you wanted one of her subordinates

10   turned in for some infraction.  Do you remember that?

11   **A.**   You're going to have to give date, time and more

12   specifics, sir.  There were multiple incidents with

13   her.

14   **Q.**   Okay.  So you had problems with Lieutenant Cynthia

15   Kiers, too?

16   **A.**   I made a formal complaint about her, yes, sir.

17   **Q.**   And you told us also about Lieutenant Devlin

18   snapping his bars in your face from his collar?

19   **A.**   His bars?  He's a firefighter, sir.

20   **Q.**   You said he snapped his collar in your face.  Do

21   you remember that?

22   **A.**   No, that's not accurate.

23   **Q.**   You never had any trouble with Lieutenant Devlin?

24   **A.**   May I speak to what occurred?

25   **Q.**   Sure.

1    **A.**   I was in my rescue.  We were responding to a call,

2    so we both were going down to our vehicle.  It was at

3    Rescue 6.  And upon his entry into the vehicle, he

4    leaned over, flicked my collar pins striking my face

5    and said, I'll never take a fucking order from you.

6    **Q.**   And you never complained to the EEO officer about

7    that incident, did you?

8    **A.**   I'm sure I did, and I also complained with Chief

9    Jeffrey Crawford.

10   **Q.**   You think you went to the EEO officer about

11   Lieutenant Devlin's incident?

12   **A.**   I know that there were multiple incidents that

13   occurred with insubordination that I referred to.

14   **Q.**   But you don't know if that was one of them; right?

15   **A.**   Correct.  Not 100 percent sure.

16   **Q.**   Now, let's talk for a couple minutes about the Job

17   Street incident.

18   **A.**   Excuse me?

19   **Q.**   Let's talk for a couple of minutes about the Job

20   Street incident.

21   **A.**   Could you spell that?

22   **Q.**   J-O-B.

23   **A.**   Job.  Okay.

24   **Q.**   That was the incident you -- well, you had trouble

25   with a number of firefighters at that incident;

1    correct?

2    **A.**   I'm not sure what you mean by having trouble with

3    them.  Insubordination is clear.  Trouble means

4    something else to me.

5    **Q.**   Okay.  Well, you had instances of insubordination;

6    correct?

7    **A.**   Absolutely.

8    **Q.**   Because you -- in your view, when you're on a

9    scene like that, you're in charge of the scene;

10   correct?

11   **A.**   It's not a view, sir.  It's a policy.  And it's in

12   our standing orders, standard operating procedures and

13   rules and regulations.

14   **Q.**   Can you -- well, we have the rules and regulations

15   in evidence here.  Do you think you could find in the

16   rules and regulations where it says a rescue lieutenant

17   is in charge of a scene?

18   **A.**   Absolutely I can, sir.

19        MR. McHUGH:  Could I show the witness the rules

20   and regulations, which are --

21        THE CLERK:  Five.

22        MR. McHUGH:  Five?  Thank you.

23        THE COURT:  Sure.

24        (Witness peruses document.)

25   **A.**   I've found it.

1  **Q.**   Okay.  Could you direct us to the page.

2  **A.**   Yes.  This needs to be in conjunction with

3  standard operating procedure.  So with the general

4  orders and memorandums, we follow protocols within

5  those guidelines, also within standard operating

6  procedures.  We are then guided by those SOPs or

7  standard operating procedures to fulfill your duties

8  and requirements.

9       So, in general, the rules and regulations would

10  govern me in this body, and then I would also need the

11  standard operating procedure of EMS scenes; and I'm not

12  sure of that at this time, but it's very easy to find.

13  **Q.**   Well, can you show me in the rules and regulations

14  where it says that the rescue lieutenant is in charge

15  of the scene, that's all I'm asking you, and then we

16  can show the jury?

17  **A.**   No, because it's in a standard operating

18  procedure, sir, but I could also state Number 4 on

19  page -- Chapter 1, page 2.  That would give me my

20  entitlement there, also, as a rescue officer.

21  **Q.**   So it's actually not in the rules and regulations,

22  is it?

23  **A.**   No.

24  **Q.**   Now, one of the -- you gave an order to

25  Firefighter Tang to go down and get the stair chair;

1    correct?

2    **A.**   We brought the stair chair, sir.  It was on scene.

3    **Q.**   Well, you ordered Firefighter Tang to go get it;

4    correct?  You don't remember that?

5    **A.**   I'm not sure.  I know it was a shooting, they're

6    not going to walk out, and it's on a second floor, sir.

7    It's standard equipment that we would bring something

8    to carry them.

9        As my officer position, I definitely would

10   indicate to him that we would need something to carry

11   him, and that would be that unit.  It would be a

12   device.  It is a stair chair.

13   **Q.**   And that would be Firefighter Tang; right?

14   **A.**   His responsibilities as a rescue technician is to

15   carry the stair chair, yes, because I was carrying

16   other equipment.

17   **Q.**   And he followed your order; correct?

18   **A.**   He did, sir.

19   **Q.**   And you also told a police officer on scene that

20   it would be -- if the patient died, it would be his

21   responsibility; correct?

22   **A.**   I did make that statement.

23   **Q.**   And you don't have any authority over the

24   Providence Police, do you?

25   **A.**   I am a ranking officer.  I am a lieutenant on --

1    it says that we share responsibilities in the

2    community.  I would assume that we have equal rank.

3    **Q.**    So you think that in your position as a rescue

4    lieutenant you can give an order to a sworn Providence

5    police officer?

6    **A.**    On a medical scene, 100 percent, sir.

7    **Q.**    Now, you demonstrated for us the other day the

8    taking off -- putting on and taking off of the glove.

9    Do you remember?

10   **A.**    I do.

11   **Q.**    And you have to admit, this is the optimum

12   situation to do that; correct?  Do you know what I mean

13   by that?

14   **A.**    Yes.  I would say so.

15   **Q.**    Because we're in a quiet courtroom; right?

16   **A.**    At times it's quiet.

17   **Q.**    It's bright; right?

18   **A.**    Sure.

19   **Q.**    And there is -- you are sitting in a comfortable

20   chair in the witness stand; right?

21   **A.**    Yes.

22   **Q.**    And there's no wind; right?

23   **A.**    Don't feel any.

24   **Q.**    No rain?

25   **A.**    Not at this time.

1    **Q.**   No movement?

2    **A.**   I don't understand by movement.   I'm moving.

3    **Q.**   Well, the witness stand is not moving around;

4    right?

5    **A.**   Correct.

6    **Q.**   But when you were at the Job Street incident with

7    Firefighter Tang in the back of the rescue, I think you

8    said there were four people in the back of that rescue?

9    **A.**   Yes.

10   **Q.**   It was crowded; right?

11   **A.**   I don't believe it was crowded.

12   **Q.**   Well, four people in the back of the rescue is

13   pretty crowded, isn't it?

14   **A.**   Not when you've been working in that environment

15   for years.   It was not crowded, sir.

16   **Q.**   Well, I thought you said that you were shoulder to

17   shoulder with Firefighter Tang, right next to him, in

18   your direct testimony.

19   **A.**   Correct.   And when I asked him to stop CPR, remove

20   his gloves properly, he -- I then took over where his

21   hand placement was to establish CPR; and I did that,

22   sir, yes.

23   **Q.**   And during this period of time, the rescue is

24   moving the whole time; correct?

25   **A.**   I cannot be 100 percent sure.

1    **Q.**    Well --

2    **A.**    I was focused on the patient.

3    **Q.**    You don't think that the rescue was -- wasn't the

4    rescue en route to the hospital when you were doing

5    this?

6    **A.**    I don't believe so, no.  I believe we just

7    completed intubation of the patient; and I truly

8    believe that prior to a shock, we performed two minutes

9    of CPR to then see, these are standard protocols, to

10   then see if the heart is in a shockable rhythm; and I

11   believe we were in that phase, sir, of treatment

12   following intubation.

13   **Q.**    So you think that when Lieutenant Tang stopped the

14   CPR and you took over and he took off his gloves, the

15   rescue was standing still?

16   **A.**    I do believe so, yes, according to how -- my

17   experience, yes.

18   **Q.**    But you thought that the patient might die?

19   **A.**    I did not think that patient was going to die.  He

20   started out with a radial pulse and agonally breathing.

21   **Q.**    Well, he did die, didn't he?

22   **A.**    Several hours after he was at the hospital.  I

23   regained his heart beating, sir.

24   **Q.**    And the rescue was supposed to proceed to the

25   nearest hospital as quickly as possible in these

1    instances; correct?

2    **A.**   Sir, you cannot have a vehicle moving when you

3    shock.  If you're on the highway or a side street, you

4    must stop the vehicle to deliver a shock for safety of

5    all people around you, sir.

6    **Q.**   I didn't ask you that.  Listen to my question.

7    Under the fire department's SOPs and rules and

8    regulations, you're supposed to get the patient to the

9    nearest hospital as quickly as possible; correct?

10   **A.**   Absolutely.

11   **Q.**   And so if you're going to get the patient to the

12   nearest hospital as quickly as possible, you're going

13   to be driving that rescue and you're not going to be

14   going 10 miles an hour; right?

15   **A.**   I don't understand your question, sir, how it

16   pertains --

17   **Q.**   The rescue is to get to the nearest hospital as

18   soon as it can; right?

19   **A.**   Yes.

20   **Q.**   And so there are times, you would admit, when

21   you're in the back of the rescue working on a patient

22   and the rescue is moving?

23   **A.**   Yes, that is true.  The rescue moves to the

24   hospital on roads and, yes, with lights and sirens,

25   too, at times.

1   **Q.**   Lights and sirens; correct?

2   **A.**   Correct.

3   **Q.**   And in this rescue, you've got four people in the

4   back of that rescue; right?

5   **A.**   Yes.

6   **Q.**   And you're right -- you're shoulder to shoulder

7   with Firefighter Tang?

8   **A.**   Because I asked him -- I was taking over CPR, sir.

9   So, in turn, I was making my hands the same placement

10  and most efficiently and effectively providing CPR

11  without interruption.  My hands are delivering and

12  pumping his heart.  It's my job.

13  **Q.**   And you think that during this whole time the

14  rescue was stopped; correct?

15  **A.**   I do believe so because of protocol.

16  **Q.**   And you don't think at any time when lieutenant --

17  when Firefighter Tang took off his gloves the rescue

18  was moving; correct?

19  **A.**   It was not.

20  **Q.**   And when you got to the -- when you arrived at the

21  hospital, you did not admonish Firefighter Tang for the

22  way he took off his gloves, did you?

23  **A.**   Yes, I did.  I then brought him into the treating

24  facility where I was, and I discussed with

25  Dr. Kobayashi that I was a patient; and I also told him

1    that he will be retrained on his gloves, the removal of

2    his gloves.

3    Q.    So you didn't think he did it on purpose?

4    A.    I truly believe he did it on purpose, sir.

5    Q.    All right.  Later on today we're going to hear

6    from your medical providers, and do you remember one of

7    the times you went to see Dr. Yanni was in January of

8    2015?

9    A.    A specific date?

10   Q.    Do you remember going to see him at some point in

11   January of 2015?

12   A.    Who are you referring to?

13   Q.    Dr. Yanni.

14   A.    That is Dr. Penelope Yanni, a female?

15   Q.    Yes.

16   A.    You referred to her as "he."  I wasn't sure who

17   you were speaking of.

18   Q.    Do you know who I'm speaking about now?

19   A.    Yes.

20   Q.    Do you remember going to her in January of 2015?

21   A.    I did seek treatment, yes.  I was compliant and

22   attended all my appointments.

23   Q.    And didn't you tell her in January of 2015 that

24   you had been getting new information that the flicking

25   of the brain matter in your face was intentional?

1    **A.**    I believe it was intentional from the get-go.

2    **Q.**    Well, you told Dr. Yanni --

3    **A.**    Do you have a transcript that I can review?

4    **Q.**    You told Dr. Yanni in January of 2015 that you had

5    received new information that it was intentional.

6    **A.**    I'm going to have to see her notes.  If you have

7    them, I'd love to look at them.

8    **Q.**    Do you deny telling her that?

9    **A.**    I'm not denying it.  I would like to make

10   reference to it.  That's all.

11           MR. McHUGH:  Your Honor, this might be a good

12   place to stop.

13           THE COURT:  Great.  Thanks, Mr. McHugh.

14           Ladies and gentlemen, we'll take our lunch break

15   now.  Please don't discuss this case amongst yourselves

16   or with anyone, and we'll see you back in about an

17   hour.

18           (Recess.)

19           THE COURT:  Ladies and gentlemen, we're going to

20   do something a little out of the ordinary, not for

21   trials but for this trial so far.  We're going to

22   interrupt the cross-examination of the Plaintiff for

23   scheduling purposes.  Did I warn you that this might

24   happen?  Maybe not.

25           It occasionally happens where people's schedules

1   don't line up with where we need them; and rather than

2   causing delay, we'll oftentimes pause things and let

3   people come in.

4        So what's happened now is that there are two

5   treating medical providers, I don't know if they're

6   both doctors or not, but two medical providers of

7   Ms. Franchina that have this time blocked off to

8   testify.

9        So by agreement of all the parties and the

10  Court, we've agreed to allow them to come in and

11  testify now.  Once that's completed, then the

12  cross-examination and the redirect of Ms. Franchina

13  will continue.

14       So it doesn't have any meaning to you

15  substantively other than to just explain what's going

16  on.  It's not hard to figure out.

17       Mr. Martin.

18       MR. MARTIN:  Plaintiff calls Dr. Michelle Olson.

19  Your Honor, the Plaintiff also offers into evidence

20  after our conversation this morning Plaintiff's

21  Exhibit 34.  This is a marked copy.

22       THE COURT:  Any objection, Mr. McHugh?

23       MR. McHUGH:  403, your Honor.

24       THE COURT:  Great.  Thank you.  The Court has

25  made its ruling.  Exhibit 34 will be admitted as a full

1    exhibit as provided.

2           (Plaintiff's Exhibit 34 admitted in full.)

3           THE COURT:  They're Ms. Franchina's medical

4    records, ladies and gentlemen.  I'm sure they'll be

5    mentioned during the course of the doctors, and you'll

6    see them as the attorneys need to use them.

7           Dr. Olson, you can come right up.  If you'd

8    remain standing there, Dr. Olson, and Ms. McGuire will

9    swear you in.

10          **MICHELLE OLSON, PH.D., PLAINTIFF'S WITNESS, SWORN**

11          THE CLERK:  Would you please state your name and

12   spell your last name for the record.

13          THE WITNESS:  Michelle Olson, O-L-S-O-N.

14          THE COURT:  Is it Dr. Olson?

15          THE WITNESS:  Correct.

16          THE COURT:  Dr. Olson, make yourself

17   comfortable, pull the chair in to where you're

18   comfortable, and then pull the base of the mike right

19   over.  The whole thing just moves.  And when you speak,

20   just speak -- don't be afraid of it, speak right into

21   it.

22          THE WITNESS:  Okay.

23          THE COURT:  Mr. Martin.

24          MR. MARTIN:  Thank you.

25

1       <u>**DIRECT EXAMINATION**</u>

2       <u>**BY MR. MARTIN**</u>:

3       **Q.**   Good afternoon, Doctor.

4       **A.**   Hello.

5       **Q.**   Could you please tell the jury what you do for

6       work.

7       **A.**   I'm a psychologist at Plaza Psychology and

8       Psychiatry in Woonsocket, Rhode Island.

9       **Q.**   Could you tell us a little bit about your

10      schooling.

11      **A.**   I went to Vassar College in Poughkeepsie,

12      New York, and then I was trained at the California

13      School of Professional Psychology in Alameda,

14      California.

15      **Q.**   And can you explain what you mean when you say

16      that you were trained.

17      **A.**   I did my doctoral level work there.

18      **Q.**   And after your doctoral work was completed, did

19      you do any type of residency or internship?

20      **A.**   I did.  I did my first primary internship at the

21      Family Institute of Pinole in Pinole, California, which

22      was a trauma-based center; and then I worked at Kaiser

23      Permanente for my post-doctoral residency.

24      **Q.**   Can you just explain to us what residency means.

25      **A.**   Unpaid internship.

1   **Q.**   Can you tell us what type of work you do during

2   the unpaid internship.

3   **A.**   I did individual, group and family therapy with

4   clients of all shapes and sizes.

5   **Q.**   And can you explain what you meant when you said

6   that it was a trauma center.

7   **A.**   Our focus was in helping people afflicted by all

8   types of personal trauma, any kind of family trauma,

9   rape, accidents.  We were trained in EMDR there, which

10   is eye movement desensitization and reprocessing, which

11   is a treatment for very severe trauma; and we did a lot

12   of work in that area.

13   **Q.**   Thank you.  Do you have any professional

14   certifications?

15   **A.**   Just my doctorate.

16   **Q.**   Okay.  What is your relationship to Lori

17   Franchina?

18   **A.**   I am her psychologist.

19   **Q.**   Can you tell us a little bit about what the --

20   what is the nature of the relationship between a

21   patient and the psychologist.

22   **A.**   I'm not sure I understand the question.

23   **Q.**   Sure.  What is your role in treating Lori?

24   **A.**   You know, a patient comes with certain symptoms,

25   things that are affecting their lives, and I try my

1      best to help them heal from those symptoms and help

2      them to be more productive in their lives.

3      **Q.**   Were you Lori's first psychologist?

4      **A.**   No.

5      **Q.**   Who was her first psychologist?

6      **A.**   I think that she has had several over the years;

7      but at my practice, I took over her case from Dr. James

8      Curran, who sadly passed away last year.

9      **Q.**   Okay.  And when you take over treatment of a

10     patient from another doctor, do you just go by using

11     their diagnosis or do you make your own diagnosis?

12     **A.**   I make my own diagnosis, but I do carefully

13     consider their records and recommendations.

14     **Q.**   Can you tell us a little bit about the process

15     that you go through before you diagnose a patient.

16     **A.**   Well, I interview the patient, closely taking into

17     account their family history, recent history, and the

18     symptoms that are affecting them currently.

19           I look at their objective presentation in the

20     room and their subjective description of what's been

21     bothering them as well as a review of the last

22     therapist's records if they're available.

23     **Q.**   Okay.  Is being accurate when you make a diagnosis

24     something that's important to you?

25     **A.**   Yes.

1    Q.    Why?

2    A.    Because an accurate diagnosis leads to effective

3    treatment.

4    Q.    I'd like to go through each of those categories

5    that you just discussed in regards to Lori.  What were

6    your objective observations of her behavior during your

7    consults with her?

8    A.    Well, she was extremely detail-oriented in the

9    minutia of the traumas that had occurred to her.  She

10   was extremely vigilant as to every single slight and

11   every single thing that had happened to her.  It was

12   like she could tick them off one by one.  It's like she

13   had been rehearsing this history over and over again in

14   her mind.

15         She was very anxious, very tense.  It was

16   clearly a difficult thing for her to be in a room with

17   a new person, as it generally is; but it was hard for

18   her I think to, you know, have to rehash all of this

19   very troubling information.  And so she was very

20   anxious in the room and very detail-oriented and

21   detail-focused on everything that had happened.

22   Q.    In addition to your objective observations, you

23   mentioned that you would ask the patient about their

24   complaints and their experiences.  What did you learn

25   about her symptoms and her experiences?

1  **A.**   That Lori was having a lot of -- especially sleep

2  disturbance was a big one, again, the ruminations,

3  intrusive thoughts of all these traumas, intrusive

4  thoughts meaning just things coming over and over and

5  over again.  No matter how she tried to distract

6  herself, the thoughts would come and really bother her,

7  get in the way of her everyday thinking, which is a big

8  impediment to concentration, attention.

9       She was avoiding stimuli associated with the

10  job.  If she came into contact with or thought she

11  would come into contact with people, places that

12  reminded her of the job, such as other firefighters,

13  stuff like that, she would become extremely anxious.

14       This was borne out very early on in our

15  relationship at the funeral for Dr. Curran, actually,

16  where Lori really tried to attend and be present

17  despite the presence of other firefighters, and it was

18  a very difficult experience for her.

19       Sleep disturbance, just general overall anxiety

20  and difficulty concentrating.

21  **Q.**   And you also mentioned that you would review the

22  patient's medical history.  Did you review her history

23  from her treatment with Dr. Curran?

24  **A.**   As much as possible.

25  **Q.**   What do you mean by that?

1    A.   Dr. Curran liked to handwrite his notes; and if

2    you ever heard a joke about doctors and their

3    handwriting, he was the epitome of that.  A lot of it

4    was hieroglyphics.  Luckily, because there had been so

5    much legal stuff going on, he had a lot of his notes

6    and his assessments typed.  So everything that I could

7    review in there that was typed I did.

8    Q.   And what about On-Site Academy, did you review

9    treatment records from On-Site Academy?

10   A.   I did.  I reviewed -- they were very thorough in

11   sending their records, which were in Dr. Curran's

12   files, and they included a lot of records of her EMDR

13   sessions there as well as their intake and the things

14   she had undergone there.

15   Q.   I think I heard you explain it before, but I kind

16   of missed part of it.  What is EMDR?

17   A.   EMDR is eye movement desensitization and

18   reprocessing, and it's basically a quicker way to treat

19   traumatic incidents.  Because post-traumatic stress

20   disorder, which I guess we will get into, is a

21   neurophysiological thing, it's both the mind and the

22   body combined, it's been found that bilateral

23   stimulations, stimulation on both sides of the body, in

24   association with talking about the trauma and

25   reexperiencing the trauma can somehow help the body and

1    brain release some of the stored affect, the stored

2    emotion that goes along with having experienced

3    something like that.

4         And so it's been found that these treatments

5    whereby somebody gets either tones in the ears or moves

6    their eyes back and forth while discussing the trauma

7    actually can help somebody heal from that trauma a lot

8    quicker.

9    Q.   Thank you.  So in your diagnostic process, did you

10   learn anything of significance from her On-Site

11   records?

12   A.   Well, the biggest thing that stood out was that

13   Lori was trying to get back to work and that that was

14   her biggest motivation for her treatment at On-Site.

15   Pretty much every progress note said that she wanted to

16   get back to work safely, and that was a big trigger

17   point for me to see as a therapist because the

18   treatment of trauma is all about giving somebody a

19   feeling of safety.  And it was clear that she wanted to

20   go back to work, but she wanted to go back in a way

21   that would make her feel safe herself.

22   Q.   And how about the typed records you reviewed from

23   Dr. Curran, was there any information in those records

24   that you found pertinent to your diagnostic process?

25   A.   Oh, everything.  I mean, he really worked very

1    hard with her, and he really had a good idea of how

2    much all of this had affected her.  Also, he had

3    reviewed all, I think, nine of her independent

4    medical --

5         MR. McHUGH:  Objection, your Honor.

6         THE COURT:  Hold on one second.  Why don't you

7    redirect the question, Mr. Martin.

8    Q.   Sure.  Without getting into any of the things that

9    you think that Dr. Curran may have reviewed or things

10   that you know that he reviewed, did you get any general

11   impressions from his records about his diagnosis or his

12   course of treatment with Ms. Franchina?

13   A.   Yeah.  I mean, he was seeing a lot of the same

14   things that I was, that she had received some very

15   difficult treatment and she had -- although she had

16   tried to get help systemically, she wasn't protected

17   systemically, and that really was a big factor in her

18   experiencing all of this very traumatically.

19   Q.   Wasn't protected by whom?

20   A.   By the powers that be that she went to, the people

21   that she reports to, whoever the higher-ups were within

22   the fire department that she sought protection from

23   from harassment.

24   Q.   At the conclusion of this process, did you come to

25   a diagnosis?

1    **A.**    Yes.

2    **Q.**    What's your diagnosis?

3    **A.**    Post-traumatic stress disorder.

4    **Q.**    Can you tell us what post-traumatic stress

5    disorder is.

6    **A.**    Yeah.  Post-traumatic stress disorder is a group

7    of symptoms that people experience after they have been

8    through a traumatic or life-threatening event,

9    including hypervigilance, agitation, anger, difficulty

10   when faced with stimuli, when faced with things that

11   remind the person of the event, and hypervigilance.

12          And, I mean, the way that I explain it to

13   clients is that it's basically when you experience

14   something so life threatening that your body and brain

15   really can't handle it.

16          Our bodies and brains were designed to keep us

17   safe.  And so when there's something that's just so out

18   of the mix and you're not protected and you don't --

19   your body and brain just sort of don't know how to deal

20   with it, a lot of times it will -- your body and brain

21   is going to try to keep you safe.

22          Even if the actual danger isn't there and you're

23   out in the regular world, your body and brain is still

24   saying, Oh, my God, that can be dangerous, oh, my God,

25   that can be dangerous.  And it starts coding all the

1    things around you as dangerous even when it's not, and

2    that's what makes it difficult to function in the

3    world.

4    **Q.**   Is it possible for a psychiatric condition such as

5    PTSD to have more than one cause?

6    **A.**   Yes, absolutely.

7    **Q.**   Can you explain to the jury how a condition like

8    PTSD can have more than one cause.

9    **A.**   Well, a lot of people are subjected to multiple

10   traumas, and so different traumas will result in

11   different symptoms.  Generally we can start to parse

12   that apart by looking at the things that are triggering

13   the person in each situation.

14         So, for instance, if somebody got into a car

15   accident, they might be afraid to drive a car again;

16   but then if they experience something like a robbery

17   the next day, then they might be afraid to go into a

18   store as well; but we would know that they had multiple

19   PTSD in those two things but they came from different

20   places.

21   **Q.**   Is determining the cause of a psychiatric

22   condition important to you when you decide how to treat

23   and care for a patient?

24   **A.**   Definitely.

25   **Q.**   Why is that?

1    **A.**   Because knowing the triggers is an incredibly

2    important part of trauma because basically the crux of

3    trauma therapy is to help the person's brain and body

4    recognize when they're safe, and directly addressing

5    the things that made them feel unsafe is a big part of

6    the treatment.

7    **Q.**   Did you form an opinion as to the cause of Lori

8    Franchina's post-traumatic stress disorder?

9    **A.**   Yes.

10   **Q.**   What was the cause?

11   **A.**   It was the treatment she received within the fire

12   department coupled with the fact that she did not feel

13   protected from it and especially in times when there

14   was actually a life-threatening situation occurring and

15   she was made to feel powerless because others weren't

16   doing their job or were actively, you know, blocking

17   her from being able to complete her job in the space of

18   a life-threatening situation to somebody else.

19   **Q.**   How can you distinguish that as the cause from

20   other potential sources of trauma in her life?

21          MR. McHUGH:  Objection as to form, leading.

22          THE COURT:  Why don't you rephrase, Mr. Martin.

23          MR. MARTIN:  Sure.

24   **Q.**   Is Lori -- well, was Lori exposed to physically

25   traumatic events in the course of her duties as a

1    firefighter?

2    **A.**    Yes.

3    **Q.**    Are those the types of events that could play a

4    factor in causing PTSD?

5    **A.**    Yes.

6    **Q.**    How would you distinguish between her treatment at

7    the hands of the fire department as a cause versus

8    those other events that she observed that were

9    traumatic?

10   **A.**    Based on the trigger stimuli that is present now,

11   for instance, there was a time when Lori had a dirty,

12   bloody glove, I think it was, snapped in her face and

13   there could have been potentially harmful material on

14   that that could have impeded her life, but she doesn't

15   seem to have a fear of blood or gore.

16        It's more human interactional triggers currently

17   that bother her, fears of rejection, humiliation,

18   running into certain individuals.  So it's way more

19   social triggers that are present for her now, and in

20   her recollections and the things that currently cause

21   her distress to rise are definitely more social

22   interactions and feelings of not being protected rather

23   than some of the things that I see in other

24   firefighters that are traumatized by the actual job.

25   **Q.**    What about childhood experiences, can traumatic

1    childhood experiences play a causal role in developing

2    a condition like PTSD?

3    **A.**    Absolutely.

4    **Q.**    Was there anything from Lori's childhood that you

5    found to be significant in your clinical diagnosis?

6    **A.**    There are a lot of things from Lori's childhood

7    that are significant in helping, you know, to create

8    the bigger picture; but, again, in terms of the stimuli

9    that I see now and in terms of her history, I don't

10   think they're a causal factor in this diagnosis, the

11   post-traumatic stress disorder.

12   **Q.**    Can you tell us the issues from her childhood that

13   you've ruled out as causes of her PTSD.

14   **A.**    Her father's alcoholism and viewing domestic

15   violence within the home, experiencing it personally.

16   **Q.**    And how is it that you're capable of -- does

17   everyone who has an alcoholic parent or experiences

18   domestic violence, does everyone who has those

19   experiences develop PTSD?

20   **A.**    No.

21   **Q.**    In this case, why did you rule -- did you want a

22   drink of water?

23   **A.**    Oh, no.  That was a burp.  Sorry.  Thanks for

24   pointing it out.

25            MR. MARTIN:  I think I've had a traumatic. . .

1        (Laughter.)

2    **Q.**   How do you rule those experiences out as a cause

3    of her PTSD?

4    **A.**   Well, I think mainly because after those

5    experiences, Lori went on to really thrive.  When she

6    left that setting, she went to college, she was a star

7    athlete, she had lots of friends, she really did

8    wonderful things and was able to really thrive after

9    that.  Those aren't the symptoms that I see popping up

10   now.

11   **Q.**   Based on your review of her psychiatric history,

12   did her ability to thrive and achieve such high success

13   in various settings change?

14   **A.**   Until now, yes.

15   **Q.**   Do you know whenabouts in terms of year when you

16   started to see that change in her ability to function

17   and thrive and succeed?

18   **A.**   It seemed like about 2009 when she started therapy

19   with Dr. Curran.

20   **Q.**   Okay.  I'd like to posit kind of a hypothetical

21   question to you.  If someone were to say that all of

22   Lori Franchina's problems in her career were caused by

23   her inability to get along with others, how would you

24   respond to that?

25        MR. McHUGH:  Objection as to form.

1        THE COURT:  It's a hypothetical.  Overruled.

2  Q.   Do you want me to ask it again?

3  A.   Yeah.

4  Q.   If someone were to say to you that all of Lori

5  Franchina's problems at work were caused by her

6  inability to get along with others, how would you

7  respond to that?

8  A.   Therapeutically, that doesn't really make sense to

9  me.

10 Q.   Why not?

11 A.   A lot of people I treat have problems getting

12 along with others, but they don't all have people

13 torturing them at work.  And, you know, also the

14 symptoms that came along afterwards were because of

15 that treatment, not because of anything inherent in

16 Lori.

17 Q.   Can you describe to the jury what we mean when we

18 use the word "prognosis."

19 A.   How good the outlook is for somebody's symptoms to

20 dissipate.

21 Q.   How good does the outcome look for Lori?

22 A.   You know, I think that she will probably deal with

23 a lot of this for a long time.  She is strong, and she

24 has shown, you know, some amazing resilience, and I

25 admire Lori a lot.  And she has great therapists, so

1    hopefully she can rise from a lot of this; but it would

2    not surprise me if she deals with some of this for the

3    rest of her life.

4    Q.   And during the course of your treatment of her,

5    has she been a responsible and conscientious patient?

6    A.   Oh, yeah.

7         MR. MARTIN:  Nothing further.

8         THE COURT:  Thanks, Mr. Martin.

9         Mr. McHugh.

10                        **CROSS-EXAMINATION**

11   **BY MR. McHUGH**:

12   Q.   Good afternoon, Doctor.

13   A.   Hi.

14   Q.   Doctor, there's no objective testing in

15   psychology, is there?

16   A.   There are some objective tests, yes,

17   neuropsychological testing.

18   Q.   Neuropsychological; right?

19   A.   Correct.

20   Q.   But when you're diagnosing someone as you did with

21   Lori Franchina for post-traumatic stress disorder or

22   anything else, your diagnosis is necessarily dependent

23   upon the history that the patient gives you; correct?

24   A.   Correct.

25   Q.   And if the patient is not an accurate historian,

1    then the diagnosis could be wrong; correct?

2    A.   Correct.

3    Q.   Because you really have to follow what the patient

4    tells you is her actual history; right?

5    A.   Yes.

6    Q.   And you never treated Lori Franchina while she was

7    actively working in the Providence Fire Department;

8    right?

9    A.   Correct.

10   Q.   Now, did you know, for instance, that -- you just

11   talked about the snapping of the gloves.

12   A.   Uh-huh.

13   Q.   You remember that testimony?

14   A.   Yes.

15   Q.   And if that were not true, then that would not be

16   something that would lend itself to your diagnosis;

17   correct?

18   A.   Well, the snapping of the glove incident doesn't

19   necessarily lend itself -- is not the only part of my

20   diagnosis.

21   Q.   I understand that, but that would not support your

22   diagnosis if it were not true that someone snapped the

23   glove in her face with blood and brain matter on it,

24   would it?

25   A.   No, I guess not.

**Q.**   And did you know that the first instance in which she complained about someone who harassed her, the chief immediately removed that person from working with her?

**A.**   Yes.

**Q.**   Did you know that the subsequent chief fired that person?

**A.**   I had -- I think she had mentioned that as well.

**Q.**   And did you know with the other individual who she says harassed her, the chief of the department put out a department-wide order in an effort to help her have no contact with that other person?

**A.**   I'm not sure that I recall that correctly.

MR. McHUGH:  Now, I wanted to ask you actually some questions about your notes, also, and they're already in evidence.

If the witness could see Plaintiff's Exhibit 34 full, please.

THE COURT:  Vickie, do you have that?

THE CLERK:  Yes.

THE WITNESS:  Thank you.

**Q.**   And I think I interpreted part of your direct testimony, Doctor, as believing that Lori Franchina has a good memory.

**A.**   Yes.

1     Q.   Good memory for details, you said?

2     A.   Yes.

3     Q.   Would that include a good memory for when things

4     happened to her?

5     A.   Seems to be.

6     Q.   All right.  If you take a look at your notes,

7     Doctor, I wanted to ask you some specific questions

8     on some of them.  If you look at your note from

9     February 3rd, 2016, if you would.

10    A.   Okay.

11    Q.   In that particular note, you're talking about her

12    feeling the need to return to therapy after a prolonged

13    absence due to upcoming court dates; correct?

14    A.   Correct.

15    Q.   So she had been out of therapy for a while.  Then

16    when it was coming time to have this trial, she went

17    back in; is that correct?

18    A.   Correct.

19    Q.   You also talk about her having difficulties

20    dealing with the family of her ex-girlfriend and they

21    asked that she not come to Thanksgiving; correct?

22    A.   Correct.

23    Q.   And that made her feel rejected; right?

24    A.   Yes.

25    Q.   Let me direct your attention to your October 8th,

1    2015, note, Doctor.  Now, in this one she talked to you

2    about she had trouble getting along with her teammates

3    on the softball team in college.  Do you remember that?

4    A.   Yes.

5    Q.   And in that instance, she turned in some of her

6    teammates for drinking and doing drugs; correct?

7    A.   Correct.

8    Q.   And they ended up being expelled from the school;

9    right?

10   A.   Yes.

11   Q.   And these people blamed Lori for that; right?

12   A.   Yes.

13   Q.   If you look at the September 30th, 2015, note,

14   Doctor.  This is the present softball team that she was

15   on in September of 2015; correct?

16   A.   Uh-huh.

17   Q.   You have to answer in words, Doctor.

18   A.   Yes.

19   Q.   Thank you.  And in this particular instance, you

20   reported or she reported to you she felt excluded from

21   her own team; right?

22   A.   Correct.

23   Q.   If we look at the August 20th, again, 2015 note,

24   Doctor.  And in that one she talked to you about

25   another incident with her softball team.  Do you

1   recall?

2   A.   Correct.  Yes.

3   Q.   And in that incident she talked about the team

4   carpooling, and when she asked other members of the

5   team, they all said that their cars were full; right?

6   A.   Correct.

7   Q.   And this led her to believe that she was

8   unlikable, unacceptable?

9   A.   Correct.

10   Q.   In the August 4th, 2015, note, Doctor, you made a

11   comment in here, "It is clear that Lori often sees

12   things in black and white and gets upset when others

13   cannot see things in the same concrete manner."  What

14   did you mean by that, Doctor?

15   A.   You know, this is, again, one of the -- a symptom

16   of post-traumatic stress disorder when there are social

17   boundaries involved; that, you know, Lori can be very

18   concrete in her ideas of what is right and what is

19   wrong and finds it difficult to be more flexible with

20   others' opinions sometimes.

21   Q.   Would that be true in her or someone who has that

22   attribute in dealing with rules?

23   A.   Yes.

24   Q.   If you look at your note from June 24th, 2015, and

25   here she talks about the -- her problems in high school

1   being an aggressive basketball player; correct?

2   **A.**   Correct.

3   **Q.**   And that sometimes she had to be -- police had to

4   escort her into some of the away games; right?

5   **A.**   Correct.

6   **Q.**   And you say that she has historically experienced

7   a misunderstanding of her adherence to rules and

8   aggressive gameplay and work ethic as feelings of

9   superiority or arrogance; right?

10  **A.**   Correct.

11  **Q.**   What did you mean by that, Doctor?

12  **A.**   That she was reporting that sometimes her

13  proclivity to stick to rules and correct gameplay was

14  misinterpreted by others as arrogance or a feeling of

15  superiority.

16  **Q.**   And then on -- you saw her again June 5th, 2015?

17  **A.**   Okay.

18  **Q.**   And this was another problem she had in dealing

19  with the members of her then softball team; correct?

20  **A.**   Correct.

21  **Q.**   And they had -- somebody gave her a beer, and

22  nobody offered her another, and she was hurt by that?

23  **A.**   Correct.

24  **Q.**   Was the first time you ever saw her April 29th,

25  2015, Doctor?  Was that your original initial intake?

1    **A.**    Correct.

2    **Q.**    And I'm looking at the presenting problem on that

3    note of April 29th, 2015; and you're talking about

4    anxiety, nightmares, anger, difficulty leaving the

5    house, flashbacks, intrusive thoughts, separation from

6    partner due to impairments, anxiety triggered by

7    environmental stimuli, which was the smell of

8    antifreeze?

9    **A.**    Uh-huh.

10   **Q.**    And there's nothing regarding the fire department

11   until the history of present illness; correct?

12   **A.**    Yes.   That is the next section.

13   **Q.**    Do you know how many years Lori Franchina worked

14   on the Providence Fire Department?

15   **A.**    Ten, 15.

16   **Q.**    And do you know what her job was on the Providence

17   Fire Department?

18   **A.**    She was a lieutenant and was on the rescue for

19   most of that time, I believe.

20   **Q.**    Do you know when she left for good the Providence

21   Fire Department?

22   **A.**    I want to say 2010 physically, but I believe

23   there's a lag between when she physically went off and

24   when she stopped, when she was officially discharged.

25   **Q.**    And these childhood problems that you talk about,

1    do you think they contribute to the post-traumatic

2    stress disorder illness?

3    **A.**   No.

4    **Q.**   Not at all?

5    **A.**   No.

6    **Q.**   And you can't point to one individual traumatic

7    event on the Providence Fire Department that caused

8    this, can you?

9    **A.**   No.

10   **Q.**   And do you think this developed over a period of

11   time?

12   **A.**   Yes.

13          MR. McHUGH:  May I have a moment, your Honor?

14          THE COURT:  Sure.

15          (Pause.)

16   **Q.**   On that April 29th, 2015, if I go back to that

17   initial assessment, Doctor, I didn't ask you about

18   history of present illness except to say that it

19   mentions that she was on the Providence Fire

20   Department; but you state in the April 29th note, "Lori

21   Franchina was a lieutenant of the Providence Fire

22   Department where she was exposed to several traumas

23   caused by both the nature of the career and

24   difficulties with co-workers."

25          So is it fair to say that the trauma she

1    experienced on the Providence Fire Department wasn't

2    limited to her problems with co-workers?

3    **A.**   Correct.

4    **Q.**   And it had also to do with the nature of the job

5    of being a firefighter?

6    **A.**   Yes.

7         MR. McHUGH:  Nothing further.  Thank you,

8    Doctor.

9         THE COURT:  Mr. Martin?

10                    <u>**REDIRECT EXAMINATION**</u>

11   <u>BY MR. MARTIN</u>:

12   **Q.**   I just want to touch back on a couple of those

13   treatment notes.  April 29th, 2015, the initial

14   assessment you just discussed.

15   **A.**   Yes.

16   **Q.**   Mr. McHugh just read the following to you:  "Lori

17   Franchina was a lieutenant of the Providence Fire

18   Department where she was exposed to several traumas

19   caused by both the nature of the career and

20   difficulties with co-workers."  Do you recall him

21   reading that to you?

22   **A.**   Yes.

23         THE COURT:  Mr. Martin, when you're going to

24   read, you have to slow down a bit.

25         MR. MARTIN:  I'm sorry.

1    THE COURT:  That's all right.  It's hard to take

2    it down stenographically, that's all.

3    Q.   Could you read the next sentence that he didn't

4    read to you.

5    A.   "Lieutenant Franchina reports being assaulted

6    three times in a pattern of poor conduct from

7    co-workers, which included name calling, refusing to

8    follow her orders or helping her on jobs, and physical

9    and sexual harassment."

10   Q.   Could I ask you to turn to the June 24, 2015,

11   note.

12   A.   Yes.

13   Q.   This is about her basketball history.

14   A.   Uh-huh.

15   Q.   Can you read to the jury the first sentence of the

16   second paragraph that Mr. McHugh did not reference when

17   he asked you about this note.

18   A.   "Lori discussed the personal nature of the attacks

19   against her in the fire department."

20   Q.   And the next?

21   A.   "Discussed the pain of feeling like others

22   actively dislike her."

23   Q.   And the next?

24   A.   "Lori revealed that this is not the first time she

25   was treated this way."

1    **Q.**   When she discussed the personal nature of the

2    attacks against her in the fire department, what did

3    she say?

4    **A.**   She said a lot, that -- I'm sorry.  I'm not

5    understanding what you mean.  She said a lot about it.

6    We talked a lot about that.

7    **Q.**   Let me ask you a better question.  Can you

8    describe for us what the connection was between her

9    experience as a high school basketball player and then

10   her experience that she related to you as a member of

11   the Providence Fire Department.

12   **A.**   Yeah, that, you know, she felt socially rejected,

13   humiliated and just really harassed and unprotected and

14   in a way that made her feel very young again and small.

15   **Q.**   Could I ask you to turn to your treatment note

16   from July 14th of 2015, please.

17   **A.**   Yes.

18   **Q.**   Directing your attention to the last paragraph, is

19   that a reference to another one of those triggers you

20   discussed before?

21   **A.**   Yes.

22   **Q.**   Can you just explain for us what exactly you mean

23   when you say that something is a trigger.

24   **A.**   When something is a trigger, it's something that,

25   when you experience it, it creates an arousal or a

1    physiological feeling that is uncomfortable and is

2    often very much like what happened when the traumas

3    were occurring in the actual timeframe.  It's something

4    that makes you feel (gesturing).

5    **Q.**   And this particular trigger, was this something

6    that was recurrent with Lori?

7    **A.**   Yes.

8    **Q.**   And can you explain to the jury what this

9    particular trigger was.

10   **A.**   Yeah.  Some of the firefighters had called Lori by

11   a very derogative name, which was Frangina, which was

12   rightly experienced as extremely derogatory and

13   abusive; and when somebody called her that, it really

14   made her extremely upset.

15   **Q.**   Mr. McHugh also asked about why -- whether her

16   childhood experience played any role, was his question,

17   in the development of her PTSD.  So my first question

18   is, can somebody who has had traumatic experiences as a

19   child be more susceptible to PTSD later in life?

20   **A.**   Yes.

21        MR. McHUGH:  Objection as to form, leading.

22   Move to strike the answer.

23        THE COURT:  Overruled.  Denied.

24   **Q.**   That's a yes?

25   **A.**   Yes.

1   **Q.**   In this case, why did you rule out her childhood

2   experiences as a cause of her PTSD?

3   **A.**   Again, she'd had a lot of corrective experiences

4   after that where she was able to thrive and create

5   friendships, create strong bonds, create relationships

6   and social networks that were really appropriate and

7   did not have any connection to the triggers that would

8   have been present had she still had that trauma from

9   childhood.

10          MR. MARTIN:  Thank you.  Nothing further.

11          THE COURT:  Thanks, Mr. Martin.

12          Dr. Olson, you can step down, ma'am.  Thank you.

13          MR. McHUGH:  Your Honor, could I take a

14   two-minute break?

15          THE COURT:  Sure.  Ladies and gentlemen, we'll

16   take a short break.

17          (Recess.)

18          THE COURT:  Mr. Martin.

19          MR. MARTIN:  Plaintiff calls Dr. Penelope Yanni.

20          THE COURT:  You can come right up here,

21   Dr. Yanni.  If you'd just remain standing when you get

22   there, and Ms. McGuire will swear you in.

23          **PENELOPE YANNI, M.D., PLAINTIFF'S WITNESS, SWORN**

24          THE CLERK:  Would you please state your name and

25   spell your last name for the record.

1      THE WITNESS:  Penelope N. Yanni, last name

2  spelled Y-A-N-N-I.

3      THE COURT:  Dr. Yanni, if you'd get yourself

4  comfortable in the chair and pull it up so that you can

5  sit comfortably and then, as soon as you do, pull the

6  mike -- the whole base moves.  Pull it in real close

7  and speak right into it.

8      THE WITNESS:  Okay.  I'm just going to open this

9  up.  Okay.

10                    **DIRECT EXAMINATION**

11  **BY MR. MARTIN**:

12  **Q.**   Good afternoon.

13  **A.**   Hi.

14  **Q.**   Could you tell the jury what you do for work.

15  **A.**   Yes.  I'm a psychiatrist, which means I'm a

16  doctor.  I treat people with psychiatric or mental

17  illnesses, treat them with medications and also with

18  therapy.

19  **Q.**   Can you describe briefly what the difference is

20  between a psychiatrist versus a psychologist.

21  **A.**   Sure.  I'm an MD.  I went to medical school.  So I

22  did a regular medical training, and then I chose to

23  specialize in psychiatry.  So when I was a resident, I

24  did an extra -- well, not extra, but four years of

25  training in psychiatry.

1      A therapist has training either at the master's

2   level or the doctorate level.  They don't prescribe

3   medicine, though.  It's a different training.

4   **Q.**   Can you tell us where you went to medical school.

5   **A.**   Yeah.  I went to Albany Medical College in upstate

6   New York, Albany, New York.

7   **Q.**   You mentioned your residency.  Can you tell us

8   where did you do your residency.

9   **A.**   Yeah.  I did my residency at Brown here in

10  Providence.

11  **Q.**   Any type of specialty that you worked with?

12  **A.**   General adult psychiatry.

13  **Q.**   Can you tell me, what is your relationship to Lori

14  Franchina?

15  **A.**   Lori has been a patient of mine since April 2011.

16  **Q.**   And were you her first psychiatrist?

17  **A.**   Lori had been prescribed some medications by her

18  primary care physician.  So I believe I was her first

19  psychiatrist.  She had been seeing a therapist in our

20  practice for a couple of years at that point.

21  **Q.**   What was that therapist's name?

22  **A.**   Dr. Jim Curran.

23  **Q.**   In this case, in Lori's case, does the

24  psychologist and the psychiatrist work together to

25  provide her treatment?

1    A.    Uh-huh.  Yes.

2    Q.    Can you describe that cooperative relationship.

3    A.    Well, Jim referred Lori to me; and so he did a

4    referral to basically, you know, gave me a little bit

5    of information about Lori before I started.

6          And then as treatment went on, we don't formally

7    meet to discuss the care of our patients, but we work

8    in the same -- we worked in the same office.  And so we

9    would talk to each other, particularly if there's

10   something concerning, something new a patient brings

11   up.  It's a very collaborative atmosphere that we work

12   in at Plaza.

13   Q.    When a new patient comes to you, do you rely on

14   the diagnosis made by the referring physician or do you

15   make your own diagnosis?

16   A.    I like to -- I actually like to start from

17   scratch.  So I go through a full diagnostic, I guess

18   you could call that a protocol, and then after that I

19   will obtain as many records as I can; but I like to, so

20   to speak, hear it from the horse's mouth and then come

21   up with my own opinion.

22   Q.    And what is the diagnostic protocol that you

23   followed with Lori Franchina?

24   A.    Well, as with all my patients, they'll come into

25   my office and we'll talk.  And what I'm looking for is

1      a series of symptoms that fit a criteria.

2            The American Psychiatric Association has over

3      the years come out with what's called a DSM manual,

4      which is the Diagnostic and Statistical Manual, which

5      they start off with III, IV.  It gets changed over

6      time.  Now we're at DSM-V.  And basically what that

7      does is it gives a list of criteria for a specific

8      diagnosis.

9            So in that initial interview, I make the effort

10     to learn the symptoms of my patients looking at all

11     different -- you know, all the different diagnoses.

12     I'll ask questions about depression, about anxiety,

13     about psychosis, about substance abuse and about

14     trauma.

15           And once I've gathered all that symptom profile

16     together, then I can make a diagnosis according to the

17     American Psychiatric Association and this DSM-V that

18     I've talked about.

19     Q.   Is reviewing the medical history or the

20     psychiatric history records part of your process?

21     A.   Well, after I've met a patient for the first time,

22     I'll make what I call a provisional diagnosis, and

23     psychiatrists will do that.  So it's based on what the

24     patient says, what I think is going on.

25           So I make a provisional diagnosis, and I'll

1    actually start treatment at that point; but then part

2    of my plan for treatment involves, like I say,

3    gathering medical records from other treaters, and that

4    will inform my diagnosis and treatment.  And I'll also

5    do some lab work often as well to help to establish a

6    firm diagnosis.

7    **Q.**   And have you established a firm diagnosis for Lori

8    Franchina?

9    **A.**   Yes.

10   **Q.**   What is that diagnosis?

11   **A.**   Her diagnosis is post-traumatic stress disorder.

12   **Q.**   Earlier you mentioned the DSM, the Diagnostic and

13   Statistical Manual.  Can you tell us the criteria for

14   post-traumatic stress disorder.

15   **A.**   Yeah.  It's actually fairly long and complicated,

16   though.  You know, in a nutshell it is a psychiatric

17   illness that is caused by a trauma.  So that's the

18   first part of the DSM criteria, is the person was

19   exposed to a trauma.

20          This can be a trauma that happened to that

21   individual or it can be a trauma that they experienced

22   or witnessed.  So, you know, for example, someone may

23   be assaulted or someone may be exposed to a trauma in

24   terms of witnessing gunshots and other violent trauma.

25          May I add something here about the DSM-V, is

1    that the DSM-V came out fairly recently, and this is an

2    updated diagnostic manual; and in it, it actually has a

3    statement that adds an example of repeated exposure to

4    trauma such as might be seen in first responders seeing

5    repeated deaths and acts of violence.

6         So anyway, so the first piece is the trauma.

7    The second piece is how the person responds to the

8    trauma.  And often, unfortunately, a trauma will be

9    reexperienced in many different ways.  The person -- so

10   this is the second part of the criteria.

11        So it's reexperiencing the trauma, and this may

12   be in the form of flashbacks where the person actually

13   feels like it's happening again to them, might be in

14   the form of nightmares, memories in your head when you

15   don't want them there.  They call it intrusive

16   memories.  So you might be doing something else, and

17   all of a sudden a smell or a raised voice will bring

18   you right back to the trauma and have it in your mind.

19   So that's the second part.

20        The third part is avoidance.  These traumas are

21   very clearly very distressing, overwhelming.  So a

22   person will try and avoid actually situations that

23   remind them of the trauma or mental thinking about the

24   trauma because triggers will trigger an extreme fear

25   response.

1          Third piece is a change in mood or thinking.  So

2     this might be that someone's psyche now feels like the

3     world is a much more dangerous place than it was

4     before.  They may -- or they feel guilty or blame

5     themselves in some way for some of the trauma that they

6     had experienced.  That's very common.

7          And, again, because it's experienced in this

8     way, the person has hyperarousal, that's actually the

9     next piece, where someone would be hypervigilant so in

10    a restaurant, not be able to sit with their back to a

11    door, which I actually think is one of the symptoms

12    that Lori told me about.  Sometimes people are just

13    fearful to leave their houses.

14         Again, the world is perceived as a dangerous,

15    scary place and not a safe place anymore.  Trouble

16    sleeping, mind racing, keeps people up at night as well

17    as the nightmares and also mood changes that can be

18    seen as depression, so loss of pleasure in life, loss

19    of interest in life in general, distance and detachment

20    from relationships in your life.

21         So those basically fulfill the criteria for

22    PTSD.  A person doesn't have to meet -- have all of

23    those symptoms, but they have to have a smattering of

24    those symptoms in each of the classes that I've

25    mentioned.  And actually Lori pretty much has all of

1    those symptoms.

2          The final piece is that the symptoms have to

3    have gone on for a certain amount of time, maybe -- in

4    the DSM, it's written as a month.  Often it goes on --

5    unfortunately, it can be lifelong.  And the symptoms

6    have to be serious enough that a person has trouble

7    functioning, so they can't function at work, they can't

8    function socially.  In order for it to be a disorder, a

9    psychiatric illness, it has to affect function.  So

10   that was rather prolonged.

11   **Q.**    Thank you.  Did you apply those criteria to Lori?

12   **A.**    Did I apply them?  Of course.

13   **Q.**    What is her diagnosis?

14   **A.**    PTSD.

15   **Q.**    Is determining the cause of the PTSD important in

16   the course of your treatment of a patient?

17   **A.**    It's important therapeutically because in therapy,

18   obviously, you need to know -- you need to get well

19   acquainted with a patient's psyche and what they're

20   going through and you need to know how the incidents

21   affect their psyche as you treat a person, you know,

22   because it can inform you about the best ways to help a

23   person.

24         And often -- again, this is more Dr. Olson's

25   realm than mine.  You know, her therapy will be more

1    directed at symptoms but also what caused them.

2         For me, my primary job is to prescribe medicine,

3    see how it works and help that person in a medical way.

4    So, for me, an actual fact, the cause of the trauma may

5    be less important than the symptom profile I'm being

6    faced with.

7    **Q.**   Okay.  In Lori's case, have you considered or

8    formed an opinion as to what caused her PTSD?

9    **A.**   Yes.

10   **Q.**   And what was the cause?

11   **A.**   It was her work as a first responder and her

12   treatment by her colleagues.

13   **Q.**   What about experiences from her childhood?

14   **A.**   Lori told me when I first met her that there was

15   some alcoholism in her family growing up, but she also

16   told me that she had gone to therapy and that she was a

17   successful human being.

18        She had made it through college, she had put it

19   all behind her, and it wasn't until she'd been working

20   in the fire department and experienced traumas on the

21   job and insubordination and certain specific incidents

22   that she had the symptoms of PTSD.

23   **Q.**   And I noticed your mentioning traumatic events

24   that she experienced on the job, plus her treatment

25   from her co-workers.  Can you explain to us how it's

1    possible to have two separate things that are the cause

2    of a psychological illness.

3    A.    Yes.  So clearly the work that Lori was doing has

4    a traumatic nature to it, seeing people with gunshot

5    wounds, seeing dead babies and trying to help them,

6    being there in that situation; but not all people who

7    do that job will have PTSD.

8         In an earlier DSM, it talks about the trauma

9    being experienced with horror and with a feeling of

10   lack of control being a big contributor to PTSD.  And

11   from the incidents that have been both reported by --

12   you know, that I've read from Dr. James Curran and from

13   our other treaters and that Lori's told me, the

14   situations that Lori was faced with were made

15   infinitely worse by insubordination from her colleagues

16   and their abusive treatment of her.

17   Q.    I'd like to go through some of the medications

18   that you discussed before or the fact that you

19   discussed that it's your job to prescribe.

20   Escitalopram?

21   A.    Escitalopram.

22   Q.    Escitalopram.  Could you tell us what that is.

23   A.    Yes.  It's in a family of antidepressants called

24   SSRIs, selective serotonin reuptake inhibitors.  Some

25   of you may be familiar with others like Prozac and

1  Zoloft.  This is one of the members of that group, and

2  they're prescribed for depression and for anxiety as is

3  the escitalopram.

4  **Q.**  Do you have any recollection as to when Lori

5  started taking antidepressants?

6  **A.**  Lori was already taking escitalopram when she

7  started treatment with me.  She was taking

8  10 milligrams at that time, and again this was April

9  2011.

10       And what may be interesting is that at that time

11  she actually said she was doing better.  She had been

12  out of work for, I don't know why I remember this but I

13  do, 191 days.  She said she was doing better.  She was

14  taking that medicine and one of the others that you

15  probably have there.

16  **Q.**  And do you know if this was prescribed before or

17  after 2009 or do you just not remember?

18  **A.**  You know what, I don't know that.  Can I add that

19  on the first visit, since she'd been doing well with

20  that and an SSRI is the recommended treatment for PTSD,

21  rather than switching her, I elected to increase the

22  dose.

23  **Q.**  Any side effects associated with the escitalopram?

24  **A.**  It's very well tolerated.  Truth is, the most

25  common side effect is sexual side effects; but other

1    than that, all medicines in its class could cause a

2    headache or stomach problems.  It's very rare with that

3    particular medicine.

4    **Q.**    And by sexual, you mean loss of libido?

5    **A.**    Correct.

6    **Q.**    How about clonazepam, what is clonazepam?

7    **A.**    Clonazepam, it's a benzodiazapine.  It's in the

8    same family as Valium.  It's a sedative hypnotic, so it

9    helps to calm anxiety and can also help with sleep.

10   **Q.**    Do you recall what Lori's symptoms were when you

11   prescribed the clonazepam?

12   **A.**    I can.  Her previous doctor already had her on a

13   low dose.  So I continued that, and I don't think we

14   did a dosage change on that.  At that time she was

15   taking that mostly for sleep but still was having

16   sleeping problems.

17   **Q.**    Do you know if those sleeping problems persist?

18   **A.**    They do, but I prescribed Trazodone at that first

19   meeting to help with the sleeping problems

20   specifically, which she is still taking.

21   **Q.**    And it looks like this one is hydroxyzine pam,

22   25 milligrams?

23   **A.**    That's a more recent medicine.  It's a mild

24   anti-anxiety agent just to facilitate -- just to help

25   her with her anxiety.  That's recent.

1    **Q.**   Trazodone?

2    **A.**   That's for sleep.  It's actually an antidepressant

3    that's not used too much for depression anymore because

4    it's sedating.  So it's a nice safe option for sleep.

5    **Q.**   And from Dr. Goldfarb, simvastatin?

6    **A.**   That's a cholesterol medicine.

7    **Q.**   Is that at all related to anxiety or stress or

8    anything like that?

9    **A.**   (No verbal response).

10    **Q.**   So I noticed that you said that some of the

11    medications had been prescribed before she started

12    treating with you and some have been added after.  Why

13    are we still adding medications now throughout her

14    treatment?

15    **A.**   For symptom management.  Obviously, this is a very

16    stressful situation for Lori, has been for a long time.

17    She still has symptoms.

18    **Q.**   Is PTSD something that can be cured?

19    **A.**   PTSD can be managed.  I mean, after time, a person

20    may no longer meet criteria and a trauma can become a

21    memory as opposed to causing all the symptoms that I

22    described.  And so a person can get on with their life

23    often in a different capacity.

24    **Q.**   And can you describe the type of events or

25    experiences that allow someone to transform a trauma to

1    a memory.

2    **A.**    Time, therapy, experiences, not having to relive

3    the trauma again.  I mean, I have to say,

4    unfortunately, as in a courtroom, that will certainly

5    set somebody back.

6    **Q.**    What's Lori's prognosis with your course of

7    treatment?

8    **A.**    Guarded.

9    **Q.**    Can you describe what you mean by that.

10   **A.**    Like I say, PTSD doesn't just go away in my

11   experience, and the medicines only do so much.  I

12   think -- you know, I think Lori is lucky enough to have

13   a great therapist, seeing my colleague, and I hope that

14   Lori will be able to move on from this and establish a

15   new life for herself; but clearly it's going to be

16   different from the life that she had when she

17   experienced the trauma.

18   **Q.**    I'd like to pose a hypothetical to you.  If

19   someone were to say to you that all of Lori's problems

20   at work were caused by Lori's inability to get along

21   with others, how would you respond to that?

22           MR. McHUGH:  Objection as to form.

23           THE COURT:  Overruled.

24   **A.**    I'm sorry, her personality?

25   **Q.**    If someone were to say to you that all of Lori

1    Franchina's problems at work were caused by her

2    inability to get along with others, how would you

3    respond to that?

4    **A.**   I would say that person didn't know Lori very

5    well.

6    **Q.**   Why?

7    **A.**   Because she's a nice person.  I think it's

8    ridiculous.  I think -- I've always found Lori to be a

9    very likeable person, and she's a strong, caring woman.

10        MR. MARTIN:  Thank you, Doctor.  Nothing

11   further.

12        THE COURT:  Thanks, Mr. Martin.

13        Mr. McHugh.

14        MR. McHUGH:  Thank you, your Honor.

15                   CROSS-EXAMINATION

16   BY MR. McHUGH:

17   **Q.**   Good afternoon, Doctor.

18   **A.**   Good afternoon.

19   **Q.**   In psychiatry, there's no objective testing;

20   correct?

21   **A.**   Correct.

22   **Q.**   And your diagnosis is necessarily dependent upon

23   the history that the patient gives you; right?

24   **A.**   Correct.

25   **Q.**   And if the patient is not an accurate historian,

1    the diagnosis could be wrong; correct?

2    A.    Correct.

3    Q.    And if the patient lies about the history, the

4    diagnosis could be wrong; correct?

5    A.    Correct.

6    Q.    And do you know how long Lori Franchina worked on

7    the Providence Fire Department?

8    A.    Let's see.  I believe she started somewhere around

9    '02.  You guys are going to have to tell me if I'm

10   right or wrong.  And then when I saw her in '11, she

11   had been out for about six months.  So I guess that

12   makes it about eight years.

13   Q.    You never treated her while she was actively

14   working as a firefighter, did you?

15   A.    Correct.  No, I didn't.

16   Q.    And you didn't interview any of the alleged

17   harassers that she complained about; correct?

18   A.    No.

19   Q.    And you don't have any of the specifics of the

20   alleged harassment she received; right?

21   A.    I have -- you know, I read the reports from

22   Dr. James Curran, and I read -- and I know she also --

23   actually, that was after he saw her.  No, it wasn't.

24   It was about the same time.  She saw a Dr. Curt

25   LaFrance who did an independent evaluation.

1          MR. McHUGH:  Your Honor, could you strike that,

2     please.

3          THE COURT:  Yeah.  Ladies and gentlemen,

4     disregard any testimony about independent medical

5     exams.

6          THE WITNESS:  Sorry.

7          THE COURT:  That's okay.  You wouldn't have

8     known.  It's not a problem.

9     Q.   So you had bits and pieces essentially --

10    A.   Correct.

11    Q.   -- of what she alleges she was harassed?

12    A.   Correct.

13    Q.   And did you know that the first person she alleged

14    harassment against in the Providence Fire Department

15    was immediately separated from working with her?

16    A.   I don't know who that first person is that you're

17    referring to.

18    Q.   Okay.  Do you know that that first person she

19    complained about was fired for harassing her?

20    A.   I did not.  Maybe it was appropriate.

21    Q.   And did you know that the chief of the department

22    put out an order that the person that Lori was

23    complaining about harassing her could not work with her

24    or work at any station where there was a rescue?

25    A.   Actually, if we're referring to -- am I allowed to

1    say this person's name who I think we're talking about?

2    **Q.**   Sure.

3    **A.**   McGarty.  Right?

4    **Q.**   Right.

5    **A.**   I believe that there was a restraining order

6    against him and that that was violated many times.

7    **Q.**   Well, did you know that the chief of the fire

8    department put out an order that Mr. McGarty was not to

9    work at all with Ms. Franchina or be assigned to any

10   station where there was a rescue?

11   **A.**   I knew something like that, but I also know that

12   it was violated; and I also believed that if someone's

13   suffering with PTSD partly due to the actions of a

14   person, that that's completely reasonable.

15   **Q.**   What's completely reasonable, that they be

16   separated?

17   **A.**   That someone not be supposed to work with a

18   perpetrator.

19   **Q.**   And you did know that Chief Dillon ordered that?

20   **A.**   I don't know who Chief Dillon is.

21   **Q.**   Did you know that the chief of the fire department

22   ordered that?

23   **A.**   I don't see why that's -- I mean. . .

24   **Q.**   I'm just asking you, did you know that the chief

25   of the Providence Fire Department ordered that

1    Mr. McGarty --

2    **A.**   Somebody ordered it.  It doesn't matter to me who

3    it was.

4    **Q.**   It's just important that it was ordered?

5    **A.**   Okay.

6    **Q.**   Now, I wanted to ask you some questions about your

7    notes.

8    **A.**   Sure.

9           MR. McHUGH:  Your Honor, if the witness could

10   see Plaintiff's Exhibit 34 full.

11   **Q.**   If you could find your notes in there.

12   **A.**   I'm looking at page 34 here?

13   **Q.**   No, it's Exhibit 34, Doctor.  Your notes, the

14   first one I wanted to ask you about was February 25th,

15   2015, if you can find that note.

16   **A.**   Okay.

17   **Q.**   And do you see in that note at that time on

18   February 25th, 2015, Ms. Franchina was experiencing

19   financial stress?

20   **A.**   Sure.

21   **Q.**   And that can add to her anxiety; correct?

22   **A.**   Correct.

23   **Q.**   And I want you to look at another one of your

24   notes, January 7th, 2015.

25   **A.**   Yes.

1    **Q.**    And you remember that she reported to you that a

2    firefighter had intentionally snapped gloves in her

3    face with blood?

4    **A.**    Uh-huh.

5    **Q.**    You have to answer in words, Doctor.

6    **A.**    Sorry.   Yes.

7    **Q.**    And in this note on January 7th, 2015, you say

8    that she has been getting new information, i.e., that

9    flicking of brain matter in her face was intentional.

10   So as of January 7th, 2015, that was new information

11   that she had that she reported to you; correct?

12   **A.**    Yes.

13   **Q.**    All right.   If you look at the December 8th, 2011,

14   note, her chief complaint says "all right"?

15   **A.**    Uh-huh.

16   **Q.**    You have to answer in words, Doctor.

17   **A.**    Yes.   That's what I wrote on my note.

18   **Q.**    And in the interim history, you talked about she

19   was feeling a lot of stress and overwhelmed because of

20   her boss; correct?

21   **A.**    Yes.

22   **Q.**    And that was after she had left the Providence

23   Fire Department and was working somewhere else; right?

24   **A.**    Yes.   That was a landscaping part-time facility.

25   **Q.**    Now, look at the November 3rd, 2011, note.   Do you

1    have that one, Doctor?

2    **A.**    Yes.

3    **Q.**    And there again she's talking about her current

4    boss and a lot of anxiety working for that individual;

5    right?

6    **A.**    A lot of anxiety and flashbacks on Admiral Street.

7    **Q.**    And at that point she was not working for the

8    Providence Fire Department, was she?

9    **A.**    No, she wasn't.

10   **Q.**    Look at the note from September 19th, 2011.

11   **A.**    Uh-huh.

12   **Q.**    There the chief complaint says "good"; right?

13   **A.**    Correct.

14   **Q.**    So she was feeling good back in September of 2011;

15   correct?

16   **A.**    Not necessarily.  That's probably what she said

17   when she walked in my door, and then the interim

18   history would be a more accurate look at how she was

19   really feeling.

20   **Q.**    Well, would that be an example of a patient not

21   telling the truth when they came in if they said their

22   chief complaint was she was good and in the interview

23   you find out they're not good?

24   **A.**    You said of not telling the truth?

25   **Q.**    Right.

1    **A.**   No, I don't think so.  I think when -- I think

2    that's more of good manners, not wanting to talk about

3    how sucky you feel.  Sorry, that's not good English,

4    but, you know.  And then as with a lot of patients, you

5    have to talk with them a bit more to get really the

6    details of how they're feeling.

7    **Q.**   So on that particular date, September 19th, 2011,

8    she was not forthcoming, would you say?

9    **A.**   No, I would not say that.

10   **Q.**   Would you say she was not an accurate historian on

11   that day?

12   **A.**   No, I would not say that.  She feels that any day

13   she could have a panic attack or not be able to

14   function in a group, irritable, frustrated, trying to

15   keep busy, low energy.  I think that's not a sign of

16   someone who's not reporting how they feel.

17   **Q.**   Now, look at the May 26th, 2011, note.  And in

18   that note, it says chief complaint "pretty good";

19   correct?

20   **A.**   Correct.

21   **Q.**   Again she's telling you she feels pretty good on

22   May 26th, 2011; right?

23   **A.**   When she walked in the door, that was the first

24   thing she said.  And "pretty good," again, I'd just

25   like to bring you back to 2009 when I first saw her.

1    She said that she was feeling better than she had.  No,

2    sorry.  I'm getting mixed up here.

3         When I first saw her in 2011, she said she was

4    doing better than when she first started treatment; but

5    she still met full criteria for post-traumatic stress

6    disorder.  So this is a matter of degrees, and I write

7    the notes for myself to evaluate how my treatment is

8    going.

9    Q.   Well, at that point she reported to you that her

10   mood has improved, she felt back to herself; isn't that

11   correct?

12   A.   Mood is improved.  She was somewhat back to

13   herself, some depression when alone or late at night.

14   So yeah, presented a mixed bag, which is not uncommon.

15   Mind races around fire department issues.

16   Q.   When's the last time you saw her, Doctor?

17   A.   Actually, I saw her on Friday.

18   Q.   And when was the time before that that you saw

19   her?

20   A.   I'd have to take a look and see.

21   Q.   Look through there, please.

22   A.   Sure.  I've got them in order here.  This goes to

23   2015.  You may not have every single note here.  Can I

24   look at my own notes to tell you?

25   Q.   Well, yeah.  I'd like to look at them, too, if you

1    have notes that we don't have, Doctor.

2    **A.**   Because it looks like these are going forward in

3    time until you get to Dr. Olson's notes.  And I've got

4    one in here from April '15, and then they go to

5    Dr. Olson's notes.  So let me ask you if you have notes

6    from -- so I saw Lori February 3rd, 2016; prior to

7    that, 8/28/15; prior to that, 7/14/15; prior to that,

8    5/19/15; and then it goes to the 4/20/15 that you've

9    got here.  Do you have those others?

10            MR. McHUGH:  No.  And with the Court's

11   permission, I'd like to see those three that you just

12   mentioned since we don't have them.

13            THE COURT:  I think that makes sense at the

14   break.

15            THE WITNESS:  I could pass them to you or we can

16   photocopy them.

17   **Q.**   At the break, we're going to take a look at them.

18   Do you know how many gunshot wound calls Lori Franchina

19   responded to during her career?

20   **A.**   No.

21            MR. McHUGH:  May I have a moment, your Honor?

22            THE COURT:  Sure.

23            (Pause.)

24            MR. McHUGH:  The only other questions I would

25   have would be based on those notes.

1          THE COURT:  Why don't we do this, Mr. McHugh, if

2     it's all right with you.  Why don't you take a look at

3     the notes now while Mr. Martin does redirect, and maybe

4     we can complete even before the break and let the

5     doctor leave.  Is that okay?

6          MR. McHUGH:  Sure.  May I approach the witness,

7     your Honor?

8          THE COURT:  Sure, of course.  Why don't you do

9     that, Mr. Martin, if you don't mind; and then if

10    there's anything that comes out of that, Mr. McHugh,

11    we'll allow you to ask some questions and then

12    Mr. Martin; but that way we can try and get the doctor

13    off the stand before the break.

14                      **<u>REDIRECT EXAMINATION</u>**

15    **<u>BY MR. MARTIN</u>:**

16    **Q.**   Hi, Doctor.

17    **A.**   Hi.

18    **Q.**   A couple of questions.  First, do you recall you

19    were just asked about finding new information about the

20    flicking of a glove being intentional?  Do you recall

21    that?

22    **A.**   I do.

23    **Q.**   I know that you made reference in your records to

24    there being new information.  Did you understand that

25    to mean that that was the first time she discovered

1      that the flicking had been intentional?

2              MR. McHUGH:  Objection, leading.

3              THE COURT:  Overruled.

4      **A.**   Yes, and I think it would be corroborated by

5      Dr. James Curran's notes.  This was a particular

6      incident on Job Street where a patient had a gunshot

7      wound, and so that was all very traumatic to begin

8      with, as well as insubordination from her colleague.

9              And then apparently one of the firefighters

10     flicked the glove and -- which resulted in brain matter

11     and blood on Lori's face, which in and of itself is

12     traumatic enough to cause PTSD.  I'm going off track

13     here, but --

14     **Q.**   But is your note --

15     **A.**   But then at that time I think it wasn't -- what I

16     got from what Lori said was at that time it wasn't

17     known to be intentional, that this person did it on

18     purpose, that it seemed accidental; but then from my

19     note and what Lori said at that particular session,

20     that she had recently learned that it was intentional,

21     that it was someone basically trying to assault her

22     with what could have been, you know, biological --

23     could have been infected with HIV.  I mean, that's very

24     serious.

25     **Q.**   What I'm trying to figure out, Doctor, is, does

1   your note mean that that was the first time you learned

2   that it was intentional?

3   **A.**   Correct.

4           MR. McHUGH:  Objection, asked and answered,

5   leading.  Move to strike the answer.

6           THE COURT:  Overruled.  Denied.

7   **Q.**   Was it the first time that you learned that the

8   incident was intentional or is it the first time that

9   Lori learned that the incident was intentional?

10  **A.**   Both.

11  **Q.**   Both.  And do you recall what Lori said about

12  that?

13  **A.**   That it was horrifying and upsetting.  I mean, I

14  can look at my note.

15  **Q.**   Yes, could you look at your note.

16  **A.**   Anyone know what date it was?  Oh, here it is.

17  Okay.  So it was January 7th, 2015.  So comment, the

18  deposition's in nine days, so that was some court

19  proceeding.  She has been getting new information,

20  i.e., that the flicking of brain matter in her face was

21  intentional.

22          How did she respond?  Actually, she said that

23  she felt that she was handling it, she was coping.

24  Excuse me.  Still has nightmares, night sweats,

25  stressors, flashbacks, hypervigilance, every corner of

1    the city, anxiety causes stomachache and nauseousness.

2    **Q.**   Okay.  I'd like to direct your attention also to

3    the April 27th, 2011, notes that Mr. McHugh addressed

4    with you.

5    **A.**   April 27th, 2011?

6    **Q.**   Yes.

7    **A.**   Okay.  My initial.  Okay.

8    **Q.**   There's typewritten and handwritten, so I'm

9    looking at the typewritten.

10   **A.**   All right.  Okay.

11   **Q.**   Under Impression, you wrote, "The patient is a

12   39-year-old gay white female firefighter with a history

13   of harassment and insubordination from her colleagues

14   possibly resulting in a bad outcome at a call."  Did I

15   read that correctly?

16   **A.**   Correct.

17   **Q.**   When she first told you the history of harassment

18   and insubordination, did she make reference to the

19   flicking of the brain matter on her face?

20   **A.**   No.  I don't think it's in my note on that day.

21   Let me see.  Sorry.  Let me look.  There was a lot that

22   was talked about.  I don't remember the specifics.

23           Okay.  So there is a reference to that incident.

24   Okay, shot himself in the head, that is that particular

25   incident.  Combination of not following orders.  She

1   was feeling remorse because her orders were not

2   followed.  There's no comment in my note about the

3   brain matter.  Do you see it?

4   **Q.**   No.  So I was still on the typewritten notes.  So

5   the handwritten notes from 4/27/11, those are where you

6   kept what she had reported to you?

7   **A.**   Yeah.

8   **Q.**   Okay.

9   **A.**   They're not there.  So I didn't know about it at

10  that time.  Again, she may have mentioned it.  I don't

11  typewrite absolutely everything down that my patients

12  say to me.

13  **Q.**   Okay.  And then on the next page -- if you don't

14  write it, is it possible that sometimes you forget?

15  **A.**   Of course.  My goal is to treat the patient and

16  to, you know, like I say, make a diagnosis so I know

17  how to treat my patients.  It's not to record every

18  detail.

19  **Q.**   Okay.  And on the next page you talk about the

20  psychiatric history, and it says "prior

21  hospitalizations, On-Site Academy"?

22  **A.**   Yes.

23  **Q.**   That was after the Job Street incident that

24  occurred at the end of July 2009?

25  **A.**   Yes.

1   **Q.**   And Dr. Curran she treated with weekly since the

2   incident, since just after 2009?

3   **A.**   Yes.

4   **Q.**   Did you notice any indication in her records as to

5   whether or not she was attempting to return to work?

6   **A.**   Yes.   From Dr. Curran's notes, I believe -- I'm

7   sorry, I'm forgetting the details, but I know she

8   started seeing Dr. Curran in 2009 and then Lori was out

9   of work.   You know what, I can remember.   And then she

10  went back to work I believe at the end of 2009.

11        And then there was another incident, and then

12  clearly she was back at work because there was a

13  restraining order and then -- so it seems to me that

14  Lori made the effort to go back to work several times.

15        MR. MARTIN:   Thank you, Doctor.   Nothing

16  further.

17        THE COURT:   Thanks, Mr. Martin.   Anything to

18  follow up based upon the --

19        MR. McHUGH:   I don't have any questions based on

20  these notes, your Honor.   Should I return them?

21        THE COURT:   Do you want to make them part of the

22  record, Mr. McHugh?

23        MR. McHUGH:   No, because --

24        THE COURT:   That's fine.   Why don't you give

25  them back to the doctor.

1           Ladies and gentlemen, we'll take -- Dr. Yanni,

2     you're all done.  Thank you, ma'am.

3           Ladies and gentlemen, we'll take our afternoon

4     break now.  We'll see you back in about 15 minutes.

5           (Recess.)

6           THE COURT:  So if it's not obvious to you,

7     ladies and gentlemen, we've completed our little detour

8     of allowing two witnesses to testify out of turn, and

9     we're going to go back to continue with the

10    cross-examination of the Plaintiff followed by the

11    redirect examination of her.

12          So Mr. McHugh.

13          MR. McHUGH:  Thank you, your Honor.

14          THE COURT:  And thank you, counsel, for

15    accommodating each other.  It makes life a whole lot

16    easier, and I really appreciate both of you doing that.

17              **LORI FRANCHINA, PLAINTIFF'S WITNESS, RESUMES**

18                    **CONTINUED CROSS-EXAMINATION**

19    **BY MR. McHUGH**:

20    **Q.**   Ms. Franchina, I think the end of my questioning

21    revolved around the Job Street incident, and I just had

22    one more question for you on that.  You finished the

23    run at Rhode Island Hospital Emergency Room; is that

24    correct?

25    **A.**   That's where I transported the victim, yes.

1   **Q.**   And when you finished the run and came out and

2   were finished with the hospital, you actually

3   complimented Firefighter Tang on the job he did, didn't

4   you?

5   **A.**   I did not.  I never came out of the hospital.  I

6   was a patient.

7   **Q.**   So you deny that you complimented Firefighter Tang

8   at the end of that incident on having done a good job?

9   **A.**   Absolutely.

10   **Q.**   Now, you told us earlier Thursday about an

11   incident in the academy where someone was urinating

12   while you were cleaning the bathroom.  Do you remember

13   that?

14   **A.**   I do.

15   **Q.**   And there was another problem at the academy,

16   wasn't there, with some of the cadets referring to the

17   female candidates as the weaker sex?

18   **A.**   I don't recall that.

19        MR. McHUGH:  Okay.  Let me show you your

20   deposition.

21        Your Honor, I wanted to read Volume I of

22   Ms. Franchina's deposition; and I want to read page 28,

23   line 2 through 25, and page 29, line 1 through the rest

24   of that page to page 30 from line 1 through line 13.

25        THE COURT:  Okay.

1    **Q.**   Do you have that on page 28, Ms. Franchina,

2    Volume I of your deposition?

3    **A.**   I do have it on page 28.

4    **Q.**   Question beginning at line 2, "That's the first

5    time you experienced harassment in the academy?"

6         Answer, "Yes."

7         "How far into the academy would you say you

8    experienced it?"

9         Answer, "I don't know.  Can't recall."

10        Question, "Do you think it was the first week?"

11        Answer, "Can't recall."

12        Question, "And what was the harassment?"

13        Answer, "Talking down to, being made aware that

14   we were weaker as a female and just banter back and

15   forth about, you know, just the weaker sex."

16        Question, "How many women were in A Group?"

17        Answer, "One."

18        "You were the only woman in A Group?"

19        Answer, "Correct."

20        "How many other women were in the academy?"

21        Answer, "Two others."

22        Question, "What were their names?"

23        "Andrea Stukus and Heidi Kennedy.  I think when

24   she started the academy it was Heidi Davis."

25        Question, "So when you say talk down and being

1    reminded about the weaker sex, was that an officer

2    doing that or fellow recruits?"

3            On page 29, answer, "Fellow recruits."

4            Question, "These fellow recruits, did they do

5    that in front of any officer?"

6            Answer, "Unaware."

7            Question, "Where did that occur?"

8            Answer, "Drill, during drills."

9            Question, "You said something about the

10   lieutenant handled it.  What do you mean by that?"

11           Answer, "He took us all aside, basically told us

12   if he heard of anything continuing, that he would

13   remove us from the academy."

14           Question, "Did he witness this?"

15           Answer, "Unaware."

16           Question, "How did he know that this was going

17   on?"

18           Answer, "We as a group brought it to his

19   attention."

20           Question, "When you say we as a group, you mean

21   the other two women and yourself?"

22           Answer, "No, group.  A Group.  Only one woman in

23   A Group.  Me, my group, A Group."

24           Question, "So when you say we brought it to his

25   attention, who brought it to his attention other than

1    you?"

2          Answer, "Me, Brian Belhumeur, which was the

3    number one in the academy and in A Group, trainee

4    number one.  I was trainee number four, and trainee

5    number nine, Danny Amarone, the three of us."

6          On page 30.  Question, "You went to see the

7    lieutenant and told him about this?"

8          Answer, "We didn't approach him other than in a

9    drill setting."

10         Question, "Okay.  Do you remember what any of

11   you said to him?"

12         Answer, "Just it needs to stop.  We all need to

13   work together.  We can't have this."

14         Question, "And then did he address A Group as a

15   group?"

16         Answer, "As a group, that's correct."

17         Question, "Outside, during a drill?"

18         Answer, "Correct."

19         Question, "Did it stop after he addressed them?"

20         Answer, "Yes."

21         Does that refresh your recollection that you

22   complained about being talked to that way and the

23   lieutenant took care of it at the academy?

24   A.   I believe it states three people complained,

25   myself, Brian Belhumeur and Danny Amarone all

1    complained.

2    **Q.**    Right.  Does that refresh your recollection, then,

3    when it was brought to the lieutenant's attention, they

4    stopped it?

5    **A.**    Yes.

6    **Q.**    Now, when you first -- you told us that when you

7    first --

8    **A.**    Am I still looking at this?

9    **Q.**    No.  That's okay.  Sorry.

10   **A.**    That's okay.

11   **Q.**    When you first started working, I think you said

12   within a few weeks you were on a -- as a rescue tech.

13   Was that correct?

14   **A.**    When I first got on the job?

15   **Q.**    Right.

16   **A.**    Yes.

17   **Q.**    Because you already had the EMT certification and

18   EMT-C certification?

19   **A.**    That's correct.

20   **Q.**    Which is cardiac; right?

21   **A.**    In the State of Rhode Island, it's considered

22   cardiac.

23   **Q.**    And so you were offered by Chief Dillon at the

24   time, who wasn't the chief, to become an acting rescue

25   lieutenant; correct?

1   **A.**   I wouldn't consider it offered.  I was ordered.

2   **Q.**   Okay.  Well, didn't he ask you at first and you

3   said no?

4   **A.**   I continued to say no for over six months.

5   **Q.**   Even though he had the authority to order you to;

6   correct?

7   **A.**   He did have the authority, and he did order me.

8   **Q.**   Eventually he ordered you to; right?

9   **A.**   That's correct.

10  **Q.**   But when you took that acting rescue lieutenant's

11  position, you made more money at that; right?

12  **A.**   No.

13  **Q.**   You had the pay of an acting rescue lieutenant

14  when you took that position, didn't you?

15  **A.**   From a rescue position, a rescue tech position, I

16  made a rescue tech's salary or pay.  And in my acting

17  officer position, yes, I would make an officer's pay.

18  So yes, I stated it incorrectly.  But even if I hadn't

19  made rank, when I was acting in that position, I would

20  have made the rank of an officer, yes.

21  **Q.**   Right.  And even for call-back, because it's

22  time-and-a-half times the regular rate, your overtime

23  rate would have been higher, too; correct?

24  **A.**   Correct.

25  **Q.**   I realize I'm jumping around here a bit, but that

1    incident at the Branch Avenue Station on October 28th

2    when you saw McGarty in the fire station, you sat for a

3    while in the office with Chief Horton; correct?

4    **A.**   Yes, I did.

5    **Q.**   And Chief Horton actually asked you if you wanted

6    a ride home and if you were okay; right?

7    **A.**   No, he did not.

8    **Q.**   You don't think he asked you if you wanted a ride

9    home?

10   **A.**   I can't recall.

11   **Q.**   Okay.  Let's look at your deposition again.  I

12   know I just told you you can put it away, but look at

13   that Volume I of your deposition again, page 139.

14   **A.**   Did you indicate a page?

15   **Q.**   Yes, page 139.

16   **A.**   Oh.

17   **Q.**   Well, let me do this.  Let me go back to page 138,

18   Volume I.  Actually, go back to page 137, and I'll get

19   to the question, and then we'll go ahead a couple of

20   pages.  So if you look at page 137 --

21   **A.**   I'm on 137.

22   **Q.**   -- line 4, question, "Where did you go then?"

23          Answer, "Captain Mello approached the chief's

24   door."

25          This is at Branch Avenue, remember, on the 28th?

1    You agree with that; correct?

2    **A.**   Yes.

3    **Q.**   "Captain Mello approached the chief's door,

4    knocked.  There was a brief conversation with Chief

5    Horton and Captain Mello.  Captain Mello stated, If

6    there's anything you heard that upset you, I'm sorry,

7    and I accept your apology, I do not accept what just

8    happened.  And then Chief Horton shut the door and

9    engaged in conversation for quite a while."

10          Question, "You and Chief Horton?"

11          Answer, "Correct."

12          Now, if you now go over to page 139, the answer

13   above on line 1.

14   **A.**   I'm sorry, 139?

15   **Q.**   139.  Okay?  Beginning on line 7, Chief Horton,

16   "He repeatedly asked me if I was okay, if I needed a

17   ride home from there.  I told him that I was -- it

18   helped talking to him, getting some answers, and it

19   helped knowing that he tried helping me but couldn't,

20   you know, because he said -- he actually used the

21   terminology, it starts to fall on deaf ears."

22          Does that refresh your recollection as to

23   whether or not Chief Horton offered you a ride home on

24   October 28th?

25   **A.**   Yes, sir.  It's just a large amount of material to

1    remember; but thank you, yes, it does refresh my

2    memory.

3    **Q.**   And you were aware from when you came on the job

4    that there was a sexual harassment policy; correct?

5    **A.**   Yes.

6    **Q.**   And you could make a complaint under that policy

7    if you so choose -- chose; correct?

8    **A.**   Yes.

9    **Q.**   Now, there were a couple of other female

10    firefighters that I believe you had some problems with.

11    You had some problems with Stephanie Blackwell?

12    **A.**   Could you refer to "problems"?

13    **Q.**   Let's look at your deposition.  Now, this is going

14    to be --

15         MR. MARTIN:  Objection.  There's no inconsistent

16    statement.  She asked for clarification.

17         THE COURT:  Sustained.

18         MR. McHUGH:  Can I refresh her recollection with

19    the deposition?

20         THE COURT:  Not until she says something that's

21    inconsistent with the testimony.  You have to ask her

22    further questions about the incident; and then if

23    there's a conflict, you can go to it.

24    **Q.**   Okay.  Do you remember ever having a conflict with

25    Stephanie Blackwell?

1    **A.**    Yes.

2    **Q.**    What conflict was that?

3    **A.**    During emergency runs with driving the vehicle,

4    lights and sirens, I found her texting, which is

5    against state law but puts myself at serious risk in

6    the back.  I ordered her to put her phone down and

7    provide safety for myself and the passenger in the back

8    of the rescue.

9    **Q.**    Okay.  Do you remember having a conflict with

10   Firefighter Jennifer LaBerge?

11   **A.**    Yes, I do.

12   **Q.**    What was that conflict?

13   **A.**    We were dispatched as Rescue 6 with Ladder 7 to a

14   severed hand; and all the times that you're on the

15   road, you will not be dispatched with the voc tones in

16   a firehouse.  You're supposed to always have access to

17   a portable radio.

18        And she delayed by several minutes to respond

19   with the ladder company that we were leaving the same

20   house with and for a severed hand.  I addressed her

21   about her promptness.  Severed hand.

22   **Q.**    At one point in this case, Ms. Franchina, you

23   attributed all your problems with your fellow

24   firefighters and officers on the Providence Fire

25   Department to that incident with Andre Ferro; is that

1    correct?

2         MR. MARTIN:  Objection.  It's a

3    mischaracterization.

4         THE COURT:  You can redirect on it.  Overruled.

5    **A.**   Repeat the question, please.

6    **Q.**   At some point you attributed all the problems you

7    had on the Providence Fire Department with your fellow

8    firefighters and officers to the Andre Ferro incident;

9    correct?

10   **A.**   I strongly believed that.

11   **Q.**   Now, we heard today from your psychologist and

12   psychiatrist; correct?

13   **A.**   That is correct.

14   **Q.**   But prior to that, you actually were in

15   counselling before you reached the age of 17; correct?

16   **A.**   Yes.  I didn't describe it as counselling.

17   **Q.**   What would you describe it as?

18   **A.**   I met with the pastor of my church, Father King.

19   **Q.**   And during your tenure on the Providence Fire

20   Department, you went out IOD for several different

21   injuries; is that correct?

22   **A.**   I did sustain injuries, correct.  It's a very

23   physical and demanding job.

24   **Q.**   Right.  One was a calf pull?

25   **A.**   Correct.

1   **Q.**   One was your back?

2   **A.**   I did have a back strain, yes.

3   **Q.**   And one was your right forearm strain?

4   **A.**   That's correct.

5   **Q.**   And you went out IOD for those injuries; correct?

6   **A.**   Absolutely, treated by a physician and given IOD

7   status.

8   **Q.**   And in this case you're not claiming any medical

9   bills as damages; correct?

10   **A.**   I'm unaware of what we're going for.

11        MR. McHUGH:  Okay.  One moment, your Honor.

12        THE COURT:  Sure.

13        (Pause.)

14   **Q.**   At one point in time when you were treating with

15   Dr. Olson, not that long ago, September 16th, 2015, you

16   were having a problem with your roommate and wanted to

17   figure out a way how you could get your roommate to

18   leave; correct?

19   **A.**   No.

20   **Q.**   Did you tell Dr. Olson at that period of time that

21   you had a situation with your roommate where you felt

22   the woman was ungrateful and irresponsible?

23   **A.**   I'm not aware.  I'd have to look at the notes and

24   refresh my memory to the exact situation.  My

25   roommate's a recovering alcoholic.  I've let her come

1    in, and I've cared for her.  She's a friend from

2    college.  So I'm actually helping her through a great

3    deal of emotional and --

4    **Q.**   If I show you Dr. Olson's note in Exhibit 34 from

5    September 16th, 2015, do you think that would refresh

6    your recollection whether or not you ever told her

7    that?

8    **A.**   Sure.

9         MR. McHUGH:  Could the witness see Exhibit 34,

10    your Honor, the note from September 16th, 2015, please.

11    **A.**   Is that coming from the date off to the right of

12    these?

13    **Q.**   Yes.

14    **A.**   Not all of them have it.  What's the date again?

15    **Q.**   September 16th, 2015.  I'm sorry, September 17th.

16    No, the date is September 16th, 2015, up in the

17    right-hand corner, 11:50 a.m.

18    **A.**   I'm going to need that date again.

19    **Q.**   September 16th, 2015.

20    **A.**   September 16th, 2015.  Would it be easier for you

21    to find it?  I have 6/10 of '15, and I don't see any

22    other additional dates.

23        THE COURT:  Do those have page numbers on the

24    bottom corner?

25        THE WITNESS:  Page 34.

1          MR. McHUGH:  If I could approach the witness,

2     I've got a copy here.

3          THE COURT:  Or you could use ELMO.  They're

4     admitted.  It's just a one-pager.

5          THE WITNESS:  Yeah, we could put it in there

6     or -- I don't know.  Sorry.

7     Q.   All right.  Ms. Franchina, it's actually

8     highlighted that last -- those last three sentences in

9     this report.

10    A.   My screen isn't on.

11         THE CLERK:  Sorry.  That's me.

12         THE WITNESS:  No worries.

13         THE COURT:  Mr. McHugh, can you pull it down a

14    little just so we can see the full document.

15         THE CLERK:  Is it okay now?

16         THE WITNESS:  It's not on, no.  Do I have to

17    touch something?

18         THE COURT:  Can the jury see it?

19    A.   Okay.  9/17/15, 11:50 a.m.

20    Q.   So you see that last sentence, "Also discussed

21    roommate situation.  Lori feels woman is ungrateful and

22    irresponsible.  Discussed how Lori can ask her to leave

23    in a way that's okay for both of them"?  Does that

24    refresh your recollection whether or not --

25    A.   I'm just -- I didn't finish reading the document.

1          I'm sorry.

2     **Q.**    I'm sorry.

3     **A.**    Yes, it does refresh my memory.

4     **Q.**    So you did tell her that?

5     **A.**    Yes, I said what was on the page.

6     **Q.**    All right.

7     **A.**    Again, she doesn't go word for word.  That is her

8     general idea, and there was a great deal about that

9     that I also discussed.

10    **Q.**    Okay.  The transfer from the North Main Street

11    Station to the Branch Avenue Station, that was actually

12    voluntary, wasn't it?

13    **A.**    Can you give me the year?

14    **Q.**    This was after you were going down to see

15    Chief Varone and you came back and cleaned out your

16    locker at the North Main Street Station and went over

17    to Branch Avenue.  So I'm not sure of the exact year,

18    but wasn't there only one transfer from North Main to

19    Branch Avenue?

20    **A.**    There was one transfer.

21    **Q.**    And that was voluntary; correct?

22    **A.**    No, it was not.

23          MR. McHUGH:  Let me show you your deposition.

24          This is Volume I, your Honor, and this is on

25    page 105.  And, your Honor, I want to --

1        MR. MARTIN:  Your Honor, can we see this page on

2    the ELMO here at counsel table.  I don't have this page

3    with me.

4        MR. McHUGH:  Yeah, if you want it on the ELMO.

5        MR. MARTIN:  I think the hard copies of the

6    depositions are with you.

7        THE COURT:  I loaned mine.

8        MR. MARTIN:  I'll bring more copies tomorrow.

9    Sorry about that.

10        THE COURT:  No problem.  Is that better,

11    Mr. Martin?

12        MR. MARTIN:  Yes.  Thank you very much.

13    **Q.**   I want to read -- that doesn't catch the line

14    numbers.  What I wanted to read was line 16 through 21;

15    and, again, just tell me if I read that correctly.

16        Question, "So now you go back to Branch Avenue?"

17        Answer, "Correct, which I voluntarily went

18    back."

19        "Excuse me?"

20        Answer, "Voluntarily."

21        "You asked for the transfer; right?"

22        Answer, "Correct."

23        Did I read that correctly?

24    **A.**   Yes.  I asked for the transcript -- I mean

25    transfer because of harassment, and it was granted by

1    an order by Chief Varone.  So he ordered me to go

2    there.  You can't just leave.

3    Q.    Now, after you left the Providence Fire Department

4    at any time from 2010 right up until the time you

5    retired, you never applied to any other fire

6    departments, did you?

7    A.    I'm permanently disabled from doing the job of a

8    rescue officer or firefighter, sir.

9    Q.    So the answer is, you never applied for another

10   job as a firefighter; correct?

11   A.    Correct.  I don't know how I could with a

12   diagnosis of permanently disabled.

13   Q.    And what job are you doing now?

14   A.    Right now I work per diem for a healthcare company

15   called Provant.

16   Q.    And what is the per diem rate for that?

17   A.    Twenty-five dollars an hour, and I haven't worked

18   since January.

19   Q.    Why is that?

20   A.    There's no job.  There's no business.  I don't

21   know how to say it.  I haven't been called.

22   Q.    Okay.  So do you wait --

23   A.    It's per diem.

24   Q.    -- for them to call you or do you call them?

25   A.    Oh, no, sir.  It's all done by computers.  You get

1    assignments, you accept your assignments, and I have

2    not received any assignments.  I do receive their

3    e-mails still to the general population.

4    **Q.**   So you have not received any assignments since

5    January?

6    **A.**   I believe so, the end of January.

7    **Q.**   When was the last time you worked at Provant?

8    **A.**   The end of January.

9    **Q.**   So you did have an assignment in January of 2016?

10   **A.**   Yes.  I worked in January of 2016.

11   **Q.**   So that's approximately -- you haven't worked

12   there February, March until today, which is April 11th;

13   correct?

14   **A.**   That is correct.

15   **Q.**   Now, what other work have you done since you

16   retired from the Providence Fire Department in December

17   of 2013?

18   **A.**   I run a landscaping company.  That was in January

19   of '14.

20   **Q.**   Okay.  Do you still have that landscaping company?

21   **A.**   I do.

22   **Q.**   Do you have any employees?

23   **A.**   No.

24   **Q.**   So it's just you?

25   **A.**   That's correct, sir.

1    **Q.**   And how much business do you get from that

2    landscaping company?

3    **A.**   I have approximately 21 clients.

4    **Q.**   And when do you start doing landscaping again?

5    **A.**   As soon as the snow goes away.  Haven't been able

6    to yet, sir.

7    **Q.**   And are there any other jobs that you applied to

8    since you left the Providence Fire Department that you

9    haven't already testified to?

10   **A.**   Yes.  I work at Eastern Connecticut State

11   University.

12   **Q.**   You work there now?

13   **A.**   I do.

14   **Q.**   What do you do there?

15   **A.**   I am the assistant softball coach for the softball

16   team.

17   **Q.**   And how much do you get paid for that?

18   **A.**   Last fall I received seven hundred and I believe

19   four dollars for the fall; and after taxes, now I

20   believe it will be around $5,000.  For February 1st

21   through May 1st, I'll receive about 5,000.

22   **Q.**   From February 1st to May 1st, 5,000?

23   **A.**   Correct.

24   **Q.**   That's for 2016?

25   **A.**   That will be for 2016.

1    **Q.**   All right.  When will you work there again?

2    **A.**   As soon as the trial ends.  I'm a coach, and we

3    play six days a week, coach and practice, play and

4    practice.

5    **Q.**   How long does that season last?

6    **A.**   I just said from February 1st to May 1st.

7    **Q.**   And the pay for that is a stipend, a flat fee?

8    **A.**   It's a flat fee, correct.

9    **Q.**   All right.  So you are going to be doing the

10   softball coaching; right?  Right?

11   **A.**   Yes.

12   **Q.**   And the landscaping; correct?

13   **A.**   Yes.

14   **Q.**   Anything else?

15   **A.**   No.

16        MR. McHUGH:  May I have a moment, your Honor?

17        THE COURT:  Sure.

18        (Pause.)

19        MR. McHUGH:  Nothing further, your Honor.

20        Thank you, Ms. Franchina.

21        Thank you, your Honor.

22        THE COURT:  Thanks, Mr. McHugh.

23        Mr. Martin.

24        MR. MARTIN:  Thank you, your Honor.  Just a

25   couple things I'd like to clear up.  Can I show the

| | |
|---|---|
| 1 | witness a document?  This is the Plaintiff's Complaint |
| 2 | that was filed in this case. |
| 3 | THE COURT:  It needs a number for |
| 4 | identification. |
| 5 | MR. MARTIN:  May we number this Exhibit 37? |
| 6 | THE CLERK:  Sure. |
| 7 | MR. MARTIN:  Thank you. |
| 8 | **REDIRECT EXAMINATION** |
| 9 | **BY MR. MARTIN**: |
| 10 | Q.   Ms. Franchina, up here where it says "filed," |
| 11 | could you tell me the date and time that this Complaint |
| 12 | was filed. |
| 13 | A.   July 12th, 2012, and I believe that's 1:51. |
| 14 | Q.   Could I ask you to read paragraph 44 aloud to the |
| 15 | jury. |
| 16 | A.   Forty-four? |
| 17 | Q.   Yes. |
| 18 | A.   "In this case, he intentionally placed his gloved |
| 19 | hand in her face and removed the gloves.  The snap |
| 20 | launched blood, brain matter and other fluids into her |
| 21 | mouth, nostrils, eyes and ears." |
| 22 | Q.   And this was filed in 2012? |
| 23 | A.   Correct. |
| 24 | Q.   I'd also like to direct your attention to what's |
| 25 | been marked as Defendant's B starting with the bottom |

1    line of page number 21.  Could you please read the

2    bottom line of page 21 to the jury.

3    **A.**   "When the body was finally placed into the vehicle

4    for transport, Rescue Tech Tang intentionally held" --

5    **Q.**   And turning to the top of page 22, could you

6    continue reading.

7    **A.**   -- "his hands up to my face and yanked off his

8    latex gloves so that they snapped, thereby projecting

9    bits of blood, brain matter and tissue into my eyes,

10   ears, nose and mouth."

11   **Q.**   So if someone were to say that you discovered or

12   suspected for the first time in January of 2015 that

13   Firefighter Tang's actions were intentional --

14          MR. McHUGH:  Objection as to form, leading.

15          MR. MARTIN:  I'll withdraw that, your Honor.

16          THE COURT:  Thanks, Mr. Martin.

17          MR. MARTIN:  We'll refer to what's been entered

18   into evidence as Exhibit Number 1.  Actually, Madam

19   Clerk, this might be actually 35.  It's either 1 or 35.

20   I know that makes a lot of sense.

21          THE CLERK:  This is what I have as 1.

22   **Q.**   I'm referring you to --

23          THE CLERK:  Thirty-five is an e-mail of 8/11,

24   2009.

25          MR. MARTIN:  Yes, this is Exhibit 35.  Thank

1    you.  Can the jury see this?

2           THE CLERK:  Yes.

3    **Q.**   Directing your attention here where it says, "She

4    was exposed to blood and bodily fluid.  It turned out

5    that the exposure was not significant; however, the

6    manner of exposure has been the last straw of a series

7    of hostile work environment experiences that she

8    believes she has been operating under for quite some

9    time now."

10          What was the manner of exposure that you

11   reported to Chief Crawford?

12   **A.**   The intentional placement of his hand and snapping

13   a glove, therefore not providing me with the same care

14   and due respect and rules and regulations all over.

15   **Q.**   So when Dr. Yanni reported that you'd learned new

16   information in January 2015 about whether or not --

17          MR. McHUGH:  Objection, your Honor, leading.

18          THE COURT:  Overruled.

19   **Q.**   -- whether or not that exposure was intentional,

20   is that your recollection that you had learned some new

21   information in January of 2015?

22   **A.**   I did.

23   **Q.**   What was the new information that you learned?

24   **A.**   I learned about an e-mail that said the action was

25   intentional, from my understanding, and that I was

1    blowing the situation out of proportion.

2    **Q.**   Refer to Plaintiff's Exhibit 15.  This is

3    Plaintiff's Exhibit 15, EEO Complaint Number 2009-026.

4    I point your attention to here.  Is this the e-mail

5    that you're referring to?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  And it says here, "One of the engine guys

8    was doing chest compressions, had too much blood on his

9    gloves.  She tells him to change the gloves.  In doing

10   so, he snapped the gloves and blood snapped on her

11   forehead.  (Chief said he seemed sincere, he's new, no

12   axe to grind with her, thinks she's blowing it out of

13   proportion)."

14        Did I read that correctly?

15   **A.**   Yes, you did.

16   **Q.**   Prior to seeing this e-mail, had you ever known

17   that Firefighter Tang was interviewed about your

18   allegation?

19   **A.**   Absolutely not.

20   **Q.**   Were you ever told that anyone had determined that

21   the amount of blood and brain matter on your face was a

22   not significant amount of exposure?

23   **A.**   No.

24   **Q.**   Were you ever told that anyone had done an

25   investigation and decided that you were blowing it out

1    of proportion?

2    **A.**   No.

3    **Q.**   When did you learn about this e-mail?

4    **A.**   I believe through your documentation.

5    **Q.**   I know where you learned about it, but when was

6    it?

7    **A.**   It wasn't until I want to say 2015.  Maybe even

8    later.

9    **Q.**   Just a couple more things.  Was the time that

10   Ferro harassed you, was that the first time he had

11   gotten in trouble for sexual harassment?

12   **A.**   No.

13   **Q.**   How do you know that?

14         MR. McHUGH:  Objection, your Honor, hearsay,

15   relevance.

16         MR. MARTIN:  Goes to the environment.

17         MR. McHUGH:  Beyond the scope.

18         THE COURT:  I'm going to have to see counsel at

19   sidebar.

20         MR. MARTIN:  Do you know what, your Honor, I'll

21   save everyone the time.  I'm going to withdraw the

22   question.

23   **Q.**   But your answer to whether it was a first-time

24   offense is no?

25   **A.**   No.

1  **Q.**   Now, I want to talk about this business with the

2  internal order of the fire department versus the

3  restraining order.

4        MR. MARTIN:  Do you still have my Exhibit 5?

5        MR. McHUGH:  Yes.

6        MR. MARTIN:  That's amazing.

7  **Q.**   I'm going to put up Exhibit 5.  Do you see --

8  first of all, when was the first time that you saw this

9  e-mail?

10  **A.**   This came out following the hearing, I believe.

11  **Q.**   I know when it came out.  When did you get it?

12  **A.**   Sometime after.  I don't recall when.

13  **Q.**   Close in time or like years later?

14  **A.**   No, when I was still on the job, I was aware of

15  it.

16  **Q.**   Is there anything in here that you find to be an

17  order to you to leave a Rescue 3 if Sean McGarty is

18  there?

19  **A.**   No.

20  **Q.**   How many times did you find Sean McGarty in a

21  Rescue 3 before you finally complained to the Court?

22  Excuse me, in a station with a rescue.

23  **A.**   Four times.

24  **Q.**   All right.  Now, here, Number 3, "Firefighter

25  McGarty is to be notified of this directive and

1    notified that it is his responsibility to notify

2    Battalion 3 that he is requesting a substitution and

3    what company he will be in.  Substitutions are not to

4    be approved for companies that are housed with a

5    rescue."

6         Did I read that correctly?

7    A.   Correct.

8    Q.   So tell us about this time you started to mention

9    with Mr. McHugh about when you showed up at Atwells and

10   Sean McGarty was there, too.

11   A.   I was on a call-back.  I entered the building, and

12   I immediately made the captain and the Division 1

13   chief, the deputy assistant chief, DAC, aware of it, of

14   his presence at the station.

15   Q.   And, of course, then Firefighter McGarty was

16   immediately removed?

17   A.   No.

18   Q.   What happened?

19   A.   I was ordered to go to Rescue 3.  He remained at

20   the house with the rescue at Atwells Avenue.

21        MR. MARTIN:  Madam Clerk, I'm looking for the

22   exhibit Opinion of the Chief.

23        THE CLERK:  Which chief?

24        MR. MARTIN:  Excuse me, Opinion of the Chief

25   Re: Lieutenant Masse.  I believe it's Defendant's P in

1    evidence.

2              THE CLERK:  Yup.

3    Q.   I'm going to show you something that's in

4    evidence.  I'm not sure if you've seen it or not.  Do

5    you see here where there's a document that's titled

6    Opinion of the Chief?

7              MR. McHUGH:  Objection, beyond the scope.  I

8    never questioned this witness about this.

9              THE COURT:  What topic was covered on

10   cross-examination that you're attempting to address,

11   Mr. Martin?

12             MR. MARTIN:  The alleged discipline of

13   Firefighter McGarty and the fact that he couldn't

14   accept call-backs at six different stations, which does

15   not comport at all with the evidence we have of what

16   actual discipline looks like.

17             THE COURT:  Objection overruled.

18   Q.   Now, do you see this document here that says

19   Opinion of the Chief?

20   A.   Yes.

21   Q.   Did you ever receive an opinion of the chief

22   regarding Firefighter Tang's intentionally snapping

23   brain matter into your face?

24   A.   No.

25   Q.   Did you ever find an opinion of the chief

1    regarding anyone calling you a bitch or a C word or

2    Frangina?

3    A.   No.

4    Q.   Ever receive an opinion of the chief regarding an

5    assault that was committed against you on Printery

6    Street resulting in a lifetime restraining order?

7    A.   No.

8    Q.   How about this first sentence here, that within

9    matter came for a hearing before Scott Mello, acting

10   chief of the department, did you ever even get called

11   in for a hearing on one of these things?

12   A.   No.

13   Q.   At the Providence Fire Department, have you had

14   occasion from time to time to meet people with

15   difficult personalities?

16   A.   Yes.

17   Q.   Have you seen any of them be treated the way that

18   you've been treated at the Providence Fire Department?

19        MR. McHUGH:  Objection, form, leading.

20        THE COURT:  Overruled.

21   A.   No.

22        MR. McHUGH:  Lack of foundation.

23        THE COURT:  Overruled.

24   A.   No.

25        MR. MARTIN:  Nothing further.

1          THE COURT:  Thanks, Mr. Martin.

2          Thank you.  You can step down.  Thank you,

3    ma'am.

4          Mr. Martin.

5          MR. MARTIN:  I'm going to hand it over to my

6    colleague.

7          MR. DUGGAN:  Good afternoon, your Honor.  We do

8    have Terry Franchina waiting outside.  I'm happy to

9    call her now to begin with her or --

10          THE COURT:  Is that the Plaintiff's sister?

11          MR. DUGGAN:  Plaintiff's mother.

12          THE COURT:  Mother.  Okay.  What's your

13    pleasure?

14          MR. DUGGAN:  I'm happy to do --

15          THE COURT:  How long will you be with her?

16          MR. DUGGAN:  I don't think I will be more than

17    an hour.  I don't think I will finish before the end of

18    the day.

19          THE COURT:  I know.  We're going to let the jury

20    take their first vote.  Would you like to break for the

21    day or would you like to plow on for the next 20

22    minutes?

23          JUROR:  Just keep going.

24          THE COURT:  You can call your next witness.

25          See how easy that was, ladies and gentlemen?

1           Ms. Franchina, right up here, ma'am.  You're

2      going to come right over here.  When you get there, if

3      you would just stay standing, and Ms. McGuire is going

4      to swear you in.

5           **TERRY FRANCHINA, PLAINTIFF'S WITNESS, SWORN**.

6           THE CLERK:  Would you please state your name and

7      spell your last name for the record.

8           THE WITNESS:  Terry Franchina,

9      F-R-A-N-C-H-I-N-A.

10          THE COURT:  Ms. Franchina, make yourself

11     comfortable in the chair, and actually Vickie will take

12     care of that.  You seem to have a soft voice, ma'am, so

13     if you could speak right into the microphone when

14     you're speaking, that would be real helpful.

15          THE WITNESS:  Okay.

16          THE COURT:  Thank you.  Mr. Duggan.

17                    **DIRECT EXAMINATION**

18     **BY MR. DUGGAN**:

19     **Q.**   Good afternoon.  Where do you live, ma'am?

20     **A.**   Falconer, New York.

21     **Q.**   How long have you lived in Falconer?

22     **A.**   Forty-eight years.

23     **Q.**   Who do you live in Falconer with?

24     **A.**   My husband.

25     **Q.**   And what is his name?

1    **A.**    Anthony.

2    **Q.**    How long have you been married to Anthony?

3    **A.**    Forty-seven years.

4    **Q.**    Where did you grow up?

5    **A.**    Randolph.

6    **Q.**    And where is that in relation to Falconer?

7    **A.**    Fifteen minutes away.

8    **Q.**    Where did you meet your husband?

9    **A.**    Out one night with nursing school friends.

10   **Q.**    Okay.  I take it you know Ms. Lori Franchina.

11   **A.**    Yes.

12   **Q.**    And how do you know her?

13   **A.**    She's my daughter.

14   **Q.**    How many children do you have?

15   **A.**    Three.

16   **Q.**    What are the names of your children?

17   **A.**    Anthony, III, Lori Ann and Emily Lynn.

18   **Q.**    And the order of the names you just gave us, is

19   that the order of the age?

20   **A.**    Age, yes.

21           THE COURT:  Mr. Duggan, would you pull the mike

22   in a little closer.

23           THE WITNESS:  I said Emily.  That's my

24   granddaughter.

25           JUROR:  We won't tell.

1          THE WITNESS:  Amy.

2          THE COURT:  I'll help you out there.  That's

3     stricken from the record.

4          THE WITNESS:  I love my granddaughter, too.

5     **Q.**   What is the age difference among your children?

6     **A.**   Well, Tony is -- he'll be 47, and Lori's 44, and

7     Amy's 43.

8     **Q.**   Are you working or are you now retired?

9     **A.**   Retired.

10    **Q.**   When did you retire?

11    **A.**   Four years ago.

12    **Q.**   And before you retired, what did you do?

13    **A.**   Nurse.

14    **Q.**   How long were you a nurse for?

15    **A.**   Forty-one years.

16    **Q.**   What kind of nursing did you do?

17    **A.**   Licensed practical nurse.

18    **Q.**   In how many different institutions did you work as

19    a nurse?

20    **A.**   Oh, two different hospitals.  I trained at one and

21    then went to several nursing homes and worked, and then

22    I went to the WCA Hospital for 29 years.

23    **Q.**   Your husband Anthony, does he still work or is he

24    retired?

25    **A.**   He's self-employed.

1    **Q.**   And what does he do?

2    **A.**   He's a shoe cobbler.

3    **Q.**   A shoe cobbler?

4    **A.**   Yes.

5    **Q.**   How long has he been a cobbler?

6    **A.**   Thirty-some years open, but he's done it since he

7    was nine years old.

8    **Q.**   And he now has his own business as a cobbler?

9    **A.**   Correct.

10   **Q.**   Does he employ anybody or just himself?

11   **A.**   No, himself.

12   **Q.**   I want to ask you some questions about your

13   relationship with your husband, if that's okay.

14   **A.**   Okay.

15   **Q.**   Specifically, has your husband ever struggled with

16   alcoholism?

17   **A.**   I wouldn't say --

18         MR. McHUGH:  Objection.  Relevance.

19         THE COURT:  Overruled.

20         MR. DUGGAN:  Go ahead.

21   **A.**   I wouldn't really consider alcoholism.  I consider

22   went through a hard time with being laid off from

23   construction, played softball, socialized with friends,

24   drank after games but couldn't handle the drinking.

25   **Q.**   Does he currently drink?

1    **A.**    No.

2    **Q.**    What was life like in your household with young

3    children growing up?

4             MR. McHUGH:  Objection.  Relevance.

5             THE COURT:  I assume this is background,

6    Mr. Duggan.

7             MR. DUGGAN:  Yes.

8             THE COURT:  Overruled.

9    **A.**    I thought our life was great.

10   **Q.**    How was child care responsibility, that kind of

11   thing, how was that divvied up between you and your

12   husband?

13   **A.**    Well, I had a babysitter when my son was first

14   born because I worked full time, and then later I went

15   nights so I could be home with the kids during the day

16   or after they got out of school, and then he would be

17   home for them when I went to work.

18   **Q.**    But fair to say that you spent the good deal of

19   time with your children as they were growing up?

20   **A.**    Yeah.

21   **Q.**    How would you describe Lori, your daughter, as a

22   girl when she was growing up?

23   **A.**    Very outgoing, always kept busy, loved to work

24   around the house, chores.  They used to fight to get

25   home first to mow the lawn.

1    **Q.**   You're lucky.

2    **A.**   They did.  They did.

3    **Q.**   When Lori was a little girl, did you ever have to

4    seek out any kind of counselling or therapy or

5    psychiatry for your daughter Lori?

6    **A.**   No.

7    **Q.**   Was she ever on any psychiatric medication as a

8    girl?

9    **A.**   No.

10   **Q.**   Moving into Lori's adolescence now, you are aware,

11   of course, that your daughter is a lesbian?

12   **A.**   Correct.

13   **Q.**   When did you first start to realize that your

14   daughter was a homosexual?

15   **A.**   I knew when she was little.

16   **Q.**   And could you give us an estimate on an age?

17   **A.**   When she was very young, if her dad went in to put

18   a tank top on, she did.  She had to copy her dad or her

19   brother all the time working on bikes, working on --

20   always just -- she wasn't like her sister.  She was the

21   skirts and shorts, you know.

22   **Q.**   Okay.  So fair to say you thought you knew fairly

23   early on?

24   **A.**   Yes, I did.

25   **Q.**   At some point did you and Lori discuss the fact

1 that she was a lesbian?

2 **A.** When she came home one time.

3 **Q.** And about how old was she at the time?

4 **A.** Well, even before that, I kind of suspected with

5 one of her friends in school.

6 **Q.** And in elementary school or high school?

7 **A.** High school.

8 **Q.** And did you talk with Lori about this at some

9 point while she was in high school?

10 **A.** Didn't really discuss it, but I knew.

11 **Q.** Okay.  Have you ever discussed it with Lori?

12 **A.** Yeah.

13 **Q.** And what have those discussions been like?

14 **A.** I just came out and asked her.

15 **Q.** What exactly did you ask her?

16 **A.** Are you?  And she said, Are you asking me if I'm

17 gay?  And I said, Yes.  And she burst into tears and so

18 did I because I wanted her to be comfortable because it

19 didn't make her any different.

20 **Q.** Well, I guess you bring me right to my next

21 question.  What has your attitude been with your

22 daughter Lori since you first became aware that she was

23 a lesbian?  How have you responded to that?

24 **A.** No different.

25 **Q.** Does it matter to you?

1    **A.**    No.

2    **Q.**    And what have you tried to do in your dealings

3    with your daughter to make that known to her?

4    **A.**    Just never had to do anything.  She knew I

5    accepted.

6    **Q.**    How about your other family members?  Let's start

7    with your husband.  How has his attitude been about it?

8    **A.**    He was a little --

9          MR. McHUGH:  I'm going to object.  Hearsay.

10         THE COURT:  I think she can describe what she

11   observed, what you personally observed.  Overruled.

12   **A.**    He didn't understand as well as I did because,

13   being a father, he just didn't.  So he kind of had a

14   hard time, but he never had a disapprovement (sic), I

15   should say; but he just couldn't comprehend or he

16   couldn't understand, but then he started to.

17   **Q.**    And how about Lori's siblings, how did they treat

18   her?

19   **A.**    No different.

20   **Q.**    I understand Lori was quite the athlete growing

21   up.

22   **A.**    Yes, she was.

23   **Q.**    What sports did she play why don't we say through

24   high school?  What were her sports?

25   **A.**    She played three sports.

Q.    What were those?

A.    Volleyball, softball and basketball.

Q.    She played them at the varsity level in high school?

A.    Eighth grade she started varsity.

Q.    And then she graduated -- well, first of all, where did she go to high school?  What high school?

A.    Falconer Central.

Q.    Is that a public school there in Falconer?

A.    Yes.

Q.    And after graduating Falconer Central, did she go off to college?

A.    She was recruited to Eastern Connecticut to play softball and basketball.

Q.    Both sports?

A.    Both sports.

Q.    Varsity level?

A.    Yes.

Q.    At college?

A.    Yes.

Q.    Before she went off to college, had Lori ever been away from home for any extended period of time?

A.    No.

Q.    When she did, in fact, go off to college, what was your communication like with her when she left the

1    house to go off to school?

2    **A.**   Every day, but I had a hard time letting her go,

3    so I'd be out there once a month.

4    **Q.**   For in-person visits?

5    **A.**   In-person visits.

6    **Q.**   Before that you said every day.  Are those phone

7    calls every day?

8    **A.**   Phone calls.

9    **Q.**   And this is jumping ahead now a little bit, but

10   these phone calls with your daughter, daily phone

11   calls --

12   **A.**   Right.

13   **Q.**   -- are these something that continue to the

14   present date?

15   **A.**   Oh, yes.

16   **Q.**   How many years do you think it's been where you've

17   had daily phone calls with your daughter?

18   **A.**   All her life.

19   **Q.**   All her life since she went off to college?

20   **A.**   Pardon?

21   **Q.**   All her life since she went off to college?

22   **A.**   Yes.

23   **Q.**   Okay.  She went off for the Olympics at one point;

24   is that right?

25   **A.**   She tried out for the Olympics, yes.

1    **Q.**   Now, the injury to her face, was that before the

2    Olympics or after the Olympics?

3    **A.**   Before.

4    **Q.**   Was that when she was in college?

5    **A.**   No.

6    **Q.**   No?

7    **A.**   The Olympics were before college.

8    **Q.**   I mean the injury to her face.

9    **A.**   That was in college.

10   **Q.**   That was during the college softball season?

11   **A.**   Yes.

12   **Q.**   Do you remember where you were when you heard the

13   news about what had happened to her face?

14   **A.**   I was just getting home from work.  I worked

15   12-hour shifts.

16   **Q.**   And what exactly did you hear?

17   **A.**   I got a phone call that she had been injured and

18   that she was being -- she was stable and being sent

19   home to her dorm.

20   **Q.**   What did you do?

21   **A.**   I grabbed a suitcase, and I told my husband, I'm

22   leaving; and he goes, You'll never make that trip; and

23   I said, Watch me.  So he said, Throw some clothes in

24   for me.  And we left at 9:30.  We got there in the

25   morning.  And when we got to her dorm, I could not

1  believe how they sent her home, 34 major fractures.

2  **Q.**   Needless to say, she was -- she must have missed

3  some time from sports with that kind of injury.

4  **A.**   Yes, she did.

5  **Q.**   Do you recall how much time about she missed?

6  **A.**   Well, they red-shirted her so she could play again

7  the next year.

8  **Q.**   And did she come back and play again the next

9  season?

10  **A.**   Yes.  She had to wear a full mask.

11  **Q.**   To protect her face?

12  **A.**   Right.

13  **Q.**   Even when she was playing?

14  **A.**   Right.

15  **Q.**   Did she do that with the mask on?  Did she keep

16  playing with the mask?

17  **A.**   Yes, she did.

18  **Q.**   And all the time your daughter was recovering from

19  what had happened to her face, did you ever hear her

20  express any kind of quit?  Was there any quit in her

21  when that injury happened?

22  **A.**   No.  The statement she said was, God puts hurdles

23  for us, and this is one I'm going to get over.

24  **Q.**   What did you and your husband teach your children

25  about quitting in general and the attitude towards

1     quitting?

2          MR. McHUGH:  I'm going to object again to

3     relevance, your Honor.  This is really getting out

4     there.

5          THE COURT:  Overruled.

6          MR. DUGGAN:  Go ahead.

7     **A.**   Could you repeat, please?

8     **Q.**   Yeah, sure.  When your children were growing up,

9     did you and your husband teach them lessons about

10    quitting?

11    **A.**   We encouraged them not to quit, to finish

12    something out.  Then the next year if they didn't want

13    to go back, that was their choice, but to at least

14    finish the, you know, the year.

15    **Q.**   After graduating from college, where did Lori go

16    to then?

17    **A.**   She went on to coach.

18    **Q.**   At what level did she coach?

19    **A.**   Division III.

20    **Q.**   In college?

21    **A.**   II, Windham.

22    **Q.**   Windham College?

23    **A.**   Windham Tech.  Windham.

24    **Q.**   How long did she do that for?

25    **A.**   I'm not sure.  This is confusing me.

1    Q.    Do you remember when Lori became an EMT?

2    A.    The year?

3    Q.    Roughly.  That's okay if you don't.

4    A.    I don't.

5    Q.    Let me ask you this.  Did Lori become an EMT

6    before she became a firefighter?

7    A.    Yes.

8    Q.    Okay.  When your children were growing up, would

9    you have family dinners together?

10   A.    Oh, yes.

11   Q.    And would you talk to your children at those

12   dinners about what your experience was like being a

13   nurse?

14   A.    Yes.

15   Q.    And helping other people?

16   A.    Yes.

17   Q.    How did you see Lori react or respond to those

18   kinds of stories?

19   A.    She liked hearing them.

20   Q.    How do you know?

21   A.    Because she knew how interested I was in my

22   patients, and just we were that close, and they were

23   interesting stories.  Some people didn't even have

24   family with them when they died, you know.

25   Q.    I know you told us that Lori was hard working and

1    outgoing.  When did you first notice, if you did, a

2    desire in Lori to help other people?

3    **A.**   She was that way ever since she was little, even

4    with her friends.

5    **Q.**   What do you remember about her dealing with her

6    friends?

7    **A.**   Even when they were having problems, she'd always

8    encourage them, talk with them, always -- even with her

9    players on the sports.  You know, she'd always keep

10   everybody's spirits and, you know, you can do it.

11   **Q.**   When was the first time Lori told you that she was

12   going to be a firefighter?

13   **A.**   She called us and said that she was trying out for

14   the academy.

15   **Q.**   Do you remember, roughly speaking, what year that

16   was?

17   **A.**   Oh, geez.  I'm so bad with dates.

18   **Q.**   That's all right.  Do you remember she went to the

19   academy in 2002?

20   **A.**   Yes.

21   **Q.**   All right.  So I'm assuming when you spoke to her

22   about joining the academy, it was before that?

23   **A.**   Yes.

24   **Q.**   Were there -- are there firefighters in your

25   family?

1    **A.**   We have a cousin that is, but he's not much older

2    than her.  So she didn't, you know, grow up watching

3    him be a firefighter.

4    **Q.**   When she told you I'm going out for the fire

5    academy, did it strike you as odd or did you see it

6    coming or how did --

7    **A.**   I didn't really see it coming.

8         MR. McHUGH:  Objection.  These are all leading

9    questions, your Honor.

10        THE COURT:  I know, but we allow leading

11   questions in certain kinds of situations.  I'm going to

12   overrule it.  You can answer.

13   **A.**   I didn't see it coming, but I thought okay.  Well,

14   then I had a patient one day that was a firefighter,

15   and I don't know what those ladders are called that

16   hang off the buildings they climb or whatever, and he

17   was telling me about it, and I thought I don't want her

18   to do this job.

19   **Q.**   You were worried about her?

20   **A.**   I was worried about her, but she'd always call us

21   and say, I'm fine.

22   **Q.**   Now, when she entered the academy, so this is 2002

23   now, would you speak to Lori on the telephone?

24   **A.**   Yes.

25   **Q.**   What were your conversations with her while she

1   was at the academy?  What were those conversations

2   like?

3   **A.**   Oh, the workouts, what she had to do, how hard it

4   was and -- but she did it.

5   **Q.**   How would you describe her attitude about

6   firefighting when she was at the academy?

7   **A.**   She was loving it.

8   **Q.**   What makes you say she was loving it?

9   **A.**   She was loving the -- what do I want to say?  The

10  challenge, I guess, the challenge of furthering

11  herself.

12  **Q.**   Okay.  Were you there at the graduation from the

13  academy?

14  **A.**   Yes.

15  **Q.**   Describe for us what that day was like.

16  **A.**   Oh, I was proud of her.

17  **Q.**   For those of us who haven't seen one, what happens

18  at a fire academy graduation?

19  **A.**   They have a big ceremony and --

20  **Q.**   Are the firefighters in uniform?

21  **A.**   Yes.

22  **Q.**   And are there speeches and the band and that kind

23  of thing?

24  **A.**   Yes.

25  **Q.**   What was her attitude like on the day she

1    graduated?

2    **A.**    It was great.

3    **Q.**    Who went with you to see the graduation?

4    **A.**    The whole family.

5    **Q.**    Everyone was there?

6    **A.**    Uh-huh.

7    **Q.**    And how were you all reacting to this day?

8    **A.**    Very good.  Very proud of her.

9    **Q.**    After she graduated from the academy and joined

10   the fire department, your daily telephone calls

11   continued?

12   **A.**    Yes.

13   **Q.**    How would you describe Lori's attitude on those

14   phone calls let's say in the immediate aftermath of the

15   academy as she was starting to really do the work of

16   being a firefighter rescue EMT?  How would you describe

17   her attitude in that period of time?

18   **A.**    She was loving it.  She'd tell me about some runs

19   she went on and how she helped somebody.  I think she

20   even told me one time about intubating a patient upside

21   down in a car, and she was so proud of herself.  Just

22   she'd tell all this -- she was just loving what she was

23   doing.

24   **Q.**    During those early telephone calls in the months

25   immediately after the academy, did she make any

1    complaints to you about the way she was treated?

2           MR. McHUGH:  Objection, your Honor.  Hearsay.

3           THE COURT:  Overruled.

4    **A.**   Repeat, please.  I'm sorry.

5    **Q.**   Sure.  Right after leaving the academy, as she's

6    getting going --

7           MR. McHUGH:  Objection.  She just answered the

8    question.

9           THE COURT:  She asked him to repeat it.

10   **Q.**   Once again, when she left the academy, as she was

11   getting going with her career --

12   **A.**   Right.

13   **Q.**   -- did she make any complaints to you at that

14   point in your telephone calls?

15   **A.**   When she first started, you mean?

16   **Q.**   Yes.

17   **A.**   No.

18   **Q.**   At some point did that change?

19   **A.**   Yes.

20          THE COURT:  Mr. Duggan, why don't we use that as

21   a breaking point.

22          MR. DUGGAN:  Perfect.  Thank you.

23          THE COURT:  Ladies and gentlemen, we'll break

24   until tomorrow morning.  We're going to start at our

25   normal time at 9:30, so whenever they tell you to

NLSHJ-LDA Document 120 Filed 02/21/17 Page 230 of 231 PageID #:

1    report for that.  You don't get a break like you did

2    this morning by a half hour.

3          Please don't do any independent research, don't

4    discuss this case amongst yourselves or with anyone

5    else, don't mention anything -- you're going to be able

6    to repeat this, aren't you, at the end of this trial?

7          Don't mention anything about your jury service

8    on any social media, and please don't read or watch or

9    listen to anything about any news reports about the

10   trial.  We'll see you tomorrow morning at 9:30.

11         (Adjourned.)

1                          C E R T I F I C A T I O N

2

3

4               I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5     hereby certify that the foregoing pages are a true and

6     accurate transcription of my stenographic notes in the

7     above-entitled case.

8

9               February 2, 2017
                _____

10              Date

11

12

13              /s/ Karen M. Wischnowsky
                _____

14              Karen M. Wischnowsky, RPR-RMR-CRR
                Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25