1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF RHODE ISLAND

3

4
    * * * * * * * * * * * * * * *   C.A. NO. 12-517M
5                                *
    LORI FRANCHINA                *
6                                *
       VS.                       *   APRIL 14, 2016
7                                *   9:30 A.M.
    CITY OF PROVIDENCE           *
8                                *
    * * * * * * * * * * * * * * *   PROVIDENCE, RI
9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                     DISTRICT JUDGE

12
                   (Jury Trial - Volume VI)
13

14    APPEARANCES:

15    FOR THE PLAINTIFF:    KEVIN P. BRAGA, ESQ.
                            Law Office of Kevin P. Braga
16                          2095 Elmwood Avenue, Suite B
                            Warwick, RI  02888
17
                            JOHN T. MARTIN, ESQ.
18                          BENJAMIN H. DUGGAN, ESQ.
                            KJC Law Firm, LLC
19                          10 Tremont Street, 6th Floor
                            Boston, MA  02108
20
      FOR THE DEFENDANT:    KEVIN F. McHUGH, ESQ.
21                          KATHRYN M. SABATINI, ESQ.
                            City Solicitor's Office
22                          444 Westminster Street, Suite 220
                            Providence, RI  02903
23
      Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
24                          One Exchange Terrace
                            Providence, RI  02903
25

1                              <u>I N D E X</u>

2       <u>DEFENSE WITNESS</u>                                    <u>PAGE</u>

3       <u>George Farrell</u>
             Direct Examination by Mr. McHugh            4
4            Cross-Examination by Mr. Martin            62
             Redirect Examination by Mr. McHugh        131
5
        <u>Paul Tang</u>
6            Direct Examination by Mr. McHugh          135
             Cross-Examination by Mr. Martin           179
7

8

9

10
                               <u>E X H I B I T S</u>
11
        <u>PLAINTIFF</u>                     <u>FOR ID</u>              <u>IN FULL</u>
12
            19                                              80
13          40                                              86

14

15
        <u>DEFENDANT</u>                     <u>FOR ID</u>              <u>IN FULL</u>
16
            O                                              188
17          Q                                               17
            R                                               51
18          T                                               39
            U                            163
19

20

21

22

23

24

25

1    14 APRIL 2016 -- 9:30 A.M.

2             THE COURT:  Good morning, everyone.  How are you

3    all?  It's a little bit warmer in here, don't you

4    think?  If you start coming in with gloves on, then

5    we're really in trouble.

6             Can you all assure me that you didn't do any

7    independent research, didn't talk to anyone, discuss

8    this case with anyone, didn't mention anything on

9    social media about your jury service and didn't see any

10   news reports about the trial?  Great.  Thanks,

11   everyone.

12            Mr. McHugh.

13            MR. McHUGH:  Thank you, your Honor.  George

14   Farrell, please.

15            THE COURT:  Right up here, Chief.  And if you'd

16   just remain standing when you get to the witness stand,

17   Ms. McGuire will swear you in.

18            **GEORGE FARRELL, DEFENSE WITNESS, SWORN**

19            THE CLERK:  Would you please state your name and

20   spell your last name for the record.

21            THE WITNESS:  George S. Farrell, F-A-R-R-E-L-L.

22            THE COURT:  Good morning.

23            THE WITNESS:  Good morning.

24            THE COURT:  Chief, just make yourself

25   comfortable, pull the chair in.  Someone I think has

1     told you exactly what to do.  Speak right into the

2     microphone when you speak.

3               THE WITNESS:  Yes, sir.

4               THE COURT:  Thanks.  Mr. McHugh.

5               MR. McHUGH:  Thank you, your Honor.

6                        **DIRECT EXAMINATION**

7     **BY MR. McHUGH**:

8     **Q.**    Good morning, Chief.

9     **A.**    Good morning.

10    **Q.**    Chief, you're retired from the Providence Fire

11    Department; right?

12    **A.**    Yes, sir.

13    **Q.**    How many years did you serve on the Providence

14    Fire Department?

15    **A.**    Approximately 30 years total.

16    **Q.**    And did you go to the Providence Fire Training

17    Academy?

18    **A.**    Yes, sir.

19    **Q.**    When was that?

20    **A.**    1980.

21    **Q.**    Which academy was that?

22    **A.**    The 38th, I believe.

23    **Q.**    And what was your first assignment out of the

24    academy?

25    **A.**    My first assignment was, after we began rotating

1    around for a little while, I went to Ladder Company 6

2    at Atwells Avenue.

3    **Q.**    And what were your duties and responsibilities on

4    Ladder Company 6 at Atwells Avenue?

5    **A.**    I was a firefighter, everything from washing the

6    truck and apparatus, cleaning the station; and then as

7    a ladder company firefighter, performing all the duties

8    and responsibilities that would be required at a scene

9    of an emergency.

10   **Q.**    And what was your next assignment?

11   **A.**    From there I bid to Ladder Company 2 at Messer

12   Street and similar duties and responsibilities at that

13   station.

14   **Q.**    How long were you at Messer Street for?

15   **A.**    I was there from probably 1990 through 1992.

16   **Q.**    And eventually you left Messer Street?

17   **A.**    Yes, sir.  I was promoted to lieutenant.

18   **Q.**    Was that lieutenant of an engine company?

19   **A.**    Initially I rotated around to a number of

20   different companies until I got an assignment at Engine

21   Company 11, which at the time was stationed at the

22   Broad Street Fire Station.

23   **Q.**    Okay.  And how were your duties different as a

24   lieutenant than they had been as a line firefighter?

25   **A.**    Well, you had overall care and management

1   responsibilities for your company, the station,

2   depending upon whether you were a single-house company

3   or there were multiple companies assigned there, and

4   certainly overall care and management of the personnel

5   who worked for you and scene management when you would

6   go on the scene of a fire or an emergency -- any

7   emergency situation.

8   **Q.**   How long were you in that position for?

9   **A.**   Well, at Engine 11 and then throughout -- through

10  Engine 8 was my last company assignment as an engine

11  company officer through about 2002.

12  **Q.**   Where was Engine Company 8?

13  **A.**   Engine Company 8 was at the Messer Street Fire

14  Station.

15  **Q.**   So when you were lieutenant -- when you first

16  became a lieutenant, how many firefighters did you have

17  under your command?

18  **A.**   When I was at Engine 11, two.

19  **Q.**   What about at Messer Street?

20  **A.**   Three.

21  **Q.**   And how long did you stay at the Messer Street

22  Station as a lieutenant?

23  **A.**   I was there until, I believe it was, September of

24  2002, so approximately eight years or so.

25  **Q.**   And what was your next assignment?

1    **A.**   I was promoted to the deputy fire marshal's

2    position, which was a command of company or chief

3    officer's position.

4    **Q.**   What were your duties and responsibilities as the

5    deputy fire marshal?

6    **A.**   In that position I oversaw and assisted the fire

7    marshal with management of the Fire Prevention Bureau.

8    We enforced codes and ordinances throughout the City of

9    Providence as it related to fire code; and we did plan

10   review, inspections, smoke detector inspections and

11   anything that related to enforcement of fire prevention

12   codes and ordinances both on the local level here in

13   the city as well as the state law, the fire safety code

14   laws of the State of Rhode Island.

15   **Q.**   In that position, did you have any firefighters

16   under your command?

17   **A.**   In that position we had at that point probably

18   somewhere around 15 captain, lieutenant, plan

19   reviewers, investigators all under the command of the

20   Fire Prevention Bureau.

21   **Q.**   What was your next assignment, Chief?

22   **A.**   I was promoted from deputy fire marshal to fire

23   marshal in the same division.

24   **Q.**   So you went from deputy fire marshal to fire

25   marshal?

1    **A.**   Yes, sir.

2    **Q.**   So now you oversaw the whole office?

3    **A.**   I oversaw the whole office, yes, sir.

4    **Q.**   So how many people were you overseeing when you

5    were the actual marshal?

6    **A.**   Probably about the same number of people.  There

7    was a fire marshal, a deputy fire marshal.  As fire

8    marshal, you took on additional responsibilities for

9    dealing with personnel in the City of Providence, the

10   command staff, being on the command staff of the chief

11   more often in meeting with the chief of the department,

12   became involved with more meetings having to do with

13   dealing with the City of Providence's other

14   departments, the Department of Inspection and

15   Standards, maybe city hall on some committees that we

16   were trying to implement faster procedures for approval

17   of building structures, zoning and all of those kind of

18   things.

19   **Q.**   How long were you the fire marshal for?

20   **A.**   I was the fire marshal for I believe three years

21   or so.

22   **Q.**   And after you finished your stint as the fire

23   marshal, where did you go?

24   **A.**   Well, at the same time I was fire marshal, I also

25   was asked by the mayor at the time to take over as the

1   acting director of the Department of Inspection and

2   Standards.  So I spent a period of about three or four

3   months overseeing another department in the city at the

4   same time.

5          I oversaw the Department of Inspection and

6   Standards, which was basically overseeing all of the

7   building code issues having to do with structures and

8   zoning, plumbing, mechanical, electrical and all of

9   those things.

10          That assignment at the same time was under -- I

11   was overseeing that for the mayor at the same time and

12   remained fire marshal for the city fire department.

13   Q.    Now, in the Department of Inspection and

14   Standards, how many employees did you oversee there?

15   A.    Probably about 40.

16   Q.    So you were overseeing 40 there and approximately

17   15 as the fire marshal?

18   A.    Yes, sir.

19   Q.    So approximately 55?

20   A.    About that.

21   Q.    And at least 40 of them were civilians?

22   A.    In the Department of Inspection and Standards,

23   they were all civilians.

24   Q.    And were they all sworn fire personnel in the fire

25   marshal's office?

1    **A.**   There may have been a few -- I think we had two

2    civilian personnel, which were our administrative

3    assistants within that division.

4    **Q.**   All right.  So at some point in time you left both

5    of those positions; correct?

6    **A.**   Yes, sir.

7    **Q.**   And where did you go?

8    **A.**   I was asked by the governor to become the state

9    fire marshal.  So I retired from the fire department in

10   Providence in 2006, and I became the state fire

11   marshal.

12   **Q.**   And in 2006, how many years had you had in the

13   fire department?

14   **A.**   About 26 years.

15   **Q.**   So you went and became the fire marshal for the

16   entire state?

17   **A.**   Yes, sir.

18   **Q.**   And what were your duties and responsibilities as

19   the fire marshal for the entire state?

20   **A.**   Fire code enforcement, fire investigation, bomb

21   squad.  We were in charge -- the state bomb squad was

22   under my command, and I worked throughout the State of

23   Rhode Island.

24         We actually had authority and jurisdiction over

25   every fire marshal.  Every assistant deputy state fire

1    marshal who was licensed throughout the State of Rhode

2    Island had to be authorized and licensed through the

3    state fire marshal.

4         So we did education, training, bomb squad, plan

5    review.  In the state fire marshal's office, we were

6    responsible for any state licensed facilities so

7    hospitals, daycares, nurseries.  Anything that was

8    licensed by the state, we had overall jurisdiction for

9    that.

10        And then we also had jurisdiction over the local

11   communities should there be any issues that we needed

12   to deal with from the state level.

13   **Q.**   So you had jurisdiction over all of the 39 cities

14   and towns?

15   **A.**   Over the 39 cities and towns, the airport, pretty

16   much everything except federal buildings; but we did a

17   lot of work even in the federal.  They would come to us

18   to comply with Rhode Island codes.

19   **Q.**   And how many people did you have working under you

20   when you were the state fire marshal?

21   **A.**   Probably about 25 or 30.

22   **Q.**   Now, you subsequently left there and came back to

23   the city; correct?

24   **A.**   That's correct.

25   **Q.**   How long did you stay in the position of state

1 fire marshal for?

2 **A.** Just under a year.

3 **Q.** And in what capacity did you return to the city?

4 **A.** I came back to the Providence Fire Department.  I

5 was appointed chief of the department in May of 19 --

6 I'm sorry, May of 2007.

7 **Q.** Okay.  And what were your duties and

8 responsibilities as chief of the department in May of

9 2007?

10 **A.** I was charged with overall care and management for

11 every division and all of the personnel here in the

12 City of Providence.  I was in charge of the Fire

13 Prevention Bureau.  Everything came under my command,

14 including a repair division that repaired our

15 apparatus, supply rooms, EMS, emergency medical

16 services, rescue.  Everything came under chief of the

17 department as it related to the fire department and our

18 responsibilities here in the city.

19 **Q.** And how many people did you have under your

20 jurisdiction when you were the chief of the department?

21 **A.** Probably close to 439, I think was about the

22 number.

23 **Q.** And they were all fire department personnel;

24 correct?

25 **A.** No, that's not correct.  I had probably in the --

1    most of the people who worked in the repair division

2    where they repaired our apparatus and equipment, those

3    were mostly civilians.  So we probably had about 15

4    people there.

5            And then there was a number of civilians that

6    worked as my executive assistant, my administrative

7    assistant, the secretaries in the office and the

8    clerical personnel who worked within -- mostly in the

9    Fire Prevention Bureau.

10   **Q.**    So you had -- when you were the chief of the

11   department, you had civilians under you as well as

12   sworn personnel?

13   **A.**    Yes, sir.

14   **Q.**    Did you ever do any stint at the, after you were

15   sworn in as a firefighter, at the Providence

16   firefighter training academy?

17   **A.**    Yes.

18   **Q.**    What did you do there, Chief?

19   **A.**    I was a training officer I believe in 1994 for

20   that academy, 2001, and in some periods in time in

21   2002.

22   **Q.**    When you say a training officer, what does that

23   mean?

24   **A.**    I was a lieutenant at the time, and we would be

25   involved with all of the training, educating the new

1    firefighters, new recruits in, you know, all of the

2    facets, hydraulics, fire science and all of the things

3    that were necessary to become a firefighter in the City

4    of Providence.  So we basically ran the day-to-day

5    operations of a number of people in the Division of

6    Training.

7    **Q.**    Did you ever work on any of those for lack of a

8    better word I call them special trucks, Special Hazards

9    or any of those units?

10   **A.**    Yes.  As a firefighter, I would be detailed in,

11   maybe have a call-back in Special Hazards or detailed

12   into rescue.  On Special Hazards, when I made the

13   lieutenant's list, I was assigned to Special Hazards

14   for a while as the acting lieutenant on a specific

15   group.

16   **Q.**    Did you ever work on the rescue?

17   **A.**    Yes, sir.

18   **Q.**    How long did you work on the rescue for?

19   **A.**    Not very long.  I served in -- when I was on the

20   department early on, as we were becoming more oriented

21   into the rescue and emergency services, when I came on

22   we only had three rescues.  So there wasn't as many

23   assignments.

24           And we would be assigned there -- when I first

25   came on, they would assign you for maybe for one cycle,

1    two days and two nights, and then maybe you would get

2    assigned for six months to get some experience in

3    there; but the vast majority of my career was in the

4    fire suppression end of the fire service.

5    Q.    And when you were on the rescue, were you a

6    lieutenant or a tech?

7    A.    No, sir, I was a firefighter, just basic --

8    EMT-Basic.

9    Q.    Because every Providence firefighter is trained in

10   EMT-Basic; correct?

11   A.    Generally, yes, they are, sir.

12   Q.    It is a condition of employment; right?

13   A.    It is a condition of employment.

14   Q.    Are you married or single, Chief?

15   A.    I am married.

16   Q.    Any children?

17   A.    Two girls.

18   Q.    How old are they?

19   A.    Thirty and twenty-five.

20   Q.    How about your educational background?

21   A.    I have a degree in fire science, associate's

22   degree in fire science from the Community College of

23   Rhode Island; and I have a bachelor's degree from Roger

24   Williams University in public administration.

25   Q.    Now, you're retired from the fire department, but

1    you're still somewhat involved in the department;

2    correct?

3    **A.**    Yes, sir.

4    **Q.**    What is your role in the fire department now?

5    **A.**    I was asked to come back by this administration as

6    a consultant for the commissioner of public safety.  So

7    I'm in not every day, but I go in; and if there are

8    issues that the -- the commissioner, who was the

9    colonel of the State Police, so there are issues that

10   come up that he may be unfamiliar with with the fire

11   service and fire department, and he will talk to me

12   about some of those issues and managing the fire

13   department from the experience that I've had previously

14   in there as chief in my experience and generally

15   statewide with the fire service.

16   **Q.**    In addition to consulting for the Providence Fire

17   Department, do you do any other consulting now?

18   **A.**    I have a small business.  I do a little bit of

19   consulting on my own.

20   **Q.**    What kind of consulting do you do, Chief?

21   **A.**    Fire code consulting mostly.

22   **Q.**    From time to time when you were the chief, would

23   you issue memoranda?

24   **A.**    Yes, sir.

25   **Q.**    Would you issue general orders?

1    **A.**    Yes, sir.

2    **Q.**    Directives?

3    **A.**    Yes, sir.

4            MR. McHUGH:  Your Honor, if I could have this

5    marked for identification.  If I could have this marked

6    as Defendant's Q for identification, please.

7            THE COURT:  Sure.

8            MR. MARTIN:  There's no objection to this.

9            THE COURT:  No objection to it being admitted?

10           MR. MARTIN:  Correct.

11           THE COURT:  Great.  Exhibit Q will be admitted

12   as a full exhibit without objection.

13           (Defendant's Exhibit Q admitted in full.)

14           THE COURT:  You can show it to the witness once

15   he identifies it and to the jury, Mr. McHugh, whenever

16   you want.

17           MR. McHUGH:  May I approach?

18           THE COURT:  Sure.

19   **Q.**    Can you just read that whole document, please,

20   Chief.

21   **A.**    All of it?

22   **Q.**    Yes, please.

23   **A.**    This is --

24   **Q.**    Well, to yourself.

25   **A.**    Okay.  Okay.

1    **Q.**   Can you identify that for the jury, please, Chief.

2    **A.**   This is a Providence Fire Department Memorandum

3    Number 102, Series 2007.  That's just generally the

4    year that it comes out.  And this is dated 26 October

5    '07, and the subject was training topics, November

6    training topics.

7    **Q.**   Did you issue that?

8    **A.**   I believe I did.

9          MR. McHUGH:  Your Honor, could I publish this to

10   the jury on the ELMO, please.

11         THE COURT:  Yes, you can.

12   **Q.**   All right.  Let me ask you some questions on this,

13   Chief.  Can you see it also on your screen?

14   **A.**   Yes, sir.

15   **Q.**   All right.  It's called Memorandum Number 102.

16   What was a memorandum in the fire department when you

17   were the chief?

18   **A.**   Generally memorandums are issued to remind people

19   to do certain things or to direct members of the

20   department to do certain things.  In this case it was a

21   directive to the members of the department,

22   particularly out to the company officers, to -- and to

23   the chief officers as well to make sure that they

24   reviewed specific items that we wanted them to review

25   or specific issues for this particular month.

1    **Q.**    And I notice it's numbered Number 102.  Does that

2    mean Number 102 in 2007 or Number 102 over time?

3    **A.**    102 in 2007.

4    **Q.**    Okay.  And the date, October 26th, 2007, is that

5    when you issued this?

6    **A.**    Yes, sir.

7    **Q.**    And so it was November training topics.  Now,

8    these are topics that the department was to be trained

9    in during the month of November?

10   **A.**    Right.  Well, everybody in the department had been

11   trained in all of these topics prior to this memo being

12   issued, but we would continue our training even after

13   you had come out of the Division of Training or studied

14   for a fire academy.

15       And some of the reasons for these memorandums

16   and specific topics could have been for NFPA 1500 in

17   this case, which was a health and safety standard, a

18   nationwide standard but also part of the Rhode Island

19   state statutes under the fire code.

20       Insurance Services Offices, they insure fire

21   departments, and they rate your fire department based

22   on training.  And some of those things, we wanted to

23   make sure topics were discussed.  So we would be -- all

24   fire departments in cities and towns are rated, and the

25   Insurance Services Offices do that.  So we would try to

1    comply with them to keep our rating, which at the time

2    was Class 2 and we were trying to move to a Class 1,

3    and then other rules and regulations within the

4    department that we wanted our membership to become or

5    our people to become familiar with again and to review

6    just to make sure that we were reviewing topics that we

7    felt were important.

8    **Q.**   So at the bottom it says, "Attached are November's

9    required training topics."  And if you look at the

10   second page, you have three topics there that are

11   required for November 2007; correct?

12   **A.**   Yes, sir.

13   **Q.**   Ventilation, what does that refer to?

14   **A.**   That would refer to how we would ventilate a

15   specific facility or occupancy if there was a fire or

16   an emergency.

17        You know, it could be roof operations, opening

18   the roof up when there's a fire.  You'll see the ladder

19   companies will go to the roof and open the fire, and

20   that would be part of ventilation.  Opening windows

21   specific sides of the building and ventilating that

22   building to remove toxic gases and smoke, and that

23   would be part of the ventilation.

24        And also to control fire spread, the way we do

25   ventilation or perform ventilation helps us to control

1    in some cases prevention of fire from moving from one

2    location in a building or one floor of a building to

3    another and also to prevent what you would call

4    backdrafts or smoke explosions or flashovers within a

5    building because those gases contained, you know,

6    certain hazardous materials that could also ignite.

7    **Q.**   Number 2 is structure fires.  What's that topic,

8    Chief?

9    **A.**   They would discuss, again, the different type of

10   structures that we would be dealing with, the different

11   type of construction that we would be dealing with.

12   And they would range from just a, you know, a house all

13   the way up to maybe an industrial building or a complex

14   in addition to, you know, whether it was built with

15   wood, whether it was built with steel, whether it was

16   built with concrete.

17         And how we would fight those type of structure

18   fires would be dependent on, in a lot of cases, the

19   construction as well as the contents of the building.

20   **Q.**   And Number 3 is sexual harassment policy; correct?

21   **A.**   Yes, sir.

22   **Q.**   Now, if you look at page 3, you've got these

23   subtopics; and under sexual harassment policy, Number

24   3, "All officers are to review the City of Providence

25   sexual harassment policy with their members."  And can

1   you tell us what the difference there is between

2   officers and members?

3   **A.**   Well, the officers would be any officer of the

4   department.  It could be a chief officer as well as

5   each of the commanding officers of a company.  It could

6   be a captain or a lieutenant.  It could be -- as well

7   as the Fire Prevention Bureau.

8       It was generally everybody in the department was

9   required based on this to review those specific items

10  that we noted, and in this case Number 3 would be to

11  review the sexual harassment policy of the City of

12  Providence as well as our rules and regulations, which

13  also contained the Providence Fire Department policies

14  on sexual harassment.

15  **Q.**   All right.  And then you said, "The City of

16  Providence sexual harassment policy is incorporated

17  into the Providence Fire Department Rules and

18  Regulations in Chapter 16."  Correct?

19  **A.**   Yes, sir.

20      MR. McHUGH:  Can I show the witness and publish

21  to the jury, your Honor, Exhibit Number 36, please.

22      THE COURT:  Sure.

23  **Q.**   Take a look at this, Chief.  If you need to read

24  the whole thing, let me know, and I'll flip the page.

25  **A.**   I'm generally familiar with it.  I haven't looked

1    at it in a while, but I'm familiar with it.

2    **Q.**   It says General Order Number 1.  What's a general

3    order, Chief?

4    **A.**   That's a specific order that comes from the

5    department.  It carries more weight than a memorandum

6    or an announcement, and it's very specific that you are

7    required to comply with what is contained within that

8    general order.

9    **Q.**   And that is -- that order came out in 1998;

10   correct?

11   **A.**   Yes, sir.

12   **Q.**   And you were on the department then?

13   **A.**   Yes, sir.

14   **Q.**   What were you doing on the department in 1998,

15   Chief?

16   **A.**   I was lieutenant I believe at that time in

17   Engine 8, but I was a lieutenant at that time.

18   **Q.**   Now, in your exhibit, we just talked about

19   Topic 3, Number 1, you ordered them to -- the officers

20   to review the city's sexual harassment policy and also

21   the sexual harassment policy that was incorporated into

22   the rules and regulations which you just identified in

23   the general order; correct?

24   **A.**   Yes, sir.

25        MR. McHUGH:  May I show the witness and have

1  published to the jury Exhibit 1 full, please, your

2  Honor.

3        THE COURT:  Sure.

4  **Q.**   I'm going to put up Exhibit 1, Chief, and ask if

5  you are aware of this sexual harassment policy.

6  **A.**   In a general sense I would say I was.  The only

7  thing that would cause me any pause is I really didn't

8  work long under Mayor Angel Tavares, but it was

9  generally the same policy that we had in place.  It was

10  just issued, I believe, with this title because he was

11  mayor at the time.

12  **Q.**   Why did you order the officers to review the

13  sexual harassment policy with the members?

14  **A.**   Well, we ordered our members to look at numerous

15  documents, as you saw.  Each month we would choose

16  training topics for them to review.  Annually -- we

17  would try annually to review some policies that were

18  not just fire department policies but also city

19  policies, in that case the sexual harassment policy,

20  and it was -- generally the sexual harassment policy

21  and the rules and regulations were issued when you came

22  to the fire department.

23        One of the first things we do with a new recruit

24  is issue them the rules and regulations, and in this

25  case they would contain the sexual harassment policy.

1    And that would be continual.  The rules and regulations

2    remained in force and effect throughout your entire

3    career; but you would also study those as part of your

4    promotional study material, and we would review those

5    when we went into the training academy for officers,

6    when the officers would go through their training as

7    well.

8            So we would continue to review all of our

9    policies, and at specific points in time we may define

10   something that we wanted you to review specifically for

11   a month or at a particular time.

12   Q.   So even anyone who had come on the Providence Fire

13   Department prior to this, when you issued this order in

14   2007, that policy would have been reviewed with them by

15   officers?

16   A.   Yes, sir.

17   Q.   So I take it you didn't want these policies just

18   sitting in a locker somewhere?

19   A.   No.  You know, the issue was -- I mean, over a

20   period of time, we issued a lot of orders.  We would

21   issue standard operating procedures.  We would issue

22   memorandums.

23           And there may be specific times of the year that

24   we would reissue or identify a certain policy that we

25   wanted you to review, whether it would be rules,

1    operating procedures or training bulletins.

2         You know, for instance, in the wintertime we

3    would want you to review winter operations, ice drills,

4    ice rescue drills and things like that.  So we picked

5    certain topics that we thought we wanted you to review

6    at certain times, and it could also be based on we

7    would have a, you know, major fire like we did a couple

8    weeks ago, wind-driven and lot of issues and cyanide.

9    There was some cyanide poisoning.

10        And the department would reissue specific

11   policies after something like that to remind, you know,

12   our members that they were there and to review them to

13   make sure that it's best that they would comply.

14   Q.   Other than the specific training you ordered in

15   2007, are you aware of anyone else doing sexual

16   harassment training in the fire department?

17   A.   Yes, sir.

18   Q.   Who else did sexual harassment training in the

19   fire department?

20   A.   Well, I think initially it was Gwen Andrade.

21   Q.   Who is she?

22   A.   She was a human resource officer or the EEO

23   officer.  I don't recall exactly what her title was in

24   probably the 1990s.  And then at the time period I was

25   chief, it was Olayinka, and she was the EEO officer for

1    the City of Providence, and she would also do trainings

2    for us at the academy with some of our -- some of our

3    promotional academies as well.

4    **Q.**   When you say promotional academies, is that the

5    same as a point school?

6    **A.**   No, that's different than a point school.

7    **Q.**   What's a point school, Chief?

8    **A.**   We would annually, and actually it was part of the

9    collective bargaining agreement, we would annually have

10   a point school.

11        So you would attend a specific training that we

12   wanted you to review.  In some cases it would be, I

13   believe, the sexual harassment policy or discrimination

14   policies maybe.  We would do other trainings having to

15   do with, you know, issues that we felt were important

16   that you reviewed.  And you would be given an

17   additional point, quarter point or whatever towards

18   your promotion.

19        So if you went to those academies, we would give

20   you a point.  When you went to become promoted, we

21   would add those point schools -- those points from the

22   point schools to your seniority points and other things

23   that you were given on the department to give you a

24   total score for your promotion.

25   **Q.**   And both the point school and the promotional

1    classes, they would include incumbent firefighters;

2    correct?

3    **A.**   They would generally be everybody on the fire

4    department because you didn't want to lose the

5    opportunity to get, you know, a quarter of a point or a

6    half a point or a point and a half.  There were schools

7    that were a point and a half for hydraulics when I

8    first came on, but you didn't -- generally no one

9    missed the opportunity to get to a point school because

10   it was helpful when you were getting promoted to have

11   those points available to you.

12   **Q.**   So there was sexual harassment training done in

13   the training academy for the recruits?

14   **A.**   Yes, sir.

15   **Q.**   And then when you were chief in 2007, you ordered

16   a review of the sexual harassment policy; right?

17   **A.**   Yes, sir.

18   **Q.**   And that one had been issued in 1998?

19   **A.**   Yes, sir.

20   **Q.**   And before you were the chief, I think you said

21   Gwen Andrade did training of the incumbent

22   firefighters?

23   **A.**   Yes, sir.

24   **Q.**   Also during your tenure as chief, Oredugba

25   Olayinka did training in sexual harassment with

1    incumbent firefighters?

2    **A.**   Yes, sir.

3    **Q.**   I want to ask you some questions, Chief, about

4    Lori Franchina.  You know who Lori Franchina is;

5    correct?

6    **A.**   Yes, I do.

7    **Q.**   Sometime in August or September of 2009, did you

8    receive information that she was making complaints of

9    harassment?

10   **A.**   I received information that she was complaining

11   about harassment or an incident that took place.  I

12   think the first time I was informed was about an

13   incident that took place at the union hall.

14   **Q.**   Okay.  Well, let's back up to September of --

15   August or September of 2009.  Do you remember

16   discussing any issues with Lori Franchina in August or

17   September of 2009 with Olayinka Oredugba?

18   **A.**   Yes.

19   **Q.**   And did she contact you, Olayinka, or who

20   contacted you?

21   **A.**   I believe that she may have contacted me.

22   **Q.**   Okay.  And did you actually meet with her?

23   **A.**   I believe I did.

24   **Q.**   And can you tell us what the topic of that meeting

25   was.

1    **A.**   I believe -- it's been a while, but I believe that

2    Lieutenant Franchina may have gone to Olayinka and

3    lodged a complaint.  She was having difficulties on the

4    fire department with harassment, and I think Olayinka

5    contacted me.

6    **Q.**   All right.  And did you take any action when

7    Olayinka told you about this?

8    **A.**   I'm sure I did.  Any issues that came up,

9    particularly with the EEO officer, I would meet with my

10   command staff and discuss those issues with them to

11   make sure that they were, as well as the rest of the

12   membership was, complying with any issues and

13   directives or, if there was any issues on the

14   department, that we took corrective actions as we

15   deemed appropriate at that time.

16   **Q.**   So after your meeting with Olayinka, what steps

17   did you take?

18   **A.**   My steps would have been to meet with my command

19   staff, which I did on just about every Tuesday.

20   **Q.**   Who comprised your command staff?

21   **A.**   The assistant chief of the department for

22   administration at that time was Chief Warren, the

23   assistant chief of the department for operations at

24   that time was Chief Dillon, my investigative officer

25   who was Chief Morgan, my EMS chief who was Chief

1    Crawford.  I would meet with my fire marshal, who was

2    Fire Marshal Anthony DiGiulio; and I believe our

3    communications chief would come in, who at that time

4    was Chief Taylor, and also the director of the Division

5    of Training, Chief Gallant.

6    **Q.**    So that comprised your command staff?

7    **A.**    Yes, sir.

8    **Q.**    And you said you met with them every week?

9    **A.**    Generally every Tuesday.

10   **Q.**    And what did you tell them -- what did you tell

11   your command staff after you learned of these

12   complaints?

13   **A.**    I would have directed my command staff to look

14   into those complaints to make sure that they directed

15   through their subordinates, which would be everybody

16   under the command staff level, deputy assistant chiefs,

17   chief officers and those chief officers to the members

18   of the department in whatever division that they were

19   assigned to, that they were required to comply with

20   rules and regulations, they were required to comply

21   with any of the policies and procedures that were of

22   concern at that time.

23   **Q.**    And when you say you told your command staff, now

24   are they directed to tell those below them?

25   **A.**    Yes, sir.

1    **Q.**    And who would constitute in the chain of command

2    those below the command staff?

3    **A.**    It would be anybody below -- that worked in the

4    shifts.  Generally the command staff were the people

5    who worked in the front office upstairs with me in the

6    chief's office or with the directors of the training

7    academy, the fire marshal or the communications

8    division.

9         So they would go back out to the company

10   officers.  In this case, it would probably be Chief

11   Dillon as the chief of operations that was his part --

12   under his responsibilities was to go out and to direct

13   the members in the engines, ladders and rescues and

14   other divisions to comply with whatever directives or

15   discussions we had that we wanted them to be -- you

16   know, to review.  So he would, and then they would go

17   from the chiefs down to the lieutenants and captains.

18   **Q.**    So you were the top person in the fire department?

19   **A.**    Yes, sir.

20   **Q.**    So when you give a directive like this, it was

21   supposed to go to the officers in the stations

22   themselves?

23   **A.**    It would generally follow the chain of command and

24   should be from me right through the chain of command to

25   whoever the junior person is on the fire department.

1    **Q.**   Okay.  And what about the line firefighters in the

2    stations, would they get word of this, too?

3    **A.**   Oh, yes.

4    **Q.**   And this directive that you gave after the meeting

5    with Olayinka, was that written or verbal?

6    **A.**   It was probably verbal.

7    **Q.**   Okay.  And you gave verbal orders all the time in

8    the fire department?

9    **A.**   I did.

10   **Q.**   Did you give written orders also?

11   **A.**   I did.

12   **Q.**   Did you give general orders?

13   **A.**   Yes, sir.

14   **Q.**   And you gave memorandum like we just saw; correct?

15   **A.**   Yes, sir.

16   **Q.**   And when you gave an order, whether it was verbal,

17   written or otherwise, would you expect that your order

18   would be followed?

19   **A.**   Yes, sir.

20   **Q.**   And why was that?

21   **A.**   That's how a department in the fire department,

22   the fire service, that's how we operate is that orders

23   come and orders are received, and the directives or

24   orders given are expected to be followed to the best of

25   the knowledge and ability of the person that we're

1      giving that order to.

2             It wasn't always, "I'm ordering you."  It would

3      be if I directed Chief Dillon or Chief Warren or Morgan

4      or any lieutenant or captain as chief or as a

5      lieutenant to the people under my command, if I said, I

6      want you to polish the brass, I didn't necessarily say,

7      "This is an order," but it was generally taken that way

8      that you were being directed, and that's how we

9      followed orders.

10     Q.   Well, if you're the chief of the department and

11     you tell someone I want you to polish the brass, they

12     take that as an order?

13     A.   I think that they would.

14     Q.   You're not giving them -- really giving them a

15     choice; right?

16     A.   No.  I think if there was an order that -- if

17     there was something that I asked someone to do, if I

18     said can you do this for me, if it wasn't complied with

19     and it was something that I felt was of importance, I

20     may ask them the next time did you mistake that for a

21     request because it generally wasn't.

22            But we didn't go around saying, I'm ordering you

23     to do this.  We would say, I want you to do this.  I

24     want you to go out and talk to the chiefs about this,

25     and it would get done.

1  **Q.**   And did you have confidence in the officers below

2  you?

3  **A.**   Yes, sir.

4  **Q.**   Now, you mentioned something about an incident at

5  the Firefighters' Hall; correct?

6  **A.**   Yes, sir.

7  **Q.**   And you know that Chief Dillon sent out an e-mail

8  regarding that incident?

9  **A.**   Yes, sir.

10      MR. McHUGH:  Let me show that to you, Chief.  I

11  think this is -- is this 6?  I shouldn't be asking you.

12  I should know myself.

13      MR. MARTIN:  I think that's right, Kevin.

14      THE COURT:  It's 6.

15      MR. McHUGH:  Oh, I was right.  Thank you.

16      THE CLERK:  It's the e-mail.

17  **Q.**   Could you just read this to yourself, Chief,

18  please.

19  **A.**   Okay.

20  **Q.**   You've seen this before; correct?

21  **A.**   Yes, I have.

22  **Q.**   Now, when this was issued January 5th, 2010, what

23  was your position then?

24  **A.**   Chief of the department.

25  **Q.**   And what was Chief Dillon's position?

1    **A.**   Assistant chief of the department for operations.

2    **Q.**   Would he have been number two in the department,

3    then?

4    **A.**   He was pretty much equal with Chief Warren, who

5    was the assistant chief for administration, but yes.

6    **Q.**   So those would be the two right below you?

7    **A.**   Yeah.  We would only really designate them

8    differently by the assignment that they had on the

9    radio.  I was Car 1.  They were Car 2 and 3.  They had

10   their responsibilities, but their rank and pay grade

11   was equal.

12   **Q.**   And do you remember that you discussed this e-mail

13   at all with Chief Dillon?

14   **A.**   Yes, sir.

15   **Q.**   And what was the purpose of this?

16   **A.**   This order wouldn't have come out without some

17   discussion with me first.  I'm sure we discussed this

18   at a command staff meeting.  And Chief Dillon was

19   directed by me to issue an order after that, the

20   incident at the union hall, to do our best to keep

21   Firefighter McGarty out of stations and in proximity

22   other than emergency responses from Lieutenant

23   Franchina.

24   **Q.**   So you considered this an order?

25   **A.**   I did.

1  **Q.**   And you actually ordered Chief Dillon to put it

2  out?

3  **A.**   Yes, sir.

4  **Q.**   Now, in your 31 years on the Providence Fire

5  Department, have you ever seen an order like this

6  before?

7  **A.**   Not to my knowledge, no.

8  **Q.**   This is an order separating two firefighters;

9  right?

10  **A.**   This was -- if you look, it went from Chief Dillon

11  to each of the two battalions as well as the deputy

12  assistant chief in Division 1, all of the assistant

13  chiefs, the Emergency Medical Division chief, as well

14  as the department investigative officer.

15      So it went from the chief, and then it was sent

16  out to them, and they were directed to discuss this --

17  the chiefs generally control the staffing and manpower,

18  so they would discuss trying to make sure that

19  Firefighter McGarty was not assigned to the same

20  station as Lieutenant Franchina.

21  **Q.**   Now, I understand that some time -- I don't think

22  it was too long after that that you had gone out sick.

23  **A.**   I went out -- I was transitioning out probably in

24  November of 2010, but by December of 2010 I was no

25  longer -- I was still chief until -- officially until

1    June of 2011, but I was out sick for a while.

2    **Q.**    Okay.  Now, Chief, there's been some testimony in

3    this -- you've spent a lot of years on the fire

4    department.  I'm sure you've gone to a lot of fires.

5    Correct?

6    **A.**    Yes, sir.

7    **Q.**    So there has been some testimony in this case

8    about who's in charge at the scene of a fire.  So I

9    want to ask you a couple of questions about that.

10        MR. MARTIN:  Objection.  I don't recall any

11    fires coming into this case at all.

12        THE COURT:  Let's see where he's going.

13    Overruled for now.

14    **Q.**    When a -- well, let me rephrase that.  Who is in

15    charge of a scene when there's a rescue and an engine

16    company, okay, whether it be a fire or -- well, don't

17    rescues get sent to working fires as a matter of

18    course?

19    **A.**    Yes, sir.

20    **Q.**    So when you have a scene where you have a rescue

21    on scene and you have an engine company on scene, what

22    is the rescue lieutenant in charge of?

23    **A.**    The rescue officer or the person in charge or the

24    acting officer would be in charge of patient care and

25    overseeing the patient care and management.

1   **Q.**   And who was in charge of the overall scene?

2   **A.**   The -- if it was a rescue and an engine, the first

3   responding officer, the first officer on the scene

4   would be the, quote, "incident commander."  And the

5   fire company officer, let's say it was a fire company

6   or an engine company with a rescue company, overall

7   scene management and control of the scene would be the

8   fire company officer.

9   **Q.**   So it's the officer on the company who is in

10  charge of the scene and not the rescue lieutenant?

11  **A.**   Scene management would be the officer in charge of

12  the scene.

13  **Q.**   Right.  Is that written down anywhere, Chief?

14  **A.**   Yes, it is.

15       MR. McHUGH:  Your Honor, may I have this marked

16  as Defendant's T for identification, please.

17       MR. MARTIN:  No objection to this entering

18  evidence.

19       THE COURT:  No objection, Mr. Martin?

20       MR. MARTIN:  No objection.

21       THE COURT:  Great.  Exhibit T will be admitted

22  as a full exhibit without objection.

23       (Defendant's Exhibit T admitted in full.)

24       MR. McHUGH:  May I approach the witness, your

25  Honor?

1          THE COURT:  Sure.

2    **Q.**    Chief, I want you to read this whole document, and

3    then we're going to put it up on the ELMO and ask you

4    some questions about it, please.

5    **A.**    Okay.

6          MR. McHUGH:  Can I publish this to the jury,

7    your Honor?

8          THE COURT:  Sure.  Pull it down a little bit.

9    There you go.  Thanks.

10   **Q.**    Now, Chief, we've had this morning a general order

11   you testified to, correct, the sexual harassment

12   policy?

13   **A.**    Yes, sir.

14   **Q.**    We had the memorandum for training you testified

15   to; correct?

16   **A.**    Yes, sir.

17   **Q.**    We had the e-mail from Chief Dillon; correct?

18   **A.**    Yes, sir.

19   **Q.**    And now we have a document entitled Standing

20   Operating Procedure.  Could you tell the jury what a

21   standing operating procedure is, please.

22   **A.**    We would from time to time, in this case we were

23   up to 21, but there were numerous more than these,

24   these would be the procedures that we would generally

25   want our engines, ladders and all of our personnel to

1    operate under under specific issues that we were

2    talking about in that general order.  I think in some

3    there were ventilation, structural fires,

4    accountability and all of those things.

5           In this case it was for the emergency medical

6    first responders, which were generally the engine and

7    ladder companies that were responding to a medical

8    emergency.

9    Q.   And then the rescue would follow in?

10   A.   Yes.

11   Q.   Now, what does it mean SOP Number 21?

12   A.   That was -- we numbered the standard operating

13   procedures so we could go back and refer to them.  So

14   we issued it by number.

15   Q.   Were they issued by number by year or just

16   chronologically from day one?

17   A.   Probably from just day one.  So, you know,

18   depending on when we issued the policy, it would follow

19   in chronological order.

20   Q.   So this one was effective October 30th, 2002?

21   A.   Yes, sir.

22   Q.   And this one involves the responding company to a

23   medical emergency as well as the rescue?

24   A.   It was to provide uniform guidelines for also

25   dispatching, response of the fire companies to

1    life-threatening emergencies to medical incidences.

2    **Q.**   All right.  Let me ask you a few questions here.

3    Down below where it says A, First Responder, "Company

4    shall be the closest available fire company," what does

5    that mean?

6    **A.**   Well, depending -- we had, you know, 14 engine

7    companies and eight ladder companies as well as Special

8    Hazards trucks.  So we had 23 engines and ladders in

9    addition to, depending on the timeframe, three, four,

10   five, six and now seven rescue companies.

11        So if there was a life-threatening emergency,

12   our rescues are on the go all the time, so they may not

13   be in the proximity of where the medical emergency or

14   the call was coming from.

15        So we would send the closest engine company

16   generally, but sometimes a ladder company, to that

17   scene first.  It could just be that the rescue company

18   was unavailable.  It could also be that a rescue

19   company was coming on mutual aid from another community

20   to Providence.

21        But we would send -- and depending on the

22   medical emergency as well.  So for life-threatening, we

23   delineated a number here that you will see, A through

24   J; but if we had a mutual aid company coming from out

25   of town, we would also send a first responder company,

1    engine or ladder, to that rescue because they would

2    arrive on scene in most cases before the rescue.

3    **Q.**    Can you tell the jury what you meant when you just

4    said mutual aid company from out of town.

5    **A.**    If we didn't have a rescue available in

6    Providence, we would call other communities surrounding

7    the city and ask if they had a rescue available, and

8    that rescue company -- it could be like this morning,

9    we had engines and ladders into the city because we had

10   a multiple-alarm fire.

11          But in this case, if we needed a rescue, the

12   rescue would come in, and we would always send one of

13   our companies that was closest to that emergency to get

14   there and get on scene and begin providing whatever

15   medical care and treatment that patient may need.

16   **Q.**    All right.  Look under Procedures For First

17   Responder Companies.  So the first thing is, upon

18   arrival at the scene, conduct a primary survey of the

19   patient; correct?

20   **A.**    Yes, sir.

21   **Q.**    And then Number 2 is establish a chief complaint

22   and a clinical impression and patient history; right?

23   **A.**    Yes, sir.

24   **Q.**    Number 3, provide prehospital care as necessary,

25   if necessary.  Does that mean if a person is going to

1    be transported to the hospital?

2    **A.**   Well, you know, sometimes -- we didn't always get

3    runs where there were medical issues.  We got runs from

4    -- sometimes it was, you know, someone was having

5    difficulty, and it wasn't always a medical emergency.

6        But if it was necessary to provide medical care

7    and treatment and if it was going to be required for

8    the first responding company, the engine or ladder and

9    the additional personnel, they would begin providing

10   whatever medical care and treatment based on the

11   protocols and based on also their level of skill and

12   training and qualifications.

13   **Q.**   Now, Number 4 says, "Pertinent victim status

14   information shall be relayed via radio by the fire

15   company officer to the incoming rescue unit."

16       So it seems, then, if the engine company's on

17   scene first, they're supposed to radio the rescue if

18   they're not there yet and give them the information

19   that's listed there?

20   **A.**   If the engine company arrived on the scene first,

21   the engine or ladder, they would try and obtain as much

22   medical information as they could from the patient or

23   from the other people on scene; and they would

24   generally transmit that information to our

25   communications division who would then transmit it or

1    they would listen to it on the radio or transmit it

2    over to the incoming rescue unit if that was possible.

3         Sometimes the rescue would arrive, you know,

4    just within a couple of minutes, and it didn't always

5    get transmitted prior to the rescue company arrival.

6    Q.   Okay.  And then Number 5 says, "Upon arrival of

7    the rescue unit, the rescue officer will be in charge

8    of the medical condition of the patient."

9         So once the rescue officer, that would be a

10   lieutenant or a captain; right?

11   A.   Most of the time.  Sometimes it was an acting

12   officer.

13   Q.   Okay.  Or acting?

14   A.   Right.

15   Q.   So when that person gets on scene with the rescue,

16   they are in charge of the medical condition of the

17   patient, not the engine company; correct?

18   A.   Right.  You would transfer the care of that

19   patient to the incoming rescue and rescue officers, but

20   you would continue to work with the rescue company.

21   Generally you would work with them, if necessary, and

22   remain on scene and even sometimes transport or be

23   released by the rescue officer.

24        But the rescue officer would then begin taking

25   control of the emergency medical and the protocols that

1    were going to be used.

2    **Q.**   And then it says, "The incident commander," and in

3    parentheses, "(first arriving officer or other officer

4    who has assumed command)."  Will you explain to the

5    jury what an incident commander is.

6    **A.**   An incident where it was just a rescue, a fire

7    apparatus and a rescue, it would be the first arriving

8    officer.  It would be the lieutenant or captain on that

9    engine company.  They would assume command in just a

10   small incident like that.

11          When you got to multiple incidences, you would

12   actually hear -- the incident commander in many cases

13   would assume command, and they would name the command

14   that they had.  It may be a street location, like

15   today, Angell Street.

16          So they would arrive on scene and say, you know,

17   Battalion 3 is on scene assuming Angell Street command.

18   In those instances, depending on the size, complexity,

19   the number of companies, it would be more clearly

20   defined and delineated what was being set up and how

21   that was being done and who was in command.

22          And then all of the communications in most

23   instances would go through that commanding officer in

24   that incident command.  So if I was on the scene as an

25   engine company officer, I would say, "Engine 8 to

1    command," and the command officer would transmit back

2    to me, "Go ahead, Engine 8," and you'd give your

3    report.

4           On smaller instances, for first responder and

5    EMS, it was generally only a rescue and engine; but it

6    was always understood that someone had to assume

7    command.  The EMS assumed command for the patient, and

8    the incident commander always remained per this general

9    order or should have remained the company officer.

10   Q.   All right.  And it says, the rest of that

11   sentence, "Shall remain in command of all other matters

12   concerning the incident, including scene safety";

13   right?

14   A.   Including scene safety, yes, sir.

15   Q.   Incident mitigation, what does that mean, sir?

16   A.   Well, if you had a car accident and there was fuel

17   leaking from that vehicle or there was a fire, you

18   would -- they would continue to try and mitigate those

19   circumstances and control the flow of the fuel, control

20   the fire, if you were trying to extricate someone from

21   a car or even in a house fire where you may be on the

22   scene and the company officer was trying to mitigate

23   the circumstances, put out the fire and remove someone

24   who was in danger.

25          So incident mitigation and then, again,

1    extrication, I just kind of explained with a car

2    accident getting someone out of either a car,

3    extricating them from a building collapse or any of

4    those things.

5    **Q.**   Okay.  And then the engine company is supposed to

6    remain on the scene to assist, if necessary, the

7    rescue; correct?

8    **A.**   If it was necessary, the rescue, engine or

9    sometimes even a chief officer was called depending on

10    the severity of the incident to an EMS emergency.  I

11    think if we dispatched a few -- a couple of rescues,

12    I'm not sure of the number because I'm not working, I'm

13    not as familiar as I was, but if it was multiple rescue

14    companies and multiple fire companies, we would send a

15    chief officer as well.

16    **Q.**   And sometimes it's not necessary; right?

17    **A.**   Sometimes it's not necessary.

18    **Q.**   Now, Chief, I want to ask you some questions about

19    Andre Ferro.  You know who Andre Ferro is; correct?

20    **A.**   Yes, sir.

21    **Q.**   And you know that Andre Ferro was fired by the

22    city's trial board?

23    **A.**   Yes, sir.

24    **Q.**   Were you the chief when Andre Ferro was fired?

25    **A.**   I believe I was the chief when he was terminated.

1    **Q.**    Were you the chief while the trial board was
2    actually going on?
3    **A.**    I don't believe I was.
4    **Q.**    So by the time you had been chief -- at the time
5    you were the chief, Ferro's fired; right?
6    **A.**    Yes, sir.
7    **Q.**    And then he filed a grievance under the union
8    contract?
9    **A.**    Yes, sir.
10   **Q.**    And there was an arbitration scheduled; correct?
11   **A.**    Right.  We denied the grievance, and the union
12   scheduled an arbitration.
13   **Q.**    Can you explain to the jury how that grievance
14   procedure worked.
15   **A.**    Well, he was -- Firefighter Ferro was terminated
16   by the trial board.  Local 799 would file a grievance,
17   in his case filed a grievance on his behalf indicating
18   that we had violated his rights under the collective
19   bargaining agreement and in this case believing he
20   shouldn't be terminated.
21          And we denied that grievance, and then the
22   process would go that they would file for arbitration,
23   which they did in this case, and an arbitration hearing
24   would be scheduled to review that termination and the
25   circumstances around that termination.

1   **Q.**   And could you tell the jury what the trial board

2   is -- consists of that terminated him.

3   **A.**   The trial board consists of the municipal court

4   judge, the head of the municipal court.  It would

5   consist of the commissioner or the acting commissioner,

6   whoever's in place.  At that time I believe the acting

7   commissioner was Mayor Cicilline, and he would --

8   generally he would assign a person to sit on his behalf

9   on that board as well as the human resource officer for

10  the City of Providence, who I believe is Sybil

11  Bailey -- was and is Sybil Bailey.

12  **Q.**   Was it the chief judge of the municipal court or

13  the probate judge?

14  **A.**   Off the top of my -- I'm not sure.  It's Judge

15  Martinelli.

16  **Q.**   The probate judge?

17  **A.**   The probate judge.  Okay.

18  **Q.**   But at the time the arbitration was scheduled, you

19  were the chief; correct?

20  **A.**   Yes, sir.

21  **Q.**   And did you attend the arbitration hearing?

22  **A.**   I did.

23  **Q.**   Who else attended on behalf of the city?

24  **A.**   Chief Warren was there.

25  **Q.**   Chief Warren was who at the time?

1      **A.**   He was my assistant chief for administration as

2      well as we had our attorney, Attorney Jeff Kasle.

3      **Q.**   Anyone else there with you?

4      **A.**   Lieutenant Franchina was there with us on our

5      side, and on the opposite side was the union.  I

6      believe they had Paul Reed, who was preparing and

7      presenting their arbitration case, as well as

8      Firefighter Ferro and I believe it was the vice

9      president of the union.  I'm not sure if it was Phil

10     Fiore or Joe Miller, but it was -- some union

11     representatives were there.  I don't recall everyone.

12     **Q.**   On the day of the arbitration, there was an

13     agreement reached?

14     **A.**   Yes, there was.

15     **Q.**   That was reduced to writing by the arbitrator?

16     **A.**   Yes, it was.

17            MR. McHUGH:  Your Honor, could I have this

18     marked for identification as Defendant's R.

19            MR. MARTIN:  No objection to the admission of

20     this document.

21            THE COURT:  Exhibit R will be admitted as a full

22     exhibit without objection.

23            (Defendant's Exhibit R admitted in full.)

24            MR. McHUGH:  May I approach the witness, your

25     Honor?

1      THE COURT:  Sure.

2  **Q.**   Chief, I'm going to show you what's been marked as

3  the city's Exhibit R, and could you read that document

4  before I publish it to the jury, please.

5  **A.**   Okay.

6      MR. McHUGH:  Can I publish this to the jury,

7  your Honor?

8      THE COURT:  You may.

9  **Q.**   So at the top, Chief, this is the name of the

10 arbitration; right?  It's the union versus the city,

11 essentially?

12 **A.**   Yes, sir.

13 **Q.**   And this is entitled an award of arbitrator.

14 What's an award of arbitrator?

15 **A.**   This in this case this -- generally in all cases

16 we would usually go through the procedure; and at the

17 end, if it still remained unresolved, the arbitrator

18 would issue his or her decision based on the facts that

19 were presented.

20      In this case, we came to a settlement prior to

21 the conclusion of the case being presented, and it was

22 agreed to by the parties, and then I believe at the

23 time it was signed by Chief Warren who was there as

24 well as Andre Ferro.

25      And then we stipulated -- basically in this case

1    it was called a stipulated award.  We stipulated to the

2    facts, the resolution, and then the arbitrator issued

3    it as a decision of that arbitrator.

4    Q.   So you essentially had the agreement between the

5    parties memorialized in writing by the arbitrator in

6    this document?

7    A.   It was reduced into writing, this decision.  It

8    was actually signed by Chief Warren and signed by Andre

9    Ferro.

10   Q.   Let's take a look at this for a minute.  Number 1,

11   the grievant was Andre Ferro; right?

12   A.   Yes, sir.

13   Q.   And the date of the arbitration was October 21st,

14   2008, right, at the bottom?

15   A.   I can't see the bottom.

16   Q.   I'm sorry.

17   A.   It was the date that he -- the arbitrator signed

18   the decision, October 21st.  I don't recall if that was

19   the actual date or the date that he signed the

20   decision.

21   Q.   And so the agreement provided that Ferro would be

22   reinstated effective November 2nd, 2008?

23   A.   Yes, sir.

24   Q.   And it says to D Group, Engine 4.  What's that

25   consist of?

1    **A.**    At that time we had a four-platoon system, A, B,

2    C, D Group; and Engine 4 would be the company on D

3    Group that Firefighter Ferro would be assigned to.

4    **Q.**    And then it says subject to an assignment --

5    subject to an assignment to the Division of Training

6    for two weeks.  So he was sent to the Division of

7    Training for two weeks?

8    **A.**    Yes, sir.

9    **Q.**    And what was that for?

10   **A.**    Well, because we had -- he had been off the job

11   after being terminated for probably close to a year and

12   a half.  So we always -- when someone was out of the

13   fire station off an engine or rescue or ladder company,

14   even if it was sometimes for an injury, we would try to

15   reassign them to the Division of Training to review any

16   policies, procedures, general orders or anything that

17   had come out and give them some retraining because

18   there may have been new training that had taken place,

19   new equipment that had taken place.

20        So we would send them there for a couple of

21   weeks to get retraining in anything that the division

22   trainer felt it was necessary that they get brought

23   back up to speed or to skill on.

24   **Q.**    And then Number 3 says, "The grievant shall be

25   subject to a last-chance agreement."  What's a

1    last-chance agreement?

2    **A.**    Basically if Firefighter Ferro had any infractions

3    within the department, minor or major, we could

4    terminate him without a hearing.

5    **Q.**    Well, this one specifically stated that any

6    violation of the department's equal employment -- equal

7    opportunity regulations or the anti-discrimination

8    provision in the collective bargaining agreement shall

9    result in termination; correct?

10   **A.**    Yes, sir.

11   **Q.**    And the last-chance agreement was going to last

12   for a period of 18 months beginning November 2nd, 2008?

13   **A.**    Yes, sir.

14   **Q.**    And then Number 4, you said, "The grievant shall

15   attend on personal time at personal expense a mutually

16   acceptable sexual harassment training within six months

17   of his reinstatement."  And why did you require that,

18   Chief?

19   **A.**    Because we wanted to make sure not only in

20   addition to going to the rules -- to the Division of

21   Training to get retraining, which would include making

22   sure that we reviewed all of those items I discussed

23   previously, that he had specific training as related to

24   sexual harassment issues beyond what we did in the fire

25   department.

1    **Q.**   So that was in addition to?

2    **A.**   Yes, sir.

3    **Q.**   Number 5, you required that Ferro provide a letter

4    of apology to Lieutenant Franchina delivered to the

5    chief prior to Ferro's reinstatement.  Why did you do

6    that?

7    **A.**   We wanted to make sure that there was something

8    there that he apologized to the lieutenant for his

9    actions for which -- well, he was getting his job back

10   here but for the actions that took place that

11   originally led to the trial board, the charges, the

12   trial board prior to this hearing.

13   **Q.**   The next, Number 6, references conduct points,

14   good conduct points.  What are they?

15   **A.**   Those are points that, if taken away from you,

16   would be deducted from your score as it related to a

17   promotion.  We talked about point schools earlier and

18   seniority points and things like that; but losing two

19   good conduct points was something that no one really

20   wanted to happen because when you went for a promotion,

21   two good conduct points could mean that you were on or

22   off a promotional list for lieutenant, for a promotion

23   to lieutenant given the complexity and the -- how

24   difficult it was to get promoted.

25        If you lose a couple of points, you are probably

1    going to lose your promotion for a long time and maybe

2    in some cases that I was aware of people never got

3    promoted.

4    **Q.**   Why do you say a long time?

5    **A.**   Well, because you lost them completely, but they

6    would certainly affect your ability to get promoted in

7    the fire department.

8           There were other cases where I disciplined

9    someone, took their good conduct points away in

10   addition to a couple of other things, and the person

11   never was able to get promoted because everybody else

12   is catching up with seniority points and you lost two

13   points.

14          In our promotional system, we're separated from

15   number 1 to number 10 on that list by just maybe a half

16   a point or a quarter of a point.  So losing two points

17   could make the difference of making the list or not

18   making the promotional list.

19   **Q.**   I noticed that there's nothing in here about back

20   pay.  Did Ferro receive any back pay?

21   **A.**   Number 2, the grievant shall not receive back pay

22   or benefits for the period of time when he was

23   terminated.  So it was probably about a year and a half

24   of salary.  It was probably his longevity, holiday pay

25   and all of those things, details that may have been

1    available to him, opportunities for call-back and

2    overtime.  So it was tens of thousands of dollars.

3    Q.    And that was gone forever?

4    A.    Gone forever.

5    Q.    And Number 7, the last part of it says, "This is a

6    full and final resolution of all issues relating to

7    this arbitration and is acceptable to all parties."

8    Was this award of the arbitrator acceptable to Local

9    799?

10   A.    Yes.

11   Q.    Was it acceptable to Ferro?

12   A.    Yes.

13   Q.    Was it acceptable to Chief Warren, did you say you

14   had with you?

15   A.    Yes.

16   Q.    Was it acceptable to you?

17   A.    Yes.

18   Q.    Was it acceptable to Lori Franchina?

19   A.    Yes.

20   Q.    How do you know it was acceptable to Lori

21   Franchina?

22   A.    She was there, and we discussed this decision with

23   her throughout.  We certainly explained how the

24   arbitration case could go.  The arbitrator had the

25   ability to make whatever decision from keeping the

1    termination in place to reinstatement without any

2    restriction.

3         And we denied the grievance and were prepared to

4    go forward and would have gone forward had we not

5    reached resolution and agreement; and specifically

6    that's why Number 7 was included, because everybody who

7    was there was in agreement.

8    **Q.**   Did you ever tell her, If you don't agree to this,

9    things are going to be rough for you on the department?

10   **A.**   No.

11   **Q.**   Now, there's also been some testimony, Chief, in

12   this case about promotions to the rank of lieutenant,

13   specifically rescue lieutenant.  When Lori Franchina --

14   do you know when Lori Franchina was promoted to rescue

15   lieutenant?

16   **A.**   I believe it was 2006, 2007, somewhere in that

17   time period.

18   **Q.**   And she had graduated from the academy in 2002;

19   right?

20   **A.**   Yes.

21   **Q.**   So was that the normal course of time, period of

22   time for promotion?

23   **A.**   For a rescue lieutenant?  That was probably within

24   the normal timeframe for a rescue lieutenant.  It was

25   different for rescue lieutenants.  They were able to

1    take the promotional exam sooner and generally in a lot

2    of cases would make lieutenant sooner than you would if

3    you were in an engine or a ladder -- if you were a fire

4    suppression engine or ladder company officer.  It took

5    longer in fire and -- fire companies than it did in a

6    rescue company to get promoted.

7    **Q.**   Why was that, Chief?

8    **A.**   We didn't have as many people available to us.

9    Not everybody stayed in the rescue division for a long

10   time.  So in the fire -- on the fire end, for fire

11   suppression lieutenant, you would have to have I

12   believe it was six years before you could begin taking

13   the promotion to become a lieutenant.

14        In the rescue division, that had been lowered to

15   I think it was three years by the collective bargaining

16   agreement between the union because we were having a

17   more difficult time getting rescue officers.  So we

18   reduced the number of years before you could begin

19   taking a promotional exam.

20   **Q.**   And when these promotions to lieutenant or

21   captain, whatever they may be, are they usually done in

22   a group of people or just individuals?

23   **A.**   We would have put out an announcement that we were

24   going to have a promotional exam based on vacancies for

25   those lieutenants and captains in fire or EMS; and then

1    whatever number of people who are available by number

2    of years in the department, they would be able to take

3    that promotional exam.

4          So in this case it was specific -- in our

5    department, we had rescue exam -- EMS promotions for

6    lieutenant and captain, we had fire suppression

7    promotions for lieutenant and captain.  Fire Prevention

8    Bureau was a different promotional system, as was

9    communications division.

10   Q.   And do you know at the time that Lori Franchina

11   was promoted, was anyone else from her academy promoted

12   to rescue lieutenant at the same time she was?

13   A.   Yes, two other members of her particular academy,

14   Lieutenant Franchina's particular academy, were

15   promoted at the same time.

16   Q.   So those other two individuals who were promoted,

17   they were promoted within five years, also?

18   A.   They were promoted within the same timeframe.

19   There were two that graduated with Lieutenant Franchina

20   from her class in 2002, and they were also on the

21   promotional list with Lieutenant Franchina.

22         I don't recall exactly when it was, but there

23   were two other members of her academy who were promoted

24   at the same time.

25         MR. McHUGH:  Thank you very much, Chief.

1          Nothing further, your Honor.

2          THE COURT:  Thanks, Mr. McHugh.

3          Mr. Martin.

4          MR. MARTIN:  Madam Clerk, could I have Exhibit

5     Number 1, please.

6                        **CROSS-EXAMINATION**

7     **BY MR. MARTIN**:

8     **Q.**   Good morning, Chief.

9     **A.**   Good morning, sir.

10    **Q.**   Now, just a moment ago we looked at Exhibit 1,

11    which we'll look at again.  I'm going to put it up on

12    the ELMO.

13         In October of 2007, you instructed your officers

14    to review this policy and share it with all of their

15    subordinates?

16    **A.**   Yes, sir.

17    **Q.**   Okay.  Can you see where I'm pointing?

18    **A.**   I believe Revision 4, 2013.

19    **Q.**   How did you review that in 2007?

20    **A.**   This specific policy, I think I testified that

21    this was not the policy because it had Mayor Tavares'

22    name on it; but we had policies that were in place for

23    sexual harassment while I was chief that were contained

24    within the collective bargaining agreement.

25    **Q.**   Where is that one?

1    **A.**   I believe it's in the -- I'm sorry, the rules and

2    regulations.  I believe it's in the rules and

3    regulations.

4    **Q.**   I see.  So that would be Exhibit 36.  Do you

5    remember the one that was in the rules and regulations?

6    **A.**   I believe I do.

7    **Q.**   Would you know it if you saw it?  You'd probably

8    know it if you saw it?

9    **A.**   Probably, yes, sir.

10    **Q.**   Is this one, General Order Number 1, Series 1998?

11    **A.**   I believe so.

12    **Q.**   Okay.  This is the one that says complaints of

13    sexual harassment and/or retaliation will be accepted

14    in writing or verbally; correct?

15    **A.**   Yes, sir.  That's what it says.

16    **Q.**   All right.  I also want to discuss with you

17    Standing Operating Procedure Number 21.  I believe this

18    is entered into evidence as Exhibit Defense T.  This

19    says that they are instructed to review with their

20    staff the sexual harassment policy incorporated into

21    the rules and regulations, Chapter 16; correct?

22    **A.**   Yes, sir.

23    **Q.**   And that's what we just looked at?

24    **A.**   I believe so.

25         MR. MARTIN:  Thank you, sir.

1          Ma'am clerk, there was another exhibit entered
2     into evidence.  I believe it's Q.
3          THE CLERK:  Q is the Memorandum Number 102.
4          MR. MARTIN:  Could I see that, please.
5          THE COURT:  T was introduced during the direct.
6     T, like Thomas.
7          MR. MARTIN:  Was there another exhibit?
8          THE CLERK:  There was R.
9          MR. MARTIN:  R.  I'm so sorry.  Thank you.
10         Was there another exhibit?
11         THE CLERK:  No.  We had Q, T and R.
12         MR. MARTIN:  Q, T and R.  And that's --
13         THE CLERK:  Q, R.
14         MR. MARTIN:  And I just did T?
15         THE CLERK:  There's T.
16         MR. MARTIN:  This is the one.  I'm sorry.
17         THE CLERK:  That's all right.
18    **Q.**   Sorry about that, Chief.  So you remember this
19    one, too?  This is the emergency medical first
20    responder?
21    **A.**   Yes, sir.
22    **Q.**   Standing Operating Procedure Number 21?
23    **A.**   Yes, sir.
24    **Q.**   And this is about who is in charge of the scene
25    and who is required to do what?

1    **A.**    Yes, sir.

2    **Q.**    Okay.  And you discussed with Mr. McHugh at length

3    paragraph number 5; correct?

4    **A.**    Yes, sir.

5    **Q.**    I'd like to discuss with you paragraph number 6

6    because number 6 says that the fire companies shall

7    remain on the scene to assist the rescue company; is

8    that correct?

9    **A.**    Yes, sir.

10   **Q.**    Until the rescue officer feels that the medical

11   condition of the patient no longer warrants any

12   additional assistance; is that correct?

13   **A.**    Yes, sir.

14   **Q.**    The rescue officer shall release the fire company

15   as soon as practical after the rescue unit arrives on

16   the scene; correct?

17   **A.**    Yes, sir.

18   **Q.**    So when it comes to the care of a patient, it is

19   the rescue officer who is issuing the orders?

20   **A.**    I believe I testified to that.  Yes, sir.  The

21   rescue officer is in charge of patient care.

22   **Q.**    And the fire company shall follow those orders?

23   **A.**    Generally they will work together to comply with

24   the directives given by the rescue officer as it

25   related to patient care.

1  **Q.**    So when you said to Mr. McHugh, and I want to make

2  sure that I got this right, that the rescue officer is

3  never in charge of an engine company, that's not

4  exactly correct?

5  **A.**    Not as it related to the sections that I was

6  discussing as if the incident commander was the rescue

7  company officer -- I'm sorry, the engine company or

8  fire company officer.

9         The rescue officer is in charge for direction as

10  it related to patient care; but yes, at that point in

11  time there would be some direction given by the rescue

12  officer to the other members on the scene.

13  **Q.**    I want to make sure I understand what you said

14  because it's important.  When you were talking about

15  paragraph 5 that you discussed with Mr. McHugh, it is

16  true that a rescue officer would never be in charge of

17  the engine company?

18  **A.**    Unless it related to patient care.

19  **Q.**    And in number 6, when it does relate to patient

20  care, the rescue officer would be in charge of members

21  of the engine company?

22  **A.**    Yes, sir.

23  **Q.**    And the failure of that engine company to follow

24  that officer's orders would be insubordination?

25  **A.**    Yes, sir.

1    **Q.**    Insubordination warranting discipline?

2    **A.**    Depending on the insubordination and the

3    occurrences that were there.

4    **Q.**    All right.  Let's talk about some rules at the

5    department.  Chief, I'm going to show you on the ELMO

6    some pages from the Providence Fire Department Rules

7    and Regulations.  That's Exhibit Number 5.  You can

8    look at those pages individually on the ELMO or you

9    could have the entire exhibit with you on the stand if

10   you'd prefer.  Which would you like?

11   **A.**    I guess we could try on the screen first; and if

12   I'm having difficulty, I'll just ask for it, if that's

13   okay.

14   **Q.**    That's perfectly fine.  And if at any point I'm

15   switching the pages too fast, just let me know, and

16   I'll go slower.  Okay?

17   **A.**    Okay.  Thank you.

18   **Q.**    Sure.  First referring to Exhibit Number 5,

19   Preamble, page 2, the oath of office, it says, "I,"

20   blank, "having been appointed a member of the fire

21   department of the City of Providence, do solemnly swear

22   that I will support the Constitution of the United

23   States and of the State of Rhode Island and the

24   Providence Home Rule Charter, that I will faithfully

25   discharge the duties of a member of the Providence Fire

1    Department according to the laws, ordinances, rules and

2    regulations governing the department and will obey the

3    orders and directions of my superiors to the best of my

4    knowledge and ability so help me God."

5           Did I read that correctly?

6    **A.**   Yes, sir.

7    **Q.**   Every member of every engine company that ever

8    responded to a scene with Lieutenant Franchina took

9    that solemn oath?

10   **A.**   Yes, sir.

11   **Q.**   And as somebody who has been on the department for

12   over 30 years and reached the highest rank possible, I

13   would imagine that you more than anyone else takes that

14   oath very seriously.

15   **A.**   Yes, sir.

16   **Q.**   And you would respond to anybody who violated that

17   oath with swift remedial action?

18   **A.**   Depending on the violation of the oath of office,

19   the action and corrective action would be as swiftly as

20   possible, yes.

21   **Q.**   Now, you talked about sometimes your companies go

22   out to fight fires, obviously; right?

23   **A.**   Lots of times, yes, sir.

24   **Q.**   Lots of times.  And if they fail to fight the

25   fires, there would be consequences?

1    **A.**   Well, we would discuss it.  You know, depending on

2    the tactics and strategies and the things that took

3    place, it's not a perfect environment.  So we would

4    have, you know, general orders reissued, standard

5    operating procedures reissued.

6         We would meet with company officers and chief

7    officers to remind them of their duties and

8    responsibilities, but it certainly isn't as cut and dry

9    and swift in disciplining everybody every time that it

10   wasn't a perfect scenario when there's an incident.

11   That did not happen.

12   **Q.**   It's not always so cut and dry when it's not a

13   perfect scenario?

14   **A.**   That's correct.

15   **Q.**   Sometimes things are cut and dry, though; right?

16   **A.**   Some places they may be, yes.

17   **Q.**   So I'm going to go through a list of rules with

18   you now, and then we're going to refer to them as we go

19   through some other exhibits; and if at any point you

20   don't remember the rule that I'm referring to later,

21   we'll just bring out the list again.  Fair enough?

22   **A.**   That's fine.  Thank you.

23   **Q.**   Sure.  Number 4, "Members shall obey all laws,

24   rules, regulations, orders and commands.  Such

25   obedience shall be prompt, implicit and unqualified."

1    That's a rule at your department?

2    **A.**   Yes, sir.

3    **Q.**   That's a rule that you enforced?

4    **A.**   Yes, sir.

5    **Q.**   Number 6, "In matters of general conduct not

6    within the scope of these rules and regulations,

7    members shall be governed by the customary rules of

8    good behavior observed by law-abiding and

9    self-respecting citizens.

10        "In all cases where members conduct themselves

11   in a manner which may bring reproach or reflect

12   discredit upon the department, charges shall be

13   preferred."

14        Did I read that correctly?

15   **A.**   Yes, sir.

16   **Q.**   That was a rule at your department?

17   **A.**   Yes, sir.

18   **Q.**   A rule that you enforced?

19   **A.**   Yes, sir.

20   **Q.**   That one's pretty cut and dry?

21   **A.**   Yes.

22   **Q.**   Rule number 8.  There's a few bullets here that

23   we're going to talk about.  A, "They shall not violate

24   their oath of office."  Correct?

25   **A.**   Yes, sir.

**Q.**   All right.  H, "They shall not use indecent, profane or uncivil language, nor be guilty of immoral or indecent conduct."  That's a rule?

**A.**   Yes, sir.

**Q.**   And that one could go either way.  Sometimes it could be cut and dry, sometimes there could be a certain level of discretion that you would need to exercise?

**A.**   There was discretion certainly with rules and regulations as chief of the department for infractions and what the penalty may or may not be.

**Q.**   But some things would be clearly immoral or indecent, and some things would require more discretion?

**A.**   Everything required an investigation to get -- for us to determine and me as chief to determine what the infraction was and how we would deal with that infraction.

**Q.**   Everything required an investigation?

**A.**   Not everything.  I didn't investigate everybody who used indecent language in a fire station or on a fire scene.

**Q.**   Sure.  You wouldn't want to do it in this courtroom either.  We've been doing it all week.

**A.**   I haven't been here all week, so I wouldn't know,

1       but no.

2       **Q.**   But certainly there are some allegations that are

3       so serious that they would warrant an investigation?

4       **A.**   Yes, sir.

5               MR. MARTIN:  All right.

6               THE COURT:  Mr. Martin, okay time to break?

7               MR. MARTIN:  Whatever you say.

8               THE COURT:  I mean, if you're about to finish up

9       a document or there's a better point.

10              MR. MARTIN:  This is a great point.  Thanks.

11              THE COURT:  Ladies and gentlemen, we'll take our

12      mid-morning break.  We'll be back in 15 minutes.

13              Chief, you're under cross-examination now, so

14      the rule for everyone is that you can't discuss your

15      testimony with the attorneys for the city while you're

16      under cross-examination.

17              THE WITNESS:  Yes, your Honor.

18              THE COURT:  Okay.  Thanks.

19              (Recess.)

20              THE COURT:  Mr. Martin.

21              MR. MARTIN:  Thank you.  Could we have the ELMO

22      on, please.

23              THE CLERK:  Sure.  What exhibit are we still on?

24              MR. MARTIN:  We are still on Exhibit Number 5,

25      Chapter 16, page 2.

1        THE CLERK:  Thank you.

2    **Q.**   I believe we just finished with number H.  Moving

3    on to I, "Members of the department shall not engage in

4    any altercation, commit an assault, nor violate any

5    law, nor do anything for which they may be arrested."

6    Correct?

7    **A.**   Yes, sir.

8    **Q.**   The next one, "No member of the department shall

9    make a false statement or report with intent to

10   deceive."  Correct?

11   **A.**   Yes, sir.

12   **Q.**   "Or do anything which may bring discredit upon the

13   department."  Correct?

14   **A.**   Yes, sir.

15   **Q.**   Rule number 15 states that, "Officers observing

16   members in uniform in any public gathering or on the

17   street or in any public or private conveyance shall

18   note any actions by such members tending to bring

19   reproach upon the department and shall take proper

20   official action."  Correct?

21   **A.**   Yes, sir.

22   **Q.**   Rule number 38 says that, "Members shall not at

23   any time speak disrespectfully of, nor to, any superior

24   officer of the department."  Correct?

25   **A.**   Yes, sir.

1    **Q.**    Number 40, "Members of the department shall

2    address officers by their proper titles."  Correct?

3    **A.**    Yes, sir.

4    **Q.**    And 42, "Whenever a member is working in a unit

5    other than that member's assigned unit, detail,

6    call-back or substitution, the member shall personally

7    report to the officer in command immediately upon the

8    member's arrival"?

9    **A.**    Yes, sir.

10   **Q.**    All right.  For this next one, Chief, same thing.

11   It's a rather large document.  You are entitled to have

12   the entire document with you or we can go page by page

13   if that works.

14   **A.**    I think I'll probably, based on all of those rules

15   you referred to, ask for those documents so I can

16   review them as you ask me questions.

17         MR. MARTIN:  That would be fine.  Can he have

18   Exhibit Number 5, please.

19         THE WITNESS:  Thank you.

20   **Q.**    The next document I'm going to be referring to,

21   Chief, is also a large document.  If you want that at

22   any point, just let us know.

23   **A.**    Thank you.

24   **Q.**    All right.  Have you ever reviewed the transcript

25   of the hearing in which Lori Franchina was seeking a

1    restraining order against Firefighter Sean McGarty?

2    **A.**   I don't believe I have.

3    **Q.**   Why not?

4    **A.**   Because I don't believe I have.  There's no

5    specific reason why I didn't.  I just don't believe

6    that I did.

7    **Q.**   Okay.  When we were talking earlier, you mentioned

8    that some allegations are clearly important enough to

9    warrant a thorough investigation; correct?

10   **A.**   Yes, sir.

11   **Q.**   In your mind, does an allegation by a female

12   firefighter that she requires a restraining order to

13   keep her safe from a male firefighter warrant a

14   thorough investigation?

15   **A.**   It warrants an investigation, yes, sir.

16   **Q.**   Did you commission such an investigation to be

17   conducted?

18   **A.**   Yes, sir.

19   **Q.**   By whom?

20   **A.**   Chief Morgan and probably other chief officers in

21   the department.

22   **Q.**   Maybe Chief Warren?

23   **A.**   Probably Chief Warren as well.  It was probably a

24   combination of a number of individuals in my command

25   staff.

1    **Q.**   Do you know if either one of those individuals

2    attended the hearing?

3    **A.**   I am not certain if they did.

4    **Q.**   Do you know if either one of those individuals

5    obtained a copy of the transcript?

6    **A.**   I'm not certain if they did.

7    **Q.**   I'd like to show you page number 53 from

8    Exhibit 20.  It starts off, Chief, that, "The Court

9    makes the following findings of fact.  Both of the

10   parties are firefighters of the Providence Fire

11   Department.  There were previous disagreements" --

12          MR. McHUGH:  Objection.  Is the jury seeing

13   this?

14          THE COURT:  What exhibit number is this?

15          MR. MARTIN:  This is Number 20, your Honor, the

16   transcript of the hearing admitted in full.

17          THE COURT:  Then they should be able to see it.

18          MR. McHUGH:  This transcript speaks for itself,

19   the findings of fact at the end of the decision.  I

20   don't think it should be published.

21          THE COURT:  It's a full exhibit.  Overruled.

22   **Q.**   It goes on to state, Chief, that, "There were

23   previous disagreements regarding what happened on a

24   call in July of 2009."

25          In the course of the investigation that you

1  commissioned, did you learn about a call involving

2  Firefighter McGarty and Rescue Lieutenant Franchina

3  from July of 2009?

4  **A.**   I believe there was reference.  I don't remember

5  the specific details of that call, but I believe there

6  was a reference to a call that they were both on.

7  **Q.**   Thank you.

8  **A.**   I was going to add I don't know the date of when

9  this actually happened, this hearing.

10  **Q.**   Oh, let me correct that, then.  Thank you for

11  pointing that out.  I show you the cover page.  It says

12  Lori Franchina versus Sean McGarty, heard before the

13  Honorable Justice Lanphear on January 5th, 2010.

14  **A.**   Thank you.

15  **Q.**   Sure.  Anything else like that, just let me know.

16  **A.**   Yes, sir.

17  **Q.**   Of course, this was sometime after the meeting

18  with Olayinka Oredugba that you mentioned you had

19  sometime in August or September of 2009?

20  **A.**   That she had contacted me, yes.

21  **Q.**   I'm going to refer back to page number 53.

22  Resuming on page number 6 -- line number 6 where we

23  stopped, it says these -- and this is under the Court's

24  findings of fact.  "These firefighters, both the

25  Plaintiff and the Defendant, met at the firefighters'

1    hall in December."

2         Is it a violation of any rule or regulation for

3    a firefighter or officer on duty to be at the union

4    hall?

5    **A.**   I don't believe there's a specific rule or

6    regulation that prohibits them from going to the union

7    hall.

8    **Q.**   Do they serve alcohol at the union hall?

9    **A.**   They do.

10   **Q.**   Is there a restriction against firefighters or

11   officers socializing in places that serve alcohol while

12   they are on duty?

13   **A.**   I believe that there is.

14   **Q.**   "At this fire hall, gestures were made by

15   Mr. McGarty against Ms. Franchina.  The Defendant," and

16   you know that the Defendant was Sean McGarty?

17   **A.**   Yes, sir.

18   **Q.**   "The Defendant swore.  He admitted that he swore,

19   that each of the parties swore, but he admits that he

20   swore.  And the Court also finds that he blocked the

21   door.  As indicated, even though two of the

22   firefighters testified that they were there, that they

23   saw the discussion heat up, that one of the lieutenants

24   was asked to intervene, neither of them see

25   Ms. Franchina leave, neither of them see whether or not

1    Mr. McGarty blocked the door."

2         During the course of your investigation, did you

3    find out the identities of the other firefighters and

4    the other lieutenants that the Court is referring to?

5    **A.**   I believe we did.  I believe we requested Form 17s

6    from the parties that were involved and were there.

7    **Q.**   Okay.  And did you personally review those

8    Form 17s?

9    **A.**   I believe I probably read them, yes.

10   **Q.**   I will approach the witness with Exhibit 19.

11   Chief, there's four pages.  Would you mind just taking

12   a read through and then let me know when you're

13   finished.

14   **A.**   Okay.

15   **Q.**   Chief, those are four Form 17s?

16   **A.**   Yes, sir.

17   **Q.**   Signed by four members of your department?

18   **A.**   Yes, sir.

19   **Q.**   Form 17s that were requested as part of the

20   investigation that you commissioned into the allegation

21   made by Ms. Franchina that she'd been assaulted by a

22   fellow firefighter?

23   **A.**   Yes, sir.

24   **Q.**   Those are documents that you personally reviewed

25   in connection with your investigation into that

1    allegation?

2    **A.**    I believe I did at the time, yes, sir.

3    **Q.**    And they are in the same or substantially the same

4    condition as they were when you reviewed them?

5    **A.**    I believe they are.

6            MR. MARTIN:  Your Honor, we offer these four

7    pages as Exhibit Number 19.

8            MR. McHUGH:  Objection, hearsay.

9            THE COURT:  Overruled.  Exhibit 19 will be

10   admitted as a full exhibit without objection.

11           (Plaintiff's Exhibit 19 admitted in full.)

12   **Q.**    So, Chief, I don't want to make it confusing for

13   everyone, but we're going to take a break from the

14   transcript for just a minute and we're going to look at

15   what the other guys said happened.  Okay?

16   **A.**    Yes, sir.

17   **Q.**    Lieutenant Elliot Murphy.  You know Mr. Murphy?

18   **A.**    I do.

19   **Q.**    Excuse me, Lieutenant Murphy?

20   **A.**    Yes, sir.

21   **Q.**    All right.  So Lieutenant Murphy says --

22           THE COURT:  Can you pull that down, Mr. Martin.

23           MR. MARTIN:  Yes.

24           THE COURT:  There we go.  Thanks.

25           MR. MARTIN:  Sure.

**Q.**   Now, Form 17s, are these -- there's nothing on here that says that they're signed under the pains and penalties of perjury; right?

**A.**   No, sir.

**Q.**   Is there a requirement in the department that these be signed with some attestation as to the truth of their contents?

**A.**   Generally in this case it would be, or in any case that someone submits a Form 17 we want them to be forthright, depending -- in this case it was an investigation, but Form 17s can come in for someone who needs a pair of gloves.  So it's kind of a -- it's kind of like our internal document that we use for just about everything.

**Q.**   So the document that people would use to report claims of sexual harassment is the same type of document that they would use to request a new pair of gloves?

**A.**   It could be.

**Q.**   So he says, "While talking to members about the previous drill, I was alerted about a heated discussion between Lieutenant Franchina (off duty) and Firefighter McGarty.  Lieutenant Franchina started to complain to me.  I told her we are all adults here and what do you want me to do, I am not a baby-sitter here."

1        Did I read that correctly?

2    A.   Yes, sir.

3    Q.   And then he goes on to say, "From what I

4    overheard, Lieutenant Franchina was bad-mouthing a

5    member of Ladder 3 about a rescue run that occurred

6    months ago, and the member was defending his

7    reputation."

8        Did I read that correctly?

9    A.   Yes, sir.

10   Q.   "After the discussion (1-2 minutes) she was

11   leaving the reception area.  Lieutenant Franchina

12   struck me in my left upper arm in an angry manner and

13   said thanks, Lieu."

14       Did I read that correctly?

15   A.   Yes, sir.

16   Q.   He says he didn't know what she meant by the

17   gesture.  Then he goes on to say, "My arm is a little

18   sore, and I did fill out an IOD form, but I will remain

19   on duty."  Correct?

20   A.   Yes, sir.

21   Q.   "I am appalled that a fellow officer of the

22   Providence Fire Department would act in this manner."

23       Did I read that correctly?

24   A.   Yes, sir.

25   Q.   Did you know that Lieutenant Murphy also went to

1    the police?

2    **A.**   Yes, sir.

3    **Q.**   And when he went to the police, he accused

4    Lieutenant Lori Franchina of assaulting him?

5    **A.**   Yes, sir.

6    **Q.**   Joseph Colannino, do you know him?

7    **A.**   Yes, I do.

8    **Q.**   Firefighter?

9    **A.**   Yes, sir.

10   **Q.**   He says, starting in the middle, "I was unaware of

11   any heated discussion between anyone.  However, I did

12   hear and see off-duty Rescue Lieutenant Lori Franchina

13   walk towards Lieutenant Murphy, shout out, 'Thanks,

14   Lieu,' as she struck him in the arm."

15        Did I read that correctly?

16   **A.**   Yes, sir.

17   **Q.**   And Joseph Colannino also signed Elliot Murphy's

18   paperwork that he submitted for injured-on-duty status?

19   **A.**   I don't have that document.

20   **Q.**   Would you like to see it?

21   **A.**   Sure.

22   **Q.**   Here's a copy marked Plaintiff's 40 for the Court.

23   Take a minute to look through that.  When you're done,

24   Chief --

25   **A.**   I'm all set, sir.

1   **Q.**   That is the injured-on-duty paperwork submitted by

2   Lieutenant Elliot Murphy?

3   **A.**   Yes, sir.

4   **Q.**   Signed by him?

5   **A.**   Yes, sir.

6   **Q.**   Dated by him?

7   **A.**   Yes, sir.

8   **Q.**   Signed by several other firefighters and members

9   of your department?

10   **A.**   Yes, sir.

11   **Q.**   Submitted to the Providence Fire Department in a

12   request for injured-on-duty status?

13   **A.**   Yes, sir.

14   **Q.**   And that's something that you reviewed during your

15   investigation of this matter?

16   **A.**   Probably would have reviewed this.

17        MR. MARTIN:  Your Honor, we offer this as

18   Plaintiff's 40.

19        MR. McHUGH:  My objection is, this is two

20   documents in one.  There's an IOD injury form; but also

21   attached to it at the back, I don't know why this is

22   attached, is a Providence Police incident report which

23   would not be part of an IOD form.  So I don't know what

24   that's doing there.

25        MR. MARTIN:  I thought the chief just said it

1    was; but if it's not, we would remove those two pages.

2           THE COURT:  Why don't you ask the chief.

3    **Q.**   Were the two pages from the Providence Police

4    incident report attached to this IOD application?

5    **A.**   I can't be certain.  They're not required to be.

6    An injury report, there's a specific number of

7    documents that come in with that.  I can't recall, sir,

8    if that was attached to it when it came in.

9    **Q.**   But when I just asked you a few questions and you

10   testified that it was in the same or substantially the

11   same condition as it was when you reviewed it in

12   connection with this investigation, you still stand by

13   that testimony, don't you?

14   **A.**   I assumed when you gave that to me that that was

15   the document that came in in total.  I can't be sure

16   whether all of -- that report, police report, that

17   incident report was attached to it.  It's not required

18   by me or the department.  So if it wasn't there, I

19   wouldn't have noticed that it wasn't.

20          MR. MARTIN:  I'll defer to the Court.

21          THE COURT:  Let me try and clarify it.

22   Mr. Martin, is that the document in the form that was

23   produced to you by the city, in the same form as

24   produced to you by the city?

25          MR. MARTIN:  They're not Bates numbered, but

1      this is the order that they came in in the box.

2             THE COURT:  That's what you're representing?

3             MR. MARTIN:  Yes.

4             THE COURT:  Do you know different from that,

5      Mr. McHugh?

6             MR. McHUGH:  The police report would not have

7      been attached to this.  The IOD report, yes, but not

8      the police report.

9             THE COURT:  Here's what we're going to do.

10     We're going to admit the document except for the police

11     report.

12            Mr. McHugh, you're going to have someone at city

13     hall go back and check this document; and if the police

14     report is attached as it's kept in the ordinary course

15     of the city's business, then we'll admit it with it

16     attached; and if it isn't, it will stay as it is

17     without it attached.

18            MR. McHUGH:  That's fine, your Honor.

19            THE COURT:  So Exhibit -- I've lost track of the

20     number.

21            MR. MARTIN:  Forty.

22            THE COURT:  Forty, without the police report at

23     this time, is admitted as a full exhibit.

24            MR. MARTIN:  Thank you.

25            (Plaintiff's Exhibit 40 admitted in full.)

1    **Q.**   So you know now after looking at Exhibit Number 40

2    that Joseph Colannino also signed off on the request

3    for IOD status due to the arm?

4    **A.**   As a witness, yes.

5    **Q.**   Yup.  And the allegation was that he had a

6    contusion or a bruise?

7    **A.**   That's what he said, yes.

8    **Q.**   Another Form 17 submitted by the firefighters at

9    the union that day was from Derek Silva, and

10   firefighter -- can you see that okay?

11   **A.**   Yes, I can.

12       THE CLERK:  This is part of 40?

13       MR. MARTIN:  This is part of 39.

14       MR. McHUGH:  This is part of 19.

15       MR. MARTIN:  Excuse me, this is part of 19.  I'm

16   sorry.

17       THE CLERK:  Okay.

18       MR. MARTIN:  Excuse me.  Thank you.

19   **Q.**   Firefighter Silva says, "As I left, I saw off-duty

20   Rescue Lieutenant Lori Franchina strike Lieutenant

21   Murphy in the left arm with a closed fist and shout,

22   'Thanks, Lieu,' as she left the hall.  I then continued

23   on my way to Engine 12 which was parked outside."

24   Correct?

25   **A.**   Yes, sir.

1   **Q.**   And then we have the Form 17 from Firefighter Sean

2   McGarty.  And he says at the bottom, starting right

3   here, "When the conversation became a little heated,

4   off-duty Lori Franchina asked to speak to my officer,

5   Lieutenant Murphy, in which he responded, 'I am not a

6   baby-sitter here.'  Lieutenant Franchina then continued

7   to exchange words with me and then exited the

8   building."

9        Did I read that correctly?

10  **A.**   Yes, sir.

11  **Q.**   Did any of the firefighters that you talked to

12  report to you that they saw Sean McGarty swear at Lori

13  Franchina?

14  **A.**   I don't believe I talked to the officers.

15  **Q.**   You relied solely on their reports?

16  **A.**   No.  I think my chief officers who were involved

17  with the investigation would have spoken to them.  I

18  don't believe that I, when those Form 17s were

19  submitted, spoke to them.

20  **Q.**   Let's go back to the transcript.  So we stopped at

21  the conversation -- the colloquy from the Court on line

22  13.  "As indicated, even though two of the firefighters

23  testified that they were there, that they saw the

24  discussion heat up, that one of the lieutenants was

25  asked to intervene, neither of them see Ms. Franchina

1  leave, neither of them see whether or not Mr. McGarty

2  blocked the door.  Therefore, the Court has serious

3  concerns about the credibility of both of the

4  lieutenants involved."

5       Did I read that correctly?

6  **A.**   Yes, sir.

7  **Q.**   And both lieutenants you know is in reference to

8  Lieutenant Robert Jackson and Lieutenant Elliot Murphy?

9  **A.**   Their names aren't here, so I can't be sure.  I

10  can't be sure.  The names are not here.

11  **Q.**   Okay.  "It's also noteworthy that throughout all

12  of this discussion, all of the testimony, that at no

13  point is -- that at no point is Ms. Franchina -- I'm

14  checking to see whether or not she signs her name as

15  lieutenant.  She does, she signs her name as

16  lieutenant.  But," flip the page, "Mr. McGarty,

17  Mr. Jackson and I believe Mr. Murphy never refer to her

18  as a lieutenant.  They refer to each other by their

19  ranks, they refer to Mr. McGarty as a Firefighter 1.

20  They never refer to an officer as an officer, which

21  hampers their credibility."  Correct?

22       MR. McHUGH:  Objection as to form.  Correct?

23       THE COURT:  Sustained.  Why don't you try again,

24  Mr. Martin.

25  **Q.**   Did I read that correctly?

1    **A.**   Could you go back because it goes from one page to

2    the next, I believe, and I'd like to see from one to

3    the next if that's okay.

4    **Q.**   Sure.  Let me know when you're ready for me to

5    flip the page.

6    **A.**   Okay.  I'm all set with that page.

7    **Q.**   Do you want me to flip it?  Is that the part that

8    you wanted more time to read?

9    **A.**   Yes, sir.

10        MR. MARTIN:  Okay.

11        THE COURT:  Mr. Martin, I'll give the chief my

12   copy, that way he can have the full one in front of

13   him.

14        THE WITNESS:  Thank you.

15   **A.**   I don't know what page this is.

16   **Q.**   This is page 54, Chief.

17   **A.**   Thank you.

18   **Q.**   Sure.

19   **A.**   Okay.  I'm all set.

20   **Q.**   Did I read that correctly?

21   **A.**   Yes, sir.

22   **Q.**   All right.  And then the next paragraph, the Court

23   goes on under the findings of fact.  "It's clear that

24   they're fighting at the scene.  It's clear that they're

25   having an argument at the scene, not a physical fight.

1    The Court finds that he blocked the door.  And the

2    Court finds also that he spit, although it may not have

3    been intentional, but he was arguing so loud or

4    becoming so pointed that it was an obviously

5    conflicting situation.  Ms. Franchina was concerned for

6    her well-being, even asked an outside source to

7    intervene, and the outside source, the ranking

8    lieutenant of Mr. McGarty, did not intervene.  Hence,

9    there does seem to be a need for an injunction."

10        Did I read that correctly?

11   **A.**   Yes, sir.

12   **Q.**   And as you already testified to Mr. McGarty -- to

13   Mr. McHugh, never before or since in your history with

14   the fire department have you ever seen such a situation

15   where a female member of the department was awarded a

16   restraining order against a male member of the

17   department?

18        MR. McHUGH:  Objection, your Honor, misstates

19   the testimony.

20        THE COURT:  Overruled.

21        MR. McHUGH:  That's not what he testified to at

22   all.

23   **Q.**   Do you believe that to be true?

24   **A.**   No, sir, I did not testify to that.

25   **Q.**   Is that true?

1    **A.**   Is what true?

2    **Q.**   Is it true that in the history of the department,

3    you've never seen a situation in which a female

4    firefighter has been awarded a restraining order by the

5    Superior Court to protect her from a male firefighter?

6    **A.**   I've never seen a restraining order issued in any

7    case within the department from one member to another

8    or a female officer with a firefighter, no.

9    **Q.**   I'm sorry for getting your testimony wrong from

10   earlier.  Now, at the end of this investigation, was

11   Firefighter McGarty brought up on charges by the

12   department?

13   **A.**   I am not sure that the completion of the

14   investigation and charges were published against

15   Firefighter McGarty.

16   **Q.**   You're not sure?

17   **A.**   I'm not sure.

18   **Q.**   Okay.  Firefighter McGarty went on to retire from

19   the department?

20   **A.**   He recently retired, is my understanding, yes.

21   **Q.**   In good standing?

22   **A.**   I believe so.

23   **Q.**   Full benefits?

24   **A.**   I believe so.

25   **Q.**   No demotion?

1    **A.**   Not that I'm aware of, sir.

2    **Q.**   No suspension?

3    **A.**   Not that I'm aware of.

4    **Q.**   Elliot Murphy, was he brought up on charges?

5    **A.**   I don't believe so.

6    **Q.**   Does he still work for the department?

7    **A.**   I don't think so.  I think he retired.

8    **Q.**   He retired in good standing?

9    **A.**   I believe so.

10   **Q.**   With his officer's benefits?

11   **A.**   Yes, sir.

12   **Q.**   No suspension?

13   **A.**   Not that I'm aware of, no.

14   **Q.**   How about the guys who signed his IOD paperwork --

15   by the way, did you guys find in the course of your

16   investigation that Lieutenant Murphy had been assaulted

17   by Lori Franchina?

18   **A.**   I believe we looked into it as part of the

19   investigation because he had alleged that.  So we did

20   look into that allegation.

21   **Q.**   And the conclusion of your investigation was that

22   he had not been assaulted?

23   **A.**   I'm not sure that there was a conclusion to the

24   investigation, but there were no charges brought

25   against Lieutenant Franchina for that, for what he

1    alleged and the other members alleged was Lieutenant

2    Franchina striking him.

3    **Q.**   Okay.  And there were no charges brought against

4    any of the firefighters who signed those forms based on

5    the rule that it's a violation to make a false

6    statement with the intent to deceive?

7    **A.**   I don't believe any of those firefighters were

8    brought up on charges.

9    **Q.**   Do you know if any of the firefighters who were

10   present were under the impression that Lieutenant

11   Franchina was filing a lawsuit against the city?

12       MR. McHUGH:  Objection, hearsay.  How could he

13   possibly know that?  Their impressions?

14       THE COURT:  We'll find out.  Overruled.

15   **A.**   Could you repeat the question, please.

16   **Q.**   Sure.  Are you aware of whether or not any of the

17   firefighters who were present at the union hall were

18   operating under the impression that Lieutenant

19   Franchina had filed a lawsuit against the city?

20   **A.**   I can't be certain if there was a lawsuit being

21   filed or if they were aware of a lawsuit being filed.

22   I'm not certain of the answer to that.

23   **Q.**   Let's go back to Exhibit Number 20.  By the way,

24   Chief, part of the sexual harassment training that we

25   talked about earlier that you had everybody do in 2010,

1    do you remember that?

2    **A.**    Yes, sir.

3    **Q.**    That policy includes a prohibition against

4    retaliation?

5    **A.**    I believe it does.

6    **Q.**    And that means that if anybody engages, in your

7    mind at the time, anybody who engages in a complaint

8    about harassment or discrimination or retaliation has

9    engaged in what you referred to as a protected

10   activity?

11   **A.**    Yes.

12   **Q.**    And by protected, we mean that no one can

13   retaliate?

14   **A.**    I didn't refer to it, you just did; but yeah,

15   people should not retaliate if someone files a

16   complaint.  It wasn't even required that Lieutenant

17   Franchina come to us.

18   **Q.**    So first I'm going to show you -- we're not going

19   to discuss it long.  First I'm going to refer you to

20   page 27 where it says here that Lieutenant Robert

21   Jackson is being duly sworn and testifies as follows.

22   Do you see that?

23   **A.**    Yes, sir.

24   **Q.**    Okay.  And I'm going to take you on to page

25   number 32 of Exhibit Number 20 so we can see Lieutenant

1    Jackson's sworn testimony.

2          By the way, do you know if Sean McGarty had a

3    lawyer at this hearing?

4    **A.**   He may have.  I'm not completely certain.

5    **Q.**   Okay.  Page number 32, starting with line 1, "From

6    lieutenant to lieutenant, I ask you in court, what does

7    trying to stay clear of me mean?"

8          And Lieutenant Jackson answered, "Prior to that,

9    you obviously had an issue on the prior run.  And

10   supposedly, through rumor control, you possibly have a

11   lawsuit and problems against me and other members.  So

12   I just wanted to avoid any conflict.  I was made aware

13   of you being there and stayed on the opposite side of

14   the hall.  That's why I knew you were gone.  You were

15   arguing with Sean.  That was the first time I knew you

16   were back by yourself."

17         Did I read that correctly?

18   **A.**   Yes, sir.

19   **Q.**   Were you aware of the rumor that Lieutenant

20   Franchina had filed a lawsuit?

21   **A.**   I can't say that I was.

22   **Q.**   You were, however, aware that there was an open

23   and active investigation into her complaints of

24   discrimination, harassment and retaliation being

25   conducted by the EEO officer?

1    A.    Yes, sir.

2    Q.    And any retaliation based on that investigation

3    would be a violation of your sexual harassment policy?

4    A.    It would be a violation of the policy, sir.

5    Q.    Prior to that hearing, there was some

6    communication going back and forth between your command

7    staff and the EEO officer?

8    A.    Yes, sir.  I believe so.

9    Q.    And on December -- excuse me, this is Exhibit

10   Number 11.  On Exhibit Number 11, the EEO officer wrote

11   this note.  "Chief Warren informed me that they are

12   preparing charges against McGarty and against

13   lieutenant who refused to assist Lieutenant Franchina."

14         Have you ever seen this note before?

15   A.    I can't say that I have, no.

16   Q.    Well, looking at it now, you see that it's dated

17   December 22nd of 2009?

18   A.    Yes, sir.

19   Q.    About two weeks before the January 5th hearing

20   that we just discussed?

21   A.    Yes, sir.

22   Q.    Was it your decision that charges should be

23   preferred against Sean McGarty and the lieutenant who

24   refused to assist Lieutenant Franchina?

25   A.    I believe it says that we were preparing some

1    charges against Firefighter McGarty or -- McGarty and

2    also against the lieutenant who refused to assist

3    Lieutenant Franchina.

4    **Q.**   I appreciate that.  I understand that that's what

5    the note says, but I'm asking more about your

6    recollection.  Do you remember if you decided in

7    December of 2009 to prefer charges against Sean

8    McGarty?

9    **A.**   We decided to prepare to begin charges against

10   Firefighter McGarty.

11   **Q.**   To prepare --

12   **A.**   And we were looking into preparing charges against

13   Lieutenant Murphy as well.

14   **Q.**   Did that ever happen?

15   **A.**   I believe we prepared the charges against McGarty.

16   I'm not sure that Lieutenant Murphy's resulted in

17   charges, resulted in us preparing charges.  I can't be

18   sure about that, but I know we were preparing charges

19   for McGarty.

20   **Q.**   When you say that you believe you prepared charges

21   against McGarty, is that something that would be in

22   writing?

23   **A.**   It may be.  You know, it's been quite a long time,

24   but we were looking at preparing charges against him.

25   **Q.**   This is really important.  Are there documents

1    that say that charges were ever prepared against Sean

2    McGarty?

3    **A.**    I think there were drafts of some charges that we

4    were preparing, yes.

5          MR. MARTIN:  Your Honor, can we approach the

6    sidebar?

7          THE COURT:  Sure.

8          (Bench conference held on the record.)

9          MR. MARTIN:  Your Honor, for the purpose of

10   preserving the record, I would like that the Court

11   ask -- the Court order the city to confirm whether or

12   not there are written charges or drafts of charges that

13   were proffered against Sean McGarty and, if there are,

14   that they be produced immediately.

15         We specifically asked for all evidence of any

16   discipline taken against any firefighter in connection

17   with that.

18         If there are no such documents, which I trust

19   that there probably aren't, I ask that the jury be so

20   instructed that no such documents exist.

21         THE COURT:  Mr. McHugh.

22         MR. McHUGH:  Well, we asked the fire department

23   for anything in the request for production and so

24   forth, and we didn't get that; but, I mean, I certainly

25   can check into it again.

1    THE COURT:  I actually think probably what John

2    is requesting is an affirmation that the city sought

3    such documents and no such documents exist.

4        MR. MARTIN:  Yeah.  I don't think --

5        THE COURT:  Sounds to me what --

6        MR. MARTIN:  There's not one iota of this

7    sidebar that's in relation to anything that happened

8    with the city solicitor's office.  I just want the jury

9    to hear that the documents were requested, that a

10   search was done and none were found.

11       MR. McHUGH:  Well, I mean, do you want me to

12   bring the person over who searches the fire department

13   for these records?

14       THE COURT:  I think how to solve this is I will

15   instruct the jury right now that counsel have informed

16   me that a search was done of the city records pursuant

17   to discovery, which takes place during the trial, and

18   that the city has represented that no such documents

19   exist in their records.

20       MR. McHUGH:  We didn't find any such records.

21       MR. MARTIN:  Perfect.  Thank you.

22       THE COURT:  What are "such records"?  How am I

23   describing them?

24       MR. MARTIN:  Charges or discipline preferred

25   against Sean McGarty or any other firefighter.

1          THE COURT:  Wait a minute.  You have to be

2     careful.  Come closer so I can get this right.

3          MS. SABATINI:  He said charges.  I would say

4     charges.

5          MR. McHUGH:  He said charges against McGarty or

6     Murphy.  That was your specific question.

7          MR. MARTIN:  That's true.

8          THE COURT:  Charges against McGarty or -- what's

9     McGarty's rank?

10          MR. McHUGH:  Firefighter.

11          THE COURT:  And what's Murphy's?

12          MR. McHUGH:  Lieutenant.

13          THE COURT:  Okay.  Thanks.

14          MR. BRAGA:  Do you want to just limit this to

15     this particular incident, just to clarify?

16          MR. McHUGH:  What do you mean?

17          MR. BRAGA:  Related to what John was --

18          MR. MARTIN:  We're happy with the instruction.

19          (End of bench conference.)

20          THE COURT:  Ladies and gentlemen, let me tell

21     you something.  In the course of litigation of a case,

22     each party is allowed to and does routinely ask each

23     other for production of documents that are in their

24     care, custody or control.  We call it discovery.  It's

25     the discovery phase of litigation after you file a

1    lawsuit.

2         In this instance, the Plaintiff asked the city

3    appropriately to produce any records from their file

4    that show any charges that were brought against

5    Firefighter McGarty or Lieutenant Murphy.

6         The city, after conducting a thorough

7    examination of their records, found that there were no

8    such charges found in their records after their review

9    of all the records of either Firefighter McGarty or

10   Lieutenant Murphy.

11        Mr. Martin.

12        MR. MARTIN:  Thank you.

13   Q.   Chief, another step that you took with Lieutenant

14   Franchina was to ask her to submit things, complaints

15   in writing, swiftly; is that right?

16   A.   I don't know if I used the word "swiftly," and I

17   don't know that I directly spoke with Lieutenant

18   Franchina; but I'm sure that we were -- fairly certain

19   that we were requesting Form 17s from Lieutenant

20   Franchina as well as any of the other officers or

21   firefighters who may have been involved.

22   Q.   All right.  Now, there was some testimony that may

23   have been confused from the EEO office that I want to

24   clarify with you.

25        Was it ever your intent that Ms. Franchina was

1    required to call for the assistance of a commanding

2    officer while responding to the scene of medical

3    emergencies in the event that she encountered

4    insubordination?

5    **A.**   Not during the response, but there were orders

6    from me, and they may have been reduced to writing, I

7    can't recall all of them, that would have in the

8    general sense for everybody, if there were any issues

9    on an emergency scene, that an officer could be

10   requested by anyone who was there.

11   **Q.**   Now, in your position as the head of the

12   department, how many employees are there, like 430 at

13   the time?

14   **A.**   About 439 or so.  Somewhere in that area.

15   **Q.**   So you've got to deal with all the safety issues?

16   **A.**   Yes, sir.

17   **Q.**   The personnel issues?

18   **A.**   Yes, sir.  Well, eventually, yes, sir.

19   **Q.**   The budget?

20   **A.**   Yes, sir.

21   **Q.**   The politics?

22   **A.**   That wasn't much.  Yes, sir.

23   **Q.**   I mean --

24   **A.**   There's a little bit.

25   **Q.**   A little bit of the game?

1    **A.**    Yes.

2    **Q.**    You have to do all of this?

3    **A.**    Politics is not a game, but I had everything to

4    deal with.

5    **Q.**    I apologize.  I wasn't trying to be flippant with

6    you.  So you rely heavily on your chiefs in times like

7    these?

8    **A.**    I rely on a lot of -- I relied on people to relay

9    information to me to be involved in investigations.  I

10   think I said earlier, I didn't necessarily talk to

11   everybody.  I would give directives, ask people to do

12   things, tell people to do things.  And sometimes we

13   would reduce it to writing.  Other times it would be

14   verbal.

15   **Q.**    But, I mean, you can't be everywhere all the time?

16   **A.**    No.

17   **Q.**    You need the people below you to be your eyes and

18   ears?

19   **A.**    Yes, sir.

20   **Q.**    And the decisions that you make are only going to

21   be as accurate or as good as the information you

22   receive from the people who fill those roles for you?

23   **A.**    The information and as well as those people in the

24   capacity of officers and firefighters.  Some are better

25   than others.  Some officers were better than others.

1          So it was -- you know, I would issue those.  And

2    what I would get in response to those directives, what

3    information was brought to me, you know, I would review

4    and try and issue the appropriate order or the

5    appropriate discipline, whatever the case may be, the

6    appropriate budget.

7    **Q.**    Is there such a thing?

8    **A.**    What's that?

9    **Q.**    Is there such a thing as an appropriate budget?

10   **A.**    You know, we tried.  We did the best we could.

11   **Q.**    All right.  I'm just going to go through a couple

12   of documents that are in evidence right now, and I just

13   want to know if they made their way to you.

14   **A.**    Okay.

15   **Q.**    I'm going to show you Exhibit Number 33, I think.

16          THE CLERK:  Oh, sorry.

17          MR. MARTIN:  Are you going on strike?  Did I

18   make you work too much?

19          THE CLERK:  Sorry about that.

20   **Q.**    This is a Form 17 submitted by Lori Franchina on

21   April 30th of 2010; is that right, sir?

22   **A.**    Yes.

23          MR. McHUGH:  I'm going to object.  He already

24   testified, your Honor, that he wasn't there then.  He

25   had left the department in early 2010 or December 2010

1    out sick.

2          MR. MARTIN:  I thought he left in December of

3    2010.

4    **A.**   It was December -- well, I was kind of in and out

5    in November.  And by I think it was around the first

6    week or so of December, I went off with an illness and

7    never came back; but I was still technically the chief

8    for, you know, several months.  But I was there

9    probably through early part of December, in and out in

10   November, but early part of December 2010.

11   **Q.**   I'm very -- I'm sorry to hear that.  When you say

12   that you were leaving in the November, December area,

13   is that November, December of 2009 or November,

14   December of 2010?

15   **A.**   2010, sir.

16   **Q.**   So you were there in April of 2010?

17   **A.**   Yes, I was.

18   **Q.**   All right.  Did you see this form from April 30th

19   of 2010?

20   **A.**   I may have.  Probably.  I can't say for certain,

21   but I may have.

22   **Q.**   Let me bring it up to you and let you read the

23   whole thing.  Just let me know when you're done.  Do

24   you know if you saw that back then?

25   **A.**   I can't recall.  I may have, but not -- although

1    these Form 17s say to the chief of the department, not

2    every Form 17 comes to the chief of the department.  So

3    I can't be completely certain that I did.

4    **Q.**    I understand.

5    **A.**    But I may have.

6    **Q.**    So I won't ask you about the facts in it because

7    you don't remember, but I want to ask you about a

8    couple of key issues that I think that you could

9    testify to.

10         So, again, this is dated April 30th, 2010.  And

11   here in the second paragraph it says, "The purpose of

12   this statement is to support my repeated verbal and

13   nonverbal claims of harassment which have been

14   displayed as both offensive and intimidating behavior

15   by multiple members but especially the one in question

16   today, Firefighter 1 Andrew McDougal."

17         Did I read that correctly?

18   **A.**    Yes, sir.

19   **Q.**    Is this one of these types of complaints that

20   would warrant an investigation?

21   **A.**    I believe Chief Morgan may have looked into this

22   as well.

23   **Q.**    And are you familiar at all with the history

24   between Lori Franchina and Firefighter Andy McDougal?

25   **A.**    No, sir, I am not.

1  **Q.**  Chief, I'm going to ask you a question, and it's
2  going to have some foul language.  I'm sure you've
3  heard it before.

4  **A.**  Promise not to bring you up on charges.

5  **Q.**  Appreciate that.  In your department with you
6  enforcing the sexual harassment policy, there's the
7  first part of the question because it's kind of sloppy,
8  if a man says to a woman who just filed a sexual
9  harassment complaint, Who the fuck do you think you
10  are, are you trying to cost him his fucking job, does
11  that raise in your mind a concern about retaliation?

12  **A.**  It raises in my mind a concern for a conflict
13  between those individuals, yes.

14  **Q.**  And if that man then proceeds to kick her out of
15  meals in the station, does that raise in your mind an
16  alarm that there may be an issue of retaliation?

17          MR. McHUGH:  Objection as to form, the loaded
18  words and so forth.  I don't know where he's going with
19  this.  It's way beyond the scope.

20          THE COURT:  Why don't you ask him as a
21  hypothetical, Mr. Martin.

22  **Q.**  Hypothetically speaking, if that same man were
23  then to kick her out of meals, would that raise in your
24  mind a concern that she was being retaliated against?

25  **A.**  It would if I was aware of it.

1    **Q.**   Hypothetically speaking, if that same man then

2    refused to cook for her, would that raise in your mind

3    an alarm of retaliation?

4    **A.**   If it occurred and I was aware of it, yes, it

5    would.

6    **Q.**   And after you instructed in October of 2007 your

7    officers to review the sexual harassment policy and to

8    share it with their subordinates, you expected that

9    every officer would be equipped to deal with a

10    situation like that?

11    **A.**   It would be expected that they were trained and

12    should be equipped to deal with situations like that,

13    yes.

14    **Q.**   And what the officer who learns of something like

15    that should do is fill out a Form 17 and push it up the

16    chain of command?

17    **A.**   Yes, sir.

18    **Q.**   So that it can get to you or another chief who can

19    handle it?

20    **A.**   Yes, sir.

21    **Q.**   Chief, this one's really long.  You don't

22    necessarily have to read the whole thing.  You're free

23    to if you want.  Do you recall getting a Form 17 on

24    November -- oh, November the 12th you weren't there.

25    **A.**   I can't be certain.  There was a transition period

1    for me when I wasn't feeling well.

2    **Q.**   I'm sorry to bring that up again.

3    **A.**   That's okay.

4    **Q.**   We'll skip that one.  October, were you pretty

5    much full time still in October?

6    **A.**   I may have.  I probably was, yes.

7    **Q.**   So this is three pages.  You can read the full

8    thing if you want, this is Exhibit Number 31, or you

9    can just take a scan, let me know if you've seen it

10   before.

11          MR. McHUGH:  Your Honor, can the witness be

12   instructed he has a right to read the entire document

13   if he wants?

14          THE COURT:  I think that's what Mr. Martin said.

15          MR. McHUGH:  I don't think so.

16          THE COURT:  But you know that, Chief; correct?

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  It's Exhibit 31?

19          MR. MARTIN:  Exhibit 31.

20          THE CLERK:  It's in full.

21   **Q.**   Chief, if I misspoke, I just want to be clear.

22   Anything I give you, you have a right to take as long

23   as you want to look at it once, twice, three times if

24   you need to.  Okay?

25   **A.**   Yes, sir.  I've seen this document.

1    **Q.**   This is a Form 17 from Lori Franchina dated

2    October the 12th, 2010?

3    **A.**   Yes, sir.

4    **Q.**   And in this paragraph she writes, "On this run,

5    along with many others, I continue to experience

6    behavior by both the engine officers and firefighters

7    on scene to be what I consider offensive and workplace

8    sexual harassment.  The behavior interferes with my

9    work performance and is creating an intimidating,

10   hostile and offensive work environment which is conduct

11   the City of Providence considers harassment and is

12   strictly prohibited."

13        Did I read that correctly?

14   **A.**   Yes, sir.

15   **Q.**   All right.  Is this one of those complaints that

16   would warrant an investigation?

17   **A.**   Yes, sir.

18   **Q.**   I know that you said that you did see it.  Do you

19   remember when you saw it?

20   **A.**   Probably around this time because I am aware of

21   this Form 17 as well as Chief Morgan directing the

22   members on that run to send Form 17s to the department.

23   **Q.**   And you reviewed their Form 17s as well?

24   **A.**   I can't be certain that I did.  I remember reading

25   this one, and I know that Chief Morgan and I discussed

1    or we discussed somewhere in the office about asking

2    for Form 17s from the other members on the run.  I'm

3    not sure if I directed that, but I'm fairly certain --

4    pretty sure that that was done.

5    **Q.**    But you don't remember if you saw the other

6    people's Form 17s?

7    **A.**    I think I may have without seeing them to be

8    certain, but I believe I may have in that case.

9    **Q.**    And just like back in December of '09, when you

10   got those Form 17s, they were actually more about

11   accusations against Lori than what your investigation

12   was; right?

13   **A.**    Which Form 17s are you referring to?

14   **Q.**    The ones in October of 2010.

15   **A.**    I'm not sure which Form 17s about Lieutenant

16   Franchina in 2010, who they were from.  I may have.

17   **Q.**    Okay.  You discussed before, I believe this is

18   Exhibit 6, this e-mail?

19   **A.**    Yes, sir.

20   **Q.**    And you did tell Mr. McHugh that this is an order?

21   **A.**    I would have considered it, you know, an order,

22   yes, that we were giving an order, a directive that,

23   you know, that we wanted our chiefs, battalion chiefs,

24   division chiefs, to make sure, because they handled the

25   manpower, to do their best not to have Firefighter

1  McGarty assigned to a station in this case where there

2  would be a rescue so as to minimize interaction between

3  Firefighter McGarty and Lieutenant Franchina.

4  **Q.**   Okay.  Did anyone tell you -- any of your officers

5  tell you that they believed that this was impossible to

6  enforce?

7  **A.**   Not to my recollection, no.

8  **Q.**   Now, as the chief of the department -- I'm sorry,

9  were you going to continue?

10  **A.**   It wouldn't be easy because we have shifts that

11  change and overlap.  So it's not an easy thing to do.

12  There's call-backs.  People come in on call-backs.  We

13  were trying here to identify call-backs, substitutions.

14        So there are a lot of moving parts; and where we

15  may technically start a shift at 0800 hours and 1800

16  hours, 8 a.m. and 6 p.m., there were people that may

17  have come in and there were free substitutions for a

18  couple of hours.  We may not get a substitution slip.

19  They didn't have to supply one.

20        So there are moving parts.  It wasn't an easy

21  thing to do.  We were doing our best to make sure we

22  complied with the directive of keeping Firefighter

23  McGarty and Lieutenant Franchina apart, apart from an

24  emergency response where that was beyond our control.

25  **Q.**   Certainly at this point, 2010, you're now 30 years

1      in, right, to your career, almost 30 years with the

2      Providence Fire Department?

3      **A.**   I'm getting up there, yeah.  About 29, 30, yes.

4      **Q.**   When you said 1980, it struck me that that doesn't

5      seem like it should have been 30 years ago, does it?

6      **A.**   It's 35 or 36 now, but I don't feel that old most

7      of the time.

8      **Q.**   But, I mean, you were well aware of the

9      difficulties of getting to the 94 people you need to

10     run the apparatus when you wrote this order?

11     **A.**   Staffing in the fire department has always been

12     difficult.

13     **Q.**   And you expected this to be followed like any

14     other order?

15     **A.**   To the best of everyone's ability, yes.

16     **Q.**   Difficult or not?

17     **A.**   As difficult as it was, we were trying within the

18     best that we could to issue a directive like this was,

19     an order it could be considered, to keep Firefighter

20     McGarty apart from Lieutenant Franchina.

21     **Q.**   And you know that it was violated?

22     **A.**   I understand that it was.  There was a day that

23     Lieutenant Franchina came into the fire station while

24     Firefighter McGarty was in the station.  He was

25     working, Lieutenant Franchina wasn't, and I believe she

1    came in, and that's how that interaction took place.

2    **Q.**   Well, there's no rule or regulation against her

3    being at her own station when she's off duty to prepare

4    paperwork; right?

5    **A.**   There's no rule against anyone from coming into

6    the fire stations where they work or any other fire

7    station.

8    **Q.**   None whatsoever?

9    **A.**   None that I'm aware of.

10   **Q.**   So if someone were to suggest that Lori Franchina

11   was somehow in violation of this order or any other

12   rule because she was there while she was off duty, you

13   would disagree with that?

14   **A.**   If there was -- if Lieutenant Franchina came into

15   a fire station, I mean, she had the ability to come

16   into stations whether she worked in that fire station

17   or not.

18        So in this order, we were doing our best to keep

19   Firefighter McGarty out of fire stations where there

20   would be a rescue because Lieutenant Franchina was a

21   rescue officer and in all likelihood would have been

22   assigned either as her permanent assignment, as a

23   temporary assignment, as a substitute or as a call-back

24   to a rescue.

25        So we were doing our best to try and identify

1  any situation where we could limit or prevent any

2  interaction between the two individuals.

3  **Q.**   Okay.  So you know that there is a violation

4  because Firefighter McGarty went to a station with a

5  rescue in the first place?

6          MR. McHUGH:  Objection.  Violation?  Form of the

7  question.

8          THE COURT:  I was a little confused.  Could you

9  rephrase that, Mr. Martin.

10         MR. MARTIN:  Sure.  Let me just think for a

11  second.  Because there's no subject of the verb?

12         THE COURT:  It could be.

13  **Q.**   There was a violation of this order when Sergeant

14  McGarty (sic) just went to the station to work that

15  day?

16         MR. McHUGH:  Objection as to form.

17         THE COURT:  Overruled.

18  **A.**   Could you repeat the question?

19  **Q.**   Sure.  There was a violation of this order just by

20  his showing up to work at a rescue that day?

21         MR. McHUGH:  Same objection.

22         THE COURT:  Overruled.

23  **A.**   I believe whoever -- I don't know how Firefighter

24  McGarty was assigned to the station on that day or who

25  made the assignment, but we would have -- I would have

1    preferred a chief and had issued a directive that he

2    should not be assigned to one of those stations.  So

3    no, I wouldn't have -- he shouldn't have been assigned

4    there.

5    Q.    The order was violated?

6    A.    Well, my directive was violated, right.

7    Q.    Is a directive different than an order?

8    A.    No.  This was an e-mail sent out which was

9    basically an order or directive from me, through me

10   from Chief Dillon, in total all of us working together

11   to try and find a way to make this work.

12         As you said earlier, it's difficult to make

13   staffing happen in the fire department.  Sometimes

14   we're ordering people to stay.  I'm required by the

15   collective bargaining that -- we were required to

16   maintain a certain level of staffing in the fire

17   department.

18         So I'm sure -- I assume that whoever was making

19   these orders and directives and assigning people that

20   day was doing the best that they could and -- you know,

21   but there was -- he was assigned to a station where

22   there was a rescue and that was in contradiction to

23   this order.

24   Q.    I'm sorry.

25   A.    It's not an exact science, doing all of this and

1    staffing fire apparatus and interaction and moving

2    people around to get the appropriate staffing on the

3    fire department.

4    **Q.**   Okay.  So let's assume that you're right and

5    whoever did the staffing was -- had the best of

6    intentions but was overworked.  I have no qualms with

7    that.  My question is, was the order violated?

8          MR. McHUGH:  Objection, again, asked and

9    answered three times.  Objection as to form.  That's

10   his answer.

11         THE COURT:  I think he has answered it, but I'll

12   give you one more shot, Mr. Martin.  Objection

13   overruled.

14   **Q.**   Is the word "violation" to you different than the

15   word "contradiction"?

16   **A.**   In this case I wouldn't -- because I don't think

17   this was a direct violation of the order.  My

18   assumption, as you called it, that you would assume, I

19   try not to assume very much in the fire department.

20   When we assume, a lot of bad things can happen.

21         So we did our best.  I believe as chief, through

22   my assistant chief, my other chiefs, we did our best to

23   try and comply with -- and they did, to try and comply

24   with my directive, my order, whatever you would like to

25   call it, to keep Lieutenant Franchina and Firefighter

1    McGarty in different locations.

2         When we put this out, as I said, we tried to

3    identify every possible scenario where they could

4    interact.  And Firefighter McGarty at some point in

5    time, for whatever reason, however that happened, was

6    assigned to this station where there was a rescue.

7         I know that they could tell that Lieutenant

8    Franchina was not working because we had a TeleStaff

9    system that told us who was on and who was off.  So

10   whoever did it, assigned him there, probably looked and

11   said Lieutenant Franchina's not working, I'll put him

12   there even though this was not in concert with the

13   directive in this e-mail that I had sent out or the

14   chief had sent out.

15   **Q.**   So this one here says, "Firefighter McGarty is to

16   be notified of this directive and notified that it is

17   his responsibility to notify Battalion 3 that he is

18   requesting a substitution and what company he will be

19   in.  Substitutions are not to be approved for companies

20   that are housed with a rescue."

21        Did I read that correctly?

22   **A.**   You did.  Yes, sir.

23   **Q.**   So you're saying that Firefighter McGarty, because

24   it was a call-back, did not have a duty to notify

25   anybody that he was not allowed to be in a rescue?

1   A.   That's --

2        MR. McHUGH:  Objection.  He never said that.

3   Again, mischaracterizing the testimony, your Honor.

4        THE COURT:   Overruled.

5   A.   Are you talking about item number 3?

6   Q.   Uh-huh.

7   A.   Item number 3 isn't a call-back.  It isn't a

8   detail.  It's a substitution.  That's a different

9   thing.  And that's directly referring to if Firefighter

10  McGarty was going to substitute from someone, for

11  someone, he needed to notify Battalion 3 where that

12  was.

13       So if he was going to substitute for George

14  Farrell and it was in the station, he was required to

15  let the chief officer, Battalion 3, know that he would

16  be substituting that day.  That's different than a

17  call-back.  That's different than a detail.

18  Q.   Okay.  So there was -- was there any order that

19  attempted to prevent them from coming into contact with

20  each other when somebody's on a call-back?

21  A.   I believe this was the directive for that.

22  Q.   So this was intended to prevent them from coming

23  into contact even when Firefighter McGarty was on a

24  call-back?

25  A.   I believe that that was what I testified to

1    already, that we did the best we could under the

2    circumstances by developing this, which hadn't been

3    done before, to try and have Lieutenant Franchina and

4    Firefighter McGarty not in the same station as much as

5    we could avoid it.

6    Q.    Another option if this was too difficult would

7    have been to fire Sean McGarty?

8    A.    I don't understand your question.

9    Q.    You wouldn't have to worry about scheduling

10   anymore if you fired Sean McGarty?

11   A.    I would have had to go through a lot of procedures

12   to fire Firefighter Sean McGarty; but if I had just

13   fired him, not something within my purview to just fire

14   somebody.  Departmental charges, there can be verbal.

15   There's discretion as to what we do as chief officers.

16        There is trial boards, which is the board that

17   we talked about earlier.  There are summary

18   proceedings, which is that we can issue certain --

19   bring him up on charges and issue certain punishments

20   for that.  There is a departmental hearing.

21        So there are several different steps short of a

22   termination, and there was a lot of -- well, there were

23   several different steps beyond just termination as you

24   call it or firing someone.

25   Q.    And at the end of all those steps, with sufficient

1    information and sufficient evidence, the person gets

2    fired, right, just like Andre Ferro?

3    **A.**    Not in each one of those steps, no.

4    **Q.**    At the conclusion of all of them, if you do a good

5    enough job and you have enough evidence, the person

6    gets fired?

7    **A.**    No.  There are investigations that we do that may

8    just be a verbal discipline.  It may be a letter of

9    reprimand.  It could be formal or not.  It could be a

10   verbal reprimand.  It could be a summary proceeding,

11   which had specific things that you could do up to, but

12   not including, termination.

13       There could be a departmental hearing internally

14   within the department, and then there would be -- if

15   your intention was to try and terminate someone's

16   employment, that would go to -- generally to the trial

17   board.

18   **Q.**    That is a long list of disciplinary actions that

19   were at your disposal at the time?

20   **A.**    That's a long list of disciplinary actions that

21   are contained within the rules and regulations of the

22   Providence Fire Department that the department could

23   implement and use.

24   **Q.**    Did you implement or use a single one of them with

25   Sean McGarty?

1        MR. McHUGH:  Objection.  Asked and answered

2    about 10 times now.

3        THE COURT:  Overruled.

4    **A.**   We were conducting an investigation, as I

5    testified earlier.  I believe that we were preparing

6    charges to present to Firefighter McGarty during this

7    process.

8    **Q.**   I just want to touch on this arbitration thing

9    with Andre Ferro really quickly.  Did you guys actually

10   show up for the arbitration or was this taken care

11   of -- was this settlement reached before the

12   arbitration occurred?

13   **A.**   Who are those guys you would be referring to, sir?

14   **Q.**   You and Andre Ferro.

15   **A.**   I believe I testified that I was there, Assistant

16   Chief Warren was there, Lieutenant Franchina was there,

17   our attorney Jeff Kasle was there, Firefighter Ferro

18   was there, and union representation was there for him.

19   He had his union representation there.

20   **Q.**   So --

21   **A.**   So yes, sir, I did show up, as you termed it.

22   **Q.**   So Andre Ferro was there with representation?

23   **A.**   Yes, sir.

24   **Q.**   And you were there with representation?

25   **A.**   Yes, sir.

1    **Q.**   Did Lori have representation?

2    **A.**   Yes, sir.

3    **Q.**   Who was her representative?

4    **A.**   The department was representing her and our

5    attorney.

6    **Q.**   You and your attorney represented Lori?

7    **A.**   I did not represent Lieutenant Franchina.  Our

8    attorney was there to represent the city and the

9    department.

10   **Q.**   Oh, I see.  My question was different.  Did Lori

11   Franchina have representation there?

12        MR. McHUGH:  Objection, asked and answered

13   again.

14        THE COURT:  Overruled.

15   **Q.**   Did Lori Franchina have personal representation

16   there?

17   **A.**   Did she bring an attorney of her own?  No, sir.

18   **Q.**   And did you tell her, as you just explained to us,

19   how difficult it is to go through all the various steps

20   to fire someone in the collective bargaining agreement?

21   **A.**   I don't believe that I went through -- I can't

22   recall everything that we talked about, but I don't

23   believe that I went through each step.

24        He had already been terminated.  Firefighter

25   Ferro had been terminated.  So we were there because

1    his union was grieving his termination, seeking to have

2    him brought back into employment into the department.

3    **Q.**   And the subject of the grievance was that the

4    Providence Fire Department had made a mistake when they

5    fired him?

6    **A.**   I'm not going to assume --

7         MR. McHUGH:  Objection, misstates the grievance.

8         THE COURT:  Overruled.

9    **A.**   I'd have to look at what the grievance said, but I

10   would --

11   **Q.**   Well, if he had already been fired, why would he

12   be entitled to reinstatement if you hadn't made a -- if

13   the department hadn't made a mistake?

14   **A.**   Well, I didn't prosecute the case for Andre Ferro

15   before a trial board -- against Andre Ferro before a

16   trial board.  I believe I testified that had been done

17   before me.

18        And the union filed a grievance.  We denied it.

19   I denied it.  They filed for arbitration, and we are

20   required to show up at the arbitration case.  In an

21   arbitration case, I believe I -- that anything can

22   happen in an arbitration case from, in this case, the

23   arbitrator upholding the termination or the arbitrator

24   bringing Firefighter Ferro back without any penalties.

25        But I certainly denied the grievance and took it

1    forward to an arbitration case and was prepared to take

2    that case forward on behalf of the department and

3    Lieutenant Franchina.

4    **Q.**   And it's your testimony that Lori Franchina, when

5    faced with an opportunity to take a stand in this

6    arbitration, she backed down from a fight?

7         MR. McHUGH:  Objection as to form, your Honor,

8    argumentative.

9         THE COURT:  Overruled.

10   **A.**   What I said was that Lori Franchina was there,

11   Lieutenant Franchina was there, and we did not make

12   that decision without her agreeing and saying it was

13   okay.

14       I would have not allowed Firefighter Ferro his

15   job back without going through an arbitration case and

16   without coming to an agreement, and specifically the

17   last bullet in that said that all parties were in

18   agreement.

19       Chief Warren signed that while we were there,

20   and then it became stipulated by the arbitrator; but I

21   did not go there in that arbitration hearing, deny a

22   grievance, go forward with the arbitration to just undo

23   something without -- and I wouldn't have undone,

24   although it was -- it would have been in my ability to

25   do that short of the arbitration case, I did not.

1          I took the arbitration case forward on behalf of

2     the department and on behalf of Lieutenant Franchina to

3     an arbitration case, and she had the ability that day

4     and did say it was okay for us to settle that case with

5     those stipulated agreements and that stipulated

6     arbitration agreement.  I didn't make that decision

7     independent of Lieutenant Franchina.

8     Q.    You had Chief Warren.  He signed something?

9     A.    I believe he was the signator with chief -- with

10    Andre -- Firefighter Ferro on that agreement, and then

11    it was stipulated through the arbitrator.

12    Q.    Did you have her sign anything?

13    A.    I don't believe that Lieutenant Franchina did.

14          THE COURT:  Mr. Martin, is this a good time for

15    a lunch break?

16          MR. MARTIN:  Yes.  Thank you.

17          THE COURT:  Ladies and gentlemen, we're going to

18    take the lunch break now.  We'll see you back in about

19    an hour.

20          (Recess.)

21          THE COURT:  Good afternoon, everyone.  Anyone

22    try the trucks?  How did you like it?

23          JUROR:  It was good.

24          THE COURT:  I think there were just three out

25    today, so there were long lines; but this is the first

1    really good Thursday weather we've had.  I think it's

2    brought a lot of extra people out.

3          MR. McHUGH:  Your Honor, we checked our response

4    to the request for production, and there was no police

5    report attached to the IOD report that we produced.

6          THE COURT:  Great.  Thanks, Mr. McHugh.  So the

7    exhibit will stay as admitted.

8          Mr. Martin.

9    Q.   Good afternoon, Chief.

10   A.   Good afternoon, sir.

11   Q.   On direct examination, you were asked if you had

12   confidence in the officers under your command.  Do you

13   recall that?

14   A.   I believe so, yes, sir.

15   Q.   And your answer was yes, that you do?

16   A.   I do, sir.  I did, in the past tense.  I did, sir.

17   Q.   And that includes their ability to investigate and

18   respond appropriately to allegations of sexual

19   harassment?

20   A.   To the best of their abilities, I did, yes.

21   Q.   Did that include at the time captain, now chief,

22   but at the time Captain Al Horton?

23   A.   I believe so, yes.

24   Q.   Were you aware that Al Horton had observed or had

25   reported to him that Andy McDougal said to Lori

1  Franchina, Who the fuck do you think you are, are you

2  trying to cost him his fucking job, in regards to Andre

3  Ferro?

4  **A.**    I was not aware of that, sir.

5  **Q.**    Does that change your opinion as to whether or not

6  you have confidence in his ability to respond

7  appropriately to complaints of sexual, or observations

8  of sexual harassment?

9  **A.**    I have no idea what he did with that information

10  because I was not involved in that investigation or

11  that trial, sir.

12  **Q.**    If I were to tell you that he did not forward that

13  information to any superior officer in any way

14  whatsoever, would that change your opinion?

15  **A.**    I would be disappointed in that, sir.

16  **Q.**    Does that -- does your confidence in your officers

17  also include Scott Mello?

18  **A.**    Not so much, sir.

19  **Q.**    Could you please explain.

20  **A.**    He really -- he was a captain in the fire

21  department, but he was not one of the people that I

22  looked up to.

23  **Q.**    Could you tell us why.

24  **A.**    Just because he wasn't.  We didn't have a very

25  good relationship either through union business and

1    things like that.  So although he was a captain, he

2    wasn't one of the people that I would have relied on.

3    **Q.**   How about Jeffrey Crawford?

4    **A.**   Yes, sir.

5    **Q.**   You found him to be someone whom you could rely

6    on?

7    **A.**   Yes, sir.

8    **Q.**   And you could count on?

9    **A.**   Yes, sir.

10   **Q.**   Have you seen a report in which the EEO officer

11   claims that Chief Crawford believed that 90 percent of

12   what Lori Franchina complained about was true?

13   **A.**   I did not see that report, sir.

14   **Q.**   How about Chief Curtis J. Varone?

15   **A.**   Yes, sir.

16   **Q.**   Someone that you could count on?

17   **A.**   I believe so, sir.

18   **Q.**   And someone that you could trust?

19   **A.**   Yes, sir.

20   **Q.**   Are you aware that he testified that when he

21   retired, he was afraid that Lori Franchina would be

22   retaliated against because of her complaints about

23   Andre Ferro?

24   **A.**   No, I was not aware of that, sir.

25        MR. MARTIN:  I have nothing further, your Honor.

1          THE COURT:  Thanks, Mr. Martin.

2          Mr. McHugh.

3          MR. McHUGH:  I believe it's Exhibit 20, your

4     Honor, I wanted to put on the ELMO, the transcript of

5     the hearing before Justice Lanphear.

6                    <u>**REDIRECT EXAMINATION**</u>

7     <u>**BY MR. McHUGH**</u>:

8     **Q.**   Chief, what I wanted to do was to show you the

9     portion that Mr. Martin read and then show you the

10    portions that he didn't read.  And it begins on page 53

11    of the transcript, the last paragraph.

12         I'll just read this, and you can tell me if I

13    read it correctly.  This is Judge Lanphear.  "It is

14    also noteworthy that throughout all of this discussion,

15    all of the testimony, that at no point is -- that at no

16    point is Ms. Franchina -- I'm checking to see whether

17    or not she signs her name as lieutenant.  She does, she

18    signs her name as lieutenant.  But" -- if you go over

19    to page 54 -- "Mr. McGarty, Mr. Jackson and I believe

20    Mr. Murphy never referred to her as lieutenant.  They

21    refer to each other by their ranks, they refer to

22    Mr. McGarty as a Firefighter 1.  They never refer to an

23    officer as an officer, which hampers their

24    credibility."

25         So Mr. Martin was saying that Judge Lanphear was

1    questioning their credibility because they did not

2    refer to Ms. Franchina as lieutenant.

3         Now I want to read to you the part that

4    Mr. Martin did not read.  If you look at page 17, this

5    is the examination of Lieutenant Elliot Murphy.  And on

6    page 18 down at the bottom, line 21, the attorney asks

7    Lieutenant Murphy, "Did you hear Sean McGarty and Lori

8    Franchina argue?"

9         Answer, "I did not, not until I was notified by

10   Lieutenant Franchina."

11        So there Lieutenant Murphy refers to

12   Ms. Franchina as Lieutenant Franchina; correct?

13   **A.**   That's correct.

14   **Q.**   Now, if you go over to page 34 and you see the

15   testimony of Firefighter Michael Evora, do you see

16   where it says Firefighter Michael Evora is sworn in?

17   **A.**   Yes, sir.

18   **Q.**   And you look at questioning of Michael Evora on

19   page 35, line 23, he asks, "And who was involved in the

20   argument?"

21        And Firefighter Evora says, "Lieutenant

22   Franchina and Sean McGarty."

23        So there's another instance where that wasn't

24   true that Evora did not call Franchina lieutenant;

25   correct?

1    A.    That's correct.

2    Q.    And if you go to page 39, which is the testimony

3    of Firefighter McGarty, do you see where he's being

4    sworn in there?

5    A.    Yes, sir.

6    Q.    And then if you look at the transcript on page 42,

7    question, "Now, did a conflict arise concerning how to

8    handle this particular call?"

9          Answer, "Um, under the circumstances, when we

10   were up there, Lieutenant Franchina never entered the

11   room to look at the severity of the wound."

12         So there's another instance where that was wrong

13   when you were cross-examined that Sean McGarty never

14   referred to Lori Franchina as Lieutenant Franchina in

15   this hearing; right?

16   A.    That's correct.

17   Q.    Because he does; right?

18   A.    Yes, sir.

19   Q.    Chief, I'm finished asking you about that.  Now,

20   you could have settled that grievance of Andre Ferro

21   without the permission of Lori Franchina; correct?

22   A.    Yes, sir.

23   Q.    But you wanted to make sure that she was satisfied

24   with the settlement; correct?

25         MR. MARTIN:  Objection.

1   A.   Yes, sir.

2        MR. MARTIN:  Leading.

3        THE COURT:  Sustained.

4   Q.   Did you want to make sure she was satisfied with

5   the settlement?

6        MR. MARTIN:  Objection.

7   A.   Yes, sir.

8        MR. MARTIN:  Leading.

9        THE COURT:  Sustained.

10  Q.   Why did you want Lori Franchina's approval for

11  that settlement?

12  A.   Because we wouldn't have gone forward without it.

13  I would not have settled.  Chief Warren and myself had

14  discussed that we would not have settled without

15  agreement with Lieutenant Franchina.

16  Q.   Okay.  Now, Chief, do you think that a firefighter

17  who just hollers at another firefighter should be

18  terminated?

19  A.   No, sir.

20  Q.   Do you think that a firefighter who just swears at

21  another firefighter should be terminated?

22  A.   No, sir.

23  Q.   Do you think that a firefighter who gets into an

24  argument with another firefighter should be terminated?

25  A.   No, sir.

1        MR. McHUGH:  Thank you, Chief.

2        I have nothing further, your Honor.

3        THE COURT:  Great.  Thanks.  Chief, you can step

4    down.  Thank you.

5        Mr. McHugh.

6        MR. McHUGH:  Paul Tang, please.

7        THE COURT:  Mr. Tang, if you'd just come right

8    up to the witness stand here and then remain standing,

9    and Ms. McGuire will swear you in.

10                **PAUL TANG, DEFENSE WITNESS, SWORN**

11        THE CLERK:  Would you please state your name and

12    spell your last name for the record.

13        THE WITNESS:  Paul Tang, T-A-N-G.

14        THE COURT:  Mr. Tang, just get yourself

15    comfortable, pull the chair all the way in, and then

16    pull the microphone in so that you can speak right into

17    it.  The whole base moves.

18        Mr. McHugh.

19        MR. McHUGH:  Thank you, your Honor.

20                     **DIRECT EXAMINATION**

21    **BY MR. McHUGH**:

22    **Q.**   Good afternoon, Firefighter Tang.

23    **A.**   How are you, sir?

24    **Q.**   Good.  How are you doing?

25    **A.**   Good.

1    **Q.**    Could you tell us when you began on the Providence

2    Fire Department, please.

3    **A.**    In 2007.  I joined the academy in January 2007,

4    got on in July.

5    **Q.**    Of 2007?

6    **A.**    Correct.

7    **Q.**    And which academy was that that you went to?

8    **A.**    The 47th.

9    **Q.**    And what was your first assignment out of the

10   academy?

11   **A.**    I was assigned to Ladder 5 over at Broad Street

12   for three months and then Engine 10, same station, for

13   about three months.

14   **Q.**    Did you have the same duties and responsibilities

15   on Engine 5, did you say?

16   **A.**    Ladder 5.

17   **Q.**    Ladder 5 as at Engine 10?

18   **A.**    No, it's different.

19   **Q.**    What were your duties and responsibilities on

20   Ladder 5?

21   **A.**    Just ladder work pretty much depending on where

22   you were called and how you arrived.  Every duty was

23   kind of different.

24   **Q.**    Okay.  And what about on Engine 10, did you say?

25   **A.**    Correct.  We did everything fire-related along

1    with EMS; and, like I said, depending on how you were

2    called, your duties were assigned differently.

3    **Q.**    And where did you go next?

4    **A.**    From there I went to Ladder 4 over at North Main

5    Street.

6    **Q.**    Okay.  And what were your duties and

7    responsibilities at Ladder 4 on North Main Street?

8    **A.**    Just about the same except for lots of cardiac

9    studying at the time.

10   **Q.**    Cardiac studying?

11   **A.**    Yes.

12   **Q.**    Why was that?

13   **A.**    We had to obtain our cardiac EMT license within

14   about 18 months of being on the job.  So I was hitting

15   the books pretty hard then.

16   **Q.**    Okay.  Did you already have the EMT-Basic when you

17   came on the job?

18   **A.**    Correct.

19   **Q.**    So it was the cardiac you had to get afterwards?

20   **A.**    Yes, sir.

21   **Q.**    And how long were you at North Main Street for?

22   **A.**    Approximately a year and four months.

23   **Q.**    Where did you go next?

24   **A.**    I obtained my cardiac license there, and from

25   there I went to Rescue 3 at Branch Ave.

1    **Q.**   Okay.  As a rescue tech?

2    **A.**   Correct.

3    **Q.**   And how long were you at Rescue 3 on Branch Ave.?

4    **A.**   That was my first six-month tour.  You do

5    six-month tours at a time.

6    **Q.**   And what were your duties and responsibilities as

7    a rescue tech on Rescue 3?

8    **A.**   Just perform EMS runs, patient care, anything the

9    officer really told you to do.

10   **Q.**   Okay.  And when you left Branch Avenue, where did

11   you go?

12   **A.**   From there, I liked it, so I bid over to Ladder 7,

13   which is in the same station, and hung out with the

14   guys there.

15   **Q.**   So Ladder 7 at Branch Avenue?

16   **A.**   Correct, with Chief Mello now, then the captain.

17   **Q.**   When you said you liked it, you mean you liked the

18   Branch Avenue Station?

19   **A.**   Yeah.  It was fun.  I liked it, and I stayed there

20   for a while.  Good people.

21   **Q.**   How long did you stay there for?

22   **A.**   Two years.

23   **Q.**   And then where did you go?

24   **A.**   Engine 11 over at Reservoir Ave.

25   **Q.**   So you still stayed on an engine company?

1    **A.**    Yes.

2    **Q.**    And after that?

3    **A.**    Where I am now, which is Engine 8 at Messer Street

4    where I wanted to be since I got on.

5    **Q.**    Okay.  So you left Engine 11 and went over to

6    Engine 8 on Messer Street?

7    **A.**    Correct.

8    **Q.**    Why did you want to be on Messer Street?

9    **A.**    I was born and raised in Providence, and that was

10    in the West End, too, so if I could give back to the

11    community.

12    **Q.**    I figured you were going to say you came from the

13    West End.  So how long have you been over at Messer

14    Street?

15    **A.**    Now it will be a year and six months, I believe.

16    **Q.**    So how long have you been on the fire department

17    total?

18    **A.**    Nine years.

19    **Q.**    And your rank is what?

20    **A.**    Firefighter 1.

21    **Q.**    Now, when you were at Branch Avenue with the

22    rescue, did you ever work with Lori Franchina?

23    **A.**    Yeah, numerous times.

24    **Q.**    Okay.  And was she the lieutenant and you were the

25    tech?

1    A.   Correct.

2    Q.   Can you tell the jury what it was like working

3    with Lori Franchina.

4    A.   It was tough sometimes, like walking on eggshells,

5    because it was kind of like a roller coaster.  You

6    didn't know who you were getting sometimes.  She'd snap

7    at you one time and then be your buddy the next.

8         And then she'd like something a certain way,

9    like an IV bag -- we have drip sets in the truck.  It

10   sits in the middle, and we leave it kind of set up,

11   ready to go.  She would complain about having it one

12   way and then the next week having it another way.  So

13   it's tough to work with that all the time, like.  It

14   was an emotional roller coaster, I guess you could say.

15   Q.   And let me ask you about a specific run on

16   July 29th, 2009, on Job Street.  Do you remember that?

17   A.   Yes, I do.

18   Q.   And you were working that day?

19   A.   Yes.

20   Q.   Was that days or nights?

21   A.   I think it was a day shift, and it was towards the

22   end of a day shift.

23   Q.   What would be the end of a day shift?

24   A.   Three, four o'clock, right towards the end, three,

25   four o'clock.

1   Q.   And what time do you come in in the morning for

2   that?

3   A.   Seven.

4   Q.   And were you working with Lori Franchina that day?

5   A.   Yes.  I'm not sure who was there already or coming

6   from a call-back or coming from home, but yeah.  We're

7   not normally assigned together.  When you work

8   overtime, my officer was out a lot, and she would be

9   working with me and vice versa.

10  Q.   So on that day, July 29th, 2009, Lori Franchina

11  was the rescue lieutenant and you were the tech?

12  A.   Yes, sir.

13  Q.   Do you remember what the call was for on Job

14  Street?

15  A.   I kind of do.  I think it was for a possible

16  suicide by gunshot.

17  Q.   Okay.  And did you leave to go there from the

18  Branch Avenue Station or from somewhere else?

19  A.   I'm not 100 percent sure.  I can't remember, sir.

20  Q.   Okay.  When you arrived, was an engine company

21  already there?

22  A.   Yes.  Engine 12 was already there.

23  Q.   Who were the members of Engine 12, do you

24  remember?

25  A.   I know for certain it was Robert Jackson, Sean

1    McGarty and Tim Kelly.

2    **Q.**   Kelly?

3    **A.**   Yes.  There should be a fourth, but I can't

4    remember who it was.

5    **Q.**   Okay.  So there was an engine company there

6    already.  Was there anyone else there?

7    **A.**   The police were on scene, also the detectives and

8    just the suits.

9    **Q.**   Police detectives and what else did you say?

10   **A.**   Just the patrolmen.

11   **Q.**   Okay.  Was that a one-family house, two-family?

12   **A.**   It was at least a two.  I think it was either -- I

13   know it was at least the second or third floor that we

14   went to.  It was at least a two-family.

15   **Q.**   All right.  When you got there, were the members

16   of Engine Company 12, were they inside or outside?

17   **A.**   They were inside.

18   **Q.**   What about the police?

19   **A.**   They were also inside and one detective outside

20   speaking to a female.

21   **Q.**   Okay.  So as soon as you got there, did you go

22   inside?

23   **A.**   Yes, we did.  We went right upstairs, bypassed the

24   detective speaking to the woman, the frantic woman, and

25   we made our way upstairs.

1    Q.    Now, when you say a frantic woman, did you find

2    out who she was?

3    A.    I never found out who she was.

4    Q.    Okay.  What do you mean when you say she was

5    frantic?

6    A.    She was just crying in a -- hysterically and just

7    a mess.  The detective was trying to calm her down.  I

8    didn't see her too long.  We just went around the

9    corner and right up the stairs.

10   Q.    Okay.  So when you entered -- it must have been an

11   apartment, then?

12   A.    Yes.

13   Q.    When you entered the apartment, what did you

14   observe?

15   A.    As we were going up the stairs, an officer was

16   coming down.

17   Q.    When you say officer, police officer?

18   A.    Correct.  A police officer was coming down, and he

19   made a comment of saying -- just shook his head, he's

20   dead.  And then this is when at the time Lieutenant

21   Franchina said, shouting, I'll make the decision.  I'll

22   decide that.  Then that's when we made our way

23   upstairs.

24   Q.    Was this police officer in uniform or out of

25   uniform?

**A.**   He was just a regular patrolman, just regular uniform.

**Q.**   Okay.  Did he say anything to Lieutenant Franchina when she hollered, I'll make the decision on that?

**A.**   No.  We just kind of made our way up, and he made his way down.

**Q.**   Okay.  What happened when you got inside the apartment?

**A.**   Members from Engine 12 were sitting outside the room.  I remember when we walked up the stairs, the doorway, and then his bedroom was, like, to the right, like, 2:00.

**Q.**   When you say his bedroom, you mean the patient?

**A.**   Correct.  Where the patient was lying in his bedroom was to the right when we walked through the door, and the members of Engine 12 were outside of the room with a few police officers inside of the room.

**Q.**   So there were -- the members of Engine 12 were in the apartment but outside of the bedroom?

**A.**   Correct.

**Q.**   But the police officers were inside the bedroom?

**A.**   Correct.

**Q.**   How many police officers were inside the bedroom?

**A.**   At least two.

**Q.**   Uniform or non-uniform?

1    **A.**    Uniform.

2    **Q.**    So what happened -- what did you observe when you

3    walked into the bedroom?

4    **A.**    I saw the victim on the bed lying on his back.

5    His bed was to the left, and I noticed a shell casing

6    on the ground first because I could see it -- as I'm

7    coming up the stairs, I could see the floor easily.

8         And then I walk in the room, and the patient has

9    a gunshot wound to the right side of his head and a

10   huge knot, looks like an egg, where the bullet I guess

11   didn't exit and it must have rattled around in there.

12        And there was some brain matter but nothing

13   excessive, I guess you could say, for something that

14   violent, I guess.

15   **Q.**    Where did you see the brain matter?

16   **A.**    It was very little on the -- on his -- where the

17   entrance wound was and a little bit on the bed, but it

18   wasn't much at all.  There wasn't even much blood, I

19   don't think.  That's all I --

20   **Q.**    There wasn't much blood when you went to the

21   apartment?

22   **A.**    I didn't think there was much blood.  I've seen a

23   lot of blood and -- strange, actually.

24   **Q.**    I'm sure by that time, 2009, you had been on quite

25   a few calls yourself.

1    **A.**    Yeah.  Being on Rescue 3, you get a lot of --

2    **Q.**    Is that a busy rescue at Branch Avenue?

3    **A.**    Oh, yeah.

4    **Q.**    So what happened next?

5    **A.**    That's when Lieutenant Franchina said she wanted

6    to work the patient, and --

7    **Q.**    What does that mean?

8    **A.**    Pretty much perform any life-saving techniques we

9    can provide the patient, whether it be CPR, medication,

10   defibrillate the patient, whatever it may be.  Whatever

11   the patient might need, we would intervene and provide

12   that.

13   **Q.**    What happened next?

14   **A.**    It was kind of strange because the whole scene

15   right from the get-go looked like a crime scene, so

16   everybody was kind of hesitant to move around or touch

17   anything because we're taught to leave everything alone

18   if it's a possible crime scene.

19   **Q.**    Why do you say it looked like a crime scene?

20   **A.**    Considering the patient, I thought he was dead as

21   well, and the police officers claimed he was gone, too.

22   So that's why everybody kind of just stood there at the

23   time.

24          And then she made the call to work the patient,

25   and she directed me to go downstairs to go get the

1    stair chair.

2    **Q.**   So when you got there, you didn't take the stair

3    chair up with you?

4    **A.**   No.  She said, Let's see what we've got,

5    considering the call, whatever it may be; but that's

6    what I remember.

7    **Q.**   So when you got upstairs, she told you to go get

8    the stair chair?

9    **A.**   Yes, sir.

10   **Q.**   Did you follow her order?

11   **A.**   Yes.

12   **Q.**   Okay.  What happened -- what happened on your way

13   down, anything?

14   **A.**   Yeah.  I go running down the stairs, and the

15   detective that's speaking to the lady is still there,

16   and she kind of was taken back because as fast as I was

17   going around the corner, I guess.  As I made my way

18   back with the chair, she's like, What are you guys

19   doing?  Since when do you guys transport dead bodies?

20        And I'm just following orders.  So I just made

21   my way up the stairs with the chair and set it up and

22   got the patient packaged and ready to go downstairs.

23   **Q.**   All right.  You said you set up the stair chair.

24   How do you do that?

25   **A.**   It's just a collapsing chair.  One of the levers

1    turns it into a regular chair.  It comes in real narrow

2    and just cover it with a sheet and place the patient on

3    there.  There's a bunch of belts you can put in

4    different configurations depending how you want to

5    carry the patient.

6    **Q.**    So did you set up the stair chair next to his bed?

7    **A.**    Yes, sir.

8    **Q.**    And how did you get him out of the bed?

9    **A.**    We lifted him up, and we wrapped him up.  We just

10   picked him up from where he was.  I believe we used a

11   sheet just to wrap him up and contain him.

12   **Q.**    Now, who is "we"?

13   **A.**    Me and everybody from Engine 12, pretty much.

14   **Q.**    Oh, so the members of Engine 12 assisted you?

15   **A.**    Yes.

16   **Q.**    So all the members of Engine 12 helped you put the

17   body in the stair chair?

18   **A.**    Yes, sir.

19   **Q.**    And what was Lieutenant Franchina doing at this

20   time?

21   **A.**    She was arguing with the detective because the

22   detective was still upset about the transportation of

23   the possible -- nobody knew if it was a murder victim.

24   It was just a person there with a gunshot wound to the

25   head.

1    **Q.**   Where was she arguing with the detective?

2    **A.**   I believe it was outside the room.  I wasn't

3    paying attention much because we were loading the

4    patient.  It was me, Sean and Tim.  And Bo Jackson was

5    there.  I don't know specifics on who was doing what,

6    but I'm pretty sure all hands were on deck at the time.

7    **Q.**   So then you, along with Bo Jackson -- was that

8    Lieutenant Jackson?

9    **A.**   Yes, sir.

10   **Q.**   Sean McGarty?

11   **A.**   Correct.

12   **Q.**   Tim, was that Tim Kelly?

13   **A.**   Correct.  I believe it was Tim Kelly.

14   **Q.**   And was there one other person you mentioned?

15   **A.**   I can't remember who it was.  I'm still trying

16   to --

17   **Q.**   But there were -- so there were four other members

18   there?

19   **A.**   Yes, sir.

20   **Q.**   So the five of you put the individual in the stair

21   chair?

22   **A.**   Yes, sir.

23   **Q.**   And while you were doing this, Lieutenant

24   Franchina was outside arguing with the detective?

25   **A.**   Yes.  I don't know what they were arguing about or

1    whatever it was.  I know there was a lot of shouting;

2    but I was instructed to have the patient packaged and

3    ready to go, and that's what we did.

4    **Q.**   And the detective that Lieutenant Franchina was

5    arguing with, was that a male or a female?

6    **A.**   That was a female.

7    **Q.**   Was she the one that you had seen downstairs when

8    you came running outside?

9    **A.**   Yes.

10   **Q.**   Okay.  What happened next?  Where were the uniform

11   police officers when you and the members of Engine 12

12   were putting him in and Lieutenant Franchina was

13   arguing?

14   **A.**   They were inside the room; and then once we

15   started packaging him up, they kind of made their way

16   out and let us do what we had to do.  They tried to

17   protect as much as they could with the shell casing and

18   the firearm sitting right on the bed, too.

19   **Q.**   Okay.  So did the five of you carry the patient

20   downstairs?

21   **A.**   Yes.  Sean had the top.  The stair chair is pretty

22   much like this with a handle on the back and two

23   extending handles by the feet.  And Sean had the top, I

24   had the bottom left, and I'm pretty sure it was Tim

25   Kelly but it could have been the other member on the

1    bottom right because the stairs were steep and those

2    chairs are very awkward to carry, especially with

3    somebody, like, dead weight on there.

4            So we're trying to work him down on top, and now

5    he's starting to bleed a little bit more because of the

6    head wound and everything.  So we tried to wrap that up

7    at the same time and work our way down in a timely

8    manner.

9    **Q.**    Okay.  How long do you think it took you to get

10   downstairs?

11   **A.**    A minute or two, tops.

12   **Q.**    So when you get outside, what happened?

13   **A.**    That's when the detective is still going back and

14   forth.  We work our way around the back door, down the

15   driveway into the back of the rescue; and I get the

16   stretcher out to load the patient from the chair onto

17   the stretcher so we can start performing what we need

18   to do.

19   **Q.**    So you get the patient to the rescue, and then you

20   get the stretcher out of the rescue?

21   **A.**    Yes, sir.

22   **Q.**    And then did the five of you load the patient onto

23   the stretcher?

24   **A.**    Yes, sir.

25   **Q.**    And where was Lieutenant Franchina?

1    **A.**    Still a shouting match.  I don't know where it

2    was, but we were actually kind of upset because me

3    being new to rescue, I need a little bit more

4    direction.  That's why they give us six-month tours, is

5    to help us with our EMS skills and allow the officer to

6    train us in a manner that we're self-sufficient.

7          So I'm still learning at the same time.  So I'm

8    waiting for her to come help guide me because I'm

9    not -- I just got my cardiac, so I'm still learning at

10    the time.  So not having her there was upsetting, I

11    guess, looking for direction.

12    **Q.**    And she was arguing with the female detective?

13    **A.**    Yes, sir.

14    **Q.**    Was that outside or inside?

15    **A.**    That came outside.

16    **Q.**    They were still arguing outside?

17    **A.**    Yes, sir.

18    **Q.**    So did the five of you actually, you and the

19    members of Engine 12, put the patient on the stretcher?

20    **A.**    Yes, sir.

21    **Q.**    Did you get him in the rescue?

22    **A.**    Yes.  And that's when the detective made her way

23    to the back and asked if she could place paper bags on

24    the patient's hands to, I guess, protect any evidence

25    of GSR maybe.

1    Q.    What is GSR?

2    A.    Gunshot residue, I believe.

3    Q.    Okay.  And who did she ask if she could put the --

4    A.    She asked me because I was closest to the back.

5    Q.    Where was Lieutenant Franchina then?

6    A.    I did not know where she was at the time.

7    Q.    So what did you tell the detective?

8    A.    I said, Sure, go ahead.  I just allowed her to do

9    what she had to do while we were still trying to

10   perform what we have to perform.

11   Q.    Was this the female detective?

12   A.    Yes, sir.

13   Q.    Now, the rescue -- can you tell the jury how big

14   the rescues are in the back.

15   A.    Oof.  Maybe a small little corridor, I guess you

16   could say.  It would probably fit two of me, and that's

17   not even working comfortably.  Then you have an officer

18   seat.  It's very tight.  So with more than any -- more

19   than three people, it's tough to operate.

20   Q.    So you have the patient in the back?

21   A.    Yes.

22   Q.    You were in the back?

23   A.    I was in the back, the patient.  Bo Jackson was in

24   the officer's seat.

25   Q.    Is the officer's seat in the back?

1    **A.**   The officer's seat is right at the head of the

2    patient.  So the stretcher slides in from the back of

3    the rescue, and it goes right to the feet of the

4    officer so the officer can oversee all the operations

5    going on.

6    **Q.**   Okay.  And anyone else in the back of the rescue

7    then?

8    **A.**   At the time I believe it was at least me, Bo --

9    Robert Jackson, I'm sorry, and Sean and Tim.

10    **Q.**   And Lieutenant Franchina still wasn't in the back?

11    **A.**   No.

12    **Q.**   Even after you loaded the patient?

13    **A.**   Yeah, no.

14    **Q.**   So once you had the patient loaded in the back,

15    what did you do?

16    **A.**   That's when we strapped him in.  I started CPR,

17    hooked him up to the EKG and the AD pads, tried to run

18    a strip, EKG strip, to see if there was any heart

19    rhythm, and there was nothing at the time.

20         And as I was doing that, Tim Kelly was getting

21    the IV established and Robert Jackson was in the

22    officer's seat protecting his airway, and he was

23    performing a maneuver with the -- it's equipment we

24    have.  It's called an ET tube, endotracheal tube.  It's

25    just a plastic tube that slides into your throat and

1    helps maintain a patent airway.

2           He did that, and he actually was very

3    successful.  The IV was done.  I was doing CPR, and

4    then that is about the time when we started getting

5    going.  And Lori hopped in the back, and I believe Sean

6    McGarty hopped up front to drive because Sean is a

7    basic only, I remember that, and basics -- EMT-Basic is

8    just a little bit under a cardiac, and they can't

9    perform as many skills as a cardiac could, like IVs or

10   whatever it may be, and administer certain drugs.

11          So not to sound mean, but the most useless

12   person is going to go and drive the rescue because

13   anybody can drive, I guess.  So him being back there

14   wouldn't be as useful.

15   Q.    So at that point you had closed the doors to the

16   rescue?

17   A.    Yes.

18   Q.    So you were at that time giving CPR to the

19   patient?

20   A.    Yes, sir.

21   Q.    Was he responding?

22   A.    No, sir.

23   Q.    And McGarty was sitting in the officer's chair?

24   A.    No, that was --

25   Q.    Or Jackson, rather?

1    **A.**   Yes, sir.

2    **Q.**   Jackson was sitting in the officer's chair.  What

3    was he doing?

4    **A.**   He was trying to make sure he had a patent airway,

5    whether it be just a bag valve mask, which is this

6    plastic tube -- plastic face piece that goes over your

7    mouth and is connected to an air bag, and it allows him

8    to pretty much breathe for the patient.  After he tried

9    to do that, he grabbed -- that's when he performed the

10   ET tube.

11   **Q.**   And what was Kelly doing?

12   **A.**   Tim was getting an IV, that's what I remember

13   vaguely, to the left of me.

14   **Q.**   And then when Lori Franchina came in, what did she

15   do?

16   **A.**   I remember a lot of yelling, and we were

17   already -- we started going.  What happened in between

18   then is very fuzzy, but all I remember from then on is

19   we were moving.

20        Everybody was kind of still doing the same thing

21   because pretty much what we do is as much as we can do

22   for the patient that's already dead.  We can only do so

23   much, and everything becomes repetitive.  So every

24   three or five minutes, we reassess and do everything

25   repetitively.

1    When she came in, I was already doing CPR and we

2    were already heading to the hospital, and that's when

3    she wanted to take over and asked me to remove my

4    gloves or whatever.

5    **Q.**    Okay.  So when she got in the rescue, was that

6    when you closed the back doors?

7    **A.**    Yes.

8    **Q.**    And then you took off for the hospital?

9    **A.**    Yes, sir.

10   **Q.**    What hospital were you going to?

11   **A.**    Rhode Island.

12   **Q.**    And do you remember if she said anything when she

13   got into the rescue?

14   **A.**    I don't remember.  I think it was just whether it

15   was getting drugs ready, whether it was -- I know she

16   was trying to get me to take my gloves off.  That's,

17   like, ingrained in my brain.  I don't know what kind of

18   orders she was shouting.  I'm not 100 percent sure.

19   **Q.**    All right.  And so you're on your way to the

20   hospital.  Were you still giving CPR?

21   **A.**    Yes, sir.

22   **Q.**    Now, when you're at the back of the rescue when

23   there were what, three other people in the back?

24   **A.**    At least, yes.

25   **Q.**    So there's -- once you took off to go to the

1    hospital, you were in the back.  Were you still giving

2    CPR?

3    **A.**    Yes, and that's when she intervened and asked me

4    to swap out my gloves because she said it was --

5    **Q.**    So you were giving CPR.  Kelly was in the back?

6    **A.**    To my left.

7    **Q.**    Okay.  Where was Lori Franchina in relationship to

8    you?

9    **A.**    She was to my right.  There's a little cabinet

10   where the drugs are kept, lockboxes where drugs are

11   kept, and that's mostly to the right, and that's where

12   she was; and Robert Jackson was still in the officer's

13   seat.

14   **Q.**    Okay.  And who was driving, McGarty?

15   **A.**    Sean.

16   **Q.**    So you're on your way to Rhode Island Hospital.

17   Now, is it -- do you know how fast they were driving,

18   approximately?

19   **A.**    I want to say at least 40, 45 miles an hour, and

20   that might have been in the residential area, too.

21   **Q.**    Did you have your lights and sirens on?

22   **A.**    Yes.

23   **Q.**    And when you're in the back of the rescue like

24   that with three other people, is it crowded back there?

25   **A.**    Oh, yeah.

1    **Q.**   And when you said she was to your right, is the

2    patient -- are you standing facing the patient and the

3    patient is vertical?  Is that how you stand in the

4    rescue?

5    **A.**   The patient's head is pointing towards the front

6    of the vehicle and foot's to the rear.  I am at his

7    waist to his left, and then behind me there's a bench.

8    And to the left of me was Tim Kelly, and to the right

9    was Lori in the officer's seat right by the head of the

10   patient.

11   **Q.**   Okay.  So it was you, Lori Franchina and Tim Kelly

12   lined up?

13   **A.**   Pretty close.  It's pretty tight in there.

14   **Q.**   Can you stand up in there?

15   **A.**   I have to duck my head, but I could stand up.

16   **Q.**   How tall are you?

17   **A.**   Five ten.

18   **Q.**   And so you're doing CPR, and you're going 40 miles

19   an hour?

20   **A.**   Yes.

21   **Q.**   So that must be difficult.  The truck must be --

22   **A.**   Yeah.  I had one hand on the grab bar and one

23   hand -- there's a bar up on the top.  It's just a grab

24   bar so you can actually do CPR, whatever it may be,

25   just to hang on for dear life while we're heading to

1   the hospital.

2   **Q.**   You said you had gloves on.  What kind of gloves

3   did you have on?

4   **A.**   Just the regular ones that the department

5   provides, the nitrile, I believe it's pronounced,

6   gloves.

7   **Q.**   Okay.  So standard?

8   **A.**   Yeah.

9   **Q.**   And you said that the gloves are ingrained in your

10  mind.  Why did you say that?

11  **A.**   Only because I -- it's kind of tough to swallow

12  when somebody says something that you haven't done.

13  That's why it's kind of --

14  **Q.**   Okay.  We'll get to that.  So you're on your way.

15  You've got your -- is that the first thing she said to

16  you, Change your gloves?

17  **A.**   Yeah, and I just kept reiterating that -- my hands

18  sweat ridiculously.  I'm sure everybody's had gloves

19  on; and when your hands sweat, it's ridiculously hard

20  to get another set on if you take those off.

21          So I just kept saying, I can't put another set

22  of gloves on if I take these off.  And then we're on

23  the road.  If I take my gloves off now, I'm useless.  I

24  can't do anything because now I could contaminate

25  myself or the patient or anybody else.

1      So by me doing that, I just would have been

2  useless.  I don't know.  I didn't want to kind of leave

3  them shorthanded, so I just wanted to stay in there.

4  **Q.**   So did you take the gloves off?

5  **A.**   I did.

6  **Q.**   She insisted on that?

7  **A.**   Yes.

8  **Q.**   So you followed -- well, you followed her order

9  when you took up the stair chair; right?

10  **A.**   Yes.

11  **Q.**   So you followed her order when she took you to --

12  she told you to take your gloves off; right?

13  **A.**   Yes.

14  **Q.**   And what happened when you took off your gloves?

15  **A.**   When I took off my glove, I had it down at the

16  patient.  And she resumed CPR after I was trying to

17  remove my gloves, and she was to my right.

18      And as I was removing my glove, it snapped, but

19  there was a boatload of sweat in my hands.  I didn't

20  have any blood on my hands.  If there was any, it was

21  dried blood.  There wasn't any fluid matter whatsoever,

22  I don't remember, on my gloves.

23      All I can remember is it was just a lot of

24  sweat, and she claimed that something hit her eye.  And

25  right when she said that, I kind of was taken back.  I

1    was apologetic.  I'm sorry.  It was, like, I didn't

2    mean to do it.  She's like, Oh.  She just kept going

3    back and forth.

4    **Q.**   This is in the rescue?

5    **A.**   Yes, it's in the rescues because she's to my

6    right.  And I was apologetic right off the bat.  I'm

7    sorry.  I didn't mean to do anything.  I just was

8    taking my glove off.  I kept trying to tell her I think

9    it's the sweat from my gloves, and she just wouldn't

10   hear it.  I was, like, I think it's the sweat.  So I

11   was just, I don't know, kind of beside myself.

12        Now I'm sitting in the back of the truck

13   useless, no gloves, and I think I contaminated a

14   member.  I don't know.  But I don't think it was

15   anything.

16   **Q.**   Do you know how far away you were from the

17   hospital when you took your gloves off?

18   **A.**   No, I don't.  I'm sorry.

19   **Q.**   Okay.  Do you know how long after you took your

20   gloves off you arrived at the hospital?

21   **A.**   I'm sorry, I don't remember.

22        MR. McHUGH:  Okay.  That's fine.  You don't have

23   to be sorry.

24        Your Honor, I have a pair of the gloves which

25   I'd like the witness to demonstrate; and I'd have them

1    marked as an exhibit, but I don't think we should write

2    on them as an exhibit until he actually takes them on

3    and off, if that's okay.

4            THE COURT:  Let's give it an exhibit number for

5    identification right now.  Would it be U?

6            THE CLERK:  I think U, yes.

7            THE COURT:  That can be Exhibit U.  We can later

8    mark a plastic bag and put them in it.  We'll mark

9    that.  I think that's probably the easiest way to

10   proceed.

11           MR. McHUGH:  Thank you, your Honor.

12           (Defendant's Exhibit U marked for ID.)

13           MR. McHUGH:  With the Court's permission, can I

14   have Firefighter Tang step down to show the jury how he

15   puts his gloves on?

16           THE COURT:  Vickie, do we need to give him a

17   mike?

18           THE CLERK:  Well, I don't know how that's going

19   to work.  You can't hold it and do it.

20           MR. McHUGH:  Not really.  He needs both hands.

21           THE COURT:  Mr. McHugh, you're going to need to

22   use the handheld mike.

23           MR. McHUGH:  Firefighter, would you step over

24   here in front of the jury.

25           THE COURT:  Wait a minute.  Now you have to

1    speak into it.

2         MR. McHUGH:  You didn't tell me that part.

3    **Q.**   First of all, are those the type of gloves you

4    wore on July 29th, 2009, at the Job Street incident?

5    **A.**   Yes, they are, sir.

6    **Q.**   What I'd like you to do is show the jury -- so you

7    put those gloves on before you leave the station?

8    **A.**   Sometimes we put them on before, right when we

9    pull up.

10   **Q.**   Don't put them on yet.  So you either have them on

11   before or when you get to the scene?

12   **A.**   Yes.

13   **Q.**   That day, do you remember, did you put them on

14   before you got to the scene, if you remember?

15   **A.**   I probably had them on before because I knew when

16   I was first on rescue I was a little more cautious.

17        THE COURT:  Mr. Martin, you can move, too, if

18   you can't see.

19        MR. MARTIN:  Thank you.

20   **Q.**   All right.  Firefighter Tang, could you show the

21   jury -- could you put the gloves on for the jury.

22        MR. McHUGH:  Ms. Sabatini, do you want to be

23   over here for this?

24   **Q.**   Could you face the jury when you do that so they

25   can see.  So when you got out of the rescue on Job

1    Street, you had gloves on like that?

2    A.    Yes, sir.

3    Q.    And you had them on the whole time when you got in

4    the rescue until Lori Franchina ordered you to take

5    them off?

6    A.    Yes.

7    Q.    Correct?  All right.  Now, I know we're in this

8    beautiful courtroom under optimum conditions.  Can you

9    show, when you took them off, the jury how -- were you

10   crouched down or how do you have to stand in the

11   rescue?

12   A.    The patient was pretty much right here.  Lori was

13   here, the officer seat here, and Tim Kelly was there.

14   So the chest was here, and when I removed --

15   Q.    Well, so you were standing there, but were you

16   standing upright or crouched over?

17   A.    Oh, I was standing upright.  Maybe my head was

18   ducked down, but I wasn't on my knees or crouched.

19   Q.    Okay.  So you were standing, but you couldn't

20   stand up all the way?

21   A.    Correct.

22   Q.    And the rescue was moving at this time?

23   A.    Yes, sir.

24   Q.    All right.  So you said earlier that you had your

25   hand up on, what did you call that, a bar?

1    **A.**    Grab bar.

2    **Q.**    Grab bar.  Okay.  In order to give CPR, so you had

3    to let that go?

4    **A.**    Yes, sir.

5    **Q.**    When you took the gloves off, the rescue was

6    moving; right?

7    **A.**    Uh-huh.

8    **Q.**    You had, what, four other people in there?

9    **A.**    Three.

10    **Q.**    Three other people.  Oh, not counting the driver.

11    And you said that Lieutenant Franchina was on your

12    right?

13    **A.**    Yes, sir.

14    **Q.**    And was it Kelly was on your left?

15    **A.**    Yes, sir.

16    **Q.**    So, again, if you'd face the jury, I just want --

17    so would that be -- you would be standing with the

18    other officers like this?

19    **A.**    Yes.

20         THE CLERK:  Hold on.

21         MR. McHUGH:  May I proceed, your Honor?

22         THE COURT:  Sure.

23    **Q.**    All right.  If you stand right in front of the

24    jury and just demonstrate to the jury how you took your

25    gloves off.

1    A.    I just pinch right by my wrist right here.   This

2    is the most efficient way, I think.   And I tuck my

3    fingers into my glove like that and roll -- pretty much

4    roll these fingers right into itself.   Then it goes

5    down that way.

6         Then with this here being that it was on the

7    inside, it's clean, I use that to grab that and roll it

8    into itself.   I've always done it that way.   I haven't

9    changed it.   I'm a bit of a germophobe myself.

10   Q.    Okay.   What did you do with them after you take

11   them off?

12   A.    Right in the bin.

13   Q.    Okay.   Where is the bin?

14   A.    The trash bin is just -- at the time it's just

15   around Lori and right in the little doghouse area which

16   we look through for the driver.

17   Q.    Okay.   Now, what was on the outside of your gloves

18   when you were taking them off?

19   A.    On the outside there was, if anything, dried

20   blood.   I'm pretty sure these gloves are designed to

21   not hold fluid or, if anything, brain matter.

22   Q.    Was there any brain matter on the outside of it?

23   A.    No.   That would make no sense whatsoever.   I would

24   have to have had the brain matter on me while I was

25   doing CPR and then also -- with the truck moving, I

1    don't see that even happening, like.

2    **Q.**   Okay.  And then -- so you throw them right in the

3    bin?

4    **A.**   Yes, sir.

5    **Q.**   And then you couldn't do anything the rest of the

6    run because --

7    **A.**   Yeah.  My hands were covered in sweat.  The gloves

8    were covered in sweat.  So now I'm just standing there

9    twiddling my thumbs.

10   **Q.**   And did you see anything at all on the outside of

11   the gloves when you took them off?

12   **A.**   No.  I don't remember anything at all.

13   **Q.**   And so you took them off like that, and what did

14   Lieutenant Franchina say when you took them off just

15   the way you showed us?

16   **A.**   She claimed that something went in her eye.  And I

17   just looked at my hands, and I just saw all the sweat.

18   I was like, I think it's sweat.  And then she didn't

19   want to hear it, so -- you know.

20   **Q.**   Did you snap those gloves right in her face?

21   **A.**   No.

22   **Q.**   So you had them, you said, pointing down?

23   **A.**   Yes, sir.

24        MR. McHUGH:  Thank you.  You can return.  I'll

25   take those.

1       THE COURT:  And the mike.

2       MR. McHUGH:  Thank you, your Honor.

3       THE COURT:  No problem.  Mr. McHugh, did you

4  want the lapel mike?  I couldn't remember if you were

5  using --

6       MR. McHUGH:  I will take that.  Thank you, your

7  Honor.

8       THE COURT:  You're welcome.

9  Q.   Okay.  After you took off the gloves and you said

10  she said she got something in her eye and you said you

11  were apologetic --

12  A.   Yes.

13  Q.   -- and from that point on until you got to the

14  hospital, did she say anything to you?

15  A.   No.  She kept saying that, Oh, now I'm going to

16  have to go get checked out and -- a lot of bad things.

17  I don't remember completely, though.

18  Q.   What do you mean by bad things?

19  A.   Kind of belittling things, comments.

20  Q.   Belittling you?

21  A.   Yeah, because I was new to rescue.  I don't know

22  what it was really; but I just kind of kept quiet,

23  tried to tell her I think it was sweat, and that was

24  all I was trying to -- I kept saying sorry.  I didn't

25  think I did anything malicious at all.

1    **Q.**   And did anyone else in the rescue say anything

2    from the point at which you took your gloves off?

3    **A.**   No.

4    **Q.**   When Lieutenant Franchina was telling you to take

5    the gloves off, did anyone else in the rescue say

6    anything?

7    **A.**   No.

8    **Q.**   So you eventually arrive at Rhode Island Hospital?

9    **A.**   Yes, sir.

10   **Q.**   Now, when you arrive at Rhode Island Hospital,

11   what do you do?

12   **A.**   We disconnect everything that's tethered to the

13   truck, whether it be O2 or the monitor, anything, IV

14   bag, and load up the patient to transfer care to the

15   ER.

16   **Q.**   So when you load up the patient, how do you load

17   up the patient then?  What do you put them on?

18   **A.**   We take the monitor, if need be, disconnect the O2

19   that's connected to the truck because it has a larger

20   portable tank to our portable tank that's on our

21   stretcher.  We have a smaller tank so we can be able to

22   provide oxygen even in between transportation and

23   transfer of care.

24   **Q.**   Do you go inside -- did you go inside the hospital

25   itself?

1    A.    Yes, sir.

2    Q.    Okay.  Who else went inside the hospital itself?

3    A.    Everybody that was in the back of the rescue,

4    Sean.  I believe that was it.

5    Q.    Okay.  Lieutenant Franchina, also?

6    A.    Yes, she was in the -- yeah.

7    Q.    Now, when you went inside the hospital, what did

8    you do?

9    A.    We just -- we normally get assigned a room.  When

10   we get a call like that, we'll call the hospital prior

11   to our arrival stating what we have so they can reserve

12   a room for us.

13         And we went to the designated room, transferred

14   care to the ER personnel, and she gave pretty much the

15   rundown on what happened.

16   Q.    Who gave the rundown?

17   A.    Lieutenant Franchina gives the -- whoever's in

18   charge of the ER the rundown, pretty much what happened

19   pre-hospital care, any interventions that we provided

20   the patient, drugs, anything really.

21   Q.    And then did you go back to the truck?

22   A.    Yes.  After that was all said and done, our job

23   was done, the transfer of care was already initiated,

24   and I had to go back to the truck and pretty much

25   decontaminate, restock and make sure the truck is

1    pretty much just as it was prior to the run for the

2    next patient and just as clean.

3    Q.   Tell the jury what you mean by decontaminate and

4    restock.

5    A.   If there was any blood on the stretcher or on the

6    floor, on the -- any equipment that we used would have

7    to be replaced by the ER, whether it be bag valve mask

8    or medications that we used.

9    Q.   How long did it take you to do that?

10   A.   It took a while.  It was very messy.  I know that.

11   Q.   About 10 minutes, 15 minutes?

12   A.   At least a half hour, I would think, yeah.

13   Q.   And you do that right at the hospital?

14   A.   Yes, sir.

15   Q.   And you do that after every run where there's --

16   well, when do you do decontamination?

17   A.   Right after every run and before any other run.

18   Q.   And what were the members of Engine 12 doing at

19   this point?

20   A.   They were inside still, but they eventually made

21   their way out.  We talked about it a little bit after

22   that, and they made their way back to their truck and

23   were on their way pretty much to grab what they used.

24   Q.   Engine 12 itself was at the hospital, also?

25   A.   Yes.  What normally happens on a rescue run like

1    that is, it's just me and an officer; and if the scene

2    is bad enough, we'll ask for a driver from the engine

3    companies.  And out of the four guys -- well, sometimes

4    there's three -- one of the guys drives and any of the

5    other three that can help help in the back of the

6    rescue depending on what kind of situation it is,

7    whether it be a gunshot, heart attack.

8    Q.    Now, while you were decontaminating and restocking

9    the truck, do you know where Lieutenant Franchina was?

10   A.    She was inside the ER, and then she made her way

11   out to speak to me.

12   Q.    Okay.  Before she made her way out to speak to

13   you, did you speak to anyone else at the hospital?

14   A.    Just an officer walked out and --

15   Q.    When you say an officer, police, fire?

16   A.    Police officer.

17   Q.    Providence police officer?

18   A.    Yes, sir.  He walked out, and I was still upset

19   about the whole situation, and he says --

20        MR. MARTIN:  Objection, hearsay.

21        THE COURT:  Sustained.

22        MR. McHUGH:  He said he was upset, the witness.

23   He didn't say the officer was.

24        THE COURT:  The objection is sustained to the

25   question.

1    **Q.**    So you were still upset?

2    **A.**    Yes.

3    **Q.**    Correct?

4    **A.**    Yes.

5    **Q.**    And so an officer walked out.  Did you have some

6    conversation with him?

7    **A.**    Yeah.  He pretty much said --

8              MR. MARTIN:  Objection.

9              THE COURT:  Sustained.  It's a weird system.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  That's okay.  I thought if I

12   explained it to you it might make it easier for you to

13   answer.

14             THE WITNESS:  I'm a little nervous.

15             THE COURT:  You're not allowed to testify about

16   what someone else said to you.  That's what we call

17   hearsay.

18             THE WITNESS:  Okay.

19             THE COURT:  So you can describe anything about

20   what you felt or what you said or whatnot, but you

21   can't describe what somebody else said to you in most

22   circumstances.

23             In this case, the Court has ruled that that's

24   hearsay.  So what I'm stopping you from saying is when

25   you said "he said."  What the officer said to you is

1   not admissible through you.

2          THE WITNESS:  Okay.

3          THE COURT:  So don't tell us what anyone said to

4   you.  Does that make sense?

5          THE WITNESS:  Yeah.

6          THE COURT:  I mean, maybe the rationale doesn't,

7   but do you understand the directive?

8          THE WITNESS:  Yeah.  I thought that would be a

9   part of the story, too.

10  Q.   Well, so when's the next time you saw Lieutenant

11  Franchina?

12  A.   She followed the officer right after, a few

13  seconds.

14  Q.   Okay.  And did you speak to Lieutenant Franchina?

15  A.   Yes.

16  Q.   What did she say?

17  A.   She made her way out.  She was -- surprisingly,

18  she was happy.  She said good job, this and that.  I

19  was apologetic still.  I was like, I'm sorry if I got

20  anything on you.  She's like, Oh, it's okay.  I'm going

21  to go get seen by the doctors, and they're going to

22  hold me for a little bit.  And we were fine.  That's

23  why I never thought anything of it.

24         And she said, They're going to hold me, and

25  they're going to run some tests and stuff; but either

1    way, she said, Good job, babe.  And she proceeded to

2    hit my rear with the clipboard as in like a football

3    kind of.  And she hits me with the clipboard in the

4    rear.  She says, Good job.  I mean, if there were

5    cameras at Rhode Island Hospital and we could go back,

6    it would be there.

7    Q.   Okay.  You were surprised when she said, Good job?

8    A.   Yeah, because of what she said in the rescue.  I

9    was just upset.  I'm pretty tough on myself, and I was

10   kind of upset that I -- even, I don't know, the notion

11   of getting something like that in somebody's face or

12   whatever, it was kind of discouraging.

13   Q.   But you thought it was your sweat that actually

14   went in her face?

15        MR. MARTIN:  Objection.

16   A.   That's what I thought, but then -- I'm sorry.

17        THE COURT:  No, no, no.  The objection's

18   sustained.  Why don't you rephrase it, Mr. McHugh.

19   Q.   What did you think had gotten in her face?

20   A.   I believed it was sweat.

21   Q.   Where would the sweat come from?

22   A.   From the inside of my glove.

23   Q.   Because your hands were sweating?

24   A.   Yeah.  I sweat pretty profusely.

25   Q.   And did you ever hear anything about the Job

1    Street incident again subsequent to that day?

2    **A.**    Just a week later from Chief Crawford.

3    **Q.**    Now, who is Chief Crawford?

4    **A.**    Chief Crawford at the time was the EMS chief.  He

5    would coordinate anything EMS-related.

6    **Q.**    Did he contact you?

7    **A.**    Yes, and --

8    **Q.**    How did he contact you?

9    **A.**    I don't think he contacted me.  From what I

10   remember, he contacted my officer I was working with at

11   the time.

12   **Q.**    Who was that?

13   **A.**    I honestly don't remember specifically.  And we

14   were asked to go to headquarters.

15   **Q.**    You and the officer?

16   **A.**    Correct.  I still didn't know what was going on.

17   I thought it might have been picking up equipment or

18   whatever it might be.

19   **Q.**    Headquarters at 325 Washington Street?

20   **A.**    Yes, sir.

21   **Q.**    Okay.  And what happened when you got there?

22   **A.**    That's when Chief Crawford asked me to go inside

23   to the back of the rescue with him, and he asked me to

24   put on some gloves.  And I said okay.  Then it started

25   clicking like, oh, it must be from last week.

1          So I was like, okay.  So I put on the gloves.
2     And he asked me, Could you remove them for me.  And I
3     removed them like he asked.  And he kind of looked at
4     me, just, That was it?  I was like, Yes, sir.  He was
5     like, Oh, okay.  And then that was the last I heard of
6     it up until I don't know when.
7     **Q.**   Did anyone ever send you for retraining for
8     putting your gloves on and off?
9     **A.**   I heard about it, but nobody ever addressed me and
10    I never went anywhere other than that one time with
11    Chief Crawford.  Guys used to make fun and say, Oh, you
12    get your glove retraining?  I was like, I don't know
13    what's going on.
14    **Q.**   Okay.  Well, let me ask you this, Firefighter
15    Tang.  Do you know what Lori Franchina's reputation was
16    in the Providence Fire Department as far as getting
17    along with her fellow firefighters?
18    **A.**   It was a little rough.  Everybody on the job has a
19    reputation, but hers was -- I don't know how to say it
20    really.  It's just guys kind of felt like what I felt,
21    just had a hard time working with her.
22         Nobody wanted to get into any trouble, so they
23    kind of just -- it's tough to say.  It's kind of like
24    working with somebody that you know is kind of a
25    troublemaker.  You don't really want to be a part of

1     it, but sometimes it's forced on you because you don't

2     want to get in any trouble.  So I just keep my mouth

3     shut and just do what I have to do.  And I tried to do

4     that, and obviously that didn't work.

5          MR. McHUGH:  All right.  Thank you very much,

6     Firefighter Tang.

7          Thank you, your Honor.

8          THE COURT:  Thanks, Mr. McHugh.

9          Mr. Martin.

10                    **CROSS-EXAMINATION**

11    **BY MR. MARTIN**:

12    **Q.**   You were on the second or the third floor?

13    **A.**   I believe it was the second.

14    **Q.**   Front of the house or the back of the house?

15    **A.**   It was in the back of the house.

16    **Q.**   How many rooms were between the front of the house

17    and the back of the house?

18    **A.**   How many rooms?  At least two.  His room was

19    pretty much on the right side in the middle.

20    **Q.**   So you went past his room and then the second room

21    and then you found him in the back of the house?

22    **A.**   I'm not quite sure when you say "his" and "him"

23    who you -- I didn't walk past --

24    **Q.**   The guy with the bullet hole in his head.

25    **A.**   Yeah, but you said you walked by his room and then

1    him in the back.

2    **Q.**   I thought you said his room.  Why don't you

3    explain how you got to the guy who was injured.

4    **A.**   I walked up the stairs, and his room was --

5    literally you walk through the kitchen, and his room

6    was pretty much like at 2:00.

7    **Q.**   Right.  My question was, how far was his room or

8    wherever you found him from the front of the house?

9    **A.**   From the front of the house?

10   **Q.**   Yeah.

11   **A.**   Approximately maybe 20 feet, 15, 20 feet.

12   **Q.**   Fifteen to twenty feet?

13        THE COURT:  Go ahead, Mr. Tang.

14   **A.**   In relation to, like, literally the front of the

15   house or from the front, like, where the rescue is?

16   I'm not quite sure.

17   **Q.**   Where was the rescue?

18   **A.**   The rescue was in front of the house, pretty much.

19   **Q.**   The rescue was in front of the house?  How far was

20   the body from the front of the house?

21   **A.**   Twenty feet.

22   **Q.**   Twenty feet.  How many people were in the room

23   with you?

24   **A.**   Four, six.  There was two officers.  Seven

25   including Lieutenant Franchina.

Q.    Seven people in the room?

A.    Approximately.

Q.    Preparing a body and a stair chair together?

A.    Not at the time when we got there because it looked more of a crime scene.  It looked like a crime scene.

Q.    I wasn't asking about when you determined that it was a crime scene.  I was asking about when you were putting the stair chair together.  There were seven of you in the room, and your job was to put the stair chair together; right?

A.    Yes.  Well, those seven aren't qualified to do everything, though.

Q.    Including not qualified to determine whether or not somebody's alive or dead?

A.    What's that?

Q.    Including none of them were qualified to determine whether or not someone is alive or dead?

A.    I don't know what the qualifications of the police officers are.

Q.    But you know that you're not qualified to make that decision?

A.    I'm not the person in charge at the scene at the time.

Q.    Who was the person in charge of the scene at the

1    time?

2    **A.**   It was Lieutenant Franchina.

3    **Q.**   So you're putting the stair chair together, and

4    there's six or seven other people in the room with you?

5    **A.**   Approximately.

6    **Q.**   And were they all being quiet or was there some

7    chatter going along?

8    **A.**   They were talking amongst themselves, but I

9    honestly don't remember what it was.

10   **Q.**   Okay.  And then downstairs you said that there was

11   a woman who was hysterical?

12   **A.**   Yes, talking to the female detective.

13   **Q.**   When you say that she was hysterical, you mean

14   that she was shouting and yelling?

15   **A.**   No.  She was just crying, sobbing.

16   **Q.**   Sobbing?

17   **A.**   Yeah.

18   **Q.**   Saying things?

19   **A.**   Yeah, pretty much.

20   **Q.**   So while you're putting the stair chair together,

21   you're focusing on your equipment and doing your job?

22   **A.**   Yes.

23   **Q.**   So then how when you're 20 feet from the front of

24   the house focused on doing your job with six or seven

25   men talking amongst themselves beside could you hear

1    Lieutenant Franchina arguing with somebody in the front

2    yard?

3    **A.**   Well, our job is to make sure you know your

4    surroundings and --

5    **Q.**   I'm sorry.  Please continue.

6          THE COURT:  You can continue, Mr. Tang.

7    **A.**   Our job is to pretty much make sure the scene is

8    safe for everybody, whether it be listening to

9    something, hearing or seeing something that could be

10   potentially dangerous to our safety.

11   **Q.**   But you couldn't see Lieutenant Franchina?

12   **A.**   No, but it was pretty apparent how loud she was

13   yelling.  She was upset with somebody.

14   **Q.**   And it was also pretty apparent to you that the

15   female detective was talking to the hysterical mother

16   and Lieutenant Franchina at the same time?

17   **A.**   Well, the stairway was only about 10 feet from

18   where she was in the back steps.  So I'm pretty sure

19   she made her way up somehow after she saw me run by her

20   with the stair chair considering she probably thought

21   it was a crime scene.  So she was probably scratching

22   her head and probably wanted to see what was going on.

23   **Q.**   Didn't you say that the argument was happening in

24   the yard in front of the house?

25   **A.**   No, that was after the fact we worked our way down

1    with the body.

2    **Q.**   So tell me about this decontamination process that

3    took 30 minutes.  Who did that with you?

4    **A.**   I did it by myself.  She was being seen by ER.

5    **Q.**   So what did you do?

6    **A.**   Pretty much just literally clean it as it was and

7    leave it in the condition it was prior to the run.

8    **Q.**   And what did you clean up?

9    **A.**   Any blood, any bodily fluids, just garbage, used

10   equipment.  And then we -- any medication we used we

11   would replace.  Any other equipment like the bag valve

12   masks we replaced.

13         It's time consuming only because you don't want

14   to forget something, like.  I don't know.  I'm pretty

15   tough on myself.  So if I forgot something and then I

16   find out the hard way when I got to another scene, it

17   would be pretty rough considering I was new on the

18   rescue.

19   **Q.**   Did you clean up blood?

20   **A.**   Yes, there was blood.

21   **Q.**   Where was there blood?

22   **A.**   There was -- it was mostly on the stretcher.

23   There was not much on the floor.

24   **Q.**   You cleaned up other bodily fluids?

25   **A.**   I think it was just blood.

1    **Q.**    Okay.  Have you ever been -- how many times have

2    you taken off your gloves in a rescue over the course

3    of your career?

4    **A.**    Hundreds, thousands of times.

5    **Q.**    Okay.  Have you ever had somebody tell you that

6    something snapped onto their face other than this time?

7    **A.**    No.

8    **Q.**    Lieutenant Franchina is the only one?

9    **A.**    Yeah.

10   **Q.**    And you do believe that something hit her face?

11   **A.**    No.  I was apologetic that if something did hit

12   her face, I was apologizing, I'm sorry.  I don't think

13   anything hit her face; but I told her that if something

14   did, I was trying to reassure her I'm pretty sure it

15   was sweat from the inside of my glove.

16   **Q.**    Hmm.  So you went to Branch Ave. because you'd

17   worked with those guys and you liked those guys?

18   **A.**    Yeah.

19   **Q.**    You got along well together?

20   **A.**    Yes, sir.

21   **Q.**    And you enjoyed spending time with them?

22   **A.**    Yup.

23   **Q.**    That includes Scott Mello?

24   **A.**    Yes, sir.

25   **Q.**    Sean McGarty?

1     **A.**    Uh-huh.

2     **Q.**    Yes?

3     **A.**    Yes, sir.

4     **Q.**    And Bo Jackson?

5     **A.**    He was not assigned to Branch Ave.

6     **Q.**    He wasn't?  He was in the rescue that night,

7     though; right?

8     **A.**    No.  Well, he was in the rescue; but he wasn't,

9     like, working on the rescue.  He was on Engine 12, and

10    he happened to be helping out with the patient.  He was

11    actually doing all the airway.

12    **Q.**    I see.  And who was it that was driving again?

13    **A.**    Sean McGarty because he's a basic, so he can't

14    really do anything like that.

15    **Q.**    What was it that you liked about being in Captain

16    Mello's station?

17    **A.**    Almost all of my classmates were there on

18    Engine 2.  That's really what it was.  It was a good

19    station, a nice station.

20    **Q.**    So basically everybody was pretty good to work

21    together with except for Lieutenant Franchina?

22    **A.**    I never had any issues with her.  I knew it was

23    tough to work with her, but it is what it is.  You have

24    tough co-workers.  There's different personalities.

25    Not everybody's going to get along with everybody, but

1    it is what it is.

2    **Q.**   And how long does it take for blood to dry on

3    those gloves that you showed us?

4    **A.**   I don't know exact time.

5    **Q.**   Well, that night, how long did it take before the

6    blood that was on your gloves dried?

7    **A.**   I don't know.  I'm pretty sure it was dry when it

8    was on there.

9            MR. MARTIN:  Nothing further.

10           THE COURT:  Thanks, Mr. Martin.

11           Mr. McHugh.

12           MR. McHUGH:  Nothing further, your Honor.  Thank

13   you.

14           THE COURT:  Mr. Tang, you can step down.  Thank

15   you, sir.

16           Mr. McHugh.

17           MR. McHUGH:  Could we just check the exhibits,

18   your Honor?

19           THE COURT:  Sure.

20           MR. McHUGH:  Could I see the exhibit list?

21           THE COURT:  Mr. McHugh, is this going to take a

22   few minutes?  Because we could take an early afternoon

23   break.

24           MR. McHUGH:  That's fine.

25           THE COURT:  Rather than just have the jury sit

1    there.  I was thinking about using it as an

2    opportunity, but I'm going to keep you guessing.

3    Ladies and gentlemen, why don't we take the

4    afternoon -- Mike, are the snacks here?

5            THE COURT SECURITY OFFICER:  Yes, they are.

6            THE COURT:  Why don't we take the afternoon

7    break.  I think it may well be that it's a short day,

8    shorter day today.  So enjoy the break now, and we'll

9    see you back in about 15 minutes.

10           (Recess.)

11           THE COURT:  Mr. McHugh.

12           MR. McHUGH:  Thank you, your Honor.  Your Honor,

13   the Defendant moves Exhibit O full.  There's no

14   objection.  It's the collective bargaining contract

15   between the City of Providence and the firefighters.

16           THE COURT:  Exhibit O will be admitted as a full

17   exhibit without objection.

18           (Defendant's Exhibit O admitted in full.)

19           MR. McHUGH:  And then the Defendant moves U,

20   which are the gloves, for ID.

21           THE COURT:  Exhibit -- the gloves, Exhibit U for

22   identification, will be marked for identification but

23   will not be admitted as a full exhibit.  They were for

24   demonstrative purposes.

25           MR. McHUGH:  With that, your Honor, the

1     Defendant rests.

2              THE COURT:  Thanks, Mr. McHugh.

3              Any rebuttal, Mr. Martin?

4              MR. MARTIN:  No, your Honor.

5              THE COURT:  Great.  Ladies and gentlemen, that

6     concludes the evidence portion of this case.  You have

7     now heard and seen all of the evidence that you will

8     see in this case to use during your deliberations.

9              We're almost there.  Not quite.  Let me tell you

10    what the schedule will look like.  I'd like you to come

11    in so that we can begin at 10:00 tomorrow morning.  We

12    need a little more time in the morning to work -- I

13    need to work with the attorneys through the jury charge

14    and rather than, again, have you come in and sit and

15    wait.

16             So we're going to begin with the Defendant's

17    closing arguments.  You'll hear in the jury charge that

18    the Plaintiff has, in many of the issues, though

19    there's one exception to this that you'll hear about,

20    but basically the Plaintiff has the burden of proving

21    her case by a preponderance of the evidence.  And so

22    the person with the burden bookends.  They open first,

23    and they close last.  They bookend the trial.

24             So it may seem illogical to you to have the

25    Defendant go first, but that's the logic behind it.

1   The person with the burden has the last word in this
2   case.
3          So we'll begin at 10:00.  We're not holding them
4   to it at all, but both counsel tell me they think their
5   closings will be no more than an hour each.  So we're
6   looking at completing closing arguments sometime
7   tomorrow morning.
8          The jury charge takes about 20 to 30 minutes, so
9   it's long.  It can be painful at times because I have
10  to read it to you, but the good part is that I'll send
11  a copy back with you to the jury room, so that will
12  help.
13         And we're anticipating you'll get this case and
14  begin your deliberations around lunchtime.  Because of
15  that, your federal tax dollars will be put to good use,
16  and we will buy you lunch tomorrow.
17         So I think, Mike, what happens is they get
18  something in the morning to order lunch.
19         Vickie, is that right?
20         THE CLERK:  They've already ordered, I think.
21         THE COURT:  Oh, they've already ordered?  Oh,
22  wow.  So don't bring any lunch tomorrow, don't make
23  plans to meet anyone.  I've got you for the day.  We've
24  got you.
25         So that's our plan in the morning.  I think

1    you'll get the case around lunchtime, give or take,

2    maybe closer to one by the time we get through

3    everything; but that's the plan.  And then you'll begin

4    your duties tomorrow afternoon.

5            So with that said, as I said yesterday and I

6    will say even more so now, we're almost there, ladies

7    and gentlemen, please continue to abide by my

8    instructions.  Don't do any independent research, don't

9    discuss this case amongst yourselves, please don't say

10   anything about your jury service on social media, and

11   please don't read or listen to any news reports in the

12   media about this trial.

13           And with that said, we'll see you back to begin

14   at 10 a.m. tomorrow morning.

15           (Adjourned.)

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4          I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5    hereby certify that the foregoing pages are a true and

6    accurate transcription of my stenographic notes in the

7    above-entitled case.

8

9          __February 10, 2017_____

10    Date

11

12

13    /s/ Karen M. Wischnowsky_____

14    Karen M. Wischnowsky, RPR-RMR-CRR
      Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25